UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN REINSURANCE COMPANY,
*et al.*,

Plaintiffs,

v.

AMERICAN INTERNATIONAL GROUP
and TRENWICK AMERICA
REINSURANCE CORPORATION,

Defendants.

05 T 11840 MLW

CIVIL ACTION NO:

MAGISTRATE JUDGE

RECEIPT # 66780
AMOUNT $250
SUMMONS ISSUED N/A
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE 9/12/05

### DEFENDANTS' NOTICE OF REMOVAL
### TO THE UNITED STATES DISTRICT COURT

Pursuant to the provisions of the Convention on the Recognition and Enforcement of

Foreign Arbitral Awards, 21 U.S.T. 2517 (the "New York Convention") and the federal statute

implementing the New York Convention, 9 U.S.C. §201, *et seq.*, Defendants the relevant

member and associated companies of American International Group, Inc. ("AIG") and Trenwick

America Reinsurance Corporation ("Trenwick") hereby give notice of their removal of this

action to the United States District Court for the District of Massachusetts from the Superior

Court of Massachusetts, in and for Suffolk County, Business Litigation Session, and in support

thereof would respectfully show as follows:

1.    AIG and Trenwick are defendants in a civil action brought in the Superior Court

of the Commonwealth of Massachusetts, in and for Suffolk County, Business Litigation Session,

styled as *American Reinsurance Company, et al. v. American International Group and Trenwick*

*America Reinsurance Corporation,* Civil Action No. 05-2788-BLS (the "*American Re* Action").

2.    AIG and Trenwick were served with a copy of the Summons and Complaint in the

*American Re* Action sometime after July 7, 2005. A true copy of the Summons and Complaint

in the *American Re* Action, as served on AIG and Trenwick, is attached to this Notice of

Removal as Exhibit A.

3.    This case is within the original jurisdiction of this Court and AIG and Trenwick

are entitled to remove the *American Re* Action to this Court based upon the provisions of the

New York Convention and 9 U.S.C. §205, which provides:

> When the subject matter of an action or proceeding in a State court
> relates to an arbitration agreement or award falling under the
> Convention, the defendant or the defendants may, at any time
> before the trial thereof, remove such action or proceeding to the
> district court of the United States District Court for the district and
> division embracing the place where the action or proceeding is
> pending. The procedure for removal of causes otherwise provided
> by law shall apply, except that the ground for removal provided in
> this section need not appear on the face of the complaint but may
> be shown in the petition for removal. For purposes of Chapter 1 of
> this title [9 U.S.C.S. §§1 *et seq.*] any action or proceeding removed
> under this section shall be deemed to have been brought in the
> district court to which it is removed.

4.    AIG and Trenwick are entitled to remove the *American Re* Action to this Court

because the "subject matter" of the action "relates to an arbitration agreement . . .falling under

the Convention."

5.    Specifically, the subject matter of the *American Re* Action relates to certain

reinsurance agreements that each contain an arbitration clause. Depending upon the applicable

situation, Plaintiff Sun Life Assurance Company of Canada ("Sun Life") is bound by the

reinsurance agreements (including the arbitration clause contained therein) either as a party to

the agreement; as a successor-in-interest to another entity that is a party to the agreement; and/or

because it accepted the rights, benefits and obligations under the agreement.

2

957631v1

6.     For example, Sun Life is a party to an agency contract known as a "Participation Agreement" with LDG Reinsurance Corporation which contains an arbitration clause. [Complaint, ¶27]. Moreover, Sun Life executed the "Quota Share Retrocessional Agreement" effective as of July 1, 1997 between and among Trenwick and various retrocessionaires, including Sun Life. The Quota Share Retrocessional Agreement contains an arbitration clause. A true copy of the Quota Share Retrocessional Agreement, including Sun Life's signature thereon, is attached to this Notice of Removal as Exhibit B. Moreover, Sun Life has participated in an arbitration relating to the Quota Share Retrocessional Agreement since January 2005.

7.     As alleged in the Complaint, Sun Life is domiciled in Toronto, Canada. [Complaint, ¶19]. Attached as Exhibit C to this Notice of Removal is a true copy of a letter from the Office of the Superintendent of Financial Institutions Canada dated August 17, 2005 confirming that Sun Life is organized under the laws of Canada with its principal place of business in the City of Toronto, Province of Ontario, Canada.

8.     As set forth above, each of the relevant agreements contains an arbitration clause. Specifically, both the Participation Agreement and the Quota Share Retrocessional Agreements at issue in the *American Re* Action provide, in relevant part:

> As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates.

9.     Since Sun Life is a foreign commercial entity, the reinsurance agreements that are the subject of the *American Re* Action relate to international commercial arbitration agreements

3

957631v1

that fall within the scope of the New York Convention. Accordingly, AIG and Trenwick are entitled to remove the *American Re* Action to this Court pursuant to the provisions of 9 U.S.C. §205.

10.    AIG and Trenwick's Notice of Removal is timely because it is filed before the trial of the *American Re* Action has occurred. Indeed, the only matters that have taken place in the *American Re* Action are agreements to enlarge the time for the Defendants to respond to the Complaint.

11.    Removal to this Court is proper because this Court is the district and division in which the *American Re* Action is currently pending.

12.    This Court has jurisdiction over this case pursuant to the provisions of 9 U.S.C. §203, which states:

> An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28 [28 U.S.C.S. §460] shall have original jurisdiction over such an action, regardless of the amount in controversy.

13.    Pursuant to 28 U.S.C. §1446(d), AIG and Trenwick will file a notice of the filing of this Notice of Removal (including a copy thereof) with the Clerk of the Superior Court of the Commonwealth of Massachusetts, in and for Suffolk County, Business Litigation Session, promptly upon the docketing of the Notice of Removal and the *American Re* action in this Court.

14.    Pursuant to 28 U.S.C. §1447(d) and Local Rule 81.1, AIG and Trenwick will request that the Clerk of the Superior Court of the Commonwealth of Massachusetts, in and for Suffolk County, Business Litigation Session,  provide certified or attested copies of all records and proceedings in the *American Re* Action and certified or attested copes of all docket entries

4

957631v1

thereon. AIG and Trenwick will cause such attested or certified copies of the state court record
to be filed with this Court within thirty (30) days hereof as required by Local Rule 81.1.

15.    Counsel for AIG and Trenwick are duly admitted to practice before this Court and
sign this Notice of Removal in accordance with the requirements of Fed.R.Civ.P. 11.

16.    All defendants in the *American Re* Action have joined in this Notice of Removal.

**WHEREFORE**, AIG and Trenwick respectfully request that the above-referenced action
now pending in the Superior Court of the Commonwealth of Massachusetts, in and for Suffolk
County, be removed from that Court to the United States District Court for the District of
Massachusetts.

> **AMERICAN INTERNATIONAL
> GROUP, INC.**
>
> By its attorneys,
>
> Michel R. Aylward BBO #024850
> John T. Harding BBO #221270
> **MORRISON MAHONEY LLP**
> 250 Summer Street
> Boston, MA 02210
> (617) 439-7558
> (617) 342-4888 (facsimile)
>
> Of Counsel:
>
> William A. Maher
> **WOLLMUTH MAHER &
> DEUTSCH LLP**
> 500 Fifth Avenue
> New York, New York 10110
> (212) 382-3300
> (212) 382-0050 (facsimile)

5

957631v1

**TRENWICK AMERICA
REINSURANCE CORP.**

By its attorneys,

Eben A. Krim, Esq.
**PROSKAUER ROSE LLP**
One International Place, 22nd Floor
Boston, MA 02110
(617) 526-9700
(617)526-9899 (facsimile)

Of counsel:

Margaret Dale, Esq.
**PROSKAUER ROSE LLP**
1585 Broadway
New York, NY 10036-8299
(212) 956-9064
(212)969-2900 (facsimile)

Dated: September 9, 2005

### CERTIFICATE OF SERVICE

I, John T. Harding, counsel for Defendant American International Group, hereby certify

that on September 9, 2005, I served a copy of the foregoing document by messenger or federal

express on all known counsel of record.

John T. Harding

957631v1

**EXHIBIT A**

# Commonwealth of Massachusetts



SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-2788-BLS

American Reinsurance Company, et al. , Plaintiff(s)

v.

American International Group and Trenwick
America Reinsurance Corporation , Defendant(s)

## SUMMONS

To the above-named Defendant:  Trenwick America Reinsurance Corporation

You are hereby summoned and required to serve upon  Scott P. Lewis

Palmer & Dodge LLP
plaintiff's attorney, whose address is 111 Huntington Ave., Boston, MA 02199-7613 , an answer to
the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the 6th day of
July , in the year of our Lord two thousand and five .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev. 30M  10/2000

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No.

_____, Plff(s).

v.

_____, Deft(s).

SUMMONS
(Mass. R. Civ. P. 4)

(AFFIX FILING STAMP HERE)

_____ , 200 .

**N.B.    TO PROCESS SERVER:—**

PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN
THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

Dated:_____ , 200 .

PROOF OF SERVICE OF PROCESS

I hereby certify and return that on _____, 200___, I served a copy of the within summons,
together with a copy of the complaint in this action, upon the within-named defendant, in the following
manner (See Mass. R. Civ. P. 4 (d) (1-5)):

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

Superior Court
Civil Action No. 05-

05-2788 -BLS

American Reinsurance Company; American
United Life Insurance Company; Dorinco
Reinsurance Company; First Allmerica
Financial Life Insurance Company; Guardian
Life Insurance Company of America; Hartford
Life Insurance Company; Houston Casualty
Company; John Hancock Life Insurance
Company (U.S.A.); Insurance Corporation of
Hannover; Monumental Life Insurance
Company; Pan American Life Insurance
Company; Phoenix Life Insurance Company;
Reliance Standard Life Insurance Company;
Reliastar Life Insurance Company; Sun Life
Assurance Company of Canada; Swiss Re Life
& Health America; and Transamerica
Occidental Life Insurance Company,

Plaintiffs,

v.

