UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN REINSURANCE COMPANY, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO.: 05-CV 11840-MLW |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, and TRENWICK AMERICA REINSURANCE CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR REMAND TO THE SUPERIOR COURT OF MASSACHUSETTS**

**PRELIMINARY STATEMENT**

Having removed this litigation to this Court under Federal Arbitration Act § 205, defendants American Insurance Group Inc. ("AIG Inc.") and Trenwick American Reinsurance Corporation ("Trenwick") now bear the burden of demonstrating grounds for federal subject matter jurisdiction. *BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of America, IAMAW Dist. Lodge 4*, 132 F.3d 824, 831 (1st Cir. 1997). The right of removal under the FAA is entirely a creature of statute. This litigation, having

been commenced in the Massachusetts state courts,[1] should be remanded to those courts absent sufficient showing by defendants of cause for its transfer under an act of Congress. *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 32-33 (2002). Any such statutory provision is to be strictly construed, *id.,* with all doubts resolved in favor of remand. *Kingsley v. Lania,* 221 F.Supp.2d 93, 95 (D.Mass. 2002).

In their opposition to remand, defendants continue to rely for subject matter jurisdiction on arbitration proceedings (the "AIG Subsidiaries Arbitration") initiated in Massachusetts by certain AIG insurance subsidiaries (the "AIG Subsidiaries") as assignees of Trenwick interests against the plaintiffs under the Quota Share Retrocessional Agreement ("QSA"). Yet neither defendant can show itself to be a real-party-in-interest to the arbitration proceedings or possessed of authority to invoke the arbitration provisions of the QSA on its own behalf. Rather, in their respective papers defendants have sought to ease their burden of proof by replacing the substantial requirements for sustaining jurisdiction under First Circuit law with a standard from the Fifth Circuit more favorable to their purposes. Relying principally on a selective reading of *Beiser v. Weyler,* 284 F.3d 665 (5th Cir. 2002) and its progeny in the district courts of Louisiana, defendants ask this Court to make "removal under 9 U.S.C. §205 easy" by conducting no more than a "limited inquiry" on remand to determine if there is an agreement to arbitrate "broadly 'related to'" the disputed matters that can be said "arguably" to fall under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 26 U.S.T. 2517 (the "New York Convention"). AIG Inc. Opp. at 15; TWK Opp. at 7, Under this analysis, defendants purport to invoke the subject matter jurisdiction of

---

[1] This action was commenced in the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session (the "Massachusetts Superior Court").

2

this Court under the FAA for purposes of staying this litigation, without first meeting the threshold requirement of establishing that a valid written agreement binds both defendants and the plaintiff Facility Members to arbitrate the claims set forth in the Complaint. AIG Inc. Opp. at 3; TWK Opp. at 5-6.

Defendants cannot prevail with this argument, *first*, because it fails to meet the requirements for subject matter jurisdiction set forth in the FAA and the New York Convention. FAA § 203 provides for subject matter jurisdiction only where "an action or proceeding fall[s] under the [New York] Convention." 9 U.S.C. §203. The language of the Convention itself provides for two causes of action: (1) an action to compel arbitration, implemented by 9 U.S.C. §206, and (2) an action to enforce arbitration agreements, implemented by 9 U.S.C. §207. In addition, some courts that recognized a third cause of action - one derived from the FAA's mandatory stay provisions for domestic arbitrations. 9 U.S.C. §3. In each instances, only actual parties to the written arbitration agreement being enforced can bring such an action. Thus, under a strict reading of the FAA subject matter jurisdiction provision, each defendant can establish the subject matter jurisdiction of the court as to its disputes with plaintiffs only if it can demonstrate standing in its own capacity to invoke arbitration. *.See Syngenta*, 537 U.S. at 32-33 (jurisdiction provisions must be strictly construed)..

*Second*, defendant's argument fails under First Circuit law requiring a removing defendant invoking the subject matter of the FAA to establish the right to arbitrate under "first principles": "[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Intergen v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003); *Restoration Preserv. Masonry, Inc. v. Grove Europe Ltd.*, 325

F.2d 54, 60 (1st Cir. 2003). The Circuit has interpreted this precept to mean that a party seeking to invoke an arbitral forum must show "at a bare minimum that the protagonists have agreed to arbitrate *some* claims." *Intergen,* 344 F.3d at 143 (emphasis in original). Following from this emphasis, the Court looks to determine arbitrability under contract principles as grounds for resolving motions on remand under the international provisions of the FAA. Where the removing defendant cannot establish its right to enforce an arbitration agreement as a party to that agreement, subject matter jurisdiction fails and remand is granted. *See, e.g., Restoration,* 325 F.2d at 60-61 (electing to apply arbitrability standard over *Beiser* jurisdiction analysis in affirming remand for lack of subject matter jurisdiction where party waived right to arbitrate under agreement); *Menorah Ins. Co. v. INX Reins. Corp.,* 72 F.3d 218, 223 (1st Cir. 1995) (remand under FAA on waiver of right to arbitrate); *Intergen,* 344 F.3d at 150 (returning case to district court for remand order under FAA consistent with finding parties not bound by agreement to arbitrate).

Under this law, subject matter jurisdiction is lacking in this matter under 9 U.S.C. § 203 because the parties named in this litigation have not entered an agreement to arbitrate their dispute. Neither AIG Inc. nor Trenwick can compel arbitration under the QSA to resolve their differences with plaintiffs. Trenwick cannot rely on the rights it has assigned away to others. Its assignees, the AIG Subsidiaries, have taken up those rights and are before the Panel in the AIG Subsidiaries Arbitration. AIG Inc. is not now and has never been a party to the QSA. Neither Trenwick nor AIG Inc. is a real-party-in-interest in the AIG Subsidiaries Arbitration. Their assets are not before the panel. Moreover, the QSA's narrow arbitration clause does not reach any of the fraud, conspiracy and related torts, or the statutory unfair practices claims alleged in the Complaint. These wrongs, carried out to

further each defendant's independent financial interests at the expense of plaintiffs, do not arise out of the interpretation of or performance under the QSA and will not be extinguished, adjudged or remedied by any holding in the AIG Subsidiaries' Arbitration.

Neither Trenwick nor AIG Inc. can establish the necessary rights to arbitrate under the QSA or the AIG Subsidiaries Arbitration to create subject matter jurisdiction in this Court under the FAA and New York Convention. For that reason the Court should remand this action to the Massachusetts Superior Court for lack of subject matter jurisdiction.

## STATEMENT OF FACTS

This action arises against the backdrop of a set of reinsurance relationships arranged in 1997. As is typical of such relationships, risk was spread along a chain of insurers, with direct insurers ceding portions of the risk they assume to reinsurers and reinsurers ceding (technically "retroceding") portions of the risk they assume to other reinsurers (otherwise called "retrocessionaires"). In 2002, the risk chain in question (the "AIG-Risk Chain") was structured in pertinent part substantially as follows: (a) as a fronting reinsurer, Trenwick held contracts of reinsurance issued to the AIG Subsidiaries and (b) had ceded those risks 100% to one of various LDG Facilities, of which Trenwick and each of the plaintiffs were members (plaintiffs being hereafter, the "Facilities Members").

As the fronting reinsurer, Trenwick owed duties to provide specific and relevant claims information to the Facilities Members, to allow account audits by its reinsures and in general to cooperate with them on their behalf. By ceding its risks in the AIG-Risk Chain, Trenwick had rights under the QSA to receive indemnification for losses it incurred under its contracts with the AIG Subsidiaries. However, because Trenwick was required to first pay funds to resolve claims under those contracts, Trenwick's place in the chain provided the

Facilities Members with an added safeguard against invalid or fraudulent claims against the Facilities.

In the Fall of 2002, when Trenwick fell on hard financial times, AIG Inc. inserted itself into the claims resolution process to "negotiate" payment to the AIG Subsidiaries on claims submitted under the Subsidiaries' reinsurance contracts with Trenwick.  In those negotiations, AIG Inc. engaged in a pattern of evasive and deliberately obstructionist behavior calculated both (1) to avoid disclosure of unlawful practices resulting in inflated claims in the AIG Subsidiaries' workers compensation books of business, and (2) to co-opt Trenwick in the pursuit of unsupportable claims payments and a restructuring of the AIG Subsidiaries' reinsurance coverage at the expense of the plaintiffs as Facilities Members.

On June 30, 2004, Trenwick entered into an unlawful agreement executed by AIG Inc., on behalf of the AIG Subsidiaries, settling more than $81 million in fraudulently inflated and unsubstantiated claims asserted by the AIG Subsidiaries under their reinsurance contract (the "Commutation").  At the same time, Trenwick issued a non-recourse promissory note to AIG Inc., secured by an assignment to the AIG Subsidiaries of any and all of Trenwick's purported "collection rights" with respect to the inflated "paid loss" to be indemnified by the Facilities Members under the QSA.  This assignment purports to cut through the AIG-Risk Chain, reducing it by one link (Trenwick), thereby creating a direct relationship between the LDG Facilities and the AIG Subsidiaries as the primary insureds.

In the fall of 2004, when the Facilities Members resisted paying the paid losses as presented, the AIG Subsidiaries (acting through AIG Inc. in its representative capacity) initiated an arbitration against each of the plaintiffs (the "AIG Subsidiaries Arbitration").  The subject matter of that arbitration deals with the reinsurance relationship among the

parties (*e.g.,* do the Facility Members, as retrocessionaires to the AIG Subsidiary Contracts, owe money to the AIG Subsidiaries).

The subject matter of this litigation does not address the reinsurance relationship, but rather the manner, means and motivation with which AIG, Inc. colluded with Trenwick to remove Trenwick from the reinsurance risk chain.

It is clear that Trenwick benefited individually and directly from the Commutation. It exchanged approximately $130 million in claims asserted by AIG Subsidiaries for a non-recourse promissory note and a small "cash" payment, while avoiding any costs incurred with further claims handling obligations under its reinsurance contracts.

There are ample grounds to allege, on information and belief, that AIG Inc. engaged in the negotiation and Commutation for reasons relating to its desire to control and manipulate its own image in the public markets. AIG, Inc. is currently being investigated for such activities by the Securities and Exchange Commission and the Attorney General for the State of New York, Eliot Spitzer. In May 2005, the State of New York filed suit against American International Group, Inc. and certain of its former officers alleging that the parent company had engaged in sham insurance transactions to "give the investing public the impression that AIG had a larger cushion of reserves to pay claims that it actually did"; "[h]id losses from [AIG, Inc.'s] insurance underwriting business by converting underwriting losses to capital losses"; and "[c]reated false underwriting income." *See,* complaint in *People of the State of New York v. AIG Inc.,* attached hereto as Exhibit A. The complaint also alleges that AIG, Inc. engaged in other activities to manipulate the financial health of the company including improperly booking workers compensation insurance premiums.

Top executives of AIG, Inc. were in charge of the Commutation, including AIG Inc. Vice President for Reinsurance Christopher Milton. Consistent with other "deals" conducted by AIG Inc. as alleged in the New York State complaint, this "commutation" was designed to bolster AIG, Inc.'s bottom line and increase stock prices for the parent company. AIG, Inc. is a publicly traded company and the performance of its holdings, including that of the AIG Subsidiaries, impacts its profitability.

In this litigation, plaintiffs seek damages for all harms suffered as a result of the wrongful actions of AIG Inc. and Trenwick, and for punitive damages.

## ARGUMENT

As the removing parties, AIG Inc. and Trenwick bear the statutorily imposed burden of establishing the subject matter jurisdiction of this Court. *BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers of America, IAMAW Dist. Lodge 4*, 132 F.3d 824, 831 (1st Cir. 1997). If they cannot establish sufficient grounds for the Court's continuing exercise of authority of the matters in dispute, removal fails and the Court must remand the action to the Massachusetts Superior Court. *Restoration Pres. Masonry Inc. v. Grove Europe Ltd.,* 325 F.3d 54, 59 (1st Cir. 2003).

## I.     Defendants Cannot Establish Subject Matter Jurisdiction For This Court To Retain The Action On §205 Removal

The right of removal is entirely a creature of statute. A suit commenced in a state court must remain there unless and until good cause is shown for its transfer under an act of Congress. *Syngenta Crop Protection, Inc. v. Henson*, 537 U.S. 28, 32-33 (2002) (citations omitted). Section 203 of the FAA provides for subject matter jurisdiction only where "an

action or proceeding fall[s] under the Convention." [2]  9 U.S.C. §203.  In evaluating whether

the defendants have met this test, the requirements of the FAA must be strictly construed.

*Syngenta,* 537 U.S. 32-33.  Any doubts as to subject matter jurisdiction must be resolved in

favor of remand.  *Kingsley v. Lania,* 221 F.Supp.2d 93, 95 (D.Mass. 2002); *see also Transit*

*Casualty Co. v. Certain Underwriters At Lloyd's of London,* 119 F.3d 619, 625 (8th Cir.

1997);

A.    **The FAA Limits Subject Matter Jurisdiction To Party Actions Seeking Enforcement Of Arbitration Agreements**

To determine whether an action or proceeding "falls under the Convention" so as to

satisfy FAA §203, this Court must examine the language of the Convention itself.  *Eastern*

*Airlines, Inc. v. Floyd,* 499 U.S. 530, 534 (1991) (the "obvious starting point" in construing a

treaty is its text); *Czarina, LLC v. W.F. Poe Syndicate,* 358 F.3d 1286, 1290-91 (11th Cir.

2004); *McCreary Tire & Rubber Co. v. Ceats,* 501 F.2d 1032, 1036 (3d Cir. 1974).  By its

terms, the New York Convention provides (1) for the recognition of certain commercial

arbitration agreements entered between international parties as (2) a predicate for the

agreement's enforcement by *the parties* to the agreement, according to the Convention's

requirements.  Thus, article II of the Convention provides that "[e]ach Contracting State shall

recognize an agreement in writing *under which the parties*[3] *undertake* to submit to arbitration

---

[2]  The Convention was ratified by the United States in 1970 and is incorporated into the terms FAA at Section 201.  9 U.S.C. § 201; *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 520 n.15 (1974).

[3]  Any attempt by AIG Inc. to pierce its own corporate veil in order to assert individual rights by reason of its representative actions should be rejected.  As set forth in detail in plaintiffs briefing in support of remand, AIG Inc. is a highly sophisticated holding company with more than 200 subsidiaries.  It has organized itself in this fashion to enjoy various legal benefits and should not be allowed to disregard the corporate distinctions when it sees fit.  Indeed, the public record is replete with examples of AIG Inc.'s reliance

all or any differences which have arisen or may arise between them in respect to a defined

legal relationship. ..."   Convention art. II(1) (emphasis added).

The Convention provides for only two causes of action:  (1) an action to compel

arbitration pursuant to article II of the Convention, and (2) an action to enforce arbitration

awards pursuant to articles III and IV.  9 U.S.C. §§ 206 & 207, respectively; *Czarina, LLC v.*

*W.F. Poe Syndicate,* 358 F.3d 1286, 1290-91 (11th Cir. 2004); *Int'l Shipping Co., S.A. v.*

*Hydra Offshore, Inc.,* 675 F. Supp. 146, 153 (S.D.N.Y. 1987) ("actions covered by the

convention are those in which the party invoking the Convention seeks either the recognition

of an action in an action to compel arbitration or the enforcement of an arbitral award"); *aff'd*

875 F.2d 388, 391 n.5 (2d Cir. 1989) (*"Hydra II"*).  In addition, to the two causes of action

found in the language of the treaty, some courts have extended the mandatory stay provisions

of the FAA domestic provisions into the international realm to create a third cause of action.

9 U.S.C. §3; *In re Talbott Big Foot, Inc.,* 887 F.2d 611, 614 n.3 (5th Cir. 1989); *Chloe Z.*

*Fishing Co., Inc. v. Odyssey Re (London) Ltd.,* 109 F. Supp. 1236, 1242, 1261 (S.D. Calif.

2000); *but see McCreary Tire & Rubber Co.,* 501 F.2d at 1037 (proper remedy in a

---

on the corporate veil to avoid liability.  *See, e.g., QST Environmental Inc. v. OHM Remediation Services Corp.*, 2000 WL 1513714 (D.N.H. 2000) (recognizing corporate separateness of members of the AIG, Inc. family); *United States v. American International Group, Inc.*, 1997 WL  66786 (S.D.N.Y. 1997) (same).  *See also* Brief for Appellants National Union Fire Insurance Co. of Pittsburgh, PA, and American International Group, Inc. filed with the Superior Court of Pennsylvania, 2002 WL 32781886, *10, *20-*21 ("It is undisputed in this case that AIG and National Union are separate corporate entitities."); Brief for Defendants-Respondents American International Specialty Lines Insurance Co., American International Group, Inc., Sedgwick James of Pennsylvania, Inc. and Daniel P. Allen filed with the Supreme Court of New York, 2001 WL 34687146, *62-*64("The mere assertion that a corporate parent *was or is involved* in the decision-making process of its subsidiary, or that it controlled the legitimate policies of its subsidiary, will not suffice to shift liabilities among otherwise distinct corporate entities.").

Convention case is to refer the parties to arbitration and dismiss for lack of subject matter jurisdiction).

The Convention sets a common pre-requisite for each of the causes of action: the party bringing the action and invoking the jurisdiction of the Court under the FAA must be a party to the written arbitration agreement. *See,* New York Convention art. II (the right to compel arbitration arises only "in a matter in respect of which the parties have made an agreement [to submit the differences arising between them to arbitration]," and then only "at the request of one of the parties."); arts. III and IV (party seeking enforcement of arbitral awards must supply duly authenticated award and original agreement among the parties to arbitrate). These limits to standing are recognized and enforced by the courts. *See, e.g., Czarina,* 358 F.3d at 1291 (denying motion to enforce an arbitration award for lack of subject matter jurisdiction where party failed to provide proof of written arbitration agreement with the other party); *Sarhank Grp. v. Oracle Corp.,* 404 F.3d 657, 662-63 (2d Cir. 2005) (reversing enforcement of an arbitration award where proof of parties' agreement to arbitrate insufficient). Further, those courts recognizing actions for mandatory stays have limited standing to only those parties to the actual arbitration agreement invoked. *Sierra Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co., Inc.,* 339 F.2d 440 (2d Cir. 1964); *In re Talbott,* 887 F.2d at 614 (mandatory stay provisions of FAA does not apply to those not contractually bound by arbitration agreement); *cf. In re Montauk Oil Transportation Corp.,* 859 F. Supp. 669, 677 (S.D.N.Y. 1994) (FAA inapplicable where stay sought was against a plaintiff not a party to the arbitration agreement).

Subject matter jurisdiction is not granted in a vacuum. It speaks to the Court's authority to enter orders and render decisions in an actual controversy between the parties

before it. *See, The Fair v. Kohler Die & Specialty Co.,* 228 U.S. 22, 25 (1913). Here

defendants urge the Court assert subject matter jurisdiction under the FAA. Yet defendants

have no standing to assert a cause of action or seek any remedy under that statute. *Hydra II,*

875 F.2d at 391 n.5 (district court appropriately rejected contention that jurisdiction could be

premised on the New York Convention where the party invoking its provisions did not seek

to bring any of the actions recognized thereunder), *cert. denied* 493 U.S. 1003 (1989).

Defendants have not and cannot meet their burden under FAA §203. Federal subject

matter jurisdiction is lacking here because the parties named in this litigation have not

entered an agreement to arbitrate their dispute. Nothing in the terms of the Convention

authorizes the application of its recognition and enforcement provisions to disputes among

parties that have not undertaken to arbitrate with each other.

### B.   Defendants Cannot Establish Standing To Arbitrate Under Binding First Circuit Precedent

In their respective opposition briefs, Defendants AIG Inc. and Trenwick argue that

arbitrability is not a threshold requirement for sustaining subject matter jurisdiction under the

FAA. TWK Opp. at 4; AIG Inc, Opp. at 3-4. In fact, however, whether a party has standing

to invoke the powers of the Court under FAA §203 is a threshold question of arbitrability and

thus must be determined by this Court. *First Options of Chicago v. Kaplan,* 514 U.S. 938,

944 (1995).

Defendants try to argue that this Court has subject matter jurisdiction under FAA

§ 205 because the "subject matter" of the litigation "relates to an arbitration agreement ...

falling under" the New York Convention. TWK Opp. at 7; AIG Inc. Opp. at 11-12. Each

defendant cites variously the AIG Subsidiaries Arbitration, the arbitration demand sent by

AIG Inc. as an agent *on behalf of* its member and associated companies, the preliminary

response letter of the Plaintiffs to the demand, and finally the QSA.  TWK Opp. at 7; AIG Inc. Opp. at 3, 12-13.  Yet neither Trenwick nor AIG Inc. is a real-party-in-interest to any of the arbitration proceedings or the QSA.

Courts have held that FAA §203 sets a much higher bar than the defendants imply.  A specific party must have standing to initiate an action to enforce a particular arbitration agreement before a court can properly take subject matter jurisdiction.  As set forth in Plaintiffs' Memorandum in Support of Remand, in the First Circuit the issue is decided on "first principles":   "Arbitration is a matter of contract"; "of consent not compulsion." *Intergen v. Grina,* 344 F.3d 134, 142 (1st Cir. 2003); *EEOC v. Waffle House,* 534 U.S. 279, 293 (2002).  Further, "[i]t goes without saying that a contract cannot bind a nonparty." *Waffle House,* 534 U.S. at 293.

The threshold issue of arbitrability under the FAA is well recognized under First Circuit law.  *See, e.g., Restoration Pres. Masonry Inc. v. Grove Europe Ltd.,* 325 F.3d 54, 63 (1st Cir. 2003).(affirming remand of FAA §205 removal for lack of subject matter jurisdiction where removing defendant had waived right to arbitrate under agreement); *Menorah Ins. Co. v. INX Ins.,* 72 F.3d 218, 223 n.9 (1st Cir. 1995) (same); *cf. Intergen,* 344 F.3d at 141, 142-144,1 150 (determining arbitrability on appeal before returning matter to district court for resolution on remand consistent with opinion).  Difficult jurisdiction issues can be deferred when the matter can be resolved upon entry of a final ruling that the defendants have no right to arbitrate.  *Restoration,* 325 F.3d at 58-59 (distinguishing jurisdiction analysis of Fifth Circuit in *Beiser v. Ibolya Weyler,* 284 F.3d 665 (5th Cir. 2002)).

13

For the purposes of this motion, the First Circuit's holding in *Intergen* is binding precedent and on point. There, as here, the defendant removed the case from the Massachusetts state courts under FAA §205 on grounds that the matter in litigation "relate[d] to an arbitration agreement." On review, the Appellate Court upheld the Trial Court's denial on motion to compel arbitration, but not on the Trial Court's grounds of lack of authority to enforce an international forum. Rather, the Appellate Court meticulously reviewed and rejected various theories of third-party standing before finding that the parties to the litigation were not bound by any agreement to arbitrate with each other.[4]  *Id.* at 142. In light of that finding, the First Circuit returned the case to the district court with the following guidance:

> "Since InterGen's motion to remand the action to the state court implicates the district court's subject matter jurisdiction, we instruct the court, as the first order of business, to revisit the issue."

*Id.* at 150.

The First Circuit is not alone in recognizing that the lack of an arbitration agreement among the litigating parties deprives the court of subject matter jurisdiction under the FAA. *See, e.g., Severonickel v. Gaston Reymenants,* 115 F.3d 265, 268-69 (4th Cir. 1997); *Transit Casualty Co. v. Certain Underwriters at Lloyd's of London,* 119 F.3d 619, 625 (8th Cir. 1997); *Czarina, LLC v. W.F. Poe Syndicate,* 358 F.3d 1286, 1294 (11th Cir. 2004) (court

---

[4]  Defendants strain to distinguish the clear implications of the *Intergen* holding for their own case on the specious grounds that none of the parties to that litigation was a signatory to the relied-upon arbitration agreement. AIG Inc. Opp. at 17 n.11. This is a distinction without meaning. As the relevant test established by the First Circuit Court of Appeals makes clear, the removing parties (here Trenwick and AIG Inc.) must show "*both* that [each] is entitled to the [arbitration] agreements' benefits *and* that [the Facilities Members] are obligated to shoulder the burdens." 344 F.3d at 143 (emphasis added). Both elements are necessary. Failing to establish either defeats recourse to the arbitration agreement. On finding that one of the parties to the litigation was not required arbitrate, the First Circuit saw no need to inquire further as to whether the removing party had a right to demand arbitration. *Id.*

14

deprived of subject matter jurisdiction where party seeking to enforce arbitration award failed to establish agreement to arbitrate among the parties); *Bothell v. Hitachi Zosen Co.,* 97 F. Supp.2d 1048, 1053-54 (W.D. Wa. 2000) (where there is no arbitration agreement between the parties, subject matter jurisdiction cannot be properly premised on the FAA or New York Convention).

### C.    Defendants' Reliance on *Beiser* is Misplaced

In an attempt to meet their burden of establishing subject matter jurisdiction under the FAA, defendants selectively cite the Fifth Circuit case of *Beiser v. Weyler* to argue that jurisdiction may be based upon a bare allegation in removal papers that an arbitration agreement to which the party opposing remand is not a party both "fall[s] under the Convention" and is "related to" the subject matter of the litigation. AIG Inc. Opp. at 9-14; TWK Opp. at 4-8. Incredibly, both defendants assert in their opposition papers that this Court has subject matter jurisdiction over the litigation brought against them by the plaintiff Facilities Members because the Facilities Members are engaged in arbitration with companies who are not parties to the litigation.

Neither Trenwick nor AIG Inc. cites a single case on point in support of this illogical proposition. None of the cases cited in their briefs holds that third parties can rely on the arbitration agreements of others to remove a matter to federal court under FAA §205. In each case cited by defendants, at least one party removing the matter was also a party to the arbitration agreement with rights to seek its enforcement.[5]    Nor does the case law cited by

---

[5]    *See, e.g.,* cases cited by AIG Inc. in support of a "low" threshold for removal: *Jaranilla v. Megasea Maritime Ltd.,* No. 02-2048, 2002 U.S. Dist. LEXIS 16505, *4 (E.D. La. 2002) (seaman's injury claims removed to federal court by defendant ship owner and manager to enforce arbitration clause in written employment contract between parties); *See also*; *Lannes v. Operators, Int'l,* No. 04-584, 2004 U.S. Dist. LEXIS 25781, *15 (E.D. La.

them support continuing subject matter jurisdiction under the FAA where none of the parties

to the litigation is bound to arbitrate with any other party to the litigation.[6]

Moreover much of the case law cited by the defendants predates subsequent emphatic

rulings by United States Supreme Court that a party cannot be required to arbitrate a dispute

where he has not so agreed. *See, e.g., Waffle House*, 534 U.S. at 293 (2002); *First Options &*

*Chicago Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

*Beiser* is simply too thin a reed to bear the heavy weight of defendants entire

argument.[7]   284 F.3d 665 (5th Cir. 2002).   While defendants present *Beiser* as "a leading

---

2004) (removal by insurer on cross-claim involving coverage dispute under policy arbitration clause).

[6]  *See, e.g.,* cases cited in footnote 5 immediately above and cases cited by Trenwick in support of its argument that courts "routinely" take §205 jurisdiction over strangers to arbitration agreements: *CAM S.A. v. ICC Tankers, Inc.,* No. 88 Civ. 9274 (MKW), 1989 U.S. Dist. LEXIS 5066 (S.D.N.Y. May 10, 1989) (subject matter jurisdiction based on plaintiff and defendant's participation in consolidated arbitration proceeding against a common intermediary shipping agent); *Dale Metals Corp. v. Kiwa Chem Indus.,* 442 F. Supp. 70 (S.D.N.Y. 1977) (subject matter jurisdiction based on enforceable arbitration agreement between plaintiff and one of four defendants).   The single case cited where a court retained subject matter jurisdiction without having jurisdiction over the opposing parties to an arbitration agreement or an on-going arbitration involved the unique circumstance of the removing party bringing litigation against the arbitration association for wrongful conduct in overseeing an on-going arbitration proceeding in which plaintiff was a party. *York Hannover Holding A.G. v. Am. Arbitration Ass'n,* 794 F. Supp. 118 (S.D.N.Y. 1992) This case provides no guidance for the decisions before this Court.

[7]  Procedurally odd - the plaintiff rebuffed pointed questioning by the Fifth Circuit directing him to a potentially more fruitful challenge to the lower court's ruling directing him to arbitration - the case considered the subject matter jurisdiction of courts upon removal under §205 by a signatory to an arbitration agreement engaged in litigation with an agent of a signatory. *Id.* at 667-68 & n.5.   In this context, the Fifth Circuit recognized a split between the issues presented on removal and the "merits" decisive of compelling the non-signatory to arbitration, holding that subject matter jurisdiction attached at the time of the removing party's bare assertions of an "at least conceivable" theory that the agent Beiser might ultimately be bound to arbitrate. *Id.* at 670.

case" on the issue of §205 subject matter jurisdiction (AIG Inc. at 11), the opinion in fact represents only the minority position, in a split in the Circuits.[8]

AIG Inc. next endeavors to link *Beiser* with two opinions from the First Circuit deciding the "limited inquiry" as to when a case falls within the scope of the Convention for purposes of compelling arbitration under the FAA, and argues that these First Circuit decisions somehow hold that the defendants need only identify an agreement in writing arising out of a commercial relationship in which one of the parties is international. AIG Inc. Opp. at 12, *citing Dimercurio v. Sphere Drake, Inc., PLC,* 202 F.3d 71, 74 n.2 (1st Cir. 2000); *Ledee v. Ceramiche Rango,* 684 F.2d 184, 186-87 (1st Cir. 1982). AIG Inc.'s brief neglects to mention that the language of the Convention only allows the *actual parties* to the arbitration agreement to file such motions. New York Convention art. II(2).

A full reading of *Beiser* makes clear that the separation posited by the Fifth Circuit functions primarily to preserve rights to appeal that may be otherwise closed off on remand under 28 U.S.C. §1447(d). *Id.* at 672-74. Lower courts in the Fifth Circuit, upon receiving

---

[8] The Fifth Circuit is joined only by the Second Circuit in recognizing a split between considerations of subject matter jurisdiction and "merits" on motion to remand after §205 removal. *Beiser,* 284 F.3d at 670; *Sarhank Grp. v. Oracle Corp.,* 404 F.3d 657, 660 (2d Cir. 2005). The Fourth, Eighth, and Eleventh Circuits require district courts to dismisses on remands for lack of subject matter jurisdiction upon a finding that a written arbitration agreement is lacking in any action brought under Chapter 2 of the FAA. *Severonickel v. Gaston Reymenants,* 115 F.3d 265, 268-69 (4th Cir. 1997); *Transit Casualty Co. v. Certain Underwriters at Lloyd's of London,* 119 F.3d 619, 625 (8th Cir. 1997); *Czarina, LLC v. W.F. Poe Syndicate,* 358 F.3d 1286, 1294 (11th Cir. 2004).

Recent Fifth Circuit case law further call into question defendants' reliance on *Beiser,* particularly in the common circumstance of a court simultaneously granting remand and also dismissing motions for stay or to compel upon finding a defect in the arbitration agreement. *See, e.g., Dahiya v. Talmidge Int'l, Ltd.,* 371 F.3d 207, 210-211 (5th Cir. 2004) (holding *Beiser* not controlling in circumstance where denial of motions under FAA is a byproduct of the district court's granting of remand for lack of subject matter jurisdiction upon finding arbitration agreement invalid).

17

an action on removal under FAA §205, are still expected to address as a first order of business the question of whether a binding agreement to arbitrate exists, and if the court finds that such an agreement is lacking, it must still remand to the state courts. *Id.* at 674-75 (under §205, the federal issue is quickly resolved; "on a decision that the arbitration clause does not provide a defense and no other grounds for federal jurisdiction exists, the court must ordinarily remand the case back to the state court"). Similarly, the Second Circuit Court of Appeals, the only other circuit to adopt the *Beiser* analysis, held that the outcome on the "merits" should be unaffected. *Sarhank Grp. v. Oracle Corp.,* 404 F.3d 657, 660 n.2 (2d Cir. 2005) (declining to reverse its earlier rulings dismissing matter for "lack of subject matter jurisdiction" issued upon finding a written agreement to arbitrate lacking, as "it would have made no difference in the outcome if we had stated that we had jurisdiction and proceeded to address the existence of an agreement to arbitrate").

The bottom line is that in order to meet their burden of establishing the Court's federal subject matter jurisdiction, defendants must first demonstrate that they have standing to invoke rights as real-parties-in-interest under a written arbitration provision. As is set forth in detail below, defendants cannot meet this challenge, and this case must be remanded accordingly.

## II.    Neither Trenwick Nor AIG Inc. Can Invoke Rights to Arbitrate As A Real-Party-In-Interest Under the QSA

### A.    Trenwick Cannot Invoke Rights to Arbitrate Under The QSA That It Assigned To The AIG Subsidiaries

Trenwick cannot invoke the arbitration clause in the QSA to obtain standing in the AIG Subsidiaries Arbitration because it assigned away any rights it had to arbitrate with respect to the "paid losses" ceded to the LDG Facilities under the Trenwick-AIG Subsidiary Contracts. MOL on Remand at 11-12. The Arbitration is limited solely to those paid losses.

18

Trenwick's argument regarding "partial assignments" is inapposite. Whether Trenwick assigned away a part or the whole of its rights to arbitrate under the QSA, it assigned away the only part that counts for the purposes of the Arbitration between the Facilities Members and the AIG Subsidiaires.[9] In exchange for consideration, Trenwick assigned away that portion of any rights, title and interest (including rights to arbitrate) such as it ever had, with respect to the subject matter of the Commutation as it affects contract obligations and defenses under the QSA. Those rights have been taken up and exercised by Trenwick's assignees, the AIG Subsidiaries, in bringing the AIG Subsidiaries Arbitration to collect the "paid losses" from the plaintiff Facilities Members. Trenwick cannot seek to collect those amounts from the Facilities Members in arbitration (or indeed, in litigation). Trenwick is estopped from denying the legal effect of that assignment. *Intergen,* 344 F.3d at 3. Any corresponding rights, title and interest Trenwick ever had have been extinguished.

**B.    AIG Inc. Cannot Invoke the QSA Or The AIG Subsidiaries' Arbitration As A Defense To Claims Against AIG Inc. In Its Individual Capacity**

**1.    AIG Inc Did Not Acquire Rights To Arbitrate Claims Against It As a Principal By Acting As The Agent Of The AIG Subsidiaries**

In its opposition briefing, AIG Inc. freely admits that: (1) the Commutation Agreement was executed by AIG Inc., "*on behalf of its member and associated companies*" (AIG Inc. Opp. at 5); (2) the assignment of rights by Trenwick under the QSA was in favor of "AIG, Inc *on behalf of its member and associated companies*" (*Id.* at 6); and (3) "AIG Inc

---

[9] Trenwick makes a further nonsensical argument that "if the roles were reversed and if Trenwick were bringing a claim against the Pool Members" it could not argue those claims were not subject to arbitration. Were Trenwick to bring such a claim with respect to matters having to do with the AIG Subsidiaries' reinsurance claims qua "paid losses," the defense would not be that the claims should be referred to arbitration, but rather that Trenwick lacked any standing to bring the claims at all, having assigned away all its rights, title and interests related thereto.

is not arbitrating the claims before the Panel on its own behalf, but is doing so *on behalf of its member and associated companies*." *Id.* at 8 (emphasis added).

It is black letter law that a person or entity signing a contract in a representational capacity, and unambiguously indicating that fact on the face of the contract documents, does not thereby become a party to the agreement. *McCarthy v. Azure,* 22 F.3d 351, 356 (1st Cir. 1994). Thus, by its own repeated admissions, AIG Inc. acted wholly in a representational capacity, in executing the Commutation, taking assignment of the Trenwick collection rights, and arbitrating claims before the AIG Subsidiaries Arbitration Panel and has acquired no legal rights in its individual capacity with respect to these contractual arrangements and proceedings. *Id.* In particular, the law is clear that, in acting in a representative capacity on behalf of the AIG Subsidiaries, AIG Inc. acquired no rights to compel or otherwise invoke the arbitration clause in the QSA for the resolution of claims brought against AIG Inc. in its individual capacity. *Id.*

The First Circuit holding in *McCarthy* is directly on point. In that case, the defendant, a corporate officer acting in his official capacity, negotiated and signed a purchase agreement on behalf of his corporate employer. The agreement contained an arbitration clause. When the transaction went sour, the seller sued the officer in his individual capacity for, *inter alia,* fraud, intentional infliction of emotional distress and tortious interference with contractual relationships. When the officer sought to compel arbitration of the dispute under the purchase agreement, the court denied his motion on grounds he was neither a party to the agreement nor entitled to invoke its provisions on his own behalf. *Id.*

As the *McCarthy* court observed, the fact that a cause of action is brought against a party it its individual capacity, as opposed to its representative capacity, "is no mere semantic

quibble," but rather "a distinction that portends a meaningful legal difference." *Id.* at 359, 360. While representative negotiations can give rise to liability of the representative in its individual capacity, standing to arbitrate is not transferred to the individual. When such claims are asserted, the suit proceeds in court against the individual or entity and not the group on whose behalf the contract is entered. *Id.* at 359.

Here the plaintiffs assert claims against AIG Inc. solely in its individual capacity, not in its representative capacity. As a result, AIG Inc. cannot invoke the arbitration clause of the QSA.

### 2. AIG Inc. Cannot Acquire Standing To Arbitrate Under QSA By Equitable Estoppel

AIG Inc.'s efforts to obtain standing to arbitrate under the QSA by equitable estoppel must also fail. Courts set a high standard for determining when a third-party such as AIG Inc. can invoke the arbitration provisions of a contract to which it is not a signatory. Central to that analysis is a finding that "the totality of the evidence supports an objective intention [on the part of the contract parties] to agree to arbitrate" in the circumstance. *Sarhank Group v. Oracle Corp.,* 404 F.3d 657, 662 (2d Cir. 2005); *Intergen,* 344 F.3d at 147 (law requires "special clarity" that the contracting parties intended to confer a benefit on a third party). The QSA neither mentions nor implies any intent of the parties to confer legal rights either specifically upon AIG Inc. or in general upon parent holding companies of the parties.

Moreover, AIG Inc. grossly overstates the degree to which the tort claims asserted in the litigation are "intertwined with" the contract issues before the arbitration panel in the AIG Subsidiaries Arbitration. In its efforts to bring the claims against it within the confines of the AIG Subsidiaries Arbitration, AIG Inc. baldly asserts: "Pool Members cannot challenge that AIG Inc. was acting on behalf of its member and associated companies in connection with

the Pool Commutation." AIG Inc. Opp. at 19. In fact, the Facilities Members do challenge this assertion. As the developing public record of AIG Inc. activities throughout the relevant period makes clear, AIG Inc. had an ample individual interest in manipulating the numbers coming into its balance sheet from its various subsidiaries and group operations. That record provides substantial grounds for alleging that AIG Inc., through the efforts of its senior management, set upon a scheme to acquire assets from the Facility Members for the AIG Subsidiaries to improve the AIG Group's balance sheet performance. *See* Complaint in *People of New York v. AIG.* Such facts clearly distinguish the circumstances here from the fact pattern in *Gulf Guaranty Life Inc. Co. v. Connecticut General Life Ins. Co.,* 957 F. Supp. 839 (S.D. Miss. 1997) on which defendant AIG Inc. relies. 957 F. Supp. 839 (S.D. Miss. 1997) (dispute with respect to payment of claim handled by defendant on behalf of underlying insurer).

**III.    The QSA's Narrow Arbitration Clause Does Not Reach Fraud**

Even if this Court were to find that AIG Inc. and Trenwick have met their burden in showing themselves to possess rights as real-parties-in-interest to invoke the QSA arbitration clause, the QSA's narrow clause does not cover the fraud, conspiracy and related tort claims asserted in the Complaint.[10] *Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F. Supp. 853, 872 (D.N.J. 1992) (clause substantially identical to that in the QSA held too "narrow" to reach tort claims).

AIG Inc. and Trenwick attack the opinion in *Zimmerman* as "unclear and flawed." AIG Inc. Opp. at 24. But they provide little of substance to advance that position.

_____

[10] For a detailed discussion of the holdings in *Zimmerman,* see plaintiffs brief in support of remand at 16-19.

*Zimmerman* remains the only case cited that actually interprets the arbitration clause found in the QSA.  In contrast, defendants continue to rely on cherry picking words and phrases out of other contracts embedded in other contracts, often from totally unrelated circumstances.  The effect is no more than to illustrate all the ways the drafters of the QSA could have drafted a broad arbitration clause had they been so inclined.  Moreover, the bulk of the cases cited by AIG Inc. continue to post-date the drafting of the QSA by years and do little to shed any light on the intention of the parties in entering the particular arbitration provision found therein.  By contast, *Zimmerman* was a published opinion reported in the industry press and available to counsel at the time the relevant provisions were being drafted.

Moreover, other than to suggest broadly that rulings in the AIG Subsidiaries Arbitration as to the "validity" of the reinsurance receivables assigned by Trenwick pursuant to the Commutation will somehow resolve the plaintiffs claims against Trenwich and AIG Inc. (AIG Inc. Opp. at 4), defendants do not address the fact that the Facility Members' "rights of action" do not "arise under" the QSA and thus are not arbitrable under the QSA arbitration clause.  As the *Zimmerman* court found in similar circumstances, the focus of proof for the claims in this litigation will not be on the terms of the QSA, but rather on defendants' concealment, deception, "intent and conduct as part of [a] complex scheme to enrich themselves to the detriment of the ...Pool Members."  *Zimmerman*, 783 F. Supp. at 872-73.

Indeed, defendants reserve their arguments with respect to the arbitrability of specific claims to facile observations rooted in their studied indifference to who is, and who is not, a real-party-in-interest in the AIG Subsidiaries Arbitration.  Thus, for example, Trenwick argues that the reasoning of the *Zimmerman* court "supports Trenwick's entitlement to

arbitration" because Trenwick contracted with the Facilities Members under the QSA. TWK Opp. at 13. Leaving aside whether Trenwick's characterization of the *Zimmerman* holding as being one principally of determining who was and who was not a party to the relevant management agreement, Trenwick's argument ignores entirely the fact that the AIG Subsidiaries are the principle protagonist in the arbitration by assignment of Trenwick's rights. Similarly, AIG Inc. ignores the legal implications of acting in its representative capacity to repeatedly suggest to this Court that there is no distinction between challenges to the rights and obligations of the AIG Subsidiaries as assignees under the Commutation (currently before the panel in arbitration) and challenges to the standing of AIG Inc. to invoke the arbitration clause of the QSA in its individual capacity when it is not now and has never been a party to that agreement.[11] *See, e.g.,* AIG Inc. Opp. at 10 n.5, and 15.

---------------------------------

[11] Other examples include AIG Inc.'s similarly muddled arguments that the Facilities Members have conceded the existence of an enforceable agreement to arbitrate as to AIG Inc. in its individual capacity by proceeding to arbitration against the AIG Subsidiaries under the QSA. AIG Inc. Opp at 13. These arguments are often accompanied by reference to the Facilities Members initial response to the AIG Subsidiaries' arbitration demand, which indicated the plaintiffs would raise claims against AIG Inc. before any arbitration panel. *Id.* As AIG Inc. well knows, the operative document as to what is before the panel in the AIG Subsidiaries Arbitration is not the response to the demand, but the Facility Member's Preliminary Statement filed with the Panel at the initiation of proceedings, which states:

> In the arbitration, the Facility Members will only present claims arising out of the "interpretation, application or effect" of the Quota Share Agreements as provided in the narrowly drafted wording of the Arbitration Clause of the Quota Share Agreements. Although AIG and Trenwick have deliberately acted in a tortuous manner with intent to cause harm to the Facility Members, those claims are beyond the scope of the narrow arbitration language in the Quota Share Agreements. Therefore, the Facility Members have filed a complaint against AIG and Trenwick based on their actions. The Facility Members intend to only address those issues in the arbitration that are related to the duties and responsibilities of the parties under the Quota Share Agreements.

24

A review of the claims actually asserted by plaintiffs in this litigation demonstrates that when contrasted with the narrow scope proposed for the AIG Subsidiaries Arbitration[12] the litigation diverges substantially from the issues before the Arbitration panel. Where the issues presented in the arbitration deal with the reinsurance relationship among the parties - e.g., do the Facility Members, as retrocessionaires to the AIG Subsidiary Contracts, owe money to the AIG Subsidiaries - the issues presented in the litigation deal substantially with the manner, means and motivation with which AIG, Inc. colluded with Trenwick to remove Trenwick from the reinsurance risk chain. These latter issues will not be determined by a decision coming out of the issues before the Arbitration Panel. An award in the Arbitration against the AIG Subsidiaries, denying the collection rights under the QSA will not require the Panel to reach issues of AIG Inc. and Trenwick's individual culpability or liability. Nor will the Panel consider the unfair business practices that form the substance of the plaintiffs' statutory G.L. c. 93A §11 claims. More recent revelations regarding the scope of AIG Inc.'s fraudulent activities with respect to the manipulation of subsidiary accounts clearly shows that the scope of the AIG Subsidiary Arbitration would be required to increase exponentially to reach issues central to plaintiffs' claims in this litigation.

---

Preliminary Statement 11-12. The principle that later-filed pleadings and equivalents supersede earlier statements of position for purposes of arguments regarding arbitrability is established in First Circuit law. *See, e.g., Intergin,* 344 F.3d at 144-45 (defendants' repeated references to allegations of complaint superseded by subsequent amended complaint unavailing).

[12] Copies of the position statements of the parties to the AIG Subsidiaries Arbitration can be found attached to the Schreckinger Affidavit in support of remand at Tabs 3 and 9.

## IV.    Defendants Are Not Entitled To A Mandatory Stay Of Proceedings

Defendants cannot meet their statutorily imposed burden of establishing rights to invoke the FAA as parties to a written arbitration agreement or as real-parties-in interest to the AIG Subsidiaries Arbitration.  For this reason, neither AIG Inc. nor Trenwick has standing to move for a mandatory stay of these proceedings under FAA §3.  *Sierra Nederlandse*, 339 F.2d at 441 (2d Cir. 1964); *In re Talbott Big Foot, Inc.* 887 F.2d at 614. The law is equally clear that because AIG Inc. and Trenwick are not entitled under the FAA to invoke the statute's mandatory stay provisions to enforce arbitration provisions of the QSA with respect to the arbitration between the plaintiff Facility Members and a third party, the AIG Subsidiaries.  339 F.2d at 441 (stay cannot be justified where defendants are not parties to the arbitration agreement and cannot themselves be referred to arbitration).

Moreover, having failed to establish the requisite federal subject matter jurisdiction of this Court, defendants cannot invoke the powers of this Court outside the FAA to grant a discretionary stay.  Nor would such an exercise of power be appropriate.  As one court held when confronted with a similar request:  [t]he purpose of the FAA is "to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219 (1985).  This goal is not enhanced by forcing a litigant that has not agreed to arbitrate with the defendant to delay the prosecution of its claims." *In re Montauk,* 859 F. Supp. at 677 (Woods, J).

## CONCLUSION

Defendants have not and cannot meet their burden of establishing the federal subject matter jurisdiction of this Court pursuant to 9 U.S.C. §203 or under the controlling law of the First Circuit. *Restoration,* 325 F.3d at 60; *Intergen,* 344 F.3d at 143.  Plaintiffs respectfully request this Court summarily deny each defendant's motion to stay these proceedings and

remand this action to the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session.

                                        Respectfully submitted,


                                        /s/ Steven L. Schreckinger
                                        Steven L. Schreckinger (BBO #447100)
                                        Lynch Brewer Hoffman & Fink LLP
                                        101 Federal Street, 22nd Floor
                                        Boston, MA  02199-7613
                                        (617) 951-0800

                                        Joseph T. McCullough IV
                                        Robin C. Dusek
                                        Lovells
                                        One IBM Plaza
                                        Suite 1900
                                        Chicago, IL  60611
                                        (312) 832-4400

                                        Kathy L. McFarland
                                        Lovells
                                        900 Third Avenue
                                        New York, NY  10022
                                        (212) 909-0600

Dated:  December 14, 2005

          I hereby certify that I caused a true copy of the above document
          to be served on the attorney of record for each other party by
          electronic means on December 14, 2005.

                    /s/ Steven L. Schreckinger
                    Steven L. Schreckinger

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK,
by ELIOT SPITZER, Attorney General of
the State of New York, and HOWARD MILLS,
Superintendent of Insurance of the State
of New York,

|  |  |
|---|---|
| Plaintiffs, | Index No. : |
| -against- | SUMMONS |

AMERICAN INTERNATIONAL GROUP, INC.,
MAURICE R. GREENBERG and
HOWARD I. SMITH,

|  |  |
|---|---|
|  | Plaintiff Designates |
|  | New York County as |
| Defendants. | the Place of Trial |

---------------------------------------------------------------------------X

TO THE ABOVE-NAMED DEFENDANTS:

        YOU ARE HEREBY SUMMONED to answer in this action and serve a copy of your

answer, or if the complaint is not served with the summons to serve a notice of appearance, on the

Plaintiffs' attorney within twenty (20) days after the service of this summons, exclusive of the day of

service. If this summons is not personally served upon you, or if this summons is served upon you

outside of the State of New York, then your answer or notice of appearance must be served within

thirty (30) days.  In case of your failure to appear or answer, judgment will be taken against you by

default, for the relief demanded in the complaint.

Filed:  May 26, 2005
       New York, New York

:

                               ELIOT SPITZER
                               Attorney General of the
                               State of New York
                               Attorney for Plaintiffs
                               By: _____
                               David D. Brown, IV
                               Assistant Attorney General
                               120 Broadway - 23rd Floor
                               New York, NY 10271
                               (212) 416-8198

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK    :
by ELIOT SPITZER, Attorney General of    :
the State of New York, and HOWARD MILLS,    :
Superintendent of Insurance of the State of    :
New York,    :
    :
                Plaintiffs,    :    **COMPLAINT**
    :
        -against-    :    Index No.
    :
    :
AMERICAN INTERNATIONAL GROUP, INC.,    :
MAURICE R. GREENBERG and    :
HOWARD I. SMITH,    :
    :
              Defendants.    :
-------------------------------------------------------------X

        1.    Plaintiffs, the State of New York, by Eliot Spitzer, Attorney General of the

State of New York ("Attorney General"), and Howard Mills, Superintendent of Insurance, allege

upon information and belief, that:

<div align="center">**PRELIMINARY STATEMENT**</div>

        2.    American International Group, Inc. ("AIG") is the world's largest

commercial insurance company. For 2004 it reported net income of more than $11 billion on

revenues of nearly $100 billion. It has approximately 93,000 employees in 130 countries. For 38

years, AIG was run by defendant Maurice R. Greenberg ("Greenberg"), also known as "Hank"

or, in internal AIG documents, as "MRG."

        3.    Between the 1980s (if not earlier) and Greenberg's departure from AIG in

2005, the defendants routinely engaged in misleading accounting and financial reporting,

projecting an unduly positive picture of AIG's underwriting performance for the investing public. As part of this effort, defendants:

- Engaged in at least two sham insurance transactions to give the investing public the impression that AIG had a larger cushion of reserves to pay claims than it actually did – transactions that Greenberg personally proposed and negotiated in phone calls with the then CEO of General Reinsurance Corporation, Inc. ("GenRe");

- Hid losses from its insurance underwriting business by converting underwriting losses to capital losses; and

- Created false underwriting income – a scheme personally approved by Greenberg and defendant Howard I. Smith ("Smith") that involved falsely reporting the income from the purchase of life insurance policies as underwriting income.

4.    Each of these fraudulent schemes misled the investing public as to the true state of AIG's business.

5.    When asked about certain of these transactions under oath, Greenberg and Smith repeatedly refused to answer on the grounds that their testimony would tend to incriminate them.

6.    Both Greenberg and Smith had a direct personal interest in AIG's stock price; both held hundreds of thousands of shares of AIG stock. For example, the value of Greenberg's holdings increased or decreased approximately $65 million for every dollar AIG stock moved.

7.    Greenberg was intensely focused on the daily movement of AIG's stock price, and he repeatedly directed AIG traders to aggressively purchase AIG stock for the purpose of propping up its price. For example, on February 3, 2005, two days after AIG announced that

2

natural disasters would create $200 million of underwriting losses in AIG's fourth quarter 2004 earnings, Greenberg called one of AIG's traders, ordered him to buy stock with the company's money, and directed: "I don't want the stock below $66 so keep buying." When the trader asked whether there was any limit to the number of shares Greenberg wanted him to buy, Greenberg replied: "If you have to go to half a million [shares], go to half a million." On Friday, February 18, 2005, four days after AIG had publicly announced its receipt of a subpoena from this office, Greenberg called the AIG trading desk from his private jet. AIG's shares were down, and Greenberg told the trader to buy up to 250,000 shares. When Greenberg called back, the trader had only purchased 25,000 shares. "I want you to be a little bit more aggressive," Greenberg said. "If you have to go up to half a million shares, go up to half a million shares," he added. Greenberg called back again as the market was closing, urging the trader to keep buying even after the 3:50 pm cut-off for company buybacks, designed in part to prevent issuers from "marking the close" in their own stock: "[Y]ou can keep buying a little more stock, it's alright. I wanna push it up a little bit if we can."

8.     In addition, for decades AIG deliberately booked workers compensation insurance premiums as regular liability insurance revenue. This practice had the potential to reduce AIG's contributions to state workers compensation systems and avoid paying state taxes on those premiums.

9.     And, AIG repeatedly deceived the New York State Insurance Department and other state regulators about its relationships with several offshore affiliate reinsurers. In the wake of this office's investigation, Greenberg's "Assistant to the Chairman, Director: Foreign

3

Companies," L. Michael Murphy ("Murphy"), ordered the destruction of documents relating to one of those offshore affiliates.

## PARTIES

10.     This action is brought by the Attorney General on behalf of the People of the State of New York based upon his authority under Article 23-A of the General Business Law, § 63(12) of the Executive Law and the common law of the State of New York, and by Howard Mills, Superintendent of Insurance of the State of New York upon his authority under Insurance Law §§ 201 and 327.

11.     Defendant AIG is a Delaware Corporation with its principal place of business in New York County, New York.

12.     Defendant Greenberg is an individual residing in New York State. Until recently, Greenberg was the Chairman and Chief Executive Officer of AIG.

13.     Defendant Smith is an individual residing in New York State. Until recently, Smith was the Chief Financial Officer of AIG.

## JURISDICTION

14.     The State of New York has an interest in the economic health and well-being of those who reside or transact business within its borders. In addition, the State has an interest in ensuring that the marketplace for the trading of securities functions fairly with respect to all who participate or consider participating in it. The State, moreover, has an interest in upholding the rule of law generally. Defendants' conduct injured these interests.

15.     Thus, the State of New York sues in its sovereign and quasi-sovereign

4

capacities, as *parens patriae*, and pursuant to Executive Law §§ 63(1) and 63(12) and General ,
Business Law §§ 352 *et seq.* (the Martin Act). The State sues to redress injury to the State and to
its general economy and citizenry-at-large. The State seeks disgorgement, restitution, damages,
including punitive damages, and costs and equitable relief with respect to defendants' fraudulent
and otherwise unlawful conduct.

16.    The New York Insurance Department is headed by the Superintendent of
Insurance, who possesses all rights, powers and duties under the Insurance Law. Under
Insurance Law § 327, the Superintendent may seek injunctive relief against any insurer, its
officers, directors, and agents to enjoin future violations of the Insurance Law.

## FACTUAL ALLEGATIONS

### I. The Insurance Industry

17.    Insurance is fundamentally simple. Clients pay money (premiums) and, in
return, insurance companies provide coverage for losses resulting from accidents or catastrophes.
The companies try to set premiums high enough to cover all the claims that they will have to pay,
plus their expenses, and still have some money left over for profit. The business of figuring out
how much money to charge in premiums is called "underwriting."

18.    Insurance companies make money a second way as well. Premiums
generally get paid up front, but claims are paid after accidents happen. In between, insurance
companies can invest the money and derive income from their investments.

19.    An insurance company's ability to make money is the key measure of that
company's value as an investment. But *how* the insurer makes its money is critically important

5

as well. While insurance companies derive substantial revenues from investing premiums, many in the insurance industry, including defendants, consider an insurance company's ability to make money through the underwriting process the core of the insurance business and the key to understanding whether the insurance company will enjoy sustained profits in the long run. As Greenberg himself once put it, "If you don't make a profit in your basic business, which is underwriting, you won't make a profit for very long." (Crain's Business Insurance Article, September 21, 1992 )[1]

20.     The insurance business is regulated by the states. A primary purpose of such regulation is to make sure that companies are financially sound and have set aside enough of the premium money to pay claims when they come in, which can be years after the premiums were collected. The money set aside to pay claims is called "reserves" or "loss reserves."

21.     Stock market analysts sometimes look at fluctuations in an insurer's reserves as an indicator of the quality of its earnings. During a period of business growth, insurers generally report increased premium income as well as the increased reserves necessary to cover potential future claims on new policies being written. If premium income is on a steady upward trend but the reserves are not, regulators and industry analysts worry because they fear the insurer is not setting aside sufficient reserves to meet its obligations under the policies. Such under-reserving could jeopardize the insurer's long-term financial health.

22.     A downward trend in reserves during a period of premium growth may also indicate that the insurer is engaged in financial trickery to boost its profits. Insurers are

---

[1]Parenthetical citations refer to documents attached as exhibits hereto.

constantly assessing and reassessing their reserves based on actuarial projections for the

insurance they write. If claims experience on a given policy or book of policies is better than

expected during the early phases of the policy period, the insurance company might decide that it

has over-reserved and change its loss projections. The insurance company can thus legitimately

"release" some of its reserves into its income.

## II. Creating False Reserves

       23.    In late 2000, AIG's stock price dropped, a decline that analysts speculated

was based on fears that AIG's reserves were being released into income so that it could meet its

projected income numbers. To counter this perception, defendants engaged in two sham

transactions with GenRe, through which defendants hoped to create the appearance of additional

reserves and thus fraudulently support the stock price.

### A. Falling Reserves Call AIG's Earnings Into Question

       24.    On October 26, 2000, AIG issued a press release describing its financial

condition at the end of the third quarter 2000. (AIG Press Release, October 26, 2000) At the

close of market the day before, October 25, AIG's stock had traded at $99.38 per share.

Although AIG's earnings met or exceeded the expectations of Wall Street analysts, AIG's shares

dropped to $93.31 at close on October 26.

       25.    Many industry analysts attributed the drop in price to the fact that, along

with positive earnings, AIG had reported a decrease of $59 million in its total loss reserves.

Investors suspected that AIG was drawing down its loss reserves to boost its profits. For

example, on or about October 27, 2000, analyst Michael Smith wrote, "Put simply, the reduction

in reserves caused some investors to challenge the quality of the company's earnings."

(AIG/GEN-RE-TRANS 0001086)  Similarly, analyst Kenneth Zuckerberg expressed his belief

that "the downward pressure on the stock" stemmed in part from "concerns about the negative

change in P&C [Property & Casualty] loss reserves." (AIG/GEN-RE-TRANS 0001074-75)

26.     Some of the analysts who covered AIG were not so worried about that

quarter's reserve drop, but continued to express concerns about long-term loss reserve trends.

For example, industry analyst Alice Schroeder wrote:

> Reserves -- we're not concerned.  The market was disturbed by AIG's net
> reserve decrease of $59 million . . . .  Pass the popcorn, we've seen this
> movie before . . . to us this looks like a classic buying opportunity. . . . We
> do care a lot about reserves, and if we see a steady trend of unexplained
> releases during a period of premium growth, we'd definitely be concerned.
> But that's not the case here.  (AIG/GEN-RE-TRANS 0001094)

27.     On or about October 31, 2000, AIG's Vice President for Investor Relations

sent Greenberg a number of these third quarter analyst reports and noted the concern about the

decline in reserves.  (GR1_0126220)

### B. Greenberg Tackles the Reserves Problem

28.     That same day, Greenberg initiated a scheme to falsely inflate AIG's

reserves for the next two quarters. The scheme began that day when Greenberg called Ronald

Ferguson ("Ferguson"), President of GenRe.  In that phone call, Greenberg suggested that GenRe

purchase up to $500 million in reinsurance from AIG because he wanted AIG to show increased

reserves.  But, in the same conversation, Greenberg also said that he wanted the deal to be risk-

free.  A riskless transaction that creates reserves is nonsensical.  An insurer can properly generate

and record reserves only if it is taking on genuine risk that there may be claims that would

8

require future payment. Greenberg wanted AIG to be able to book hundreds of millions of dollars in reserves from GenRe, but he did not want there to be any risk that AIG would actually have to pay any claims.

29.     Mentioning a concern about analysts, Greenberg told Ferguson that the deal only needed to last for six to nine months. Ferguson said that this proposed transaction would be highly unusual for GenRe, which was in the business of selling reinsurance, not buying it. Accordingly, Greenberg and Ferguson discussed the possibility that AIG would pay a fee to GenRe. Finally, Greenberg told Ferguson that Christian Milton ("Milton"), Vice President of Reinsurance, would be the contact at AIG for the deal.

30.     Over the next two weeks, Greenberg's proposal was refined in a series of conversations between Milton and GenRe personnel. It was agreed that the deal would be extended to a 24-month term from the original term proposed by Greenberg. (GR1_0126378)

31.     On or about November 17, 2000, Greenberg called Ferguson to discuss the deal. Ferguson told Greenberg that he thought they had put together a structure that would accomplish Greenberg's objectives. They also discussed the fact that AIG would "not bear real risk" in the transaction, and that, in the end, AIG would pay GenRe a $5 million fee. (GR1_0126232) Greenberg told Ferguson that defendant Smith and Milton would handle the transaction on AIG's end. Later that day, a GenRe employee emailed Milton at AIG to provide details of the proposed transaction, along with a draft contract. (GR1_0126245-51)

32.     Ultimately, AIG's subsidiary, National Union, and GenRe's subsidiary, Cologne Re of Dublin, entered into two contracts. In form, GenRe was to pay a total of $500

9

million to AIG, and AIG was to provide $600 million of reinsurance coverage. (GR1_0126257.) As a consequence of this fiction, AIG would be able to show reserves of $500 million in accordance with Greenberg's original design. (GR1 0126113-33) The first of the sham contracts would allow AIG to book $250 million of reserves in the fourth quarter of 2000, and the second sham contract would allow AIG to book another $250 million of reserves in the first quarter of 2001. In fact, GenRe did not pay premiums. And in fact, AIG did not reinsure genuine risk. To the contrary, AIG paid GenRe $5 million, and the only genuine service performed by either party was that GenRe created false and misleading documentation to satisfy Greenberg's illicit goals.

33.    Even the $10 million that GenRe actually paid ultimately was secretly paid back, along with the $5 million fee. All this was accomplished a year later by entering into a convoluted series of transactions involving an AIG subsidiary which accepted $15 million less than it was owed in an entirely unrelated deal with GenRe, yielding GenRe's $5 million fee.

34.    To cover up this scheme, AIG and GenRe created additional false documents, making it appear that GenRe had approached AIG and asked to buy reinsurance. On or about December 20, 2000, John Houldsworth, the then CEO of Cologne Re Dublin, had a subordinate send an email to Milton at AIG. (AIG/GEN-RE-TRANS 00000134-42; 00000203-10)  The email attached a draft term sheet for the AIG-GenRe transaction as well as a draft letter from Houldsworth to Milton. Finally, on December 27, 2000, Houldsworth emailed Milton another unsigned letter embellishing the fiction further: "We are encouraged that you believe AIG will be able to provide us with cover for approximately 50% of what we originally had in mind."  (AIG/GEN-RE-TRANS 00000130-32)

35.    The entire AIG-GenRe transaction was a fraud.  It was explicitly designed by Greenberg from the beginning to create no risk for either party – AIG never even created an underwriting file in connection with the deal.  Indeed, the true nature of the deal is clear if one follows the money:  AIG paid GenRe $5 million for the deal – exactly the opposite of what would happen if AIG were actually taking on potential liabilities from GenRe.  AIG admitted in March of this year that "the Gen Re transaction documentation was improper and, in light of the lack of evidence of risk transfer, these transactions should not have been recorded as insurance." (AIG Press Release, March 30, 2005)  When questioned about the AIG-GenRe transactions in early 2005, Greenberg, Smith and Milton refused to answer, on the ground that their answers would tend to incriminate them.

### C. "Topside" Reserve Adjustments

36.    The GenRe transaction was not the only way that AIG sought to boost its reserves illegally.  In a somewhat more direct scheme of similar effect, defendants made unsupported accounting entries to increase AIG's reserve levels before AIG issued its quarterly reports.

37.    At the end of each reporting quarter, AIG goes through an extensive process of consolidating the financial information from its subsidiaries.  Part of this entails making company-wide adjusting entries known as "topside" or "top level" adjustments.

38.    Defendants employed fictitious "adjustments" to create additional reserves in late 2000 and early 2001.  Smith personally directed that a number of alterations be made to the reserve numbers, instructing a subordinate named Vincent Cantwell ("Cantwell") who wrote

11

the changes down in a spiral bound notebook. Cantwell then photocopied the relevant pages ,

from his notebook and handed them to a clerk to enter into the official books and records of the

firm. After making the entries, the clerk retained copies of the photocopied pages for his records.

(Cantwell notes for the first quarter of 2001 are attached hereto.)

       39.    As a result of these terse handwritten directions, AIG reserves increased in

the fourth quarter of 2000 by approximately $32 million and in the first quarter of 2001 by

approximately $70 million. AIG reports that it has searched for documentation or analysis to

support the directions contained in the spiral notebook, and has found none. At least as far back

as the early 1990s, Smith and Cantwell made similarly unsupported changes. For quarter after

quarter, AIG's official books and records were altered on the basis of nothing more than Smith's

say so and Cantwell's handwritten sheets, with hundreds of millions of dollars shifting from

account to account.

            *     *     *

       40.    Having inflated its reserves through the artifices of both the GenRe deal

and unsupported topside adjustments, AIG announced its fraudulently enhanced reserves in the

press release that accompanied its fourth quarter 2000 results. (AIG Press Release, February 8,

2001) AIG posted a reserve increase from the prior quarter of $106 million. This deception had

the desired effect on industry analysts. On or about February 8, 2001, analyst Zuckerberg wrote,

"AIG added to loss reserves during the quarter – the net change was $106 million – a clear

positive from an earnings quality standpoint." (AIG/GEN-RE-TRANS 0000910) Similarly,

Michael Smith wrote:

In·past quarters, American International Group has received criticism from
some corners regarding what has been viewed to be a rather small increase
in loss reserves, but we believe there is little room for criticism on this
score in the most recent quarter. The company increased reserves by a
total of $106 million . . . . (AIG/GEN-RE-TRANS 0000925)

AIG also reported reserve increases in its first quarter 2001 press release. (AIG Press Release,

April 26, 2001) Again, the analyst Smith wrote positively about the reserves: "[T]he underlying

quality of general insurance results also improved, evidenced by the increase in loss reserves . . ."

(AIG/GEN-RE-TRANS 0000777-78)

41.    The investing public relied upon AIG's reported loss reserves to its

detriment and was financially damaged.

42.    Until the foregoing facts came to light in 2005, defendants concealed from

the investing public all facts that would have provided notice of their fraudulent and illegal

scheme.

## III. Disguising Underwriting Losses

43.    As noted above, Greenberg considered underwriting results to be the key

measure of AIG's success. In order to preserve AIG's image in this area, defendants participated

in two separate schemes to disguise underwriting losses. The first involved the concealment of

auto warranty insurance losses by making it falsely appear as if they were investment losses

instead. The second involved the fraudulent transformation of Brazilian life insurance losses into

investment losses.

### A. Disguising Auto Warranty Losses as Investment Losses

44.    In the mid-1990s AIG began writing auto warranties. This business

13

proved to be disastrous: by 1999, AIG's subsidiary National Union projected claims of $420

million, creating a loss of $210 million on the business. Rather than post a loss of this size and

publicly reveal AIG's underwriting misstep, defendant Smith, with the approval of defendant

Greenberg, decided to turn this loss in AIG's "basic business" into a less embarrassing

investment loss.

45.    In a December 20, 1999 memo, Smith laid out a scheme for converting the

auto warranty losses into investment losses. (The December 20, 1999 Memo is attached hereto.)

Smith directed: "Discussion of this deal should be limited to as few people as possible."

46.    On or about March 6, 2000, Smith met with other high-level AIG

executives, including Joseph Umansky ("Umansky"), and discussed how to convert the auto

warranty losses into investment losses. In testimony compelled pursuant to General Business

Law § 359 and Criminal Procedure Law § 50.20(2), Umansky has stated that Smith directed the

plan to recharacterize the losses.

47.    Umansky laid out the particulars of the plan to Greenberg and Smith in an

April 20, 2000 memo:

> Our objective was to convert an underwriting loss into a capital
> loss. The approach we devised is unique but conceptually,
> somewhat simple. AIG forms an off-shore reinsurer and reinsures
> the warranty book into that wholly-owned subsidiary. AIG then
> sells the subsidiary through a series of partial sales, thus
> recognizing a capital loss. As the warranty losses emerge they are
> recognized in this off-shore company that is not consolidated as
> part of AIG. The accounting is aggressive and there will be a
> significant amount of structuring required in order to address all
> the legal, regulatory and tax issues.

(AIG-F 0000144-45)

14

48.     In other words, the scheme was for AIG to "invest" in a shell corporation. The shell corporation would take on AIG's auto warranty losses and then fail, leaving AIG with an investment loss, instead of an embarrassing insurance underwriting failure.

49.     At Smith's direction, Umansky sought an offshore vehicle suitable for "reinsuring" the auto warranty losses. Umansky had learned that Western General Insurance Ltd. – a company with which AIG had a longstanding business relationship – planned to wind down its offshore subsidiary, CAPCO Reinsurance Company, Ltd. ("CAPCO"), a small Barbados insurance company. Smith approved Umansky's suggestion that AIG use CAPCO as the offshore vehicle for the auto warranty scheme.

50.     AIG, however, had to take control of CAPCO without appearing to do so. If AIG overtly controlled CAPCO, AIG would have to consolidate CAPCO's underwriting results on AIG's books, when the whole point was to get them off AIG's books. Under New York Insurance Law, insurance companies are presumed to "control" entities for which they own "ten percent or more of the voting securities." N.Y. Ins. Law § 1501(a)(2). Therefore, on paper, AIG needed to make it appear that someone else was running CAPCO.

51.     Consequently AIG's use of CAPCO involved several steps. First, Western General transferred almost all of the existing business and capital out of CAPCO, leaving only $200,000 in capital. (AIG/GEN-RE-TRANS 0012429) This reduced CAPCO to a shell.

52.     Second, AIG needed to find individuals who would be the nominal shareholders and mask AIG's control of CAPCO. Umansky has testified that, to find these "investors," Greenberg personally dispatched him to Switzerland to meet with AIG's private

15

bank in Zurich, which then helped select suitable non-U.S. passive investors for the deal.

53.    Third, AIG had to invest in CAPCO.  Smith authorized Bermuda-domiciled AIG subsidiary, American International Reinsurance Company ("AIRCO"), to purchase non-voting CAPCO shares for $170 million. (AIG-GEN-RE Transaction 0012457) And the three Zurich "investors" each paid $6.33 million to CAPCO for voting common shares for a total of $19 million. (AIG/GEN-RE-TRANS 0012581-86)  But the "investors" did not have to put up their own funds.  Instead, their purchases of the CAPCO securities were 100 percent financed by non-recourse loans from another AIG subsidiary, which defendants knew "in all probability" would never be repaid.  (AIG/GEN-RE-TRANS 0012456)  Thus, even if their CAPCO "investment" became worthless, the Swiss investors would incur no liability on the loans, and would suffer no losses.  (AIG/GEN-RE-TRANS 0012449)  Although the individual investors played no active management role in CAPCO, they each received a $33,000 fee for every year of their "investment" and another $33,000 payment upon its termination.

54.    John L. Marion, President of Western General, and a director of Union Excess, another of AIG's offshore affiliates, was appointed a director and served as president of CAPCO.  AIG, however, exercised complete control over CAPCO.  AIG appointed MIMS International (Barbados) Ltd. to manage CAPCO and AIG Global Investment Corp. (Ireland) Limited to handle CAPCO's investments.

55.    Umansky continued to keep Greenberg, Smith, and other senior executives apprised of CAPCO's progress.  Three months later, in a memorandum to Greenberg, Smith and others, dated November 16, 2000, Umanksy wrote:

16

> The warranty treaty (#21) is designed to cover $210 million of
> losses through a unique structure. The cash has been transferred
> into the structure and is shown on our balance sheet as assets;
> nothing has yet been charged to expense. The expectation is that as
> the losses develop and are recovered from the reinsurer, a capital
> loss will be recognized.

(AIG-D 0023603)

56.    Having set up CAPCO, AIG next needed to transfer its underwriting losses

to CAPCO. To do this, CAPCO reinsured National Union for the all but certain $210 million in

auto warranty losses, receiving a premium of only $20 million. As Umansky testified, the

transaction was designed from the beginning to lose money for CAPCO, a fact known to both

Greenberg and Smith. In or around early 2001, CAPCO began paying out on reinsurance claims

to National Union in order to cover the auto warranty losses.

57.    The scheme succeeded. On or about September 25, 2001, Umanksy

reported: "Warranty structure (Capco) is working. 2001 will be second year end. I want to close

down the structure as soon as possible." (AIG-D 0023584)

58.    CAPCO, as planned, steadily paid AIG for the incoming auto warranty

claims that it had reinsured. Also as planned, by the end of 2001, this had nearly depleted

CAPCO's assets. All that remained was for AIG – which, through its subsidiary, AIRCO, still

held CAPCO stock – to determine how to account for this now worthless investment. In the

fourth quarter of 2001, AIG sold $68 million of its shares back to CAPCO for pennies on the

dollar, realizing an enormous investment loss. Over time, AIRCO, at Smith's direction, wrote

off the balance of its interest in CAPCO as a loss.

59.    The final result of this complex series of transactions was that AIG had

moved its underwriting losses to an off-balance sheet entity where AIG investors could not see them. Instead AIG reported a far less noticeable investment loss.

60.    By 2002, CAPCO had served its purpose. The board of directors and shareholders of CAPCO voted to wind up its affairs and liquidate it. (AIG/GEN-RE-TRANS 0012581) Umanksy sent Greenberg and Smith a memorandum dated September 9, 2002, stating: "CAPCO will be liquidated by year-end. AIG contracts in CAPCO will be commuted or novated by September 30." (AIG-D –0024421)

61.    When the liquidation was complete by the end of 2002, CAPCO's few remaining assets were distributed to AIRCO, as the holder of CAPCO's preferred shares. (AIG/GEN-RE-TRANS 0012581) In a March 4, 2003 memo to Greenberg and Smith, Umansky reported: "Capco has been liquidated and the AIG contracts novated." (AIG-D 0023570)

62.    Even as defendants were executing the CAPCO plan, Umansky began to express misgivings about its propriety. In a memorandum to Greenberg and Smith dated May 22, 2002, Umansky wrote: "The Capco structure needs to be revamped in order to put us farther from criticism in today's environment." (AIG-D 0023586)

63.    In a March 30, 2005 press release, AIG admitted that its transactions with CAPCO:

> involved an improper structure created to recharacterize underwriting losses as capital losses. That structure, which consisted primarily of arrangements between subsidiaries of AIG and Capco, will require that Capco be treated as a consolidated entity in AIG's financial statements. The result of such consolidation is to recharacterize approximately $200 million of previously reported capital losses as an equal amount of underwriting losses relating to auto warranty business from 2000 through 2003.

18

(AIG Press Release, March 30, 2005)

64.    When Greenberg was asked in April 2005 about his involvement in CAPCO, he refused to answer, asserting his right not to testify under the Fifth Amendment. Umansky has testified that the transaction was improper.

65.    The investing public relied upon AIG's reported underwriting results to its detriment and was financially damaged.

66.    Until the foregoing facts came to light in 2005, defendants concealed from the investing public all facts that would have provided notice of their fraudulent and illegal scheme.

### B. Disguising Brazilian Life Insurance Losses as Investment Losses

67.    In 1999, AIG's Brazilian life insurance business had unfavorable underwriting results which were magnified by currency exchange losses occasioned by the collapse of the Brazilian *real*.  To avoid reporting these negative results, all of which would be characterized as an underwriting loss, the defendants, among others, devised a scheme to convert these Brazilian losses into investment losses.  In furtherance of this goal, AIG entered into a series of complex and fraudulent reinsurance transactions, known as Nan Shan I and Nan Shan II. Greenberg personally was apprised of the progress of both Nan Shan I and II..  As in the CAPCO scheme, the end result of Nan Shan I and II was conversion of embarrassing underwriting losses to more palatable investment losses.

### 1. Nan Shan I

68.    According to Umansky's sworn testimony, in 1999 he attended a meeting

with Smith and another AIG employee in which Smith directed Umansky to recharacterize
underwriting losses arising from Unibanco Seguros ("UNISEG"), AIG's Brazilian life insurance
business. Without such a plan, these negative results would have been recorded as underwriting
losses on the books of AIRCO, the same entity that was used to purchase CAPCO's shares in the
auto warranty scheme.

69.     The following plan was initially conceived: Union Excess, one of AIG's
off-balance sheet affiliates, would reinsure AIRCO for the already existing underwriting losses
(AIG/GEN-RE-TRANS 0013431-37), but would be made whole through a "swap" transaction
between Union Excess and AIRCO. The effect of these transactions would have been to convert
AIG's Brazilian life insurance losses to investment losses. A December 9, 1999 internal AIG
email set forth the purpose of the transaction:

> [W]e have a foreign exchange loss of $44m in our Brazilian life
> operations and we are being asked to come up with a reinsurance
> contract before the end of the year which will somehow 'cancel' out
> the loss. The source of the request is from Joe Umansky's team,
> apparently based on Howie Smith's instructions.

(AIG/GEN-RE-TRANS 0016636)

70.     This initial plan proved unworkable because Union Excess was not
licensed to reinsure life insurance. So, at Smith's direction, AIG searched for another entity
whose underwriting results would be reported on the line at AIRCO where the Brazilian losses
would have appeared. AIG identified such an entity: Nan Shan Life Insurance Company, Ltd.
("Nan Shan"), a Taiwanese AIG company, which had incurred major accident and health losses
in 1999.

71.    The new plan called for Union Excess to reinsure AIRCO for Nan Shan's losses;  then, AIRCO, in order to "compensate" Union Excess, entered into the swap transaction with Union Excess, for which AIRCO declared an investment loss.  After these machinations, AIRCO's (and therefore AIG's) Brazilian underwriting losses were converted to investment losses.

72.    Umansky testified that he briefed Greenberg and Smith on this transaction. When questioned about it in April 2005, Greenberg refused to answer, invoking his rights under the Fifth Amendment.

### 2. Nan Shan II

73.    AIG repeated this scheme in 2000 to convert more underwriting losses into investment losses.

74.    On or about March 9, 2000, an executive in AIG's Life Management Division received an email discussing Nan Shan I.  (AIG/GEN-RE-TRANS 0016610)  He responded, "Are you aware that [Greenberg] wants a similar transaction for 2000 for about $56 million." (AIG/GEN-RE-TRANS 0016610)

75.    Indeed, Greenberg was aware of the Nan Shan I transaction and was being apprised of the new initiative.  In an April 20, 2000 memorandum to Greenberg and Smith, Umanksy reported:

> This contract is one where a significant recovery is realized and a
> compensating arrangement through a swap generates a capital loss
> for [American Life Insurance Company] and a gain for the
> reinsurer.  The accounting is very aggressive and it's a duplication
> of a contract that was done last year.  The 1999 swap will not be
> repeated, although a similar swap will be put in place to accomplish

21

> the same objective. There are a number of other issues that I look
> forward to discussing with you on Monday.

(AIG-F 0000145)

76.     Under the second Nan Shan transaction or "cover," as it was referred to in an internal AIG May 10, 2000 email, Union Excess agreed to reinsure AIRCO for $30 million of losses arising from Nan Shan's 2000 accident year. (AIG/GEN-RE-TRANS 0016651) In consideration, AIRCO paid Union Excess $2 million for the reinsurance. Because Nan Shan's losses were certain, this agreement was, according to that same email, "designed to yield a 28m underwriting benefit (2m premium and 30m recovery)" for AIRCO, where the Nan Shan losses would have been be reported.

77.     Once again, Union Excess needed to be "made whole," and so AIRCO entered into three swap transactions with Union Excess, which were later terminated with an "investment loss" to AIRCO of $28.3 million. (AIG/GEN-RE-TRANS 0016625) Thus, similar to the first Nan Shan transaction, the result of this transaction was to convert $28 million in underwriting losses into capital losses.

78.     Umansky notified both Smith and Greenberg about the Nan Shan II transaction.

79.     The investing public relied upon AIG's reported underwriting results to its detriment and was financially damaged.

80.     Until the foregoing facts came to light in 2005, defendants concealed from the investing public all facts that would have provided notice of their fraudulent and illegal scheme.

## IV. Creating False Underwriting Income

81.     Greenberg's efforts to boost the public view of the soundness of AIG's core business extended to the false reporting of income from AIG's "life settlements" investments as underwriting income.

82.     In 2001, AIG decided to enter into the life settlements business. In a life settlement an investor purchases an insurance policy from a policyholder who is near the end of his or her life, for a price somewhat higher than the cash surrender value of the policy. The policyholder gets an immediate, though discounted, payout on the policy. The investor continues paying premiums on the policy and collects the benefits when the policyholder dies. The investor is making a simple bet that the death benefits will exceed the sum of the cash paid to the policyholder and any premiums the investor pays while waiting for the policyholder to die.

83.     AIG and Greenberg decided as a public relations matter that it was best not to use the AIG name to handle its life settlements business, which amounted to purchasing life insurance policies – often from sick or elderly persons with a life expectancy greater than two years – as a bet that they would die sooner rather than later. As Forbes Magazine put it in its March 19, 2001 issue: "This is a pretty ghoulish way to make a buck, but as a cold-blooded investment it sounds good." (AIG-Cov 005949) On or about April 16, 2001, Greenberg expressed his concerns to AIG's David Fields ("Fields") who headed up the initiative: "It seems to me that anybody doing anything in the field stands the risk of adverse PR. . . . I am uneasy about this." (AIG-COV 005746, 005944)

84.     AIG was also concerned that under Generally Accepted Accounting

23

Principles ("GAAP"), purchasers of life settlements must carry the investment at a loss because the purchase price of such a policy exceeds its cash surrender value at the time of purchase. To avoid the public relations risk and the accounting issues, AIG decided to conduct its life settlement transactions through a third-party trust.

85.    Greenberg worked with Fields and Murphy to set up the life settlements structure. (AIG-COV 006010-11) In a September 19, 2001 memorandum to Greenberg, Fields reported that AIG would set up a trust called Coventry Life Settlement Trust ("Coventry"), which would be majority owned by Hanover Life Reassurance (Ireland) Limited, a non-AIG entity. Coventry would act as owner and administrator of a trust that would permit AIG to book its life settlement activities as underwriting volume, thereby enhancing AIG's underlying insurance underwriting results. (AIG-F 0000349)

86.    Under the Fields scheme, American Home Assurance Corp. ("AHAC"), an AIG affiliate, would loan Coventry all of the funds needed to purchase the life settlement policies and pay the premiums on the purchased policies. Instead of using that money directly to purchase life settlements, however, Coventry would use the borrowed funds to pay a "premium" to an Alaskan insurance subsidiary of AIG known as American International Specialty Lines Insurance Co. ("AISLIC") in exchange for a fake surety insurance policy – i.e., a policy that would guarantee Coventry's obligations to third parties. Coventry would then file a "claim" with AISLIC for the same amount that it had just paid to AISLIC as a premium. AISLIC would pay the amount back to Coventry, which would use the same funds to purchase the life settlements and pay its other expenses. When the death benefits were ultimately paid under the life

24

settlements, Coventry would pay the benefits to AISLIC as further "premium" on the insurance policy, and AISLIC would be able to report the life settlement income as underwriting income on its surety policy.

87.    On or about September 26, 2001, Fields wrote to Greenberg: "Coventry will sign documents partnering with us as soon as practicable - which at the latest should be Monday, October 1st. We expect premium production of at least $10 Million before the end of that week." (AIG-COV 006011) Two years later, on or about August 4, 2003, Smith reported to Greenberg that net written premium for life settlements had grown to $927 million with losses incurred of $851 million and a GAAP underwriting profit of $76 million. (AIG-COV 006034) AIG has continued to falsely report this investment income as underwriting income to the present day, contributing to AIG's highly-touted underwriting results.

88.    In 2004, the Alaska Department of Insurance issued a determination that AISLIC's policy with Coventry did not constitute insurance, and directed AISLIC its underwriting reporting. (AIG-COV 000070-72) Facing this adverse determination from the state where AISLIC was domiciled, AIG moved its life settlement business offshore to AIRCO, the same entity used in the CAPCO and Nan Shan schemes. AIG continues to account for this investment as if it were insurance.

89.    In April 2005, Greenberg invoked his Fifth Amendment privilege when asked about the Coventry matter.

90.    The investing public relied upon AIG's reported underwriting results to its detriment and was financially damaged.

25

91.     Until the foregoing facts came to light in 2005, defendants concealed from the investing public all facts that would have provided notice of their fraudulent and illegal scheme.

## V. Mischaracterizing Premiums on Workers Compensation Policies

92.     For over a decade, AIG engaged in a scheme to mischaracterize premiums paid on the workers compensation line of insurance. Documents obtained during the investigation show that the conduct continued for years after internal personnel repeatedly warned that it was illegal.

93.     Specifically, when selling workers compensation insurance, insurers generally pay higher premium taxes and pay additional monies into state funds, known as special assessment funds. AIG avoided paying these monies by using a secret side agreement with customers (one never filed with or approved by the New York Insurance Department) that had the effect of recharacterizing a portion of workers compensation premiums as general or auto liability insurance, where there were no such assessments.

94.     High-ranking employees of AIG were warned that these practices were illegal. In a June 1989 memorandum, one employee memorialized a meeting he had with his supervisors, urging that AIG stop the practice. The employee stated that the practices constituted a violation of the risk assessment rules and "illicit tax evasion," and added that he "pointed out the prospect we will be caught." The employee memorialized one supervisor's response:

> [He] responded to the effect that none of my presentation was news to him; and that in fact he had made a similar presentation (using stronger language) to his superiors some time ago. The policy decision in those higher councils had been to continue the illicit practices, pending

26

discovery and implementation of another effective scheme to avoid some substantial part of the taxes and Assigned Risk assessments on our Worker's Compensation business. Therefore [he] prohibited me from directing our operations staffs to adopt the recommendation above.

95.     That year and through 1991, the employee continued memorializing his view that the practice was illegal, and, indeed, that it "imperils the insurance licenses of the insurance companies for which we produce business."

96.     In 1991, AIG's general counsel, newly arrived from a law firm, undertook a review of the practice. Interview notes that he made during his inquiry reflect that employees had been told "that MRG knows the whole prog. & that he wants it this way." One interviewee told him: "You should be aware that MRG knows about this and has approved it."

97.     In his interviews, the General counsel learned about the cost that the company would have to incur in order to "get legal." It would have to hire about 40 new people to do filings properly, charge clients more, and pay "much higher" assessment fees. Indeed, the General counsel's notes reflect that at one stage, an employee went to AIG's president and was told "that MRG did not want him to change things to make it legal – he wants to continue as is." In another interview a witness recounted a meeting he and others had with Greenberg. According to the notes, "MRG" asked "are we legal?" When an employee responded, "If we were legal, we wouldn't be in business," then "MRG began laughing and that was the end of it."

98.     In addition to being told of the history of noncompliance, counsel learned that for years AIG had evaded answering certain questionnaires from the California Department of Insurance. A responsive submission, one employee reported, "would reveal that we had made false reports."

27

99.    The General counsel summarized his findings in a memorandum to
Greenberg dated January 31, 1992. Counsel warned that the practices that he had examined were
"permeated with illegality." The result, he wrote, "is that AIG makes millions of dollars illegally
each year." Moreover, "[t]he situation is so serious that it could threaten the continued existence
of senior management in its current form." (AIG-D 0023434-41)

100.    After detailing the ways in which the misbooking violated the law, the
General counsel concluded: "A jury could find that the above conduct constitutes various kinds
of State and Federal civil and criminal violations, including common law fraud, mail fraud,
Securities Act violations, RICO violations, State statutory and regulatory violations, State tax
fraud and breach of contract." (AIG-D 0023439)

101.    The memorandum recommended specific "corrective actions," including
an immediate end to the illegal conduct, discharge of employees involved, restitution, and the
institution of a compliance program. (AIG-D 0023440) As it turned out, AIG did none of these
things.

102.    What it did do was promptly engage two law firms to review the General
counsel's memorandum. They named their inquiry the "AIG – X MATTER." Fax transmission
sheets bore handwritten notations: "Extremely Confidential" (emphasis in original).

103.    In doing their investigation, the outside firms reviewed a 1989
memorandum from AIG's actuarial department. A portion of the memorandum discussed how
proper booking of workers compensation premiums would increase assessments and taxes that
AIG would have to pay. In the margins of the copy from the lawyers' files are two notations.

28

One reads "! Admits Div 50 is avoiding proper WC tax + [state assessment] charges." The other reads "$20-30M tax and [state assessment] dodge."

    104.    Draft memoranda created by the law firm described the two main practices General counsel had found unlawful. As to one, the firm reported a possible defense, but added: "We should not be understood as endorsing this argument, or suggesting that it would necessarily carry the day in a litigation or regulatory proceeding. Nor should we be understood as condoning [the practice]." At best, the draft noted, the practice "may be" in a "grey area." As to the other practice, the firm observed that it was even "more problematic," but noted that it "appears" that the genesis of the practice was not an "intent to reduce RMLs or premium taxes" and that recent efforts to reduce the extent of understatement have been "partially successful." Finally, the firm noted, "[o]n a going-forward basis, both practices . . . are being discontinued."

    105.    The outside law firm also produced a draft memorandum titled "Duty to Report Internal Insurance Fraud" which analyzed a corporation's duty to report fraud under the laws of a number of states. This draft concluded that "in their capacity as agents of a corporation, corporate directors and officers must cause the corporation to report fraudulent insurance transactions." It additionally stated, "An obligation of a director or an officer, including the general counsel of an insurance corporation . . . to disclose internal insurance fraud might exist as a result of the individual's fiduciary duties to the corporation and its shareholders as developed under the New York Business Corporation Law."

    106.    Although AIG has reported that it is confident today that the misbooking has stopped, it has been unable to say *when* the misbooking stopped. In addition, AIG has

admitted having no evidence that disclosure of the decades of deception was ever made to the

regulators of any state. To the contrary, each year AIG files forms with the New York Insurance

Department, reporting the amount of workers compensation premiums it has received for each of

the preceding nine years. In 2000, those forms continued to reflect the understated number

falsely reported in 1991.

107.    Until the foregoing facts came to light in 2005, defendants concealed from

the investing public and regulators all facts that would have provided notice of their fraudulent

and illegal scheme.

## VI. Misleading Regulators About Offshore Entities

108.    AIG's deceit has gone beyond statements of reserves, earnings, losses and

workers compensation premiums. Beginning at least in the mid 1980s, AIG set up several

offshore entities for the purpose of reinsuring AIG and its subsidiaries. AIG has repeatedly

misled regulators about the nature of its relationships with these entities.

109.    In 1987, AIG set up Coral Re, a Barbados-based reinsurer, for the purpose

of reinsuring AIG business. By 1991, AIG had purchased from Coral Re approximately $1

billion in reinsurance, although Coral Re had a capitalization of only $15 million. (AIG-F

0001218)

110.    By the early 1990s, Coral Re had come under regulatory scrutiny from

insurance departments in Delaware, New York and Pennsylvania. In 1995, the New York

Insurance Department raised concerns that AIG might control Coral Re. Pursuant to GAAP

accounting on a consolidated basis, if an insurer purchases reinsurance from a reinsurance

company that it owns or controls, the insurer cannot claim on its books a reinsurance recoverable, i.e. protection against potential losses covered by the reinsurance, because the insurer is effectively reinsuring itself. In addition, under Section 1505 of the New York Insurance Law, AIG was required to file such arrangements for review by the New York Insurance Department before entering into them.

111.    In its examination, the New York Insurance Department cited the following facts as evidence that AIG controlled Coral Re: (1) AIG created Coral Re; (2) AIG found the investors and drafted all documents related to the initial capitalization of Coral Re; (3) Coral Re was undercapitalized from the start and assumed huge amounts of risk through the sale of reinsurance to AIG; (4) in 1991 approximately 83% of Coral Re's assets were pledged for letters of credit with AIG as the beneficiary; (5) a material amount of the premiums from AIG to Coral Re was paid to a bank that is an affiliate of AIG and acted as collateral agent on the letters of credit; (6) all of Coral Re's management and administrative functions were performed by an AIG affiliate; (7) AIG unilaterally amended certain provisions in its reinsurance contracts with Coral Re; and (8) there were numerous relationships between the Coral Re investors and AIG.[2] (AIG-F 0001211)

112.    As a condition of resolving the New York Insurance Department's examination, the Department mandated that AIG agree to stop purchasing reinsurance from Coral Re and that AIG would "report any reinsurer that has characteristics similar to Coral Re as an

---

[2]For example, a director of AIG also sat on the board of an investor company, one of the Coral Re investors had common officers and a common chairman with AIG, and investors, Coral Re and AIG entites shared the same management company.

affiliate reinsurer in future filings with state insurance regulators." (AIG-F 0001222)[3]

113.    At no time during the negotiations for the resolution of the Coral Re examination or thereafter did AIG disclose to the New York Insurance Department that it already had two preexisting offshore affiliates with "characteristics similar to Coral Re." In 1986, AIG had formed Richmond Reinsurance Company, a Bermuda holding company with a Barbados reinsurance subsidiary similar to Coral Re, and having a similar purpose. And in 1991, AIG had formed Union Excess Reinsurance Company Ltd., under a different name, a Barbados reinsurer similar to Coral Re, also for a similar purpose. Although there were minor variations, Richmond, Union Excess and Coral Re shared the following "characteristics": (1) they were created by AIG; (2) AIG found the investors and drafted all documents related to the initial capitalization; (3) they were undercapitalized; (4) they had passive investors backed by AIG or its affiliates; (5) the management and administrative functions of each were performed by the same AIG affiliate; and (6) officers of the three offshore entities had numerous relationships with AIG and with each other.[4]

114.    Umansky, who was responsible for setting up Union Excess, testified that he modeled the Union Excess structure on Coral Re. He further testified that he had a number of conversations with both defendants Smith and Greenberg about Union Excess, and that they too were aware that Union Excess was modeled on Coral Re. They nonetheless failed to make the

---

[3]AIG had reached a similar settlement with Delaware in 1992. (AIG-F 0001121)

[4]For example, Coral Re, Richmond and Union Excess all shared a management company owned by AIG, the three entities had investors in common, certain individuals sat on the board of all three, and Murphy, an AIG employee, was an officer and alternate director of Richmond.

32

required disclosure to the insurance departments.

115.    AIG's deceit was not limited to omissions. In 1999, when the New York Insurance Department inquired whether AIG controlled Richmond, AIG unequivocally answered that AIG "does not control [Richmond]." (AIG/GEN-RE-TRANS 0013514) The Insurance Department then requested that AIG file a formal Disclaimer of Control.[5]

116.    AIG and its subsidiary, AIUO Ltd. ("AIUO"), filed a Disclaimer of Control in November 1999 with the Insurance Department. The filing was signed by Murphy and omitted three critical facts bearing directly on the issue of control: (1) a Richmond subsidiary had a management agreement with an AIG subsidiary; (2) Richmond's investors had a put agreement with AIUO, obligating AIUO to repurchase their shares at a value that rendered the "investments" riskless to the investors; and (3) defendant Greenberg, on behalf of AIG, had guaranteed AIUO's put obligations to the investors under the Shareholders Agreement. At least two of these omissions violated specific New York Insurance Department regulations.[6]

117.    AIG's submission had the intended effect:  the Insurance Department in a letter dated November 13, 2000 determined that AIG did not control Richmond. (The November 13, 2000 letter is attached hereto.)

118.    Not until March 30, 2005, did AIG concede the truth. In a press release it

---

[5]Under New York law, where questions exist concerning control over an insurance company, the suspected controlling entity may file a Disclaimer of Control to resolve the issue under Insurance Law § 1501(c) and Insurance Department regulation 11 N.Y.C.R.R. § 80-1.3. If approved by the Insurance Department, the filing entity is deemed not to control the insurer.

[6]11 N.Y.C.R.R. § 80-1.3(b)(2) required Murphy to report any interest that AIG had in Richmond's securities. 11 N.Y.C.R.R. § 80-1.3(c) required Murphy to report any contract for services between AIG and Richmond.

stated:

> [T]he review of the operations of the Richmond subsidiaries has shown
> significant previously undisclosed evidence of AIG control. Therefore,
> AIG has determined that Richmond should be treated as a consolidated
> entity in AIG's financial statements.

119.    Until the foregoing facts came to light in 2005, defendants concealed from

the regulators and the investing public all facts that would have provided notice of their

fraudulent and illegal scheme.

120.    But even as AIG internal investigations and those of law enforcement and

regulators were uncovering facts that would lead to this acknowledgment, efforts to hide the true

nature of AIG's relationships to these offshore entities persisted.

121.    In November 2004, in the wake of disclosure of this office's inquiry into

finite insurance, a Richmond investor advised Murphy that it wanted to sell its shares back to

AIG. (AIG/GEN-RE-TRANS 0014315) Beginning on or about March 16, 2005, Murphy called

a board of directors meeting to discuss the investor's desire to sell its shares and this office's

investigation. The meeting was subsequently adjourned over several days. The meeting was

tape recorded and, according to routine practice, an AIG employee took possession of and stored

the recordings after the meeting. Over the weekend of March 19, Murphy removed the

recordings (which have not yet been recovered) and issued a directive that electronic files of any

draft transcripts of the recordings be deleted. Unbeknownst to Murphy, a hard copy draft

transcript of the meeting exists and was subsequently turned over to AIG management, who

provided it to law enforcement and regulatory authorities.

34

122.    Defendants' actions as set forth above were gross, wanton, and wilful; were aimed at the public generally; and involved a high degree of moral culpability.

## FIRST CAUSE OF ACTION
(Fraudulent business practice – Executive Law §63(12))

123.    The acts and practices alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SECOND CAUSE OF ACTION
(Securities Fraud - Gen. Bus Law §352-c(1)(a))

124.    The acts and practices of the defendants alleged herein violated Article 23-A of the General Business Law, in that they involved the use or employment of a fraud, deception, concealment, suppression, or false pretense, where said uses or employments were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of any securities.

## THIRD CAUSE OF ACTION
(Securities - Gen. Bus. Law § 352-c(1)(c))

125.    The acts and practices of the defendants alleged herein violated Article 23-A of the General Business Law, in that defendants made representations or statements which were false, where (i) they knew the truth, or (ii) with reasonable efforts could have known the truth, or (iii) made no reasonable effort to ascertain the truth, or (iv) did not have knowledge concerning the representations or statements made, where said representations or statements were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or

purchase within or from this state of any securities.

## FOURTH CAUSE OF ACTION
(Common Law Fraud)

126.    The acts and practices of defendants alleged herein constitute actual and/or

constructive fraud under the common law of the State of New York.

## FIFTH CAUSE OF ACTION
(Insurance Law § 310(a)(3))
(As to Defendant AIG Only)

127.    The acts and practices alleged herein constitute conduct proscribed by §

310(a)(3) of the Insurance Law, in that AIG did not facilitate and aid Insurance Department

examiners in the examination of American Home Assurance Company, an AIG subsidiary, to

wit, AIG failed to report Union Excess and Richmond Reinsurance Company as affiliated

reinsurers in AIG's regulatory filings with the Insurance Department, when it was in AIG's

power to do so.

WHEREFORE, plaintiffs demand judgment against the defendants as follows:

A.    Enjoining and restraining defendants, their affiliates, assignees,

subsidiaries, successors and transferees, their officers, directors, partners, agents and employees,

and all other persons acting or claiming to act on their behalf or in concert with them, from

engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any

practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect

similar to, the conduct complained of above.

B.    Directing that defendants, pursuant to Article 23-A of the General

36

Business Law and section 63(12) of the Executive Law and the common law of the State of New York, disgorge all gains and pay all restitution and damages caused, directly or indirectly by the fraudulent and deceptive acts complained of herein;

        C.      Directing that defendants pay punitive damages;

        D.      Directing that defendants pay plaintiffs' costs, including attorneys' fees as provided by law;

        E.      Directing such other equitable relief as may be necessary to redress defendant's violations of New York law; and

        F.      Granting such other and further relief as may be just and proper.

Dated:      New York, New York
              May 26, 2005

                        ELIOT SPITZER, ESQ.
                        Attorney General of the State of New York
                        *Attorney for Plaintiffs*
                        120 Broadway, 23rd Floor
                        New York, New York 10271
                        (212) 416-6356

                        By:_____
                        David D. Brown, IV
                        Assistant Attorney General

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

                            :

THE PEOPLE OF THE STATE OF NEW YORK    :
by ELIOT SPITZER, Attorney General of       :
the State of New York, and HOWARD MILLS,  :
Superintendent of Insurance of the State of   :
New York,                                 :

                            :

                      Plaintiffs,    :     **COMPLAINT**

                            :

          -against-              :     Index No.

                            :

                            :

AMERICAN INTERNATIONAL GROUP, INC.,   :
MAURICE R. GREENBERG and          :
HOWARD I. SMITH,                  :

                            :

                    Defendants.   :

-------------------------------------------------------------------X

 

**EXHIBITS TO COMPLAINT**

 

**ELIOT SPITZER**
**Attorney General of the**
 **State of New York**
*Attorney for Plaintiffs*
**120 Broadway - 23rd Floor**
**New York, N.Y. 10271**
**(212) 416-8198**

**Milton, Chris**

| | |
|---|---|
| **From:** | jhouldsw@colognere.com |
| **Sent:** | Wednesday, December 27, 2000 1:36 PM |
| **To:** | Milton, Chris |
| **Cc:** | ████████@gcre.com |
| **Subject:** | Cologne Re of Dublin Cover |

Milton27Dec.doc  AIGALALD27Dec.do
c

eSafe Protect Gateway (tm) has scanned this mail for viruses, vandals and suspicious attachments and has found it to be CLEAN.

File: Milton27Dec.doc (24,576 bytes)
Encoding: Base64
Result: Clean.

File: AIGALALD27Dec.doc (50,176 bytes)
Encoding: Base64
Result: Clean.
-------------------------------------------------

Chris, please find below electronic copies of documents currently being sent to you by fax.

(See attached file: Milton27Dec.doc)(See attached file: AIGALALD27Dec.doc)

Best regards, John

CONFIDENTIAL

AIG/GEN-RE-TRANS 00000130

Dear Chris,

Re: Our Aggregate Liability Adverse Loss Development Agreement

I am writing further to my fax of December 17th and our subsequent conversations in respect of the above agreement. We are encouraged that you believe AIG will be able to provide us with cover for approximately 50% of what we originally had in mind. We can also confirm that we will currently be retaining the remaining balance of these exposures for our own account.

Consequently we have drafted a contract wording for discussion purposes which I have attached for your examination. You will note that the Reinsurer's participations have been amended in Schedule A to reflect your agreement to accept $250m of current liabilities with a maximum exposure of $300m. I would stress that this is very much a discussion document and we may yet need to make some minor adjustments from our end.

I hope that on review of the draft agreement you will be able to support this cover and look forward to hearing from you shortly with your initial comments

Yours sincerely,

John Houldsworth,
Chief Executive Officer.

AIG/GEN-RE-TRANS 0000013

# The Cologne Re of Dublin.
#### Cologne Reinsurance Company (Dublin) Ltd.

2
27.12.2000

**DRAFT**

Milton, Chris

**From:** ███ @colognere.com
**Sent:** Wednesday, December 20, 2000 12:21 PM
**To:** Milton, Chris

Projed A.doc    Milton.doc

eSafe Protect Gateway (tm) has scanned this mail for viruses, vandals and suspicious attachments and has found it to be CLEAN.

File: Project A.doc (36,864 bytes)
Encoding: Base64
Result: Clean.

File: Milton.doc (27,136 bytes)
Encoding: Base64
Result: Clean.
-------------------------------------------------------

Please see attached fax that was resent today.

(See attached file: Project A.doc)(See attached file: Milton.doc)

1

CONFIDENTIAL

# Draft for Discussion Purposes

**Reinsured:** Cologne Reinsurance Company (Dublin) Limited

**Type:** Loss portfolio transfer Agreement

**Term:** Continuous commencing 12:01a.m., Central European Time, 1/12/2000, until all liability hereunder has been discharged.

**Territory:** As detailed under the attached schedule of original Reinsurance contracts.

**Business Covered:** Original Reinsurance Contracts or other evidences of liability (whether written or oral) heretofore issued covering in respect of business written as detailed under the attached schedule.

**Limit:** The Reinsured obligates itself to cede to the Reinsurer and the Reinsurer obligates itself to accept as reinsurance from the Reinsured a 100% interest in the Net Retained liability of the Reinsured in respect of the Business covered, subject however to an overall limit of liability to the Reinsurer equal to USD 600m.

**Reinsurance Premium:** A reinsurance premium of USD 500,000,000 of which 98% shall be retained within an experience account by the Reinsured.

**Reporting and Accounts:** Within 90 days of the end of each calendar year, the Reinsured shall prepare an account for the Reinsurer showing:

A) Outstanding reserves, including allocated loss adjustment expenses at the beginning of the year, plus

B) The sum of reserves including allocated loss adjustment expenses increased or established during the year, minus

C) Claims and allocated loss adjustment expenses paid during the year, equals

D) Outstanding reserves, including allocated loss adjustment expenses at the end of the year.

The Reinsurer shall upon receipt of the account, authorise the Reinsured to draw payment from the experience account for the balance due in respect of claims paid during the year. In the event that the balance within the experience account is insufficient to satisfy the obligation of the Reinsurer, then payment shall be made within 90 days by the Reinsurer of the amount owed in excess of the balance in the experience account.

Word/U/Contract/Draft Contract/Project A.doc

# Draft for Discussion Purposes

Definition:

**A)** The term "Ultimate Net Loss" as used in this Agreement shall be understood to mean the sum actually paid or payable by the Reinsured in settlement of losses for which it is liable, such losses to include expenses of litigation and any and all other loss expenses of the Reinsured, except for office expenses and salaries of the Reinsured's officials. Any salvages and recoveries, including recoveries under any reinsurances which inure to the benefit of this Agreement, whether collected or not, are to be first deducted from such loss to arrive at the amount of liability, if any, attaching hereunder.

Nothing in this definition shall be construed as meaning that losses are not recoverable hereunder until the Ultimate Net Loss to the Reinsured has been finally ascertained.

**B)** The term "Net Retained Liability" as used in this Agreement shall be understood to mean, and this Agreement shall only apply to, that portion of any insurance or reinsurance covered by this Agreement which the Reinsured retains net for its own account and in calculating the amounts of loss hereunder, only loss or losses in respect of that portion of any insurance or reinsurance which the Reinsured retains net for its own account shall be included.

It is understood and agreed that the amount of the Reinsurer's liability hereunder in respect of loss or losses shall not be increased due to the Reinsured's failure to retrocede in accordance with its normal practice, nor by reason of the inability of the Reinsured to collect from any other Reinsured, whether specific or general, any amounts which may have become due from them, whether such inability arises from the insolvency of such other Reinsurer or otherwise.

**C)** The term "Original Reassured" as used in this Agreement shall be understood to mean the insurance or reinsurance company to which the Reinsured issued an Original Reinsurance Contract.

**D)** The term "Original Reinsurance Contract" as used in this Agreement shall be understood to mean all binders, policies, certificates, agreements, treaties, bonds or contracts or reinsurance or retrocession authorised by the Reinsured to Original Reassured's under the same Reinsurance Form covering the same liability (whether issued in one layer or more than one layer).

**E)** The term "Reinsurance Form" as used herein shall be understood to mean the type of Liability reinsurance afforded.

Exclusions:     As contained in the Reinsured's Original Reinsurance, without additional limitations hereunder.

Word/U/Contract/Draft Contract/Project A.rine

CONFIDENTIAL

# Draft for Discussion Purposes

**Experience Account:** At inception, the Reinsured shall establish a funds withheld experience account into which shall initially be placed the withheld portion of the reinsurance premium and from which the Reinsured shall make claim payments hereunder. Annually the Reinsured shall prepare a status report on the experience account showing:

**Credit Items**

A)   Credit balance brought forward from the previous statement.

B)   Withheld premiums equal to 98% of reinsurance premiums due.

C)   Interest on the positive balance within the account calculated at a rate of 3% per annum on the beginning balance brought forward from the previous statement.

**Debit Items**

A)   Claims paid during the year.

B)   Any settlements made as commutation of claims, loss adjustment expenses or other liabilities hereunder.

**Cancellation:** This Agreement may be cancelled by the parties hereto:

1)   Immediately by giving the other party notice:

A)   If the performance of the whole or any part of this Agreement be prohibited or rendered impossible de jure or de facto in particular and without prejudice to the generality of the preceding words in consequence or any law or regulation which is or shall be in force in any country or territory, or if any law or regulation shall prevent directly or indirectly the remittance of any or all or any part of the balance of payments due to or from either party.

B)   If the other party has become insolvent or unable to pay its debts or has lost the whole or any part of its capital.

C)   If there is any material change in the ownership or control of the other party.

D)   If the country or territory in which the other party resides or has its head office or is incorporated shall be involved in armed hostilities with any other country whether war be declared or not or is partly or wholly occupied by another power.

CONFIDENTIAL

AIG/GEN-RE-TRANS 0000013

# Draft for Discussion Purposes

E)    If the other party shall have failed to comply with any of the terms and condition so this Agreement.

All notices of termination which the Reinsured shall have the right to issue in accordance with any of the provisions of this paragraph shall be by Telex, Facsimile or Registered Mail and shall be deemed to be served upon dispatch, or, where communications between the parties are interrupted, upon attempted dispatch.

2)    By the Reinsured giving 90 days notice at any time in writing of its intention to cancel this Agreement.

All outstanding losses and other reserves, if any, for business covered under this Agreement, shall be commuted on the date of cancellation upon payment to the Reinsured of the amount equal to the credit balance under the experience account at the date of cancellation. Such payment shall constitute full and final release of all liabilities of the Reinsurer under this agreement.

**Administration Fee:**

TBA payable on TBA and annually on 1st January thereafter until termination.

**General Conditions:**

Currency Conversion: All balances shall be converted to USD at the rate of exchange used in the Reinsurer's books.

Offset Clause

Errors and Omissions Clause

Access to Records Clause

Insolvency Clause

Arbitration Clause (English law).

Inspection of Records: *The Reinsured retains the right to protect the confidentiality of the underlying reinsurance covers and reserves the right to inspection of records. However inspection by an independent third party as approved by the Reinsured will be arranged if requested.*

Change in underlying reinsurance contracts: *The Reinsured retains the right to manage the run off of the underlying reinsurance contracts without detailed disclosure to the Reinsurer. The Reinsured will however act in good faith at all times.*

Ultimate net loss clause: This reinsurance shall have the benefit of all underlying reinsurances inuring to the benefit of the underlying reinsurance contracts.

**Wording:**

To be agreed.

Word\\US-notces\Draft-Contract\Project A.doc

CONFIDENTIAL

AIG/GEN-RE-TRANS 0000013

Draft for Discussion Purposes

Reinsurer:

Ref: _____ By: _____

Dated: _____

Placement Agreed

Reinsured: Cologne Reinsurance Company (Dublin) Limited

Ref: _____ By: _____

Dated: _____

CONFIDENTIAL

AIG/GEN-RE-TRANS 00000139

# Draft for Discussion Purposes

## Appendix A:

### Schedule of underlying reinsurance contracts

| Contract | Country of Origin | Current reserves in USD |
|---|---|---|
| Contract A | USA | 254,000,000 |
| Contract B | Germany | 63,243,000 |
| Contract C | USA | 69,323,000 |
| Contract D | Norway | 25,734,000 |
| Contract E | USA | 36,728,000 |
| Contract F | Australia | 60,416,000 |

CONFIDENTIAL

The Cologne Re of Dublin. - 1 George's Dock - I.F.S.C. - Dublin 1
Ireland

Mr Chris Milton
AIG

Dublin
**12.12.2000**
Milton.doc



Cologne Reinsurance
Company (Dublin) Ltd.

1 George's Dock
I.F.S.C.
Dublin 1
Ireland

Telephone
Telefax +1

http://www.cologne-re.com

Registered In.(
Ireland
Registered Number
1 George's Dock, I.F.S.C.,
Dublin 1

Directors

**DRAFT**

Dear Chris,

Re: Our Aggregate Liability Adverse Loss Development Cover

I am writing further to your various conversations in respect of the above with ██████ ██████ of our parent company in Stamford. I hope that I can give you a little more background on the proposal we hope that you will be able to help us with.

Fundamentally we are seeking to achieve two primary objectives. Firstly to reduce the reserving "leverage" in our local balance sheet and secondly to smooth any unexpected adverse loss development in our local statutory income statements (as opposed to our US GAAP consolidation packs). There are a number of other minor benefits and costs in the structure proposed but the above are the headline objectives.

The contract structure we have in mind (which I have attached as a draft for discussion purposes) serves our purpose at a cost we believe to be appropriate to the benefit and risk involved for our reinsurer. To anticipate one question you may ask it is important to note that our local accounting here follows similar risk transfer rules to the US but does not differentiate between retrospective and prospective contracts.

In relation to the risk inherent in the underlying portfolio we are willing to make the following representations at this time:-

1) The current stated reserves plus accumulating interest will, we believe, be adequate to meet the maturing liabilities.

2) The current stated reserves are based in best current information on each portfolio.

3) The portfolio's are distinct and unrelated (i.e. diversified).

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd.

2
12.12.2000

## DRAFT

4) The underlying portfolio's are not "cat" exposed and should under all normal circumstances exhibit little volatility.

The reason we are making these representations reflects, I trust as ▮▮▮ has mentioned, that it is very important to us that confidentiality in respect of the underlying client specific portfolio's is maintained more so than in any normal reinsurance relationship. We will of course make limited records available for initial underwriting purposes but would not expect these to be withheld for public review in your offices. In addition it will be contractually required that any subsequent inspections are performed by independent professional advisors legally bound by confidentiality agreements.

I hope that the above gives you a feel for what we have in mind and look forward to any comments you may have in respect of either my letter or the attached "discussion" draft slip.

I hope that on further review AIG will be able to support this cover and look forward to working together over the next few years.

Yours sincerely,


John Houldsworth,
Chief Executive Officer.

AIG/GEN-RE-TRANS 00000142

## The Cologne Re of Dublin

*Affiliated with the World's oldest Reinsurance Company*

The Cologne Re of Dublin - 1 George's Dock - U.S.C. - Dublin 1 - Ireland

Dublin
**17.12.2000**
[illegible]

Christian M. Milton
Vice President
American International Group
110 William Street, 15th Floor
NY, NY 10038
USA

*(Hand delivered phone)*
*AIG. will take 50% = 2000*
*+ consider a further 50% = 2001*

Dear Chris,

Re: Our Aggregate Liability Adverse Loss Development Cover

I am writing further to your various conversations in respect of the above with ████ ████ of our parent company in Stamford. I hope that I can give you a little more background on the proposal we hope that you will be able to help us with.

Fundamentally we are seeking to achieve two primary objectives. Firstly to reduce the reserving "leverage" in our local balance sheet and secondly to smooth any unexpected adverse loss development in our local statutory income statements (as opposed to our US GAAP consolidation packs). There are a number of other minor benefits and costs in the structure proposed but the above are the headline objectives.

The contract structure we have in mind (I have attached a draft slip for discussion purposes) serves our purpose at a cost we believe to be appropriate to the benefit and risk involved for our reinsurer. To anticipate one question you may ask it is important to note that our local statutory accounting here follows similar risk transfer rules to the US but does not differentiate between retrospective and prospective contracts.

In relation to the risk inherent in the underlying portfolio we are willing to make the following representations at this time:-

1) The current stated reserves plus accumulating interest will, we believe, be adequate to meet the maturing liabilities.

2) The current stated reserves are based in best current information on each portfolio.



RECEIVED
JAN 2 2 2001
[illegible]

-2-

CONFIDENTIAL

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd.

2
17.12.2000

### DRAFT

4) The underlying portfolios are not "cat" exposed and should under all normal circumstances exhibit little volatility.

The reason we are making these representations reflects, I trust as ▆▆▆▆ has mentioned, that it is very important to us that confidentiality in respect of the underlying client specific portfolios is maintained more so than in any normal reinsurance relationship. We will of course make limited records available for initial underwriting purposes but would not expect these to be withheld for public review in your offices. The reinsurance agreement will provide that access to our records by AIG is subject to a confidentiality agreement and access will only be provided to those AIG officers or agents similarly bound by confidentiality agreements.

I hope that the above gives you a feel for what we have in mind and look forward to any comments you may have in respect of either my letter or the attached "discussion" draft slip.

I hope that on further review AIG will be able to support this cover and look forward to working together over the next few years.

Yours sincerely,

John Houldsworth,
Chief Executive Officer.

CONFIDENTIAL

AIG/GEN-RE-TRANS 0000020

# Draft for Discussion Purposes

**Reinsured:**          Cologne Reinsurance Company (Dublin) Limited

**Type:**               Loss portfolio transfer Agreement

**Term:**               Continuous commencing 12:01a.m., Central European Time, 1/12/2000, until all liability hereunder has been discharged.

**Territory:**          As detailed under the attached schedule of original Reinsurance contracts.

**Business
Covered:**              Original Reinsurance Contracts or other evidences of liability (whether written or oral) heretofore issued covering in respect of business written as detailed under the attached schedule.

**Limit:**              The Reinsured obligates itself to cede to the Reinsurer and the Reinsurer obligates itself to accept as reinsurance from the Reinsured a 100% interest in the Net Retained liability of the Reinsured in respect of the Business covered, subject however to an overall limit of liability to the Reinsurer equal to USD 600m.

**Reinsurance
Premium:**              A reinsurance premium of USD 500,000,000 of which 98% shall be retained within an experience account by the Reinsured.

**Reporting and
Accounts:**             Within 90 days of the end of each calendar year, the Reinsured shall prepare an account for the Reinsurer showing:

A)      Outstanding reserves, including allocated loss adjustment expenses at the beginning of the year, plus

B)      The sum of reserves including allocated loss adjustment expenses increased or established during the year, minus

C)      Claims and allocated loss adjustment expenses paid during the year, equals

D)      Outstanding reserves, including allocated loss adjustment expenses at the end of the year.

The Reinsurer shall upon receipt of the account, authorise the Reinsured to draw payment from the experience account for the balance due in respect of claims paid during the year. In the event that the balance within the experience account is insufficient to satisfy the obligation of the Reinsurer, then payment shall be made within 90 days by the Reinsurer of the amount owed in excess of the balance in the experience account.

# Draft for Discussion Purposes

**Definition:**

**A)** The term "Ultimate Net Loss" as used in this Agreement shall be understood to mean the sum actually paid or payable by the Reinsured in settlement of losses for which it is liable, such losses to include expenses of litigation and any and all other loss expenses of the Reinsured except for office expenses and salaries of the Reinsured's officials. Any salvages and recoveries, including recoveries under any reinsurances which inure to the benefit of this Agreement, whether collected or not, are to be first deducted from such loss to arrive at the amount of liability, if any, attaching hereunder.

Nothing in this definition shall be construed as meaning that losses are not recoverable hereunder until the Ultimate Net Loss to the Reinsured has been finally ascertained.

**B)** The term "Net Retained Liability" as used in this Agreement shall be understood to mean, and this Agreement shall only apply to, that portion of any insurance or reinsurance covered by this Agreement which the Reinsured retains net for its own account and in calculating the amounts of loss hereunder, only loss or losses in respect of that portion of any insurance or reinsurance which the Reinsured retains net for its own account shall be included.

It is understood and agreed that the amount of the Reinsurer's liability hereunder in respect of loss or losses shall not be increased due to the Reinsured's failure to retrocede in accordance with its normal practice, nor by reason of the inability of the Reinsured to collect from any other Reinsured, whether specific or general, any amounts which may have become due from them, whether such inability arises from the insolvency of such other Reinsurer or otherwise.

**C)** The term "Original Reassured" as used in this Agreement shall be understood to mean the insurance or reinsurance company to which the Reinsured issued an Original Reinsurance Contract.

**D)** The term "Original Reinsurance Contract" as used in this Agreement shall be understood to mean all binders, policies, certificates, agreements, treaties, bonds or contracts of reinsurance or retrocession authorised by the Reinsured to Original Reassured's under the same Reinsurance Form covering the same liability (whether issued in one layer or more than one layer).

**E)** The term "Reinsurance Form" as used herein shall be understood to mean the type of Liability reinsurance afforded.

**Exclusions:**

As contained in the Reinsured's Original Reinsurance, without additional limitations hereunder.

AIG/GEN-RE-TRANS 00000206

# Draft for Discussion Purposes

**Experience Account:**

At inception, the Reinsured shall establish a funds withheld experience account into which shall initially be placed the withheld portion of the reinsurance premium and from which the Reinsured shall make claim payments hereunder. Annually the Reinsured shall prepare a status report on the experience account showing:

**Credit Items**

A)   Credit balance brought forward from the previous statement.

B)   Withheld premiums equal to 96% of reinsurance premiums due.

C)   Interest on the positive balance within the account calculated at a rate of 3% per annum on the beginning balance brought forward from the previous statement.

**Debit Items**

A)   Claims paid during the year.

B)   Any settlements made as commutation of claims, loss adjustment expenses or other liabilities hereunder.

**Cancellation:**

This Agreement may be cancelled by the parties hereto:

1)   Immediately by giving the other party notice:

A)   If the performance of the whole or any part of this Agreement be prohibited or rendered impossible de jure or de facto in particular and without prejudice to the generality of the preceding words in consequence or any law or regulation which is or shall be in force in any country or territory, or if any law or regulation shall prevent directly or indirectly the remittance of any or all or any part of the balance of payments due to or from either party.

B)   If the other party has become insolvent or unable to pay its debts or has lost the whole or any part of its capital.

C)   If there is any material change in the ownership or control of the other party.

D)   If the country or territory in which the other party resides or has its head office or is incorporated shall be involved in armed hostilities with any other country whether war be declared or not or is partly or wholly occupied by another power.

CONFIDENTIAL

# Draft for Discussion Purposes

E) If the other party shall have failed to comply with any of the terms and condition so this Agreement.

All notices of termination which the Reinsured shall have the right to issue in accordance with any of the provisions of this paragraph, shall be by Telex, Facsimile or Registered Mail and shall be deemed to be served upon dispatch, or, where communications between the parties are interrupted, upon attempted dispatch.

2) By the Reinsured giving 90 days notice at any time in writing of its intention to cancel this Agreement.

All outstanding losses and other reserves, if any, for business covered under this Agreement, shall be commuted on the date of cancellation upon payment to the Reinsured of the amount equal to the credit balance under the experience account at the date of cancellation. Such payment shall constitute full and final release of all liabilities of the Reinsurer under this agreement.

**Administration Fee:** TBA payable on TBA and annually on 1st January thereafter until termination.

**General Conditions:** Currency Conversion: All balances shall be converted to USD at the rate of exchange used in the Reinsurer's books.
Offset Clause
Errors and Omissions Clause
Access to Records Clause
Insolvency Clause
Arbitration Clause (English law).
Inspection of Records: *The Reinsured retains the right to protect the confidentiality of the underlying reinsurance covers and reserves the right to inspection of records. However inspection by an independent third party as approved by the Reinsured will be arranged if requested.*
Change in underlying reinsurance contracts: *The Reinsured retains the right to manage the run off of the underlying reinsurance contracts without detailed disclosure to the Reinsurer. The Reinsured will however act in good faith at all times.*
Ultimate net loss clause: This reinsurance shall have the benefit of all underlying reinsurances inuring to the benefit of the underlying reinsurance contracts.

**Wording:** To be agreed.

CONFIDENTIAL

## Draft for Discussion Purposes

Reinsurer:

Ref: _____ By: _____

Dated: _____

Placement Agreed

Reinsured: Cologne Reinsurance Company (Dublin) Limited

Ref: _____ By: _____

Dated: _____

CONFIDENTIAL

# Draft for Discussion Purposes

## Appendix A:

## Schedule of underlying reinsurance contracts

| Contract | Country of Origin | Current reserves in USD |
|---|---|---|
| | | |
| Contract A | USA | 254,000,000 |
| Contract B | Germany | 63,243,000 |
| Contract C | USA | 69,323,000 |
| Contract D | Norway | 25,734,000 |
| Contract E | USA | 36,728,000 |
| Contract F | Australia | 60,416,000 |

CONFIDENTIAL

01:23pm EDT 26-Apr-01 Bear Stearns (A. Smith,M./█████████████████) AIG TW
AIG: Strong Earnings.  Raise Estimates

Michael A. Smith 212 272-9465 masmith@bear.com
███████████  ███████████  ███████@bear.com                          04/26/01

Subject: Analysis of Sales/Earnings
Industry: Insurance/Nonlife

BEAR, STEARNS & CO. INC.
EQUITY RESEARCH

American International Group (AIG $79.75) - Buy
Strong Earnings.  Raise Estimates

Data
Last ROE 16%              52-Wk Range $104-$52      Shares Out 2,359
Target Price $104-$107    Dividend/Yield $0.15/0.2% Market Cap (MM) $188,130

Key Points
*** American International Group beat "Street" estimates by $0.01 per share in
    the first quarter.
*** Property-casualty insurance premiums increased by 15%, accelerating from
    the 12.4% growth rate reported in the 2000 fourth quarter.  Domestic
    brokerage premiums increased by 27%, reflecting the addition of HSB Group
    late last year.
*** Loss reserves increased $62 million, three-times the level of increase
    last year.
*** Life insurance operations were ahead of expectations, both top and bottom
    line.
*** We are raising our estimates and reiterating our aggressive Buy rating of
    American International Group shares, with a price target of $104-$107.

|          | Earnings Estimates | | | | | P/E |
|          | Q1 Mar | Q2 Jun | Q3 Sep | Q4 Dec | Year | Year |
|----------|--------|--------|--------|--------|--------|------|
| 2000     | $0.56A | $0.61A | $0.61A | $0.65A | $2.45A | 32.6 |
| 2001     | $0.67A | $0.70E | $0.73E | $0.75E | $2.85E | 28.0 |
| Previous | $0.65E | $0.70E | $0.70E | $0.75E | $2.80E | 28.5 |
| 2002     | $0.77E | $0.80E | $0.85E | $0.88E | $3.30E | 24.2 |
| Previous | $0.75E | $0.80E | $0.85E | $0.85E | $3.25E | 24.5 |

American International Group reported first quarter earnings that were $0.01
ahead of the consensus estimate, at $0.67 per share (diluted, excluding
realized investment gains and losses), up from $0.58 a year ago.

Earnings were much better than we had anticipated in both the general insurance
(property-casualty) and in the life insurance segments, and we are raising our
estimates for this year and 2002 by $0.05 per share, to $2.85 and $3.30
respectively.

-- FIRST CALL --

CONFIDENTIAL

**General Insurance: Premiums Up 15% and Accelerating**
Written premiums in the general insurance segment increased by 15.1% from last year's level, accelerating from the 12.4% growth rate reported in the fourth quarter. Within this figure, domestic brokerage operations, commercial lines businesses, increased by 27.5%, driven mostly by price increases and improved renewal retentions. HSB Group that was acquired late in 2000 added, by the company's estimation, approximately two percentage points to the overall growth rate and less than five points to the brokerage subtotal rate.

Perhaps as attractive, the underlying quality of the general insurance results also improved, evidenced by the increase in loss reserves that in turn drove the paid-to-incurred claims ratio down to 98% from last year's 99%. The loss reserve increase of $62.8 million was three-times the $22.0 million reported last year. Of this amount, we estimate approximately $36-$38 was in the Transatlantic Holdings (TRH, rated Attractive) book and in 21st Century Insurance (TW, not rated). In recent quarter, the declining rate of increase, and even decreases, had raised some concerns in the market when reported, although those figures were explainable by the company's retrenchment in exposures as it went through a rigourous re-pricing/re-underwriting of its book of business.

Overall, the combined ratio (a proxy for underwriting margin, consisting of claims and expenses measured as a percent of premium) was 95.9%, up very slightly from last year's 95.8%, with deterioration in the personal lines that reported an unprofitable result. Winter storm losses palyed a part, but only a part, in the personal lines results that the company describes as still unsatisfactory.

**Life Insurance Results Also Ahead of Expectations**
Life insurance results were also stronger than we had anticipated, especially in view of the slowdown in world-wide economies. But according to the company, business remained strong, with premiums up 31.8% and pretax earnings up 17.8%. Most of the strength appears to be in the domestic markets which reported a14% increase in premiums and more than doubled its deposits in investment products. However, the international growth rate was not too shabby, either, when measured in original currency. Foreign life insurance premiums increased by 7.9% in US currency, 14% when measured in original currency.

According to the company, American International Group continues to benefit from the flight to quality in the Asian markets, especially in Japan where life insurance companies have been failing and American International Group's triple-A rating is a major marketing asset. The sale of investment products through the company's overseas life insurance channels declined by 7.5%, although this includes the negative translation effect of foreign currency - in original currency, sales and deposits increased.

Domestic annuities and investment product sales more than doubled, although the company cautions against annualizing this figure. However, we also notice a steady upward progression toward the current figure over the past four quarters.

**Financial Services: Strong Growth, Improved Margins.**
Revenues in the financial services segment increased by 14.5%, with the largest element, International Lease Financing, growing by 13.1%. The so-called

-- FIRST CALL --

CONFIDENTIAL

```
10:55am EST  8-Feb-01 Wasserstein Perella (Kenneth S. Zuckerberg  212.903.218)
Wasserstein: AIG Initial Read on 4Q Results

Initial Read on 4Q Results

COMPANY: American International Group
RATING : Hold
ANALYST: (Kenneth S. Zuckerberg  212.903.2189)      PRICE: $86.9      EXCH: NYSE

E P S : --- FULL YEAR ($US) ----   --------- PRICE -----   ---SHARES (Thsnd's)---
FY: Dec. Curr.    Prior    P/E    12 Mo Tgt :      $100    Mkt Cap: $201,221,729
2000 FC   2.45a                   52 Wk High:   $103.75    Shrs Out:   2,315,555
2001 WP   2.80e            31.04x 52 Wk Low :    $52.38    Dly Vol :       4,968
     FC   2.81e                   3Yr Growth:    15.00%    Div/Yld : $0.15/0.17%
2002 WP                           YTD Perf  :   -11.83%    LTD/CAP :      46.60%
     FC   3.22e                   Book Value:    $15.79
2003 WP                           Px/Book   :     5.50x
     FC

                                          as of: 02/08/2001 10:34 EST
```

```
E P S : --- 1st QTR ---   --- 2nd QTR ---    --- 3rd QTR ---    --- 4th QTR ---
         Curr.    Prior    Curr.    Prior    Curr.    Prior    Curr.    Prior
2000     0.58a             0.61a             0.61a             0.65a
2001
2002
2003
```

Footnote: Earnings have been adjusted for the July 31, 2000 3 for 2 stock
split.


Event: AIG reports on-target 4Q00 results.

Recommend: Maintain existing positions.

Analysis: AIG reported 4Q00 operating EPS of $0.65 compared to $0.56 in
4Q99, exactly in line with our EPS estimate and consensus.  While property &
casualty earnings growth fell materially short of our projections (11% actual
growth vs. 27% projected) and asset management earnings were modestly below
target (all references relate P/T operating income), the shortfalls were
completely offset by better results in life insurance (18% actual growth vs.
15% projected) and financial services  (23% growth vs. a projected 2% decline),
the latter being driven by aircraft leasing and AIG Financial Products.  In
the core P&C segment, it appears that underwriting profits were dampened by
U.S. personal lines, consistent with our recent comments about private
passenger auto insurance. While AIG's actual underwriting ratios (76.16% loss
ratio, 22.65% expense ratio, 98.81% combined ratio) were several points higher
than our estimate, the quarter's combined ratio was below 4Q99's level of
98.95%.  That said, AIG added to loss reserves during the quarter--the net
change was $106 million--a clear positive from an earnings quality standpoint.
Importantly, worldwide net premiums written and earned grew by a robust 12%
and 15% even with negative foreign currency adjustments (we had projected 8%
for each), underscoring our view that AIG continues to achieve low double-digit
rate increases.  CEO Greenberg commented that "stronger rates are evident

  -- FIRST CALL --
```

Fourth quarter earnings, at $0.65 per share (diluted, excluding investment gains), up from $0.56, were in line with consensus expectations, but apparently the market wanted more, judging by the decline in the share price. In our view, there was nothing in the earnings release itself that could be interpreted as bad news that would justify a sell-off.

In our opinion, the "Street" received earnings in line with what we viewed to be an aggressive expectation. Our own estimate was $0.63, and as it turns out, our estimate was low for each operating segment with the exception of the comparatively small asset management operation. But in view of the report, we are adding $0.02 to our 2001 earnings estimate, bringing it up to $2.80 per share. And we are raising our 2002 estimate from $3.15 per share to $3.25.

General Insurance -- Written Premiums Up 12.4%:
Our initial reaction, and one that we have not changed, is that the earnings report was quite positive if only because of the 12.4% growth of written premiums in the general insurance (property-casualty) segment. This was up from the 8% growth rate reported in the third quarter, and is in line with the trends we have been anticipating, as we look for upward acceleration of the growth rate of written premiums that we believe will drive the property-casualty stocks higher.

Nay-sayers might carp about the premium growth, pointing to the inclusion of one month of premium of the newly acquired HSB Group, and to the downward effect of foreign exchange currency translation. However, by our estimate, HSB business of perhaps $35 million accounts for less than 1% of the reported growth. And adjusted for the foreign exchange translation, the growth rate was a very strong 14%.

Especially impressive was the 18.4% growth in the domestic brokerage business. Most of the growth was in the core AIG business, as Transatlantic Holdings (TRH, rated Attractive), 56% owned by AIG and consolidated in the company's results, reported written premium growth of less than 9%.

In past quarters, American International Group has received criticism from some corners regarding what has been viewed to be a rather small increase in loss reserves, but we believe there is little room for criticism on this score in the most recent quarter. The company increased reserves by a total of $106 million, of which we believe roughly $30 million was put up by 21st Century (TW, not rated) that is also consolidated in AIG,s results, and $7 million by Transatlantic Holdings. That would leave roughly $70 million of reserves put up on the AIG core business.

A year ago, American International Group reduced reserves in the fourth quarter to the tune of $95 million net of increases at 21st Century and Transatlantic amounting to $65 million.

Perhaps some investors are concerned with the decline in profitability of the domestic property-casualty business, and especially the underwriting loss racked up by the personal lines operation. We had actually anticipated even weaker results in our model, simply based on industry conditions that are in the early stages of a broad upturn. However, the fact is that there is quite a delay after prices begin to improve before the results become visible on the bottom line of the income statements. But we do believe those results are well

-- FIRST CALL --

CONFIDENTIAL

AIG/GEN - RE - TRANS 0000925

07:30am EDT 27-Oct-00 Wasserstein Perella (Kenneth S. Zuckerberg 212.903.218)
Wasserstein: AIG Another On-Target Qtr; Pricing Trends Remain Positive

Another On-Target Qtr; Pricing Trends Remain Positive

COMPANY: American International Group
RATING : Buy
ANALYST: (Kenneth S. Zuckerberg  212.903.2189)    PRICE: $93.31    EXCH: NYSE

```
E P S  : --- FULL YEAR ($US) ----    --------- PRICE -----    ---SHARES (Thsnd's)---
FY: Dec. Curr.    Prior    P/E    12 Mo Tgt :    $100    Mkt Cap: $215,909,635
1999 FC      2.13a                52 Wk High :   $99.94    Shrs Outr :   2,313,834
2000 WP      2.45e            38.09x    52 Wk Low :    $52.38    Dly Vol :      3,261
     FC      2.45e                3Yr Growth:    15.00%    Div/Yld : $0.15/0.24%
2001 WP      2.80e            33.33x    YTD Perf  :    29.45%    LTD/CAP :     46.77%
     FC      2.80e                Book Value:    $15.04
2002 WP                            Px/Book   :     6.20x
     FC      3.10e
                                        as of: 10/27/2000 06:48 EDT
```

```
E P S  : --- 1st QTR ---   --- 2nd QTR ---    --- 3rd QTR ---   --- 4th QTR ---
        Curr.    Prior    Curr.    Prior    Curr.    Prior    Curr.    Prior
1999    0.50a            0.54a            0.53a            0.56a
2000    0.58a            0.61a            0.61a            0.64e
2001
2002
```

Footnote: Earnings have been adjusted for the July 31, 2000 3 for 2 stock split.

Event: AIG reported on-target 3Q00 EPS of $0.61, up 15% from 3Q99.

Recommend: Maintain positions, consider accumulating on weakness.

Analysis: Executive Summary on 3Q00 EPS:

AIG reported on target operating EPS of $0.61 in 3Q00 vs. $0.53 in 3Q99 or 15% growth. Relative to our model, pretax earnings were higher in the P&C and Life segments, partially offset by lower-than-expected growth in the Financial Services and Asset Management segments, though growth in both FS and AM were double digit.

In its press release, CEO Hank Greenberg was very positive on P&C pricing, citing continued improvement in domestic commercial and reinsurance. VERY IMPORTANTLY, HE CONFIRMED THAT AIG IS SEEING RATE INCREASES ARE OCCURING IN MANY CLASSES AND REGIONS OF THE WORLD."

In the P&C segment, net premiums earned (NPE) growth of 13% were above target and underwriting results were more favorable than we had expected. The combined ratio came in at 96.25% vs. our 96.40% projection, and improved relative to 3Q99 by 16 basis points.

- FIRST CALL --

CONFIDENTIAL

AIG/GEN - RE - TRANS 0001074

The only wrinkle in P&C was that there was a negative $59 million change in loss reserves which equates to 1.4% of NPE. While a decrease in reserves often raises a red flag, the change resulted from higher paid claims from past periods (which lowers the absolute level of outstanding loss reserves) rather than a "take-down" of loss reserves.

We believe that the downward pressure on the stock is the result of: 1) a "buy on the rumor, sell on the news" mentality vis-à-vis the improvement in domestic pricing; 2) concerns about the negative change in P&C loss reserves; and 3) perhaps the lower-than-expected results in the FS and AM segments.

Our full year EPS estimates of $2.45 and $2.80 are unchanged.

Valuation: AIG shares continue to trade at a premium valuation of 36x projected 2001 EPS of $2.80. Given the limited upside relative to our price target, we would accumulate shares principally on weakness.

Upcoming Events: None.

---

First Call Corporation, a ██████████████ company.
All rights reserved.  888.558.2500

-> End of Note <-

.- FIRST CALL --

CONFIDENTIAL

life insurance segment was considerably stronger than we anticipated and we believe general insurance (property-casualty) could surprise on the upside as well.

American International Group earned $0.61 per share in the third quarter, up from $0.53 reported last year and spot-on with the consensus expectation. However, investors were clearly un-nerved by the net reduction in property-casualty loss reserves during the quarter, amounting to $58.9 million that the stock market assumed was a reserve release that allowed the company to achieve its earnings target.

Put simply, the reduction is reserves caused some investors to challenge the quality of the company's earnings. Incorrectly, in our view.

Essentially, all of the reserve take-down represented catastrophe reinsurance reserves on the books of Transatlantic Holdings (TRH, rated Attractive) that were paid down during the third quarter. These reserves were attributed to catastrophe losses incurred previous to the third quarter. In addition, 21st Century Insurance (TW, not rated) also had a net reduction in reserves.

Another factor that clouds the reserve issue is that most of American International Group's strongest growth came in lines where the reserving tail is rather short (personal auto and mortgage guaranty). This, coupled with the continued payments on reserves built relatively recently results in the net reduction in reserves.

Investors also appeared to react negatively to one comment in the press release attributed to the CEO, that, in view of the poor underwriting environment, AIG stands ready to be a consolidator in the industry. Our interpretation of this remark is that the company agrees with our view that the industry's health is far weaker than is widely believed, and that this will create opportunities for strong companies such as AIG to buy companies or blocks of business on an opportunistic basis. Expanding on this, the company notes that the industry problems are not limited to the domestic property-casualty market, but also involve overseas markets including the London non-Life sector and the Asian life insurance markets.

Recently, the Japanese life insurance industry lost its second major player in two weeks to the bankruptcy courts. What was interesting about the second event was that an official indicated his company's downfall was hastened by the publicized difficulties of other companies that in turn is causing weaker companies to lose new sales and to experience a rising rate of cancellations and surrenders. Thus, we might conclude that the Japanese life insurance industry is experiencing a run on the bank that is allowing the strong companies such as triple-A rated American International Group to experience the benefits of a flight to quality.

With respect to each of American International Group's segments, our reactions are as follows:

** General Insurance (Property-casualty). Impressed by sequential increase in growth rate of domestic brokerage premiums. Company indicates it is getting price increases that are being offset somewhat by a continued paring back of unattractive accounts. Combined ratio was nearly unchanged from year-ago levels, although the personal lines was elevated above 100%,.

-- FIRST CALL --

CONFIDENTIAL

(excluding Transatlantic and 21st Century) grew 7.7%, up from 6.7% last quarter. International premium growth was slightly lower at 6.9%, in line with last year.

AIG's life insurance business showed an acceleration in premium growth. On a GAAP (reported) basis, international premiums rose 17.6%, above our long-term 15% growth assumption. Domestic premiums rose 27.4%. Including products treated as deposits, domestic premiums would have grown 26.3% and international premiums would have grown 17.7%. In general, foreign life insurance growth is accelerating while domestic premiums are, as expected, slowing down as the base of business continues to build. Our 2001 assumption for domestic premium growth is 20%.

Life insurance earnings, which rose 16.3%, were at a lower run rate than the recent 17%+ primarily because international life insurance earnings growth slowed down to 15.2%. This is in line with our estimates for 2001. SunAmerica's sales rose a very impressive 47.4%. However, its operating earnings rose 18.1% as compared to 21% last quarter. SunAmerica's earnings tend to be lumpy due to the timing of gains recognized in its alternative investment portfolio. SunAmerica's earnings are included both in the life segment and under Asset Management; Asset Management earnings increased 27.0% to $110.2 million and appear on track to range from $420-450 million for the year (we estimate to reach 5.2% of AIG's total earnings, up from 4.2% a year ago).

Underwriting was generally good. AIG reported a 95.3% combined ratio, excellent as usual and in line with its recent trends. Personal lines were a drag on results this quarter, coming in at 101.3% mostly as a result of 21st Century's 105.8% combined ratio. Because 21st Century is around one-third of AIG's personal lines business, by interpolation appears that AIG Direct is writing personal lines at a very acceptable 99% combined ratio. Personal lines are just under 15% of AIG's nonlife business mix. Overcoming the personal lines drag this quarter, the foreign general combined ratio came in at 95.77% and domestic brokerage wrote at a 98.56% combined ratio, consistent with the quarter's very light levels of catastrophe losses.

Reserves -- we're not concerned. The market was disturbed by AIG's net reserve decrease of $59 million, $43 million of which related to its Transatlantic Holdings reinsurance subsidiary. Pass the popcorn, we've seen this movie before . . . to us this looks like a classic buying opportunity. AIG has reduced reserves twice recently -- in the second and fourth quarters of 1999 -- and the market reacted badly then as well. AIG bounced back in both cases because 1) like today, the explanation for the reserve decline was reasonable and 2) more important, no "other shoe" ever dropped. We don't believe another shoe will drop this time either.

We do care a lot about reserves, and if we saw a steady trend of unexplained releases during a period of premium growth, we'd definitely be concerned. But that's not the case here.

· First, the number we are talking about is small -- 0.2% of AIG's reserves -- and represents only a single quarter's data point, not a trend.

· In general, we think it's dangerous to draw sweeping conclusions from one quarter's reserve data, given the many complex factors that drive this

- FIRST CALL --

CONFIDENTIAL

AIG/GEN - RE - TRANS 0001094



**WESTERN GENERAL INSURANCE LTD.**
P.O. BOX HM 2442, HAMILTON HM JX, BERMUDA

TELEPHONE: (441) 295-5338
TELECOPIER: (441) 292-3168
E-MAIL: western@ibl.bm

By Air Courier

① return #
② Keep a copy for pour file.

June 20, 2000

Mr. ████████████

American International Group, Inc.
70 Pine Street
39ᵗʰ Floor
New York, N.Y. 10270

Dear ████

Re: Transfer of reinsurance
Capco Re (Barbados) to Westgen (Bermuda)
Effective April 28, 2000
Our policy nos. 1310-93 and 94
AIGRM Stop Loss

Enclosed herewith are three (3) originals of the Novation Agreement on the above captioned transfer of reinsurance.

Please arrange for the signing of all originals by the Insured entities and then forward all sets to ███████ at MIMS International (Barbados) for execution on behalf of Capco Re. Upon completion, ███████ will then return a fully executed copy to both yourself and Westgen.

Many thanks for your assistance with this matter.

Yours sincerely,

John L. Marion
President & Managing Director

Encl.

Cc: ████████████ (by fax)

████:JLM:████

SWAN BUILDING, 26 VICTORIA STREET, HAMILTON HM 12.

CONFIDENTIAL

JUL 19 2000 15:09 FR AIG FINANCIAL PL    212 785 6017 TO 14412928092    P.02/02

## PROPRIETARY AND CONFIDENTIAL

**Narrative Description of Proposal for External Investor**

Capco Reinsurance Company Ltd. (Capco) is a Barbados domiciled insurer with approximately $5m in equity and $93m assets as at December 31, 1999. Prior to June 30, 2000 Capco will be restructured, novating all active contracts to it's parent, distributing all remaining assets save $.2m of equity and obtaining an indemnification from it's parent in respect of all prior business.

The restructured Capco will then be available for the sole purpose of reinsuring a U.S. insurance entity (Reinsured Company) on a particular closed book of U.S. risk business. Immediately prior to entering this reinsurance treaty Capco will be recapitalized with non-voting cumulative redeemable Preferred shares of $170m, to be funded by a Sponsor Company and $20m Common shares. The Sponsor Company is seeking an External Investor(s) to take a majority holding in the Common shares of Capco.

Since the nature of the business is somewhat unpredictable, and the related losses are difficult to estimate, the business ceded may ultimately create an underwriting loss to Capco. The External Investor's risk of loss from its ownership of Common shares of Capco will be limited through the use of non-recourse loans provided by the Sponsor Company to purchase such Common shares. However, the emergence of a possible underwriting loss in the assumed reinsurance may render such Common equity interest worthless. Immediately thereafter, any continuing losses would erode the value of the Preferred shares placed by the Sponsor Company.

The fully paid purchase price for the Common and Preferred shares and the premium received under the reinsurance treaty will fully fund the limit of the reinsurance treaty. Restrictions will be placed on the business operations of Capco to ensure that these funds are not used for other purposes.

Although the last paid loss under the ceded book will be in approximately six years, the Reinsured Company may wish to commute the reinsurance treaty in three to four years subject to loss experience to date on mutually agreed upon terms. If there were unfavourable underwriting experience the Sponsor Company's remaining Preferred shares would then receive all remaining assets of Capco. Conversely, if there were favourable underwriting experience, the External Investor would receive all remaining assets after redemption of the Preferred shares.

Capco will be managed by a services company. Capco will bear the expenses of the services company, audit fees, directors' fees and applicable insurance as required.

Notice: This presentation is not an offer to sell or a solicitation of an offer to buy securities in any jurisdiction where such offer or solicitation would be unlawful.

** TOTAL PAGE.02 **

CONFIDENTIAL

AIG/GEN-RE-TRANS    0012449



From:
Sent:                 Tuesday, August 08, 2000 2:52 PM
To:
Cc:
Subject:              CAPCO Reinsurance Company Ltd.

I met with [redacted] (Umansky's group) last week. AIG Capital Corp. has been proposed as the on-shore company to participate in this deal. AIRCO is the other company. [redacted] had told me you were familiar with the deal but not that AIGCC has entered into the picture.

The purpose of the CAPCO structure is to transfer U/W losses (approx. $200 MM) on auto warranty business from NUFI, primarily, to Capital losses over the next 3-4 years. AIGCC's portion would be a $19 Million loan, split equally to three hand-picked investors (by AIG Private Bank).

AIGCC would get a $19 Million capital contribution. Lend the money (via AIGPB) to the 3 investors who must use the loan proceeds to purchase Common Stock of CAPCO. AIGCC gets a secured interested in the Common Stock (from the investors, but has no direct ownership in CAPCO). The 3 loans mature June 30, 2005 & interest rate is 6% compounded annually. All payments of P&I are balloons, at maturity.

The $19 Million loans will, in all probability, biome worthless at some time in the future (it is anticipated that the structure will be completely unwound in 3-4 years). Assuming full write down, AIGCC would end up with negative retained earnings. Total capital structure would still be positive because of the offsetting capital injection above. Since AIGCC is unaudited, the negative retained earnings is not the major issue it would be with an audited company.

Since, I would have to book this as an arm's length transaction, the interest income will need to be accrued (even though I would reserve against it in the financials). Thus, for tax purposes, taxes will have to be paid annually on the interest income. I can only take the tax write-off when the loan + interest defaults are deemed worthless for tax purposes. The tax statutes don't allow write-offs without 100% proof (there must be no doubt or possibility, at all, as to possible future recovery).

Please let me know when you are ready to discuss this matter.

| Tracking: | Recipient | Delivery | Read |
|---|---|---|---|
| | | Delivered: 8/8/2000 2:52 PM | Read: 8/8/2000 3:04 PM |
| | | Delivered: 8/8/2000 2:52 PM | Read: 8/8/2000 3:00 PM |

1



**MEMORANDUM**                                      August 11, 2000

To:

From:   Howard Smith

Re:     Investment in Capco Preferred shares

This memo serves as authorization for AIRCO to execute the purchase of 8,500 Series A Preferred Shares of Capco Reinsurance Company Ltd. for the aggregate purchase price of $170,000,000 USD. I understand the transaction is to take place at or near August 25ᵗʰ, 2000.

cc:     M. Murphy
        J. Urbansky

AIGTI, Inc.
70 Pine Street
New York, NY 10270

January 2, 2003



c/o
AIG Private Bank Ltd.,
Pelikanstrasse 37,
CH-8021 Zurich
Switzerland

Re:    Capco Reinsurance Company Ltd.

Dear ███████:

In connection with the US$6,333,334 Limited Recourse Promissory Note, dated August 25, 2000 (the "Note"), between you, as borrower (the "Borrower"), and AIGTI, Inc. ("AIGTI", formerly known as AIG Capital Corp.), as holder (the "Holder"), and the Pledge and Security Agreement, dated August 25, 2000 (the "Pledge Agreement"), between you, as pledgor, and AIGTI, as pledgee, pledging 6,333,334 shares of the common stock (the "Common Stock") of Capco Reinsurance Company, Ltd., a Barbados corporation ("Capco") to AIGTI in order to secure the obligations of the Borrower under the Note, please be advised of the following:

1.    As you are aware, the board of directors and shareholders of Capco voted to wind up Capco's affairs and liquidate Capco on or prior to December 31, 2002.

2.    All of the existing assets of Capco remaining after commutation of Capco's reinsurance agreements and payment of other expenses were distributed to the holders of shares of the preferred stock (the "Preferred Stock") of Capco in partial satisfaction of the liquidation preference on the Preferred Stock.

3.    Upon the distribution of the assets of Capco to the holders of shares of the Preferred Stock, no further assets remained for distribution to the holders of shares of the Common Stock.

4.    In light of the non-recourse nature of the Note, you have no further liability under the Pledge Agreement or the Note.

5.    AIGTI, therefore, (x) cancels the Note and (y) agrees to terminate the Pledge Agreement.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL

Please signify your agreement with the foregoing by executing a copy of this letter and kindly returning it to me by facsimile at ( ) . Should you have any questions regarding this matter, please do not hesitate to contact me at ( ) .

Very truly yours,



AGREED TO AND ACCEPTED
As of the date first written above.   *14 January 2003*

By: _____

CONFIDENTIAL

AIGTI, Inc.
70 Pine Street
New York, NY 10270

January 2, 2003

c/o ███████████
AIG Private Bank Ltd.,
Pelikanstrasse 37,
CH-8021 Zurich
Switzerland

Re:   Capco Reinsurance Company Ltd.

Dear Sir or Madam:

In connection with the US$6,333,333 Limited Recourse Promissory Note, dated August 25, 2000 (the "Note"), between ██████████████ ("██████"), as borrower (the "Borrower"), and AIGTI, Inc. ("AIGTI", formerly known as AIG Capital Corp.), as holder (the "Holder"), and the Pledge and Security Agreement, dated August 25, 2000 (the "Pledge Agreement"), between ███████, as pledgor, and AIGTI, as pledgee, pledging 6,333,333 shares of the common stock (the "Common Stock") of Capco Reinsurance Company, Ltd., a Barbados corporation ("Capco") to AIGTI in order to secure the obligations of the Borrower under the Note, please be advised of the following:

1.    As you are aware, the board of directors and shareholders of Capco voted to wind up Capco's affairs and liquidate Capco on or prior to December 31, 2002.

2.    All of the existing assets of Capco remaining after commutation of Capco's reinsurance agreements and payment of other expenses were distributed to the holders of shares of the preferred stock (the "Preferred Stock") of Capco in partial satisfaction of the liquidation preference on the Preferred Stock.

3.    Upon the distribution of the assets of Capco to the holders of shares of the Preferred Stock, no further assets remained for distribution to the holders of shares of the Common Stock.

4.    In light of the non-recourse nature of the Note, ██████ has no further liability under the Pledge Agreement or the Note.

5.    AIGTI, therefore, (x) cancels the Note and (y) agrees to terminate the Pledge Agreement.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL

Please signify ████████ agreement with the foregoing by executing a copy of this letter and kindly returning it to me by facsimile at ████████ Should you have any questions regarding this matter, please do not hesitate to contact me at ████████

Very truly yours,

████████

████████

AGREED TO AND ACCEPTED
As of the date first written above,    *14 January 2003*

████████

By ████████
    Name: ████████
    Title: ████████

CONFIDENTIAL

AIG/GEN-RE-TRANS    0012584

AlGTI, Inc.
70 Pine Street
New York, NY 10270

January 2, 2003



c/o
CH-8001 Zurich
Switzerland

Re:    Capco Reinsurance Company Ltd.

Dear Mr. ████:

In connection with the US$6,333,333 Limited Recourse Promissory Note, dated August 25, 2000 (the "Note"), between you, as borrower (the "Borrower"), and AlGTI, Inc. ("AlGTI", formerly known as AIG Capital Corp.), as holder (the "Holder"), and the Pledge and Security Agreement, dated August 25, 2000 (the "Pledge Agreement"), between you, as pledgor, and AlGTI, as pledgee, pledging 6,333,333 shares of the common stock (the "Common Stock") of Capco Reinsurance Company, Ltd., a Barbados corporation ("Capco") to AlGTI in order to secure the obligations of the Borrower under the Note, please be advised of the following:

1.      As you are aware, the board of directors and shareholders of Capco voted to wind up Capco's affairs and liquidate Capco on or prior to December 31, 2002.

2.      All of the existing assets of Capco remaining after commutation of Capco's reinsurance agreements and payment of other expenses were distributed to the holders of shares of the preferred stock (the "Preferred Stock") of Capco in partial satisfaction of the liquidation preference on the Preferred Stock.

3.      Upon the distribution of the assets of Capco to the holders of shares of the Preferred Stock, no further assets remained for distribution to the holders of shares of the Common Stock.

4.      In light of the non-recourse nature of the Note, you have no further liability under the Pledge Agreement or the Note.

5.      AlGTI, therefore, (x) cancels the Note and (y) agrees to terminate the Pledge Agreement.

[SIGNATURE PAGE FOLLOWS]

CONFIDENTIAL

Please signify your agreement with the foregoing by executing a copy of this letter and kindly returning it to me by facsimile at ███████████. Should you have any questions regarding this matter, please do not hesitate to contact me at ███████████.

Very truly yours,



AGREED TO AND ACCEPTED
As of the date first written above,

By: ███████████

CONFIDENTIAL

Spier, Arnold

**From:**
**Sent:** Tuesday, December 07, 1999 3:23 PM
**To:**
**Cc:** Umansky, Joseph;
**Subject:** AGG LOSS RATIO AND EXCES AGRMT

Attached is the rough basis of an agreement I was discussing. Thanks for your assistance.

aglosaigunion.doc

CONFIDENTIAL

AIG/GEN-RE-TRANS    0013431

# 1999 AGGREGATE LOSS RATIO AGREEMENT

between

## AMERICAN INTERNATIONAL REINSURANCE COPMANY, LTD.
(hereinafter called the "Company")

and

## UNION EXCESS REINSURANCE COMPANY LTD.
(hereinafter called the "Reinsurer")

## ARTICLE I

### BUSINESS COVERED

The Reinsurer hereby agrees to obligate itself to accept 100% of the liability deemed by the Company to be classified as Life Insurance in Brazil for the calendar year 1999 in excess of the retention.

## ARTICLE II

### TERM AND TERMINATION

This Agreement commences at 12:01 a.m. Eastern Standard Time, January 1, 1999 and shall remain in force until all liabilities of the Company are settled.

## ARTICLE III

### TERRITORY

This Agreement covers risks Originally underwritten in Brazil as Life policies.

## ARTICLE IV

### LIMIT AND RETENTION

The Reinsurer shall be liable for 100% of the excess loss incurred by the company as a result of an aggregate loss ratio in excess of _____ %. The aggregate liability of the Reinsurer shall not exceed $35,000,000.

## ARTICLE V

### CONSIDERATION

The Company will pay the Reinsurer a premium of $1,000,000 (US Dollars) prior to December 31, 1999.

CONFIDENTIAL

## ARTICLE VI

### REPORTS AND ACCOUNTING

As promptly as possible after the end of each calendar quarter, the Company shall furnish a report to the Reinsurer including the following:

1.  Subject earned premiums, inception to date;

2.  Net losses paid by the Company, inception to date;

3.  Reserve for outstanding losses on subject business.

Should the net paid losses of the Company exceed _____% of the subject earned premiums, the Reinsurer will pay to the Company the amount by which such losses exceed _____% subject to the limit specified in Article IV. The amount due shall be remitted to the Company within one hundred eighty (180) days following receipt of the report by the Reinsurer.

## ARTICLE VII

### CURRENCY

All premium and loss payments hereunder shall be in United States currency. The rate of exchange applied shall be that used by the Company in its own books of account or in accordance with any subsequent adjustments thereto.

## ARTICLE VIII

### ACCESS TO RECORDS

Provided the Reinsurer's balance with respect to this Agreement is current in accordance with the terms and conditions of the Agreement, or with the consent of the Company, the Reinsurer or its duly appointed representatives shall have free access at all reasonable times to such books and records of those Divisions, Departments and Branch Offices of the Company which are directly involved with the subject matter business of this Agreement as shall reflect premium and loss transactions of the Company for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof. All non-public information provided in the course of the inspection shall be kept confidential by the Reinsurer as against third parties.

## ARTICLE IX

### ERRORS & OMISSIONS

Any inadvertent delay, omission or error shall not relieve either party hereto from any liability which would attach to it hereunder if such delay, omission or error had not been made, provided such delay, omission or error is rectified immediately upon discovery.

CONFIDENTIAL

AIG/GEN-RE-TRANS   0013433

## ARTICLE X

### FOLLOW THE FORTUNES

The Reinsurer's liability shall attach simultaneously with that of the Reinsured Company, and shall be subject in all respects to the same risks, terms, conditions, interpretations, waivers and to the same modifications, alterations and cancellations, as the respective insurances (or reinsurances) of the Reinsured Company, the true intent of this Agreement being that the Reinsurer shall, in every case to which this Agreement applies, follow the fortunes of the Company.

## ARTICLE XI

### SERVICE OF SUIT

(Applicable only to Reinsurers domiciled outside the United States of America)

A. It is agreed that in the event of the failure of the Reinsurers hereon to pay any amount claimed to be due hereunder, the Reinsurers hereon, at the request of the Company, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this clause constitutes or should be understood to constitute a waiver of Reinsurers' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Mendes & Mount, 3 Park Avenue, New York, New York 10016, and that in any suit instituted against any one of them upon this contract, Reinsurers will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

B. The above-named are authorized and directed to accept service of process on behalf of Reinsurers in any such suit and/or upon the request of the Company to give a written undertaking to the Company that they will enter a general appearance upon Reinsurers' behalf in the event such a suit shall be instituted.

C. Further, pursuant to any Statute of any state, territory or district of the United States which makes provision therefore, Reinsurers hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Company or any beneficiary hereunder arising out of this contract of reinsurance, and hereby designate the above-named Mendes & Mount as the person to whom the said officer is authorized to mail such process or a true copy thereof.

CONFIDENTIAL

## ARTICLE XII

### INSOLVENCY

In the event of the insolvency of the Company, this reinsurance shall be payable directly to the Company, or to its liquidator, receiver, conservator or statutory successor on the basis of the liability of the Company without diminution because of the insolvency of the Company or because the liquidator, receiver, conservator or statutory successor of the Company has failed to pay all or a portion of any claim. It is agreed, however, that the liquidator, receiver, conservator or statutory successor of the Company shall give written notice to the Reinsurer of the pendency of a claim against the Company indicating the policy or bond reinsured which claim would involve a possible liability on the part of the Reinsurers within a reasonable time after such claim is filed in the conservation or liquidation proceeding or in the receivership, and that during the pendency of such claim the Reinsurers may investigate such claim and interpose, at their own expense, in the proceeding where such claim is to be adjudicated any defense or defenses that they may deem available to the Company or its liquidator, receiver, conservator or statutory successor. The expense thus incurred by the Reinsurers shall be chargeable, subject to the approval of the court, against the Company as part of the expense of conservation or liquidation to the extent of a pro rata share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurers.

Where two or more Reinsurers are involved in the same claim and a majority in interest elect to interpose defense to such claim, the expense shall be apportioned in accordance with the terms of the reinsurance agreement as though such expense had been incurred by the Company.

This reinsurance shall be payable by the Reinsurers to the Company or to its liquidator, receiver, conservator or statutory successor, except (a) where the Agreement specifically provides another payee of such reinsurance in the event of the insolvency of the Company, and (b) where the Reinsurers with the consent of the direct insured or insureds have assumed such policy obligations of the Company as direct obligations of the Reinsurers to the payees under such policies and in substitution for the obligations of the Company to the payees.

## ARTICLE XIII

### OFFSET

Each party hereto shall have, and may exercise at any time and from time to time, the right to offset any undisputed balance or balances, whether on account of premiums or on account of losses or otherwise, due from such party to the other (or, if more than one, any other) party hereto under this Agreement or under any other reinsurance agreement heretofore or hereafter entered into by and between them, and may offset the same against any undisputed balance or balances due to the former from the latter under the same or any other reinsurance agreement between them, and the party asserting the right of offset shall have and may exercise such right whether the undisputed balance or balances due to such party from the other are on account of premiums or on account of losses or otherwise and regardless of the capacity, whether as assuming insurer or a ceding insurer, in which each party acted under the agreement or, if more than one, the different agreements involved.

CONFIDENTIAL

## ARTICLE XIV

### ARBITRATION

All disputes or differences arising out of the interpretation of this Agreement shall be submitted to the decision of two arbitrators, one to be chosen by each party and in the event of the arbitrators failing to agree, to the decision of an umpire to be chosen by the arbitrators. The arbitrators and umpire shall be active or retired executive officials of fire or casualty insurance or reinsurance companies. If either of the parties fails to appoint an arbitrator within one month after being required by the other party in writing to do so, such arbitrator or umpire, as the case may be, shall at the request of either party be appointed by a Justice of the Supreme Court of the State of New York.

The Arbitration proceeding shall take place in New York, New York. The applicant shall submit its case within one month after the appointment of the court of arbitration, and the respondent shall submit his reply within one month after the receipt of the claim. The arbitrators and umpire are relieved from all judicial formality and may abstain from following the strict rules of law. They shall settle any dispute under the Agreement according to an equitable rather than a strictly legal interpretation of its terms and their decision shall be final and not subject to appeal. Each party shall bear the expenses of its arbitrator and shall jointly and equally share with the other the expenses of the umpire and the arbitration.

This Article shall survive the termination of this Agreement.

## ARTICLE XV

### SEVERABILITY

If any provision of this Agreement shall be rendered illegal or unenforceable by the laws, regulations or public policy of any state, such provision shall be considered void in such state, but this shall not affect the validity or enforceability of any other provision of this Agreement or the enforceability of such provision in any other jurisdiction.

## ARTICLE XVI

### GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the state of New York.

## ARTICLE XVII

### ENTIRE AGREEMENT

The contract constitutes the entire understanding between the parties to this Agreement and may only be amended by written agreement signed by both parties and attached hereto.

CONFIDENTIAL

# ARTICLE XVIII

## CONFIDENTIALITY

All terms and conditions of this Agreement and any materials provided in the course of inspection shall be kept confidential by the Reinsurer as against third parties, unless the disclosure is required pursuant to process of law or unless the disclosure is to Reinsurer's retrocessionaires, financial auditors or governing regulatory bodies. Disclosing or using this information for any purpose beyond the scope of this Agreement, or beyond the exceptions set forth above, is expressly forbidden without the prior consent of the Company.

IN WITNESS WHEREOF: The parties hereto have caused this Agreement to be executed by their authorized representatives.

In: _____ this _____ day of _____ 1999

### AMERICAN INTERNATIONAL REINSURANCE COMPANY, LTD.

By: _____        Title _____

And in: _____ this _____ day of _____ 1999

### UNION EXCESS REINSURANCE COMPANY LTD.

By: _____        Title: _____

CONFIDENTIAL

MAR 17 2005 22:21 FR           TO      P.04

# MEMORANDUM

**AMERICAN INTERNATIONAL COMPANIES.**
DBG LEGAL SERVICES
160 Water Street, 24 th. Floor
New York, NY 10038
Fax No.:      (212) ▬
Direct Dial No.:    (212) ▬

| | | | |
|---|---|---|---|
| **TO:** |  | **DATE:** | March 16, 2005 |
| **FROM:** | | | |
| **RE:** | **Richmond Insurance Company** | | |

In response to your memo of January 7, 1999 regarding the above, please be advised that although an AIG entity owns 19.9 % of Richmond Insurance Company Ltd. (Bermuda) it does not control the insurer. 49.9 % of the single class of common voting stock of the Bermuda insurer is owned by Munich RE.

The remaining shares are owned by three minority investors;  (a ▬ company), the ▬ (a trust) and ▬. Each of these minority investors is independent of American International Group, Inc. and its subsidiaries and affiliates.

**Redacted for Privilege**

1/18/99

CONFIDENTIAL

AIG/GEN-RE-TRANS    0013514

somehow. So the investment guy was saying that we got to go down, lower than 20% anyway and the underwriting guy was saying I don't anything about non-traditional business and I'm retiring next may and so lets work this out. So they sent me this letter and exchange of e-mail in early December - [REDACTED] and I went over to a meeting with them to see what they were talking about, you know, how they wanted to work it out. The e-mail said let's work it out to our mutual advantage – that's what initially started this. And we had long conversations about options and they were saying, well we would really like to put the shares to get time period going because if they did not put them – they did not express interest in the put, you know, a then which is just telling us, basically, if they did not express that interest in December then they would have to wait another eighteen (18) months. So they expressed the interest at the meeting and I said that I would honor that as a tender and that means that on June 30$^{\text{th}}$, technically they could put the shares. But putting the shares is the worst exit for everybody because they lose 80% of the value that's built up, you know they'll lose the excess over cost and its not going to get them out of what happens subsequently which is the letter that I sent to you that they said they got form Spitzer of S— or whatever it is and they are going to cooperate just like AIG is cooperating. You know the —— in the non-traditional business I've been able to count twelve of them but anytime Spitzer's group gets wind of a non-traditional contract, they send out a subpoena and so, you know, he is just looking at every transaction he can and he wants to investigate. \

So, what happened in December, we came back and I told them I would look for a buyer – went back to Howie and Howie Smith, our CFO at that time and the Actuary, [REDACTED] and I went up to see them all to explain the business and discuss the options, you know, including running it off, winding it up, finding a buyer to take the put from Munich and continue as usual. And, initially in January, like mid-January, 3$^{\text{rd}}$ week in January they

CONFIDENTIAL

AIG/GEN-RE-TRANS  0014315

**From:**
**Sent:** Friday, March 10, 2000 9:01 AM
**To:**
**Cc:**
**Subject:** RE: AIRCO settlements

████ will liase with ████████ concerning the cash requirement for 20th March.

-----Original Message-----
**From:**
**Sent:** Friday, March 10, 2000 8:56 AM
**To:**
**Subject:** RE: AIRCO settlements

The proposed settlements of 33.3 million to Union Excess in March and the 34.2 million due AIRCO under the commutation agreement are wrap ups of last year's reinsurance.

I do not know anything about a similar transaction for about 56 million for 2000.

-----Original Message-----
**From:**
**Sent:** Friday, March 10, 2000 8:41 AM
**To:**
**Subject:** FW: AIRCO settlements

There has been some new correspondence about Union Excess. Can you please clarify what these payments/bookings are for Hank?

Also, does anyone know anything about this similar transaction for 2000 for about $56m, mentioned by Hank?

Regards

-----Original Message-----
**From:**
**Sent:** Thursday, March 09, 2000 3:29 PM
**To:**
**Cc:**
**Subject:** RE: AIRCO settlements

Isn't this just the wrap-up of last year's reinsurance?
No, I did not know that MRG wants more.
Can you be more specific. Suggest that this be done by phone. ████████ is one hour ahead.

-----Original Message-----
**From:**
**Sent:** Thursday, March 09, 2000 2:12 PM
**To:** Austin, Frank
**Cc:**
**Subject:** RE: AIRCO settlements
**Importance:** High

What does all this mean.
Are you aware that MRG wants a similar transaction for 2000 for about $56 million?

AIG - Life Management Division - Wilmington, DE
Phone: ████ Fax: ████
Internet E-Mail: ████████@AIG.com

1

From:
Sent:                    Tuesday, January 09, 2001 10:43 AM
To:
Subject:                 FW: Union Excess - Swaps

██████please accrue the RCL in 4Q'00 with a payable due to Union Excess.

See me if you have any questions

Thanks

—Original Message—
From:
Sent:        Tuesday, January 09, 2001 10:34 AM
To:
Subject:     Union Excess - Swaps

In 2000 AIRCO (Life) entered in to 3 swap transactions with Union Excess. These were closed out on December 5, 2000 with a loss to AIRCO of $28,300,000. Please accrue a payable in AIRCO (Life)'s 2000 results for this realised capital loss.

Settlement is due to Union Excess by January 19, 2001 and I will speak to you about this separately.

Thanks.

1

CONFIDENTIAL          AIG/GEN-RE-TRANS 0016625

From:    ███████████
Sent:    Thursday, December 09, 1999 10:45 AM
To:      ███████████
Cc:      ███████████  y  @New York
Subject: Urgent Reinsurance Contract (Uniseg/Forex)

I discussed the above with ███████████ yesterday. Since I am due to leave for Japan this evening and the proposals involve AIRCO, I thought I should summarise my understanding of the situation. ███████████ has also been involved in discussions about this.

I understand that we have a foreign exchange loss of $44m in our Brazilian life operations and we are being asked to come up with a reinsurance contract before the end of the year which will somehow "cancel" out the loss. The source of the request is from Joe Umansky's team, apparently based on Howie Smith's instructions.

The first suggestion was that AIRCO Life should effect reinsurance on part of the Brazilian Life business with a Barbados company Union Excess. AIRCO would make a reinsurance recovery under the contract. Clearly there could be problems getting approval for this from our auditors, and I felt that we should also run the proposals past Mike Murphy to see if he is happy with it. There was also the tricky issue of finding a suitable block of business in Brazil and a reinsurance structure that would work.

The deal is apparently very urgent, since we need a contract in place in time for it to be approved at a board meeting of Union Excess on Tuesday 14th Dec.

I had further discussions with ███████████ (of Umansky's team) yesterday and the details are now quite different from what we originally thought. It seems that it does not need to be a reinsurance contract based on Brazil after all: any block of Life business would be OK. Also, since Union Excess is not licensed to accept life business, it would have to be "non-life" business coming from the Life Division, which probably means A&H.

As it stands now, I think all we can do is locate a suitable block of A&H business within the Life Division that could be used. The wording of the reinsurance contract would depend on what we are reinsuring, but we have received a draft of how this would be handled on the Gen side, and I understand that ███████ is now involved with this. ███████████ discussed some of the accounting issues yesterday evening, but it appears that we do not yet have a clear picture of what has to be achieved.

Regards

███████████

1

**From:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Sent:** Wednesday, August 30, 2000 2:42 PM
**To:** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
**Cc:** Umansky, Joseph; ▓▓▓▓▓▓▓▓ Smith, Howard▓▓▓▓▓▓ @70 Pine;
**Subject:** FW: Nan Shan 2000
**Importance:** High

Following-up as to the status of the 2000 agreement. Will anything be book in the 3rd quarter as previously discussed.
Please advise.
Thanks

▓▓▓▓▓▓▓▓▓▓▓

AIG - Life Management Division - Wilmington, DE
Phone: ▓▓▓▓▓▓▓▓ Fax: ▓▓▓▓▓▓
Internet E-Mail: ▓▓▓▓▓▓@AIG.com

——Original Message——
**From:** ▓▓▓▓▓▓▓▓▓▓
**Sent:** Tuesday, May 16, 2000 11:50 AM
**To:** ▓▓▓▓▓▓▓▓▓
**Subject:** FW: Nan Shan 2000
**Importance:** High

Before I send an e-mail to ▓▓▓▓▓▓ asking for projected premiums, claims, expenses, etc. as last year, please confirm the amounts (I take it that this is a continuation of Brazil F/X).

——Original Message——
**From:** ▓▓▓▓▓▓▓▓▓▓
**Sent:** Wednesday, May 10, 2000 4:05 PM
**To:** ▓▓▓▓▓
**Cc:** Umansky, Joseph
**Subject:** Nan Shan 2000
**Importance:** High

▓▓▓▓▓ attached is a draft reinsurance agreement for the 2000 accident year of the same structure as the 1999 cover. The 2000 cover is designed to yield a 28m underwriting benefit (2m premium and 30m recovery). ▓▓▓▓▓▓ informed me that 28m is the desired underwriting benefit.

Unlike last years the attachment point is designed to be sure of consuming the full 30m limit of the policy. I am using a 38% attachment rather than last years 40%.

Could you look at the latest full year loss ratio and premium volume projections for the subject business of this contract and let me know if we have comfort that the full limit will be consumed.



Reinsurance Cover
2000.doc

EXECUTION COPY

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (the "Settlement Agreement"), dated as of March 14, 2005, is entered into by and between AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, an Alaska stock insurance company (the "Company"), and the STATE OF ALASKA, DIVISION OF INSURANCE (the "Division").

## W I T N E S S E T H:

WHEREAS, the Division has completed its statutory financial examination of the Company for the three year period ending December 31, 2002 and issued a final report of examination (the "Examination Report") containing various "Findings" and "Recommendations;"

WHEREAS, the Company is required under Alaska law to comply with such Recommendations;

WHEREAS, the Company disagrees with some of the Recommendations contained in the Examination Report and by letter dated December 23, 2004, requested a hearing relating to the Examination Report under AS 21.06.180;

WHEREAS, the Company and the Division have engaged in extensive settlement negotiations and believe that an agreed-upon settlement would be in the best interests of both the Company and the Division; and

WHEREAS, concurrently with the effectiveness of the Settlement Agreement, the Company will withdraw its hearing request relating to the Examination Report.

NOW, THEREFORE, the Company and the Division each hereby agree as follows:

1.      After the Examination Report was sent to the Company recommending that the Company remove the Coventry Life Settlements Program from its book of business, the Company assigned and transferred all rights, obligations, duties, and liabilities under the Coventry Life Settlements Program Insurance Agreement and the related reinsurance agreements to American International Reinsurance Company, Ltd., a Bermuda insurance company and an affiliate of the Company. Under the transfer agreements, copies of which are attached hereto as Exhibit A, the Company received a full release of liability from all parties. The transfer agreements were made effective October 1, 2004.

As a transfer to an affiliate, the Company was required to seek and obtain approval from the Division prior to the transfer and to file and have approved a Form D. The Company did not seek nor obtain the required approvals from the Division. However, as part of this settlement, the Division will not require the Company to unwind the transfer.

2.      The Company will record the transfer agreements as the correction of an error in previously issued financial statements under SSAP No. 3. More specifically, the Company will:

AIG-COV 000070
CONFIDENTIAL

a.    adjust surplus in its 2004 Annual Statement, as provided in paragraph 10 of SSAP No. 3, by approximately $3.7 million (representing less than 1% of the company's surplus at December 31, 2003) representing the net impact of all activity recorded under the Insurance Agreement and related reinsurance from October 2, 2001 (inception) through December 31, 2003, net of taxes;

b.    reverse the activity recorded under the Insurance Agreement and related reinsurance from January 1, 2004 through September 30, 2004 in its 2004 Annual Statement; and

c.    make the disclosures set forth in paragraph 13 of SSAP No. 3 in its 2004 Annual Statement. The format and wording of the disclosures shall be as set forth in Exhibit B hereto.

3.    The Company's response letter to the Recommendations set forth in the Examination Report is attached as Exhibit C hereto.

4.    The Company shall provide a certification in the form set forth as Exhibit D hereto signed by its President to the effect that the Company's 2004 Annual Statement, as filed with the Division and the NAIC, reflects the implementation of all Recommendations cited in the Examination Report as applied to the 2004 activity of the Company.

5.    The Company shall pay a civil fine of $400,000 for violations of Alaska law arising out of the Coventry Life Settlements Trust Program and related transactions.

6.    Concurrently with the execution and delivery of this Settlement Agreement, the Company shall withdraw its request for a hearing on the Examination Report dated December 23, 2004.

7.    The Company and the Division each agree that:

a.    the foregoing represents a full and final settlement of their disagreements on any and all matters identified in the Examination Report;

b.    it has been represented by counsel in connection with the settlement effected herein, and has not relied upon any representations made by the other party in entering into this Settlement Agreement, other than any representations made by a party to the other in writing; and

c.    the Division will take no further action against, and will seek no further fines or penalties from, the Company, its parents, directors, officers, and affiliates relating to any and all matters identified in the Examination Report; provided, however, that this Settlement Agreement shall not preclude the Division from taking action against the Company for any future failure to comply with the Recommendations set forth in the Examination Report or for seeking fines or penalties from the Company for any future failure to comply with such Recommendations or Alaska law.

AIG-COV 000071
CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have caused this Settlement Agreement to be executed by their duly authorized representatives as of the date first set forth above.

AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE COMPANY

By: _____

    Name:

    Title:

STATE OF ALASKA,
DIVISION OF INSURANCE

By: _____

    Name:

    Title:

3

AIG-COV 000072
CONFIDENTIAL

Office of
## M. R. Greenberg
Chairman

April 16, 2001

Mr. David Fields

There have been more and more
situations by viatical sales schemes.
The latest one is in Florida.

It seems to me that anybody doing
anything in the field stands the
risk of adverse PR.

I am concerned that we get ourselves
into another "bail bond" problem -
I am uneasy about this.

MRG

Attachment

AIG-COV 005746
CONFIDENTIAL

Office of

## M. R. Greenberg
Chairman

March 12, 2001

Mr. David Fields

RE: Forbes article entitled, "Death Wish"  3/19/01

Not very attractive.

MRG

MRG/mb
Attachment

AIG-COV 005944
CONFIDENTIAL

agents—promise investors lush returns.

This is a pretty ghoulish way to make a buck, but as a cold-blooded investment it sounds good. Too bad for a lot of viatical investors that their capital expires before the patients do.

That's happening to ██████ ██, a retiree from Collins, Iowa who in 1997 plunked down $46,000 for a partial interest in four policies, each insuring someone dying from AIDS. Documents from viatical firm Dedicated Resources guaranteed her a fixed return of 128% in two years.

Well, three years later, all the patients are still alive. Not only that, turns out the sales contract requires ██████ to start chipping in for the patients' premiums after three years. And the 128% guaranteed return? An inflated number. Seems this was really 28%; the 100% part was just getting back her principal. By next year ██████ premiums will have whittled her aftertax return to just 4.5%, calculates ██████ a Kalamazoo, Mich. fee-only insurance expert. And if the patients live any longer than that, she will start losing money. ██████ an attorney for Delray Beach, Fla.-based Dedicated, says the company does not guarantee returns. That may be true now, but on ██████ paperwork a 28% return is promised and other words contradicting that claim are buried.

Don't investors at least get to check out, before paying, the real medical situation of the patients and the particulars of their policies? Not usually. Some viatical firms don't even provide enough information to show that the patients exist and their policies remain paid up and in force, says ██████ author of Viatical Settlements: An Investor's Guide (Bialkin Books, 1998). Even when they do furnish copies of medical records and policies, what does that tell you? Not much. Because of this opacity, says planner ██████ "An astute investor should throw a viatical salesman out the door."

Beyond these questions, the viatical

industry lately has been hit with a batch of outright fraud complaints.

██████ 52, a former medical technologist from Occidental, Calif. contends that viatical firm Mutual Benefits altered life expectancies on the policies he bought to convince him that 20 patients were on their deathbeds, leading him to believe they would expire within four years. That was four years ago. According to his lawsuit against Fort Lauderdale, Fla.-based Mutual Benefits, he invested $570,000 and the patients are still living. An attorney for Mutual Benefits declines to comment.

It gets worse. Some viatical firms use "senior settlements," recruiting older folks who are neither terminally nor even chronically ill to take out life insurance policies, to which unsuspecting investors buy rights.

Trouble is, insurers can rescind policies that are quickly sent to viatical-land. Insurer ██████ is going to court to rescind five policies with a total death benefit of $5 million sold to old people in Florida allegedly recruited by brokers who had the policies flipped to viatical firm ██████ Investors stand to get screwed if ██████ succeeds in the case, set to go to trial in May in Miami's U.S. district court.

Yet another viatical scam, called "clean sheeting," involves recruiting people who really are terminally ill but uninsured. The recruits then take out an insurance policy by claiming to be healthy. The trick is to make sure the death benefit is small enough—often $100,000 or less—that a medical exam isn't required. Of course, buying one of these viaticated policies is deadly for investors: Should the underwriter discover the fraud within two years, it will cancel the coverage, even if the insured

person has died. Investors get stiffed.

That was Alpha Capital Group's modus operandi when the New York company signed up AIDS patients to take out several policies each, claiming their last doctor's visit was for innocuous reasons like a flu shot. Some patients pocketed as much as $500,000 apiece for their part in the 1998–2000 scheme. Alpha executives, who pleaded guilty to money laundering and mail fraud, are awaiting sentencing in Tennessee. Several patients were also convicted.

Another egregious viatical scam was masterminded by ██████ ██████ owner of now-defunct ██████ His Ponzi scheme took 5,000 investors for $117 million. ██████ investors were told ██████ owned $117 million of life insurance policies from the terminally ill and promised a 42% return on a 36-month investment. But ██████ actually purchased policies worth only $6.5 million and misappropriated the remaining funds to support ██████ lavish lifestyle— exotic automobiles, boats, helicopters and vacation homes. ██████ was sentenced to 55 years in federal prison in January.

Don't count on government regulators to monitor this industry. "No one can stop viatical firms from thumbing their noses at regulators," says ██████ professor emeritus of insurance at Indiana University. There are 25 states, including Georgia, Wyoming, South Carolina and Nebraska, with no licensing requirements for viatical selling. Even real estate agents hawk them.

The Securities & Exchange Commission has tried to get involved by charging one viatical firm, Life Partners, with selling unregistered securities. The SEC won in a Washington, D.C. federal district court, but that ruling was overturned on appeal. Reason: These rotten investments are "insurance," overseen by the states, not "securities," regulated by the SEC. **F**

## DISCLOSURE OF DYING PEOPLE'S INSURANCE POLICIES AND THEIR MEDICAL RECORDS IS SPOTTY.

AIG-COV 005949
CONFIDENTIAL

NO. 1255   P. 1/2

# AMERICAN INTERNATIONAL COMPANY LTD.

P.O. Box HM 152, Hamilton, Bermuda HMAX
☎ (441) 295-2121

## FACSIMILE

| | | | | | | |
|---|---|---|---|---|---|---|
| **T O** | NAME: | M. R. Greenberg | **F R O M** | NAME: | Mike Murphy | |
| | COMPANY: | AIG | | COUNTRY: | Bermuda | |
| | FAX #: | 1 212 344 6628 | | FAX #: | (441) 295-6983 | |
| | TOTAL PAGES: | 2 | | DATE: | August 16, 2001 | |

See attached

cc: David Fields - 1 212 482 6098

 Document2

AIG-COV 006010
CONFIDENTIAL

**AIG RISK FINANCE**
THE UNCONVENTIONAL SOLUTIONS GROUP
70 PINE STREET
NEW YORK, NY 10270

DAVID N. FIELDS, ACAS
PRESIDENT

RECEIVED IN
EXECUTIVE FILES

CT 0 1 2001

PHONE: 212/770-5814
FACSIMILE: 212/482-6098

9-26-01

DATE:     September 26, 2001

TO:       Mr. M.R. Greenberg

FROM:     D.N. Fields

RE:       Life Settlements Update

Per your request, the following is an update from my note last week on the above captioned.

Coventry will sign documents partnering with us as soon as practicable - which at the latest should be Monday, October 1st. We expect premium production of at least $10 Million before the end of that week. We have already begun review of policies that can be acquired.

I will drop you a short note upon completion of our deal with Coventry. Please let me know if you wish a more in depth report.

cc:

A DIVISION OF AMERICAN INTERNATIONAL COMPANIES

AIG-COV 006011
CONFIDENTIAL

## MEMO

**RECEIVED**

AUG 21 2003

**EXECUTIVE FILES**

**AIG**

Howard L. Smith
Vice Chairman,
Chief Financial Officer,
Chief Administrative Officer
70 Pine Street
New York, N.Y. 10270
Tel: (212) 770-6800
Fax: (212) 509-4543                          8-4-03

---

Date:    August 4, 2003

To:      M.R. Greenberg

Re:      Accounting Treatment for Life Settlement Business

         Attached is a copy of the response I plan to send to Audit Committee members in connection with the anonymous letter (copy attached) we received on this issue.

         Separately, you had asked about the volume of business we have transacted, inception to date. The following is a summary of the relevant P&L items through June 30, 2003:

|                            |                                      |
|----------------------------|--------------------------------------|
| Net written/earned premium | $927 million                         |
| Losses incurred            | $851 million ($247 in paid losses)   |
| Expenses                   | Virtually zero net of cede commission|
| GAAP U/W profit            | $76 million                          |

         Please let me have your comments on the draft and I will forward to the Audit Committee members.

Attachment

**AIG-COV 006034**
**CONFIDENTIAL**

**PRIVATE AND CONFIDENTIAL**

(This memorandum is based on personal interviews with AIG employees and assumes the accuracy of their comments).

TO:  M.R. Greenberg          DATE: January 31, 1992

FROM: ███████████

RE:  AIGRM and AI Global Operations
     <u>Summary of Attached Memorandum</u>



### ILLEGAL CONDUCT

The conduct of AIG in connection with the domestic workers compensation ("WC"), general liability ("GL") and auto liability ("AL") business written by Division 55, Division 50 and AI Global involves various kinds of intentional violations of State and Federal law. Such conduct would also be a violation of the new Federal insurance fraud law if it is enacted in early 1992 as expected. Under the U.S. Sentencing Commission Guidelines which became law on November 1, 1991, the illegal activities are such that a Federal criminal conviction would expose AIG to fines and penalties in the hundreds of millions of dollars and would jeopardize the careers of numerous long-time employees. The major elements of illegality include false reporting of WC premiums as GL premiums, exceeding maximum legal WC premiums, avoiding residual market and other WC-related assessments and expenses, avoiding premium taxes, overcharging clients for residual market assessments and premium taxes, booking fictitious premiums and assets, SEC reporting violations, illegal rebates to insureds and intentional use of unfiled, unapproved WC contracts which would not qualify for regulatory approval in most States.

### CORRECTIVE ACTIONS

1. <u>Cessation Of Illegal Conduct</u>. Instructions should be given immediately to all relevant parties that all false reporting of WC premiums as GL premiums and related illegal conduct described in the attached memorandum must cease immediately.

2. <u>Housecleaning</u>. In order for AIG to meet the requirements of the U.S. Sentencing Commission Guidelines concerning an effective Compliance Program, all employees who were aware of the illegal conduct over the years and who participated in, or had supervisory authority over those who committed the illegal acts, will have to be terminated or removed from positions of "substantial discretionary authority". Employees affected include J. Smetana, ████████, ████████, ████████, ██, ████████, and numerous others.

3. <u>Restitution</u>. The amount of monetary damages to insureds, State tax authorities and other insurers caused by AIG's employees must be calculated and a method of restitution must be devised.

4. <u>Compliance Program</u>. Pursuant to the U.S. Sentencing Commission Guidelines, a monitoring and compliance program must be instituted to assure cessation of the illegal conduct and to detect and prevent any future illegal conduct.

PRIVATE AND CONFIDENTIAL

(This memorandum is based on personal interviews with AIG employees and assumes the accuracy of their comments).

TO:    M.R. Greenberg          DATE:  January 31, 1992

FROM:   █████████████

RE:     AIGRM and AI Global Operations

========================================================

    I have now completed some preliminary informal information gathering and following are the results:

    The conduct of AIG in connection with the domestic workers compensation ("WC"), general liability ("GL") and auto liability ("AL") business written by Division 55, Division 50 and AI Global* is permeated with illegality.   The result is that AIG makes millions of dollars illegally each year.   This conduct currently involves intentional violations of State and Federal law and assuming that, as expected, the Federal insurance fraud law is enacted early in 1992, this conduct will be a violation of the new insurance fraud law.   Under the U.S. Sentencing Commission Guidelines which took effect on November 1, 1991, the level of management involvement and culpability, the amount of money involved and the widespread nature of the illegal activities are such that a Federal conviction would expose AIG to fines and penalties in the hundreds of millions of dollars and would cause the loss of jobs and careers of numerous long-time employees of AIG.   The situation is so serious that it could threaten the continued existence of senior management in its current form. There are 13 primary elements of illegality involved, as follows:

    (1) <u>GENERAL REPORTING AND FILING VIOLATIONS</u>.   By various methods, AIGRM and AI Global ("AIGRM/Global") falsely report a substantial portion

---

*I understand that AI Global is being renamed and that its domestic WC, GL and AL business is being transferred to Division 55 and Division 50.

CONFIDENTIAL                 AIG-D 0023435

-2-

of their WC premiums as GL premiums. This is a violation of State statutes and regulations which require that premiums be reported by line of business. In addition, in many cases, guaranteed cost WC policy forms are filed and are the only forms approved for use by AIG in the particular States. However, the approved guaranteed cost forms are intentionally ignored by AIG employees, who write the business on Indemnity Agreement forms which have not been filed or approved and which would not qualify for approval in most States.

(2) 18 MONTH CLOSEOUT PROGRAM. Under this program, AIGRM purports to terminate the WC policy at the first adjustment point 18 months after inception, calculates the refund of WC premium due to the insured and records the refund on its books as having been paid to the insured. Simultaneously, AIGRM records on its books that an amount equal to the WC refund was paid to AIG as a "Stop-Gap Liability Policy" premium, which premium is reported as GL premium. These are book entries only; no cash refund is paid. In addition, any further premiums generated at later adjustment points by the WC business for which the policy was terminated are also booked by AIGRM as GL premiums. This constitutes one of the methods by which AIGRM falsely reports WC premiums as GL premiums.

(3) EXCEEDING MAXIMUM LEGAL PREMIUMS. AIGRM/Global's false reporting of WC premiums as GL premiums enables them to collect WC premiums in excess of the maximum amount permitted by law for a particular policy and to avoid reporting such collections.

(4) AVOIDING RESIDUAL MARKET ASSESSMENTS. AIGRM/Global's false reporting of WC premiums as GL premiums enables them to report a much lower volume of WC premiums than they actually write. Since WC residual market assessments against AIG are based on its reported WC premium volume, this results in a substantial reduction of such assessments against AIG. Rough estimates are that the amount of WC premiums not being reported is in the range of $300-$400 million or more annually at current levels of business, and that this results in an unlawful benefit to AIG in the range of $60-$80 million or more annually. The amount of residual market assessments which AIG avoids by this technique is, of necessity, paid as additional assessments by the other insurance companies subject to WC residual market assessments.

(5) OVERCHARGING CLIENTS FOR RESIDUAL MARKET ASSESSMENTS. Concerning Division 50's "50% Pay-In Program", AIGRM, with respect to the uncollected portion of the standard premium, does not pass along to the insured the benefit of the reduced residual market assessments described in paragraph (4) above. Instead, AIGRM charges the insured a residual market loading ("RML") equal to the amount the RML would have been if AIGRM had not falsely under-reported its WC premium volume and had collected and reported 100%

CONFIDENTIAL

-3-

of the standard premium instead of a lesser portion.  The result is that AIGRM is charging its insureds for residual market assessments on the uncollected portion of the standard premium which are not made against AIG and which AIG does not pay.

(6) AVOIDING STATE PREMIUM TAXES.  Since AIG's State WC premium tax obligations are based on its reported WC premium volume and since the GL premium tax rate is generally somewhat lower than the WC tax rate, AIGRM/Global's false reporting of WC premiums as GL premiums enables AIG to pay lower premium taxes than it is legally obligated to pay.  In addition, State laws require that WC premiums be reported and paid to every State where an insured's employees are located, while GL premiums are required only to be reported and paid to a single State, usually the domiciliary of the named insured.  The result is that, not only is AIG paying less taxes than it is legally obligated to pay, but individual States are losing substantial tax revenues to which they are legally entitled.

(7) OVERCHARGING CLIENTS FOR STATE PREMIUM TAXES. Concerning Division 50's "50% Pay-In Program", AIGRM, with respect to the uncollected portion of the standard premium, does not pass along to the insured the benefit of the reduced premium tax payments described in paragraph (6) above.  Instead, AIGRM charges the insured a premium tax loading equal to the amount the premium tax would have been if AIGRM had not falsely under-reported its WC premium volume and had collected and reported 100% of the standard premium instead of a lesser portion.  The result is that AIGRM is charging its insureds for premium taxes on the uncollected portion of the standard premium which AIG does not report and does not pay.

(8) AVOIDING GUARANTY FUND AND SPECIAL PURPOSE FUND ASSESSMENTS.  Most States have Guaranty Funds and Special Purpose Funds that levy assessments against insurers based on their reported WC premium volume.  In these States, AIGRM/Global's false reporting of WC premiums as GL premiums enables AIG to pay substantially lower assessments for Guaranty Funds and Special Purpose Funds than it is legally obligated to pay.  The amount of such assessments which AIG avoids is, of necessity, paid as additional assessments by the other insurance companies subject to Guaranty Fund and Special Purpose Fund assessments.

(9) AVOIDING REINSURANCE PREMIUMS DUE MINNESOTA REINSURANCE FACILITY.  Minnesota requires all WC insurers to purchase a mandatory WC reinsurance cover for a designated excess layer of coverage.  The reinsurance premium paid by each WC direct writer is based on its reported WC premium volume in Minnesota. AIGRM/Global's false reporting of WC premiums as GL premiums enables AIG to pay lower reinsurance premiums to the Minnesota facility than it is legally obligated to pay.

CONFIDENTIAL                    AIG-D 0023437

—4—

(10) <u>BOOKING FICTITIOUS PREMIUMS AND ASSETS</u>.  In Division 50's "50% Pay-In Program", only 50% of the designated maximum premium is collected at the inception of the policy.  However, an amount equal to the uncollected portion of the premium is recorded by AIGRM at the inception of the policy as a reinsurance assumed premium and as an asset.  These constitute fictitious premiums and assets on the books of AIG, as there are no reinsurance contracts and these are not reinsurance premiums.

(11) <u>BOOKING FICTITIOUS PREMIUMS AND ASSETS</u>.  A study has been performed which estimates the amount of retrospective WC premiums expected to be collected on the subject business during the next decade.  A practice has been instituted of taking down $25 million each quarter of the expected WC retro premiums and recording it as premium income on an accrual basis.  This premium income is booked as reinsurance assumed premiums instead of WC premiums.  This violates State statutes and regulations which require that premiums be reported by line of business.  Also, such premiums and assets constitute fictitious income and assets on the books of AIG since there are no reinsurance contracts and these are not reinsurance premiums.  In addition, this method avoids the payment of State premium taxes, residual market assessments and other fees and assessments that apply to written direct WC premiums but don't apply to reinsurance premiums.  The annual unlawful benefit to AIG could be in the range of $15-$20 million.

(12) <u>SEC REPORTING VIOLATIONS</u>.  The reporting of fictitious premiums and assets referred to in items (10) and (11) above exists in the Form 10-K and Form 10-Q filings which AIG makes to the SEC.  Assuming the amounts involved and the related circumstances constitute "material facts", this would trigger Section 78ff of the U.S.C.A., the penalty provision for false reports to the SEC.  Section 78ff prescribes a penalty of up to $1 million and a jail term of up to 10 years for each person who willfully and knowingly makes or causes to be made a false report.  It is possible that, for purposes of this provision, each quarterly and annual report would constitute a separate false report.

(13) <u>ILLEGAL REBATES</u>.  In AIGRM's "Cash Collateral" program, AIGRM, with respect to some of the business, has dispensed with the Notes for which cash was previously held as collateral, and just accepts the cash which is booked as premium income.  If Notes are used, the Notes can be booked as premium income, the cash deposits are collateral for the Notes, and interest can legally be paid to the insureds on the cash deposits collateralizing the Notes.  However, when the Notes are eliminated and the cash is booked as premium income, as is the current practice for some of the business, it is illegal to pay interest on the cash because

-5-

such interest constitutes a rebate to the insureds.  Most, if not all, States have laws prohibiting insurers from paying rebates to their insureds.

A jury could find that the above conduct constitutes various kinds of State and Federal civil and criminal violations, including common law fraud, mail fraud, Securities Act violations, RICO violations, State statutory and regulatory violations, State tax fraud and breach of contract.  In addition, this conduct would be a violation of the proposed new Federal insurance fraud statute if it becomes law in early 1992 as expected.  The RICO statute, in addition to stringent criminal penalties, provides a treble damages civil action to private plaintiffs.  Potential plaintiffs who could take advantage of this and the other causes of action are the other insurance companies who have to pick up AIG's share of residual market assessments and other assessments, the States who lose premium tax payments to which they are legally entitled and AIG's insureds who pay for residual market assessments and premium taxes that AIG does not report or pay.  Also possible are class actions by such plaintiffs seeking bad faith and punitive damages.  If successful, such class actions would result in astronomical damages awards against AIG.

CONFIDENTIAL                                    AIG-D 0023439

-6-

## CORRECTIVE ACTIONS

Compliance with State and Federal laws, as well as fulfillment of the fiduciary duties of senior management, require that the following corrective actions be taken immediately.

1. <u>Cessation of Illegal Conduct</u>. Instructions should be given immediately to all relevant parties that all illegal conduct must cease immediately. The instructions should specifically state that:

1) All WC premiums must be booked and reported as WC premiums and no WC premiums will be booked and reported as GL or any other line of premiums.

2) All additional premiums paid at the adjustment points under the Retrospective and Indemnity Agreements which are generated by WC business must be booked and reported as WC premiums and not GL or AL premiums.

3) The "18-month Closeout Program" under which the WC policy is purported to be terminated and the WC refund plus all additional WC premiums are booked and reported as Stop Gap Liability Policy premiums must be halted immediately.

4) The practice of booking a reinsurance assumed premium in the amount of the uncollected portion of the WC premium in Division 50's "50% Pay-In Program" must be halted immediately.

5) The practice of booking reinsurance assumed premiums in the amount of $25 million per quarter in connection with the accrual of future WC retro premiums must be halted immediately.

6) No premiums for a particular policy should be collected in excess of the maximum permitted by applicable law.

7) All residual market and other WC-related assessments, premium taxes, and any other applicable fees and expenses must be paid on the basis of full and accurate booking and reporting as WC premiums of all premiums generated by the WC business, including adjustment premiums paid under Retrospective or Indemnity Agreements.

CONFIDENTIAL                    AIG-D 0023440

-7-

2. <u>Housecleaning</u>. Whenever illegal acts by its employees are discovered by a corporation, corrective actions include disciplinary action against the employees involved in or responsible for the misconduct. Ordinarily, this would mean termination of those employees directly involved. In addition, in order to meet the requirements of the U.S. Sentencing Commission Guidelines (which became law on November 1, 1991) concerning an effective Compliance Program, AIG must not delegate substantial discretionary authority to individuals "with a propensity to engage in illegal activities". To comply, AIG will have to remove from positions of substantial discretionary authority all employees who were aware of the illegal conduct over the years and who participated in or had supervisory authority over those who committed the illegal acts. Employees who would be affected by such compliance include ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ as well as numerous others. Since there is no statutory or case law yet which defines precisely what is meant by "with a propensity to engage in illegal activities", it is possible that any others in the AIG chain of command above Messrs. Smetana and ▓▓▓▓ who had knowledge of the illegal conduct and approved or condoned it would also be affected.

If senior management fails to implement a Compliance Program meeting the above requirements, and such failure results in a substantially higher fine for a future conviction than would otherwise have been imposed, senior management and the AIG Board of Directors will be exposed to derivative suits and class action suits by AIG shareholders for intentional misconduct, breach of fiduciary duty and negligence.

3. <u>Restitution</u>. Whenever illegal acts by its employees are discovered by a corporation, corrective actions include restitution for any harm caused by the employee misconduct. This would require AIG to calculate the amount of monetary damages that the acts of its employees have caused to other insurers subject to residual market assessments, States which have lost premium taxes, insureds who have been charged for residual market assessments and premium taxes which AIG did not pay, State Guaranty Funds, and any others who have been harmed by AIG's conduct. A fair method of restitution to injured parties must be devised.

4. <u>Compliance Program</u>. Whenever illegal acts by its employees are discovered by a corporation, corrective actions include instituting a monitoring and compliance program to prevent any recurrence of the illegal activity. This means a system must be set up to independently monitor the activities which have been the subject of illegality to assure prevention and detection of any additional illegal conduct in the future. An audit team of employees from units other than those in which the illegal conduct occurred, or from an outside firm, will be necessary for this function.

CONFIDENTIAL

Joseph H. Umansky

March 4, 2003

TO:  M. R. Greenberg
     H. I. Smith

RE:  Special Re

Please see attached.

JHU:ge
Attachments

AIG-D  002356

<u>Special Re – notes and observations</u>

The attached schedule indicates a $103 million shortfall (NPV over funds available). This should be viewed relative to the funds available ($4.3B), credit taken ($6.1B), payout (10+ years), and the subjective nature of the estimate.

I am executing the 2003 plan I outlined to you in November, 2002. Key elements and their status are:

- Capco has been liquidated and the AIG contracts novated.
- Newbridge (equity linked notes) have been liquidated and the funds reinvested.
- Union Excess' reliance on SICO has been reduced.
- The implied discount has been reduced by $100M vs. $150M target; the difference being the new workers comp treaty.
- 2003 contracts are being limited to the DBG Aggregate Stop Loss and the AIU Aggregate. (est. $425M of Gross Premium ceded).
- The older deals will stay in place until their natural expiry. They will begin to pay out this year.

Other matters:

- I am being asked by profit centers for discounting treaties – the most significant request from Environmental. I indicated that we have ceased placing those treaties unless specifically authorized.
- At this point, we will need to use Hannover Re in order to complete the 2003 placement. Hannover Re took the largest share of our 2002 treaties and the other reinsurers are cutting back this year.
- The cost of reinsurance is increasing somewhat and the scrutiny by reinsurers is increasing significantly. London Life Re will not be participating in 2003; their underwriting authority has been restricted. The situation is manageable, I just want to make you aware of the trend.
- Last month, ██████████████ sold their interest in Union Excess to a new shareholder controlled by ████████████ and ███ are also interested in selling. No serious buyers have been identified yet.
- The retrocession of the assumed workers comp book ($50M of premium for $92M of limit) was executed last month with a new reinsurer. I am approaching new reinsurers cautiously.



February 28, 2003

# SPECIAL REINSURANCE

(in millions)

| | | Ulti-mate Loss | NPV of Ulti-mate | Funds Avail-able | Over (Short) | Credit Taken |
|---|---|---|---|---|---|---|
| | **AGGREGATE EXCESS / STOP LOSS** | | | | | |
| 1. | Aggregate Excess - 1984-1985 | 206 | 164 | 166 | 2 | 206 |
| 2. | Abeille - 1988 - Retrospective | 352 | 329 | 329 | 0 | 352 |
| 3. | Abeille - 1991 - 10 Yr. | 140 | 124 | 121 | (3) | 139 |
| 4. | AIGRM Stop Loss - 1994 | 50 | 43 | 44 | 1 | 23 |
| 5. | Division 50 - Blown Max - 1997 | 34 | 27 | 25 | (2) | 25 |
| 6. | Aggregate Loss Ratio / Excess - 1996 | 625 | 326 | 275 | (51) | 548 |
| 7. | Aggregate Loss Ratio / Excess - 1997 | 733 | 436 | 370 | (66) | 574 |
| 8. | Aggregate Loss Ratio / Excess - 1998 | 600 | 455 | 378 | (77) | 589 |
| 9. | Aggregate Loss Ratio / Excess - 1999 | 620 | 328 | 282 | (46) | 435 |
| 10. | Aggregate Loss Ratio / Excess - 2000 (B) | 652 | 337 | 296 | (41) | 460 |
| 11. | Aggregate Loss Ratio / Excess - 2001 (B) | 635 | 404 | 359 | (45) | 670 |
| 12. | Aggregate Loss Ratio / Excess - 2002 (B) | 800 | 368 | 368 | 0 | 640 |
| 13. | DBG - Fac Obligatory - Aggregate Excess - 1999 | 351 | 224 | 224 | 0 | 351 |
| 14. | AIU - Aggregate Excess - 1999 | 30 | 18 | 18 | 0 | 30 |
| 15. | AIU - Aggregate Excess - 2000 | 30 | 17 | 17 | 0 | 30 |
| 16. | DBG - Aggregate Excess - 1999 | 60 | 40 | 40 | 0 | 60 |
| 17. | DBG - Aggregate Excess - 2000 | 60 | 33 | 33 | 0 | 60 |
| 18. | Foreign General Aggregate - 2000 | 51 | 32 | 32 | 0 | 51 |
| 19. | Foreign General Aggregate - 2001 | 64 | 38 | 38 | 0 | 64 |
| 20. | Foreign General Aggregate - 2002 | 6 | 5 | 5 | 0 | 6 |
| 21. | Personal Lines Auto Aggregate - 2000-2002 | 224 | 122 | 52 | (70) | 159 |
| 22. | DBG Divisional Stop Loss - 7/2000 (B) | 200 | 126 | 126 | 0 | 150 |
| 23. | DBG Divisional Stop Loss - 1/2001 (B) | 219 | 121 | 121 | 0 | 210 |
| 24. | DBG Divisional Stop Loss - 7/2001 (B) | 190 | 120 | 120 | 0 | 0 |
| 25. | Starr Excess - Excess of Loss - 2001-2002 | 96 | 26 | 26 | 0 | 92 |
| 26. | Workers Compensation Quota Share - 2002 (B) | 92 | 50 | 50 | 0 | 92 |
| | **Total Aggregate Excess / Stop Loss** | **7,619** | **4,311** | **3,913** | **(398)** | **6,117** |
| | **MISCELLANEOUS** | | | | | |
| 27. | Other - Active Contracts | 62 | 62 | 144 | 82 | 29 |
| 28. | Other - Commuted & Cancelled Contracts (A) | 0 | 0 | 213 | 213 | 0 |
| | **Total Miscellaneous** | **62** | **62** | **357** | **296** | **29** |
| | **TOTAL SPECIAL REINSURANCE** | **7,681** | **4,373** | **4,270** | **(103)** | **6,146** |

(A) Commuted & Cancelled Accounts Funds:

| | |
|---|---|
| Global Catastrophe Cover | 131 |
| Lexington Warehouse | 117 |
| DBG Replacement Treaties | (80) |
| Professional Liability (NU Agg X/S)-Div 65 | (3) |
| All Others Including Interest on Balance | 48 |
| Total Commuted & Cancelled Contracts | 213 |

03/03/2003
06:29 AM

(B) Fund is recorded as funds withheld by DBG and accrues interest

CONFIDENTIAL

## SPECIAL RE
### September 25, 2001

1. Funding of aggregate trusts: $100M done; additional amounts to come from AG/Security National reserve which will be ceded offshore. This approach is preferable to "capital loss" approach.

2. Offshore PV shortfall is $100M+; the biggest increment coming from the personal lines treaty.

3. New Divisional Stop Loss and new personal lines treaty will be in place by Friday, September 28. Div Stop Loss is $114M of net premium and $175 of ceded losses - $60M benefit.

4. Stress on structure:
   - Investment yield decreasing
   - Newbridge Trust ($250M) yield is –0- for now.
   - Losses are emerging faster than anticipated.
   - Losses are beginning to be ceded from reinsurer to reinsurer, thus creating greater scrutiny by auditors who will question reinsurance recoverables of our reinsurers. This puts great stress on the structure.

5. Several shareholders of Union Excess have express interest in selling their shares.

6. Hannover Re is a shareholder and a major reinsurer.

7. 1988 Aggregate: reinsurers ██████ and ██████ are not very cooperative; ██████ is giving us static. Both acknowledge liability of $400 ultimately. $50M of ultimate is unsecured (25 each).

8. Warranty structure (Capco) is working. 2001 will be second year end. I want to close down the structure as soon as possible.

9. 2002 treaties need to be redone with the objective of strengthening the structure.

10. Will need additional resources to deal with offshore "administrative" issues.

CONFIDENTIAL

Special Re                                                            May 22, 2002

The attached schedule shows a $104 million present value shortfall. The shortfall can change significantly as a result of a relatively minor shift in the payout pattern. The $90 million shortfall in the Personal Lines treaty will be repaid over the next three years.

The strains on the structures, and capacity constraints are becoming more severe and although I believe that they are manageable for the remainder of this year, 2003 will be a challenge. Specific points and notes follow:

- The adverse development on a number of our contracts should be obvious to the reinsurers, and should be a major concern to them, their auditors and their actuaries. This has implications for each of the reinsurer's retro covers and the related recoverables. To date I have heard of no serious questions. The action I took last year could have satisfied some of the concerns. The last audits are due to be completed within a few weeks.

- Mike Murphy would like to replace Astral on the Union Excess/Astral agreement. There are a number of obstacles. The issue will be revisited next month.

- A few of our reinsurers now have large concentrations of our reinsurance risk. We will be cutting back on the largest, the Hannover Re group with >$2 billion as shown on our Schedule F (that number includes traditional reinsurance). Others have indicated that they will need to reduce their shares next year. The total reinsurance recoverable from the group of reinsurers approximates $5.9 billion.

- Three of the Union Excess shareholders interested in selling their stakes are OPL (in runoff), ▮▮▮▮▮▮ (in trouble), and ▮▮▮▮▮▮▮ has indicated an interest in buying the OPL shares but has raised a number of issues that I believe can be resolved. I have not heard from ▮▮▮▮ or ▮▮▮ recently on this matter.

- The Capco structure needs to be revamped in order to put us farther from criticism in today's environment. These changes will be implemented before year-end.

- The 1989 Aggregate (#2) was placed with two reinsurers, ▮▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮ Part of the balance is unsecured. We are completing the novation of the ▮ share into Capco that will fully secure their 50% share. Discussions with ▮▮▮▮▮ have been delayed due to ▮▮▮▮ departure.

- The $100 million American General/Superior National contract is included on the attached list. We are assuming that there will be no claim.

- We will be ceding $510 million of premium as part of the 2002 program, the vast majority of it on a funds withheld basis. Two additional contracts are being considered: a discounting treaty for Environmental and a spread loss for RMG.

- Not included in funds available are approximately $65 million of unrealized capital gains. These gains are somewhat phantom because the ultimate losses are discounted using the higher yields. I factor in the unrealized gain when I evaluate the implications of taking back a contract.

JHU:▮
Attachment

CONFIDENTIAL                                              AIG-D  0023586

# MEMORANDUM

November 16, 2000

### CONFIDENTIAL ATTORNEY-CLIENT COMMUNICATION

**TO:** M. R. Greenberg

**FROM:** Joseph H. Umansky

**RE:** Special Reinsurance

Investments held in excess of NPV is shown $26 million. The decrease from the previous report is principally attributable to the Personal Lines treaty (#22) offset by the gains on the AIG Cat treaty (#20). The deficiency in the Personal Lines treaty of $43 million will be made up over the next three years.

- The Warranty treaty (#21) is designed to cover $210 million of losses through a unique structure. The cash has been transferred into the structure and is shown on our balance sheet as assets; nothing has yet been charged to expense. The expectation is that as the losses develop and are recovered from the reinsurer, a capital loss will be recognized. On this and future schedules I will be showing this contract with no over/(short).

- The Newbridge Trust securities ($250 million), yielding approximately 8.8% are now included in the investment portfolios. We are now planning for the second tranche.

- Year to date we took back $280 million as a result of commutations and $50 million in losses recovered. I expect an additional $50 million in recoveries before year end.

- Excluding APs, premiums to be ceded for 2000 treaties approximate $480 million. $260 million of the $480 million is on a funds withheld basis. To date only $23 million of the balance has been paid. The $480 million does not include the $210 million cash transferred related to the Warranty treaty.

- The deferral of premium payments combined with an acceleration of loss recoveries is putting a strain on the overall position. While we are managing it for now, if the condition continues the indicated cushion will quickly disappear.

- The Foreign Gen Aggregate treaty is a stop loss designed to cover catastrophes. I understand that a $70 million claim is expected which will generate a $35 million AP.



Attachment

cc: H. I. Smith



# M E M O R A N D U M

September 9, 2002

**TO:**     M. R. Greenberg
            H. I. Smith

**FROM:**   Joseph H. Umansky

**RE:**     <u>Special Re – 2002</u>

The attached shows an $87 million shortfall, $67 million of which relates to Personal
Lines which will be repaid over the next 3 years. In addition to points previously raised
the following should be noted:

1. SICO replaced Astral on the Union Excess Agreement, which is in the form of a
   swap.

2. CAPCO will be liquidated by year-end. AIG contracts in CAPCO will be
   commuted or novated by September 30.

3. Further to our discussion, in planning for 2003, I will be looking to wean us off
   the Aggregate Stop Loss type treaties. However, I continue to see a demand for
   discounting contracts in a number of profit centers because of the nature of the
   business they write. One alternative is to account for these contracts as deposits
   rather than premiums written. The benefits would be actual expense savings,
   lower loss ratios, a greater focus on economic gain and the elimination of a
   backdoor discounting practice. This approach can be used in a limited, defined
   way. If implemented the change will have a direct impact on GPW but only a
   minimal impact on NPW. I suggest exploring it further using Environmental
   policies as a test case.



Attachments

AIG-D 0024421

RECEIVED IN
EXECUTIVE FILES

APR 25 2000

# MEMORANDUM

4-20-2000

April 20, 2000

**TO:** M. R. Greenberg

**FROM:** Joseph H. Umansky

**RE:** 2000 Reinsurance Contracts

The contracts summarized in this memo are those to be discussed in a meeting scheduled for Monday.

There are ten contracts listed on the attached schedule and additional information on selected contracts in the attachments. Five of the contracts are similar to the 1999 contracts; I am including them because of the effect that they have on the financial statements. I would like to review six specific contracts with you because of their unique nature. The six contracts are #5 through #10.

All of the contracts are beyond the conceptual stage, but a considerable amount of work needs to be done to put them in final form, including arranging for a reinsurer/counterparty, which could be the most difficult step. I would like to get your reaction to the structures before I proceed. I will cover the six contracts in this memo.

## Warranty

Our objective was to convert an underwriting loss into a capital loss. The approach we devised is unique but conceptually, somewhat simple. AIG forms an off-shore reinsurer and reinsures the warranty book into that wholly-owned subsidiary. AIG then sells the subsidiary through a series of partial sales, thus recognizing a capital loss. As the warranty losses emerge they are recognized in this off-shore company that is not consolidated as part of AIG. The accounting is aggressive and there will be a significant amount of structuring required in order to address all the legal, regulatory and tax issues. This is more fully described in Exhibit I.

AIG-F 0000144

- 2 -

## AIG Catastrophe Cover

The objective was to cap aggregate catastrophe losses for AIG at $75 million. There are a number of issues that we need to discuss, including whether $75 million is the right attachment point and how we define a catastrophe. Since AIG's catastrophe losses consistently aggregate more than $75 million, I am proposing two additional treaties that sit under this catastrophe cover which will mitigate the catastrophe losses and use the discount on the casualty book to subsidize the catastrophe losses.

The two above-mentioned treaties are contracts #9 and #10. They are aggregate treaties (for Foreign Gen and Transatlantic) which have the effect of covering property catastrophe losses with the discount of the related casualty book. These contracts are not specifically catastrophe covers but have the same effect. A similar contract cannot be put together for DBG since this group already has an Aggregate Loss Ratio Treaty (Contract #1). The three contracts are more fully described in Exhibit II. Transatlantic has expressed a number of concerns regarding the treaty.

## Personal Lines – Aggregate Loss Ratio Treaty - #5

This is a multi-year excess of loss cover that has the effect of smoothing losses. The attachment is 78%, increasing 1% each year for the term. The premium is constant. Loss recoveries are expected in the first two years. See Exhibit III.

## ALICO – Brazil Currency Treaty

This contract is one where a significant recovery is realized and a compensating arrangement through a swap generates a capital loss for ALICO and a gain for the reinsurer. The accounting is very aggressive and it's a duplication of a contract that was done last year. The 1999 swap will not be repeated, although a similar swap will be put in place to accomplish the same objective.

There are a number of other issues that I look forward to discussing with you on Monday.



████  Att.

cc: H. I. Smith

AIG-F 0000145
CONFIDENTIAL

## AIG RISK FINANCE

"THE UNCONVENTIONAL SOLUTIONS GROUP"
70 PINE STREET
NEW YORK, NY 10270

9/24/01

11:00 AM

DAVID N. FIELDS, ACAS
PRESIDENT

PHONE: 212/770-5814
FACSIMILE: 212/482-0008

**RECEIVED**

SEP 2 0 2001

DATE:    September 19, 2001

TO :    Mr. M.R. Greenberg

FROM:    D.N. Fields

RE:    Life Settlements – Progress Report

We are poised to commence our life settlements operation. Since we last met on this topic, we have:

- selected Coventry Financial as our life settlements accumulator;
- completed our due diligence review of Coventry, utilizing ▆▆▆▆▆▆ and the MGA review group to ensure the thoroughness of the review. Note that Coventry will not be an MGA.
- designed a structure to maximize the premium and profit that can be recognized. The structure we've created for this purpose will increase the premium booked on a single transaction by over 20 times the amount we originally contemplated. Furthermore, this structure will also enhance our statutory loss ratio and net investment income as well. Generated from the acquisition of 1000 policies (1 Billion in total face amount) is anticipated premium of $700M, loss ratio of 65%, and profit of $100M (in excess of a 6% return); and
- engaged ▆▆▆▆ and ▆▆▆▆ who are now producing the documentation we will require for the transaction and will finish the legal due diligence.

We need to alert you that, because this market is so small, we deem it likely that people will quickly become aware that we are involved in this field. The public relations risk should be acceptable because the AIG name will not be used in marketing the concept to the life insurance policyholder. ▆▆▆▆▆▆ has stated that Coventry's approach to compliance is exemplary and the regulatory requirement for licensing participants in life settlements reduces our risk further. Furthermore, please note that Financial Service Corporation (FSC - part of Sun America) is currently being paid commissions for developing life settlements business for Coventry – our profile with Coventry will have less public relations risk than exists with FSC.

Per our discussion with Howie Smith, we are also anticipating that AIG funds would be invested via premium financing through AICCO, at least initially. This approach gives

A Division Of American International Companies

CONFIDENTIAL

AIG-F 0000349

REPORT ON EXAMINATION

OF THE

LEXINGTON INSURANCE COMPANY

AS OF

DECEMBER 31, 1992

CONFIDENTIAL

AIG-F  0001096

# State of Delaware



# Department of Insurance
## Dover, Delaware

—————————◇—————————

I, ▰▰▰▰▰▰▰▰ INSURANCE COMMISSIONER OF THE
STATE OF DELAWARE, DO HEREBY CERTIFY THAT the attached REPORT ON EXAMINATION,
made as of December 31, 1992 of the

### LEXINGTON INSURANCE COMPANY

is a true and correct copy of the document filed with this Department.

ATTEST BY: ▰▰▰▰▰▰▰▰▰▰

DATE:    3 January 1997



In Witness Whereof, I HAVE HEREUNTO SET MY HAND AND
AFFIXED THE OFFICIAL SEAL OF THIS DEPARTMENT AT THE
CITY OF DOVER, THIS _____**3rd**_____ DAY
OF _____**January**_____ 19 **97**



_Insurance Commissioner_

_____
_Deputy Insurance Commissioner_

DOCUMENT CONTROL  # 12 - 03/32/01/93

CONFIDENTIAL

AIG-F  0001097





**State of Delaware**

**Department of Insurance**

841 SILVER LAKE BLVD.
P.O. BOX 7007
DOVER, DELAWARE 19903-1507

FACSIMILE

# REPORT ON EXAMINATION

## OF THE

## LEXINGTON INSURANCE COMPANY

## AS OF

## DECEMBER 31, 1992

The above captioned Report was completed by examiners of the Delaware Insurance Department.

Consideration has duly been given to the comments, conclusions, and recommendations of the examiners regarding the status of the Company as reflected in the Report.

This Report is hereby accepted, adopted, and filed as an official record of this Department.



DATED this 3rd day of October, 1996.

CONFIDENTIAL

<u>Lexington Insurance Company</u>

44.69% of Transatlantic Holdings, Inc. and its wholly owned subsidiaries, Putnam and

Transatlantic. Under Delaware Insurance Code Section 5002 (5), Control is defined as:

> "Control shall be presumed to exist if any person, directly or indirectly, owns,
> controls, holds with the power to vote or holds proxies representing 10% or more
> of the voting securities of any other person. This presumption may be rebutted by
> a showing made in the manner provided by Section 5004 of this title that control
> does not exist in fact...."

There is a presumption under Delaware law that Putnam and Transatlantic are controlled by AIG

based on ownership. The Company has not filed a rebuttal to the presumption of control. It is

recommended that Putnam Reinsurance Company and Transatlantic Reinsurance Company, be

classified as affiliates in any statutory filings made by the Company. A similar recommendation

was made in the 1988 Report of Examination.

<u>Coral Reinsurance Company Ltd. (Coral Re)</u>

The Company reported $119 million ceded to Coral Re in the December 31, 1992 Annual

Statement. Coral Re was formed on December 14, 1987 under the laws of Barbados. At

December 31, 1992, Coral Re was owned by shareholders from France and Canada.

In 1995, documents were obtained through a Freedom of Information Act request from

the Arkansas Development and Finance Authority, one of the initial shareholders of Coral Re,

which included the "Confidential Private Placement Memorandum" (Private Placement)

provided to potential investors. According to the Private Placement, Coral Re was "...designed

to reinsure certain risks from several of the U.S. subsidiary insurance companies of American

International Group, Inc. (AIG). AIG's interest in creating the Company [Coral Re] is to create a

reinsurance facility which will permit its U.S. companies to write more U.S. premiums. For a

20

AIG-F  0001117

Lexington Insurance Company

U.S.-domiciled company, a high level of surplus is required to support insurance premiums in accordance with U.S. statutory requirements. The statutory requirements in Barbados are less restrictive." Coral Re was not created to write reinsurance in the general market place or to provide reinsurance for companies outside the AIG Group. It appears that virtually all of Coral Re's business originates from the companies in the AIG Group. Although AIG does not have a stock ownership interest in Coral Re, it played a significant role in its creation, including the design of the reinsurance contracts.

The Department has questioned whether AIG controls Coral Re. The Department's concerns were based on the definitions of "Affiliate" and "Control" contained in Delaware Insurance Code, Chapter 50, "Insurance Holding Company System Registration", "Section 5001. Definitions". The definitions are as follows:

> "'Affiliate.' An 'affiliate' of, or person 'affiliated' with, a specific person, is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the person specified."

> "'Control.' The term 'control' (including the terms 'controlling', 'controlled by' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract other than a commercial contract for goods or non-management services, or otherwise, unless the power is the result of an official position with or corporate office held by the person. Control shall be presumed to exist if any person, directly or indirectly, owns, controls, holds with the power to vote, or holds proxies representing, ten percent or more of the voting securities of any other person. This presumption may be rebutted by a showing made in the manner provided by Section 5004(k) of this title that control does not exist in fact. The Commissioner may determine, after furnishing all persons in interest notice and opportunity to be heard and making specific findings of fact to support such determination, that control exists in fact, notwithstanding the absence of a presumption to that effect."

21

CONFIDENTIAL                                      AIG-F  0001118

<u>Lexington Insurance Company</u>

The Department has questioned whether Coral Re may be an affiliate based on control in accordance with the above definitions. Control under this definition may be demonstrated by the following:

- AIG played an integral role in the creation and design of Coral Re, including the terms of the reinsurance prior to any involvement by the investors.

- The Private Placement states that *"AIG's interest in creating* [emphasis added] the Company [Coral Re] is to create a reinsurance facility which will permit its U.S. companies to write more U.S. premiums." In addition, the reinsurance treaties that were to be entered into with Coral Re were attached as exhibits to the Private Placement. Thus the basic terms of the reinsurance were determined by the creators of Coral Re prior to any solicitation of investors. AIG was actively involved in the process of obtaining investors to purchase stock in Coral Re.

  The Private Placement states that "AIG and the Company [Coral Re] will make available to any prospective qualified investor, prior to the closing date for the sale of the common stock, the opportunity to ask questions of and to receive answers from AIG and/or the Company [Coral Re] concerning the terms and conditions of the offering, the Company [Coral Re] or any other relevant matters, and to obtain any additional information to the extent that AIG or the Company [Coral Re] possesses such information or can acquire it without unreasonable effort or expense."

- The purpose for creating Coral Re was to reinsure risks for the AIG group of insurance companies. It was not created to reinsure any other company or write reinsurance in the general marketplace.

  The Executive Summary Section of the Private Placement states "The Company [Coral Re] is designed to reinsure certain risks from several of the reinsurance subsidiaries of American International Group ("AIG"). The Company Summary, which is Section II in the Private Placement, under "Purpose:" states "Provide reinsurance for certain AIG subsidiaries." Coral Re was incorporated on December 14, 1987, and began writing AIG business on December 18, 1987. A similar contract with Putnam Reinsurance Company, an AIG affiliate, was terminated on December 16, 1987. Virtually all of Coral Re's business has continued to originate from AIG through December 31, 1992.

- Coral Re is managed by a member of the AIG Group.

  Coral Re entered into a management agreement dated December, 1987 with American International Management Company Limited (AIMCO), an AIG company, domiciled in Barbados. The agreement states that AIMCO agrees "to do all things necessary or incidental to the conduct of the insurance or reinsurance business which the Company

CONFIDENTIAL

AIG-F  0001119

Lexington Insurance Company

[Coral Re] now is or hereby may be by its charter authorized to transact; and to maintain books and records with respect to the business hereunder and render annual accounts and other schedules in such form and detail as the Company [Coral Re] may reasonably require." This statement is far more encompassing than the "back office accounting" function which is how AIG officials have described AIMCO's role.

- The economic viability and health of Coral Re is dependent on the reinsurance ceded to it by the AIG companies.

  As of December 31, 1992, most of Coral Re's assets were derived from reserves ceded to it by the AIG companies and the related investment income earned on those assets. Most of Coral Re's assets were pledged for letters of credit collateralizing reserves assumed from companies in the AIG Group. In addition, the AIG companies continue to be virtually the only source of business for Coral Re.

- The return, to the owners of the common stock, is based on their investment in Coral Re, not on its overall profitability.

  Under their investment agreement, the equity owners of Coral Re do not expect to receive any other profits and will not receive less than the investment return discussed in the Private Placement. The mechanism for accomplishing this is contained within the original Private Placement and does not require the active involvement of Coral Re. As a result, the investors in Coral Re have little or no interest in controlling and actively managing the reinsurance aspect of Coral Re's arrangements with AIG.

  According to the Financial Review Section of the Private Placement "An Investor in the Company [Coral Re] is expected to earn a pre-tax return on its investment equal to the sum of its share of the investment returns on the total equity capital plus 2% per annum." The 2% per annum is the risk fee paid to the equity owners for investing in Coral Re.

- Investment in Coral Re is structured so that its book value is maintained at an amount that is at least equal to the value of the equity owners' original investment.

  An investor that wants to terminate his investment under the exit provision is entitled to receive book value for his investment. Due to the previously mentioned mechanism, an investor terminating his investment will basically be receiving a return of cash approximately equal to the amount he originally invested plus investment income and the risk fee less financing expenses. The mechanism for accomplishing this is contained within the original Private Placement and does not require the active involvement of Coral Re.

23

CONFIDENTIAL

<u>Lexington Insurance Company</u>

As a result of the above, the Department has expressed concerns that Coral Re may be "under common control with" the AIG group of companies because AIG may have "...possession of, direct or indirect, power to direct or cause the direction of the management and policies of..." Coral Re. In order to alleviate the Department's concerns regarding the close relationship of the AIG companies to Coral Re, the Company has agreed to stop ceding any business to Coral Re and commute $100 million of the reinsurance credits currently being taken. The Company has also agreed to report any reinsurer that has the previously mentioned characteristics as an affiliated reinsurer in future filings with the state insurance regulators.

The Company has provided the Department with a copy of an opinion letter prepared by the New York law firm of ████████████ This letter was prepared at the request of American International Group, Inc. ("AIG") to respond to questions raised by the New York Insurance Department in connection with the examination of certain New York domiciled subsidiaries of AIG. This law firm opined that the Company does not control Coral Re within the meaning of the New York Insurance law. This opinion was reviewed by the Department as part of the examination.

<u>Parental LOC</u>

Beginning in 1985, the Company began utilizing a "Parental Blanket Letter of Credit" (AIG LOC) to reduce the Provision for Unauthorized Reinsurance for various reinsurers who have not otherwise provided collateral for reinsurance ceded. The AIG LOC originally approved by the Department was for $20,000,000. No requests for increases in the original amount

24

Lexington Insurance Company

approved have ever been received by the Department. The amount of the AIG LOC has increased in recent years as follows:

| 1985 | $25,000,000 | 1990 | $ 85,000,000 |
| 1986 | 35,000,000 | 1991 | 100,000,000 |
| 1987 | 35,000,000 | 1992 | 120,000,000 |
| 1988 | 50,000,000 | 1993 | 120,000,000 |
| 1989 | 65,000,000 | 1994 | 200,000,000 |

As of December 31, 1992, the AIG LOC had increased to $120,000,000, $100,000,000 more than the amount originally approved. A further discussion of the AIG LOC can be found in this Examination Report under the "Provision for Unauthorized Reinsurance" caption.

It was noted that although reinsurers covered by this AIG LOC have failed over this time period, the AIG LOC has never been drawn upon. Instead these unrecoverable balances have been transferred to Coral Re.

The Company has represented to the Department that the purpose and function of the AIG LOC is to protect it when unauthorized reinsurers become insolvent. The Department has stipulated that the provision for unauthorized reinsurance may not be reduced using the AIG LOC unless the Company draws on it when a covered reinsurer does not pay in accordance with the underlying reinsurance agreement.

It is recommended that the Company draw upon the AIG LOC as soon as the reinsurers covered by it go into default in accordance with the intention of that LOC. In addition, recoverable balances which have been secured by the AIG LOC should not be transferred to the Coral Re agreement, or any similar agreement.

CONFIDENTIAL

AIG-F  0001122

Lexington Insurance Company

Reinsurance Ceded - Coral Reinsurance Company

General Information

The Company and its affiliates in the American Home/National Union pool and Landmark Insurance Company, collectively referred to as the Domestic Brokerage Group, are participants in several "Reinsurance Agreements" with Coral Re.

Due to the significant impact this one reinsurer could have on the financial stability of the Company, the agreements with Coral Re were reviewed very carefully.

The following three contracts, as referred to by the Company, were in place between the Company and Coral Re as of December 31, 1992:

- Reinsurance Agreement
- Aggregate Loss Ratio and Excess Agreement
- Quota Share Replacement Agreement

Due to the unusual nature of these agreements, they were submitted for review to the NAIC's Senior Reinsurance Manager. His conclusions were in agreement with the following discussion of the treaties.

The Department met with the Company's external auditors ████████████ and obtained copies of their audit work papers and various memorandums concerning their evaluation and assessment of the company's relationship and transactions with Coral Re. The Department's discussion with ████████████ and review of their documentation covered ████████████ work dating back to 1987. ████████████ work papers document that ████████████ has accepted the company's position that the reinsurance agreements with Coral Re transfer underwriting risk. ████████████ opinion was reviewed by the Department as part of this examination.

26

AIG-F  0001123

<u>Lexington Insurance Company</u>

Reinsurance Agreement

This agreement, dated December 18, 1987, provides 100% reinsurance on up to $2.5 million for any one risk or insured not to exceed the Company's matching net retention on certain lines of business. The agreement covers business written by the Company on May 1, 1987 and subsequent. Premiums are allocated based on policy limits and 87.5% of the original premium is paid to Coral Re.

A Reserve Deposit clause for non-admitted reinsurers requires that Coral Re's share of losses, IBNR and loss adjustment expense reserves be secured. Coral Re provided the Company with a letter of credit to satisfy this clause as of December 31, 1992.

Aggregate Loss Ratio and Excess Agreement

This agreement, dated January 1, 1992, contains two sections and is effective until all liabilities of the Company are settled. "Section A" relates to combination risk excess coverage and "Section B" relates to loss ratio coverage. The premium for both sections, collectively, according to the agreement, is a flat amount of $8,000,000 with no adjustment provisions.

"Section A" covers all losses occurring during the 1992 accident year in excess of the Company's retention. "Section A" coverage affords $5 million excess coverage but not more than $10 million per occurrence, and is subject to a maximum of $35 million for the term of the agreement. "Section B" provides for aggregate protection in excess of a 70% loss ratio for 1992 accident year losses.

The Net Retained Lines clause of the agreement excludes unrecoverable amounts from any other reinsurer. Therefore, this coverage does not overlap the Quota Share Replacement

27

CONFIDENTIAL

AIG-F 0001124

Lexington Insurance Company

Agreement discussed in detail below.  Losses prior to January 1, 1986 are also not covered under this agreement.  The agreement does not contain a cancellation clause, nor a commutation provision of any kind.

The Delaware Insurance Department was provided a copy of Coral Re's audited financial statements.  The audit opinion was unqualified, however it was noted that as of December 31, 1992 Coral reported total liabilities of $930,132,177, including outstanding losses of $884,728,120, and total shareholders equity of $15,049,289.  The ratio of outstanding losses to equity is 59: 1 and the ratio of total liabilities to equity is 62:1.

The notes to the audited financial statements indicated that the loss reserves "...were reviewed by an independent consulting actuary...".  Due to the high ratio of outstanding losses and total liabilities to equity, the Department requested a copy of the existing actuarial opinion on the Coral Re reserves.  Although a Company official confirmed that an actuarial opinion was in existence, he said that he had requested a copy from Coral Re who indicated that they must obtain approval from their Board of Directors before releasing the report.  The Company later stated that they were unable to provide the actuarial report because the Board of Directors of Coral Re voted not to release it to the Delaware Insurance Department.

A Reserve Deposit clause for non-admitted reinsurers requires that the reinsurer's share of losses, IBNR and loss adjustment expense reserves be secured.  Coral Re provided the Company a letter of credit to satisfy this clause as of December 31, 1992.

28

Lexington Insurance Company

Quota Share Replacement Agreement

This agreement is the most significant of the Company's agreements with Coral Re. The inception date of this agreement was December 18, 1987, four days after Coral Re was incorporated. This agreement replaced a similar agreement with Putnam Reinsurance Company, an AIG affiliate, which was terminated on December 16, 1987. The agreement provides that the Company be reimbursed for uncollectible reinsurance (Section A) and adverse development on commuted treaties (Section B).

No demonstrable risk transfer appears to exist in exchange for the risk fee described in the quota share agreement. The retrospective rated risk fee component of the treaty premium is calculated as follows for all years since inception:

- Flat risk fee of $700,000 annually
- Plus 1% of the minimum premium as stated in the agreement
- Plus all applicable operating expenses (including the cost of lines of credit used to secure the Company's unauthorized recoverables from Coral Re)
- All subject to a minimum risk fee of $1,790,200 for each year the contract is in effect.

The remaining components of the treaty premium are calculated as follows:

- Plus cumulative paid losses
- Plus outstanding losses
- Plus any return premium paid
- Less the yield on investable funds, where investable funds are the net premium paid to Coral Re less the risk fee and applicable expenses. The Department requested details of the calculations. The Company responded that they were not in possession of the details which support the investment yield calculation. They also informed the Department that the Pennsylvania Insurance Department made the request directly of Coral Re and Coral Re refused to provide the details.
- Plus prior cumulative yields
- Less losses (net of recoveries) paid to the Company.

29

CONFIDENTIAL

AIG-F  0001126

Lexington Insurance Company

The agreement requires a provisional premium for Section A of 200% of the minimum premium stated in the agreement. The minimum premium is not determined until the last quarter of the contract year. Subsequent endorsements are made in accordance with the retrospective risk fee rating provisions of the contract outlined above.

The contract language indicates that each contract period (January 1st to December 31st) would be reviewed independently, that is, replaced reinsurers (Section A) or commuted treaties (Section B) would be associated with the contract period in which they were initially ceded (declared) to this treaty. If the experience for the transferred reinsurers developed such that the losses exceeded the policy year limit, the excess would not be covered by the agreement.

The Company has represented that the parties to the contract view the agreement as an aggregate of experience from the inception of the contract. Under such a view the Company would expect that any excess in a given period would be covered by the unused limits of other treaty periods. This "view" of the parties, according to the Company, is not explained in the contract wording.

Section A

Agreement provisions for Section A allow the Company to transfer to Coral Re all "loss and premium liability" that has been previously ceded to a reinsurer whereby the Company has or would incur a loss because of the inability of the reinsurer to pay amounts due or to become due by reason of "Financial Impairment" or "Government Regulation". Under the contract provisions the Company shall solely decide if "Financial Impairment" exists.

30

AIG-F  0001127

<u>Lexington Insurance Company</u>

Chapter 22, Reinsurance, of the "Accounting Practices and Procedures Manual for Property and Casualty Insurance Companies" (Chapter 22) published by the NAIC stipulates the following under "<u>Reinsurance Contracts Include Transfer of Risk</u>":

"The essential ingredient of a reinsurance contract is the shifting of risk. A subcommittee of the National Association of Insurance Commissioners which studied alleged problems in certain reinsurance agreements reported:

> The essential element of every true reinsurance contract is the undertaking by the reinsurer to indemnify the ceding insurer [i.e. reinsured company], not only in form but in fact, against loss or liability by reason of the original insurance. Unless the so-called reinsurance contract contains this essential element of risk transfer, no credit whatsoever shall be allowed on account thereof in any accounting or financial statement of the ceding insurer.

Insurance risk involves uncertainties as to the ultimate amount of any claim payments (underwriting risk) and the timing of those payments (timing risk). An insurance contract indemnifies the insured against loss from such risks. Risk must be fortuitous; that is, the possibility of adverse events occurring must be outside the control of the insured.

In addition to insurance risk, reinsurance contracts involve other business risks including, but not limited to, investment yield risk, credit risk and expense:...

- Credit risk relates to the exposure that the amounts due or to become due under the contracts may not be fully collectible. Such amounts include those currently due for reinsurance recoverable on paid losses as well as amounts that will become due for reinsurance recoverable on unpaid losses and amounts receivable under contingent commission or profit-sharing arrangements...."

It is the Department's opinion that the coverage provided under this section of the agreement only transfers "credit risk" as defined in the above section of Chapter 22 because it only covers a loss resulting from the inability of the reinsurer to pay amounts due or to become due. It follows from this opinion that neither the underwriting nor the timing components of "insurance risk" as defined in Chapter 22 are transferred. Chapter 22 requires that:

31

AIG-F  0001128

Lexington Insurance Company

"Reinsurance contracts that do not transfer both components of insurance risk shall be accounted for and reported as deposits in the NAIC annual and interim financial statements..."

The Company has agreed to run-off the quota share and other Coral Re treaties under the transition rule. It is recommended that the Company account for cessions that do not meet the test of insurance risk transfer and have not been stipulated as being run-off under the transition rule as "deposits" in accordance with Chapter 22 of the NAIC's Accounting Practices and Procedures Manual.

## Section B

Section B consideration is equal to the cost established by the Company for any commutation agreements transferred to Coral Re in accordance with Section B of the agreement. The consideration paid to Coral Re equals the cash received from the commuted treaties less the portion of the cash attributable to the paid portion of the loss. It is important to note that the Company does not record this cash as a new transaction, but instead changes the billing information to reflect Coral Re via a memo entry. The name of the original reinsurer remains in the Company's reinsurance accounting system with Coral Re designated as the responsible party under the Coral Re agreement. This method of recording the transfer allows the Company to avoid recording any loss for the difference between the cash received from the commutation and the related liabilities.

The commutation of a reinsurance contract and the transfer made under Section B are two distinct events and need to be recorded separately. It is recommended that the Company record a

32

AIG-F  0001129

charge to the income statement for the difference between the assets received and the ultimate value of the commuted losses or claims on all commutations. The Company has agreed to run-off the quota share and other Coral Re treaties under the transition rule. It is recommended that the Company account for cessions that meet the definition of "loss portfolio transfers" and have not been stipulated by the Company as being run-off under the transition rule as "loss portfolio transfers" in accordance with Chapter 22 of the NAIC's Accounting Practices and Procedures Manual. The basis for the recommendation for loss portfolio transfer accounting is discussed below.

Chapter 22 stipulates the following under "Loss Portfolio Transactions":

"Certain arrangements, often characterized as reinsurance agreements, are structured to apply retroactively to a portfolio of losses which occurred prior to the effective date of the agreement. Due to potential abuses involving the creation of surplus to policyholders, and which will result in the distortion of underwriting results, a special accounting treatment for such agreements is warranted.

As used in this manual, "loss portfolio transfer" means an agreement in which:

1. The transferer's (ceding insurer's) surplus to policyholders increases as a result of payment of consideration to a transferee (assuming insurer) for undertaking any loss obligation already incurred; and

2. The consideration paid by the transferer, in connection with transferring such loss obligation, is derived from present value or discounting concepts based upon anticipated investment income."

In general, loss portfolio accounting will be necessary when the consideration and the losses are transferred to another party because criteria 1 and 2 above are met. As a general rule, when a reinsurance contract is commuted, the Company accepts the present value (or another amount which is less than full value), for reinsurance recoverable on claims to be paid at full value over a future period. If the ceding company transfers the assets received and the related

33

Lexington Insurance Company

existing losses to another reinsurer the transaction meets the criteria previously discussed for a loss portfolio transfer. It meets the first criteria because the assets received are less than the loss reserves transferred, which results in an increase to policyholders' surplus. It meets the second criteria because the reinsurer is dependent on anticipated investment income in order to generate adequate cash to pay the ultimate losses.

The Department has determined that the quota share reinsurance agreement between the Company and Coral Re does not transfer underwriting risk in accordance with Chapter 22. It was not possible for the Department to quantify the adjustment which would be required because the accuracy of the supporting documentation provided by the Company could not be verified. However, the Company has agreed to run-off all of the Coral Re treaties, including the quota share treaty and any similar treaties under the transition rule contained in Chapter 22 and place no new business with Coral Re after December 31, 1995. In order to utilize this rule, the Company has agreed to do the following with the Coral Re treaties, any similar treaties with other companies and any other treaties that do not comply with Chapter 22:

- Provide the Department with a list of reinsurance treaties that will be run-off under the transition rule.
- Stop ceding premium to Coral Re and other companies having reinsurance treaties that will be run-off under the transition rule.
- Run-off the existing reinsurance treaties with Coral Re and other reinsurance treaties listed as being run-off under the transition rule.
- Commute $100 million of liabilities with Coral Re.
- Make certain that all existing reinsurance agreements not being run-off under the transition rule comply with Chapter 22.

Make certain that all future reinsurance agreements comply with Chapter 22.

34

CONFIDENTIAL

AIG-F 0001131

Lexington Insurance Company

The Company has contended that several items requested in connection with the examination are not available and are under the proprietary control of a third party (Coral Re). The quantity and quality of information purportedly available at the Company regarding Coral Re is severely lacking, considering the fact that it is one of the Company's major reinsurers, even though it is the Company's contention that Coral Re is a completely independent third party.

The Company was requested to provide supporting documentation for cash transactions in the form of processed drafts, wire transfers and bank deposits. Instead, entry memos to the AIG Intercompany Pool were provided. The memos could not be traced to cash amounts reported by the Company. The Company has not provided the evidence requested. This is a violation of Delaware Insurance Code Section 324(c) as follows:

> "Every person being examined, its officers, attorneys, employees, agents and representatives shall make freely available to the Commissioner or his examiners the accounts, records, documents, files, information, assets and matters of such person in his possession or control relating to the subject of the examination and shall facilitate the examination."

Due to the numerous violations of Section 324(c), subsequent references to this section in this examination report will be, "This is in violation of Section 324(c)".

It is recommended that the Company prepare and maintain detailed documentation on all cessions made to Coral Re. This would include detailed documentation on all commutations.

35

CONFIDENTIAL

AIG-F  0001132

**SHORT CERTIFICATE**

## STATE OF NEW YORK

## INSURANCE DEPARTMENT

It is hereby certified that the annexed copy of Report on Examination of AMERICAN HOME ASSURANCE COMPANY, of New York, New York, dated July 6, 1995, showing condition as of December 31, 1991,

has been compared with the original on file in this Department and that it is a correct transcript therefrom and of the whole of said original. The correspondence attached at the beginning of this report is not included in the original on file.



In Witness Whereof, I have hereunto set my hand and affixed the official seal of this Department at the City of Albany, this 9th day of February, 1998.

CONFIDENTIAL

REPORT ON EXAMINATION

OF THE

AMERICAN HOME ASSURANCE COMPANY

AS OF

DECEMBER 31, 1991

DATE OF REPORT

EXAMINER

JULY 6, 1995

CONFIDENTIAL

AIG-F 0001195

In addition to the foregoing, the Company has backup coverages and super global catastrophe programs.

The back up catastrophe cover is in effect when there is a second occurrence after the primary coverage has been penetrated. This coverage is in 5 layers with a minimum retention of $35,000,000 up to a maximum of $150,000,000.

The super global catastrophe program covers all foreign and domestic AIG companies for property losses in excess of limits of the Domestic Property Catastrophe Program. The maximum liability under the super global program is $250,000,000.

Unauthorized reinsurance plays a major role in the Company's international operations. Deposits by and funds withheld from reinsurers at December 31, 1991 amounted to $4.5 billion from the AIG pool companies. An in-depth review was made of the letters of credit, trust agreements and funds withheld with no material discrepancies noted.

## Agreement with Coral Reinsurance Company

In December of 1987, American Home Assurance Company, along with National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Commerce and Industry Insurance Company, AIU Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, The Insurance Company of the State of Pennsylvania ("AIG pool companies"), Lexington Insurance Company ("Lexington"), and Landmark Insurance Company ("Landmark") entered into a financial arrangement with Coral Reinsurance Company ("Coral Re"), a Barbados company, for the purpose of window dressing its balance sheet and to give the appearance of increasing its statutory surplus.

CONFIDENTIAL

AIG-F  0001211

This agreement provides that Coral Re, for consideration, reimburse the AIG pool companies for reinsurance recoverable due from insolvent or impaired insurers or insurers that AIG unilaterally deemed financially impaired. In addition to the consideration paid, AIG pool companies assigned any reinsurance recoverable to Coral Re. In effect, AIG pool companies paid the present value of these recoverables to Coral Re and avoided the necessity of writing off the balances. The arrangement further enhances AIG pool companies' surplus by transferring to Coral Re liabilities reassumed by the AIG pool companies under commuted treaties. The cash received by AIG pool companies on commuted treaties is transferred to Coral Re and the liabilities under these treaties are assumed by Coral Re. Thus this arrangement enables AIG to avoid recording an underwriting loss on the commutations, which represents the difference between the cash received on the commutations and the related liabilities assumed.

In the calculation of the retrospective rating provision of the agreement the AIG pool companies are credited with yield on "investable funds" which represents premiums ceded to Coral Re, less losses paid, less applicable expenses. Since Coral Re is entitled to a tax exemption for a period of fifteen years under Barbados law, this financial arrangement enables the AIG pool companies to benefit from the higher tax free yield available on funds held offshore.

The following is a summary of the more significant aspects of this financial arrangement nominally called "Quota Share Replacement Treaty" with Coral Re (AIG has other similar agreements with Coral Re):

This agreement, incepted in December 1987, provides that the AIG pool companies be reimbursed for uncollectible reinsurance from insolvent or financially impaired reinsurers and liabilities assumed on commuted treaties. The contract was initiated in 1987, with an initial provisional consideration of $160 million. In addition $62 million was paid to Coral Re which represented consideration received by AIG pool companies on commuted treaties. The total consideration paid for the first contract period from December

CONFIDENTIAL

AIG-F   0001212

18, 1987 to December 31, 1987 amounted to $222,089,747. While the premiums are determined separately for uncollectible reinsurers and for commuted treaties, the treaty limits are aggregate limits for both sections and are established for each contract period. The Company was unable to provide the examiners with any underwriting file to support the premiums paid to Coral Re.

The section of the contract pertaining to uncollectible reinsurance relates to loss and premium liability ceded, where the pool would incur a financial loss because of the inability of the assuming reinsurers to pay the amounts due by reason of "Financial Impairment" or "Government Regulation" as set forth in the preamble. In Article V of the contract "Financial Impairment" is defined as "... the date the prior reinsurer is prohibited from paying their liabilities due to government regulation or the date the Company (AIG) declares a financial impairment exists." (emphasis added). The contract allows the determination of financial impairment to include: "Standard accounting practice of the Company for amounts deemed uncollectible due to financial condition of prior Reinsurer." The Company was unable to provide the examiners with any specific guidelines that the Company utilizes to declare amounts uncollectible. Therefore, the Company can unilaterally, at its sole discretion, declare reinsurance recoverable from any entity it deems appropriate as uncollectible. This does not appear to be an arms length reinsurance contract provision.

In addition, the reinsurers to which business was originally ceded by the AIG pool companies are not a party to this agreement. This agreement does not constitute a retrocession from such reinsurers to Coral Re. The quota share agreement does not effect a transfer of underwriting risk; the element of risk assumed by Coral Re is simply a timing risk and a credit risk represented by unrecoverable balances on the original reinsurance contracts. Coral Re is acting as a guarantor of the performance of the original reinsurers. The long-standing position of the New York Insurance Department is that unless a reinsurance contract contains

CONFIDENTIAL

-13-

an element of underwriting risk no credit shall be allowed for reinsurance in any accounting or financial statement of the ceding insurer.

The Company, on the portion of the treaty pertaining to commutations, does not record the ceded premium to Coral Re nor the loss on the commutation. Only a memo entry is made to replace the named reinsurer. This is inappropriate statutory accounting. It is recommended that the Company properly reflect the transaction in the corresponding general ledger accounts to fully disclose the separate transactions: the loss on the commutation and the subsequent cession to Coral Re.

The agreement contains a retrospective rating provision. The actual consideration is determined by the following formula: losses incurred less investment income on premium funds, plus a risk fee and applicable expenses. Coral Re is paid a fee for its participation in the financial arrangement.

The following summary of the retrospective rating provision of the contract with AIG pool companies, Lexington, and Landmark, from December 18, 1987 to December 31, 1991, clearly demonstrates that there is no transfer of underwriting risk:

| | |
|---|---:|
| Losses incurred | $1,076,056,130 |
| Risk fee (1) | 10,313,435 |
| Applicable expenses (2) | 13,125,554 |
| Less Investment yield (3) | (201,918,836) |
| Retrospective consideration | $ 897,576,283 |
| Less consideration paid | (887,843,491) |
| Difference (adjustment) | $ 9,732,792* |
| Excess of risk fee over adjustment ($9,732,792 - $10,313,435) | $ (580,643) |

* No settlement was paid because consideration paid ($887,843,491) is the maximum consideration per the agreement.

CONFIDENTIAL

AIG-F  0001214

(1) The risk fee is $700,000 plus 1% of the premium for each contract year. Subject to a minimum of $1,790,200 for each contract year. (1987, 1988, 1989, 1990, and 1991).

(2) The Company informed the examiners that applicable expenses pertained mostly to Coral Re's cost to obtain letters of credit for the benefit of the AIG pool companies.

(3) AIG pool companies are credited with yield on "investable funds" - premiums ceded less losses paid less applicable expenses.

The above calculation shows, that the amount paid since inception is within .06% of the retrospective plan calculation, after deducting the risk fee. This immaterial difference would not constitute a transfer of risk.

The quota share reinsurance agreement with Coral Re does not transfer underwriting risk. Therefore, it is recommended that the Company not take credit for the treaty with Coral Re.

The following additional items were noted during the examination of this agreement:

(a)    In 1991, the AIG pool companies borrowed $190,000,000 from an affiliated company, AIG Funding Inc. and erroneously reported this loan as a sale of reinsurance recoverable on paid losses due from Coral Re. AIG pool companies did not make any filings with the Department for this transaction. Furthermore, there is no written agreement or contract detailing the transaction and the terms of borrowing. The failure to maintain written documentation of a transaction of this magnitude is evidence of poor financial management and lack of internal controls. This transaction also violates Section 1505(d)(1) of the New York Insurance Law which states:

> "The following transactions between a domestic controlled insurer and any person in its holding company system may not be entered into unless the insurer has notified the superintendent in writing...at least thirty days prior... and he has not disapproved it within such period:
> (1) sales, purchases, exchanges, loans or extensions of credit, or investments, involving more than one-half of one percent but less than five percent of the insurer's admitted assets..."

CONFIDENTIAL

AIG-F  0001215

-20-

The amount collected from Coral Re was $184,688,149, however, the amount subsequently paid to AIG Funding Inc. was exactly $190,000,000 plus interest. This confirms that this transaction is a loan from an affiliated company, rather than a sale of assets. The effect of the Company recording this transaction as a sale of reinsurance recoverable on paid losses, was to window dress the Company's balance sheet by avoiding the unauthorized penalty for reinsurance recoverable on paid losses due from Coral Re.

This report on examination will reflect an increase to the AIG pool companies' asset "Reinsurance recoverable on paid losses" (see Item 5) for $184,688,149 (100%), with American Home's share (36%) amounting to $66,487,735 and a corresponding increase to "Provision for reinsurance" net of any funds held (see Item 9). In addition, this report will establish a liability "Payable to affiliates" (see Item 10) amounting to $190,000,000 (100%), American Home's share (36%) being $68,400,000 representing the loan from AIG Funding Inc.

It is recommended that all transactions between the Company and its affiliates be evidenced by written agreements and such agreements be filed with the New York Insurance Department in accordance with Section 1505(d)(1) of the New York Insurance Law.

(b)    In statements filed with the Department, the AIG pool companies reflected reinsurance recoverable from unauthorized reinsurers as collateralized in a manner allowed by Section 125.4(f) of Regulation 20 (11 NYCRR 125). Section 125.4(f) of Regulation 20 permits a non-insurer parent of a ceding insurer to provide funds as security for reinsurance recoverable due from certain named unauthorized reinsurers in lieu of funds provided by such reinsurers. The funds are in the form of a letter of credit ("LOC") purchased by the parent for the benefit of the ceding insurers. A ceding insurer may elect to use the

CONFIDENTIAL

parental LOC to take credit as a deduction from loss and unearned premium reserves, for reinsurance recoverable from designated unauthorized reinsurers. The parental LOC must be available to the ceding insurer in instances where an unauthorized reinsurer fails or delays in meeting its contractual obligation. Rather than drawing down on the LOC provided by the parent company as required by Regulation 20, the AIG pool companies transferred the amounts due from unauthorized reinsurers to the Coral Re agreement, thus avoiding the necessity to draw down the LOC. The failure to draw down the LOC is a violation of Department Regulation 20 and Article 15 and defeats the purpose of the LOC as a vehicle to ensure payment of balances owed. The parental LOC is reduced to the role of window-dressing to be discarded when a draw down is imminent.

It is recommended that the Company draw down the parental LOC as required under Regulation 20.

(c)    The Department questions whether the Company "controls" Coral Re within the meaning of Section 1501(a)(2) of the New York Insurance Law which states,

"Control", including the terms "controlling", "controlled by", and "under common control with", means the possession direct or indirect of the power to direct or cause the direction of the management and policies of a person whether through ownership of voting securities, by contract...or otherwise..."

The Company's "control" of Coral Re may be demonstrated by the following:

(1)    The examiners reviewed the Executive Summary of the Private Placement Memorandum dated December 1987 ("the offering memorandum") which states, in part,

"Investors ("Investors") are being solicited to jointly establish Coral Reinsurance Company Ltd. ("Coral" or the "Company") incorporated in Barbados. The Company is designed to reinsure certain risks from several of the US subsidiary insurance companies of American International Group, Inc. ("AIG"). AIG's interest in creating the Company (emphasis added) is to create a reinsurance facility which will permit its U.S. companies to write more U.S. premiums. For a U.S. domicile company, a high level of surplus is required to support insurance premiums in accordance with U.S. statutory requirements. The statutory requirements in Barbados are less restrictive. The proposed transaction involves incorporating a Barbados based reinsurance company to be capitalized with $60 million of equity provided by the investors."

CONFIDENTIAL

-22-

(2)     In addition, the examiners have reviewed a "Stock Subscription Agreement" dated December 17, 1987 by and between Coral Re and the Investors which states in Section 2.2 (e),

> "In addition to the Offering Memorandum, the Investor and the Investor's representatives, if any have been given the opportunity to examine all documents which Coral and American International Group, Inc. ("AIG") have submitted to or made available for inspection by the Investor relating to and, if applicable, executed in connection with the transactions contemplated. Coral and AIG have also provided the Investors with the opportunity to ask questions of, and receive answers from, Coral, AIG and their representatives concerning the terms and conditions of the Shares and obtain any additional information necessary to verify the information contained in the Offering Memorandum...."

(3)     Coral Re was incorporated under the laws of Barbados on December 14, 1987. Only four days later, on December 18, 1987, the AIG pool companies sent $160 million dollars of premium covering $400 million of loss reserves to Coral Re which had only $52,680,000 in capital and $483,260 in retained earnings. The transfer of such a large liability to an undercapitalized insurer with no operating record is a further indication that AIG controls Coral Re.

The capital of Coral Re was reduced from $52,680,000 in 1987 to $15,000,000 in 1991. In accordance with the exit provision of the private placement memorandum, an investor that wants to terminate his investment is entitled to receive the book value of his entire investment in the common stock of Coral Re. In 1991, 628 common shares were redeemed, each investor received the book value of the common stock. The issued and paid common shares were reduced from 878 common shares to 250 common shares.

Coral Re has not written any business other than the premiums assumed from AIG companies. In 1991, Coral Re reported $1,009,866,599 in assumed losses outstanding from AIG pool companies with only $15,000,000 in capital and $104,732 in retained earnings. The continuation of this reinsurance relationship, in view of such a high leverage ratio, is further indication of control by the AIG pool companies.

CONFIDENTIAL

AIG-F   0001218

-23-

4)      In 1991, approximately 83% of Coral Re's assets were pledged for letters of credit with AIG pool companies as the beneficiaries.

5)      A material amount of the premiums ceded to Coral Re is paid directly to Uberseebank, which is an affiliate of AIG. The bank acts as a collateral agent for the letters of credit to which the pool companies are the beneficiaries.

6)      All of Coral Re's accounting and administrative functions are performed by American International Management Company (Barbados) Ltd., an affiliate of the AIG pool companies, through a management agreement effective December 1987.

7)      Article V of the quota share replacement agreement with Coral Re defines "contract period" as the first contract period December 18, 1987 through December 31, 1987. Subsequent contract periods are January 1st to December 31st for each subsequent calendar year. A literal reading of the contract indicates that each contract period would be reviewed independently. If the experience for the transferred reinsurers developed such that the losses exceeded the contract year policy limit, the excess would not be covered by the agreement.

The AIG pool companies have aggregated the coverage limits for all contract periods, and would expect that any excess in a given period would be covered by any unused limits in a different contract period covered by the treaty. The AIG pool companies unilaterally aggregated all contract periods contrary to the reinsurance contract provisions. This further demonstrates AIG pool companies' control of Coral Re.

CONFIDENTIAL

-24-

8)    The following is a list of shareholders of Coral Re at December 31, 1991:

| Shareholder | No. of Shares | Percent of Ownership |
|---|---|---|
| Abeille Reassurance Paris, France | 24 | 9.6% |
| Abeille Assurance Paris, France | 24 | 9.6% |
| CT Insurance Company Ltd. Bridgetown, Barbados | 50 | 20.00% |
| First Transportation Indemnity Ltd. Bridgetown, Barbados | 100 | 40.00% |
| The Molsons Company Ltd. Toronto, Canada | 52 | 20.80% |
| Total | 250 | 100.00% |

The following was noted about 80% of the shareholders of Coral Re:

i)     First Transportation Indemnity Ltd., formerly Laidlaw International Ltd., (Barbados) was also managed by American International Management Company Ltd. (Barbados).

ii)    The President and CEO of the Molsons Company Ltd. is a Director of AIG.

iii)   Abeille Assurance and Abeille Reassurance together own more than 19.2% of Coral Re stock. An Abeille Assurance affiliate, Abeille General Insurance Company is managed by an AIG subsidiary (North American Managers Inc.) and has common officers and a common chairman of the board with AIG. Abeille Assurance and Coral Re have a common director. Also reinsurance recoverable

CONFIDENTIAL

-25-

balances from Abeille Reassurance are transferred to Coral Re in the quota share replacement treaty.

Both the "Stock Subscription Agreement" and the "Private Placement Memorandum" were executed in December 1987 which clearly establishes AIG's involvement in creating Coral Re for the sole purpose of allowing AIG's U.S. companies to write more business and avoid limitations on such writings due to U.S. statutory requirements.

The AIG pool companies did not include Coral Re in their annual holding company filings with the Department since 1987 to the present. Also. AIG's senior management. in a meeting with the New York Insurance Department denied that AIG or its affiliates control Coral Re. The Department requested documentation to support $200 million dollars of investment yield on funds held by Coral Re. The Company responded that it did not control Coral Re and this was third party information which was not available to them.

In light of the above. the Department has advised the Company of its concerns that AIG and the Company may have "...the possession. direct or indirect. of the power to direct or cause the direction of the management and policies of..." Coral Re. In an effort to alleviate the Department's concerns regarding the relationship between the AIG companies and Coral Re. the Company has agreed to the following actions:

Effective January 1. 1996 the Company will commute substantially all liability under the "replacement" agreement with Coral Re;

Not cede premium under any reinsurance replacement agreement without the approval of the New York Insurance Department;

Make certain that all reinsurance agreements comply with Chapter 22 of the NAIC's Accounting Practices and Procedures Manual.

CONFIDENTIAL

The Company has also agreed to report any reinsurer that has characteristics similar to Coral Re as an affiliated reinsurer in future filings with state insurance regulators.

d)     Section 310(a)(3) of the New York Insurance Law states as follows:

"The officers and agents of such insurer or other person shall facilitate such examination and aid such examiners in conducting the same so far as it is in their power to do so."

The AIG pool companies have failed to provide the following Department-requested information relevant to the examination which is in violation of the provisions of Section 310(a) of the New York Insurance Law:

1)     A complete restated balance sheet reflective of the amounts that would have been reported had the Coral Re treaty not been entered into.  This was requested in a meeting in the Department on February 4, 1993 and again on April 29, 1993.

2)     The detailed calculation of the investment yield.  The only response after numerous requests was that the interest rate was 8.76%.  The examiners repeatedly requested further documentation and the Company responded that this was "third" party information which is not available to AIG.  It is inconceivable that the Company would pay over $800 million dollars in consideration and could not receive detailed information supporting the investment yield in the final premium calculation, especially in view of the fact that Coral Re is managed by an affiliated company of the AIG pool companies.

CONFIDENTIAL

-27-

3)    The support for the applicable expenses in the retrospective premium calculation amounting to $13 million. The Company's response was that it primarily relates to the letters of credit commissions. When the examiner requested further detail

information, the Company responded that this was not available to AIG as this represents Coral Re's internal documentation.

It is recommended that the Company comply with Section 310(a)(3) of the New York Insurance Law and provide information requested to facilitate the examination.

## D.    Holding Company System

American Home Assurance Company is wholly-owned by AIG, a Delaware holding company organized in 1967, which owns directly or indirectly all of the capital stock of several insurance companies including the American Home/National Union Group.

The Company, in turn, owns part of the companies listed below which are part of the same holding company system of which it is a member:

| Company Ownership | Percent of Ownership |
|---|---|
| American International Recovery Inc. | 100.00% |
| American International Ins. Co. | 25.00% |
| AIG Equipment Lessors, Inc. | 25.00% |
| AIG Hawaii Insurance Company | 100.00% |
| AIG Realty, Inc. | 30.96% |
| AIG Overseas Finance Europe, Inc. | 100.00% |
| AIGOF Investments | 100.00% |
| American International Life Assurance Co. | 22.48% |
| American International Oil & Gas Corp. | 50.00% |
| Transatlantic Reinsurance Corporation | 33.00% |

CONFIDENTIAL

AIG-F  0001223

## The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

### AGGREGATE LIABILITY ADVERSE LOSS DEVELOPMENT
### AGREEMENT OF REINSURANCE

between

### COLOGNE REINSURANCE COMPANY (DUBLIN) LIMITED
An Irish corporation
having its principal offices at
1 George's Dock
I.F.S.C.
Dublin 1, Ireland

(the "Company")

and

### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH
a Pennsylvania corporation
having its principal offices at
175 Water Street, New York, New York, United States 10038

(the "Reinsurer")

---

In consideration of the promises set forth in this Agreement, the parties agree as follows:

### Article I - SCOPE OF AGREEMENT

As a condition precedent to the Reinsurer's obligations under this Agreement, the Company shall cede to the Reinsurer the business described in this Agreement, and the Reinsurer shall accept such business as reinsurance from the Company. The terms of this Agreement shall determine the rights and obligations of the Company.

### Article II - PARTIES TO THE AGREEMENT

This Agreement is solely between the Company and the Reinsurer. When more than one Company is named as a party to this Agreement, the first Company named shall be the agent of the other companies as to all matters pertaining to this Agreement. Performance of the obligations of each party under this Agreement shall be rendered solely to the other party. However, if the Company becomes insolvent, the liability of the Reinsurer shall be modified to the extent set forth in the article entitled INSOLVENCY OF THE COMPANY. In no instance shall any insured or reinsured of the Company or any claimant against an insured or reinsured of the Company have any rights under this Agreement.

- 1 -

Agreement No. R000040/2000

GR1 0126113

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

## Article III - BUSINESS SUBJECT TO THIS AGREEMENT

This Agreement shall apply to Ultimate Net Loss which the Company is or becomes obligated to pay under the Original Reinsurance Contracts written by the Company and listed in Schedule A.

## Article IV - TERM

This Agreement shall become effective at 12:01 a.m., Central European Time on March 31, 2001 and shall remain in force and effect until the obligations hereunder have been discharged.

## Article V - LIABILITY OF THE REINSURER

The Reinsurer shall pay to the Company 100% of the Company's Net Retained Liability of 50% for Ultimate Net Loss paid by the Company on and after March 31, 2001 on the business reinsured hereunder, subject to an overall limit of liability to the Reinsurer of US $300,000,000.

## Article VI - DEFINITIONS

(a) Ultimate Net Loss means the sum actually paid or payable by the Company in settlement of losses for which it is liable under the Original Reinsurance Contracts, including Allocated Adjustment Expense, after deduction of salvage, subrogation and other recoveries and after deduction of amounts due from all other reinsurance, whether collectible or not. If the Company becomes insolvent, this definition shall be modified to the extent set forth in the article entitled INSOLVENCY OF THE COMPANY.

Notwithstanding the provisions of the article entitled MANAGEMENT OF CLAIMS AND LOSSES, this term shall also include 100% of Losses in Excess of Policy Limits and 100% of Extra Contractual Obligations.

Nothing in this definition shall imply that losses are not recoverable under this Agreement until the Company's Ultimate Net Loss has been finally ascertained.

(b) Allocated Adjustment Expense means expenditures by the Company within the terms of the Company's policies in the direct defense of claims and in connection with Losses in Excess of Policy Limits and Extra Contractual Obligations and as allocated to an individual claim or loss (other than for office expenses and for the salaries and expenses of employees of the Company or of any subsidiary or related or wholly owned company of the Company) made in connection with the disposition of a claim, loss, or legal proceeding including investigation,

- 2 -

Agreement No. R000040/2000

GR1_0126114

# The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

negotiation, and legal expenses; court costs; prejudgment interest; and postjudgment interest.

**(c)    Losses in Excess of Policy Limits and Extra Contractual Obligations**

**(1)**    "Loss in Excess of Policy Limits" means a payment made to a third party claimant in excess of the policy limit which the Company is legally obligated to pay resulting from an action taken by the insured or assignee arising from a third party claimant being awarded an amount in excess of the Company's policy limit as a result of the Company's failure to settle within the policy limit or of the Company's alleged or actual negligence or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

**(2)**    "Extra Contractual Obligation" means a loss which the Company is legally obligated to pay, which is not covered under any other provision of this Agreement and which arises from the Company's handling of any claim on the business reinsured hereunder.

The date on which a Loss in Excess of Policy Limits or an Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original Occurrence.

There shall be no coverage hereunder where the Loss in Excess of the Policy Limit or the Extra Contractual Obligation has been incurred due to the fraud or criminal conduct of a member of the Board of Directors, a corporate officer of the Company, or any other employee of the Company, acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the investigation, defense or settlement of any claim covered hereunder.

Any insurance or reinsurance, whether collectible or not, which indemnifies or protects the Company against claims which are the subject matter of this definition and any contribution, subrogation, or recovery shall inure to the benefit of the Reinsurer and shall be deducted to arrive at the amount of the Company's Net Loss.

**(d)    Occurrence** means each accident or occurrence or series of accidents or occurrences arising out of one event regardless of the number of employees or employers involved, except as modified below.

As respects an occupational or other disease or cumulative injury under workers' compensation or employers' liability policies for which the employer is liable:

- 3 -

Agreement No. R000040/2000

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd

(1) Which arises from a specific sudden and accidental event limited in time and place, such occupational or other disease suffered by one or more employees of one or more employers shall be deemed to be an Occurrence within the meaning of this Agreement and the date of Occurrence shall be deemed to be the date of the sudden and accidental event.

(2) Which does not arise from a specific sudden and accidental event limited in time and place, such occupational or other disease or cumulative injury shall be deemed to be an Occurrence within the meaning of this Agreement, and the date of Occurrence shall be deemed to be the date of the beginning of the disability for which compensation is payable if the case is compensable under the Workers' Compensation law; or the date that disability due to said disease actually began if the case is not compensable under the Workers' Compensation law.

Each case of an employee contracting such occupational or other disease or cumulative injury for which the employer insured by the Company is held liable shall be considered a separate Occurrence regardless of the date of loss.

(e) **Original Reinsured** means the insurance company or reinsurance company to which the Company issued an Original Reinsurance Contract.

(f) **Original Reinsurance Contract** means all binders, policies, certificates, agreements, treaties, bonds, or contracts of reinsurance or retrocession authorized by the Company to Original Reinsureds under the same Reinsurance Form covering the same liability, whether issued in one layer or more than one layer, and appearing on Schedule A.

(g) **Reinsurance Form** means the type of liability reinsurance afforded by the Company to its cedants and retrocedants.

(h) **Net Retained Liability** means, and this Agreement shall only apply to, that portion of any Original Reinsurance Contract covered by this Agreement which the Company retains net for its own account, and in calculating Ultimate Net Loss only loss or losses in respect of that portion of any insurance or reinsurance which the Company retains net for its own account shall be included. It is understood and agreed that the amount of the Reinsurer's liability under this Agreement shall not be increased due to the Company's failure to retrocede in accordance with its normal practice, nor by reason of the inability of the Company to collect from any other reinsurer, whether specific or general, any amounts which may have been due from them, whether that inability arises from the insolvency of the other reinsurer or otherwise.

- 4 -

Agreement No. R000040/2000

GR1_0126116

# The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

## Article VII - EXCLUSIONS

This Agreement shall not apply to any liability excluded by the Original Reinsurance Contracts.

## Article VIII - MANAGEMENT OF CLAIMS AND LOSSES

The Company shall investigate and settle or defend all claims and losses. When requested by the Reinsurer, the Company shall permit the Reinsurer, at the expense of the Reinsurer, to be associated with the Company in the defense or control of any claim, loss, or legal proceeding which involves or is likely to involve the Reinsurer. All payments of claims or losses by the Company within the terms and limits of its policies which are within the limits set forth in the applicable Agreement shall be binding on the Reinsurer, subject to the terms of this Agreement.

## Article IX - RECOVERIES

The Company shall pay to or credit the Reinsurer with the Reinsurer's portion of any recovery obtained from salvage, subrogation, or other insurance. Allocated Adjustment Expense for recoveries shall be deducted from the amount recovered. However, if the Allocated Adjustment Expense incurred in obtaining recoveries exceeds the amount recovered, if any, the excess Allocated Adjustment Expense shall be apportioned between the parties in proportion to the liability of each party for the loss before the recovery was obtained.

The Reinsurer shall be subrogated to the rights of the Company to the extent of its loss payments to the Company. The Company agrees to enforce its rights of salvage, subrogation, and its rights against insurers or to assign these rights to the Reinsurer.

Recoveries under this Agreement shall be distributed to the parties in an order inverse to this in which their liabilities accrued.

## Article X - LOSS TRANSFER PAYMENT AND CONSIDERATION

The Company shall pay to the Reinsurer a loss transfer payment of US $250,000,000 within thirty business days after the execution of this Agreement. Ninety-eight percent (98%) of this sum shall be withheld and retained within an experience account (the "Experience Account") by the Company from which the Company shall make claim payments due from the Reinsurer hereunder.

## Article XI - REPORTS AND REMITTANCES

### (a)    Claims and Losses

Within 90 days of the end of each year the Company shall render to the Reinsurer an annual status report of the Experience Account during the preceding year showing:

- 5 -

Agreement No. R000040/2000

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

Credit Items:

A) Credit balance forward from the previous statement

B) Withheld premiums equal to 98% of reinsurance premiums due

C) Interest on the positive balance within the account calculated at a rate of 3% per year on the beginning balance brought forward from the previous statement

Debit Items:

A) Ultimate Net Loss payments made by the Company during the year.

(b)        Within 90 days of the end of each year the Company shall prepare a report for the Reinsurer showing:

A) Outstanding reserves, including Allocated Adjustment Expenses, at the beginning of the year, plus

B) The sum of reserves, including Allocated Adjustment Expenses, increased or established during the year, minus

C) Claims and Allocated Loss Adjustment Expenses paid during the year, equals

D) Outstanding reserves, including Allocated Adjustment Expenses, at the end of the year.

Upon receipt of this report the Reinsurer shall authorize the Company to draw payment from the experience account for the balance due in respect of claims paid during the year. If the balance in the experience account is insufficient to satisfy the obligation of the Reinsurer, then the Reinsurer shall pay the amount owed in excess of the balance of the experience account within 90 days after receipt of the report. All balances shall be converted to United States Dollars at the exchange rate used in the Reinsurer's books.

(b)   General

In addition to the reports required by (a) above, the Company shall furnish such other information as may be required by the Reinsurer for the completion of the Reinsurer's quarterly and annual statements and internal records.

- 6

GR1_0126118

# The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

All reports shall be rendered on forms or in format acceptable to the Company and the Reinsurer.

## Article XII - ERRORS AND OMISSIONS

The Reinsurer shall not be relieved of liability because of an error or accidental omission of the Company in reporting any claim or loss or any business reinsured under this Agreement, provided that the error or omission is rectified promptly after discovery. The Reinsurer shall be obligated only for the return of the premium paid for business reported but not reinsured under this Agreement.

## Article XIII - SPECIAL ACCEPTANCES

Business not within the terms of this Agreement may be submitted to the Reinsurer for special acceptance and, if accepted by the Reinsurer, shall be subject to all of the terms of this Agreement except as modified by the special acceptance.

## Article XIV - RESERVES AND TAXES

The Reinsurer shall maintain the required reserves as to the Reinsurer's portion of unearned premium, if any, claims, losses, and Allocated Adjustment Expense.

The Company shall be liable for all premium taxes on premium ceded to the Reinsurer under this Agreement. If the Reinsurer is obligated to pay any premium taxes on this premium, the Company shall reimburse the Reinsurer; however, the Company shall not be required to pay taxes twice on the same premium.

## Article XV - OFFSET

The Company or the Reinsurer may offset any balance, whether on account of premium, commission, claims or losses, Adjustment Expense, salvage, or otherwise, due from one party to the other under this Agreement or under any other agreement heretofore or hereafter entered into between the Company and the Reinsurer.

## Article XVI - INSPECTION OF RECORDS; CONFIDENTIALITY

A) Inspection of records  Subject to paragraph B, Confidentiality, the Company shall allow the Reinsurer to inspect, at reasonable times, the records of the Company relevant to the business reinsured under this Agreement, including the Company's files concerning claims, losses, or legal proceedings which involve or are likely to involve the Reinsurer. The inspection may only be conducted by representatives of the Reinsurer who execute a confidentiality agreement in a form satisfactory to the Company.

B) Confidentiality  The Reinsurer acknowledges that the Original Reinsurance Contracts and the Company's records with respect to those contracts constitute valuable privileged, commercial and confidential information not generally known about the operations or clientele of the Company ("Company confidential information"). Neither the Reinsurer nor

- 7 -

GR1 0126119

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

its representatives shall, directly or indirectly, disclose, divulge or make available any Company confidential information whether acquired before or after the date of this Agreement, including but not limited to information relating to investment, financial, accounting, names and addresses of clients, carrier relationships, insurance broker/agent relationships, merchandising, marketing and selling practices, and the services, functions, systems, computer programs, procedures, or work products contemplated by, or produced by the Reinsurer or its representatives pursuant to this Agreement or which they are to use or perform in connection with the Agreement. As used in this Agreement, "Company confidential information" does not include information which (a) is or becomes generally available to the public other than as a result of a disclosure by the Reinsurer or its representatives, (b) was available to the Reinsurer on a non-confidential basis prior to its disclosure by the Reinsurer or its representatives, or (c) becomes available to the Reinsurer on a non-confidential basis from a person other than the Company or its representatives who is not otherwise bound by a confidentiality agreement with the Company or its representatives, or is not otherwise prohibited from transmitting the information to the Reinsurer.

## Article XVII - ARBITRATION

All unresolved differences of opinion between the Company and the Reinsurer relating to this Agreement, including its formation and validity, shall be submitted to arbitration consisting of one arbitrator chosen by the Company, one arbitrator chosen by the Reinsurer, and a third arbitrator chosen by the first two arbitrators.

The party demanding arbitration shall communicate its demand for arbitration to the other party by registered or certified mail, identifying the nature of the dispute and the name of its arbitrator, and the other party shall then be bound to name its arbitrator within 30 days after receipt of the demand.

Failure or refusal of the other party to so name its arbitrator shall empower the president of the Insurance Institute of Ireland to name the second arbitrator. If the first two arbitrators are unable to agree upon a third arbitrator after the second arbitrator is named, each arbitrator shall name three candidates, two of whom shall be declined by the other arbitrator, and the choice shall be made between the two remaining candidates by drawing lots. The arbitrators shall be impartial and shall be active or retired officers of property or casualty insurance or reinsurance companies.

The arbitrators shall adopt their own rules and procedures and are relieved from judicial formalities. In addition to considering the rules of equity and the customs and practices of the international insurance and reinsurance business, the arbitrators shall make their award with a view to effecting the intent of this Agreement.

The arbitration shall take place in London and English law shall apply to the conduct of the arbitration.

The decision of the majority of the arbitrators shall be in writing and shall be final and binding upon the parties.

- 8 -

Agreement No. R000040/2000

GR1_0126120

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

Each party shall bear the cost of its own arbitrator and shall jointly and equally bear with the other party the expense of the third arbitrator and other costs of the arbitration. In the event both arbitrators are chosen by one party, the fees of all arbitrators shall be equally divided between the parties.

The arbitration shall be held at the times and places agreed upon by the arbitrators.

### Article XVIII - INSOLVENCY OF THE COMPANY

In the event of the insolvency of the Company, the reinsurance proceeds will be paid to the Company or the liquidator, with reasonable provision for verification, on the basis of the claim allowed in the insolvency proceeding without diminution by reason of the inability of the Company to pay all or part of the claim, except as otherwise specified in the statutes of any state having jurisdiction of the insolvency proceedings or except where the Agreement, or other written agreement, specifically provides another payee of such reinsurance in the event of insolvency.

The Reinsurer shall be given written notice of the pendency of each claim against the Company on the contract(s) reinsured hereunder within a reasonable time after such claim is filed in the insolvency proceedings. The Reinsurer shall have the right to investigate each such claim and to interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defenses which it may deem available to the Company or its liquidator. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

### Article XIX Cancellation.

This Agreement may be immediately cancelled on written notice by either party if:

A) The performance in whole or in part of this Agreement is prohibited or rendered impossible de jure or de facto, in particular, and without prejudice to the generality of the preceding words, in consequence of any law or regulation which is or shall be in force in any country or territory, or if any law or regulation shall directly or indirectly prevent the payment of any or all of the sums due to or from either party;

B) The other party has become insolvent or unable to pay its debts or has lost the whole or any part of its capital;

C) There is any material change in ownership or control of the other party;

D) The country or territory in which the other party resides or has its headquarters or is incorporated is involved in armed hostilities with any other country, whether war is declared or not, or is partly or wholly occupied by another power; or

- 9 -

Agreement No. R000040/2000

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd

E) The other party fails to comply with any of the terms and conditions of this Agreement.

This Agreement may be cancelled by the Company at any time on 90 days written notice to the Reinsurer.

Written notices under this article shall be sent by Telex, facsimile or registered mail and shall be deemed received when sent or, where communications between the parties are interrupted, upon the attempt to send. All outstanding losses and other reserves, if any, for business covered by this Agreement shall be commuted as of the date of cancellation upon payment to the Company of the amount equal to the credit balance of the Experience Account as of the date of cancellation. Payment and acceptance of that amount shall constitute a full and final mutual release of all liabilities of the parties under this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate,

this _____ day of _____, 2001.

COLOGNE REINSURANCE COMPANY (DUBLIN) LIMITED

Attest: _____          Financial Controller

and this 28 day of _____, 2001.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH

Attest: _____

- 10 -
Agreement No. R000040/2000

GR1_0126122

# The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

## AGGREGATE LIABILITY ADVERSE LOSS DEVELOPMENT
## AGREEMENT OF REINSURANCE

between

## COLOGNE REINSURANCE COMPANY (DUBLIN) LIMITED
An Irish corporation
having its principal offices at
1 George's Dock
I.F.S.C.
Dublin 1, Ireland

(the "Company")

and

## NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH
a Pennsylvania corporation
having its principal offices at
175 Water Street, New York, New York, United States 10038

(the "Reinsurer")

In consideration of the promises set forth in this Agreement, the parties agree as follows:

### Article I - SCOPE OF AGREEMENT

As a condition precedent to the Reinsurer's obligations under this Agreement, the Company shall cede to the Reinsurer the business described in this Agreement, and the Reinsurer shall accept such business as reinsurance from the Company. The terms of this Agreement shall determine the rights and obligations of the Company.

### Article II - PARTIES TO THE AGREEMENT

This Agreement is solely between the Company and the Reinsurer. When more than one Company is named as a party to this Agreement, the first Company named shall be the agent of the other companies as to all matters pertaining to this Agreement. Performance of the obligations of each party under this Agreement shall be rendered solely to the other party. However, if the Company becomes insolvent, the liability of the Reinsurer shall be modified to the extent set forth in the article entitled INSOLVENCY OF THE COMPANY. In no

- 1 -
Agreement No. R000040/2000

GR1_0126123

# The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

instance shall any insured or reinsured of the Company or any claimant against an insured or reinsured of the Company have any rights under this Agreement.

## Article III - BUSINESS SUBJECT TO THIS AGREEMENT

This Agreement shall apply to Ultimate Net Loss which the Company is or becomes obligated to pay under the Original Reinsurance Contracts written by the Company and listed in Schedule A.

## Article IV - TERM

This Agreement shall become effective at 12:01 a.m., Central European Time on December 1, 2000 and shall remain in force and effect until the obligations hereunder have been discharged.

## Article V - LIABILITY OF THE REINSURER

The Reinsurer shall pay to the Company 50% of the Company's Net Retained Liability for Ultimate Net Loss paid by the Company on and after December 1, 2000 on the business reinsured hereunder, subject to an overall limit of liability to the Reinsurer of US $300,000,000.

## Article VI - DEFINITIONS

(a) **Ultimate Net Loss** means the sum actually paid or payable by the Company in settlement of losses for which it is liable under the Original Reinsurance Contracts, including Allocated Adjustment Expense, after deduction of salvage, subrogation and other recoveries and after deduction of amounts due from all other reinsurance, whether collectible or not. If the Company becomes insolvent, this definition shall be modified to the extent set forth in the article entitled INSOLVENCY OF THE COMPANY.

Notwithstanding the provisions of the article entitled MANAGEMENT OF CLAIMS AND LOSSES, this term shall also include 100% of Losses in Excess of Policy Limits and 100% of Extra Contractual Obligations.

Nothing in this definition shall imply that losses are not recoverable under this Agreement until the Company's Ultimate Net Loss has been finally ascertained.

(b) **Allocated Adjustment Expense** means expenditures by the Company within the terms of the Company's policies in the direct defense of claims and in connection with Losses in Excess of Policy Limits and Extra Contractual Obligations and as allocated to an individual claim or

- 2 -

Agreement No. R000040/2000

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd.

loss (other than for office expenses and for the salaries and expenses of employees of the Company or of any subsidiary or related or wholly owned company of the Company) made in connection with the disposition of a claim, loss, or legal proceeding including investigation, negotiation, and legal expenses; court costs; prejudgment interest; and postjudgment interest.

(c) **Losses in Excess of Policy Limits and Extra Contractual Obligations**

    (1) "Loss in Excess of Policy Limits" means a payment made to a third party claimant in excess of the policy limit which the Company is legally obligated to pay resulting from an action taken by the insured or assignee arising from a third party claimant being awarded an amount in excess of the Company's policy limit as a result of the Company's failure to settle within the policy limit or of the Company's alleged or actual negligence or bad faith in rejecting an offer of settlement or in the preparation of the defense or in the trial of any action against its insured or in the preparation or prosecution of an appeal consequent upon such action.

    (2) "Extra Contractual Obligation" means a loss which the Company is legally obligated to pay, which is not covered under any other provision of this Agreement and which arises from the Company's handling of any claim on the business reinsured hereunder.

The date on which a Loss in Excess of Policy Limits or an Extra Contractual Obligation is incurred by the Company shall be deemed, in all circumstances, to be the date of the original Occurrence.

There shall be no coverage hereunder where the Loss in Excess of the Policy Limit or the Extra Contractual Obligation has been incurred due to the fraud or criminal conduct of a member of the Board of Directors, a corporate officer of the Company, or any other employee of the Company, acting individually or collectively or in collusion with any individual or corporation or any other organization or party involved in the investigation, defense or settlement of any claim covered hereunder.

Any insurance or reinsurance, whether collectible or not, which indemnifies or protects the Company against claims which are the subject matter of this definition and any contribution, subrogation, or recovery shall inure to the benefit of the Reinsurer and shall be deducted to arrive at the amount of the Company's Net Loss.

- 3 -

Agreement No. R000040/2000

GR1_0126125

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

(d)   Occurrence means each accident or occurrence or series of accidents or occurrences arising out of one event regardless of the number of employees or employers involved, except as modified below.

As respects an occupational or other disease or cumulative injury under workers' compensation or employers' liability policies for which the employer is liable:

(1)   Which arises from a specific sudden and accidental event limited in time and place, such occupational or other disease suffered by one or more employees of one or more employers shall be deemed to be an Occurrence within the meaning of this Agreement and the date of Occurrence shall be deemed to be the date of the sudden and accidental event.

(2)   Which does not arise from a specific sudden and accidental event limited in time and place, such occupational or other disease or cumulative injury shall be deemed to be an Occurrence within the meaning of this Agreement, and the date of Occurrence shall be deemed to be the date of the beginning of the disability for which compensation is payable if the case is compensable under the Workers' Compensation law; or the date that disability due to said disease actually began if the case is not compensable under the Workers' Compensation law.

Each case of an employee contracting such occupational or other disease or cumulative injury for which the employer insured by the Company is held liable shall be considered a separate Occurrence regardless of the date of loss.

(e) Original Reinsured means the insurance company or reinsurance company to which the Company issued an Original Reinsurance Contract.

(f)  Original Reinsurance Contract means all binders, policies, certificates, agreements, treaties, bonds, or contracts of reinsurance or retrocession authorized by the Company to Original Reinsureds under the same Reinsurance Form covering the same liability, whether issued in one layer or more than one layer, and appearing on Schedule A.

(g) Reinsurance Form means the type of liability reinsurance afforded by the Company to its cedants and retrocedants.

(h) Net Retained Liability means, and this Agreement shall only apply to, that portion of any Original Reinsurance Contract covered by this Agreement which the Company retains net for its own account, and in calculating Ultimate Net Loss only loss or losses in respect of that portion of any insurance or reinsurance which the

- 4 -

Agreement No. R000040/2000

GR1_0126126

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

Company retains net for its own account shall be included. It is understood and agreed that the amount of the Reinsurer's liability under this Agreement shall not be increased due to the Company's failure to retrocede in accordance with its normal practice, nor by reason of the inability of the Company to collect from any other reinsurer, whether specific or general, any amounts which may have been due from them, whether that inability arises from the insolvency of the other reinsurer or otherwise.

## Article VII - EXCLUSIONS

This Agreement shall not apply to any liability excluded by the Original Reinsurance Contracts.

## Article VIII - MANAGEMENT OF CLAIMS AND LOSSES

The Company shall investigate and settle or defend all claims and losses. When requested by the Reinsurer, the Company shall permit the Reinsurer, at the expense of the Reinsurer, to be associated with the Company in the defense or control of any claim, loss, or legal proceeding which involves or is likely to involve the Reinsurer. All payments of claims or losses by the Company within the terms and limits of its policies which are within the limits set forth in the applicable Agreement shall be binding on the Reinsurer, subject to the terms of this Agreement.

## Article IX - RECOVERIES

The Company shall pay to or credit the Reinsurer with the Reinsurer's portion of any recovery obtained from salvage, subrogation, or other insurance. Allocated Adjustment Expense for recoveries shall be deducted from the amount recovered. However, if the Allocated Adjustment Expense incurred in obtaining recoveries exceeds the amount recovered, if any, the excess Allocated Adjustment Expense shall be apportioned between the parties in proportion to the liability of each party for the loss before the recovery was obtained.

The Reinsurer shall be subrogated to the rights of the Company to the extent of its loss payments to the Company. The Company agrees to enforce its rights of salvage, subrogation, and its rights against insurers or to assign these rights to the Reinsurer.

Recoveries under this Agreement shall be distributed to the parties in an order inverse to this in which their liabilities accrued.

## Article X - LOSS TRANSFER PAYMENT AND CONSIDERATION

The Company shall pay to the Reinsurer a loss transfer payment of US $250,000,000 within thirty business days after the execution of this Agreement. Ninety-eight percent (98%) of this sum shall be withheld and retained within an experience account

- 5 -

Agreement No. R000040/2000

GR1_0126127

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

(the "Experience Account") by the Company from which the Company shall make claim payments due from the Reinsurer hereunder.

## Article XI - REPORTS AND REMITTANCES

**(a)  Claims and Losses**

Within 90 days of the end of each year the Company shall render to the Reinsurer an annual status report of the Experience Account during the preceding year showing:

Credit Items:

A) Credit balance forward from the previous statement

B) Withheld premiums equal to 98% of reinsurance premiums due

C) Interest on the positive balance within the account calculated at a rate of 3% per year on the beginning balance brought forward from the previous statement

Debit Items:

A) Ultimate Net Loss payments made by the Company during the year.

**(b)**          Within 90 days of the end of each year the Company shall prepare a report for the Reinsurer showing:

A) Outstanding reserves, including Allocated Adjustment Expenses, at the beginning of the year, plus

B) The sum of reserves, including Allocated Adjustment Expenses, increased or established during the year, minus

C) Claims and Allocated Loss Adjustment Expenses paid during the year, equals

D) Outstanding reserves, including Allocated Adjustment Expenses, at the end of the year.

Upon receipt of this report the Reinsurer shall authorize the Company to draw payment from the experience account for the balance due in

– 6 –

Agreement No. R000040/2000

# The Cologne Re of Dublin.
Cologne Reinsurance Company (Dublin) Ltd.

respect of claims paid during the year. If the balance in the experience account is insufficient to satisfy the obligation of the Reinsurer, then the Reinsurer shall pay the amount owed in excess of the balance of the experience account within 90 days after receipt of the report. All balances shall be converted to United States Dollars at the exchange rate used in the Reinsurer's books.

(b) **General**

In addition to the reports required by (a) above, the Company shall furnish such other information as may be required by the Reinsurer for the completion of the Reinsurer's quarterly and annual statements and internal records.

All reports shall be rendered on forms or in format acceptable to the Company and the Reinsurer.

## Article XII - ERRORS AND OMISSIONS

The Reinsurer shall not be relieved of liability because of an error or accidental omission of the Company in reporting any claim or loss or any business reinsured under this Agreement, provided that the error or omission is rectified promptly after discovery. The Reinsurer shall be obligated only for the return of the premium paid for business reported but not reinsured under this Agreement.

## Article XIII - SPECIAL ACCEPTANCES

Business not within the terms of this Agreement may be submitted to the Reinsurer for special acceptance and, if accepted by the Reinsurer, shall be subject to all of the terms of this Agreement except as modified by the special acceptance.

## Article XIV - RESERVES AND TAXES

The Reinsurer shall maintain the required reserves as to the Reinsurer's portion of unearned premium, if any, claims, losses, and Allocated Adjustment Expense.

The Company shall be liable for all premium taxes on premium ceded to the Reinsurer under this Agreement. If the Reinsurer is obligated to pay any premium taxes on this premium, the Company shall reimburse the Reinsurer, however, the Company shall not be required to pay taxes twice on the same premium.

## Article XV - OFFSET

The Company or the Reinsurer may offset any balance, whether on account of premium, commission, claims or losses, Adjustment Expense, salvage, or otherwise, due from one

-7-

Agreement No. R000040/2000

GR1_0126129

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd.

party to the other under this Agreement or under any other agreement heretofore or hereafter entered into between the Company and the Reinsurer.

## Article XVI - INSPECTION OF RECORDS; CONFIDENTIALITY

A) **Inspection of records** Subject to paragraph B, Confidentiality, the Company shall allow the Reinsurer to inspect, at reasonable times, the records of the Company relevant to the business reinsured under this Agreement, including the Company's files concerning claims, losses, or legal proceedings which involve, or are likely to involve the Reinsurer. The inspection may only be conducted by representatives of the Reinsurer who execute a confidentiality agreement in a form satisfactory to the Company.

B) **Confidentiality** The Reinsurer acknowledges that the Original Reinsurance Contracts and the Company's records with respect to those contracts constitute valuable privileged, commercial and confidential information not generally known about the operations or clientele of the Company ("Company confidential information"). Neither the Reinsurer nor its representatives shall, directly or indirectly, disclose, divulge or make available any Company confidential information whether acquired before or after the date of this Agreement, including but not limited to information relating to investment, financial, accounting, names' and addresses of clients, carrier relationships, insurance broker/agent relationships, merchandising, marketing and selling practices, and the services, functions, systems, computer programs, procedures, or work products contemplated by, or produced by the Reinsurer or its representatives pursuant to this Agreement or which they are to use or perform in connection with the Agreement. As used in this Agreement, "Company confidential information" does not include information which (a) is or becomes generally available to the public other than as a result of a disclosure by the Reinsurer or its representatives, (b) was available to the Reinsurer on a non-confidential basis prior to its disclosure by the Reinsurer or its representatives, or (c) becomes available to the Reinsurer on a non-confidential basis from a person other than the Company or its representatives who is not otherwise bound by a confidentiality agreement with the Company or its representatives, or is not otherwise prohibited from transmitting the information to the Reinsurer.

## Article XVII - ARBITRATION

All unresolved differences of opinion between the Company and the Reinsurer relating to this Agreement, including its formation and validity, shall be submitted to arbitration consisting of one arbitrator chosen by the Company, one arbitrator chosen by the Reinsurer, and a third arbitrator chosen by the first two arbitrators.

The party demanding arbitration shall communicate its demand for arbitration to the other party by registered or certified mail, identifying the nature of the dispute and the name of its

- 8 -

Agreement No. R000040/2000

GR1_0126130

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

arbitrator, and the other party shall then be bound to name its arbitrator within 30 days after receipt of the demand.

Failure or refusal of the other party to so name its arbitrator shall empower the president of the Insurance Institute of Ireland to name the second arbitrator. If the first two arbitrators are unable to agree upon a third arbitrator after the second arbitrator is named, each arbitrator shall name three candidates, two of whom shall be declined by the other arbitrator, and the choice shall be made between the two remaining candidates by drawing lots. The arbitrators shall be impartial and shall be active or retired officers of property or casualty insurance or reinsurance companies.

The arbitrators shall adopt their own rules and procedures and are relieved from judicial formalities. In addition to considering the rules of equity and the customs and practices of the international insurance and reinsurance business, the arbitrators shall make their award with a view to effecting the intent of this Agreement.

The arbitration shall take place in London and English law shall apply to the conduct of the arbitration.

The decision of the majority of the arbitrators shall be in writing and shall be final and binding upon the parties.

Each party shall bear the cost of its own arbitrator and shall jointly and equally bear with the other party the expense of the third arbitrator and other costs of the arbitration. In the event both arbitrators are chosen by one party, the fees of all arbitrators shall be equally divided between the parties.

The arbitration shall be held at the times and places agreed upon by the arbitrators.

## Article XVIII - INSOLVENCY OF THE COMPANY

In the event of the insolvency of the Company, the reinsurance proceeds will be paid to the Company or the liquidator, with reasonable provision for verification, on the basis of the claim allowed in the insolvency proceeding without diminution by reason of the inability of the Company to pay all or part of the claim, except as otherwise specified in the statutes of any state having jurisdiction of the insolvency proceedings or except where the Agreement, or other written agreement, specifically provides another payee of such reinsurance in the event of insolvency.

The Reinsurer shall be given written notice of the pendency of each claim against the Company on the contract(s) reinsured hereunder within a reasonable time after such claim is filed in the insolvency proceedings. The Reinsurer shall have the right to investigate each such claim and to interpose, at its own expense, in the proceeding where such claim is to be adjudicated, any defenses which it may deem available to the Company or its liquidator. The expense thus incurred by the Reinsurer shall be chargeable, subject to court approval, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate

- 9 -

GR1_0126131

# The Cologne Re of Dublin.
### Cologne Reinsurance Company (Dublin) Ltd.

share of the benefit which may accrue to the Company solely as a result of the defense undertaken by the Reinsurer.

### Article XIX Cancellation

This Agreement may be immediately cancelled on written notice by either party if:

A) The performance in whole or in part of this Agreement is prohibited or rendered impossible de jure or de facto, in particular, and without prejudice to the generality of the preceding words, in consequence of any law or regulation which is or shall be in force in any country or territory, or if any law or regulation shall directly or indirectly prevent the payment of any or all of the sums due to or from either party;

B) The other party has become insolvent or unable to pay its debts or has lost the whole or any part of its capital;

C) There is any material change in ownership or control of the other party;

D) The country or territory in which the other party resides or has its headquarters or is incorporated is involved in armed hostilities with any other country, whether war is declared or not, or is partly or wholly occupied by another power; or

E) The other party fails to comply with any of the terms and conditions of this Agreement.

This Agreement may be cancelled by the Company at any time on 90 days written notice to the Reinsurer.

Written notices under this article shall be sent by Telex, facsimile or registered mail and shall be deemed received when sent or, where communications between the parties are interrupted, upon the attempt to send. All outstanding losses and other reserves, if any, for business covered by this Agreement shall be commuted as of the date of cancellation upon payment to the Company of the amount equal to the credit balance of the Experience Account as of the date of cancellation. Payment and acceptance of that amount shall constitute a full and final mutual release of all liabilities of the parties under this Agreement.

GR1_0126132

# The Cologne Re of Dublin.

Cologne Reinsurance Company (Dublin) Ltd.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate,

this _____ day of _____, 2001,

### COLOGNE REINSURANCE COMPANY (DUBLIN) LIMITED

_____

Attest: _____     John Houldsworth
                                       Chief Executive Officer

and this _____ day of _____, 2001.

### NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH

_____

Attest: _____

- 11 -
Agreement No. R000040/2000

GR1 0126133

## AIG – MRG REQUEST
## OCTOBER 31, 2000

**Proposal:**   GCR transfer $200m - $500m of reserves to AIG for a six to nine month period.

**Need:**   Unclear at this time.  Speculation is that this is in response to analysts' negative reaction to AIGs reserve reductions at Q3.  Chris Milton's description of his conversation with MRG did not add much to our knowledge.  MRG indicated it would be desirable to use longer tailed lines to minimize the administration.

**Timeframe:**   By year-end.

**REF Thoughts:**
➤   Due diligence is important, make certain we do not create (reporting) problems of our own
➤   Funds withheld, don't want to convert any investments
➤   Need to involve ▓▓▓▓▓▓▓▓ at a minimum

**JPB Thoughts:**
➤   Big numbers, may be a problem to find $500m
➤   Funds withheld;
➤   May be best to stay away from the US companies to avoid large fluctuations in our reported      reserves. Use non-US entities. KR Dublin?
➤   Any way to give the film finance reserves to AIG on a permanent basis?
➤   Tax planning opportunities regarding CLR Unicover reserves?
➤   Ajit reserves?
➤   Suggested ▓▓▓▓▓▓▓ as a good resource

▓▓▓▓ and I discussed this opportunity this afternoon. He suggested I confirm four points with Chris:
1. Are they indifferent to using reserves related to AIG business or "general purpose reserves"? [Chris thought it would be better using "general purpose reserves". He thought a commutation would be problematic, but did not know for certain.]
2. How much do they really need? [As much as we can put together up to $500m]
3. Any problem with a no funds deal? [Funds withheld is not an issue. They only want reserve impact.]
4. Any issues with currency or original country? [They are indifferent regarding the country or currency of origin.]

During the conversation, Chris said:
• MRG called earlier for a status report.
• Chris confirmed that this is to address the criticism they received from the analysts.
• Chris is also fine with finite reserves and mentioned that he and MRG discussed the idea of using

RCF
11·17·00

① Ref explained Dublin

② Ref wants 1% fee ($54)

③ Two transections
       250 ot    2000
       250 v     2001

④ there ! chos pont prions.

⑤ how to perfect how to get fee back

⑥ All sold been sold side.

⑦ Last night Mike proposed 2½% of OCS back
       → re Mike said rather have fee

⑧ Mike said he is going to try to get out 2½% back anyway

GR1_0126232



To: Cmilton@worldnet.att.net

cc: ████████████/GRN@GRN

11/17/2000 06:19 PM    Subject: Project A

Chris, below is a very general overview of the structure we propose. Please treat this as a discussion draft. There will likely be changes as we continue to vet the structure.

At this point, the structure appears to meet your needs with a minimum amount of frictional cost. One area we are continuing to investigate is the potential for unforeseen taxes.

As I mentioned this afternoon, Ron's discussions with MRG established the following points:

- The Dublin structure outlined below appears workable.
- You may want to divide the transaction into two parts - one for 2000 and one for 2001.
- The fee to GCR will be 1% or $5m.
- We need to work out a mechanism for GCR to recover the 2% fee advanced to AIG under the agreement.
- You, Howie Smith, ████████ and I have been appointed to work out the details.

A point that may not be sufficiently clear in the discussion document is the term of the agreement. In accordance with our conversations, we anticipate terminating the agreement at 24 months via a commutation.

████ and I have a 4:00 p.m. appointment with you on Monday. We would like to conduct the meeting via conference call. That way we can involve other Stamford resources as needed.

Regards,

████



Project A.doc

# Draft for Discussion Purposes

| | |
|---|---|
| **Reinsured:** | Cologne Reinsurance Company (Dublin) Limited |
| **Type:** | Loss portfolio transfer Agreement |
| **Term:** | Continuous commencing 12:01a.m., Central European Time, 1/12/2000, until all liability hereunder has been discharged. |
| **Territory:** | As detailed under the attached schedule of original Reinsurance contracts. |
| **Business Covered:** | Original Reinsurance Contracts or other evidences of liability (whether written or oral) heretofore issued covering in respect of business written as detailed under the attached schedule. |
| **Limit:** | The Reinsured obligates itself to cede to the Reinsurer and the Reinsurer obligates itself to accept as reinsurance from the Reinsured a 100% interest in the Net Retained liability of the Reinsured in respect of the Business covered, subject however to an overall limit of liability to the Reinsurer equal to USD 600m. |
| **Reinsurance Premium:** | A reinsurance premium of USD 500,000,000 of which 98% shall be retained within an experience account by the Reinsured. |
| **Reporting and Accounts:** | Within 90 days of the end of each calendar year, the Reinsured shall prepare an account for the Reinsurer showing: |

A)     Outstanding reserves, including allocated loss adjustment expenses at the beginning of the year, plus

B)     The sum of reserves including allocated loss adjustment expenses increased or established during the year, minus

C)     Claims and allocated loss adjustment expenses paid during the year, equals

D)     Outstanding reserves, including allocated loss adjustment expenses at the end of the year.

The Reinsurer shall upon receipt of the account, authorise the Reinsured to draw payment from the experience account for the balance due in respect of claims paid during the year. In the event that the balance within the experience account is insufficient to satisfy the obligation of the Reinsurer, then payment shall be made within 90 days by the Reinsurer of the amount owed in excess of the balance in the experience account.

Word/U/Contract/Draft Contract/Project A.doc

GR1_0126246

## Draft for Discussion Purposes

**Definition:**    **A)**    The term "Ultimate Net Loss" as used in this Agreement shall be understood to mean the sum actually paid or payable by the Reinsured in settlement of losses for which it is liable, such losses to include expenses of litigation and any and all other loss expenses of the Reinsured except for office expenses and salaries of the Reinsured's officials. Any salvages and recoveries, including recoveries under any reinsurances which inure to the benefit of this Agreement, whether collected or not, are to be first deducted from such loss to arrive at the amount of liability, if any, attaching hereunder.

Nothing in this definition shall be construed as meaning that losses are not recoverable hereunder until the Ultimate Net Loss to the Reinsured has been finally ascertained.

**B)**    The term "Net Retained Liability" as used in this Agreement shall be understood to mean, and this Agreement shall only apply to, that portion of any insurance or reinsurance covered by this Agreement which the Reinsured retains net for its own account and in calculating the amounts of loss hereunder only loss or losses in respect of that portion of any insurance or reinsurance which the Reinsured retains net for its own account shall be included.

It is understood and agreed that the amount of the Reinsurer's liability hereunder in respect of loss or losses shall not be increased due to the Reinsured's failure to retrocede in accordance with its normal practice, nor by reason of the inability of the Reinsured to collect from any other Reinsured, whether specific or general, any amounts which may have become due from them, whether such liability arises from the insolvency of such other Reinsurer or otherwise.

**C)**    The term "Original Reassured" as used in this Agreement shall be understood to mean the insurance or reinsurance company to which the Reinsured issued an Original Reinsurance Contract.

**D)**    The term "Original Reinsurance Contract" as used in this Agreement shall be understood to mean all binders, policies, certificates, agreements, treaties, bonds or contracts of reinsurance or retrocession authorised by the Reinsured to Original Reassured's under the same Reinsurance Form covering the same liability (whether issued in one layer or more than one layer).

**E)**    The term "Reinsurance Form" as used herein shall be understood to mean the type of Liability reinsurance afforded.

**Exclusions:**    As contained in the Reinsured's Original Reinsurance, without additional limitations hereunder.

Word/U/Contract/Draft Contract/Project A.doc

GR1_0126247

# Draft for Discussion Purposes

**Experience Account:**

At inception, the Reinsured shall establish a funds withheld experience account into which shall initially be placed the withheld portion of the reinsurance premium and from which the Reinsured shall make claim payments hereunder. Annually the Reinsured shall prepare a status report on the experience account, showing:

**Credit Items**

A)    Credit balance brought forward from the previous statement.

B)    Withheld premiums equal to 98% of reinsurance premiums due.

C)    Interest on the positive balance within the account calculated at a rate of 3% per annum on the beginning balance brought forward from the previous statement.

**Debit Items**

A)    Claims paid during the year.

B)    Any settlements made as commutation of claims, loss adjustment expenses or other liabilities hereunder.

**Cancellation:**

This Agreement may be cancelled by the parties hereto:

1)    Immediately by giving the other party notice:

    A)    If the performance of the whole or any part of this Agreement be prohibited or rendered impossible de jure or de facto in particular and without prejudice to the generality of the preceding words in consequence or any law or regulation which is or shall be in force in any country or territory, or if any law or regulation shall prevent directly or indirectly the remittance of any or all or any part of the balance of payments due to or from either party.

    B)    If the other party has become insolvent or unable to pay its debts or has lost the whole or any part of its capital.

    C)    If there is any material change in the ownership or control of the other party.

    D)    If the country or territory in which the other party resides or has its head office or is incorporated shall be involved in armed hostilities with any other country whether war be declared or not or is partly or wholly occupied by another power.

Word/U/Contract/Draft Contract/Project A.doc

# Draft for Discussion Purposes

    E)     If the other party shall have failed to comply with any of the terms and condition so this Agreement.

All notices of termination which the Reinsured shall have the right to issue in accordance with any of the provisions of this paragraph shall be by Telex, Facsimile or Registered Mail and shall be deemed to be served upon dispatch, or, where communications between the parties are interrupted, upon attempted dispatch.

    2)     By the Reinsured giving 90 days notice at any time in writing of its intention to cancel this Agreement.

All outstanding losses and other reserves, if any, for business covered under this Agreement, shall be commuted on the date of cancellation upon payment to the Reinsured of the amount equal to the credit balance under the experience account at the date of cancellation.. Such payment shall constitute full and final release of all liabilities of the Reinsurer under this agreement.

**Administration Fee:**    TBA payable on TBA and annually on 1<sup>st</sup> January thereafter until termination.

**General Conditions:**    Currency Conversion: All balances shall be converted to USD at the rate of exchange used in the Reinsurer's books.
Offset Clause
Errors and Omissions Clause
Access to Records Clause
Insolvency Clause
Arbitration Clause (English law).
Inspection of Records: *The Reinsured retains the right to protect the confidentiality of the underlying reinsurance covers and reserves the right to inspection of records. However inspection by an independent third party as approved by the Reinsured will be arranged if requested.*
Change in underlying reinsurance contracts: *The Reinsured retains the right to manage the run off of the underlying reinsurance contracts without detailed disclosure to the Reinsurer. The Reinsured will however act in good faith at all times.*
Ultimate net loss clause: This reinsurance shall have the benefit of all underlying reinsurances inuring to the benefit of the underlying reinsurance contracts.

**Wording:**    To be agreed.

Word/U/Contract/Draft Contract/Project A.doc

GR1_0126249

# Draft for Discussion Purposes

**Reinsurer:**

Ref: _____ By: _____

Dated: _____

**Placement Agreed**

Reinsured: Cologne Reinsurance Company (Dublin) Limited

Ref: _____ By: _____

Dated: _____

GR1_0126250

## Draft for Discussion Purposes

## Appendis A:

## Schedule of underlying reinsurance contracts

| Contract | Country of Origin | Current reserves in USD |
|----------|-------------------|-------------------------|
|          |                   |                         |
| Contract A | USA | 254,000,000 |
| Contract B | Germany | 63,243,000 |
| Contract C | USA | 69,323,000 |
| Contract D | Norway | 25,734,000 |
| Contract E | USA | 36,728,000 |
| Contract F | Australia | 60,416,000 |

GR1_0126251

To: ▇▇▇▇▇▇/GRN@GRN, John B.
Houldsworth/CRD/CologneRe/GRN@GRN, ▇▇▇▇
12/07/2000 11:59 AM                    ▇▇▇▇/GRC/GRN@GRN
cc: Ronald E. Ferguson/GRN@GRN, ▇▇▇▇▇▇▇GRN@GRN, ▇▇▇
▇▇▇▇/GRC/GRN@GRN, ▇▇▇▇/GRN@GRN
Subject: AIG Project

Chris called this morning to say they want to proceed as outlined in John's slip and in accordance with
REF's conversation with MRG.  Two installments, $250m each, one for '00, the other in '01.

We need to get together to discuss next steps. ▇▇▇▇ looks to be available tomorrow around 8:00.  Chris,
John, how does that look for you.



11/07/2000 07:24 AM

To: Ronald E. Ferguson/GRN@GRN
cc: ████████████/GRC/GRN@GRN, ████████████GRN@GRN, ████
    ████GRN@GRN, ████████/GRN@GRN,
    ████/GRC/GRN@GRN, ████████/GRN@GRN
Subject: Re: MRG Request 10/31/00 - Update

Understood.

██ and I met with ██ and ████ to move the process forward. ██ is working to identify reserves that may be most attractive from our standpoint. ██ has agreed to be our Group Finance point person. We are pushing to meet Chris' commitment to MRG that we will have general ideas by the end of the week. The next step will be to meet with AIG representatives to discuss the details of the structures. To fashion a final solution we need a better understanding of the impact they are seeking and the financial costs they are prepared to bear (aside from the cost of our product).

████

---

Ronald E. Ferguson

Ronald E. Ferguson          To: ████████GRC/GRN
11/07/2000 07:08 AM         ████████/GRC/GRN@GRN, ████████████/GRN@GRN,
                            ████████/GRN@GRN, Lee R. Steeneck/GRN@GRN, ██
                            ████/GRC/GRN@GRN, ████████/GRN@GRN
                            Subject: Re: MRG Request 10/31/00 - Update

Thanks.

Please keep me posted.

Please do not make any pricing commitments or even pricing suggestions without talking to me.

ref
████████

████████          To: Ronald E. Ferguson/GRN@GRN, ████████/GRC/GRN@GRN, ████
11/06/00 10:09 AM     ████/GRN@GRN, ████████/GRC/GRN@GRN, ████
                  cc: ████████/GRN@GRN, ████████/GRN@GRN, ████
                      ████/GRC/GRN@GRN
                  Subject: MRG Request 10/31/00 - Update

I spoke with Chris Friday evening. The deal has changed a little. Instead of a 6 to 9 month duration, they are seeking a 24 month term with a declining balance. We do not have any details regarding the "amortization" schedule AIG is seeking.

██ and I met with ████ this morning and will hopefully meet with ███ later today.

████

—— Forwarded by ████████GRC/GRN on 11/06/2000 09:58 AM ——

████████          To: Ronald E. Ferguson/GRN@GRN, ████████/GRN@GRN, ████
11/01/2000 05:02 PM   ████/GRN@GRN, ████████/GRN@GRN

ews Release



<< Back

**AIG'S THIRD QUARTER 2000 INCOME EXCLUDING REALIZED CAPITAL GAINS (LOSSES) ROSE 14.6 PERCENT TO $1.41 BILLION**

NEW YORK, NY, October 26, 2000 - American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 14.6 percent to $1.41 billion in the third quarter and 14.4 percent to $4.21 billion for the first nine months of 2000.

Net income for the third quarter of 2000, including net realized capital gains (losses), increased 9.3 percent to $1.39 billion, compared to $1.27 billion in the third quarter of 1999. For the first nine months of 2000, net income totaled $4.14 billion, an increase of 10.6 percent, compared to $3.74 billion in the same period of 1999. Following is a summary table of third quarter and nine months information (in millions, except per share amounts).

|  | THIRD QUARTER | | | NINE MONTHS | | |
|---|---|---|---|---|---|---|
|  | 2000 | 1999 | Change | 2000 | 1999 | Change |
| Net income, as reported | $1,385.6 | $1,267.4 | 9.3% | $4,138.7 | $3,743.2 | 10.6% |
| Income, as adjusted* | $1,413.6 | $1,233.6 | 14.6% | $4,208.4 | $3,680.1 | 14.4% |
| **PER SHARE RESULTS:**\** | | | | | | |
| Net income, as reported | $ 0.60 | $ 0.54 | 11.1% | $ 1.77 | $ 1.59 | 11.3% |
| Income, as adjusted* | $ 0.61 | $ 0.53 | 15.1% | $ 1.80 | $ 1.57 | 14.6% |
| Average shares outstanding | 2,339.9 | 2,351.3 | | 2,341.5 | 2,350.7 | |

*Adjusted to exclude realized capital gains (losses), net of taxes.
\**Share information reflects the three-for-two split in the form of a 50 percent common stock dividend, paid July 28, 2000.

Income before income taxes, minority interest and realized capital gains (losses) for the third quarter of 2000 amounted to $2.10 billion, an increase of 15.8 percent over the $1.81 billion reported in 1999. For the first nine months of 2000, income before income taxes, minority interest and realized capital gains (losses) increased 14.5 percent to $6.24 billion from $5.45 billion reported last year.

Revenues in the third quarter of 2000 rose 15.6 percent to $11.21 billion from $9.64 billion in the year-earlier quarter. For the first nine months, revenues totaled $33.46 billion, an increase of 12.8 percent over $29.66 billion in 1999.

At September 30, 2000, AIG's consolidated assets and shareholders' equity approximated $295 billion and $36.5 billion, respectively.

Commenting on the third quarter results, AIG Chairman M.R. Greenberg said, "AIG had a very good quarter, with increased momentum on the domestic commercial insurance pricing front, strong results from our overseas general insurance business, an excellent quarter for life insurance, and outstanding results in our financial services and asset management businesses.

"Worldwide general insurance net premiums written increased 8.1 percent to $4.29 billion, our largest quarterly percentage increase of the year, and we achieved an adjusted underwriting profit of $192.7 million. Our combined ratio was 96.25, compared to 96.56 in last year's third quarter. General insurance operating income for the quarter posted a 14.0 percent increase over last year. Overall, our general insurance business is in very strong shape around the world and our underwriting results continue to be satisfactory.

"In the domestic commercial property-casualty marketplace, we are seeing a continuation of rate increases for many classes of business. We have every reason to believe that this momentum will continue into future quarters, as the need for adequate pricing is clearly understood by all underwriting companies. It bears repeating, however, that while rates are clearly strengthening, rates had declined for nearly a decade, and hence the industry needs considerable improvement in pricing to get back to reasonable levels. AIG remains extremely disciplined in underwriting selectivity, and we continue to shed or non-renew business where rates and underwriting conditions are still inadequate. In this environment, AIG's Domestic Brokerage Group had a solid quarter.

"AIG's domestic personal lines business did reasonably well, but we are aggressively pursuing increased pricing in all of our automobile operations and feel confident that a firmer market will develop. In the meantime, our recently announced Private Client Group is making good progress, and our direct auto business continues to expand.

"United Guaranty Corporation (UGC), AIG's mortgage guaranty insurance subsidiary, reported outstanding results for the quarter, with a strong 19.5 percent gain in operating income.

"The Foreign General Insurance Group had a good quarter, with a 6.9 percent increase in net premiums written and a combined ratio of 95.77. In particular, our property-casualty business in Asia, the United Kingdom and Continental Europe continued to report good

underwriting results. Rates are also increasing in many classes and many regions of the world.

"Transatlantic Holdings, Inc., whose results are reported through both AIG's domestic and foreign general insurance segments, had improved results in the quarter. The worldwide reinsurance market is tightening, which should benefit future quarters' results for Transatlantic. Claims resulting from prior periods' catastrophes are being paid currently, resulting in a reduction in outstanding losses. Transatlantic reported an increase in both net premiums written and operating income in the quarter, as well as an improved combined ratio to below 100.

"AIG's worldwide life business was quite strong in the third quarter, with excellent results across all of our life subsidiaries. Operating income increased 16.3 percent to $886.6 million, including the life operations of SunAmerica. Results throughout Asia, as well as in the United States, Continental and Central Europe, and the United Kingdom were very good. SunAmerica itself had an excellent quarter in both its life and asset management business segments. Earlier in the year, we announced that AIG member company American International Assurance Company (Bermuda), Ltd. had received a license from the government of Vietnam to operate a wholly owned life company there. We commenced recruiting agents some months ago, and AIA Vietnam is now officially opened and doing business.

"Recently, AIG and the Tata Group filed applications with the Indian Insurance Regulatory Development Authority to establish joint venture general and life insurance companies in India, and we expect to begin operations there early next year.

"The poor underwriting environment that existed for a number of years in the non-life sector in many parts of the world, as well as the failure to meet investment guarantees to policyholders in the life sector, must lead to a continuing consolidation in the industry. We view this as an opportunity given our strong financial position and global network. AIG is well positioned to evaluate such opportunities.

"The Financial Services Group reported an outstanding quarter, with particularly strong results from International Lease Finance Corporation and AIG Financial Products Corp. Overall operating income rose 23.3 percent to $308.4 million. AIG Trading Group Inc. reported a profitable quarter, though moderately lower than last year. The Consumer Finance Group did very well in the quarter, and its credit card operations in Asian markets continue to gain share.

"The Asset Management Group also continued its strong growth and performance, including the asset management operations of SunAmerica. Operating income for the Group rose 27.0 percent to $110.2 million."

GENERAL INSURANCE

General insurance pretax income before realized capital gains for the third quarter of 2000 was $868.3 million, 14.0 percent above the $761.4 million last year. For the first nine months of 2000, general insurance pretax income before realized capital gains was $2.63 billion, an increase of 8.9 percent, compared to $2.42 billion in 1999.

Worldwide general insurance net premiums written in the third quarter of 2000 amounted to $4.29 billion, 8.1 percent ahead of the $3.97 billion in 1999. For the first nine months of 2000, general insurance net premiums written were $13.02 billion, an increase of 6.6 percent, compared to $12.22 billion last year.

General insurance net investment income rose 6.9 percent to $675.6 million in the third quarter and 6.9 percent to $2.00 billion in the nine months of 2000.

LIFE INSURANCE

AIG's worldwide life insurance operations reported third quarter 2000 pretax income before realized capital losses of $886.6 million, an increase of 16.3 percent, compared to $762.5 million in 1999. For the first nine months of 2000, life insurance pretax income before realized capital losses increased 18.0 percent to $2.59 billion, compared to $2.20 billion last year.

Life insurance premium income increased 18.5 percent in the third quarter to $3.28 billion from $2.77 billion in 1999. For the first nine months, premium income amounted to $9.94 billion, a gain of 15.3 percent, compared to $8.62 billion in 1999.

Life insurance net investment income rose 17.3 percent to $1.77 billion in the third quarter of 2000, compared to $1.51 billion for the same period last year. For the first nine months, net investment income amounted to $5.18 billion, an increase of 14.0 percent, compared to $4.55 billion in 1999.

FINANCIAL SERVICES

Financial services pretax operating income during the third quarter of 2000 increased 23.3 percent to $308.4 million, compared to $250.2 million in 1999. For the first nine months of 2000, financial services operating income was $893.8 million, an 18.2 percent increase, compared to $755.8 million in 1999.

ASSET MANAGEMENT

Asset management pretax operating income during the third quarter of 2000 amounted to $110.2 million, an increase of 27.0 percent, compared to $86.8 million in 1999. For the first nine months of 2000, pretax operating income increased 47.1 percent to $320.5 million, compared to $217.9 million in 1999. At September 30, 2000, third party assets under management, including retail mutual funds and institutional accounts, totaled approximately $36 billion.

# # # #

AIG is the leading U.S.-based international insurance and financial services organization and the largest underwriter of commercial and industrial insurance in the United States. Its member companies write a wide range of commercial and personal insurance products through a variety of distribution channels in approximately 130 countries and jurisdictions throughout the world. AIG's global businesses also include financial services and asset management, including aircraft leasing, financial products, trading and market making, consumer finance, institutional, retail and direct investment fund asset management, real estate investment management, and retirement savings products. American International Group, Inc.'s common stock is listed on the New York Stock Exchange, as well as the stock exchanges in London, Paris, Switzerland and Tokyo.

# # # #

Caution concerning forward-looking statements

This press release may contain forward-looking statements. Please refer to AIG's Annual Report on Form 10-K for the year ended December 31, 1999 for a description of the business environment in which AIG operates and the important factors that may affect its business. AIG is not under any obligation to (and expressly disclaims any such obligations to) update or alter its forward-looking statements whether as a result of new information, future events or otherwise.

## American International Group, Inc.
### Financial Highlights
(in thousands, except per share amounts)

| | Nine Months Ended September 30, | | | Three Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | Change | 2000 | 1999 | Change |
| **General Insurance Operations** | | | | | | |
| Net Premiums Written | $ 13,023,420 | $ 12,237,999 | 6.6 % | $ 4,293,706 | 3,972,422 | 8.1 % |
| Net Premiums Earned | 12,621,333 | 11,378,191 | 18.9 | 4,112,496 | 3,626,187 | 13.4 |
| Adjusted Underwriting Profit | 632,118 | 546,596 | 18.6 | 192,722 | 129,118 | 49.3 |
| Net Investment Income | 1,998,477 | 1,869,425 | 6.9 | 578,866 | 632,233 | 6.9 |
| Income before Realized Capital Gains | 2,630,595 | 2,416,421 | 8.9 | 868,270 | 761,268 | 14.3 |
| Realized Capital Gains | 42,321 | 218,964 | - | 33,289 | 71,841 | - |
| Operating Income | $ 2,672,916 | 2,627,486 | 1.7 % | $ 901,861 | 833,284 | 8.2 % |
| Loss Ratio | 74.96 | 75.88 | | 74.96 | 76.82 | |
| Expense Ratio | 21.88 | 20.97 | | 21.69 | 20.84 | |
| Combined Ratio | 96.98 | 96.85 | | 96.28 | 96.66 | |
| **Life Insurance Operations** | | | | | | |
| Premium Income (a) | $ 9,942,187 | $ 8,623,676 | 18.3 % | $ 3,277,289 | 2,766,428 | 18.5 % |
| Net Investment Income | 5,264,468 | 4,848,611 | 14.8 | 1,773,068 | 1,611,682 | 17.5 |
| Income before Realized Capital Losses | 2,693,278 | 2,196,882 | 18.9 | 836,691 | 762,486 | 16.3 |
| Realized Capital Losses | (123,378) | (61,593) | - | (65,187) | (12,437) | - |
| Operating Income | 2,469,909 | 2,136,489 | 18.6 | 821,994 | 780,049 | 9.6 |
| **Financial Services Operating Income** | 893,789 | 755,846 | 18.2 | 308,398 | 250,192 | 23.3 |
| **Asset Management Operating Income** | 320,945 | 217,913 | 47.3 | 110,288 | 86,688 | 27.8 |
| Other Realized Capital Losses | (10,642) | (18,298) | - | (4,491) | (5,998) | - |
| Other Income (Deductions) - net | (189,232) | (129,514) | - | (73,127) | (44,338) | - |
| Foreign Exchange Losses | (6,633) | (5,646) | - | (1,246) | (3,941) | - |
| Income before Income Taxes and Minority Interest | 6,150,615 | 5,684,226 | 19.1 | 2,062,773 | 1,867,811 | 18.6 |
| Income Taxes | 1,823,846 | 1,648,171 | - | 610,231 | 548,783 | - |
| Income before Minority Interest | 4,327,067 | 3,944,894 | 9.7 | 1,452,542 | 1,319,228 | 18.2 |
| **Minority Interest, after tax: (b)** | | | | | | |
| Operating Income | (178,228) | (178,464) | - | (65,786) | (49,452) | - |
| Capital Gains | (10,091) | (22,976) | - | (2,946) | (0,539) | - |
| Net Income, as reported | 4,138,786 | 3,745,196 | 18.6 | 1,383,622 | 1,267,489 | 9.3 |
| Per Common Share (c) - Basic | 1.59 | 1.61 | 11.2 | 0.88 | 0.66 | 9.1 |
| - Diluted | 1.57 | 1.59 | 11.3 | 0.88 | 0.64 | 11.3 |
| Income, as adjusted (d) | 4,208,419 | 3,680,139 | 14.4 | 1,413,646 | 1,233,682 | 14.6 |
| Per Common Share (c) - Diluted | $ 1.88 | 1.57 | 14.5 % | $ 0.61 | 0.83 | 16.3 % |
| **Average Common Shares Outstanding (c)** | | | | | | |
| - Basic | 2,516,297 | 2,322,198 | | 2,914,626 | 2,521,796 | |
| - Diluted | 2,541,462 | 2,350,689 | | 2,339,807 | 2,351,538 | |

(a) Inclusive of Fall policy universal life and interest sensitive whole life premiums, the growth rate would have been 18.8 percent and 17.9 percent for the third quarter and nine months 2000, respectively.

(b) Represents minority shareholders' equity in operating income and capital gains of certain consolidated subsidiaries, including Transatlantic Holdings, Inc. and 21st Century Insurance Group.

(c) Share information reflects the three-for-two split in the form of a 50 percent common stock dividend, paid July 28, 2000.

(d) Adjusted to exclude realized capital gains (losses), net of taxes.

## American International Group, Inc.
### Supplementary Data
(in thousands)

| | Nine Months Ended September 30, | | | Three Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | Change | 2000 | 1999 | Change |
| **General Insurance Operations:** | | | | | | |
| Net Premiums Written | | | | | | |
| Brokerage Division (a) (b) | $ 6,409,449 | $ 5,272,579 | 2.2 % | $ 2,320,030 | $ 1,897,522 | 6.7 % |
| Personal Lines | 1,867,798 | 1,611,314 | 15.9 | 634,876 | 565,222 | 14.5 |
| Mortgage Guaranty | 355,597 | 290,698 | 16.4 | 116,092 | 100,072 | 16.4 |
| Total Domestic General (a) | 8,632,268 | 6,374,588 | 6.4 | 2,871,905 | 2,642,646 | 8.7 |
| Foreign General (a) | 4,219,862 | 4,042,126 | 9.1 | 1,421,901 | 1,929,876 | 9.1 |
| Total | 12,923,426 | 12,217,009 | 6.6 | 4,293,706 | 3,972,422 | 8.1 |
| | | | | | | |
| **Operating Income (c)** | | | | | | |
| Brokerage Division (a) | 1,498,732 | 1,283,306 | 16.8 | 624,347 | 435,542 | 28.3 |
| Personal Lines | 82,298 | 171,289 | (52.1) | 17,682 | 44,542 | (60.2) |
| Mortgage Guaranty | 273,449 | 219,873 | 24.8 | 93,712 | 78,452 | 19.6 |
| Intercompany Adjustments | 69,898 | 49,447 | — | 22,374 | 17,311 | — |
| Total Domestic General (a) | 1,938,628 | 1,724,428 | 11.2 | 668,038 | 676,684 | 1.1 |
| Foreign General (a) | 712,346 | 691,996 | 2.9 | 210,298 | 184,672 | 13.9 |
| Total | $ 2,650,695 | $ 2,416,421 | 8.9 % | $ 868,278 | $ 761,366 | 14.5 % |
| | | | | | | |
| **Combined Ratios** | | | | | | |
| Brokerage Division (a) | 99.68 | 100.65 | | 98.85 | 99.98 | |
| Personal Lines | 99.18 | 94.28 | | 101.98 | 96.88 | |
| Mortgage Guaranty | 59.82 | 48.98 | | 60.82 | 48.90 | |
| Total Domestic General (a) | 97.08 | 97.31 | | 96.86 | 96.81 | |
| Foreign General (a) | 93.63 | 92.84 | | 95.77 | 96.20 | |
| | | | | | | |
| Losses & Loss Expenses Paid | $ 9,449,483 | $ 8,466,466 | 11.6 % | $ 3,328,031 | $ 2,945,992 | 13.9 % |
| Change in Loss and LAE Reserve (d) | 10,247 | 76,201 | (86.5) | 738,939 | 12,090 | — |
| Losses and Loss Expenses Incurred | 9,459,730 | 8,542,666 | 10.7 | 9,066,092 | 2,766,061 | 11.3 |
| | | | | | | |
| Net Loss and LAE Reserve | 24,609,212 | 24,696,066 | (0.3) | | | |
| | | | | | | |
| GAAP Underwriting Profit | 693,118 | 844,996 | 16.5 | 192,732 | 129,125 | 49.3 |
| | | | | | | |
| **Life Insurance Operations (a)** | | | | | | |
| Premium Income (f) | | | | | | |
| Domestic | 680,699 | 676,118 | 30.4 | 310,297 | 243,941 | 27.6 |
| Foreign | 9,061,427 | 7,948,461 | 15.3 | 2,966,452 | 2,422,492 | 17.5 |
| Total | 9,742,127 | 8,623,678 | 16.0 | 3,277,292 | 2,666,422 | 18.5 |
| | | | | | | |
| Net Investment Income | | | | | | |
| Domestic | 2,864,728 | 2,700,290 | 5.2 | 976,397 | 878,019 | 11.1 |
| Foreign | 2,029,337 | 1,948,321 | 19.5 | 797,669 | 633,662 | 19.5 |
| Total | 5,384,068 | 4,646,611 | 14.8 | 1,772,066 | 1,511,681 | 17.5 |
| | | | | | | |
| Operating Income (c) | | | | | | |
| Domestic | 947,863 | 777,078 | 22.0 | 322,724 | 273,128 | 19.2 |
| Foreign | 1,645,415 | 1,421,904 | 15.8 | 563,857 | 488,961 | 15.3 |
| Total | 2,593,278 | 2,198,982 | 18.0 | 886,081 | 762,086 | 16.3 |
| | | | | | | |
| **Financial Services** | | | | | | |
| Revenues | | | | | | |
| International Lease Finance Corp. | 1,784,192 | 1,634,974 | 9.2 | 629,342 | 688,222 | 12.9 |
| AIG Financial Products Corp. | 731,298 | 494,449 | 47.8 | 260,328 | 189,390 | 37.4 |
| AIG Trading Group Inc. | 190,389 | 153,448 | 24.8 | 55,349 | 25,683 | 117.3 |
| Other | 206,692 | 118,439 | 74.2 | 79,249 | 26,603 | 197.3 |
| Total | 2,894,274 | 2,402,312 | 20.5 | 1,024,281 | 799,578 | 28.3 |
| | | | | | | |
| Operating Income | | | | | | |
| International Lease Finance Corp. | 476,408 | 429,740 | 10.8 | 168,494 | 145,712 | 14.2 |
| AIG Financial Products Corp. | 432,799 | 316,369 | 36.8 | 164,218 | 120,348 | 36.3 |
| AIG Trading Group Inc. | 40,677 | 76,751 | (47.1) | 5,281 | 10,297 | (47.7) |
| Other | (197) | 9,978 | — | 2,648 | (2,679) | — |
| Intercompany Reclassifications | (65,980) | (70,778) | — | (20,329) | (24,711) | — |
| Total | 893,707 | 762,060 | 15.2 | 320,208 | 250,193 | 23.6 |
| | | | | | | |
| **Pan-America** | | | | | | |
| Operating Income (c) | $ 1,017,672 | 812,897 | 25.2 | 347,362 | 293,996 | 18.1 |
| Total Sales | $ 10,224,226 | $ 8,191,283 | 24.8 % | $ 3,651,215 | $ 2,406,829 | 47.4 % |
| | | | | | | |
| **Effective Tax Rates** | | | | | | |
| Excluding Capital Gains (Losses) | 29.73% | 29.34% | | 29.61% | 29.29% | |
| Capital Gains (Losses) Alone | 34.97% | 34.82% | | 29.97% | 26.04% | |
| As Reported | 29.65% | 29.37% | | 29.65% | 29.39% | |

(a) Restated for WorldSource Division.
(b) Net premiums written in the Domestic Brokerage Group grew approximately ten and six percent in the third quarter and nine months 2000, respectively, after adjusting for non-renewed premiums.
(c) Operating income excludes realized capital gains (losses).
(d) The reduction in loss and loss adjustment expense reserve is primarily attributable to Transatlantic Holdings, Inc., as discussed above.
(e) Results for Sun America Inc. are included in Life Insurance and Asset Management Operations.
(f) Includes of full policy universal life and interest sensitive whole life premium, the growth rates for Life Insurance premium income would have been 26.9 percent for Domestic, 17.7 percent for Foreign and 18.6 percent for Total in the third quarter, and 28.5 percent for Domestic, 16.9 percent for Foreign and 17.0 percent for Total in the nine months 2000.

## American International Group, Inc.
### Supplementary Data
(in thousands)

| | Nine Months Ended September 30, | | | Three Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | Change | 2000 | 1999 | Change |
| **General Insurance Operations** | | | | | | |
| Net Premiums Written | | | | | | |



&lt;&lt; Back

**AIG REPORTS 2000 NET INCOME EXCLUDING REALIZED CAPITAL GAINS (LOSSES) ROSE 14.8 PERCENT TO RECORD $5.74 BILLION**

NEW YORK, NY, February 8, 2001 - American International Group, Inc. (AIG) today reported that its income excluding net realized capital gains (losses) increased 14.8 percent to $5.74 billion for the year 2000 and 15.9 percent to $1.53 billion in the fourth quarter of 2000.

Net income for 2000, including net realized capital gains (losses), increased 11.5 percent to $5.64 billion, compared to $5.06 billion in 1999. For the fourth quarter of 2000, net income totaled $1.50 billion, an increase of 14.1 percent, compared to $1.31 billion in the same period of 1999.

Revenues for the year 2000 rose 13.1 percent to $45.97 billion from $40.66 billion in 1999. Fourth quarter revenues totaled $12.51 billion, an increase of 13.8 percent over $11.00 billion in the year earlier quarter.

At December 31, 2000, AIG's consolidated assets approximated $303 billion, an increase of 13 percent, compared to $268 billion at the prior year-end. In 2000, shareholders' equity increased to approximately $40 billion, a 20 percent increase over the $33.3 billion reported at December 31, 1999.

Following is a summary table of fourth quarter and full year information (in millions, except per share amounts).

|  | FOURTH QUARTER | | | TWELVE MONTHS | | |
|---|---|---|---|---|---|---|
|  | 2000 | 1999 | Change | 2000 | 1999 | Change |
| Net income, as reported | $1,497.3 | $1,312.2 | 14.1% | $5,636.1 | $5,055.4 | 11.5% |
| Income, as adjusted* | $1,528.1 | $1,318.5 | 15.9% | $5,736.5 | $4,998.6 | 14.8% |
| PER SHARE RESULTS:** |  |  |  |  |  |  |
| Net income, as reported | $ 0.64 | $ 0.56 | 14.3% | $ 2.41 | $ 2.15 | 12.1% |
| Income, as adjusted* | $ 0.65 | $ 0.56 | 16.1% | $ 2.45 | $ 2.13 | 15.0% |
| Average shares outstanding | 2,345.6 | 2,351.3 |  | 2,343.2 | 2,350.2 |  |

*Adjusted to exclude realized capital gains (losses), net of taxes.
**Share information reflects the three-for-two split in the form of a 50 percent common stock dividend, paid July 28, 2000.

Income before income taxes, minority interest and realized capital gains (losses) for the year 2000 increased 14.8 percent to $8.49 billion from $7.39 billion reported last year. For the fourth quarter of 2000, income before income taxes, minority interest and realized capital losses amounted to $2.24 billion, an increase of 15.9 percent over the $1.94 billion reported in 1999.

Foreign exchange rates negatively affected the translation into U.S. dollars of foreign currency net premiums written, as shown in the following table, which compares fourth quarter 2000 to fourth quarter 1999. Worldwide life insurance includes life premium income and other considerations.

| | Worldwide General Insurance | Foreign General Insurance | Worldwide Life Insurance | Foreign Life Insurance |
|---|---|---|---|---|
| Premium Growth in Original Currency | 14.0% | 6.4% | 7.3% | 20.0% |
| Foreign Exchange Impact | (1.6) | (4.8) | (3.8) | (6.0) |
| Premium Growth as Reported in U.S. $ | 12.4% | 1.6% | 3.5% | 14.0% |

Commenting on the fourth quarter and full year 2000, AIG Chairman M.R. Greenberg said, "AIG had a very good quarter and year. Our worldwide businesses reported strong results and met their goals for the year. Net income for the year 2000 before realized capital gains and losses rose 14.8 percent to a record $5.74 billion, or $2.45 per share. AIG is well positioned in 2001 in our principal markets. The strengthening rate environment across the board, both in the U.S. property-casualty market and in key overseas markets, is a major positive event for our industry and most particularly for AIG.

"Our worldwide general insurance business had a strong quarter. Worldwide net premiums written increased 12.4 percent in the quarter to $4.50 billion, and 8.0 percent to $17.53 billion for the full year. We achieved an adjusted underwriting profit of $152.9 million in the fourth quarter and a record $785.0 million for the full year. Our combined ratio for the quarter was 98.81, compared to 98.95 in last year's fourth quarter. For the full year, AIG's combined ratio was 96.73, compared to last year's 96.35.

"We added $106 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, and together with the acquisition of HSB Group, Inc., increased the total of those reserves to $25.0 billion at year-end 2000.

"The Domestic Brokerage Group benefited in the fourth quarter from the broad strengthening of commercial property-casualty rates and our array of specialized products and services tailored to the changing needs of our customers. Stronger rates are evident across virtually all classes of business, and we believe rates will continue to firm. Nonetheless, it bears repeating that commercial insurance rates have experienced a steady decline over the past decade, eroding the financial strength and balance sheets of many companies. Therefore, continued broad rate increases are essential to the future health of our industry.

"AIG's domestic personal lines business did not meet our expectations, but relative to the market, performed satisfactorily. For the year 2000, net premiums written increased 16.1 percent to $2.51 billion. Virtually all companies in this market have been increasing rates during the year, and AIG has filed for rate increases in all states where we offer personal lines products. We expect to see these rate increases reflected in operating results toward mid-year, barring any unforeseen catastrophes.

"United Guaranty Corporation (UGC), our mortgage guaranty insurance subsidiary, had another outstanding year, with record operating income. UGC's results have benefited from a strong housing market. For the quarter and full year, UGC reported 10.1 percent and 20.6 percent gains, respectively, in operating income.

"Our Foreign General Insurance Group, including the foreign operations of Transatlantic Holdings, Inc., achieved 6.4 percent and 7.4 percent increases, respectively, in net premiums written in original currency for the quarter and year. The strengthening U.S. dollar, particularly with respect to the Japanese yen, negatively impacted net premiums written. Also, opportunistically driven risk finance transactions can affect the growth in premiums written during any given quarter. Excluding risk finance transactions and

foreign exchange, traditional Foreign General net premiums written rose 11.5 percent in the fourth quarter. The Group had combined ratios of 95.07 in the quarter and 94.09 for the year. Rates in the United Kingdom and Continental Europe are rising, following the same pattern that is evident in the United States. This reflects the poor underwriting experience in many classes over a number of years, especially the effect of the major storms that have struck Europe in each of the past two years.

"In Asia, our non-life operations did quite well, with very good underwriting results. Despite Japan's stagnant economy, our business there was good, with stronger growth than was achieved by the domestic property-casualty industry. In Southeast Asia, the breadth of the AIG network and distribution system had a very positive impact on results. Our joint venture insurance company in Israel, AIG Golden Insurance Ltd., received a license shortly after year-end to market commercial property-casualty insurance lines in that country. Previously, the company had been limited to personal lines. Also, AIG purchased a 90 percent share in an Egyptian non-life insurance company, Pharaonic Insurance Company S.A.E., adding to our extensive network in the Middle East. In addition, we have received a general insurance license for the Ukraine, a further step in building our network in Central Europe and the C.I.S.

"In January 2001, in an important development for AIG's global network, our joint venture general insurance company in India, Tata AIG General Insurance Co. Ltd., received its license to market both commercial and personal lines products in India. Our partner, the Tata Group, with whom AIG has had a long relationship, is the premier business and industrial group in India. In addition, we have been advised that our joint venture life insurance company, Tata AIG Life Insurance Co. Ltd., has received approval in principle and the formal license should be issued shortly. This marks our return to India after an absence of 30 years.

"Integration of HSB Group, Inc. and its subsidiary, The Hartford Steam Boiler Inspection and Insurance Company, acquired in the fourth quarter, is proceeding very well in both new product development and in the provision of new opportunities to market HSB's strong lineup of insurance products and inspection services to AIG clients both in the U.S. and overseas.

"Transatlantic Holdings, Inc., whose results are reported through both AIG's Domestic and Foreign General insurance segments, had solid performance in the fourth quarter and full year. Net premiums written rose 10.7 percent for the year 2000, with strong gains in operating income. Transatlantic is benefiting from the same environment of broad rate increases as AIG, in both its domestic and international operations. Transatlantic's core casualty business was particularly strong.

"AIG's worldwide Life Division had an excellent full year and fourth quarter. Including the results of SunAmerica's life business, premium income and the sale of annuities, pensions and investment products rose for the full year by 20.2 percent to $29.60 billion. For the fourth quarter, these revenues rose 3.5 percent to $7.08 billion as the sales of annuities, pensions and investment products declined slightly. This was largely due to market timing considerations not reflective of the year's results as a whole or the business going forward. Life operating income before realized capital losses rose 18.1 percent for the year 2000 to $3.55 billion, and for the quarter increased 18.3 percent to $955.2 million. Our life distribution system markets a variety of life and investment products, and we are constantly introducing new products and services tailored to meet buyers' needs.

"Once again, Asia was a major contributor to our life results, led by Japan, Southeast Asia and Taiwan. Our new life company in Vietnam, licensed in 2000, is off to an excellent start. Central Europe has become an important component of our growing life business, and Latin America achieved satisfactory results. In Japan, as reported earlier, AIG was named as the business sponsor for Chiyoda Mutual Life Insurance Company, a Japanese life company that had applied for protection from its creditors. We are continuing to work with Chiyoda on the details of a reorganization plan for the company.

"The Financial Services Group, led by International Lease Finance Corporation (ILFC) and AIG Financial Products Corp. (AIGFP), produced outstanding results for the fourth quarter and full year 2000. Operating income for the Group gained 22.6 percent to $398.9 million in the quarter and 19.5 percent for the year to $1.29 billion. Both ILFC and AIGFP had record operating income and continued to expand their business franchises. A new management team was put in place at AIG Trading Group Inc. following AIG's purchase of the minority ownership interest of the previous management. We believe the new structure will strengthen that unit's performance going forward. Our consumer finance business, started in 1996, continues to make excellent progress in both its consumer loan and credit card businesses and contributed to the Group's operating income in 2000.

"SunAmerica had a very good year in both asset management and in its variable annuity business. Operating income for the year 2000 gained 26.2 percent to $1.41 billion. Retirement savings continues to be a major and growing business globally. SunAmerica, working with AIG units both domestically and overseas, is taking advantage of these expanding opportunities with products tailored to individual market needs.

"AIG's Asset Management Group, which includes the asset management business of SunAmerica, posted excellent results for the fourth quarter and full year. Operating income for the quarter rose 14.1 percent to $109.7 million. For the year 2000, operating income gained 37.0 percent to $430.2 million. At year-end 2000, AIG's third party assets under management, including retail mutual funds and institutional accounts, totaled approximately $35 billion."

### GENERAL INSURANCE

General insurance pretax income before realized capital gains for the year 2000 was $3.49 billion, 9.4 percent above the $3.19 billion reported last year. For the fourth quarter of 2000, general insurance pretax income before realized capital gains (losses) was $855.2 million, an increase of 11.1 percent compared to $769.5 million in 1999.

Worldwide general insurance net premiums written for the year 2000 amounted to $17.53 billion, 8.0 percent ahead of the $16.22 billion in 1999. In the fourth quarter, general insurance net premiums written were $4.50 billion, an increase of 12.4 percent, compared to $4.01 billion last year.

General insurance net investment income rose 7.3 percent to $2.70 billion in 2000 and 8.5 percent to $702.3 million in the fourth quarter.

### LIFE INSURANCE

AIG's worldwide life insurance operations reported pretax income before realized capital losses of $3.55 billion in the year 2000, an increase of 18.1 percent, compared to $3.01 billion in 1999. For the fourth quarter, life insurance pretax income before realized capital losses increased 18.3 percent to $955.2 million, compared to $807.4 million last year.

For the year 2000 life insurance premium income and other considerations rose 20.2 percent to $29.60 billion from $24.62 billion in 1999. Fourth quarter premium income and other considerations amounted to $7.08 billion, a gain of 3.5 percent, compared to $6.84 billion in 1999.

Life insurance net investment income rose 14.8 percent to $7.12 billion for the year 2000, compared to $6.21 billion last year. For the fourth quarter, net investment income amounted to $1.94 billion, an increase of 17.0 percent, compared to $1.66 billion in the same period last year.

### FINANCIAL SERVICES

Financial services pretax operating income amounted to $1.29 billion for the year 2000, compared to $1.08

billion last year, an increase of 19.5 percent. For the fourth quarter, financial services operating income increased 22.6 percent to $398.9 million, compared to $325.5 million in 1999.

ASSET MANAGEMENT

Asset management pretax operating income amounted to $430.2 million for the year 2000, compared to $314.1 million last year, an increase of 37.0 percent. For the fourth quarter, asset management operating income increased 14.1 percent to $109.7 million, compared to $96.2 million in 1999.

# # # #

AIG is the leading U.S.-based international insurance and financial services organization and the largest underwriter of commercial and industrial insurance in the United States. Its member companies write a wide range of commercial and personal insurance products through a variety of distribution channels in approximately 130 countries and jurisdictions throughout the world. AIG's global businesses also include financial services and asset management, including aircraft leasing, financial products, trading and market making, consumer finance, institutional, retail and direct investment fund asset management, real estate investment management, and retirement savings products. American International Group, Inc.'s common stock is listed on the New York Stock Exchange, as well as the stock exchanges in London, Paris, Switzerland and Tokyo.

# # # #

Caution concerning forward-looking statements

This press release may contain forward-looking statements. Please refer to AIG's Quarterly Report on Form 10-Q for the quarter ended September 30, 2000 for a description of the business environment in which AIG operates and the important factors that may affect its business. AIG is not under any obligation to (and expressly disclaims any such obligations to) update or alter its forward-looking statements whether as a result of new information, future events or otherwise.

# American International Group, Inc.
## Financial Highlights
### (in thousands, except per share amounts)

| | Twelve Months Ended December 31, | | | Three Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | Change | 2000 | 1999 | Change |
| **General Insurance Operations:** | | | | | | |
| Net Premiums Written | $ 17,526,539 | $ 16,223,886 | 8.0 % | $ 4,502,919 | $ 4,006,876 | 12.4 % |
| Net Premiums Earned | 17,405,850 | 15,543,887 | 12.0 | 4,785,517 | 4,165,614 | 14.9 |
| Adjusted Underwriting Profit | 784,972 | 669,246 | 17.3 | 152,864 | 122,249 | 25.0 |
| Net Investment Income | 2,700,784 | 2,516,691 | 7.3 | 702,507 | 647,266 | 8.5 |
| Income before Realized Capital Gains (Loss) | 3,485,756 | 3,185,936 | 9.4 | 855,161 | 769,515 | 11.1 |
| Realized Capital Gains (Losses) | 38,461 | 294,694 | - | (3,860) | 83,710 | - |
| Operating Income | $ 3,524,217 | $ 3,480,630 | 1.3 % | $ 851,301 | $ 853,225 | (0.2) % |
| Loss Ratio | 75.28 | 75.51 | | 76.16 | 76.69 | |
| Expense Ratio | 21.45 | 20.84 | | 22.65 | 22.26 | |
| Combined Ratio | 96.73 | 96.35 | | 98.81 | 98.95 | |
| **Life Insurance Operations:** | | | | | | |
| Premium Income and Other Considerations: (a) | | | | | | |
| Life | $ 13,346,788 | $ 11,494,671 | 16.1 % | $ 3,502,247 | $ 3,101,287 | 12.9 % |
| Annuities, Pension and Investment Products | 16,253,817 | 13,126,849 | 23.8 | 3,582,259 | 3,741,542 | (4.3) |
| Total | 29,600,605 | 24,620,530 | 20.2 | 7,084,506 | 6,842,829 | 3.5 |
| Net Investment Income | 7,123,786 | 6,205,934 | 14.8 | 1,938,540 | 1,657,313 | 17.0 |
| Income before Realized Capital Losses | 3,548,493 | 3,005,689 | 18.1 | 955,215 | 807,427 | 18.3 |
| Realized Capital Losses | (161,661) | (147,456) | - | (38,283) | (86,065) | - |
| Operating Income | 3,386,832 | 2,857,833 | 18.5 | 916,932 | 721,364 | 27.1 |
| **Financial Services Operating Income** | 1,293,627 | 1,081,515 | 19.6 | 398,862 | 325,470 | 22.6 |
| **Asset Management Operating Income** | 438,225 | 314,069 | 37.0 | 109,680 | 96,186 | 14.1 |
| Other Realized Capital Losses | (25,578) | (25,019) | - | (3,433) | (6,751) | - |
| Other Income (Deductions) - net | (261,072) | (186,952) | - | (71,749) | (27,430) | - |
| Foreign Exchange Losses | (6,521) | (9,702) | - | (2,898) | (4,857) | - |
| Income before Income Taxes and Minority Interest | 8,349,533 | 7,512,194 | 11.1 | 2,198,720 | 1,927,989 | 14.0 |
| Income Taxes | 2,458,083 | 2,218,381 | | 634,037 | 578,218 | |
| Income before Minority Interest | 5,891,250 | 5,293,813 | 11.3 | 1,564,683 | 1,349,779 | 15.9 |
| Minority Interest, after tax: (b) | | | | | | |
| Operating Income | (243,759) | (216,508) | - | (66,539) | (37,142) | - |
| Capital Gains | (11,392) | (21,772) | - | (1,301) | (397) | - |
| Net Income, as reported | 5,636,099 | 5,055,436 | 11.5 | 1,497,343 | 1,312,240 | 14.1 |
| Per Common Share (c)  - Basic | 2.43 | 2.18 | 11.5 | 0.64 | 0.57 | 12.3 |
| - Diluted | 2.41 | 2.16 | 12.1 | 0.64 | 0.56 | 14.3 |
| Income, as adjusted (d)  - Diluted | 5,724,598 | 4,996,617 | 14.5 | 1,528,097 | 1,318,497 | 15.9 |
| Per Common Share (c)  - Diluted | $ 2.45 | $ 2.13 | 15.0 % | $ 0.65 | $ 0.56 | 16.1 % |
| **Average Common Shares Outstanding (c)** | | | | | | |
| - Basic | 2,518,341 | 2,522,498 | | 2,520,420 | 2,523,182 | |
| - Diluted | 2,543,214 | 2,550,150 | | 2,548,604 | 2,551,386 | |

(a)  GAAP premium income was $3,667,529 and $13,609,636 for the fourth quarter and twelve months 2000, respectively, compared to $3,316,189 and $11,941,864 for the fourth quarter and twelve months 1999, respectively.

(b)  Represents minority shareholders' equity in operating income and capital gains of certain consolidated subsidiaries, including Transatlantic Holdings, Inc. and 21st Century Insurance Group.

(c)  Share information reflects the three-for-two split in the form of a 50 percent common stock dividend, paid July 28, 2000.

(d)  Adjusted to exclude realized capital gains (losses), net of taxes.

4/21/2005 12:59 PM

## American International Group, Inc.
### Supplementary Data
#### (in thousands)

| | Twelve Months Ended December 31, | | | Three Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 1999 | Change | 2000 | 1999 | Change |
| **General Insurance Operations:** | | | | | | |
| Net Premiums Written | | | | | | |
| Brokerage Division | $ 8,805,428 | $ 8,297,398 | 6.1 % | $ 2,595,985 | $ 2,024,419 | 28.4 % |
| Personal Lines | 2,509,806 | 2,162,211 | 16.1 | 642,008 | 550,897 | 16.5 |
| Mortgage Guaranty | 455,397 | 396,298 | 14.6 | 118,070 | 105,708 | 11.7 |
| Total Domestic General | 11,768,631 | 10,855,907 | 8.4 | 3,356,063 | 2,681,024 | 17.5 |
| Foreign General | 5,757,708 | 5,367,978 | 7.3 | 1,346,856 | 1,325,852 | 1.6 |
| Total | 17,526,339 | 16,223,885 | 8.2 | 4,502,919 | 4,006,576 | 12.4 |
| | | | | | | |
| **Operating Income (a)** | | | | | | |
| Brokerage Division | 2,010,017 | 1,805,719 | 11.3 | 511,286 | 522,413 | (2.1) |
| Personal Lines | 76,497 | 189,109 | (59.5) | (5,792) | 17,300 | - |
| Mortgage Guaranty | 363,118 | 301,145 | 20.6 | 89,478 | 81,272 | 10.1 |
| Intercompany Adjustments | 76,792 | 66,769 | - | 13,204 | 17,313 | - |
| Total Domestic General | 2,526,424 | 2,362,732 | 6.9 | 608,176 | 638,298 | (4.7) |
| Foreign General | 959,332 | 825,208 | 16.0 | 246,987 | 131,237 | 88.2 |
| Total | $ 3,485,756 | $ 3,185,936 | 9.4 % | $ 855,161 | $ 769,535 | 11.1 % |
| | | | | | | |
| **Combined Ratios** | | | | | | |
| Brokerage Division | 100.27 | 100.77 | | 101.35 | 101.23 | |
| Personal Lines | 100.94 | 96.29 | | 105.96 | 101.97 | |
| Mortgage Guaranty | 40.92 | 43.69 | | 44.98 | 42.34 | |
| Total Domestic General | 97.94 | 97.63 | | 100.18 | 99.34 | |
| Foreign General | 94.09 | 94.22 | | 95.07 | 99.08 | |
| | | | | | | |
| Losses & Loss Expenses Paid | $ 12,987,803 | $ 11,756,689 | 10.5 % | $ 3,538,320 | $ 3,290,233 | 7.5 % |
| Change in Loss and LAE Reserve | 116,589 | (19,216) | - | 106,342 | (95,416) | - |
| Losses and Loss Expenses Incurred | 13,104,392 | 11,737,473 | 11.6 | 3,644,662 | 3,194,817 | 14.1 |
| | | | | | | |
| Net Loss and LAE Reserve | 24,951,595 | 24,599,672 | 1.4 | | | |
| | | | | | | |
| GAAP Underwriting Profit | 784,972 | 669,246 | 17.3 | 152,854 | 122,245 | 25.0 |
| | | | | | | |
| **Life Insurance Operations (b)** | | | | | | |
| Premium Income and Other Considerations | | | | | | |
| Domestic | | | | | | |
| Life (c) | 628,787 | 568,699 | 10.6 | 163,721 | 130,649 | 25.3 |
| Annuities, Pension and Investment Products (d) | 9,054,495 | 8,260,162 | 9.6 | 2,001,569 | 2,396,932 | (16.5) |
| Total | 9,683,282 | 8,828,861 | 9.7 | 2,165,290 | 2,527,581 | (14.3) |
| | | | | | | |
| Foreign | | | | | | |
| Life (c) | 12,718,031 | 10,925,772 | 16.4 | 3,338,526 | 2,970,638 | 12.4 |
| Annuities, Pension and Investment Products (d) | 7,199,322 | 4,865,887 | 48.0 | 1,580,790 | 1,344,610 | 17.6 |
| Total | 19,917,353 | 15,791,659 | 26.1 | 4,919,316 | 4,315,248 | 14.0 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Net Investment Income** | | | | | | |
| Domestic | 3,925,949 | 3,496,764 | 12.3 | 1,071,221 | 896,474 | 19.5 |
| Foreign | 3,197,156 | 2,709,160 | 18.0 | 867,419 | 760,839 | 14.0 |
| Total | 7,123,105 | 6,205,924 | 14.8 | 1,938,640 | 1,657,313 | 17.0 |
| | | | | | | |
| **Operating Income (a)** | | | | | | |
| Domestic | 1,310,967 | 1,062,175 | 23.4 | 363,105 | 285,097 | 27.4 |
| Foreign | 2,237,526 | 1,943,334 | 15.1 | 592,110 | 522,330 | 13.4 |
| Total | 3,548,493 | 3,005,509 | 18.1 | 955,215 | 807,427 | 18.3 |
| | | | | | | |
| **Financial Services:** | | | | | | |
| **Revenues** | | | | | | |
| International Lease Finance Corp. | 2,440,974 | 2,194,105 | 11.3 | 654,642 | 559,151 | 17.1 |
| AIG Financial Products Corp. | 1,055,459 | 736,602 | 43.3 | 344,209 | 241,142 | 42.7 |
| AIG Trading Group Inc. | 253,551 | 227,276 | 11.6 | 63,382 | 73,827 | (14.2) |
| Other | 301,415 | 182,398 | 65.3 | 94,722 | 63,968 | 48.1 |
| Total | 4,051,399 | 3,540,380 | 21.3 | 1,157,128 | 938,068 | 23.4 |
| | | | | | | |
| **Operating Income** | | | | | | |
| International Lease Finance Corp. | 653,925 | 590,071 | 10.8 | 177,519 | 160,333 | 10.7 |
| AIG Financial Products Corp. | 648,398 | 482,199 | 34.5 | 215,596 | 166,039 | 29.8 |
| AIG Trading Group Inc. | 62,141 | 109,356 | (43.2) | 21,564 | 32,606 | (33.9) |
| Other | 3,341 | (15,145) | - | 3,476 | (19,116) | - |
| Intercompany Reclassifications | (75,168) | (85,165) | - | (19,288) | (14,391) | - |
| Total | 1,292,627 | 1,081,316 | 19.5 | 398,868 | 325,478 | 22.6 |
| | | | | | | |
| **SunAmerica:** | | | | | | |
| Operating Income (b) | 1,409,987 | 1,117,408 | 26.2 | 392,935 | 304,421 | 28.9 |
| Total Sales (c) | $ 12,934,478 | $ 11,283,895 | 14.6 % | $ 2,709,640 | $ 3,092,534 | (12.4) % |
| | | | | | | |
| **Effective Tax Rates:** | | | | | | |
| Excluding Capital Gains (Losses) | 29.53% | 29.44% | | 28.99% | 30.02% | |
| Capital Gains (Losses) Alone | 35.11% | 34.77% | | 35.40% | 35.52% | |
| As Reported | 29.44% | 29.53% | | 28.86% | 29.99% | |

(a)  Operating Income excludes realized capital gains (losses).
(b)  Results for SunAmerica Inc. are included in Life Insurance and Asset Management Operations.
(c)  Life includes traditional life, interest sensitive and variable life products.
(d)  The decline in fourth quarter sales was largely due to market timing considerations not reflective
     of the year's results as a whole or the business going forward.



**American International Group, Inc.**
70 Pine Street  New York, NY 10270

# News

American International Group (ticker: AIG, exchange: New York Stock Exchange) News Release - April 26, 2001

# AIG'S FIRST QUARTER 2001 INCOME ROSE 15.2 PERCENT TO $1.57 BILLION

NEW YORK, NY, April 26, 2001 - American International Group, Inc. (AIG) today reported that its income excluding the cumulative effect of an accounting change and net realized capital gains (losses) for the first quarter of 2001 increased 15.2 percent to $1.57 billion, compared to $1.36 billion in the first quarter of 2000. Net income increased 13.8 percent to $1.53 billion, compared to $1.35 billion in the first quarter of 2000.

Revenues in the first quarter of 2001 rose 11.6 percent to $12.15 billion from $10.89 billion in the year-earlier quarter. At March 31, 2001, AIG's consolidated assets and shareholders' equity approximated $315 billion and $41.7 billion, respectively.

Following is a summary table of first quarter information (in millions, except per share amounts):

|  | **FIRST QUARTER** | | |
|  | **2001** | **2000** | **Change** |
|---|---|---|---|
| Net income, as reported | $1,531.8 | $1,346.1 | 13.8% |
| Income, as adjusted* | $1,571.7 | $1,364.1 | 15.2% |
| **PER SHARE RESULTS:**** |  |  |  |
| Net income, as reported | $ 0.65 | $ 0.57 | 14.0% |
| Income, as adjusted* | $ 0.67 | $ 0.58 | 15.5% |
| Average shares outstanding | 2,359.2 | 2,346.3 |  |

*Adjusted to exclude the cumulative effect of an accounting change and realized capital gains (losses), net of taxes.
**Share information reflects the three-for-two split in the form of a 50 percent common stock dividend, paid July 28, 2000.

Income before income taxes, minority interest, cumulative effect of an accounting change and realized capital gains (losses) for the first quarter of 2001 increased 15.5 percent to $2.32 billion from $2.01 billion reported in 2000.

Foreign exchange rates negatively affected the translation into U.S. dollars of foreign currency net premiums written and worldwide life insurance premium income and other considerations, as shown in the following table, which compares first quarter 2001 to first quarter 2000.

| | Worldwide General Insurance | Foreign General Insurance | Worldwide Life Insurance | Foreign Life Insurance |
|---|---|---|---|---|
| Premium Growth in Original Currency | 17.3% | 8.2% | 36.4% | 9.2% |
| Foreign Exchange Impact | (2.2) | (6.6) | (4.6) | (6.6) |
| Premium Growth as Reported in U.S. $ | 15.1% | 1.6% | 31.8% | 2.6% |

Commenting on the first quarter's results, AIG Chairman M.R. Greenberg said, "AIG had a solid first quarter, benefiting from a continuing strengthening of pricing in the commercial property-casualty market, as well as strong performance by our overseas life insurance business and financial services businesses. Excluding the cumulative effect of an accounting change and realized capital gains and losses, AIG's net income rose 15.2 percent in the quarter to $1.57 billion, or $0.67 per share.

"In worldwide general insurance, net premiums written gained 15.1 percent to $4.86 billion, reflecting the broad increases in commercial pricing both in the United States and in key overseas markets. Our adjusted underwriting profit for the quarter totaled $256.4 million and our worldwide combined ratio was 95.89, compared to 95.78 in last year's first quarter. "The Domestic Brokerage Group, including the results of the insurance operations of HSB Group, Inc., reported a 27.5 percent gain in net premiums written to $2.65 billion, a record level, and a combined ratio of 98.19, compared to 100.92 last year. Rates continued to firm during the quarter but, as mentioned in last quarter's earnings release, additional strengthening is required in order to return pricing to satisfactory levels after years of eroding rates.

"HSB Group, Inc., which AIG acquired late in 2000, is integrating its operations into AIG's general insurance profit centers, both domestically and overseas, and had a good quarter overall.

"Our domestic personal lines business continued to increase prices, resulting in a gain in net premiums written. However, underwriting results still lag and are not yet at acceptable levels. Winter storms also had an adverse impact on reported results.

"United Guaranty Corporation (UGC), our mortgage guaranty insurance subsidiary, had another strong quarter, with an increase in net premiums written. UGC continues to do extremely well, benefiting from an increase in home refinancings due to a lower interest rate environment.

"The Foreign General Insurance Group had a good quarter, achieving a combined ratio of 93.14. Net premiums written in original currency rose 8.2 percent in the quarter, but were adversely affected by foreign exchange. In particular, the Japanese yen weakened significantly against the U.S. dollar, which impacted the conversion of yen premiums into dollars. Such fluctuations are a normal part of doing business globally, having a favorable impact in some quarters and an unfavorable impact in others. These quarter-to-quarter fluctuations are not predictable and generally average out over time.

"Transatlantic Holdings, Inc. (TRH), whose results are reported through both AIG's Domestic and Foreign General insurance segments, achieved a 13.5 percent increase in net premiums written over last year's first quarter, a 2.7 percent gain in operating income, and an improved combined ratio of 99.63.

"We added $63 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, bringing the total of those reserves to $25.0 billion at March 31, 2001.

"Our worldwide Life Division had an excellent first quarter. Including the results of SunAmerica's life business, premium income and the sales of annuities, pensions and investment products gained 31.8 percent in the quarter to $8.77 billion, while operating income before realized capital losses rose 17.8 percent to $956.4 million. ALICO and American International Assurance Company, Ltd., our two largest overseas life companies, both had solid performance, while our domestic life companies posted strong gains in both premiums and operating income. In Japan, as reported earlier, AIG was chosen by the Legal Trustee to rehabilitate The Chiyoda Mutual Life Insurance Company. The Chiyoda reorganization plan was approved by the court last week, and Chiyoda is now an AIG stock subsidiary operating as AIG Star Life Insurance Co., Ltd. As a result, we will be able to significantly expand AIG's presence in the traditional Japanese life market. In India, both our general and life insurance joint venture companies have now received their licenses and are off to excellent starts in this major emerging market.

"The Financial Services Group performed well in the quarter, with a 17.0 percent increase in operating income.

International Lease Finance Corporation (ILFC) and AIG Financial Products Corp. (AIGFP) each had strong gains in operating income. AIG's Consumer Finance Group continued to build its franchise in its markets in Southeast Asia, Central Europe and Latin America.

"The Asset Management Group, including the asset management business of SunAmerica, had satisfactory results. For the quarter, operating income totaled $111.2 million, a solid performance in view of the poor market conditions. At March 31, 2001, AIG's third party assets under management, including retail mutual funds and institutional accounts, totaled approximately $33 billion."

GENERAL INSURANCE

General insurance pretax income before realized capital gains (losses) for the first quarter of 2001 was $972.3 million, an increase of 11.2 percent compared to $874.7 million last year.

Worldwide general insurance net premiums written in the first quarter of 2001 amounted to $4.86 billion, 15.1 percent ahead of the $4.23 billion reported last year.

General insurance net investment income rose 7.9 percent to $715.9 million in 2001 from $663.2 million last year.

LIFE INSURANCE

AIG's worldwide life insurance operations reported first quarter 2001 pretax income before realized capital losses of $956.4 million, an increase of 17.8 percent, compared to $812.1 million last year.

Life insurance premium income and other considerations increased 31.8 percent in the first quarter of 2001 to $8.77 billion from $6.65 billion in 2000.

Life insurance net investment income rose 14.9 percent to $1.92 billion for the first quarter of 2001, compared to $1.67 billion for the same period last year.

FINANCIAL SERVICES

Financial services pretax operating income rose 17.0 percent to $328.6 million in the first quarter of 2001, compared to $280.8 million in the same period last year.

ASSET MANAGEMENT

Asset management pretax operating income in the first quarter of 2001 amounted to $111.2 million, an increase of 7.2 percent, compared to $103.8 million in 2000.

# # # #

AIG is the leading U.S.-based international insurance and financial services organization and the largest underwriter of commercial and industrial insurance in the United States. Its member companies write a wide range of commercial and personal insurance products through a variety of distribution channels in approximately 130 countries and jurisdictions throughout the world. AIG's global businesses also include financial services and asset management, including aircraft leasing, financial products, trading and market making, consumer finance, institutional, retail and direct investment fund asset management, real estate investment management, and retirement savings products. American International Group, Inc.'s common stock is listed on the New York Stock Exchange, as well as the stock exchanges in London, Paris, Switzerland and Tokyo.

# # # #

Caution concerning forward-looking statements

This press release may contain forward-looking statements. Please refer to AIG's Annual Report on Form 10-K for the year ended December 31, 2000 for a description of the business environment in which AIG operates and the important factors that may affect its business. AIG is not under any obligation to (and expressly disclaims any such obligations to) update or alter its forward-looking statements whether as a result of new information, future events or otherwise.

## American International Group, Inc.
## Financial Highlights
### (in thousands, except per share amounts)

| | | Three Months Ended March 31, | |
| --- | --- | --- | --- |
| | 2001 | 2000 | Change |
| **General Insurance Operations:** | | | |
| Net Premiums Written | $ 4,864,753 | $ 4,226,296 | 15.1 % |
| Net Premiums Earned | 4,721,733 | 4,106,903 | 15.0 |
| Adjusted Underwriting Profit | 256,404 | 211,492 | 21.2 |
| Net Investment Income | 715,913 | 663,199 | 7.9 |
| Income before Realized Capital Gains (Losses) | 972,317 | 874,691 | 11.2 |
| Realized Capital Gains (Losses) | (20,863) | 12,086 | . |
| Operating Income | $ 951,454 | $ 886,777 | 7.3 % |
| Loss Ratio | 75.64 | 75.21 | |
| Expense Ratio | 20.25 | 20.57 | |
| Combined Ratio | 95.89 | 95.78 | |
| **Life Insurance Operations:** | | | |
| Premium Income and Other Considerations (a) | $ 8,770,211 | $ 6,652,184 | 31.8 % |
| Net Investment Income | 1,920,826 | 1,671,068 | 14.9 |
| Income before Realized Capital Losses | 956,410 | 812,087 | 17.8 |
| Realized Capital Losses | (17,822) | (28,735) | . |
| Operating Income | 938,588 | 783,352 | 19.8 |
| Financial Services Operating Income | 328,608 | 280,846 | 17.0 |
| Asset Management Operating Income | 111,225 | 103,787 | 7.2 |
| Other Realized Capital Losses | (11,940) | (3,731) | . |
| Other Income (Deductions) - net | (45,911) | (59,975) | . |
| Income before Income Taxes, Minority Interest | | | |
| and Cumulative Effect of an Accounting Change | 2,272,024 | 1,991,086 | 14.1 |
| Income Taxes | 664,671 | 589,726 | . |
| Income before Minority Interest and Cumulative | | | |
| Effect of an Accounting Change | 1,607,353 | 1,401,320 | 14.7 |
| Minority Interest, after tax: (b) | | | |
| Operating Income | (68,195) | (50,503) | . |
| Capital Gains | (1,155) | (4,724) | . |
| Income before Cumulative Effect of an Accounting Change | 1,538,003 | 1,346,093 | 14.3 |
| Cumulative Effect of an Accounting Change, net of tax (c) | (6,246) | 0 | . |
| Net Income, as reported | 1,531,757 | 1,346,093 | 13.8 |
| Income, as adjusted (d) | $ 1,571,667 | $ 1,364,064 | 15.2 % |
| **Per Share: (e)** | | | |
| **Basic:** | | | |
| Net Income, as reported | $ 0.66 | $ 0.58 | 13.8 % |
| **Diluted:** | | | |
| Net Income, as reported | 0.65 | 0.57 | 14.0 |
| Income, as adjusted (d) | $ 0.67 | $ 0.58 | 15.5 % |
| **Average Common Shares Outstanding (e)** | | | |
| - Basic | 2,333,576 | 2,319,632 | |
| - Diluted | 2,359,227 | 2,346,330 | |

(a)   GAAP premium income was $3,506,051 in the first quarter 2001, compared to $3,277,632 in the first quarter 2000.

(b)   Represents minority shareholders' equity in operating income and capital gains of certain consolidated subsidiaries, including Transatlantic Holdings, Inc. and 21st Century Insurance Group.

(c)   Represents the cumulative effect of an accounting change, net of tax, related to the adoption of FASB 133 "Accounting for Derivative Instruments and Hedging Activities".

(d)   Adjusted to exclude the cumulative effect of an accounting change and realized capital gains (losses), net of taxes.

(e)   Share information reflects the three-for-two split in the form of a 50 percent common stock dividend, paid July 28, 2000.

# American International Group, Inc.
## Supplementary Data
### (in thousands)

|  | Three Months Ended March 31, | | |
|  | 2001 | 2000 | Change |
|---|---|---|---|
| **General Insurance Operations:** |  |  |  |
| **Net Premiums Written** |  |  |  |
| Brokerage Division | $ 2,649,852 | $ 2,077,539 | 27.5 % |
| Personal Lines | 634,502 | 601,269 | 5.5 |
| Mortgage Guaranty | 118,519 | 108,834 | 8.9 |
| Total Domestic General | 3,402,873 | 2,787,642 | 22.1 |
| Foreign General (a) | 1,461,880 | 1,438,654 | 1.6 |
| Total | 4,864,753 | 4,226,296 | 15.1 |
|  |  |  |  |
| **Operating Income (b)** |  |  |  |
| Brokerage Division | 552,792 | 458,909 | 20.5 |
| Personal Lines | 12,461 | 41,481 | (70.0) |
| Mortgage Guaranty | 102,044 | 93,218 | 9.5 |
| Intercompany Adjustments | 5,830 | 20,265 | - |
| Total Domestic General | 673,127 | 613,873 | 9.7 |
| Foreign General | 299,190 | 260,818 | 14.7 |
| Total | $ 972,317 | $ 874,691 | 11.2 % |
|  |  |  |  |
| **Combined Ratios** |  |  |  |
| Brokerage Division | 98.19 | 100.92 |  |
| Personal Lines | 103.47 | 96.70 |  |
| Mortgage Guaranty | 35.96 | 35.45 |  |
|  |  |  |  |
| Total Domestic General | 96.93 | 97.37 |  |
| Foreign General | 93.14 | 92.52 |  |
|  |  |  |  |
| Losses & Loss Expenses Paid | $ 3,508,840 | $ 3,066,619 | 14.4 % |
| Change in Loss and LAE Reserve | 62,780 | 21,988 | - |
| Losses and Loss Expenses Incurred | 3,571,620 | 3,088,607 | 15.6 |
|  |  |  |  |
| Net Loss and LAE Reserve | 25,014,376 | 24,621,660 | 1.6 |
|  |  |  |  |
| GAAP Underwriting Profit | 256,404 | 211,492 | 21.2 |

### *Life Insurance Operations: (c)*

| | | | |
|---|---:|---:|---:|
| **Premium Income and Other Considerations** | | | |
| **Domestic** | | | |
| Life (d) | 173,588 | 152,686 | 13.7 |
| Annuities, Pension and | | | |
| Investment Products (e) | 3,826,512 | 1,852,031 | 106.6 |
| Total | 4,000,100 | 2,004,717 | 99.5 |
| | | | |
| **Foreign (f)** | | | |
| Life (d) | 3,305,264 | 3,064,393 | 7.9 |
| Annuities, Pension and | | | |
| Investment Products (e) | 1,464,847 | 1,582,994 | (7.5) |
| Total | 4,770,111 | 4,647,387 | 2.6 |
| | | | |
| **Net Investment Income** | | | |
| Domestic | 1,058,539 | 924,094 | 14.5 |
| Foreign | 862,287 | 746,971 | 15.4 |
| Total | 1,920,826 | 1,671,065 | 14.9 |
| | | | |
| **Operating Income (h)** | | | |
| Domestic | 363,935 | 299,155 | 21.7 |
| Foreign | 592,475 | 512,932 | 15.5 |
| Total | 956,410 | 812,087 | 17.8 |

### *Financial Services:*

| | | | |
|---|---:|---:|---:|
| **Revenues** | | | |
| International Lease Finance Corp. | 621,605 | 549,611 | 13.1 |
| AIG Financial Products Corp. | 247,691 | 212,365 | 16.6 |
| AIG Trading Group Inc. | 38,892 | 73,050 | (46.8) |
| Other | 116,573 | 60,216 | 93.6 |
| Total | 1,024,761 | 895,242 | 14.5 |
| | | | |
| **Operating Income** | | | |
| International Lease Finance Corp. | 160,498 | 138,752 | 15.7 |
| AIG Financial Products Corp. | 165,244 | 139,436 | 18.5 |
| AIG Trading Group Inc. | 6,517 | 21,851 | (70.2) |
| Other | 18,714 | (905) | - |
| Intercompany Reclassifications | (22,357) | (18,288) | - |
| Total | 328,608 | 280,846 | 17.0 |

### *SunAmerica:*

| | | | | |
|---|---|---:|---:|---:|
| Operating Income (h)(c) | | 368,116 | 324,796 | 13.3 |
| Total Sales | $ | 4,238,838 | $   2,861,482 | 48.1  % |

### *Effective Tax Rates:*

| | | | |
|---|---:|---:|---:|
| Excluding Capital Gains (Losses) | 29.40% | 29.67% | |
| Capital Gains (Losses) Alone | 35.79% | 35.00% | |
| As Reported | 29.25% | 29.62% | |

*Effective Tax Rates:*

| | | |
|---|---|---|
| Excluding Capital Gains (Losses) | 29.40% | 29.67% |
| Capital Gains (Losses) Alone | 35.79% | 35.00% |
| As Reported | 29.25% | 29.62% |

(a)   The growth in foreign net premiums written in original currency was 8.2 percent.

(b)   Operating income excludes realized capital gains (losses).

(c)   Results for SunAmerica Inc. are included in Life Insurance and Asset Management Operations.

(d)   Includes traditional life, interest sensitive and variable life products.

(e)   Quarterly fluctuations in the sale of investment products do not represent a trend for the year.

(f)   The growth in foreign life premiums in original currency was 14.1 percent. The growth in foreign annuities, pension and investment products in original currency was approximately flat with last year and, as mentioned in footnote (e) above, quarterly fluctuations in the sale of investment products do not represent a trend for the year.



<< Back

## AIG DELAYS FORM 10-K FILING TO COMPLETE REVIEW

PDF Version

NEW YORK, Mar 30, 2005 -- American International Group, Inc. ("AIG") announced today that the filing of its 2004 Form 10-K will be delayed beyond the March 31, 2005 extended due date in order to provide AIG, its Board of Directors and its new management adequate time to complete their extensive review of AIG's books and records. The review includes issues arising from pending investigations into non-traditional insurance products and certain assumed reinsurance transactions by the Office of the Attorney General for the State of New York ("NYAG") and the Securities and Exchange Commission ("SEC") and from AIG's decision to review the accounting treatment of certain additional items. AIG currently believes that it will be able to file its Form 10-K on or prior to April 30, 2005. AIG intends to seek relief from the SEC to allow the continued use of registration statements on Form S-3 following the filing of its Form 10-K, although there can be no assurance that relief will be granted.

Because AIG's review is not yet complete, AIG is not yet able to determine whether the adjustments identified to date as a result of the review will require restatement of prior period results or an adjustment to fourth quarter 2004 published unaudited information. Therefore, AIG is not currently able to determine the potential effects of any proposed adjustment on AIG's results of operations for any particular period. AIG currently believes that the maximum aggregate effect on AIG's consolidated shareholders' equity at December 31, 2004 of known errors and changes in accounting estimates and classifications, including the potential effect of treating Union Excess as a consolidated entity as discussed below, would be a decrease of approximately two percent from the previously reported unaudited consolidated shareholders' equity of $82.87 billion. The investigations and AIG's review are continuing, and AIG cannot presently determine whether additional matters will be discovered or further adjustments will be required.

As previously disclosed, in February 2005 AIG received subpoenas from the NYAG and the SEC relating to investigations of non-traditional insurance products and certain assumed reinsurance transactions and AIG's accounting for such transactions. The New York Department of Insurance is currently investigating related issues. The initial investigations related principally to an assumed reinsurance transaction involving two tranches of $250 million each which took place in December 2000 and March 2001 between an AIG subsidiary and a subsidiary of General Re Corporation ("Gen Re"). In connection with each tranche, each of consolidated net premiums written and consolidated net loss reserves increased by $250 million in each of the fourth quarter of 2000 and the first quarter of 2001. The first tranche of the transaction was commuted in November 2004, which reduced premiums and reserves for losses and loss expenses by approximately $250 million in the fourth quarter 2004 previously reported unaudited financial information. The second tranche remains on AIG's books as previously recorded.

Based on its review to date, AIG has concluded that the Gen Re transaction documentation was improper and, in light of the lack of evidence of risk transfer, these transactions should not have been recorded as insurance. Therefore, AIG's financial statements will be adjusted to recharacterize such transactions as deposits rather than as consolidated net premiums. The recharacterization will have virtually no impact on AIG's financial condition as of December 31, 2004, but will reduce the reserve for losses and loss expenses by $250 million and increase other liabilities by $245 million.

In preparation for the issuance of the Form 10-K, management reviewed the accounting treatment for certain additional items with its independent accountants. Some of these matters were subsequently disclosed by AIG to various federal and state law enforcement and regulatory authorities. The continuing review has led AIG management to conclude that the accounting for certain of these matters may need to be recharacterized or otherwise adjusted. Certain but not all of the original characterizations resulted from transactions which appear to have been structured for the sole or primary purpose of accomplishing a desired accounting result. The matters reviewed to date include:

- Union Excess: AIG's general insurance company subsidiaries operate worldwide, primarily by underwriting and accepting risks for their direct account and securing reinsurance on that portion of the risk in excess of the limit which they wish to retain. Many of these reinsurers are large, well capitalized organizations well known within the insurance industry or smaller

reinsurance companies with no affiliation with AIG. AIG subsidiaries have also ceded business to Union Excess Reinsurance Company, Ltd. ("Union Excess") a Barbados-domiciled reinsurer. AIG has no direct equity interest in Union Excess. However, based upon AIG's review to date, including consideration of previously undisclosed facts, AIG now believes that a significant portion of the ownership interests of Union Excess shareholders are protected under financial arrangements with Starr International Company, Inc. ("SICO"), a private holding company which owns approximately 12 percent of AIG's outstanding common stock and whose board of directors consists of current and former members of AIG management. From its formation in 1991, Union Excess has reinsured risks emanating primarily or solely from AIG subsidiaries, both directly and indirectly. The transactions with Union Excess permitted AIG to reflect income arising from the discounting of reserves permitted under Barbados law. If Union Excess is required to be treated as a consolidated entity by AIG, it would result in a maximum reduction of approximately $1.1 billion in AIG's consolidated shareholders' equity as of December 31, 2004, which represents the after-tax cumulative effect of the transactions with Union Excess over a 14 year period from 1991 to 2004. AIG is continuing to evaluate whether Union Excess should be treated as a consolidated entity in AIG's financial statements and whether the financial statement benefit from cessions to Union Excess should be adjusted.

- Richmond: AIG subsidiaries have also ceded reinsurance to subsidiaries of Richmond Insurance Company, Ltd. ("Richmond"), a Bermuda-based reinsurance holding company in which AIG holds a 19.9 percent ownership interest. Although AIG owns only a minority ownership interest in Richmond, the review of the operations of the Richmond subsidiaries has shown significant previously undisclosed evidence of AIG control. Therefore, AIG has determined that Richmond should be treated as a consolidated entity in AIG's financial statements. Consolidation of Richmond will result in a small increase in consolidated assets with a similar increase in consolidated liabilities and a minimal impact on AIG's consolidated shareholders' equity as of December 31, 2004.

- Capco: The transactions with Capco Reinsurance Company, Ltd. ("Capco"), a Barbados domiciled reinsurer, involved an improper structure created to recharacterize underwriting losses as capital losses. That structure, which consisted primarily of arrangements between subsidiaries of AIG and Capco, will require that Capco be treated as a consolidated entity in AIG's financial statements. The result of such consolidation is to recharacterize approximately $200 million of previously reported capital losses as an equal amount of underwriting losses relating to auto warranty business from 2000 through 2003.

- Covered Calls: From 2001 to 2003, AIG entered into a series of transactions with third parties whereby AIG subsidiaries would sell in-the-money call options on bonds in their portfolios that had unrealized appreciation associated with them. Through a series of forward transactions and swaps that allowed AIG to retain the bonds, AIG recognized net investment income in the amount of the unrealized gains. The cumulative increase in net investment income from these transactions was approximately $300 million with a corresponding decrease in realized capital gains over the three year period. There was no effect on AIG's consolidated shareholders' equity.

- Receivables: AIG continues to assess the recoverability of certain balances, consisting mainly of receivables in the domestic general insurance operations, to determine whether additional charges would be appropriate. AIG currently believes that the after-tax impact of these charges would not exceed $300 million.

In addition:

- AIG is reviewing its prior estimates relating to deferred acquisition costs and certain other accruals and allowances with respect to AIG's general insurance and financial services subsidiaries to determine if adjustments are necessary. These revisions could result in an aggregate after tax charge of approximately $370 million.

- AIG may reclassify certain items previously identified and reported as net investment income. The aggregate effect of the misclassifications AIG has identified to date was to increase reported net investment income over the period from 2000 through 2004 by approximately four percent. The reclassification will have no effect on AIG's consolidated shareholders' equity as of December 31, 2004.

- AIG has determined to change its accounting treatment to expense the deferred compensation granted to certain AIG employees by SICO. The magnitude of these amounts in prior years has been disclosed in the notes to AIG's audited

financial statements, but not included as expenses in the calculation of AIG's consolidated net income. Although the expense will be a charge to reported earnings, the change will have no negative impact on shareholders' equity because an equal amount will be treated as deemed contributions from SICO to additional paid-in capital.

In addition to the above matters, AIG has reviewed a series of transactions involving International Lease Finance Corporation ("ILFC"), a wholly owned subsidiary of AIG engaged in the leasing and remarketing of commercial aircraft, that were discussed in various press reports. AIG has reviewed its accounting at both the ILFC and consolidated levels and determined that no adjustments are necessary.

In view of its continuing review, management has not yet completed its assessment of the effectiveness of AIG's internal control over financial reporting as of December 31, 2004. The assessment will be made prior to the filing of AIG's Form 10-K.

AIG anticipates making further public disclosure on these matters in its Form 10-K or otherwise if appropriate.

Caution concerning forward-looking statements

This press release contains forward-looking statements. Please refer to the AIG Quarterly Report on Form 10-Q for the quarter ended September 30, 2004 and AIG's past and future filings and reports filed with the Securities and Exchange Commission for a description of the business environment in which AIG operates and the important factors that may affect its business. AIG is not under any obligation to (and expressly disclaims any such obligation to) update or alter its forward-looking statements whether as a result of new information, future events or otherwise.

American International Group, Inc. (AIG) is the world's leading international insurance and financial services organization, with operations in more than 130 countries and jurisdictions. AIG member companies serve commercial, institutional and individual customers through the most extensive worldwide property-casualty and life insurance networks of any insurer. In the United States, AIG companies are the largest underwriters of commercial and industrial insurance and AIG American General is a top-ranked life insurer. AIG's global businesses also include retirement services, financial services and asset management. AIG's financial services businesses include aircraft leasing, financial products, trading and market making. AIG's growing global consumer finance business is led in the United States by American General Finance. AIG also has one of the largest U.S. retirement services businesses through AIG SunAmerica and AIG VALIC, and is a leader in asset management for the individual and institutional markets, with specialized investment management capabilities in equities, fixed income, alternative investments and real estate. AIG's common stock is listed in the U.S. on the New York Stock Exchange and ArcaEx, as well as the stock · exchanges in London, Paris, Switzerland and Tokyo.

American International Group, Inc.
Charlene Hamrah (Investment Community)
212-770-7074

Joe Norton (News Media)
212-770-3144



1) Accrue 18 million of DAC with respect to DBS's operations

1) DR Parent APIC - other        28,600,000
   CR Financial Service Insured
      In. Deferred Income                    13,600,000
   CR Agent Management Financial
      Service Division Income              10,000,000
   Parents Put Program renders current accounting rules with respect to contract.

1) The market reserve with respect to AIG Parent's carried trades is 31.0 million. Release the amount as a Gen Starting entry, the offset is Other Liabilities.

2) DR UTA                         33,000,000
   CR Loss Reserves                         33,000,000
   Restore FX effect to the loss reserves.

I (A)

12(A) 12) Correct entry 18A with respect to UGC. The Losses Incurred should be 9.5 million not 6.25 million.

13) The remittance ledger with respect to Iasega from Japan operations are not a ledger with respect to

3(O) FAJA 129. Toret 352

DR UTA Japan        24,000,000
CR Losses Paid                    20,000,000
CR Acquisition Expense             4,000,000

14) DR Loss Reserves DBG    50,000,000
DR Loss Reserves UGC    10,000,000
18F 6
DR Loss Reserves 21st    5,000,000
CR   CHG IN RES DBG             50,000,000
" " " UGC                   10,000,000
" " " 21st                   5,000,000

15) DR Insurance balances R/I    11,000,000
21(P) CR Commission expense R16RE.        11,000,000
Accrue R16 RE Commissions

21 Q 16) DR ┌reserve Comm. fees & Expenses    15,000,000
CR ISB general expenses             15,000,000
Reflect consolidated accrued expenses more reasonably

12) Correct entry 18A with respect to UGC. The
Losses Incurred should be 3.5 million not
6.25 million

18(A)

13) The remittance ledger with respect to foreign June
Japan operations are not a ledger with respect to
EAJA 133. Tax at 35 2 1/2 % of Amour

2)(D) DR  UTA JAPAN        24,000,000
CR  Losses paid                    20,000,000
CR  acquisition Expense            4,000,000

14) DR  Loss Reserves DBG   50,000,000
DR  Loss Reserves UGC    10,000,000
DR  Loss Reserves 21st     5,000,000
18 F   CR      Chg in Res DBG              50,000,000
H         " - "  UGC                  10,000,000
          " - "  21st                 5,000,000

28) DR  Other Liabilities NI          8,100,000
    CR  OID - Parent NI                          8,100,000
        Reflect Parents NI to OID

27)  DR  Losses paid - DBO             50,000,000
     CR  Loss res change                        50,000,000
  )  DR  Reinsurance Rec M/B           50,000,000
  )  CR  Loss Reserve                          50,000,000
        Reflect MetLife transaction properly as paid


33)  Current tax A/P                   5,000,000
  )  Current tax Exp                           5,000,000
        Accrue garbage gas tax shelter

# Facsimile



**American International Group**
70 Pine Street – 29th Floor
New York, NY 10270

Date:

To: _Joe Umansky_

Fax: _785 - 0599_

Tel:

From: ▬▬▬

Fax: ▬▬▬

Tel: ▬▬▬

Message: _As follow up to our meeting yesterday._

** TOTAL PAGE.02 **

JAN 18 2000 12:19 FR AIG

P.01/01

# MEMORANDUM



<u>FAX: 011-813-3284-4003</u>

To: ▮▮▮▮▮

From: Howard I. Smith

Date: December 20, 1999

Re: <u>Warranty Book</u>

The book of business we discussed is essentially all auto warranty business. As of December 31, 1999 the unearned premium reserve will approximate $210 million and, it is estimated, that the loss ratio will be about 200%, or incurred losses of $420 million. The payout pattern for these losses is estimated to be as follows:

| Year | Payments (In millions) |
|------|------------------------|
| 2000 | $144 |
| 2001 | 120 |
| 2002 | 82 |
| 2003 | 46 |
| 2004 | 20 |
| 2005 | 6 |
| 2006 | 2 |
|      | $420 |

Essentially we would swap this book of business for investments of a Japanese Company which are in an unrealized loss position of $210 million. The investments could be removed from the Japanese entity's books upon reaching an agreement with us while the warranty loss could be absorbed over a longer period of time. We could conceivably give the entity a note in payment for the investments and the payout terms of the note could roughly correspond to the warranty loss payouts. This scenario could, obviously, be further developed if we get close to an arrangement.

Discussion of this deal should be limited to as few people as possible. This should give you a good overview and if you need more details at this point, please let me know.

HIS:▮▮▮

001 22:14 FR                                          TO 914412956983        P.03



**STATE OF NEW YORK**
**INSURANCE DEPARTMENT**
25 BEAVER STREET
NEW YORK, NEW YORK 10004

November 13, 2000

[redacted]

Domestic Brokerage Group
American International Group, Inc.

New York, NY 10038

Re: Disclaimer of Control of Richmond Insurance Company Ltd. (Richmond)

Dear Mr. [redacted]:

This is in reference to Mr. L.M. Murphy's initial letter of November 10, 1999 and subsequent correspondence with you regarding the disclaimer of control of Richmond by American International Underwriters Overseas, Ltd. (AIUO, Ltd.).

Mr. Murphy indicated that Richmond has 51,800 outstanding voting shares, of which AIUO, Ltd. owns 10,358 shares or 19.99%. No other person controlling, controlled by, or under common control with AIUO, Ltd. owns any additional shares of Richmond. The remaining voting shares are owned by Munich Holdings (49.01%); [redacted] (9.99%); [redacted], a trust established and controlled by the [redacted] (9.99%); and The Richmond Partnership, a group of private individuals led by [redacted] (9.99%). Of the five members of the Richmond board of directors, AIUO, Ltd. or persons controlling, controlled by or under common control with AIUO, Ltd. have the right to elect one board member.

Based on Mr. Murphy's representations and subsequent correspondence, the Department has determined that AIUO, Ltd. does not control Richmond pursuant to Section 1501(a)(2) of the New York Insurance Law.

Very truly yours,



NOV 16 2000

FOCUS – 1 of 2 DOCUMENTS

Copyright 1992 Crain Communications, Inc.
Business Insurance

September 21, 1992

SECTION: HOUSTON MARINERS CLUB; Pg. 65

LENGTH: 1213 words

HEADLINE: Boosting rates a priority before Andrew: AIG;
Greenberg defends memo, reiterates need for price hikes

BYLINE: By MICHAEL BRADFORD

DATELINE: HOUSTON

BODY:

Boosting property/casualty insurance rates had been a priority at American International Group Inc. long before Hurricane Andrew and the controversy sparked by an internal memo, AIG's chairman says.

"I've been very public for the last three years that the property/casualty industry has to increase rates," said AIG Chairman Maurice R. Greenberg.

"Rates are just historically low," he said during the 1992 Houston Marine Insurance Seminar last week.

The philosophy of raising rates "did not begin with Hurricane Andrew," Mr. Greenberg said.

What did begin with Hurricane Andrew was a storm of controversy when Mr. Greenberg's son, Jeffrey W. Greenberg, executive vp-domestic general-brokerage, sent a memo to AIG company presidents and regional vps that the catastrophe provides "an opportunity to get price increases now" (BI, Sept. 14).

Because of the memo, which said the insurance industry would be unable to absorb Andrew-related losses without increasing rates, several insurance regulators said they would closely review rate requests by AIG and other insurers.

Indeed, Florida has frozen action on AIG rate requests and is asking all insurers to submit rates for approval under the state's use-and-file system. Louisiana will attempt to impose a similar moratorium on AIG rate requests next month.

Some states also are studying whether the memo violates antitrust statutes. But Maurice Greenberg maintains that the memo merely restates his call for higher rates, and he says consumer advocates took the document out of context.

"To take an internal memorandum and use that as a basis for saying AIG has acted in a despicable way, I just think is contrary...to the facts," he said. "And before you start condemning a company, you ought to have all the facts."

Mr. Greenberg pointed out that AIG is not a personal lines insurer in south Florida, where most of the damage was sustained by homeowners, and writes very little personal lines coverage in Louisiana.

The memo "did not refer to property insurance rates," he noted. "It said rates have to be increased. That's what I've been saying for the last three years — hurricane or no hurricane."

Mr. Greenberg said that the company's "experience in Florida the last three years" shows a combined ratio of approximately 120%. "So clearly we need rate increases in Florida and other states as well," he said.

The memo, written the day Andrew hit Florida, said the storm "will cause extensive damage in southern Florida and, if it also strikes a populated area after picking up speed in the Gulf, may cause the insurance industry the biggest storm loss ever."

It went on to say, "We have opportunities from this, and everyone must probe with brokers and clients."

AIG and "all other insurers need rate increases," Maurice Greenberg said. "There's nothing secret about that."

Insurers will face their own rate hikes from reinsurers, he pointed out. "If you think that catastrophe reinsurance is not going up in price, think again. (That's) if it's available at all from responsible companies."

On another topic, Mr. Greenberg said the U.S. workers compensation insurance system is "out of control" and that insurers won't continue to write the coverage without making a profit.

"What was an exclusive remedy is no longer so in many states," he said. "Benefits have been broadened — for political reasons in most instances — and rates suppressed. It doesn't take a mathematician to figure out that that is not going to fly."

AIG already has decided it will not write workers comp or any other business in states that do not allow it a shot at making an underwriting profit, said Mr. Greenberg.

"There is no constitutional reason for us to put our capital at risk with no hope of achieving a reasonable profit," he said. "AIG is a global company. We do very well outside the United States."

AIG is "not obliged to write any business that is not on a level playing field for the underwriter," Mr. Greenberg said. "We will continue to be very disciplined in that way."

All property/casualty insurers ought to be focusing on achieving an underwriting profit ahead of increasing market share, he emphasized. Many insurers believe that investment income or sale of securities will take care of the bottom line, he said. But, Mr. Greenberg challenged, "If you don't make a profit in your basic business, which is underwriting, you won't make a profit for very long."

And insurers that believe market share is more important than bottom-line results will pay the price, Mr. Greenberg predicted.

Insurers that topped the list in "size and financial strength a decade ago" have lost business and are now ranked lower on that list because of failed management strategies that concentrated too heavily on market share alone, he pointed out.

There are very few AAA-rated insurance companies today, and "the list is growing smaller by the year," he observed.

And, as insurers continue to deliver poor returns, investors become disillusioned with the industry, he said.

"If you don't have a decent return, shareholders move on. And indeed they should because no business can prosper and grow" without a decent return on capital, Mr. Greenberg said.

Many property/casualty insurers are averaging about an 8% return on capital, including sales of securities, he noted.

"How can an industry as important as the property and casualty industry is serve the needs of the nation and the people if its returns are so meager? And why would anyone long want to invest in companies that continue with such pitiful returns?"

Mr. Greenberg stressed: "The (property/casualty) industry, generally, ought to be working toward an underwriting profit."

In some classes of business, insurers may have to begin limiting their exposure by writing policies that will not respond if legislative changes broaden liability, Mr. Greenberg said.

"We're living in a country now where individual responsibility and accountability for our own acts has vanished," he explained. "Everybody must be rewarded one way or another if anything befalls them, regardless of their responsibility in the event."

The courts have changed and broadened statutes that determine liability, he said.

An insurance underwriter writing a liability policy "is held accountable for achieving an underwriting profit," but laws often change the definition of liability after a contract has been negotiated with intermediaries and clients, Mr. Greenberg observed.

"How long can an industry survive in that kind of environment?" he asked. "It's virtually impossible for an underwriter today in many classes of liability business to predict what will happen in the future.

"I think we're reaching the point where we must consider whether we issue a policy in certain classes of liability

Business Insurance September 21, 1992

limited to the laws that then exist. Any change that broadens those definitions in the future would not be covered," he said.

"I don't see how you can price a policy in today's environment in many classes of liability business and hold anybody accountable. What it is is simply turning to the deepest pocket — social engineering going on at its worst," Mr. Greenberg observed.