American International Group and Trenwick
America Reinsurance Corporation,

Defendants.

## COMPLAINT

1.    The plaintiff insurance companies are all members of reinsurance facilities

managed in Massachusetts that provided insurance to defendant Trenwick America Reinsurance

Corporation ("Trenwick") to cover the risk of losses on contracts of reinsurance ostensibly

"fronted" by Trenwick on their behalf, including reinsurance contracts Trenwick issued to various

subsidiaries of defendant International Group ("AIG"). Working in collusion with

Trenwick, AIG has wrongfully manipulated this arrangement to create almost $73 million in

181239.5

improper demands for coverage against the plaintiffs as part of a pattern of unfair, deceptive and fraudulent practices by AIG involving the workers' compensation, occupational accident and industrial aid claims of a number of AIG insurance company subsidiaries.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under G.L. c. 212, § 4 (general jurisdiction), G.L. c. 93A, § 11 (unfair and deceptive trade practices) and c. 231A, § 1 (declaratory judgments). This Court has personal jurisdiction over the defendants, AIG and Trenwick, under G.L. c. 223A, § 3 and otherwise, because they each transacted business or caused tortious injury by an act or omission in the Commonwealth.

3.      Venue is proper in this Court under G.L. c. 223, § 1 because one of the plaintiffs, John Hancock Life Insurance Company (U.S.A.), maintains its principal place of business in Boston, Massachusetts.

### PARTIES

**Plaintiffs**

4.      Plaintiff American Reinsurance Company ("Am Re") is a professional reinsurer domiciled in Delaware and licensed to conduct business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of G.L. c. 93A, AIG has made demand against Am Re on false claims for reinsurance coverage. On November 23, 2004, AIG sent Am Re an improper demand in the amount of $2,485,602, by reason of which Am Re has been damaged.

5.      Plaintiff American United Life Insurance Company ("American United") is an insurance company domiciled in Indiana and licensed to conduct business in Massachusetts. American United received over $36 million in premium and annuity considerations in 2004 from

2

business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against American United on false claims for reinsurance coverage. On November 23, 2004, AIG sent American United an improper demand in the amount of $5,125,459, by reason of which American United has been damaged.

6.     Plaintiff Dorinco Reinsurance Company ("Dorinco") is a licensed insurance company domiciled in Michigan. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Dorinco on false claims for reinsurance coverage. On November 23, 2004, AIG sent Dorinco an improper demand in the amount of $448,261, by reason of which Dorinco has been damaged.

7.     Plaintiff First Allmerica Financial Life Insurance Company ("First Allmerica") is an insurance company domiciled in Massachusetts with its main office in Worcester, Massachusetts. First Allmerica is licensed to conduct business in Massachusetts and received over $2 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against First Allmerica on false claims for reinsurance coverage. On November 23, 2004, AIG sent First Allmerica an improper demand in the amount of $20,501,035, by reason of which First Allmerica has been damaged.

8.     Plaintiff Guardian Life Insurance Company of America ("Guardian") is an insurance company domiciled in New York and licensed to conduct business in Massachusetts. Guardian operates in Massachusetts through a subsidiary and through two administrative offices. Guardian received over $235 million in premium in 2004 from business conducted in

3

Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other

torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Guardian on

false claims for reinsurance coverage. On November 23, 2004, AIG sent Guardian an improper

demand in the amount of $2,762,546, by reason of which Guardian has been damaged.

9.     Plaintiff Hartford Life Insurance Company ("Hartford") is an insurance company

domiciled in Connecticut and licensed to conduct business in Massachusetts. Hartford received

approximately $185 million in premium in 2004 from business conducted in Massachusetts. In

collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the

plaintiffs, and in violation of c. 93A, AIG has made demand against Hartford on false claims for

reinsurance coverage. On November 23, 2004, AIG sent Hartford an improper demand in the

amount of $4,024,509, by reason of which Hartford has been damaged.

10.     Plaintiff Houston Casualty Company ("HCC") is an insurance company

domiciled in Texas and operating on a surplus lines basis in Massachusetts. HCC received over

$10 million in premium in 2004 from business conducted in Massachusetts. In collusion with

Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in

violation of c. 93A, AIG has made demand against HCC on false claims for reinsurance

coverage. On November 23, 2004, AIG sent HCC an improper demand in the amount of

$57,361, by reason of which HCC has been damaged.

11.     Plaintiff Insurance Corporation of Hannover ("ICH") is an insurance company

domiciled in Illinois and licensed to conduct business in Massachusetts. ICH operates, in part,

through an agent located in Lowell, Massachusetts. ICH received over $2.5 million in premium

in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful

scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has

4

made demand against ICH on false claims for reinsurance coverage. On November 23, 2004, AIG sent ICH an improper demand in the amount of $2,608,329, by reason of which ICH has been damaged.

12.     Plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), the successor through merger to Facility member The Manufacturer's Life Insurance Company (U.S.A.) ("Manulife"), is an insurance company domiciled in Michigan with its main office in Boston, Massachusetts. John Hancock is licensed to conduct business in Massachusetts and received over $45 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Manulife on false claims for reinsurance coverage. On November 23, 2004, AIG sent Manulife an improper demand in the amount of $6,765,043, by reason of which John Hancock, as successor-in-interest to Manulife, has been damaged.

13.     Plaintiff Monumental Life Insurance Company ("Monumental") is an insurance company domiciled in Maryland and licensed to conduct business in Massachusetts. Monumental received over $12 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Monumental on false claims for reinsurance coverage. On November 23, 2004, AIG sent Monumental an improper demand in the amount of $73,563, by reason of which Monumental has been damaged.

14.     Plaintiff Pan American Life Insurance Company ("Pan American") is an insurance company domiciled in Louisiana and licensed to conduct business in Massachusetts.

Through its agents in Massachusetts, Pan American received over $500,000 in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Pan American under false claims for reinsurance coverage. On November 23, 2004, AIG sent Pan American an improper demand in the amount of $72,885, by reason of which Pan American has been damaged.

15.     Plaintiff Phoenix Life Insurance Company, formerly Phoenix Home Life Mutual Insurance Company ("Phoenix Life"), is an insurance company domiciled in New York and licensed to do business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Phoenix Life under false claims for reinsurance coverage. On November 23, 2004, AIG sent Phoenix Life an improper demand in the amount of $2,713,228, by reason of which Phoenix Life has been damaged.

16.     Plaintiff Reliance Standard Life Insurance Company ("RSL") is an insurance company domiciled in Illinois with an office in Boston, Massachusetts. RSL is licensed to do business in Massachusetts and received over $22 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against RSL on false claims for reinsurance coverage. On November 23, 2004, AIG sent RSL an improper demand in the amount of $4,046,533, by reason of which RSL has been damaged.

17.     Plaintiff Reliastar Life Insurance Company ("ING") is an insurance company domiciled in Minnesota. ING is licensed to conduct business in Massachusetts and maintains an office in Boston, Massachusetts. ING received over $60 million in premium and annuity

considerations in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against ING on false claims for reinsurance coverage. On November 23, 2004, AIG sent ING an improper demand in the amount of $225,249, by reason of which ING has been damaged.

18.     Plaintiff Sun Life Assurance Company of Canada ("Sun Life") is domiciled in Ontario, Canada, but has its United States home office in Wellesley Hills, Massachusetts and is licensed to conduct business in Massachusetts. Sun Life received over $63 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Sun Life on false claims for reinsurance coverage. On November 23, 2004, AIG sent Sun Life an improper demand in the amount of $3,573,408, by reason of which Sun Life has been damaged.

19.     Plaintiff Sun Life is also the successor-in-interest by acquisition to Facility member Clarica Life Insurance Company ("Clarica"). In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Clarica on false claims for reinsurance coverage. On November 23, 2004, AIG sent Clarica an improper demand in the amount of $9,042,784, by reason of which Sun Life as successor-in-interest to Clarica has been damaged.

20.     Plaintiff Swiss Re Life & Health America, Inc. ("Swiss Re") is an insurance company domiciled in Connecticut and licensed to conduct business in Massachusetts. Swiss Re received over $95 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the

plaintiffs, and in violation of c. 93A, AIG has made demand against Swiss Re on false claims for reinsurance coverage. On November 23, 2004, AIG sent Swiss Re an improper demand in the amount of $4,012,599, by reason of which Swiss Re has been damaged.

21.     Plaintiff Swiss Re is also the successor-in-interest to Facility member Mercantile & General Company ("M&G"). On November 23, 2004, in collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made an improper demand (mistakenly addressed to Generali USA Life Reassurance Company as successor to Mercantile and General Life Reassurance Company of America) in the amount of $109,328 representing M&G's proportionate share of the AIG demand against the LDG Facilities, by reason of which Swiss Re has been damaged.

22.     Plaintiff Transamerica Occidental Life Insurance Company ("Transamerica") is an insurance company domiciled in Iowa and licensed to conduct business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG made demand against Transamerica on false claims for reinsurance coverage. On November 23, 2004, AIG sent Transamerica an improper demand in the amount of $195,154, by reason of which Transamerica has been damaged.

**Defendants**

23.     Defendant AIG is an insurance holding company with registered offices in New York, New York. With operations in more than 130 countries and jurisdictions, AIG is the largest commercial and industrial insurance group in the United States. It is the parent of various insurance company subsidiaries, a number of which are licensed to conduct business in Massachusetts. AIG transacted business or caused tortious injury by an act or omission in the Commonwealth.

24.    Defendant Trenwick (in its own right and as successor-in-interest to Chartwell Reinsurance Company by acquisition in December 2002) is an insurance company domiciled in Connecticut. Trenwick transacted business or caused tortious injury by an act or omission in the Commonwealth.

FACTS

**Plaintiffs' Massachusetts Reinsurance Facilities**

25.    The plaintiffs are each members of one or more of three groups of reinsurers called "facilities" that were formed by their members to share reinsurance risks underwritten for the facilities by a common managing agent. The facilities are the Special Risk Reinsurance Facility, the Special Risk Reinsurance Facility II and the Occupational Accident & Health Facility (each, an "LDG Facility;" collectively, the "LDG Facilities").

26.    The managing agent for each of the LDG Facilities is LDG Reinsurance Corporation ("LDG"), formerly known either as SRRF Management Incorporated or LDG Reinsurance Underwriters. Throughout its existence LDG has been incorporated in Massachusetts and, at all relevant times, has maintained its principal place of business in Wakefield, Massachusetts.

27.    Each of the plaintiffs entered into an agency contract with LDG, called a "participation agreement" (collectively, the "Participation Agreements"), under which they each granted LDG authority to underwrite reinsurance risks, manage claims and undertake accounting activities for the LDG Facilities on their behalf. Under the Participation Agreements, LDG collected premiums, handled any reported losses and paid claims on behalf of the plaintiffs from its offices in Massachusetts.

9

28.     As the managing agent of the LDG Facilities, LDG was at the center of the relationships among all parties to this action. In implementing their wrongful scheme to unfairly saddle the plaintiffs with false obligations based on inflated and unsubstantiated reinsurance claims, the defendants prepared and transmitted numerous demand letters, position statements, threats and other communications, and engaged in false and bad faith negotiations, that were intended to be and were received and acted upon primarily and substantially in Massachusetts through plaintiffs' agent LDG.

### LDG Arranges For A "Fronting Member" To Issue Reinsurance For The Facilities

29.     In 1997, LDG, acting as managing agent of the LDG Facilities, arranged for Trenwick's predecessor-in-interest Chartwell Reinsurance Company ("Chartwell") to participate as a member in each of the LDG Facilities. Chartwell entered into a Participation Agreement by which it took a share of any reinsurance contracts issued by the LDG Facilities and granted LDG authority to underwrite risks, manage claims and undertake accounting activities on its behalf with respect to that reinsurance.

30.     That same year, Chartwell also agreed to act as one of the member "fronting" reinsurers for the LDG Facilities. As a fronting reinsurer, Chartwell issued reinsurance contracts to third parties such as various AIG insurance company subsidiaries and then reinsured ("ceded") those risks by placing 100% of the risk with one or more of the LDG Facilities in which it participated as a member (the "Fronting Arrangement"). LDG arranged for and managed this Fronting Arrangement from its offices in Wakefield, Massachusetts.

31.     Chartwell negotiated with LDG for a fee of 2.5% of the "gross net reinsurance premiums" for all reinsurance risks that were fronted under the Fronting Arrangement. This amount was deducted by Chartwell from the premium ceded to the plaintiffs as members of the

10

LDG Facilities. Pursuant to the Fronting Arrangement, between 1997 and 2002 the LDG
Facilities paid substantial sums to Chartwell and its successor-in-interest Trenwick.

32.    In an attempt to further formalize its role as fronting member, Chartwell sought to
have LDG recommend that each Facility member enter into a written "fronting agreement" with
Chartwell explicitly authorizing the ceding of Chartwell-fronted reinsurance to the LDG
Facilities. This agreement, to be governed by Massachusetts law, was known as the Quota Share
Retrocessional Agreement ("QSA") and was designed and intended, once executed, to operate in
conjunction with the Participation Agreements establishing LDG's underwriting and claims
authority.

33.    In a series of letters and other communications between February 1998 and
September 1998, Chartwell directly and through LDG pressed the various plaintiffs to sign the
QSA. When certain plaintiffs raised concerns about the scope of the authority granted to
Chartwell under the QSA, Chartwell characterized the agreement's provisions as merely
(i) reiterating the authority already granted to LDG by each of the members of the LDG Facilities
under the Participation Agreements and (ii) confirming that the Participation Agreements
allowed the ceding of risks from Chartwell to the LDG Facilities.

34.    To further induce the plaintiffs to sign the QSA, Chartwell often repeated that as a
party to a Participation Agreement, Chartwell had itself granted LDG oversight authority as its
chosen managing agent and that this authority was incorporated by reference in any fronting
contract. For example, on April 30, 1998, Chartwell's in-house counsel Kathleen M. Carroll
wrote to LDG Facility member Manulife, making the following representations regarding the
relative functions of LDG and the fronting reinsurer under the proposed terms: "Where
Chartwell fronts for the pool, LDG acts as Chartwell's agent and decisions made by LDG are

binding on Chartwell . . .. As a practical matter, LDG will be performing all the actual claims

handling as agent for Chartwell." LDG saw this correspondence and agreed with the description

provided by Chartwell.

35.     The QSA was never fully executed. Certain of the plaintiffs declined to rely on

Chartwell's representations and rejected the QSA as drafted. On information and belief, lacking

full participation by the LDG Facility members, Chartwell never signed the QSA.

36.     In December 2002, Trenwick acquired Chartwell by merger and stepped into

Chartwell shoes as successor-in-interest to its representations, rights and obligations under the

Participation Agreement and the Fronting Arrangement with the LDG Facilities. As the chosen

managing agent under Chartwell's Participation Agreement, to which Trenwick succeeded, LDG

continued to act on behalf of Trenwick in underwriting risks, managing claims and undertaking

accounting activities on all reinsurance ceded to the LDG Facilities.

37.     From December 2002 through August 2003, Trenwick continued to front

reinsurance risks for the LDG Facilities, issuing no fewer than eleven separate reinsurance

contracts to various AIG subsidiaries providing coverage for their workers' compensation,

occupational accident and industrial aid insurance risks. On information and belief,

Massachusetts risks were among the AIG insurance policies reinsured by Trenwick and ceded

100% to the LDG Facilities and proportionately to the plaintiffs as Facility members. The

plaintiffs paid almost $300,000 in fees to Trenwick for fronting the reinsurance of the AIG risks.

### The Defendants' Wrongful Scheme to Make False Claims

38.     AIG and Trenwick are bound by duties, imposed by reinsurance industry custom

and recognized by law, to act in "utmost good faith" in their course of dealings with the plaintiffs

and with LDG as the authorized agent of the plaintiffs and the LDG Facilities.

39.     Reinsurance is an insurance contract issued to an insurer, known as the "ceding
insurer" or "cedent." The contract is one of "indemnity" and only provides a right for
reimbursement when the cedent incurs losses by making payments to resolve claims under
insurance policies or reinsurance contracts it has issued to others. The reinsurer owes nothing
unless and until the cedent has paid a claim and can present a record of the payment as a "paid
loss." The Trenwick Fronting Arrangement with the LDG Facilities is an arrangement providing
indemnity, and any right Trenwick has to reimbursement from the LDG Facilities can arise only
after Trenwick itself has paid out funds to resolve claims made under the reinsurance contracts it
issued for the LDG Facilities.

40.     Reinsurance typically spreads risk along a chain of insurers. Direct insurers cede
portions of the risk they assume to reinsurers. Those reinsurers cede (technically, "retrocede")
portions of the risk they assume to other reinsurers (otherwise called "retrocessionaires"). As the
chain lengthens and fans out, risk can be distributed among an ever larger number of companies.

41.     Various AIG insurance company subsidiaries, Chartwell (and later Trenwick) and
the plaintiffs together formed a number of such reinsurance chains, each of similar but not
identical structure. Each of the reinsurance chains along which the AIG-related risks were
distributed (the "AIG-Risk Chains") were structured in pertinent part substantially as follows:
(a) as a fronting reinsurer, Chartwell would issue reinsurance contracts to the AIG insurance
company subsidiaries; (b) Chartwell would then cede those risks by placing 100% of the risk
with one of the LDG Facilities, of which Chartwell (and later Trenwick) and each of the
plaintiffs were members; (c) each of Chartwell (and later Trenwick) and the plaintiffs as
members of the LDG Facilities would then (i) retain a proportionate share of the risk and (ii)
cede the remaining proportionate share (up to 95%) to a different LDG Facility and/or to another

retrocessionaire. The exact percentages ceded and the identities of the LDG Facilities and others acting as retrocessionaires in each of the AIG-Risk Chains varied among the eleven AIG contracts ceded or purported to be ceded to the LDG Facilities through Chartwell.

42.    Each of the reinsurance contracts in the AIG-Risk Chains is a contract of indemnity. Under each of these contracts, the insured party must pay out a claim and present record of payment as a "paid loss" before it is to be reimbursed by the reinsurers at the next level in the chain.

43.    The cedent owes a duty to its reinsurers to competently handle claims before paying them. It owes a duty to provide timely notice of loss. The cedent owes duties to provide specific and relevant claim information to its reinsurers, to allow account audits by the reinsurers, and in general, to cooperate with the reinsurers. Because the cedent must first pay out funds to resolve claims before seeking reimbursement from its reinsurers, the ceding insurer has a financial incentive to investigate the legitimacy of any claims made under the reinsurance contracts it has obtained before fronting funds to pay those claims. The requirement that Trenwick first incur "paid losses" before seeking payment from the LDG Facilities provided the plaintiffs, as Facility members, with an added safeguard against invalid or fraudulent claims.

44.    The cedent's duties are also enforced by an obligation of absolute and perfect candor. By industry tradition and by law, all the cedent's duties must be performed with "utmost good faith" or *uberrimae fidei,* meaning openess and honesty and the absence of any concealment or deception.

45.    Without *uberrimae fidei* there would be no reinsurance. Reinsurance works only if the reinsurance premium is less than the original premium received by the cedent. For the reinsurance premium to be less, reinsurers cannot duplicate the costs of the primary insurer in

14

evaluating risks and handling claims. Thus, unlike the arms-length relationships typical among sophisticated parties in other industries, reinsurers must rely completely on the ceding insurer to provide accurate, complete and timely information regarding the nature of risks and extent of losses.

46.     The duty of *uberrimae fidei* underlies the entire reinsurance relationship. Each party in a chain of reinsurance relationships must act in utmost good faith with respect to its obligations to report and investigate claims. The good faith performance of these obligations is intended to benefit and be relied upon by each and every indemnifying party up the chain.

47.     As a fellow and fronting member of the LDG Facilities, Trenwick owed to each of the plaintiffs a duty of *uberrimae fidei* in all dealings regarding the LDG Facilities, including deference to LDG, the managing agent of the Facilities as chosen by Trenwick and each of the plaintiffs under their respective Participation Agreements.

48.     In making claims against the plaintiffs for alleged losses reinsured by Trenwick, AIG owed to Trenwick and to each of the plaintiffs a duty of *uberrimae fidei* requiring AIG, among other things, to submit only valid claims and to provide proof of the insured losses underlying such claims. On information and belief, AIG acted at all relevant times with the knowledge that Trenwick was ceding 100% of the AIG-related business to the LDG Facilities and to the plaintiffs as members of the LDG Facilities, and AIG understood and intended that its dealings with Trenwick would have a direct financial impact on the plaintiffs.

49.     As set forth in detail below, AIG and Trenwick have each breached the duties set forth above by engaging in a pattern of fraudulent, unfair and deceptive practices to unfairly manipulate Trenwick's fronting arrangement to assert improper and inflated coverage claims against the LDG Facilities and the plaintiffs.

181239.5

50.    In April 2003, Trenwick reported to LDG that AIG was requesting a full and final settlement or "commutation" of all past, current and future liabilities owed by Trenwick under the fronted reinsurance contracts issued to AIG's subsidiaries. Since that date, LDG, in keeping with its duty of utmost good faith as managing agent of the LDG Facilities, has repeatedly sought fair access to AIG claim records to confirm the reasonableness and accuracy of the alleged outstanding losses. At all relevant times, AIG knew that LDG, as the manager of the LDG Facilities, was the chosen agent for Trenwick and the plaintiffs for handling any incoming claims. AIG could have and should have acted in utmost good faith by providing LDG, as agent for the plaintiffs, with access to any records substantiating its alleged claims. AIG has persistently refused LDG access to such records, and AIG's refusal has precluded LDG from handling, adjusting or paying any of the losses AIG alleges under the contracts fronted by Trenwick.

51.    Contrary to its obligations of utmost good faith, AIG inserted itself into the claims resolution process and engaged in a pattern of evasive and deliberately obstructionist behavior calculated, on information and belief, to avoid disclosure of unlawful practices resulting in inflated claims in its workers' compensation and other books of business. Further, at all relevant times, AIG has pursued a strategy of negotiating unfairly using escalating demands for payment intended, on information and belief, to co-opt Trenwick in the pursuit of unsupportable claims payments and a restructuring of AIG's reinsurance coverage at the expense of the plaintiffs as Facility members.

52.    Because of its deteriorating financial circumstances, Trenwick colluded with AIG in carrying out these unfair, deceptive and tortious activities, the nature, purpose and effect of which were to hijack LDG's rightful gatekeeper role in handling claims for the LDG Facilities

and to give unfair advantage to AIG in passing off inflated loss reports in its workers'

compensation and other books of business.

### AIG Seizes the Opportunity to Co-opt Trenwick

53.    In the fall of 2002, the Trenwick group of companies faced a financial crisis.

Trenwick's parent, Trenwick America Corporation, suffered a loss of public confidence in its

stock. Onerous financing covenants were widely reported as restricting its options for recovery.

As Trenwick's management looked for ways to ensure its survival, on information and belief,

AIG took advantage of Trenwick's financial vulnerabilities by improperly pressuring for

payment of insufficiently substantiated losses reported by AIG subsidiaries under the reinsurance

contracts Trenwick fronted for the LDG Facilities.

54.    When, in April 2003, AIG requested a commutation of liabilities allegedly owed

under Trenwick-fronted reinsurance contracts, Trenwick reported AIG's demand to LDG as

manager of the LDG Facilities and as agent for Trenwick and the plaintiffs in handling any

incoming claims. Writing from its offices in Wakefield, Massachusetts on or about June 26,

2003, LDG responded to AIG's coverage demands by requesting an audit of the accounts of the

various covered AIG subsidiaries to verify the reported losses. The requested audits were to be

coordinated through the offices of C. Mindy Kipness, Director of Corporate Receivables for

AIG.

55.    AIG, on information and belief, knew the reported workers' compensation and

other claims of its insurance company subsidiaries were grossly inflated. In a deliberate strategy

to avoid having to disclose the improper claims accounting practices of its subsidiaries, AIG

itself responded to LDG's request to verify purported losses by taking actions that threatened

Trenwick's solvency.

17

56.    On July 9, 2003, less than two weeks after receiving LDG's audit request, AIG Associate General Counsel Eric S. Kobrick sent a formal demand letter to LDG at its offices in Wakefield, Massachusetts. Addressing LDG in its capacity as "Managing General Agent of Trenwick," AIG purported to exercise rights under "special termination provisions" governing its subsidiaries' reinsurance contracts with Trenwick to "accelerate Trenwick's obligations, requiring immediate settlement of all present and future obligations." By AIG's unsubstantiated accounting, the "losses" owed by Trenwick totalled almost $130 million. AIG demanded that Trenwick "remit payment promptly."

57.    On July 25, 2003, LDG again requested an on-site audit of the records of AIG's subsidiaries to verify each of the components of the $130 million claim, including outstanding losses, unsettled balances, and incurred but not reported claims ("IBNR"). On August 11, 2003, outside counsel Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), on information and belief acting on instruction from AIG's management, wrote LDG threatening arbitration proceedings against Trenwick if the demanded $130 million payment was not promptly made. The demand letter further stated that access to the records of AIG subsidiaries would only be granted on the condition that LDG first agree to render its due diligence meaningless by executing on behalf of the plaintiffs a "clean, irrevocable, evergreen letter of credit" covering the entire amount of the disputed claims.

58.    On August 20, 2003, Trenwick's parent, Trenwick America Corporation, filed for Chapter 11 protection in the United States District Court for the District of Delaware.

59.    On information and belief, on or about August 27, 2003, having provided no information to substantiate its claims, AIG instructed Gibson Dunn to commence an arbitration proceeding against Trenwick seeking payment in full of the approximately $130 million "claim,"

18

together with interest and attorneys' fees. The demand for arbitration was delivered into and, as intended, was received and acted upon by LDG within the Commonwealth of Massachusetts. The letter commencing arbitration was sent to LDG at its offices in Wakefield, Massachusetts and "require[d] LDG/Trenwick" to appoint an arbitrator within one month.

60.    Upon information and belief, Trenwick submitted to voluntary supervision by the Connecticut Department of Insurance during this time period or shortly thereafter.

### AIG and Trenwick Collude to Give AIG Unfair Leverage in Negotiations for a Novation

61.    From July 2003 through June 2004, AIG engaged in negotiations with LDG, in its role as managing agent of the LDG Facilities and the plaintiffs, ostensibly to resolve obstacles to payment of the claims asserted by the AIG subsidiaries. In reliance on AIG's purported good faith, LDG sent to and received from AIG and its affiliates numerous letters and other communications concerning a review of the accounts of the reinsured AIG subsidiaries. AIG's express and implied representations as to its good faith in the course of its dealings with LDG were delivered to LDG in Massachusetts and, as intended by AIG, were received and relied upon by the plaintiffs through their agent LDG in Massachusetts.

62.    At this same time, Trenwick was on notice that LDG was negotiating with AIG on behalf of the LDG Facilities and that pursuant to the terms of its Participation Agreement and the representations of its predecessor-in-interest Chartwell, Trenwick was required to defer to the authority of LDG as managing agent with regard to such negotiations. On September 8, 2003, LDG formally wrote Trenwick to advise that the LDG Facility members "will not be bound by any settlement reached or any payments made by Chartwell to AIG in the absence of their express preapproval."

63.    On September 18, 2003, Trenwick responded to LDG and promised plaintiffs "a full and fair opportunity to review and comment upon the proposals" before any commutation with AIG would be agreed. Trenwick's representations were delivered to LDG in Massachusetts and, as intended by Trenwick, were received and relied upon by the plaintiffs through their agent LDG in Massachusetts.

64.    The plaintiffs now know that during the period July 2003 through June 2004, AIG entered into secret negotiations with the financially vulnerable Trenwick aimed at securing an improper commutation of various reinsurance contracts Trenwick had issued to AIG subsidiaries. In so doing, AIG acted in bad faith and induced Trenwick to engage in conflicts of interest and other breaches of Trenwick's fiduciary duties to the plaintiffs.

65.    During this same period of time, Trenwick intentionally excluded LDG from its negotiations with AIG, effectively preventing LDG from acting as the gatekeeper to improper claims ceded to the LDG Facilities. Trenwick's actions prevented LDG from exercising the authority, granted to it by Chartwell (and later by Trenwick) and the plaintiffs under their respective Participation Agreements, to act as agent for the LDG Facilities in managing claims and undertaking accountings on behalf of the Facility members. Trenwick prevented LDG from fulfilling its role of representing the plaintiffs' interests as Facility members.

66.    On information and belief, AIG induced Trenwick to improperly usurp LDG's rightful role as manager of the LDG Facilities and to breach the duty of utmost good faith owed to the plaintiffs by offering the financially distressed company a global settlement favorably resolving all of Trenwick's reinsurance liabilities to AIG, of which the risks ceded to the LDG Facilities comprised only a part.

67.    With respect to the reinsurance contracts issued to AIG subsidiaries by Trenwick and ceded to the LDG Facilities, Trenwick faced demands that it pay claims nominally totalling more than $130 million with a present value of more than $81 million. AIG offered a deal permitting Trenwick to resolve those claims for an up-front cash outlay by Trenwick of only $4 million.

68.    Under the deal, AIG would fund Trenwick's "payment" of most of the remaining risk by accepting a non-recourse promissory note from Trenwick in the amount of approximately $73 million. This financing would relieve Trenwick of the need to secure funds to pay AIG's claims from either the other members of the LDG Facilities or the general marketplace. Given Trenwick's perilous financial situation at the time, such financing would have been available only on terms unfavorable to Trenwick.

69.    In exchange for such favorable treatment from AIG, Trenwick agreed to assist AIG in unfairly pressuring the plaintiffs to enter a novation on terms dictated by AIG by which the plaintiffs would assume direct responsibility to AIG and succeed to Trenwick's contractual rights and obligations under its contracts with the AIG subsidiaries. In the event negotiations for the novation failed, Trenwick agreed to participate with AIG in a commutation to cram down a settlement on the plaintiffs by (a) issuing a promissory note to AIG, (b) presenting AIG's wrongfully inflated coverage claim to the plaintiff members of the LDG Facilities as a "paid loss" under the QSA, and (c) assigning to AIG any and all "collection rights" Trenwick had against the plaintiff Facility members under the QSA.

70.    AIG's first attempt to force novation came in early December 2003, when AIG and Trenwick jointly confronted LDG with the fruits of their private negotiations. At that time, AIG demanded that a novation on its proposed terms be executed by the end of January 2004. If

LDG did not agree and the plaintiffs, as Facility members, did not pay as demanded, AIG and

Trenwick threatened to go forward with a commutation under which Trenwick would pass

through to the LDG Facilities as "paid losses" roughly $80 million in AIG claims. AIG's

demand was delivered to LDG in Massachusetts and, as intended by AIG and Trenwick, was to

be acted upon by plaintiffs through their agent LDG in Massachusetts.

71.    On February 3, 2004, LDG initiated negotiations with AIG. In a letter also copied

to Trenwick, LDG set out proposed terms for a novation acceptable to the Facility members.

Over the next five months, LDG continued its good faith efforts to negotiate a novation of the

AIG risks. At the time, LDG and the plaintiffs believed AIG to be negotiating in good faith with

LDG to achieve a mutually agreed novation, and to have ceased its talks with Trenwick seeking

an improperly collusive commutation. Plaintiffs now know that over these five months, AIG

clandestinely continued to collude with Trenwick against the LDG Facilities' interests.

72.    On May 25, 2004, AIG wrote to LDG threatening that unless a novation on AIG

terms was finalized by June 15, 2004, all reinsurance accepted by the LDG Facilities from the

AIG subsidiaries with Trenwick as a front would be "automatically commuted" and AIG would

seek the full amount of each Facility member's share immediately, by arbitration if necessary.

On information and belief, over the next two weeks AIG revealed to LDG that Trenwick had

agreed to enter a written commutation agreement under which Trenwick would pass through to

the LDG Facilities as "paid losses" roughly $80 million in AIG claims if the novation AIG

proposed was not accepted. Each of these demands was delivered to LDG in Massachusetts and,

as intended by AIG and Trenwick, was to be acted upon by plaintiffs through their agent LDG in

Massachusetts.

181239.5

73.    By letter dated June 24, 2004, several of the plaintiffs advised Trenwick that the ultimatum received from AIG by the LDG Facilities through LDG as managing agent was "completely unacceptable" and that the proposed commutation did not conform to "established principles of good faith within the reinsurance industry." As members of the LDG Facilities, these plaintiffs objected to Trenwick's not having carried out an independent valuation of the AIG claims and to Trenwick's failure to assess the validity of the $80 million commutation figure. The June 24 letter advised Trenwick that further discussion of novation would require full disclosure of all relevant facts, including copies of any agreements or side letters between AIG and Trenwick, as well as information regarding the calculation of IBNR and any data, assumptions and actuarial methodologies that might support AIG's demand. Neither AIG nor Trenwick provided the requested information to LDG or to any of the plaintiffs.

### The Suspicious "Commutation" By AIG and Trenwick

74.    Instead, on June 30, 2004, Trenwick entered into an unlawful agreement with AIG commuting more than $81 million in fraudulently inflated and unsubstantiated claims asserted by AIG subsidiaries under reinsurance contracts Trenwick fronted for and ceded to the Facility members (the "Commutation"). On information and belief, the Commutation was negotiated by and under the direction of Christopher Milton, AIG Vice President of Reinsurance. The Commutation agreement was signed on behalf of AIG by a Vice President of AIG and by Jane Byrne, AIG Assistant General Counsel. On information and belief, the Commutation was negotiated on behalf of Trenwick by its Chief Executive Officer, David B. Semeraro, and signed by Trenwick under his authority. AIG and Trenwick are the only signatories to the Commutation agreement.

75.    By letters dated August 19 and October 11, 2004, respectively, and addressed and delivered to plaintiffs' agent LDG at its offices in Wakefield, Massachusetts, AIG and Trenwick each advised the plaintiffs that the Commutation would pass AIG's inflated claims through to the LDG Facilities as "paid losses" to be covered by the LDG Facility members.

76.    The Commutation was intended to give a lawful patina to AIG and Trenwick's unlawful scheme to present fraudulent claims for payment under various reinsurance contracts.

77.    Both AIG's demand for more than $130 million and the "paid loss" amount of $81 million passed on by Trenwick were on their face inconsistent with reasonable commercial and actuarial expectations given the age and nature of the underlying coverages.

78.    AIG's demand for acceleration of the liabilities under reinsurance contracts with Trenwick required AIG to present actuarial projections for IBNR, *i.e.,* for anticipated claims that assume the existence of insured events, such as an industrial accident, for which a claim has not yet been reported to the insurer.  To be valid, IBNR projections must use sound actuarial methods applied to assumptions reasonably related to historical experience.  Of the almost $130 million demanded from Trenwick by AIG, less than $15 million represented claims paid or identified for payment, while more than $116 million represented IBNR projections of unasserted, unpaid claims.  Offered baldly, without supporting detail, and in light of both AIG and Trenwick's continuing refusal to provide any back-up information and audit, AIG's IBNR claims were (and remain) highly suspicious.

79.    The AIG claims are suspect because, without explanation, they assert losses that are contrary to reasonable commercial and actuarial expectations.  Prevailing industry experience demonstrates that workers' compensation claims are usually asserted early in the coverage cycle, and by 2004 a book of such business written in 1999 and 2000 would characteristically have a

24

significantly lower percentage of "losses" in the form of IBNR than AIG presented. AIG's reported ratio of $15 million paid and reserved claims to $116 million of IBNR claims on this book of business was, at best, an aberration. Further, more than $117 million of the total exposure was disproportionately attributed to a single risk – an unexpected pattern that, without explanation, raises questions as to whether losses were properly allocated among the contracts and whether required retentions were properly applied.

80.     Despite the suspicious characteristics of AIG's claims, Trenwick and AIG passed AIG's claims through to the LDG Facilities in a "paid loss" report. The paid loss report and the wrongful representations it contained were delivered to and intended to be acted on by plaintiffs through their agent LDG in Massachusetts.

81.     The "paid loss" report is also suspect because it lacks any signs that Trenwick followed common and expected industry practice to substantiate underlying claims before payment. With so large a portion of the claim based on projected IBNR, industry custom and prudent claims-handling practice required Trenwick either directly or through LDG to, at a minimum, audit AIG's actuarial calculations and underlying claims history. Yet Trenwick's "paid loss" report to the LDG Facilities is strikingly devoid of evidence that Trenwick conducted even a minimal coverage analysis. The paid loss report fails to provide basic supporting detail required of AIG both under its reinsurance contracts and by industry custom and practice. On information and belief, Trenwick did not require AIG to report how it calculated either the purported IBNR or the present value of its claims. To the contrary, Trenwick informed the members of the LDG Facilities that AIG was unwilling to provide calculations for IBNR and other amounts. Nor did Trenwick exercise its contractual right under its contracts with AIG to open the transaction up to the light of day by demanding review by an independent auditor.

82.    In addition, Trenwick's "payment" of over $73 million of the Commutation by funds obtained from AIG under a promissory note with terms and conditions more favorable to Trenwick than otherwise available in the marketplace, and secured by an assignment to AIG of collection rights against the LDG Facilities and the plaintiffs, is unorthodox and contrary to the practices and standards of the reinsurance industry. Under the QSA, Trenwick was required to pay the full amount of the Commutation and then seek indemnity from the LDG Facilities. This requirement was designed to ensure that Trenwick would have a strong financial interest in investigating the validity of claims under the reinsurance contracts it issues and in paying only legitimate obligations. The benefits Trenwick realized under its promissory note to AIG eliminated Trenwick's financial incentive to negotiate on behalf of itself and the LDG Facilities and, on information and belief, induced Trenwick to accept Commutation terms dictated by AIG.

83.    Trenwick furthered AIG's scheme to defraud the LDG Facilities and the plaintiffs by among other things (a) failing to exercise basic care on behalf of the LDG Facilities, care that the plaintiffs, as LDG Facility members, were entitled to and expected from Trenwick as a fronting member, and (b) colluding with AIG to avoid review by LDG of the validity of AIG's fraudulently inflated claims by presenting those claims as "paid losses" under the Trenwick Fronting Arrangement.

### AIG and Trenwick Collude to Pass Off
### AIG's Inflated Claims as Paid Losses

84.    Since the Commutation, AIG has flatly refused the LDG Facilities any access to its records. Without such information, LDG and the plaintiffs, as LDG Facility members, cannot assess the validity of AIG's claims, a determination that Trenwick, as fronting member, should have made, but entirely failed to pursue. On information and belief, AIG's stonewalling extends

26

beyond its own files to continuing pressure on Trenwick to refuse cooperation with reasonable requests made by LDG on behalf of the Facilities to investigate the paid loss claim.

85.     On or about August 19, 2004, Trenwick wrote LDG as managing agent of the LDG Facilities to request that LDG collect payment in settlement of Trenwick's claim for indemnification on paid losses relating to the AIG-Risk Chains. In support of its claim, Trenwick presented a purported "paid loss" of $4 million, representing Trenwick's payment to AIG to consummate the wrongful Commutation, for which it seeks reimbursement of 95%. By collecting on this claim, Trenwick seeks to reduce to approximately $200,000 its total outlay for resolving in excess of $130 million in asserted AIG liabilities.

86.     As a cedent to retrocessionaires in various AIG-Risk Chains, Trenwick owes a duty of *uberrimae fidei* requiring Trenwick to submit only valid claims and to provide proof of the insured losses underlying the claim. In seeking reimbursement for its participation in a fraudulent and deceptive scheme with AIG, Trenwick has breached this duty to the plaintiffs who act as its retrocessionaires in the AIG-Risk Chains.

87.     On November 23, 2004, AIG sent each plaintiff a demand for payment of its alleged proportional share of the $73,360,000 promissory note, addressing the demand letter both to each plaintiff's own offices and to the plaintiff's attention, care of LDG in Wakefield, Massachusetts. LDG was also included as a direct recipient of each demand letter.

88.     Each of the November 23, 2004 letters offered to release the addressed plaintiff from any obligation under the promissory note if the plaintiff signed the previously unacceptable novation agreement. Absent payment or novation, AIG threatened to commence arbitration within 30 days.

89.    As cedents to retrocessionaires farther out the AIG-Risk Chains, the plaintiffs owe a duty of *uberrimae fidei* requiring each of them, among other things, to submit only valid claims and to provide proof of the insured losses underlying the claim. In light of AIG's and Trenwick's continuing refusal to provide any supporting documentation for the claims they have asserted, neither LDG nor any of the plaintiffs has agreed, nor consistent with the duty of *uberrimae fidei* could they agree, to either option offered by AIG.

### AIG and Trenwick Collude to Collect the Spoils of Their Unfair Practices in Massachusetts

90.    AIG, with Trenwick's collusion, has manufactured more than $81 million in fraudulent "paid losses" for which it has asserted almost $73 million in wrongful demands for payment under reinsurance contracts ceded to the plaintiffs. AIG, in conspiracy with Trenwick, continues to assert these claims in Massachusetts despite knowing of their falsity.

91.    The false liabilities manufactured by AIG in an unlawful scheme with Trenwick have implicated the plaintiffs' forecasting and reserving practices, and have required the victimized plaintiffs to expend significant time and money on the investigation of and defense against these claims and demands for payment.

92.    On January 10, 2005, acting as purported assignee under the Commutation of Trenwick's collection rights, AIG initiated arbitration asserting rights under the QSA to enforce its unlawful demands for payment. AIG sent each plaintiff a demand for arbitration. The demands were addressed both to each plaintiff's own offices and in care of LDG in Wakefield, Massachusetts. The arbitration has commenced in Massachusetts.

93.    Trenwick, as purported assignor under the Commutation of its rights under the QSA, is not a party to the arbitration.

28

94.    To protect their rights, the plaintiffs have been required to respond to AIG's arbitration demand, and have to date expended very substantial sums in investigating and defending themselves from AIG's manufactured claims.

95.    By reason of the foregoing wrongful acts on the part of Trenwick and AIG, each of the plaintiffs has suffered damage, and their damages continue to rise.

## COUNT I

### Chapter 93A Claim (Against AIG and Trenwick)

96.    The plaintiffs adopt by reference the allegations of ¶¶ 1-95, above.

97.    This claim is brought pursuant to G.L. c. 93A, § 11.

98.    Each of the plaintiffs, and both of the defendants, have been engaged in trade or commerce within the meaning of c. 93A, § 11.

99.    The following conduct by AIG and Trenwick, as described above in greater detail, constitutes unfair and deceptive acts or practices committed in Massachusetts in willful and knowing violation of c. 93A:

    (a)    Providing improperly inflated calculations of losses in demanding accelerated payment on each of the eleven separate reinsurance contracts issued to AIG subsidiaries by Chartwell and ceded to the LDG Facilities;

    (b)    Presenting the fraudulently inflated Commutation amount as a paid loss under the Trenwick QSA;

    (c)    Demanding that each of the eighteen plaintiff insurance companies pay its purported share of the fraudulently inflated Commutation amount;

    (d)    Presenting wrongful and fraudulent paid loss figures to Trenwick's retrocessionaires in the AIG-Risk Chains;

29

(e)    Trenwick's failure to meet its duty of care owed to the plaintiffs by not investigating AIG's claims;

(f)    Purporting to negotiate in good faith with LDG, the plaintiffs' representative, while simultaneously agreeing to, but not disclosing, the Commutation;

(g)    Negotiating in bad faith in an attempt to pressure LDG and the plaintiffs to settle the dispute on terms favorable to AIG; and

(h)    Wrongfully filing a demand for arbitration in Massachusetts to enforce fraudulent claims for reinsurance coverage.

100.    The defendants AIG and Trenwick, by their actions set forth above, have engaged in a course of unfair and deceptive acts and practices aimed at wrongfully collecting almost $73 million from plaintiffs.

101.    The defendants have carried out a pattern of evasive and obstructionist conduct in rejecting all attempts by LDG, on behalf of the plaintiffs, to obtain information supporting the claims, and have given no indication of a willingness to reciprocate LDG's desire to amicably resolve the parties' disputes.

102.    The defendants' actions and statements in connection with their improper scheme were aimed at, and were acted upon by, LDG, on behalf of the plaintiffs, in Wakefield, Massachusetts.

103.    The defendants' unfair and deceptive acts and practices occurred primarily and substantially in Massachusetts.

104.    The defendants' conduct constitutes unfair and deceptive acts and practices in violation of c. 93A.

105.    The defendants knowingly and wilfully violated c. 93A.

106.    The plaintiff insurance companies have each suffered a loss of money or property in an amount to be determined at trial as a result of the defendants' violations of c. 93A.

## COUNT II

### Common Law Fraud (against AIG and Trenwick)

107.    Plaintiffs adopt by reference the allegations of ¶¶ 1-106, above.

108.    AIG and Trenwick each individually and together engaged in wrongdoing that included the making of numerous materially false and misleading statements, representations and omissions with respect to their course of dealings and the Commutation of AIG reinsurance contracts, including but not limited to the presentation of AIG's wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" and Trenwick's presentation of a fraudulent and wrongful paid loss to its retrocessionaires in the AIG-Risk Chains.

109.    Each of AIG and Trenwick knew that their statements, representations and omissions were materially false and misleading with respect to presently existing or past facts.

110.    Each of AIG and Trenwick intended that each plaintiff rely to its detriment on their materially misleading false and misleading statements, representations and omissions in processing, reserving for, investigating and paying the fraudulent and inflated claims under the AIG reinsurance contracts ceded to the LDG Facilities.

111.    Each of the plaintiffs reasonably relied upon such false and misleading statements, representations and omissions to its detriment by, among other things, entering a false liability on its books, paying unnecessary fees and expending monies for the investigation and defense against claims fraudulently created.

112.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

31

## COUNT III

### Civil Conspiracy (Against AIG and Trenwick)

113.    Plaintiffs adopt by reference the allegations of ¶¶ 1-112, above.

114.    By various wrongful acts, defendants AIG and Trenwick have acted in concert in furtherance of a common plan to commit insurance fraud and other unlawful acts, the object of which was to defraud the plaintiff insurance companies with respect to reinsurance coverage claims presented against the LDG Facilities.

115.    By various wrongful acts, defendants AIG and Trenwick have acted in concert in furtherance of a common plan to wrongfully file a demand for arbitration to enforce fraudulent claims for reinsurance coverage, the object of which is to defraud the plaintiff insurance companies.

116.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT IV

### Aiding and Abetting Breach of Fiduciary Duty (Against AIG)

117.    Plaintiffs adopt by reference the allegations of ¶¶ 1-116, above.

118.    Trenwick had a fiduciary obligation to the plaintiff insurance companies to act under a duty of *uberrimae fidei* or utmost good faith in all dealings with respect to its role as a fronting reinsurer for the LDG Facilities and LDG Facility members. AIG, as Trenwick's reinsured, with knowledge of Trenwick's relationship to plaintiffs, also owed plaintiffs a duty of utmost good faith.

119.    By various wrongful acts, AIG induced Trenwick to breach that fiduciary duty by participating in a scheme to commit insurance fraud by presenting AIG's wrongfully inflated

32

coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" under plaintiffs' QSA with Trenwick, to assist AIG in pursuing a wrongful demand for arbitration to enforce fraudulent claims for reinsurance coverage and to commit other torts to the plaintiffs' detriment.

120.    At the time AIG, a sophisticated insurer, approached Trenwick, AIG understood that Trenwick was acting as a fronting reinsurer for the LDG Facilities and knew of the duties that arise from that relationship.

121.    By acting in concert with Trenwick to commit insurance fraud, to fraudulently inflate the Commutation amount and to commit other torts, AIG knowingly participated in and facilitated Trenwick's breach of fiduciary duty.

122.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

### COUNT V

### Tortious Interference With Contractual Relations (Against AIG)

123.    Plaintiffs adopt by reference the allegations of ¶¶ 1-122, above.

124.    One or more of the plaintiffs had a contractual relationship with Trenwick by which Trenwick acted as a fronting reinsurer for the LDG Facilities.

125.    AIG was not a party to that contractual relationship, but knew that Trenwick had a business relationship with the plaintiffs that was manifested by a contract specifying that Trenwick would act on the plaintiffs' behalf as a fronting reinsurer.

126.    AIG knowingly and intentionally induced Trenwick to breach its contractual duties as a fronting reinsurer and to commute AIG's reinsurance contract in a manner detrimental to the plaintiffs and unduly favorable to AIG; to present AIG's wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" under plaintiffs' QSA with

33



Trenwick; and to enable AIG pursuant to a wrongful assignment of Trenwick's contract rights to pursue an improper demand for arbitration to enforce fraudulent insurance claims.

127.    AIG had no justification for interfering with the contractual relations between Trenwick and the plaintiffs; AIG's motive was to commute the claims in an unreasonable manner that would unfairly benefit AIG.

128.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT VI

### Declaratory Judgment (Against Trenwick)

129.    Plaintiffs adopt by reference the allegations of ¶¶ 1-128, above.

130.    Trenwick has demanded that the plaintiffs indemnify the $4 million cash payment Trenwick made to AIG under the Commutation.

131.    The plaintiffs have rejected Trenwick's unjustified and wrongful demand for indemnification.

132.    There is an actual controversy about whether the plaintiffs are required to indemnify Trenwick for the $4 million Trenwick paid to AIG under the Commutation.

133.    The declaratory judgment sought by the plaintiffs would properly resolve this controversy.

### RELIEF SOUGHT

Each of the plaintiff insurance companies demands judgment against the defendants AIG and Trenwick as follows:

        a.    For compensatory damages;

b.     For disgorgement of all benefits received by either defendant as a result of

their fraud or unfair and deceptive acts and practices;

c.     For treble damages under c. 93A;

d.     For punitive and exemplary damages;

e.     For interest and costs;

f.     For a declaration that the plaintiffs serving as retrocessionaires in the AIG-

Risk Chains are not required to indemnify Trenwick for the $4 million Trenwick paid to

AIG under the Commutation; and

g.     For such other and further relief as the Court may deem just.

By its attorneys,

Scott P. Lewis (BBO # 298740)
Steven L. Schreckinger (BBO # 447100)
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Of counsel:

Joseph T. McCullough, IV
Kathy L. McFarland
Robin C. Dusek
LOVELLS
One IBM Plaza
330 North Wabash Avenue
Suite 1900
Chicago, IL 60611
(312) 832-4400

July 6, 2005

35

**EXHIBIT B**



## SRRF MANAGEMENT INCORPORATED

### QUOTA SHARE RETROCESSIONAL AGREEMENT

**by and among**

### CHARTWELL REINSURANCE COMPANY
**(Chartwell)**

**and**

### THE RETROCESSIONAIRES WHOSE NAMES AND INTERESTS APPEAR IN THE INTERESTS AND LIABILITIES ENDORSEMENT
**(the Retrocessionaires)**



## SRRF MANAGEMENT INCORPORATED

### Article I - Term

This Agreement shall take effect July 1, 1997 and is to be a Continuous Agreement unless and until terminated in accordance with Article VIII.

### Article II - Definitions

"Agreement Year" means each 12 consecutive calendar months during the continuance of this Agreement, beginning on each July 1.

"Subject Business" means occupational accident and health reinsurances and/or retrocessions which become effective as new or renewal business on or after the effective date of this Agreement, and which have been bound and accepted by Chartwell through SRRF Management.

All such reinsurances and/or retrocessions shall be provided in accordance with terms and provisions of Reinsurance Contracts issued to a Reinsured by Chartwell through SRRF Management, and shall apply on either an excess or pro-rata form, and on either a treaty or facultative basis, as bound and accepted by Chartwell through SRRF Management.

"Reinsured" means any insurance or reinsurance company or companies, or any other admitted insurer or reinsurer or non-admitted alien reinsurer reinsured under a Reinsurance Contract issued by Chartwell through SRRF Management.

"Reinsurance Contract" means all binders, contracts, agreements, treaties, certificates, addenda, endorsements, or other evidences of Occupational Accident and Health Reinsurance which have been issued by Chartwell through SRRF Management to a Reinsured, including renewals and cancellations thereof.

"Contract Term" means the consecutive period of a Reinsurance Contract issued by Chartwell through SRRF Management beginning on the inception date of each such contract, or on each renewal date thereof, and ending on a date no later than thirty-six (36) months thereafter.

Notwithstanding any statement to the contrary, Chartwell through SRRF Management at its discretion, may also issue continuous Reinsurance Contracts; provided that all such contracts retain a provision for termination at an initial termination date not longer than eighteen (18) months after the inception of each such contract, and at subsequent termination dates not to exceed twelve (12) month intervals thereafter.

"Contract Year" means each twelve (12) consecutive calendar months during the continuance of a Reinsurance Contract issued by Chartwell through SRRF Management, provided, however, that at the option of Chartwell, the first such Contract Year only may be comprised of any period of up to eighteen (18) consecutive months beginning on the initial inception date of each such contract.

2



## SRRF MANAGEMENT INCORPORATED

SRRF Management shall perform the underwriting, claims management and accounting activities related to the business retroceded pursuant to this Agreement.

"Loss Adjustment Expenses" means all costs incurred by SRRF Management in investigating, resisting, settling, adjusting, managing, and processing of claims, exclusive of salaries of full-time employees and other office expenses of SRRF Management, unless otherwise agreed.

"Gross Net Reinsurance Premium" means gross premiums applicable to Reinsurance Contracts issued by Chartwell through SRRF Management, less cancellations and return premiums.

### Article III - Business Covered

Chartwell obligates itself to cede to the Retrocessionaire, and the Retrocessionaire obligates itself to accept a quota share part of all Subject Business underwritten by SRRF Management on behalf of Chartwell during the term of this Agreement. All Subject Business shall consist of the classes of business, and be written in accordance with terms, conditions, exclusions and limits that are set forth in the Reinsurance Management Agreement between SRRF Management and Chartwell, which Agreement is attached to, and made part of this Agreement.

### Article IV - Follow the Fortunes

Chartwell shall, in all cases, be the sole judge of (1) what constitutes a claim or loss covered under all Reinsured Contracts, (2) Chartwell's liability under the Reinsured Contracts, (3) commutation amounts, and (4) the amount for which the Retrocessionaire shall be liable, subject always to the terms and conditions of this Agreement and the Reinsurance Management Agreement. The Retrocessionaire shall be bound by Chartwell's judgment as to the obligation and liability of the Retrocessionaires. All cessions to the Retrocessionaires pursuant to this Agreement shall be subject in all respects to the same risks, terms, conditions, interpretations, assessments, waivers, modifications, alterations, and cancellations as the Reinsured Contracts, the true intent of this Agreement being that the Retrocessionaires shall, in every case to which this Agreement applies and in the proportions specified herein, follow Chartwell's fortunes with respect to the Reinsured Contracts.

### Article V- Errors and Omissions

Except as may be otherwise specifically provided herein no inadvertent errors, delays or omissions shall relieve any party to this Agreement from their liability or obligations hereunder, provided such errors, delays or omissions are rectified as soon as possible after discovery.

3



### SRRF MANAGEMENT INCORPORATED

#### Article VI - Reports and Remittances

1.  All books and records deemed necessary and appropriate for proper management and conduct of the Subject Business shall be maintained by SRRF Management or Chartwell and shall be available for inspection by the Retrocessionaire, or its designated representative, at all reasonable times for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof.

2.  As soon as possible after the close of each calendar quarter that this Agreement remains in force, but in no event longer than forty-five (45) days thereafter, SRRF Management shall furnish to Chartwell and the Retrocessionaire a quarterly report setting forth details of all transactions which affected business the subject matter hereof during each such quarter. Each such report shall provide the following information on both quarterly and cumulative year to date basis:

#### Underwriting Report

A.  100% of Gross Net Reinsurance Premiums written during each such quarter.

B.  100% of allowances payable to SRRF Management during each such quarter.

C.  100% of allowances payable to Chartwell during each such quarter.

D.  100% of unearned premium reserves at the end of each quarter.

E.  100% of losses and loss expenses paid by Chartwell during each such quarter (net of recoveries from ceded reinsurance).

F.  100% of losses and loss expense reserves established by SRRF Management at the end of each such quarter for claims incurred and reported but not paid.

G.  100% of losses and loss expense reserves recommended by SRRF Management at the end of each such quarter for claims incurred but not reported.

H.  100% of net premiums payable during each such quarter for ceded reinsurance secured on behalf of Chartwell.

#### Cash Report

A.  100% of Gross Net Reinsurance Premiums paid to Chartwell during each such quarter by Reinsurance Contract.

4



## SRRF MANAGEMENT INCORPORATED

B.   100% of amounts recovered during each such quarter from ceded reinsurance secured on behalf of Chartwell.

C.   100% of net premiums paid during each such quarter for ceded reinsurance secured on behalf of Chartwell.

D.   100% of allowances paid to SRRF Management during each such quarter.

E.   100% of losses and loss expenses paid by Chartwell during each such quarter.

Amounts payable to the Retrocessionaire shall be remitted by SRRF Management at the same time that each such quarterly report is rendered. If, however, any amounts due from the Retrocessionaire exceed amounts on deposit in the special account and the claims reserve fund maintained by SRRF Management, such amounts shall be paid within three (3) business days following request by means of a wire transfer. same day available funds, to SRRF Management. Any amounts payable by the Retrocessionaire in accordance with this Article which are not remitted within the time required, shall bear interest at the rate of 1% per month (or part thereof) that the amount remains unpaid. If the Retrocessionaire fails to make the payment required in this Article on more than three (3) occasions. the Retrocessionaire shall be required to provide funding as set forth in Article VIII, below and SRRF Management shall not be required to pay any amounts to the Retrocessionaires until the Retrocessionaire has complied with Article VIII.

### Article VII - Currency

All amounts due to any party hereunder shall be payable in United States currency.

### Article VIII - Loss Funding

1.   If the Retrocessionaire is unauthorized in the state of Minnesota. the Retrocessionaire shall provide funding in an amount equal to 102% of the sum of the following:

    A.  losses and allocated loss adjustment expenses owed to Chartwell;
    B.  reserves for losses reported and outstanding;
    C.  reserves for losses incurred but not reported (IBNR);
    D.  reserves for allocated loss expenses; and
    E.  reserves for unearned premium.

2.   Such funding may be provided by permitting Chartwell to withhold funds otherwise payable to the Retrocessionaire in a trust account established for Chartwell's benefit or letter of credit issued for the benefit of Chartwell or any combination of the foregoing. If at any time, the funds so withheld are not equal to the amount required pursuant to Section 1 of this Article, the Retrocessionaire shall provide additional funds so that the



SRRF MANAGEMENT INCORPORATED

total amount of funds held by Chartwell equals the amount required by Section 1 of this Article.

3. If the Retrocessionaire's rating from A.M. Best & Co. is, or, at any time during the pendency of this Agreement, declines to below "A-" or if the policyholders surplus of the Retrocessionaire is, or declines to below, $100 million, the Retrocessionaire shall provide funding of losses in accordance with paragraph 1 of this Article.

A claims reserve fund placed under Chartwell's control shall be established and shall be funded in the following manner. Quarterly deductions from the positive balances developed for account of the Retrocessionaires shall be withheld until a reserve fund of the greater or (1) $500,000 or (2) 20% of gross net reinsurance premium has been accumulated. The amounts thus withheld shall be separately maintained in a fiduciary trust account, and shall be used by Chartwell solely for the payment of losses payable pursuant to this Agreement. Upon payment of losses, the reserve fund shall be automatically re-established to the level specified above. If the amounts deposited have been reduced to the extent that they are inadequate to pay all or a part of losses payable pursuant to this Agreement, the liability of the Retrocessionaire shall continue in force as respects all such losses without diminution because of the inadequacy of the reserve fund.

The claims reserve fund shall be maintained until all losses have been finally settled.

### Article IX Liability of Chartwell

Under no circumstances will Chartwell be liable to the Retrocessionaires for extra or non-contractual damages or legal fees and expenses attendant to the defense thereof; including, but not limited to, compensatory, exemplary, and punitive damages or fines or statutory penalties which are awarded against SRRF Management as a result of an act or omission, or course of conduct committed by or on behalf of SRRF Management unless Chartwell shall have concurred in writing with the proposed act, omission or course of conduct to be taken by SRRF Management which led to the award of such damages.

### Article X - Termination

1. This Agreement may be terminated at 12:01 A.M. Eastern Standard Time July 1, 1998 or any other subsequent July 1, by Chartwell or the Retrocessionaire giving one hundred and eighty (180) days prior written notice to the other party. Such termination shall not apply to Reinsurance Contracts having effective dates prior to the date of termination until the earlier of (A) the Reinsurance Contract's scheduled renewal date or (B) thirty-six (36) months from the date of termination.

6



SRRF MANAGEMENT INCORPORATED

2.    After the service of any notice of termination hereunder, all Articles of this Agreement that confer rights or liabilities upon any party shall continue to apply until the final settlement of the accounts for all Agreement Years in which the Retrocessionaire participates.

During the period after such notice of termination is given but before the effective date of termination, SRRF Management shall rightfully continue to accept, sign and issue Reinsurance Contracts and all endorsements or amendments thereto and all other acts hereunder on behalf of Chartwell.

### Article XI - Arbitration

As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates. The Arbitration shall be held in a place mutually agreeable to the parties.
One Arbitrator shall be chosen by Chartwell and the other by the Retrocessionaires. The Umpire shall be chosen by the two Arbitrators.

Arbitration may be initiated by either party (the Petitioner) demanding arbitration and naming its Arbitrator. The other party (the Respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the Petitioner. If the Respondent fails to designate its Arbitrator within the time stated above, the Petitioner is expressly authorized and empowered to name the second Arbitrator; and Respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. If the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, such selection shall be made in accordance with the provisions of the Massachusetts Uniform Arbitration Act Chapter 251 of the Massachusetts General Laws Annotated.

Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement. The Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest

7



## SRRF MANAGEMENT INCORPORATED

convenient date, but in no event later than one hundred and twenty (120) days from submission of the case to the Board, shall be final and binding upon all parties.

### Article XII - Controlling Law

This Agreement shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts.

### Article XIII - Insolvency

In the event of Chartwell's insolvency, any amounts payable hereunder by the Retrocessionaire shall be payable directly to Chartwell's liquidator, receiver, conservator or statutory successor without diminution because of the insolvency, except where this Agreement specifically provides another payee of such retrocessional amount due.

In the event of SRRF Management's insolvency or its refusal or inability to fulfill its responsibilities pursuant to the Reinsurance Management Agreement, any amounts payable to SRRF Management as consideration for services provided pursuant to the Reinsurance Management Agreement shall be paid to Chartwell which shall be substituted for SRRF Management until either the earlier of: (a) all reinsurance issued by Chartwell has been terminated and all obligations arising thereunder have been fulfilled or, (b) another manager has been appointed. No manager shall be appointed without the prior written consent of Chartwell. The Retrocessionaire shall pay its proportionate share of any increased costs incurred by Chartwell as a result of SRRF Management's inability to fulfill its contractual obligations. If the duties of SRRF Management are assumed by Chartwell, all fees, costs and expenses previously payable to SRRF Management shall be payable to Chartwell.

### Article XIV - Entire Agreement

This Agreement and the Reinsurance Management Agreement constitute the entire Agreement between the parties and may be varied only by a writing signed by the parties hereto. The headings of the Articles herein are for convenience only and are not a part of this Agreement.

8



## SRRF MANAGEMENT INCORPORATED

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized representatives, have executed this Agreement in duplicate.

SRRF MANAGEMENT INCORPORATED

By _Barbara Smith_

Title _President_

CHARTWELL REINSURANCE COMPANY

By _____

Title _____

9



## SRRF MANAGEMENT INCORPORATED

## INTEREST AND LIABILITIES ENDORSEMENT

### SRRF II

**IN WITNESS WHEREOF,** the parties hereto, by their respective duly authorized representatives, have executed this Agreement in duplicate.

American United Life Insurance Company                    Date

Cologne Life Reinsurance Company                          Date

Crown Life Insurance Company                              Date

First Allmerica Financial Life Insurance Company          Date

Hartford Life Insurance Company                           Date

Insurance Corporation of Hannover an Illinois Co.         Date

Life Reassurance Corporation of America                   Date

Manulife Reinsurance Corporation (U.S.A.)                 Date

10



## SRRF MANAGEMENT INCORPORATED

**SRRF II - continued**

_____          _____
Mercantile & General Life Re. Co. of America          Date
(A Member of the Swiss Re Group) ·

_____          _____
Pan-American Life Insurance Company          Date

_____          _____
Phoenix Home Life Mutual Insurance Company          Date

_____          _____
Reliance National Insurance Company          Date

_____          _____
Reliance Standard Life Insurance Company          Date

_____          _____
Reliastar Life Insurance Company          Date

_____          JUN 2 9 1999
Sun Life Assurance Company of Canada          _____
                                             Date

_____          _____
Swiss Re Life Company America          Date

_____          _____
TMG Life Insurance Company          Date

II

**EXHIBIT C**

Office of the Superintendent of   Bureau du surintendant des
Financial Institutions Canada     Institutions financières Canada

August 17, 2005


Ms. Shawna Hansen
Corporate Paralegal
Morrison Mahoney
250 Summer Street
Boston, Massachusetts
02210-1181


Dear Ms. Hansen:

**Subject:  Sun Life Assurance Company of Canada ("Sun Life")**

Further to the Certificate of Confirmation issued to you on August 16, 2005, in respect of
Sun Life, I wish to confirm that the company was incorporated under the laws of Canada
and has its head office location in the City of Toronto, in the Province of Ontario,
Canada.


Yours sincerely,


George Harris
Director
Legislation and Approvals Division
(613) 990-5893




OSFI    255 Albert Street
BSIF    Ottawa, Canada
        K1A 0H2
        www.osfi-bsif.gc.ca



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) American Reinsurance Company v.
   American International Group

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   | | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
   |---|---|---|
   | ☐ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. for patent, trademark or copyright cases |
   | ☒ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
   | ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
   | ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   N/A

   05 - 11840 MLW

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐    NO ☒

7. Do **all** of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☒    NO ☐

   A.    If yes, in which division do **all** of the non-governmental parties reside?
         Eastern Division ☒    Central Division ☐    Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
         Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐    NO ☒

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME     John T. Harding

ADDRESS     Morrison Mahoney LLP 250 Summer St., Boston, MA 02210

TELEPHONE NO.     (617) 439-7558

(CategoryForm.wpd - 5/2/05)

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

American Reinsurance Co., et al

**DEFENDANTS**

American International Group and Trenwick America Reinsurance Corp.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Scott P. Lewis, Palmer & Dodge
111 Huntington Ave., Boston, MA  02199

Attorneys (If Known)
John T. Harding, Morrison Mahoney LLP
250 Summer St., Boston, MA  02210

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN    (Place an "X" in One Box Only)

☐ 1 Original
Proceeding

☒ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Federal arbitration Act, 9 U.S.C. Section 3

Brief description of cause:
Reinsurance dispute

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☐ Yes  ☒☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____     DOCKET NUMBER _____

DATE
9/9/05

SIGNATURE OF ATTORNEY OF RECORD
_(signature)_

**FOR OFFICE USE ONLY**

RECEIPT # _____     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____