UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN RE-INSURANCE COMPANY, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION,<br>    Defendants. | CIVIL ACTION NO: 05-11840-MLW |

## NOTICE OF FILING OF REDACTED PLEADINGS

Pursuant to the Remark entered on the docket on February 6, 2006, plaintiffs hereby submit as Exhibits A through D redacted copies of the following pleadings, which have been filed under seal:

1. Memorandum of Law in Support of Plaintiffs' Motion for Remand to the Superior Court of Massachusetts, dated October 13, 2005, docket no. 14 – Redacted copy attached as Exhibit A;

2. Affidavit of Steven L. Schreckinger in Support of Plaintiffs' Motion for Remand to the Superior Court of Massachusetts, dated October 13, 2005, docket no. 15 – Redacted copy attached as Exhibit B, with Tabs 1 through 9;

3. Corrected Memorandum of Law in Opposition to Defendants' Motion to Stay Proceedings, dated October 17, 2005, docket no. 20 – Redacted copy attached as Exhibit C; and

4. Plaintiffs' Memorandum in Opposition to the Renewed Motions of Defendants AIG Inc. and Trenwick to Stay Proceedings Pending Arbitration, dated February 2, 2006, docket no. 42 – Redacted copy attached as Exhibit D.

Plaintiffs provided copies of the pleadings as redacted to counsel for the defendants on March 30, 2006, and defendants have not raised any objections to the filing of the redacted pleadings. For clarity, plaintiffs have stamped the attached pleadings "Redacted" in the upper

239432_1.DOC

right-hand corner of every page, in addition to indicating those portions of the text or exhibits that have been redacted.

Respectfully submitted,

/s/ Steven L. Schreckinger
Steven L. Schreckinger (BBO #4471000)
Anne Robbins (BBO #561968)
LYNCH BREWER HOFFMAN & FINK LLP
101 Federal Street, 22nd Floor
Boston, MA  02199-7613
(617) 951-0800

Joseph T. McCullough IV
Robin Dusek
LOVELLS
One IBM Plaza
Suite 1900
Chicago, IL  60611
(312) 832-4400

Kathy L. McFarland
LOVELLS
900 Third Avenue
New York, NY  10022
(212) 909-0600

Dated:  May 2, 2006

I hereby certify that a true copy of the above document was served
upon the attorney of record for each other party by electronic means on
May 2, 2006.

/s/ Anne Robbins
Anne Robbins

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

AMERICAN REINSURANCE COMPANY, *et al.*,    :

Plaintiff,    :    Civil Action No. 05-11840-MLW

V.    :

AMERICAN INTERNATIONAL GROUP and
TRENWICK AMERICAN REINSURANCE    :
CORPORATION
    :

Defendants.    :
    :

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR REMAND TO THE SUPERIOR COURT OF MASSACHUSETTS

Plaintiffs American Reinsurance Company, *et al.*, each a member of one or more reinsurance pools (the "LDG Facilities"), submit this memorandum of law in support of their motion pursuant to 28 U.S.C. §1447, to remand each and every cause of action set forth in the complaint dated July 6, 2005 (the "Complaint"), against defendants American International Group ("AIG Inc.") and Trenwick America Reinsurance Corporation ("Trenwick") to the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session (the "Massachusetts Superior Court"), on grounds that federal subject matter jurisdiction is lacking under 9 U.S.C. §203 because the parties named in this litigation have not entered an agreement to arbitrate their dispute.[1] The plaintiffs rely on this Memorandum of Law, the allegations of the Complaint, the admissions of defendants, and the documents attached to the supporting affidavit of Steven Schreckinger, Esq.[2]

---

[1]    Each defendant has also filed a motion for stay pending arbitration. Plaintiffs' opposition to these motions will be filed tomorrow October 14, 2005, in accordance with the response time set for those motions by Stipulation to Enlarge filed October 7, 2005

[2]    Materials attached to the Schreckinger Affidavit are hereinafter cited by reference to the tab. number assigned in the Affidavit, together with a short name description, in the form "T-__: short name." Citations to the Complaint, which is found at Tab 1 of the Schreckinger Affidavit, are in the form "Compl. ¶_"

## Preliminary Statement

This matter arises out of a reinsurance scam.[3] Defendants AIG Inc. and Trenwick colluded to convert tens of millions of dollars in spurious claims asserted by AIG insurance subsidiaries ("AIG Subsidiaries") against Trenwick reinsurance contracts into more than $76 million in fraudulent "paid losses" to be presented to plaintiffs for reimbursement under a reinsurance fronting agreement between Trenwick and the LDG Facilities. The vehicle of this fraud – the "negotiating" by Trenwick and AIG Inc. of a commutation (settlement) of the AIG Subsidiaries' claims[4] in exchange for a non-recourse promissory note running from Trenwick to AIG Inc. and assignment to the AIG Subsidiaries of all of Trenwick's rights as cedent against the plaintiffs - was conceived and carried out by AIG Inc. management and in-house counsel, known to its most-senior officers, and financed from its coffers.

In removal papers and in their respective motions for stay, Trenwick and AIG Inc. rely for federal subject matter jurisdiction on arbitration proceedings (the "AIG Subsidiaries Arbitration") initiated in Massachusetts by the AIG Subsidiaries as assignees of Trenwick's interests under the Quota Share Retrocessional Agreement ("QSA").[5] Indeed, seeking now to manufacture standing in that arbitration, AIG Inc. presents itself before this Court as "the relevant members and associated

---

[3]     Reinsurance is an insurance contract issued to an insurer (the "cendent") to indemnify losses the cedent incurs by making payments to resolve claims under insurance policies or reinsurance contracts it has issued to others. Barry R. Ostrager and Mary Kay Vyskocil, *Modern Reinsurance Law and Practice* §1.01 (2000).

[4]     The purported commutation was memorialized in the June 30, 2004 LDG Pool Commutation, Settlement and Release Agreement (the "Commutation Agmt"). T-2.

[5]

# REDACTED

There are two relevant Quota Share Retrocessional Agreements, effective May 1, 1997 and July 1, 1997, respectively, between and among Trenwick and various retrocessionaires from the LDG Facilities.

271288.1
NYCLIB01/NYKM/87480.01

Lovells

companies of American International Group, Inc. ('AIG')"[6]  Plaintiffs, however, did not sue AIG

Inc. as a representative of its members and affiliates.  As set forth in detail in the Complaint, and in

summary below, Plaintiffs sued AIG Inc. in its individual legal capacity as a holding company, for

actions taken by and through AIG Inc.'s own officers, management and employees.  The AIG

Subsidiaries, neither named nor necessary parties to this litigation, are improperly before this Court.

AIG Inc. cannot offer substitute defendants to answer to the claims against it.[7]

The question of whether a valid agreement has been entered that binds specific parties to

arbitrate a particular dispute is a threshold question to be determined by the Court and is not

arbitrable.[8]  *First Options of Chicago Inv. v. Kaplan*, 514 U.S. 938, 944 (1995); *Intergen v. Grina*,

344 F.3d 134, 142 (2003).  With the proper defendants before the court, neither Trenwick nor AIG

Inc. can meet its burden in showing standing to arbitrate for two reasons:

*First*, neither Trenwick nor AIG Inc. is itself a party to the AIG Subsidiaries Arbitration nor

can either invoke arbitration rights under the QSA.  Trenwick cannot both affirm the rights of the

AIG Subsidiaries to bring proceedings as its assignees, and claim to stand before the panel with

those self-same rights.  Nor can AIG Inc. - itself not a signatory, not an assignee, not a third-party

---

[6]    Defendants' Notice of Removal to the United States District Court ("Removal Notice") at 1 ("Defendants the relevant member and associated companies of the American International Group ('AIG')"); Defendant AIG Inc.'s Motion to Stay Proceedings Pending Arbitration ("AIG Inc.'s Mot. to Stay") at 1 ("the relevant member and associated companies of defendant American International Group, Inc. ("AIG") move that the Court ...").

[7]    Although AIG Inc.'s motion practice is thus procedurally flawed under 28 U.S.C. §1446 (which provides for removal only by "defendant(s)"), the liberal timing provisions for removal under 9 U.S.C. §205 make objection self-defeating.  Plaintiffs have thus chosen to treat the removal and motion for stay as having originated with the defendant AIG Inc.

[8]    It is undisputed that the parties have not put the issue of AIG Inc.'s standing to arbitrate as a question to the Subsidiaries Arbitration panel.  **REDACTED**    The issue of AIG Inc. standing to arbitrate was first raised within this litigation by virtue of the defendants' removal to federal court on grounds of subject matter jurisdiction under the FAA.

beneficiary, and not even a proper party to the LDG Facilities reinsurance relationships - pierce its own veil to acquire through its subsidiaries rights to arbitrate it never contracted for.

*Second,* plaintiffs' claims against Trenwick and AIG Inc. for fraudulently and deceitfully manufacturing false reinsurance "paid losses" are not within the QSA's narrow arbitration clause. Indeed, in a well-reasoned and widely cited opinion, the District Court of New Jersey found that the identical clause - construed in its entirety in the context of a reinsurance-pool relationship - did not authorize arbitration of fraud and conspiracy claims substantially similar to those asserted in the Complaint. *Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F. Supp 853, 872 (D.N.J. 1992).

Firmly grounded in defendants' independent acts of fraud and deceit, the claims in the Complaint do not duplicate the contract issues before the panel. They will not be resolve by reference to actuarial calculations and the principles of claims adjusting that will settle amounts due under the QSA. Nor is the Complaint derivative of the AIG Subsidiaries' arbitration action. AIG Inc. and Trenwick's fraud against the plaintiffs was complete upon their agreement to execute a commutation fraudulently manufacturing "paid losses" to create a false liability against the LDG Facilities. When litigated, the proof at trial will focus on the defendants' intent and conduct - on their bad faith negotiation practices, their concealing of material facts, and their seeking to wrongfully enrich themselves at the expense of plaintiffs - and not on matters of contract interpretation and performance. Moreover, the commutation was structured to insulate AIG Inc. and Trenwick and their assets from the arbitrator's authority. The power to compensate the plaintiffs for defendants' wrongdoing or vindicate society's interests in deterring and punishing the manufacture of fraudulent insurance claims is not within the arbitration's narrow scope.

Defendants' lack of standing in the AIG Subsidiaries Arbitration is fatal to the subject matter jurisdiction of this Court. For the reasons set forth herein and substantiated below, plaintiffs move this Court to remand this action to the Superior Court of Massachusetts.

## Factual Background And Proceedings

1.    Plaintiffs are members of the LDG Facilities, reinsurance pools under the management of LDG Reinsurance Corporation ("LDG") that entered into a fronting arrangement with defendant Trenwick. Compl. ¶¶ 25, 26. Their agreement provided for plaintiffs to indemnify valid losses paid by Trenwick under reinsurance contracts it entered with primary insurers, including certain contracts (the "Trenwick-AIG Subsidiary Contracts") running between Trenwick and the AIG Subsidiaries. *Id.* ¶37, 39. Although never fully executed, the parties do not dispute that Trenwick and the plaintiffs performed their respective roles in this arrangement substantially as embodied in the QSA.[9]

2.    In July 2005, the plaintiffs filed an action in the Superior Court of Massachusetts The Complaint asserts tort claims sounding in fraud, civil conspiracy, aiding and abetting breach of fiduciary duty, and tortious interference with contractual relations, as well as unfair and deceptive acts in violation of Massachusetts G.L. §93A. The factual allegations set out in detail how AIG Inc. and Trenwick manipulated the QSA fronting arrangement to create false recoverables against the LDG Facilities members. The focus of the claims is defendants' intent and conduct: their bad faith negotiation practices (*id.* ¶¶61, 64, 66-69, 71), concealing of material facts (*id.* ¶¶54-57, 77-80, 84), and efforts to wrongfully enrich themselves at plaintiffs' expense. *Id.* ¶¶ 66, 76, 82, 90.

## AIG Inc. Is A Defendant In Its Own Name

3.    The named defendants in this litigation are American International Group and Trenwick American Reinsurance Company. As set forth in the Complaint:

---

[9]    Trenwick became a fronting member of the LDG Facilities as successor-in-interest to Chartwell Reinsurance Company ("Chartwell"). Although a principle proponent of the QSA, Chartwell never actually signed the agreement after certain of the plaintiffs rejected the QSA as drafted. *Id.* ¶35. The plaintiffs do not deny having entered a fronting arrangement with Chartwell and its successor-in-interest Trenwick, but the rights of remote parties to rely on contract rights equitably implied should be given close scrutiny by the Court.

- Defendant "Trenwick America Reinsurance Company" is defined as "an insurance company domiciled in Connecticut." *Id.* ¶23.

- Defendant "American Insurance Group" as "an insurance holding company with registered offices in New York, New York" and "the parent of various insurance company subsidiaries." *Id.* ¶24.

4.     Defendant AIG Inc. is a corporation validly existing under the laws of Delaware and headquartered at 70 Pine Street, New York New York. Its shares are publicly traded on the New York Stock Exchange and on one or more international exchanges. According to its 2004 Annual Report, AIG Inc. has approximately 60,000 common shareholders. T-6: Corporate Documents. On information and belief, AIG Inc. is engaged solely in the business of holding and managing its investments in more than 200 subsidiaries. It is not recorded in industry resources as a licensed insurer, insurance agent or broker, reinsurance intermediary, insurance adjuster, managing general underwriter, managing general agent or as any other regulated entity, other than an insurance holding company, under the insurance laws of any state. Nor has AIG Inc. made representations in its papers as to the posting of surety bonds, letters of credit or other security under any state's reinsurance regulations.

5.     The Complaint alleges specific actions taken by AIG Inc., under the control of and through its senior officers and management, including, *inter alia*:

- AIG Inc. "on information and belief, knew the reported workers' compensation and other claims of its insurance subsidiaries were grossly inflated. In a deliberate strategy to avoid having to disclose the improper claims accounting practices of its subsidiaries, AIG itself responded to LDG's request to verify purported losses by taking actions that threatened Trenwick's solvency." Compl. ¶55.

- "[L]ess than two weeks after receiving LDG's audit request, AIG Associate General Counsel Eric S. Kobrick sent a formal demand letter to LDG" *Id.* ¶56.

- "On information and belief, the Commutation was negotiated by and under the direction of Christian Milton, AIG Vice President of Reinsurance." *Id.* ¶74.

- The Commutation Agreement was signed by a Vice President of AIG [Christian

Milton] and by Jane Byrne, AIG Assistant General Counsel. *Id.* ¶73.

6.    In an April 15, 2003 memorandum to M.R. Greenburg, then-Chairman of AIG Internal, Milton reports on progress toward securing the Trenwick commutation, with promises to keep the AIG Chairman apprised. T-7: April 15 Memorandum at 1.

7.    Defendants do not dispute that AIG Inc. employees negotiated the underlying commutation giving rise to the "paid losses" presented to plaintiffs for reimbursement under the QSA. T-5: AIG Companies Status Sbms. at 2.  Nor do defendants dispute that the non-recourse[10] promissory note by which AIG Inc. provided financing for the commutation runs from Trenwick "to the order of AMERICAN INTERNATIONAL GROUP, INC." *Id.* at 3; T-2.

## The Arbitration Is Brought By AIG Subsidiaries As Trenwick's Assignees

8.    It is undisputed that the parties to the Commutation Agreement are Trenwick and "American International Group, Inc. on behalf of its member and associated companies, including but not limited to those companies listed on Exhibit A [t]hereto,"[11] T-2 at 1. *See also:*

- The Commutation Agreement is executed by "American International Group, Inc. on behalf of its members and associated companies." ; T-2: Commutation Agmt. at 10.    **REDACTED**

- Paragraph 6(a) of the Commutation Agreement by its terms provides for Trenwick to assign all its "rights, title and interest" in the recoverables arising from the [QSA]" to "American International Group Inc. on behalf of its members and associated companies."[12]                    ; T-2: Commutation Agmt ¶6(a)    **REDACTED**

---

[10]    T-8: Promissory Note §4 ("the principal and interest due on this Note ... are not general obligations" of Trenwick, and grants no recourse against Trenwick assets other than those rights against the LDG Facilities assigned under the Commutation Agreement).

[11]    Exhibit A to the Commutation Agreement lists 30 separately incorporated insurance subsidiaries of AIG Inc.

[12]

**REDACTED**

(continued...)

7

9.

**REDACTED**

- 

- 

- 

10.

**REDACTED**

- 

- 

_____

(continued...)

**REDACTED**

271288.1

NYCLIB01/NYKM/87480.01

Lovells

### The Scope Of The Arbitration Is Narrow

11.        **REDACTED**

The QSA's narrow arbitration clause provides, in pertinent part:

> As a condition precedent to any right of action hereunder, any dispute or difference hereunder arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration.

**REDACTED**

### ARGUMENT

#### I.        ARBITRABILITY IS A THRESHHOLD ISSUE BEFORE THIS COURT

Defendants invoke the jurisdiction of this Court under section 203 of the Federal Arbitration Act ("FAA") on grounds that the "subject matter" of the litigation "relates to an arbitration agreement ... falling under" the New York Convention on the enforcement of international arbitration awards. [13] Removal Notice ¶¶3 & 4; 9 U.S.C. §§203, 205. However, the law sets a much higher bar than defendants' imply. In the First Circuit, courts adhere to "first principles":

---

[13]        Plaintiffs do not dispute that one or more of the seventeen named plaintiffs in this action is a reinsurance company domiciled outside of the United States.

"'[a]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Intergen*, 344 F.2d at 142, *quoting United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574 (1960). Where arbitrability of claims determines subject matter jurisdiction, as it does here, the question of whether the specific parties agreed to arbitrate a particular dispute is a threshold question that must be determined by the Court. *Intergen*, 344 F.3d at 142.

Under these principles, the defendants cannot invoke arbitration rights under the AIG Subsidiaries Arbitration or the jurisdiction of this Court without establishing not only that (1) the QSA is a valid agreement to arbitrate (2) binding on the plaintiffs as members of the LDG Facilities, but also (3) that each of AIG Inc. and Trenwick is entitled to invoke rights under the QSA, and further, (4) that plaintiffs' litigation claims sounding in fraud, conspiracy, deceit and wrongful acts fall within the narrow scope of the QSA arbitration clause. *Id.* (applying Chapter 2 of the FAA to international parties). As will be shown in detail below, nothing in the QSA supports a finding that Trenwick or AIG Inc. - each no more than a third-party interloper to an arbitration agreement fully engaged by parties already before the Arbitration panel - can meet these last criteria by bringing themselves or the claims against them within the ambit of the QSA arbitration clause.

Moreover, defendants cannot use federal arbitration policy to manufacture standing. *See* AIG Inc. MOL at 7-9, incorporated at Trenwick MOL at 1-2. Policies favoring enforcement of arbitration contracts do not extend to circumstances such as these where the identities of the parties, the scope of agreement, or other threshold issues are in dispute. *Intergen*, 344 F.3d at 150. "[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, or by any parties, that are not already covered in the [arbitration] agreement."[14] *EEOC v. Waffle House*, 534 U.S. 279,

---

[14]    Congress intended passage of the FAA to "'make[] arbitration agreements as enforceable as other contracts, *but not more so.*'" *Id.* at 294  (emphasis added).

289, 294 (2002). Nonparties are not bound by and cannot invoke arbitration clauses. *Id* at 294, *Intergin,* at 143; *Loeber Indus. of Calif. v. Los Angeles Printworks,* 803 F.2d 523 (9th Cir. 1986). Nor does the FAA expand the range of claims subject to arbitration beyond what the parties agreed. *Waffle House,* 534 U.S. at 289. The Court cannot override the QSA simply because a policy favoring arbitration may be implicated. *Id.*

Neither Trenwick nor AIG Inc. can meet the burden to establish standing to arbitrate under the QSA. Plaintiffs respectfully submit that this failing destroys federal subject matter jurisdiction under 9 U.S.C. §203 and the litigation must be remanded to the Massachusetts Superior Court.

## II.     NEITHER TRENWICK NOR AIG INC. IS ENTITLED TO INVOKE THE QSA

"[C]ourts should be extremely cautious about forcing arbitration in situations in which the identity of the parties who have agreed to arbitrate is unclear." *Intergen,* 344 F.3d at 142

### A.     Trenwick Cannot Rely On Arbitration Rights Assigned To Others

Trenwick cannot invoke the arbitration clause in the QSA to obtain standing in the AIG Subsidiaries Arbitration because it contracted to assign away any rights it had to arbitrate with respect to the "paid losses" ceded to the LDG Facilities under the Trenwick-AIG Subsidiary Contracts. Statement of Facts ("SF") ¶8.

Under the terms of the Commutation Agreement it executed, Trenwick contracted to assign all "rights, title and interest" in any "recoverables" arising under the QSA with respect to paid losses on the Trenwick-AIG Subsidiary Contracts to "American International Group on behalf of its member and associated companies." SF¶8.

# REDACTED

By analogy the contract's assignment of

"recoverables" would appear an assignment for "money due,"[15] - it is black letter law that a party who takes valid assignment on "all rights, title and interest" in money due becomes the real party in interest in any proceedings seeking payment. *Banque de Paris et des Pays-Bas v. Amoco Oil,* 573 F. Supp. 1464, 1469-74 (S.D.N.Y. 1983). The debt comes to the assignee subject to defenses, and also subject to the any bargained-for rights to arbitrate. *Id.* Conversely, all such rights in the party giving the assignment are extinguished.

Trenwick is estopped from denying the legal effect of this assignment on its right to arbitrate in this matter against these plaintiffs. Estoppel precludes a party from enjoying rights and benefits under a contract while at the same time avoiding its burdens and obligations. *Intergen,* 344 F.3d at 145. Trenwick has never repudiated the Commutation Agreement. To the contrary, it has accepted substantial financial benefits from its bargain. Under the Commutation Agreement, Trenwick's obligations to the AIG Subsidiaries under the Trenwick-AIG Subsidiaries Contracts was cancelled without further recourse against Trenwick. T-2: Commutation Agmt. at ¶¶2, 7. AIG Inc. MOL at 3 (commutation had effect of canceling Trenwick's reinsurance obligations to AIG Subsidiaries). Moreover, Trenwick's repeated ratification of the Commutation Agreement has come at the expense of the plaintiffs.

**REDACTED**

---

[15] The analogy has limits. Ordinarily money due suggests a settled or readily settlable amount of money which has not yet been paid, such as a receivable from goods sold or provided to a customer. Rupp's Insurance & Risk Management Glossary at 379. However, the "recoverables" at issue in this matter involve actuarial calculations of IBNR, *i.e.,* an estimated present-day value for insurance losses "incurred but not yet reported." The inherently speculative nature of such amounts makes them potentially unsuitable for assignment under "money due" principles.

271288.1

NYCLIB01/NYKM/87480.01                                                                              Lovells

REDACTED        further benefit to Trenwick – which stands now as a third-party to the QSA - would be inequitable.

Trenwick has bargained away its rights to arbitrate under the QSA in exchange for relief from the AIG Subsidiaries' claims against it. Its claim also to be unavailable for judgment before the courts for its wrongs against the plaintiffs cannot be sustained.

### B.    AIG Inc. Is Not A Party To The QSA

Unlike Trenwick, AIG Inc. has never been a party to the QSA. It is not a signatory to the QSA, it was never intended to be a signatory to the QSA, and it has never met obligations as a Facilities member under the QSA. T-4: QSA. AIG Inc. cannot rely on the equitable rights that benefit an original party that failed to sign and yet performed. *Intergen,* 344 F.3d at 145; *Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F. Supp. 853, 866 (D.N.J. 1992). Nor does AIG Inc. fall within the law that gives agent employees standing to arbitrate under the rights of a principal. *See, e.g.,Schar v. Bear Sterns & Co., Inc.,* 723 F. Supp. 211, 217 (S.D.N.Y. 1987) (account executive covered by employers arbitration clause regarding trading accounts)..[16]

In fact, AIG Inc.'s papers before this Court do not articulate any grounds for finding the holding company itself has any standing to arbitrate issues as to its own interests under the QSA. Rather, to claim standing this defendant has taken up the guise of presenting itself to the Court as an alter-ego of its subsidiaries – *i.e.,* the "the relevant members and associated companies of American International Group, Inc. ('AIG')." *See,* discussion *supra* at 2-3. On the facts, however, and as a matter of corporations law, AIG Inc.'s gambit must fail.

AIG Inc. is not an unincorporated association sharing rights, obligations and liabilities across its "members and associated companies." AIG Inc. is a corporation. It is duly organized

---

[16]    Should AIG Inc. seek to make an argument that it is entitled to arbitration rights

under the laws of the state of Delaware and registered to do business in New York as a corporate

headquarters and holding company. It has more than 60,000 public shareholders and its shares are

traded on the New York and international stock exchanges. SF¶4. AIG Inc. cannot simply

disregard its own corporate veil to obtain arbitration rights under contracts entered for the benefit of

the AIG Subsidiaries. *Intergin,* 344 F.3d at 150 (citing strong public policy considerations deferring

to principles of corporate law as superior to policy favoring arbitration); *see also Dayhoff v. H.J.*

*Heinz Company,* 86 F.3d 1287, 1296 (3d Cir.) (a non-signatory parent corporation cannot 'by reason

of their corporate relationship' enforce an arbitration clause signed by a wholly owned subsidiary

absent an agreement to that effect), *cert denied,* 513 U.S. 1028 (1996). In the words of the First

Circuit:

> Both [Plaintiff] and [Defendant] are sophisticated commercial actors, and
> each has been quite deliberate in constructing and deploying an elaborate
> web of affiliates to handle the [transaction]. As a result of these
> posturings, neither of them is a signatory to the underlying contracts. ...
> [W]e find unpersuasive [Defendant's] myriad arguments as to why
> [Plaintiff] should nonetheless be bound to the arbitration clauses
> contained in those contracts. Therefore, the claims asserted by [Plaintiff]
> in its amended complaint are not subject to compulsory arbitration.

*Intergen,* 344 F.3d 150; *see also Westmoreland v. Sadoux,* 299 F.3d 462, 467 (5th Cir. 2002) (where

parent company for reasons advantageous to itself, elects not to enter as a party an arbitration

agreement the courts should not offer agreement's protections after trouble arrives).

Here, AIG Inc. is a highly sophisticated holding company with more than 200 subsidiaries

engaged in various financial and insurance businesses. SF¶4. In the commutation papers, drafted

no doubt with the heavy input of AIG Inc. counsel, the holding company and its assets are quite

deliberately isolated from either obligations or potential liabilities. AIG Inc. did not execute a

single document in the transaction on its own behalf. It appears only once in that capacity - as the

beneficiary of the Trenwick Promissory Note - a document not requiring its signature because AIG

14

incurred no obligation.[17] By contrast, the AIG Subsidiaries are the transaction's active counterparty – taking assignment of the "recoverables" from Trenwick

**REDACTED**

**REDACTED**
It is because of this maneuvering, which would appear designed (among other things) to shield AIG Inc. assets from the arbitration panel's authority, that AIG Inc cannot possibly be an assignee through commutation of Trenwick rights under the QSA[18]. Although it controlled the commutation, AIG Inc. chose not to deal itself in to the arbitration. Under First Circuit law, AIG Inc. will not be heard to pierce its own veil to invoke those arbitration rights now. *Intergen*, 344 F.3d at 150.

In the final analysis, the demand of AIG Inc., as a third-party nonsignatory, to arbitrate under the QSA cannot be honored in the absence of clear intent of the contracting parties reflected in the plain language of their agreement. "Special clarity" is required for any finding that contracting parties intended to confer benefits on third parties creating standing to arbitration. *Intergin*, 344 F.3d at 146. There is nothing in the four corners of the QSA to indicate that any of the LDG Facilities reinsurers intended to confer benefits of any kind on parent holding companies of primary insurers who contracted for reinsurance with a fronting member.

To the contrary, the contract by its terms and function anticipates relationships that under industry custom and practice assign to fronting members like Trenwick a gatekeeper role in controlling risks flowing into the pool from third parties such as AIG Inc. T-4: QSA art. II (definitions of "subject business" of "reinsurance and/or retrocessions" presupposes entry of

---

[17] Without discovery, plaintiffs do not know if these paper transactions resulted in any commitment of actual funds, as opposed to book entries wiping out insurance obligations and replacing it with non-recourse debt.

[18] To the extent AIG Inc. seeks to exploit any ambiguities in the term "American International Group, Inc. on behalf of its members and associate companies," courts in the First Circuit apply the principle of *contra preferentem* when determining standing for arbitration purposes. *See Paul Revere Variable Annuity Ins. Co. v. Kirschofer*, 226 F.3d 15, 25 (1st Cir. 2000).

271288.1

NYCLIB01/NYKM/87480.01

Lovells

"reinsurance contracts" among "insurers" and "reinsurers"); *see also* Ostrager, *supra,* § 3.01 (reinsurance relationship assumes a large area of common interest and the tradition of utmost good faith); Compl. ¶¶38-47. Moreover, it must be recognized as highly improbable that reinsurers would risk regulatory sanction by extending contract benefits to an entity that engages in activities in substance equivalent to doing what insurers do in a manner seemingly designed to avoid submitting to regulation. The activities from which AIG Inc. seeks to acquire standing to arbitrate under the QSA – *i.e.,* negotiating a commutation giving rise to assignment of claims for reinsurance indemnification – skirts too close to doing the business of insurance without a license or in a manner intended to evade regulation for the LDG Facilities members to see AIG Inc. as a proper party to any right under a retrocessional agreement. This same reasoning renders it inappropriate to impose a contract relationship between these. 15 U.S.C. §1012 (FAA not construed to impair state regulation of insurance industry).

AIG Inc. cannot meet the burden of showing itself entitled to invoke the arbitration provisions of the QSA. The failure of defendants to establish standing is fatal to the Court's subject matter jurisdiction, and requires remand to the Massachusetts Superior Court.

## III.    THE QSA'S NARROW ARBITRATION CLAUSE DOES NOT REACH FRAUD

Even were the Court to find that AIG Inc. and Trenwick have met their burden in establishing party rights to arbitrate under the QSA, the agreement's narrow arbitration clause does not cover the fraud, conspiracy and related tort claims asserted in the Complaint. *Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F. Supp. 853, 872 (D.N.J.) (clause substantially identical to QSA held too "narrow" to reach tort claims arising out of scheme to defraud reinsurance pool members), *aff'd* 970 F.2d 899 (3d Cir. 1992).

In *Zimmerman* - a decision notably missing from defendants' briefings – members of a

reinsurance pool brought claims alleging fraud, RICO violations, civil conspiracy and tortious interference with fiduciary duties arising out of a scheme among the pool manager and various insurance intermediaries to manufacture commissions by improperly committing the pool to questionable reinsurance risks. 783 F. Supp. at 872-73. Defendants sought to compel arbitration. The pool management agreement contained an arbitration clause substantially identical to that found in the QSA:

> As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or [other] effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration ...

*Id.* at 870.(bracketed term "other" not in QSA.  T-4: QSA art. XI).

In the first step of its carefully reasoned analysis, the court considered the effect of the clause's multiple "*words of limitation*," including "[a]s a condition precedent to any right of action hereunder," "with reference to the interpretation, application, or other effect of this agreement," and "arising with reference to," as well as the "omit[ting] of any reference to disputes 'relating to' the agreement." *Id.* at 870, 872 (emphasis added) (collecting cases construing terms). The court found that, taken in its entirety, "the language of the arbitration clause is narrow and the parties did not intend to arbitrate all and any disputes." *Id.* at 872. Only breach of contract claims and issues involving the interpretation or performance of the agreement itself fall within the clause's narrow purview and are arbitrable. *Id.*

The *Zimmerman* court's carefully reasoned analysis construing the entire arbitration clause to determine the parties' intent from their chosen terms stands in stark contrast to the selectively edited parantheticals on which defendants ask this Court to rely.  First, none of the cases defendants cases actually interpret the arbitration clause found in the QSA.  Second, the cherry-picking of words and phrases does not convey the analysis of the cited case law, which often gives little

support to defendants' expansive reading of the QSA provision when the entire arbitration clause and the court's holding are paired.[19] Finally, the vast majority of defendants' citations post-date the negotiation of the QSA by years. The *Zimmerman* interpretation, however, speaks directly to the contracting parties' understanding and intention in incorporating this particular arbitration clause into their written agreement(s). The Zimmerman Lines fraud, on which the litigation in question was based, was a significant event in reinsurance circles and was widely reported in the industry press. *See, New York Life Successful in Claim Against Reinsurer,* CIVIL RICO REPORT, Sept. 16, 1996 (reporting on RICO and conspiracy counts); Steven P. Bann, *Arbitration-Insurance,* NEW JERSEY LAW JOURNAL, Mar. 23, 1992 at 59 ("claims for fraud, RICO violations, conspiracy and tortious interference do not involve rights under the agreement"). Individuals charged with drafting the QSA in 1997 reasonably can be presumed to have known of the case and the court's holding, and to have incorporated the arbitration clause into the QSA with the expectation it would continue to be construed narrowly.  .

In the second step of its analysis, the *Zimmerman* court applied the terms of the arbitration clause to the factual allegations in the case. The court found the plaintiffs' "rights of action" in fraud, RICO and conspiracy did not "arise under the management agreement" and thus were not arbitrable. *Id.* Even conceding that the pool manager was bound by the management agreement and the defendants' fraudulent scheme involved manipulation of risks accepted under the

---

[19]    *See, e.g., Int'l Brotherhood of Elec. Wkrs. v. Freedom WLNE-TV, Inc.,* 760 F.2d 8, 11 (1st Cir. 1985) (scope: "[a]ll problems arising out of grievances or the application or interpretation of this agreement or the performance of any party hereto"; holding: "reflects the parties' agreement to arbitrate any disputes involving construction of the substantive provisions of the contract"); *Coors Brewing Co. v. Molson Brewer,* 51 F.3d 1511, 1515-17 (10th Cir. 1995) ("any dispute arising in connection with the implementation, interpretation or enforcement" of the agreement; comprehensive terms "implementation" and "enforcement" cover antitrust disputes that turn on specific provisions in licensing agreement, but not those regarding market concentration); *Depreynl Animal Health Inc. v. U. of Toronto Innovations Foundation,* 297 F.3d 1343, 1358 (Fed. Cir. 2002) ("In the event a disagreement shall, from time to time, arise between the parties in connection with the interpretation, application or affect of this Agreement"; "it is uncertain whether the issue of [patent] validity falls within the scope of what the parties agreed to arbitrate" but "[t]hat is an issue for the Canadian courts to determine").

271288.1

NYCLIB01/NYKM/87480.01                                                                                                    Lovells

management agreement, the court found that the focus of the tort claims was not on the terms of the agreement, but rather on the defendants' concealment, deception, "intent and conduct as part of [a] complex scheme to enrich themselves to the detriment of the ...Pool Members." *Id.* at 872-73.

Using this same standard to evaluate the arbitrability of the LDG Facility members' rights of action against AIG Inc. and Trenwick, it is clear that fraud and related tort claims brought by plaintiffs here do not fall within the scope of the QSA's narrow arbitration clause

- The complaint brings causes of action against AIG Inc. in common law fraud, conspiracy, aiding and abetting breach of fiduciary duty, and statutory deceit based on AIG Inc.'s wrongful acts beginning as early as April 2003 in adopting a deliberate strategy to avoid disclosure of its subsidiaries' grossly inflated insurance claims and to further convert those claims into recoverables. No contract existed between the plaintiffs and AIG Inc. during any period leading up to the commutation (or thereafter). These allegations raise issues of concealment, deception, "intent and conduct," and not of interpretation or performance under the QSA. Compl. ¶¶54-60.

- G.L. c.93A §11 recognizes, *inter alia,* abuse of negotiation as grounds for an action claiming unfair and deceptive acts. The Complaint's multiple allegations as to AIG Inc.'s obstructionist and bad faith behavior in collusion with Trenwick does not arise out of the interpretation of or performance under the QSA. Compl. ¶¶61-66, 71-73.

- The Complaint alleges that Trenwick, aided and abetted by AIG Inc. exploited its role as fronting member for the LDG Facilities to create a false liability against the Facilities which Trenwick then used as security on a promissory note in exchange for which Trenwick procured cancellation of more than $70 million in obligations to the AIG Subsidiaries. The conversion of a principal's assets to an agent's benefit, and the aiding and abetting in that endeavor, does not arise out of interpretation of or performance under the QSA. Compl. ¶¶67, 74-83.

**REDACTED**

Moreover, trial of defendants' wrongdoing can not only compensate the plaintiffs for defendants' wrongdoing, but can also vindicate society's substantial interests in deterring and punishing those who engage in fraudulent activities in the insurance business. *See, e.g, Waffle House*, 534 U.S. at 294-95 (punitive damages available outside the context of arbitration "serve an obvious public function in deterring future violations").

For each of the reasons set forth above, plaintiffs' claims against the defendants Trenwick and AIG Inc. as set forth in the Complaint do not fall within the narrow arbitration clause of the QSA and are not arbitrable

## CONCLUSION

Defendants cannot meet the burden set by the First Circuit for asserting rights to arbitration under an agreement. Neither AIG Inc. nor Trenwick has standing to invoke the arbitration clause of the QSA. Moreover, the QSA arbitration clause is narrow and does not reach the claims asserted in the Complaint. The lack of arbitrable issues deprives this Court of subject matter jurisdiction. For each of these reasons. plaintiffs respectfully request this Court remand this action to the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session.

By their attorney,

*Steven L. Schreckinger / eR*
Steven L. Schreckinger (BBO #447100)
PALMER & DODGE LLP
111 Huntington Avenue at Prudential Center
Boston, MA  02199-7613
617.239.0100

Dated: October 13, 2005

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on _____
_____

**REDACTED**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN REINSURANCE COMPANY, *et al.*, | : | |
| Plaintiff, | : | Civil Action No. 05-11840-MLW |
| V. | : | |
| AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICAN REINSURANCE CORPORATION | : | |
| | : | |
| Defendants. | : | |

**AFFIDAVIT OF STEVEN L. SCHRECKINGER IN SUPPORT OF
PLAINTIFFS' MOTION FOR REMAND
TO THE SUPERIOR COURT OF MASSACHUSETTS**

STATE OF MASSACHUSETTS )
                        ) ss:
SUFFOLK COUNTY          )

I, Steven L. Schreckinger, declare as follows:

1.    I am an attorney admitted to practice before this Court, and a Partner in Palmer & Dodge LLP, counsel for Plaintiffs American Reinsurance Company, *et al.* I am fully familiar with the matters stated herein based on personal knowledge or review of files in the possession of my firm. I submit this affidavit in support of Plaintiffs' Motion for Remand to the Superior Court of Massachusetts.

2.    Plaintiffs rely upon the following true and correct copies of documents in support of the Motion:

| | |
|---|---|
| **Tab 1:** | Complaint dated July 6, 2005; |
| **Tab 2:** | LDG Pool Commutation, Settlement and Release Agreement dated June 30, 2004; |
| **Tab 3:** | Initial Position Statement for AIG Companies dated July 22, 2005; |

**Tab 4:**            Quota Share Retrocessional Agreement by and among Chartwell Reinsurance Company and the Retrocessionaires whose names and interests appear in the interests and liabilities endorsement dated July 1, 1997;

           Quota Share Retrocessional Agreement by and among Chartwell Reinsurance Company and the Retrocessionaires whose names and interests appear in the interests and liabilities endorsement dated May 1, 1997;

**Tab 5:**            AIG Companies' Submission on the Status of American International Group, Inc. dated October 8, 2005;

**Tab 6:**            Corporate Records and Business Registrations for American International Group, Inc.

**Tab 7:**            Memorandum from Christian Milton to M.R. Greenberg dated April 15, 2003;

**Tab 8:**            Promissory Note of Trenwick America Reinsurance Corporation dated June 30, 2004; and

**Tab 9:**            Respondents and Counter-Petitioners' Preliminary Statement in support of their position in the arbitration with various AIG Subsidiaries.

Signed under the pains and
Penalties of perjury,

*Steven L. Schreckinger / OR*

Steven L. Schreckinger (BBO # 447100)
Palmer & Dodge LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Dated: October 13, 2005

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail (by hand) on _____

*Doug M*    *Steven L. Schreckinger*

Tab 1

COMMONWEALTH OF MASSACHUSETTS

Suffolk, ss.

Superior Court
Civil Action No. 05-

05-2788-*BLS*

---

American Reinsurance Company; American
United Life Insurance Company; Dorinco
Reinsurance Company; First Allmerica
Financial Life Insurance Company; Guardian
Life Insurance Company of America; Hartford
Life Insurance Company; Houston Casualty
Company; John Hancock Life Insurance
Company (U.S.A.); Insurance Corporation of
Hannover; Monumental Life Insurance
Company; Pan American Life Insurance
Company; Phoenix Life Insurance Company;
Reliance Standard Life Insurance Company;
Reliastar Life Insurance Company; Sun Life
Assurance Company of Canada; Swiss Re Life
& Health America; and Transamerica
Occidental Life Insurance Company,

Plaintiffs,

v.

American International Group and Trenwick
America Reinsurance Corporation,

Defendants.

---

## COMPLAINT

1.      The plaintiff insurance companies are all members of reinsurance facilities

managed in Massachusetts that provided insurance to defendant Trenwick America Reinsurance

Corporation ("Trenwick") to cover the risk of losses on contracts of reinsurance ostensibly

"fronted" by Trenwick on their behalf, including reinsurance contracts Trenwick issued to various

subsidiaries of defendant American International Group ("AIG"). Working in collusion with

Trenwick, AIG has wrongfully manipulated this arrangement to create almost $73 million in

181239.5

improper demands for coverage against the plaintiffs as part of a pattern of unfair, deceptive and fraudulent practices by AIG involving the workers' compensation, occupational accident and industrial aid claims of a number of AIG insurance company subsidiaries.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under G.L. c. 212, § 4 (general jurisdiction), G.L. c. 93A, § 11 (unfair and deceptive trade practices) and c. 231A, § 1 (declaratory judgments). This Court has personal jurisdiction over the defendants, AIG and Trenwick, under G.L. c. 223A, § 3 and otherwise, because they each transacted business or caused tortious injury by an act or omission in the Commonwealth.

3.      Venue is proper in this Court under G.L. c. 223, § 1 because one of the plaintiffs, John Hancock Life Insurance Company (U.S.A.), maintains its principal place of business in Boston, Massachusetts.

## PARTIES

**Plaintiffs**

4.      Plaintiff American Reinsurance Company ("Am Re") is a professional reinsurer domiciled in Delaware and licensed to conduct business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of G.L. c. 93A, AIG has made demand against Am Re on false claims for reinsurance coverage. On November 23, 2004, AIG sent Am Re an improper demand in the amount of $2,485,602, by reason of which Am Re has been damaged.

5.      Plaintiff American United Life Insurance Company ("American United") is an insurance company domiciled in Indiana and licensed to conduct business in Massachusetts. American United received over $36 million in premium and annuity considerations in 2004 from

business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against American United on false claims for reinsurance coverage. On November 23, 2004, AIG sent American United an improper demand in the amount of $5,125,459, by reason of which American United has been damaged.

6.    Plaintiff Dorinco Reinsurance Company ("Dorinco") is a licensed insurance company domiciled in Michigan. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Dorinco on false claims for reinsurance coverage. On November 23, 2004, AIG sent Dorinco an improper demand in the amount of $448,261, by reason of which Dorinco has been damaged.

7.    Plaintiff First Allmerica Financial Life Insurance Company ("First Allmerica") is an insurance company domiciled in Massachusetts with its main office in Worcester, Massachusetts. First Allmerica is licensed to conduct business in Massachusetts and received over $2 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against First Allmerica on false claims for reinsurance coverage. On November 23, 2004, AIG sent First Allmerica an improper demand in the amount of $20,501,035, by reason of which First Allmerica has been damaged.

8.    Plaintiff Guardian Life Insurance Company of America ("Guardian") is an insurance company domiciled in New York and licensed to conduct business in Massachusetts. Guardian operates in Massachusetts through a subsidiary and through two administrative offices. Guardian received over $235 million in premium in 2004 from business conducted in

181239.5

3

Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other

torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Guardian on

false claims for reinsurance coverage. On November 23, 2004, AIG sent Guardian an improper

demand in the amount of $2,762,546, by reason of which Guardian has been damaged.

9.    Plaintiff Hartford Life Insurance Company ("Hartford") is an insurance company

domiciled in Connecticut and licensed to conduct business in Massachusetts. Hartford received

approximately $185 million in premium in 2004 from business conducted in Massachusetts. In

collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the

plaintiffs, and in violation of c. 93A, AIG has made demand against Hartford on false claims for

reinsurance coverage. On November 23, 2004, AIG sent Hartford an improper demand in the

amount of $4,024,509, by reason of which Hartford has been damaged.

10.    Plaintiff Houston Casualty Company ("HCC") is an insurance company

domiciled in Texas and operating on a surplus lines basis in Massachusetts. HCC received over

$10 million in premium in 2004 from business conducted in Massachusetts. In collusion with

Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in

violation of c. 93A, AIG has made demand against HCC on false claims for reinsurance

coverage. On November 23, 2004, AIG sent HCC an improper demand in the amount of

$57,361, by reason of which HCC has been damaged.

11.    Plaintiff Insurance Corporation of Hannover ("ICH") is an insurance company

domiciled in Illinois and licensed to conduct business in Massachusetts. ICH operates, in part,

through an agent located in Lowell, Massachusetts. ICH received over $2.5 million in premium

in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful

scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has

made demand against ICH on false claims for reinsurance coverage. On November 23, 2004, AIG sent ICH an improper demand in the amount of $2,608,329, by reason of which ICH has been damaged.

12.    Plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), the successor through merger to Facility member The Manufacturer's Life Insurance Company (U.S.A.) ("Manulife"), is an insurance company domiciled in Michigan with its main office in Boston, Massachusetts. John Hancock is licensed to conduct business in Massachusetts and received over $45 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Manulife on false claims for reinsurance coverage. On November 23, 2004, AIG sent Manulife an improper demand in the amount of $6,765,043, by reason of which John Hancock, as successor-in-interest to Manulife, has been damaged.

13.    Plaintiff Monumental Life Insurance Company ("Monumental") is an insurance company domiciled in Maryland and licensed to conduct business in Massachusetts. Monumental received over $12 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Monumental on false claims for reinsurance coverage. On November 23, 2004, AIG sent Monumental an improper demand in the amount of $73,563, by reason of which Monumental has been damaged.

14.    Plaintiff Pan American Life Insurance Company ("Pan American") is an insurance company domiciled in Louisiana and licensed to conduct business in Massachusetts.

Through its agents in Massachusetts, Pan American received over $500,000 in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Pan American under false claims for reinsurance coverage. On November 23, 2004, AIG sent Pan American an improper demand in the amount of $72,885, by reason of which Pan American has been damaged.

15. Plaintiff Phoenix Life Insurance Company, formerly Phoenix Home Life Mutual Insurance Company ("Phoenix Life"), is an insurance company domiciled in New York and licensed to do business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Phoenix Life under false claims for reinsurance coverage. On November 23, 2004, AIG sent Phoenix Life an improper demand in the amount of $2,713,228, by reason of which Phoenix Life has been damaged.

16. Plaintiff Reliance Standard Life Insurance Company ("RSL") is an insurance company domiciled in Illinois with an office in Boston, Massachusetts. RSL is licensed to do business in Massachusetts and received over $22 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against RSL on false claims for reinsurance coverage. On November 23, 2004, AIG sent RSL an improper demand in the amount of $4,046,533, by reason of which RSL has been damaged.

17. Plaintiff Reliastar Life Insurance Company ("ING") is an insurance company domiciled in Minnesota. ING is licensed to conduct business in Massachusetts and maintains an office in Boston, Massachusetts. ING received over $60 million in premium and annuity

considerations in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against ING on false claims for reinsurance coverage. On November 23, 2004, AIG sent ING an improper demand in the amount of $225,249, by reason of which ING has been damaged.

18.    Plaintiff Sun Life Assurance Company of Canada ("Sun Life") is domiciled in Ontario, Canada, but has its United States home office in Wellesley Hills, Massachusetts and is licensed to conduct business in Massachusetts. Sun Life received over $63 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Sun Life on false claims for reinsurance coverage. On November 23, 2004, AIG sent Sun Life an improper demand in the amount of $3,573,408, by reason of which Sun Life has been damaged.

19.    Plaintiff Sun Life is also the successor-in-interest by acquisition to Facility member Clarica Life Insurance Company ("Clarica"). In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made demand against Clarica on false claims for reinsurance coverage. On November 23, 2004, AIG sent Clarica an improper demand in the amount of $9,042,784, by reason of which Sun Life as successor-in-interest to Clarica has been damaged.

20.    Plaintiff Swiss Re Life & Health America, Inc. ("Swiss Re") is an insurance company domiciled in Connecticut and licensed to conduct business in Massachusetts. Swiss Re received over $95 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the

181239.5

7

plaintiffs, and in violation of c. 93A, AIG has made demand against Swiss Re on false claims for reinsurance coverage. On November 23, 2004, AIG sent Swiss Re an improper demand in the amount of $4,012,599, by reason of which Swiss Re has been damaged.

21.    Plaintiff Swiss Re is also the successor-in-interest to Facility member Mercantile & General Company ("M&G"). On November 23, 2004, in collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG has made an improper demand (mistakenly addressed to Generali USA Life Reassurance Company as successor to Mercantile and General Life Reassurance Company of America) in the amount of $109,328 representing M&G's proportionate share of the AIG demand against the LDG Facilities, by reason of which Swiss Re has been damaged.

22.    Plaintiff Transamerica Occidental Life Insurance Company ("Transamerica") is an insurance company domiciled in Iowa and licensed to conduct business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG made demand against Transamerica on false claims for reinsurance coverage. On November 23, 2004, AIG sent Transamerica an improper demand in the amount of $195,154, by reason of which Transamerica has been damaged.

**Defendants**

23.    Defendant AIG is an insurance holding company with registered offices in New York, New York. With operations in more than 130 countries and jurisdictions, AIG is the largest commercial and industrial insurance group in the United States. It is the parent of various insurance company subsidiaries, a number of which are licensed to conduct business in Massachusetts. AIG transacted business or caused tortious injury by an act or omission in the Commonwealth.

181239.5

8

24.     Defendant Trenwick (in its own right and as successor-in-interest to Chartwell Reinsurance Company by acquisition in December 2002) is an insurance company domiciled in Connecticut.  Trenwick transacted business or caused tortious injury by an act or omission in the Commonwealth.

## FACTS

### Plaintiffs' Massachusetts Reinsurance Facilities

25.     The plaintiffs are each members of one or more of three groups of reinsurers called "facilities" that were formed by their members to share reinsurance risks underwritten for the facilities by a common managing agent.  The facilities are the Special Risk Reinsurance Facility, the Special Risk Reinsurance Facility II and the Occupational Accident & Health Facility (each, an "LDG Facility;" collectively, the "LDG Facilities").

26.     The managing agent for each of the LDG Facilities is LDG Reinsurance Corporation ("LDG"), formerly known either as SRRF Management Incorporated or LDG Reinsurance Underwriters.  Throughout its existence LDG has been incorporated in Massachusetts and, at all relevant times, has maintained its principal place of business in Wakefield, Massachusetts.

27.     Each of the plaintiffs entered into an agency contract with LDG, called a "participation agreement" (collectively, the "Participation Agreements"), under which they each granted LDG authority to underwrite reinsurance risks, manage claims and undertake accounting activities for the LDG Facilities on their behalf.  Under the Participation Agreements, LDG collected premiums, handled any reported losses and paid claims on behalf of the plaintiffs from its offices in Massachusetts.

9

28.     As the managing agent of the LDG Facilities, LDG was at the center of the relationships among all parties to this action.  In implementing their wrongful scheme to unfairly saddle the plaintiffs with false obligations based on inflated and unsubstantiated reinsurance claims, the defendants prepared and transmitted numerous demand letters, position statements, threats and other communications, and engaged in false and bad faith negotiations, that were intended to be and were received and acted upon primarily and substantially in Massachusetts through plaintiffs' agent LDG.

### LDG Arranges For A "Fronting Member" To Issue Reinsurance For The Facilities

29.     In 1997, LDG, acting as managing agent of the LDG Facilities, arranged for Trenwick's predecessor-in-interest Chartwell Reinsurance Company ("Chartwell") to participate as a member in each of the LDG Facilities.  Chartwell entered into a Participation Agreement by which it took a share of any reinsurance contracts issued by the LDG Facilities and granted LDG authority to underwrite risks, manage claims and undertake accounting activities on its behalf with respect to that reinsurance.

30.     That same year, Chartwell also agreed to act as one of the member "fronting" reinsurers for the LDG Facilities.  As a fronting reinsurer, Chartwell issued reinsurance contracts to third parties such as various AIG insurance company subsidiaries and then reinsured ("ceded") those risks by placing 100% of the risk with one or more of the LDG Facilities in which it participated as a member (the "Fronting Arrangement").  LDG arranged for and managed this Fronting Arrangement from its offices in Wakefield, Massachusetts.

31.     Chartwell negotiated with LDG for a fee of 2.5% of the "gross net reinsurance premiums" for all reinsurance risks that were fronted under the Fronting Arrangement.  This amount was deducted by Chartwell from the premium ceded to the plaintiffs as members of the

LDG Facilities.   Pursuant to the Fronting Arrangement, between 1997 and 2002 the LDG

Facilities paid substantial sums to Chartwell and its successor-in-interest Trenwick.

32.    In an attempt to further formalize its role as fronting member, Chartwell sought to

have LDG recommend that each Facility member enter into a written "fronting agreement" with

Chartwell explicitly authorizing the ceding of Chartwell-fronted reinsurance to the LDG

Facilities.  This agreement, to be governed by Massachusetts law, was known as the Quota Share

Retrocessional Agreement ("QSA") and was designed and intended, once executed, to operate in

conjunction with the Participation Agreements establishing LDG's underwriting and claims

authority.

33.    In a series of letters and other communications between February 1998 and

September 1998, Chartwell directly and through LDG pressed the various plaintiffs to sign the

QSA.  When certain plaintiffs raised concerns about the scope of the authority granted to

Chartwell under the QSA, Chartwell characterized the agreement's provisions as merely

(i) reiterating the authority already granted to LDG by each of the members of the LDG Facilities

under the Participation Agreements and (ii) confirming that the Participation Agreements

allowed the ceding of risks from Chartwell to the LDG Facilities.

34.    To further induce the plaintiffs to sign the QSA, Chartwell often repeated that as a

party to a Participation Agreement, Chartwell had itself granted LDG oversight authority as its

chosen managing agent and that this authority was incorporated by reference in any fronting

contract.  For example, on April 30, 1998, Chartwell's in-house counsel Kathleen M. Carroll

wrote to LDG Facility member Manulife, making the following representations regarding the

relative functions of LDG and the fronting reinsurer under the proposed terms: "Where

Chartwell fronts for the pool, LDG acts as Chartwell's agent and decisions made by LDG are

binding on Chartwell . . .. As a practical matter, LDG will be performing all the actual claims handling as agent for Chartwell." LDG saw this correspondence and agreed with the description provided by Chartwell.

35.    The QSA was never fully executed. Certain of the plaintiffs declined to rely on Chartwell's representations and rejected the QSA as drafted. On information and belief, lacking full participation by the LDG Facility members, Chartwell never signed the QSA.

36.    In December 2002, Trenwick acquired Chartwell by merger and stepped into Chartwell shoes as successor-in-interest to its representations, rights and obligations under the Participation Agreement and the Fronting Arrangement with the LDG Facilities. As the chosen managing agent under Chartwell's Participation Agreement, to which Trenwick succeeded, LDG continued to act on behalf of Trenwick in underwriting risks, managing claims and undertaking accounting activities on all reinsurance ceded to the LDG Facilities.

37.    From December 2002 through August 2003, Trenwick continued to front reinsurance risks for the LDG Facilities, issuing no fewer than eleven separate reinsurance contracts to various AIG subsidiaries providing coverage for their workers' compensation, occupational accident and industrial aid insurance risks. On information and belief, Massachusetts risks were among the AIG insurance policies reinsured by Trenwick and ceded 100% to the LDG Facilities and proportionately to the plaintiffs as Facility members. The plaintiffs paid almost $300,000 in fees to Trenwick for fronting the reinsurance of the AIG risks.

### The Defendants' Wrongful Scheme to Make False Claims

38.    AIG and Trenwick are bound by duties, imposed by reinsurance industry custom and recognized by law, to act in "utmost good faith" in their course of dealings with the plaintiffs and with LDG as the authorized agent of the plaintiffs and the LDG Facilities.

12

181239.5

39.    Reinsurance is an insurance contract issued to an insurer, known as the "ceding insurer" or "cedent." The contract is one of "indemnity" and only provides a right for reimbursement when the cedent incurs losses by making payments to resolve claims under insurance policies or reinsurance contracts it has issued to others. The reinsurer owes nothing unless and until the cedent has paid a claim and can present a record of the payment as a "paid loss." The Trenwick Fronting Arrangement with the LDG Facilities is an arrangement providing indemnity, and any right Trenwick has to reimbursement from the LDG Facilities can arise only after Trenwick itself has paid out funds to resolve claims made under the reinsurance contracts it issued for the LDG Facilities.

40.    Reinsurance typically spreads risk along a chain of insurers. Direct insurers cede portions of the risk they assume to reinsurers. Those reinsurers cede (technically, "retrocede") portions of the risk they assume to other reinsurers (otherwise called "retrocessionaires"). As the chain lengthens and fans out, risk can be distributed among an ever larger number of companies.

41.    Various AIG insurance company subsidiaries, Chartwell (and later Trenwick) and the plaintiffs together formed a number of such reinsurance chains, each of similar but not identical structure. Each of the reinsurance chains along which the AIG-related risks were distributed (the "AIG-Risk Chains") were structured in pertinent part substantially as follows: (a) as a fronting reinsurer, Chartwell would issue reinsurance contracts to the AIG insurance company subsidiaries; (b) Chartwell would then cede those risks by placing 100% of the risk with one of the LDG Facilities, of which Chartwell (and later Trenwick) and each of the plaintiffs were members; (c) each of Chartwell (and later Trenwick) and the plaintiffs as members of the LDG Facilities would then (i) retain a proportionate share of the risk and (ii) cede the remaining proportionate share (up to 95%) to a different LDG Facility and/or to another

13

REDACTED

retrocessionaire. The exact percentages ceded and the identities of the LDG Facilities and others acting as retrocessionaires in each of the AIG-Risk Chains varied among the eleven AIG contracts ceded or purported to be ceded to the LDG Facilities through Chartwell.

42.     Each of the reinsurance contracts in the AIG-Risk Chains is a contract of indemnity. Under each of these contracts, the insured party must pay out a claim and present record of payment as a "paid loss" before it is to be reimbursed by the reinsurers at the next level in the chain.

43.     The cedent owes a duty to its reinsurers to competently handle claims before paying them. It owes a duty to provide timely notice of loss. The cedent owes duties to provide specific and relevant claim information to its reinsurers, to allow account audits by the reinsurers, and in general, to cooperate with the reinsurers. Because the cedent must first pay out funds to resolve claims before seeking reimbursement from its reinsurers, the ceding insurer has a financial incentive to investigate the legitimacy of any claims made under the reinsurance contracts it has obtained before fronting funds to pay those claims. The requirement that Trenwick first incur "paid losses" before seeking payment from the LDG Facilities provided the plaintiffs, as Facility members, with an added safeguard against invalid or fraudulent claims.

44.     The cedent's duties are also enforced by an obligation of absolute and perfect candor. By industry tradition and by law, all the cedent's duties must be performed with "utmost good faith" or *uberrimae fidei,* meaning openess and honesty and the absence of any concealment or deception.

45.     Without *uberrimae fidei* there would be no reinsurance. Reinsurance works only if the reinsurance premium is less than the original premium received by the cedent. For the reinsurance premium to be less, reinsurers cannot duplicate the costs of the primary insurer in

14

181239.5

evaluating risks and handling claims. Thus, unlike the arms-length relationships typical among sophisticated parties in other industries, reinsurers must rely completely on the ceding insurer to provide accurate, complete and timely information regarding the nature of risks and extent of losses.

46.     The duty of *uberrimae fidei* underlies the entire reinsurance relationship. Each party in a chain of reinsurance relationships must act in utmost good faith with respect to its obligations to report and investigate claims. The good faith performance of these obligations is intended to benefit and be relied upon by each and every indemnifying party up the chain.

47.     As a fellow and fronting member of the LDG Facilities, Trenwick owed to each of the plaintiffs a duty of *uberrimae fidei* in all dealings regarding the LDG Facilities, including deference to LDG, the managing agent of the Facilities as chosen by Trenwick and each of the plaintiffs under their respective Participation Agreements.

48.     In making claims against the plaintiffs for alleged losses reinsured by Trenwick, AIG owed to Trenwick and to each of the plaintiffs a duty of *uberrimae fidei* requiring AIG, among other things, to submit only valid claims and to provide proof of the insured losses underlying such claims. On information and belief, AIG acted at all relevant times with the knowledge that Trenwick was ceding 100% of the AIG-related business to the LDG Facilities and to the plaintiffs as members of the LDG Facilities, and AIG understood and intended that its dealings with Trenwick would have a direct financial impact on the plaintiffs.

49.     As set forth in detail below, AIG and Trenwick have each breached the duties set forth above by engaging in a pattern of fraudulent, unfair and deceptive practices to unfairly manipulate Trenwick's fronting arrangement to assert improper and inflated coverage claims against the LDG Facilities and the plaintiffs.

181239.5

15

50.     In April 2003, Trenwick reported to LDG that AIG was requesting a full and final

settlement or "commutation" of all past, current and future liabilities owed by Trenwick under

the fronted reinsurance contracts issued to AIG's subsidiaries. Since that date, LDG, in keeping

with its duty of utmost good faith as managing agent of the LDG Facilities, has repeatedly

sought fair access to AIG claim records to confirm the reasonableness and accuracy of the

alleged outstanding losses. At all relevant times, AIG knew that LDG, as the manager of the

LDG Facilities, was the chosen agent for Trenwick and the plaintiffs for handling any incoming

claims. AIG could have and should have acted in utmost good faith by providing LDG, as agent

for the plaintiffs, with access to any records substantiating its alleged claims. AIG has

persistently refused LDG access to such records, and AIG's refusal has precluded LDG from

handling, adjusting or paying any of the losses AIG alleges under the contracts fronted by

Trenwick.

51.     Contrary to its obligations of utmost good faith, AIG inserted itself into the claims

resolution process and engaged in a pattern of evasive and deliberately obstructionist behavior

calculated, on information and belief, to avoid disclosure of unlawful practices resulting in

inflated claims in its workers' compensation and other books of business. Further, at all relevant

times, AIG has pursued a strategy of negotiating unfairly using escalating demands for payment

intended, on information and belief, to co-opt Trenwick in the pursuit of unsupportable claims

payments and a restructuring of AIG's reinsurance coverage at the expense of the plaintiffs as

Facility members.

52.     Because of its deteriorating financial circumstances, Trenwick colluded with AIG

in carrying out these unfair, deceptive and tortious activities, the nature, purpose and effect of

which were to hijack LDG's rightful gatekeeper role in handling claims for the LDG Facilities

16

and to give unfair advantage to AIG in passing off inflated loss reports in its workers'
compensation and other books of business.

### AIG Seizes the Opportunity to Co-opt Trenwick

53.     In the fall of 2002, the Trenwick group of companies faced a financial crisis.
Trenwick's parent, Trenwick America Corporation, suffered a loss of public confidence in its
stock. Onerous financing covenants were widely reported as restricting its options for recovery.
As Trenwick's management looked for ways to ensure its survival, on information and belief,
AIG took advantage of Trenwick's financial vulnerabilities by improperly pressuring for
payment of insufficiently substantiated losses reported by AIG subsidiaries under the reinsurance
contracts Trenwick fronted for the LDG Facilities.

54.     When, in April 2003, AIG requested a commutation of liabilities allegedly owed
under Trenwick-fronted reinsurance contracts, Trenwick reported AIG's demand to LDG as
manager of the LDG Facilities and as agent for Trenwick and the plaintiffs in handling any
incoming claims. Writing from its offices in Wakefield, Massachusetts on or about June 26,
2003, LDG responded to AIG's coverage demands by requesting an audit of the accounts of the
various covered AIG subsidiaries to verify the reported losses. The requested audits were to be
coordinated through the offices of C. Mindy Kipness, Director of Corporate Receivables for
AIG.

55.     AIG, on information and belief, knew the reported workers' compensation and
other claims of its insurance company subsidiaries were grossly inflated. In a deliberate strategy
to avoid having to disclose the improper claims accounting practices of its subsidiaries, AIG
itself responded to LDG's request to verify purported losses by taking actions that threatened
Trenwick's solvency.

17

181239.5

56.     On July 9, 2003, less than two weeks after receiving LDG's audit request, AIG

Associate General Counsel Eric S. Kobrick sent a formal demand letter to LDG at its offices in

Wakefield, Massachusetts. Addressing LDG in its capacity as "Managing General Agent of

Trenwick," AIG purported to exercise rights under "special termination provisions" governing its

subsidiaries' reinsurance contracts with Trenwick to "accelerate Trenwick's obligations,

requiring immediate settlement of all present and future obligations." By AIG's unsubstantiated

accounting, the "losses" owed by Trenwick totalled almost $130 million. AIG demanded that

Trenwick "remit payment promptly."

57.     On July 25, 2003, LDG again requested an on-site audit of the records of AIG's

subsidiaries to verify each of the components of the $130 million claim, including outstanding

losses, unsettled balances, and incurred but not reported claims ("IBNR"). On August 11, 2003,

outside counsel Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), on information and belief

acting on instruction from AIG's management, wrote LDG threatening arbitration proceedings

against Trenwick if the demanded $130 million payment was not promptly made. The demand

letter further stated that access to the records of AIG subsidiaries would only be granted on the

condition that LDG first agree to render its due diligence meaningless by executing on behalf of

the plaintiffs a "clean, irrevocable, evergreen letter of credit" covering the entire amount of the

disputed claims.

58.     On August 20, 2003, Trenwick's parent, Trenwick America Corporation, filed for

Chapter 11 protection in the United States District Court for the District of Delaware.

59.     On information and belief, on or about August 27, 2003, having provided no

information to substantiate its claims, AIG instructed Gibson Dunn to commence an arbitration

proceeding against Trenwick seeking payment in full of the approximately $130 million "claim,"

together with interest and attorneys' fees. The demand for arbitration was delivered into and, as intended, was received and acted upon by LDG within the Commonwealth of Massachusetts. The letter commencing arbitration was sent to LDG at its offices in Wakefield, Massachusetts and "require[d] LDG/Trenwick" to appoint an arbitrator within one month.

60.     Upon information and belief, Trenwick submitted to voluntary supervision by the Connecticut Department of Insurance during this time period or shortly thereafter.

### AIG and Trenwick Collude to Give AIG Unfair Leverage in Negotiations for a Novation

61.     From July 2003 through June 2004, AIG engaged in negotiations with LDG, in its role as managing agent of the LDG Facilities and the plaintiffs, ostensibly to resolve obstacles to payment of the claims asserted by the AIG subsidiaries. In reliance on AIG's purported good faith, LDG sent to and received from AIG and its affiliates numerous letters and other communications concerning a review of the accounts of the reinsured AIG subsidiaries. AIG's express and implied representations as to its good faith in the course of its dealings with LDG were delivered to LDG in Massachusetts and, as intended by AIG, were received and relied upon by the plaintiffs through their agent LDG in Massachusetts.

62.     At this same time, Trenwick was on notice that LDG was negotiating with AIG on behalf of the LDG Facilities and that pursuant to the terms of its Participation Agreement and the representations of its predecessor-in-interest Chartwell, Trenwick was required to defer to the authority of LDG as managing agent with regard to such negotiations. On September 8, 2003, LDG formally wrote Trenwick to advise that the LDG Facility members "will not be bound by any settlement reached or any payments made by Chartwell to AIG in the absence of their express preapproval."

63.    On September 18, 2003, Trenwick responded to LDG and promised plaintiffs "a full and fair opportunity to review and comment upon the proposals" before any commutation with AIG would be agreed.  Trenwick's representations were delivered to LDG in Massachusetts and, as intended by Trenwick, were received and relied upon by the plaintiffs through their agent LDG in Massachusetts.

64.    The plaintiffs now know that during the period July 2003 through June 2004, AIG entered into secret negotiations with the financially vulnerable Trenwick aimed at securing an improper commutation of various reinsurance contracts Trenwick had issued to AIG subsidiaries. In so doing, AIG acted in bad faith and induced Trenwick to engage in conflicts of interest and other breaches of Trenwick's fiduciary duties to the plaintiffs.

65.    During this same period of time, Trenwick intentionally excluded LDG from its negotiations with AIG, effectively preventing LDG from acting as the gatekeeper to improper claims ceded to the LDG Facilities.  Trenwick's actions prevented LDG from exercising the authority, granted to it by Chartwell (and later by Trenwick) and the plaintiffs under their respective Participation Agreements, to act as agent for the LDG Facilities in managing claims and undertaking accountings on behalf of the Facility members.  Trenwick prevented LDG from fulfilling its role of representing the plaintiffs' interests as Facility members.

66.    On information and belief, AIG induced Trenwick to improperly usurp LDG's rightful role as manager of the LDG Facilities and to breach the duty of utmost good faith owed to the plaintiffs by offering the financially distressed company a global settlement favorably resolving all of Trenwick's reinsurance liabilities to AIG, of which the risks ceded to the LDG Facilities comprised only a part.

67.     With respect to the reinsurance contracts issued to AIG subsidiaries by Trenwick and ceded to the LDG Facilities, Trenwick faced demands that it pay claims nominally totalling more than $130 million with a present value of more than $81 million. AIG offered a deal permitting Trenwick to resolve those claims for an up-front cash outlay by Trenwick of only $4 million.

68.     Under the deal, AIG would fund Trenwick's "payment" of most of the remaining risk by accepting a non-recourse promissory note from Trenwick in the amount of approximately $73 million. This financing would relieve Trenwick of the need to secure funds to pay AIG's claims from either the other members of the LDG Facilities or the general marketplace. Given Trenwick's perilous financial situation at the time, such financing would have been available only on terms unfavorable to Trenwick.

69.     In exchange for such favorable treatment from AIG, Trenwick agreed to assist AIG in unfairly pressuring the plaintiffs to enter a novation on terms dictated by AIG by which the plaintiffs would assume direct responsibility to AIG and succeed to Trenwick's contractual rights and obligations under its contracts with the AIG subsidiaries. In the event negotiations for the novation failed, Trenwick agreed to participate with AIG in a commutation to cram down a settlement on the plaintiffs by (a) issuing a promissory note to AIG, (b) presenting AIG's wrongfully inflated coverage claim to the plaintiff members of the LDG Facilities as a "paid loss" under the QSA, and (c) assigning to AIG any and all "collection rights" Trenwick had against the plaintiff Facility members under the QSA.

70.     AIG's first attempt to force novation came in early December 2003, when AIG and Trenwick jointly confronted LDG with the fruits of their private negotiations. At that time, AIG demanded that a novation on its proposed terms be executed by the end of January 2004. If

LDG did not agree and the plaintiffs, as Facility members, did not pay as demanded, AIG and Trenwick threatened to go forward with a commutation under which Trenwick would pass through to the LDG Facilities as "paid losses" roughly $80 million in AIG claims. AIG's demand was delivered to LDG in Massachusetts and, as intended by AIG and Trenwick, was to be acted upon by plaintiffs through their agent LDG in Massachusetts.

71.    On February 3, 2004, LDG initiated negotiations with AIG. In a letter also copied to Trenwick, LDG set out proposed terms for a novation acceptable to the Facility members. Over the next five months, LDG continued its good faith efforts to negotiate a novation of the AIG risks. At the time, LDG and the plaintiffs believed AIG to be negotiating in good faith with LDG to achieve a mutually agreed novation, and to have ceased its talks with Trenwick seeking an improperly collusive commutation. Plaintiffs now know that over these five months, AIG clandestinely continued to collude with Trenwick against the LDG Facilities' interests.

72.    On May 25, 2004, AIG wrote to LDG threatening that unless a novation on AIG terms was finalized by June 15, 2004, all reinsurance accepted by the LDG Facilities from the AIG subsidiaries with Trenwick as a front would be "automatically commuted" and AIG would seek the full amount of each Facility member's share immediately, by arbitration if necessary. On information and belief, over the next two weeks AIG revealed to LDG that Trenwick had agreed to enter a written commutation agreement under which Trenwick would pass through to the LDG Facilities as "paid losses" roughly $80 million in AIG claims if the novation AIG proposed was not accepted. Each of these demands was delivered to LDG in Massachusetts and, as intended by AIG and Trenwick, was to be acted upon by plaintiffs through their agent LDG in Massachusetts.

22

73.    By letter dated June 24, 2004, several of the plaintiffs advised Trenwick that the ultimatum received from AIG by the LDG Facilities through LDG as managing agent was "completely unacceptable" and that the proposed commutation did not conform to "established principles of good faith within the reinsurance industry." As members of the LDG Facilities, these plaintiffs objected to Trenwick's not having carried out an independent valuation of the AIG claims and to Trenwick's failure to assess the validity of the $80 million commutation figure. The June 24 letter advised Trenwick that further discussion of novation would require full disclosure of all relevant facts, including copies of any agreements or side letters between AIG and Trenwick, as well as information regarding the calculation of IBNR and any data, assumptions and actuarial methodologies that might support AIG's demand. Neither AIG nor Trenwick provided the requested information to LDG or to any of the plaintiffs.

### The Suspicious "Commutation" By AIG and Trenwick

74.    Instead, on June 30, 2004, Trenwick entered into an unlawful agreement with AIG commuting more than $81 million in fraudulently inflated and unsubstantiated claims asserted by AIG subsidiaries under reinsurance contracts Trenwick fronted for and ceded to the Facility members (the "Commutation"). On information and belief, the Commutation was negotiated by and under the direction of Christopher Milton, AIG Vice President of Reinsurance. The Commutation agreement was signed on behalf of AIG by a Vice President of AIG and by Jane Byrne, AIG Assistant General Counsel. On information and belief, the Commutation was negotiated on behalf of Trenwick by its Chief Executive Officer, David B. Semeraro, and signed by Trenwick under his authority. AIG and Trenwick are the only signatories to the Commutation agreement.

75.    By letters dated August 19 and October 11, 2004, respectively, and addressed and delivered to plaintiffs' agent LDG at its offices in Wakefield, Massachusetts, AIG and Trenwick each advised the plaintiffs that the Commutation would pass AIG's inflated claims through to the LDG Facilities as "paid losses" to be covered by the LDG Facility members.

76.    The Commutation was intended to give a lawful patina to AIG and Trenwick's unlawful scheme to present fraudulent claims for payment under various reinsurance contracts.

77.    Both AIG's demand for more than $130 million and the "paid loss" amount of $81 million passed on by Trenwick were on their face inconsistent with reasonable commercial and actuarial expectations given the age and nature of the underlying coverages.

78.    AIG's demand for acceleration of the liabilities under reinsurance contracts with Trenwick required AIG to present actuarial projections for IBNR, *i.e.,* for anticipated claims that assume the existence of insured events, such as an industrial accident, for which a claim has not yet been reported to the insurer.  To be valid, IBNR projections must use sound actuarial methods applied to assumptions reasonably related to historical experience.  Of the almost $130 million demanded from Trenwick by AIG, less than $15 million represented claims paid or identified for payment, while more than $116 million represented IBNR projections of unasserted, unpaid claims.  Offered baldly, without supporting detail, and in light of both AIG and Trenwick's continuing refusal to provide any back-up information and audit, AIG's IBNR claims were (and remain) highly suspicious.

79.    The AIG claims are suspect because, without explanation, they assert losses that are contrary to reasonable commercial and actuarial expectations.  Prevailing industry experience demonstrates that workers' compensation claims are usually asserted early in the coverage cycle, and by 2004 a book of such business written in 1999 and 2000 would characteristically have a

significantly lower percentage of "losses" in the form of IBNR than AIG presented. AIG's

reported ratio of $15 million paid and reserved claims to $116 million of IBNR claims on this

book of business was, at best, an aberration. Further, more than $117 million of the total

exposure was disproportionately attributed to a single risk – an unexpected pattern that, without

explanation, raises questions as to whether losses were properly allocated among the contracts

and whether required retentions were properly applied.

80.     Despite the suspicious characteristics of AIG's claims, Trenwick and AIG passed

AIG's claims through to the LDG Facilities in a "paid loss" report. The paid loss report and the

wrongful representations it contained were delivered to and intended to be acted on by plaintiffs

through their agent LDG in Massachusetts.

81.     The "paid loss" report is also suspect because it lacks any signs that Trenwick

followed common and expected industry practice to substantiate underlying claims before

payment. With so large a portion of the claim based on projected IBNR, industry custom and

prudent claims-handling practice required Trenwick either directly or through LDG to, at a

minimum, audit AIG's actuarial calculations and underlying claims history. Yet Trenwick's

"paid loss" report to the LDG Facilities is strikingly devoid of evidence that Trenwick conducted

even a minimal coverage analysis. The paid loss report fails to provide basic supporting detail

required of AIG both under its reinsurance contracts and by industry custom and practice. On

information and belief, Trenwick did not require AIG to report how it calculated either the

purported IBNR or the present value of its claims. To the contrary, Trenwick informed the

members of the LDG Facilities that AIG was unwilling to provide calculations for IBNR and

other amounts. Nor did Trenwick exercise its contractual right under its contracts with AIG to

open the transaction up to the light of day by demanding review by an independent auditor.

82.    In addition, Trenwick's "payment" of over $73 million of the Commutation by funds obtained from AIG under a promissory note with terms and conditions more favorable to Trenwick than otherwise available in the marketplace, and secured by an assignment to AIG of collection rights against the LDG Facilities and the plaintiffs, is unorthodox and contrary to the practices and standards of the reinsurance industry. Under the QSA, Trenwick was required to pay the full amount of the Commutation and then seek indemnity from the LDG Facilities. This requirement was designed to ensure that Trenwick would have a strong financial interest in investigating the validity of claims under the reinsurance contracts it issues and in paying only legitimate obligations. The benefits Trenwick realized under its promissory note to AIG eliminated Trenwick's financial incentive to negotiate on behalf of itself and the LDG Facilities and, on information and belief, induced Trenwick to accept Commutation terms dictated by AIG.

83.    Trenwick furthered AIG's scheme to defraud the LDG Facilities and the plaintiffs by among other things (a) failing to exercise basic care on behalf of the LDG Facilities, care that the plaintiffs, as LDG Facility members, were entitled to and expected from Trenwick as a fronting member, and (b) colluding with AIG to avoid review by LDG of the validity of AIG's fraudulently inflated claims by presenting those claims as "paid losses" under the Trenwick Fronting Arrangement.

### AIG and Trenwick Collude to Pass Off
### AIG's Inflated Claims as Paid Losses

84.    Since the Commutation, AIG has flatly refused the LDG Facilities any access to its records. Without such information, LDG and the plaintiffs, as LDG Facility members, cannot assess the validity of AIG's claims, a determination that Trenwick, as fronting member, should have made, but entirely failed to pursue. On information and belief, AIG's stonewalling extends

REDACTED

beyond its own files to continuing pressure on Trenwick to refuse cooperation with reasonable requests made by LDG on behalf of the Facilities to investigate the paid loss claim.

85.    On or about August 19, 2004, Trenwick wrote LDG as managing agent of the LDG Facilities to request that LDG collect payment in settlement of Trenwick's claim for indemnification on paid losses relating to the AIG-Risk Chains. In support of its claim, Trenwick presented a purported "paid loss" of $4 million, representing Trenwick's payment to AIG to consummate the wrongful Commutation, for which it seeks reimbursement of 95%. By collecting on this claim, Trenwick seeks to reduce to approximately $200,000 its total outlay for resolving in excess of $130 million in asserted AIG liabilities.

86.    As a cedent to retrocessionaires in various AIG-Risk Chains, Trenwick owes a duty of *uberrimae fidei* requiring Trenwick to submit only valid claims and to provide proof of the insured losses underlying the claim. In seeking reimbursement for its participation in a fraudulent and deceptive scheme with AIG, Trenwick has breached this duty to the plaintiffs who act as its retrocessionaires in the AIG-Risk Chains.

87.    On November 23, 2004, AIG sent each plaintiff a demand for payment of its alleged proportional share of the $73,360,000 promissory note, addressing the demand letter both to each plaintiff's own offices and to the plaintiff's attention, care of LDG in Wakefield, Massachusetts. LDG was also included as a direct recipient of each demand letter.

88.    Each of the November 23, 2004 letters offered to release the addressed plaintiff from any obligation under the promissory note if the plaintiff signed the previously unacceptable novation agreement. Absent payment or novation, AIG threatened to commence arbitration within 30 days.

89.     As cedents to retrocessionaires farther out the AIG-Risk Chains, the plaintiffs owe a duty of *uberrimae fidei* requiring each of them, among other things, to submit only valid claims and to provide proof of the insured losses underlying the claim. In light of AIG's and Trenwick's continuing refusal to provide any supporting documentation for the claims they have asserted, neither LDG nor any of the plaintiffs has agreed, nor consistent with the duty of *uberrimae fidei* could they agree, to either option offered by AIG.

### AIG and Trenwick Collude to Collect the Spoils of Their Unfair Practices in Massachusetts

90.     AIG, with Trenwick's collusion, has manufactured more than $81 million in fraudulent "paid losses" for which it has asserted almost $73 million in wrongful demands for payment under reinsurance contracts ceded to the plaintiffs. AIG, in conspiracy with Trenwick, continues to assert these claims in Massachusetts despite knowing of their falsity.

91.     The false liabilities manufactured by AIG in an unlawful scheme with Trenwick have implicated the plaintiffs' forecasting and reserving practices, and have required the victimized plaintiffs to expend significant time and money on the investigation of and defense against these claims and demands for payment.

92.     On January 10, 2005, acting as purported assignee under the Commutation of Trenwick's collection rights, AIG initiated arbitration asserting rights under the QSA to enforce its unlawful demands for payment. AIG sent each plaintiff a demand for arbitration. The demands were addressed both to each plaintiff's own offices and in care of LDG in Wakefield, Massachusetts. The arbitration has commenced in Massachusetts.

93.     Trenwick, as purported assignor under the Commutation of its rights under the QSA, is not a party to the arbitration.

94.     To protect their rights, the plaintiffs have been required to respond to AIG's arbitration demand, and have to date expended very substantial sums in investigating and defending themselves from AIG's manufactured claims.

95.     By reason of the foregoing wrongful acts on the part of Trenwick and AIG, each of the plaintiffs has suffered damage, and their damages continue to rise.

## COUNT I

### Chapter 93A Claim (Against AIG and Trenwick)

96.     The plaintiffs adopt by reference the allegations of ¶¶ 1-95, above.

97.     This claim is brought pursuant to G.L. c. 93A, § 11.

98.     Each of the plaintiffs, and both of the defendants, have been engaged in trade or commerce within the meaning of c. 93A, § 11.

99.     The following conduct by AIG and Trenwick, as described above in greater detail, constitutes unfair and deceptive acts or practices committed in Massachusetts in willful and knowing violation of c. 93A:

(a)     Providing improperly inflated calculations of losses in demanding accelerated payment on each of the eleven separate reinsurance contracts issued to AIG subsidiaries by Chartwell and ceded to the LDG Facilities;

(b)     Presenting the fraudulently inflated Commutation amount as a paid loss under the Trenwick QSA;

(c)     Demanding that each of the eighteen plaintiff insurance companies pay its purported share of the fraudulently inflated Commutation amount;

(d)     Presenting wrongful and fraudulent paid loss figures to Trenwick's retrocessionaires in the AIG-Risk Chains;

(e)     Trenwick's failure to meet its duty of care owed to the plaintiffs by not investigating AIG's claims;

(f)     Purporting to negotiate in good faith with LDG, the plaintiffs' representative, while simultaneously agreeing to, but not disclosing, the Commutation;

(g)     Negotiating in bad faith in an attempt to pressure LDG and the plaintiffs to settle the dispute on terms favorable to AIG; and

(h)     Wrongfully filing a demand for arbitration in Massachusetts to enforce fraudulent claims for reinsurance coverage.

100.    The defendants AIG and Trenwick, by their actions set forth above, have engaged in a course of unfair and deceptive acts and practices aimed at wrongfully collecting almost $73 million from plaintiffs.

101.    The defendants have carried out a pattern of evasive and obstructionist conduct in rejecting all attempts by LDG, on behalf of the plaintiffs, to obtain information supporting the claims, and have given no indication of a willingness to reciprocate LDG's desire to amicably resolve the parties' disputes.

102.    The defendants' actions and statements in connection with their improper scheme were aimed at, and were acted upon by, LDG, on behalf of the plaintiffs, in Wakefield, Massachusetts.

103.    The defendants' unfair and deceptive acts and practices occurred primarily and substantially in Massachusetts.

104.    The defendants' conduct constitutes unfair and deceptive acts and practices in violation of c. 93A.

105.    The defendants knowingly and wilfully violated c. 93A.

106.    The plaintiff insurance companies have each suffered a loss of money or property in an amount to be determined at trial as a result of the defendants' violations of c. 93A.

## COUNT II

### Common Law Fraud (against AIG and Trenwick)

107.    Plaintiffs adopt by reference the allegations of ¶¶ 1-106, above.

108.    AIG and Trenwick each individually and together engaged in wrongdoing that included the making of numerous materially false and misleading statements, representations and omissions with respect to their course of dealings and the Commutation of AIG reinsurance contracts, including but not limited to the presentation of AIG's wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" and Trenwick's presentation of a fraudulent and wrongful paid loss to its retrocessionaires in the AIG-Risk Chains.

109.    Each of AIG and Trenwick knew that their statements, representations and omissions were materially false and misleading with respect to presently existing or past facts.

110.    Each of AIG and Trenwick intended that each plaintiff rely to its detriment on their materially misleading false and misleading statements, representations and omissions in processing, reserving for, investigating and paying the fraudulent and inflated claims under the AIG reinsurance contracts ceded to the LDG Facilities.

111.    Each of the plaintiffs reasonably relied upon such false and misleading statements, representations and omissions to its detriment by, among other things, entering a false liability on its books, paying unnecessary fees and expending monies for the investigation and defense against claims fraudulently created.

112.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT III

### Civil Conspiracy (Against AIG and Trenwick)

113.    Plaintiffs adopt by reference the allegations of ¶¶ 1-112, above.

114.    By various wrongful acts, defendants AIG and Trenwick have acted in concert in furtherance of a common plan to commit insurance fraud and other unlawful acts, the object of which was to defraud the plaintiff insurance companies with respect to reinsurance coverage claims presented against the LDG Facilities.

115.    By various wrongful acts, defendants AIG and Trenwick have acted in concert in furtherance of a common plan to wrongfully file a demand for arbitration to enforce fraudulent claims for reinsurance coverage, the object of which is to defraud the plaintiff insurance companies.

116.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT IV

### Aiding and Abetting Breach of Fiduciary Duty (Against AIG)

117.    Plaintiffs adopt by reference the allegations of ¶¶ 1-116, above.

118.    Trenwick had a fiduciary obligation to the plaintiff insurance companies to act under a duty of *uberrimae fidei* or utmost good faith in all dealings with respect to its role as a fronting reinsurer for the LDG Facilities and LDG Facility members. AIG, as Trenwick's reinsured, with knowledge of Trenwick's relationship to plaintiffs, also owed plaintiffs a duty of utmost good faith.

119.    By various wrongful acts, AIG induced Trenwick to breach that fiduciary duty by participating in a scheme to commit insurance fraud by presenting AIG's wrongfully inflated

coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" under plaintiffs' QSA with Trenwick, to assist AIG in pursuing a wrongful demand for arbitration to enforce fraudulent claims for reinsurance coverage and to commit other torts to the plaintiffs' detriment.

120.    At the time AIG, a sophisticated insurer, approached Trenwick, AIG understood that Trenwick was acting as a fronting reinsurer for the LDG Facilities and knew of the duties that arise from that relationship.

121.    By acting in concert with Trenwick to commit insurance fraud, to fraudulently inflate the Commutation amount and to commit other torts, AIG knowingly participated in and facilitated Trenwick's breach of fiduciary duty.

122.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT V

### Tortious Interference With Contractual Relations (Against AIG)

123.    Plaintiffs adopt by reference the allegations of ¶¶ 1-122, above.

124.    One or more of the plaintiffs had a contractual relationship with Trenwick by which Trenwick acted as a fronting reinsurer for the LDG Facilities.

125.    AIG was not a party to that contractual relationship, but knew that Trenwick had a business relationship with the plaintiffs that was manifested by a contract specifying that Trenwick would act on the plaintiffs' behalf as a fronting reinsurer.

126.    AIG knowingly and intentionally induced Trenwick to breach its contractual duties as a fronting reinsurer and to commute AIG's reinsurance contract in a manner detrimental to the plaintiffs and unduly favorable to AIG; to present AIG's wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" under plaintiffs' QSA with

Trenwick; and to enable AIG pursuant to a wrongful assignment of Trenwick's contract rights to pursue an improper demand for arbitration to enforce fraudulent insurance claims.

127.    AIG had no justification for interfering with the contractual relations between Trenwick and the plaintiffs; AIG's motive was to commute the claims in an unreasonable manner that would unfairly benefit AIG.

128.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT VI

### Declaratory Judgment (Against Trenwick)

129.    Plaintiffs adopt by reference the allegations of ¶¶ 1-128, above.

130.    Trenwick has demanded that the plaintiffs indemnify the $4 million cash payment Trenwick made to AIG under the Commutation.

131.    The plaintiffs have rejected Trenwick's unjustified and wrongful demand for indemnification.

132.    There is an actual controversy about whether the plaintiffs are required to indemnify Trenwick for the $4 million Trenwick paid to AIG under the Commutation.

133.    The declaratory judgment sought by the plaintiffs would properly resolve this controversy.

### RELIEF SOUGHT

Each of the plaintiff insurance companies demands judgment against the defendants AIG and Trenwick as follows:

a.    For compensatory damages;

REDACTED

b.    For disgorgement of all benefits received by either defendant as a result of their fraud or unfair and deceptive acts and practices;

c.    For treble damages under c. 93A;

d.    For punitive and exemplary damages;

e.    For interest and costs;

f.    For a declaration that the plaintiffs serving as retrocessionaires in the AIG-Risk Chains are not required to indemnify Trenwick for the $4 million Trenwick paid to AIG under the Commutation; and

g.    For such other and further relief as the Court may deem just.

By its attorneys,

Scott P. Lewis (BBO # 298740)
Steven L. Schreckinger (BBO # 447100)
PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA 02199
(617) 239-0100

Of counsel:

Joseph T. McCullough, IV
Kathy L. McFarland
Robin C. Dusek
LOVELLS
One IBM Plaza
330 North Wabash Avenue
Suite 1900
Chicago, IL 60611
(312) 832-4400

July 6, 2005

181239.5                                    35

Tab 2

REDACTED

## LDG POOL COMMUTATION, SETTLEMENT AND RELEASE AGREEMENT

This LDG POOL COMMUTATION, SETTLEMENT AND RELEASE AGREE-MENT ("SETTLEMENT") entered into between Trenwick America Reinsurance Corporation, as successor to Chartwell Reinsurance Company (the "REINSURER"), and AMERICAN INTERNATIONAL GROUP, INC. on behalf of its member and associated companies, including but not limited to those companies listed on Exhibit A hereto (collectively, the "COMPANY"), is dated as of June 30, 2004 (the "EFFECTIVE DATE").

WHEREAS, the REINSURER entered into the reinsurance agreements (the "LDG-RELATED REINSURANCE AGREEMENTS"), in which the REINSURER acted as the fronting reinsurer for various reinsurance pools arranged by LDG Reinsurance Corporation ("LDG"), including but not limited to those agreements listed in Exhibit B, pursuant to which the COMPANY ceded to the REINSURER, and the REINSURER assumed from the COMPANY, certain liabilities arising from insurance written by the COMPANY; and

WHEREAS, the REINSURER entered into the retrocession agreements listed in Exhibit C hereto (the "POOL AGREEMENTS") with certain retrocessionaires (the retrocessionaires and participants in the POOL AGREEMENTS shall be referred to herein as the "RETROCESSIONAIRES") in which the REINSURER retroceded, and the RETROCESSIONAIRES assumed, risks assumed by the REINSURER under the LDG-RELATED REINSURANCE AGREEMENTS; and

WHEREAS, on July 9, 2003 the COMPANY invoked the Special Termination Provisions of the LDG-RELATED REINSURANCE AGREEMENTS, thereby purportedly accelerating the liabilities and obligations of the COMPANY thereunder; and

WHEREAS, REINSURER denies the validity of such invocation; and

WHEREAS, on August 27, 2003 the COMPANY commenced an arbitration against REINSURER seeking $129,866,183.00 and other relief from REINSURER (the "LDG POOL ARBITRATION"); and

WHEREAS, the REINSURER has offered to pay and the COMPANY has agreed to accept in full satisfaction of the REINSURER'S present and future liability under the LDG-RELATED REINSURANCE AGREEMENTS the sum of Eighty-One Million, Seven Hundred Forty-Five Thousand, Five Hundred Three United States Dollars ($81,745,503), to be paid to the COMPANY in the manner set forth herein; and

WHEREAS, the REINSURER and the COMPANY (individually, a "PARTY;" together, the "PARTIES") agree that it is mutually beneficial for the PARTIES to enter into this SETTLEMENT;

NOW THEREFORE, in consideration of the foregoing and of the material covenants and agreements of the PARTIES contained herein, the receipt and sufficiency of which is acknowledged by the undersigned, it is agreed by and between the REINSURER and the COMPANY that:

1. Commutation Payment

(a) No later than three business days after the EFFECTIVE DATE, REINSURER shall pay to COMPANY the total consideration Eighty-One Million, Seven Hundred Forty-Five Thousand, Five Hundred Three United States Dollars ($81,745,503) for reassuming certain risks insured by COMPANY under the LDG-RELATED REINSURANCE AGREEMENTS.

(b) This amount shall be paid as follows:

(i) One Million, Seven Hundred Forty-Five Thousand, Five Hundred Three United States Dollars ($1,745,503) in cash, as payment on account of commutation of the Difference in Conditions coverage under the LDG-RELATED REINSURANCE AGREEMENTS, it being understood that the term "Difference in Conditions Coverage" refers to that portion of the liability ceded to the REINSURER under the LDG-RELATED REINSURANCE AGREEMENTS that was not in turn retroceded under the POOL AGREEMENTS, it being further understood that if and to the extent that a portion of the liability arising from a given loss was retroceded under the POOL AGREEMENTS and a portion of such liability was not so retroceded, then only the portion not so retroceded is within the term "Difference in Conditions Coverage";

(ii)    Four Million United States Dollars ($4,000,000), in cash, as payment on account of the REINSURER's retained participation in the POOL AGREEMENTS with respect to the LDG-RELATED REINSURANCE AGREEMENTS;

(iii)    Two Million, Six Hundred Forty Thousand United States Dollars ($2,640,000), in cash, as payment on account of the participation of Reliance National Insurance Company in the POOL AGREEMENTS with respect to the LDG-RELATED REINSURANCE AGREEMENTS; and

(iv)    a promissory note substantially in the form of Exhibit D hereto (the "NOTE") in the amount of Seventy-Three Million Three Hundred Sixty Thousand United States Dollars ($73,360,000), made by the REINSURER to the order of the COMPANY and delivered to the COMPANY, on account of the REINSURER's remaining participation in the LDG-RELATED REINSURANCE AGREEMENTS.

(c)    Payment of items (i), (ii), and (iii) above shall be effected by release from escrow of the sums deposited into escrow with Cahill Gordon & Reindel LLP under and pursuant to that certain Commutation, Settlement And Release Agreement Between Trenwick America Reinsurance Corporation and American International Group, Inc. deemed effective as of September 30, 2003. Accrued interest on the escrowed amounts shall be paid to the COMPANY upon such release, with no credit being given to the REINSURER for the amount of such interest paid.

2.    COMPANY shall accept the sums set forth in paragraph 1 herein in full and final settlement of any and all amounts claimed to be due to COMPANY from REINSURER and arising under or in respect of the LDG-RELATED REINSURANCE AGREEMENTS.

3.    This SETTLEMENT is expressly limited to REINSURER'S participation in the particular underwriting years of the particular LDG-RELATED REINSURANCE AGREE-MENTS. It is not the intention of the PARTIES to affect the terms, conditions or provisions of any other reinsurance agreement(s) or commutation agreements between the REINSURER and the COMPANY.

4.    REINSURER hereby assigns to COMPANY all its rights, title and interest, if any, to its share or shares of any common account excess of loss protection which would inure to its benefit in connection with the LDG-RELATED REINSURANCE AGREEMENTS.

5.     REINSURER represents and warrants that its liabilities and obligations under the LDG-RELATED REINSURANCE AGREEMENTS (except for the Differences in Conditions coverage) have been retroceded under the POOL AGREEMENTS to the RETROCESSIONAIRES.

6.     REINSURER hereby assigns to the COMPANY, as security for payment of the promissory note given in paragraph 1(b)(iv) hereof,

(a)     all of the REINSURER's rights, title and interest in the recoverables arising from POOL AGREEMENTS on account of the retrocession thereunder of the LDG-RELATED REINSURANCE AGREEMENTS; *provided, however,* that such rights assigned do not include either (x) retrocessional protection, if any, available to REINSURER other than protection purchased through LDG or (y) REINSURER's share of retrocessional protection purchased by LDG on behalf of the LDG Pool Members, in both case (x) and case (y), insofar (but only insofar) as such retrocessional protection is applicable to REINSURER's NET LDG LIABILITY and/or the RELIANCE LDG LIABILITY and

(b)     any claims the REINSURER has, had, or may have against LDG and/or SRRF under the REINSURANCE MANAGEMENT AGREEMENTS as further security for payment of such promissory note.

REINSURER will provide COMPANY with any and all necessary governmental and regulatory approvals for this assignment or any other writings necessary to affect this assignment. In furtherance of the assignment and security interest granted above, the REINSURER shall receive any cash payments from the RETROCESSIONAIRES, LDG and/or SRRF Management Incorporated ("SRRF") as a trustee for the COMPANY and shall deliver up to the COMPANY any amounts so received, but the COMPANY shall have no further recourse to the REINSURER on or on account of the promissory note, except so as to enforce this paragraph.

7.     The COMPANY shall not have recourse directly against the REINSURER on such promissory note but shall look solely and exclusively to the assigned rights against the RETROCESSIONAIRES, LDG, and/or SRRF, and/or any successors or affiliates thereof, in the POOL AGREEMENTS and REINSURANCE MANAGEMENT AGREEMENTS for repayment thereof. The cost of pursuing such assigned rights shall be borne solely by the COMPANY.

8.    REINSURER will cooperate fully with COMPANY, at the expense of the COMPANY, in any proceedings COMPANY (or REINSURER) may bring against the RETROCESSIONAIRES and/or LDG and/or SRRF. Such cooperation will include, but not be limited to:

(a)    making REINSURER's current officers and employees, and using its best efforts to make previous officers and employees, available to COMPANY for interviews and, as needed, for depositions and/or appearances at any hearings;

(b)    providing COMPANY with all documents regarding REINSURER's dealings with RETROCESSIONAIRES and/or LDG and/or SRRF;

(c)    assisting fully in any effort to procure non-party discovery; and

(d)    assisting fully throughout any arbitration or other legal proceedings.

9.    If for any reason the assignment under paragraph 6 is deemed void, REINSURER shall commence proceedings against the RETROCESSIONAIRES and/or LDG and/or SRRF to recover Seventy-Three Million Three Hundred Sixty Thousand United States Dollars ($73,360,000). Such litigation and/or arbitration shall be directed by COMPANY, which may appoint lead counsel of its own choosing, and all fees, costs and expenses reasonably incurred by REINSURER or any of its directors, officers, employees, advisors, or attorneys, past or present, in connection with such litigation and/or arbitration shall be paid by the Company. The COMPANY shall receive all recoveries effected thereby.

10.    If and when REINSURER has fulfilled all of its obligations under this SETTLEMENT, then REINSURER, its affiliates, successors and assigns and their respective directors, officers, employees and agents shall be released and forever discharged from all remaining liability that REINSURER, its affiliates, successors and assigns and their respective directors, officers, employees and agents had, have or shall have to COMPANY by reason of or in respect of any act, matter, cause or thing whatsoever with respect to the LDG-RELATED REINSURANCE AGREEMENTS. This release does not apply to LDG, SRRF or the RETROCESSIONAIRES.

11. Effective on the same date on which COMPANY shall release the REIN-SURER as provided for in paragraph 10 herein, REINSURER shall likewise release and forever discharge COMPANY, their affiliates, successors and assigns and their respective directors, officers, employees, and agents from all liability that COMPANY, their affiliates, successors and assigns and their respective directors, officers, employees and agents had, have or shall have to REINSURER by reason of or in respect of any act, matter, cause or thing whatsoever with respect to the LDG-RELATED REINSURANCE AGREEMENTS. This release does not apply to LDG, SRRF or the RETROCESSIONAIRES.

12. In the event that the REINSURER fails to fulfill all of its obligations under this SETTLEMENT, the PARTIES hereto agree that the REINSURER shall, at the request of COMPANY, submit to the jurisdiction of any court of competent jurisdiction within the State of Connecticut and shall comply with all the requirements necessary to give such court jurisdiction with respect to any litigation commenced by COMPANY which arises out of this SETTLE-MENT or the breach thereof or REINSURER'S liability to COMPANY on the LDG-RELATED REINSURANCE AGREEMENTS.

13. In the event that the REINSURER fails to make the payments to the COM-PANY required to be paid under this SETTLEMENT, the COMPANY will be free to seek the payment of such funds from the REINSURER. Nothing in this SETTLEMENT, including without limitation the releases in paragraphs 10 and 11, shall be deemed to prevent the COMPANY from initiating such proceedings against the REINSURER.

14. Within three (3) business days of REINSURER's fulfilling all of its obligations herein, except those described in paragraphs 8 and 9, the COMPANY and REINSURER will inform the party-appointed arbitrators that the LDG POOL ARBITRATION has been resolved and should be dismissed with prejudice. Following such dismissal, COMPANY and RE-INSURER each agree to bear their own costs and attorney's fees regarding the LDG POOL AR-BITRATION.

15.   The rights, duties and obligations set forth herein shall inure to the benefit of and be binding upon the COMPANY and the REINSURER as they are identified in this SETTLEMENT and their respective predecessors, parents, successors, affiliates, officers, directors, employees, agents, subsidiaries, shareholders, representatives, attorneys, liquidators, receivers and assigns of the parties hereto and is not intended to confer any rights or benefits upon persons or entities other than the foregoing parties.

16.   This SETTLEMENT shall constitute the entire agreement between the PARTIES as it relates to the subject matter herein. This SETTLEMENT may not be modified or amended, except by an instrument in writing signed by the PARTIES hereunder.

17.   The PARTIES hereto expressly warrant and represent that they are corporations in good standing in their respective places of domicile, that the execution of this SETTLEMENT is fully authorized by each of them, that any necessary regulatory approvals have been obtained, and that the person or persons executing this SETTLEMENT have the necessary and appropriate authority to do so.

18.   The PARTIES agree to maintain the confidentiality of this SETTLEMENT and its terms, subject to the following:

(a)   A PARTY may, when necessary or required, disclose this SETTLEMENT to such PARTY's auditors, shareholders, or governing regulatory bodies.

(b)   A PARTY may, when necessary or required, disclose this SETTLEMENT to third parties in court proceedings and arbitrations in connection with mandatory discovery requirements, or in any bankruptcy, insolvency, or similar proceeding involving a parent, subsidiary or affiliate of such PARTY.

(c)   The COMPANY may make such disclosures (including UCC-1 or other filings) as, in its judgment, are necessary to perfect the security interest granted herein.

(d)   Any PARTY may also disclose this SETTLEMENT and its terms under other circumstances if it obtains the prior written consent of the other PARTY for such disclosure.

(e)   Any PARTY may disclose this SETTLEMENT and its terms for purposes of enforcing the SETTLEMENT or seeking redress for any breach thereof.

In the event of any request or order for disclosure, other than pursuant to subparagraphs (a) or (c) above, no disclosure shall be made unless and until the disclosing party has given the other party not less than five (5) BUSINESS DAYS prior written notice of the requirement of making such disclosure and an opportunity to obtain a protective order. Any PARTY disclosing this SETTLEMENT in a manner permitted by this article will take all reasonable precautions to protect its confidentiality.

19.     Each of the Parties represents to the other as follows:  (a) it has had full opportunity to consult with its respective attorneys in connection with the review of this SETTLEMENT; (b) it has carefully read and understands the scope and effect of each provision contained in this SETTLEMENT; (c) it has conducted all necessary due diligence, investigation and analysis of the transactions contemplated by this SETTLEMENT; and (d) it is not relying upon any representations made by any other party, its attorneys or other representatives.

20.     The PARTIES agree to execute and deliver such other documents and take such other action as may be necessary to effect this SETTLEMENT, including without limitation, providing such information and representations as may be requested by (a) the Insurance Department of the State of Connecticut, and (b) the REINSURER in connection with any retrocessionaire or other person or entity obligated to indemnify or reimburse it for any payment hereunder or under the LDG-RELATED REINSURANCE AGREEMENTS.

21.     The parties agree that, in order to enable and assist the REINSURER to present claims and information to its retrocessionaires, the COMPANY shall provide the REINSURER, upon the REINSURER's request, with the same notice of losses or occurrences, notices of subsequent developments respecting such losses or occurrences and proofs of loss that it would have been obligated to provide (or would in the ordinary course have provided) to the REINSURER under the LDG-RELATED REINSURANCE AGREEMENTS.  It is understood and agreed that such requests will be limited to those reasonably necessary to accomplish such pur-

-8-

pose, and that the sufficiency of the COMPANY's response to such requests will be measured against their relation to such purpose.

22.    This SETTLEMENT shall be interpreted under and governed by the substantive laws of the State of Connecticut without regard to its conflict of law principles.

23.    All notices under this SETTLEMENT shall be in writing and shall be deemed to be duly given and received (i) upon delivery if delivered by certified mail; or (ii) on the next Business Day if sent by overnight courier.

24.    This SETTLEMENT may be executed in a number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute one and the same SETTLEMENT.

The remainder of this page is left blank intentionally.

IN WITNESS WHEREOF the PARTIES hereto have executed this SETTLE-
MENT AND RELEASE AGREEMENT in duplicate, as of the day and year first written above.

AMERICAN INTERNATIONAL GROUP, INC.
on behalf of its member and associated companies.

BY: _____    WITNESS: _____

TITLE: _____

BY: _____    WITNESS: _____

TITLE: Assistant General Counsel

TRENWICK AMERICAN REINSURANCE CORPORATION,
as successor to CHARTWELL REINSURANCE COMPANY

BY: _____    WITNESS: _____

TITLE: _____

-10-

IN WITNESS WHEREOF the PARTIES hereto have executed this SETTLE-

MENT AND RELEASE AGREEMENT in duplicate, as of the day and year first written above.

AMERICAN INTERNATIONAL GROUP, INC.
on behalf of its member and associated companies.

BY:_____    WITNESS:_____

TITLE:_____


BY:_____    WITNESS:_____

TITLE:_____

TRENWICK AMERICA REINSURANCE CORPORATION,
as successor to CHARTWELL REINSURANCE COMPANY

BY:_____    WITNESS:_____

TITLE:_____CRO_____

-10-

**Exhibit A**
**To the LDG Pool Commutation, Settlement and Release Agreement**

**COMPANY**

A.I. Lloyds Insurance Company
AIG Europe S.A.
AIG Global Trade and Political Risk Insurance Company
AIG Risk Management Inc
AIG Worldsource Division
AIU Insurance Company
American Home Assurance Company
American Home Assurance Company Canada
American International Marine Agency
American International Underwriters Overseers Ltd.
American International Pacific Insurance Company
American International Reinsurance Company, Ltd.
American International South Insurance Company
American International Specialty Lines Insurance Company
Audubon Insurance Company
Birmingham Fire Insurance Company of Pennsylvania
China America Insurance Company, Ltd.
Commerce & Industry Insurance Company
Commerce and Industry Insurance Company of Canada
Granite State Insurance Company
Illinois National Insurance Company
The Insurance Company of the State of Pennsylvania
New Hampshire Indemnity Company, Ltd.
Landmark Insurance Company
Lexington Insurance Company
National Union Fire Insurance Company of Louisiana
National Union Fire Insurance Company of Pittsburgh, PA
New Hampshire Insurance Company
The Philippine American General Insurance Company, Inc.
Starr Excess Liability Insurance Company Limited

80284365_2.DOC

EXHIBIT – B

TRENWICK AMERICA RE (F/ CHARTWELL REINS CO)

LDG REINSURANCE CORPORATION, SPECIAL RISK DIVISION TREATIES

| Company | Intermediaries | Contract # | Contract Name | Account Share% | Contract Share% | Effective Date | Expiration Date | RSD # |
|---|---|---|---|---|---|---|---|---|
| Amer Home | AON RE INC | 02757 | OCCUP ACCID XS WC | 25.000000 | 25.000000 | 01/01/98 | 12/31/99 | 01037C |
| Amer Home | AON RE INC | 03126 | OCCUP ACCID 1ST XS | 100.000000 | 100.000000 | 01/01/99 | 12/31/99 | 01037D |
| Amer Home | AON RE INC | 03926 | OCCUP ACCID 1ST XS | 100.000000 | 100.000000 | 01/01/00 | 12/31/00 | 01037D |
| Amer Home | AON RE INC, FKA ALEXANDER RE | 02758 | INDUST AID AIRCRAFT | 25.000000 | 25.000000 | 01/01/98 | 12/31/98 | 01339A |
| Amer Home | AON RE INC, FKA ALEXANDER RE | 03128 | INDUST AID AIRCRAFT | 50.000000 | 50.000000 | 01/01/99 | 12/31/99 | 01039B |
| Amer Home | BENFIELD COMPANY (FKA BENFIELD | 02851 | WC/GUARANTEED COST | 5.263158 | 4.000000 | 07/01/98 | 06/30/99 | 01059G |
| Amer Home | BENFIELD COMPANY (FKA BENFIELD | 03151 | WC/GUARANTEED COST | 6.555555 | 4.000000 | 07/01/99 | 06/30/00 | 01059G |
| Amer Home | BENFIELD COMPANY (FKA BENFIELD | 04105 | WC/GUARANTEED COST | 5.263158 | 5.263100 | 07/01/98 | 06/30/99 | 01059G |
| New Hampshire | BENFIELD COMPANY (FKA BENFIELD | 02851 | WC/GUARANTEED COST | 5.263158 | 4.000000 | 07/01/99 | 06/30/00 | 01059G |
| New Hampshire | BENFIELD COMPANY (FKA BENFIELD | 03151 | WC/GUARANTEED COST | 5.555555 | 4.000000 | 07/01/98 | 06/30/99 | 01059G |
| New Hampshire | BENFIELD COMPANY (FKA BENFIELD | 04105 | WC/GUARANTEED COST | 5.263100 | 5.263100 | 07/01/98 | 06/30/99 | 01059G |
| New Hampshire | BENFIELD COMPANY (FKA BENFIELD | 04805 | WC/GUARANTEED COST | 5.555500 | 5.555500 | 07/01/99 | 06/30/00 | 01059G |
| | | | | | | | | |
| TRENWICK AMERICA RE (F/ CHARTWELL INS CO) | | | | | | | | |
| | | | | | | | | |
| AI Specialty | GUY CARPENTER (F/SEDGWICK RE) | 03717 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 07/01/98 | 12/31/98 | 010531 |
| Amer Home | GUY CARPENTER (F/SEDGWICK RE) | 03717 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 07/01/98 | 12/31/98 | 010531 |
| American Home Canada | GUY CARPENTER (F/SEDGWICK RE) | 03718 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 07/01/98 | 12/31/98 | 010531 |
| New Hampshire | GUY CARPENTER (F/SEDGWICK RE) | 03717 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 07/01/98 | 12/31/98 | 010531 |
| AI Specialty | GUY CARPENTER (F/SEDGWICK RE) | 04130 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 01/01/99 | 12/31/99 | 010531 |
| Amer Home | GUY CARPENTER (F/SEDGWICK RE) | 04130 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 01/01/99 | 12/31/99 | 010531 |
| American Home Canada | GUY CARPENTER (F/SEDGWICK RE) | 04137 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 01/01/99 | 12/31/99 | 010531 |
| New Hampshire | GUY CARPENTER (F/SEDGWICK RE) | 04135 | OBLIG 2ND WC - 90% | 30.000000 | 27.000000 | 01/01/99 | 12/31/99 | 010531 |
| AI Specialty | GUY CARPENTER (F/SEDGWICK RE) | 03711 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 07/01/98 | 12/31/98 | 010531 |
| Amer Home | GUY CARPENTER (F/SEDGWICK RE) | 03711 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 07/01/98 | 12/31/98 | 010531 |
| American Home Canada | GUY CARPENTER (F/SEDGWICK RE) | 03712 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 07/01/98 | 12/31/98 | 010531 |
| New Hampshire | GUY CARPENTER (F/SEDGWICK RE) | 03711 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 07/01/98 | 12/31/98 | 010531 |
| AI Specialty | GUY CARPENTER (F/SEDGWICK RE) | 04132 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 01/01/99 | 12/31/99 | 010531 |
| Amer Home | GUY CARPENTER (F/SEDGWICK RE) | 04133 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 01/01/99 | 12/31/99 | 010531 |
| American Home Canada | GUY CARPENTER (F/SEDGWICK RE) | 04132 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 01/01/99 | 12/31/99 | 010531 |
| New Hampshire | GUY CARPENTER (F/SEDGWICK RE) | 04132 | OBLIG CESSION 2ND WC | 30.000000 | 30.000000 | 01/01/99 | 12/31/99 | 010531 |

Trenwick / AIG: March 2004

Page 1 of 1

Exhibit C
To the LDG Pool Commutation, Settlement and Release Agreement

POOL AGREEMENTS

Quota Share Retrocessional Agreements by and among Chartwell Reinsurance Company and The Retrocessionaires:

1.    Agreement effective 7/1/1997, as subsequently renewed, amended or otherwise modified, applying to occupational accident and health reinsurances and/or retrocessions which have been bound and accepted by Chartwell through SRFF Management. This agreement applies to both the SRRF I and SRRF II facilities. Interests and Liabilities Endorsements for both facilities are attached to the same agreement.

2.    Agreement effective 5/1/1997, as subsequently renewed, amended or otherwise modified, applying to occupational accident and health reinsurances and/or retrocessions which have been bound and accepted by Chartwell through LDG Reinsurance Underwriters. This agreement applies to the facility often referred to as the Occupational Accident and Health Facility.

3.    Agreement effective 5/1/1997, as subsequently renewed, amended or otherwise modified, applying to workers compensation and alternative workers compensation reinsurances and/or retrocessions which have been bound and accepted by Chartwell through LDG Reinsurance Underwriters. This agreement applies to the facility often referred to as the Workers' Compensation Alternative Facility ("WCAF").

80284323_2.DOC

**Exhibit D**

$73,360,000.00

## TRENWICK AMERICA REINSURANCE CORPORATION

6.0% Promissory Note

TRENWICK AMERICA REINSURANCE CORPORATION (together with its successors, the "Company"), for value received, and subject to the terms and conditions hereof and the Agreement (as defined below), hereby promises to pay to the order of AMERICAN INTERNATIONAL GROUP, INC. (the "Purchaser"), immediately upon the written demand of the Purchaser, the principal sum of SEVENTY-THREE MILLION THREE HUNDRED SIXTY THOUSAND DOLLARS ($73,360,000.00) by wire transfer of immediately available funds to the Purchaser's account (the "Bank Account") at such bank in the United States as may be specified in writing by the Purchaser to the Company, in such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts.

Section 1.    Interest.  The Company promises to pay interest, semi-annually in arrears, on each May 15 and November 15 (unless such day is not a Business Day, in which event on the next succeeding Business Day) (each an "Interest Payment Date") to Purchaser and upon any repayment of principal, on the principal sum hereof outstanding in like coin or currency, at the rates per annum set forth below, by wire transfer of immediately available funds to the Bank Account from the most recent Interest Payment Date to which interest has been paid on this Note, or if no interest has been paid on this Note, from the date of this Note until payment in full of the principal sum hereof has been made.

Interest on this Note will accrue at the rate of 6.0% per annum from and including the date of this Note to but excluding the date of repayment thereof.  Interest shall be calculated on the basis of a year of twelve 30-day months and on the actual number of days elapsed.

Section 2.    Issuance.  This Note is being issued by the Company pursuant to the LDG Pool Commutation, Settlement and Release Agreement entered into between the Company and the Purchaser, dated as of June 30, 2004 (as the same may be amended, modified or in effect from time to time in accordance with its terms, the "Agreement").  This Note is subject to the terms and conditions of the Agreement.  For avoidance of doubt if the Agreement is deemed to be void or invalid for any reason, this Note shall automatically be null and void.

Section 3.    Transfer; Replacement; and Prepayment.  In the event of any transfer or assignment of this Note, which shall be subject to the prior written consent of the Company, the Company agrees to issue from time to time replacement Notes in the form hereof to facilitate such transfer or assignment upon surrender and cancellation of the Notes to be replaced (or provision of a suitable indemnity to the Company in the event of any lost or

stolen Notes). This Note may be prepaid, in whole or in part, at any time and from time to time, without any penalty.

Section 4.    No Recourse.    The principal and interest due on this Note (together, the "Payment Obligations") are not general obligations of the Company. Pursuant to the Agreement, the Purchaser shall not have any recourse against the Company or its assets (other than the assigned assets specified in this Section 4) on this Note, but shall look solely and exclusively to the assigned rights against the "Retrocessionaires," "LDG," and/or "SRRF," and/or any successors or affiliates thereof, in the "Pool Agreements" and the "Reinsurance Management Agreements" for payment of principal and interest due hereon (as each such term is defined in the Agreement). Any judgment in any action or proceeding against the Company pursuant to this Note shall be enforceable only to the extent of the Company's interest in the assigned assets specified in this Section 4 and the Purchaser shall not bring any action, or make any claim, for any deficiency judgment against the Company in connection with this Note. The cost of pursuing such assigned rights shall be borne solely by the Purchaser. The Payment Obligations of the Company under this Note shall terminate upon certification by the Purchaser that its recovery efforts with respect to the assigned rights are concluded, regardless of the amounts recovered, it being understood that the Purchaser shall provide the certification to the Company promptly after such recovery efforts are concluded, and it being further understood that the Company will not request certification more frequently than once a year.

Section 5.    Governing Law; Venue; and Trial by Jury.    This Note shall be deemed to be a contract made under the laws of the State of Connecticut, and for all purposes shall be governed by and construed in accordance with the laws of said State without regard to its conflict of laws principles. The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum. The Company hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Note.

Section 6.    Headings; Construction.    The headings of the sections of this Note are inserted for convenience only and shall not be deemed to constitute a part hereof and words used herein which are either singular or plural shall be construed to include the other where appropriate.

The Purchaser by acceptance of this Note, agrees to be bound by the provisions of this Note which are expressly binding on Purchaser.

-2-

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:  June 30, 2004

TRENWICK AMERICA REINSURANCE CORPORATION

By:  _____

Name:
Title:

-3-

AIG Treaties Ceded to Trenwick

| AIG Ceding Company Name | Broker # | Intermediaries | AIG Treaty Contract # | AIG Treaty Name | Underwriting Year | Contract Share% | Effective Date | Expiration Date | RSO # | LOG Ref # | Retro # | Pool Numbers |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AMERICAN HOME ASSURANCE COMPANY | 006476006 | AON RE INC. FKA ALEXANDER RE | 02757 | QCGUP ACCID_XS WC | 1998 | 25 | 01/01/98 | 12/31/98 | 010579C | 97-02154 | SRRF 1997 | See Attachment A |
| AMERICAN HOME ASSURANCE COMPANY | 006476006 | AON RE INC. FKA ALEXANDER RE | 03176 | QCGUP ACCID 1ST XS | 1999 | 100 | 01/01/99 | 12/31/99 | 010331D | 99-02154 | SRRF II 1998 | See Attachment B |
| AMERICAN HOME ASSURANCE COMPANY | 006476006 | AON RE INC. FKA ALEXANDER RE | 03926 | QCGUP ACCID 1ST XS | 2000 | 100 | 01/01/00 | 12/31/00 | 010331D | 99-02154 | SRRF II 1998 | See Attachment B |
| AMERICAN HOME ASSURANCE COMPANY | 006476006 | AON RE INC. FKA ALEXANDER RE | 03128 | HOUST AID AIRCRAFT | 1998 | 50 | 01/01/98 | 12/31/98 | 010578B | 98-02155 | SRRF II 1998 | See Attachment B |
| AMERICAN HOME ASSURANCE COMPANY | 006476006 | AON RE INC. FKA ALEXANDER RE | 03128 | HOUST AID AIRCRAFT | 1999 | 50 | 01/01/99 | 12/31/99 | 010578B | 99-02155 | SRRF II 1998 | See Attachment B |
| NATIONAL UNION FIRE INSURANCE | 006309012 | GUY CARPENTER (FSEDGWICK RE) | 03711 | OBLIG CESSION 2ND WC | 1998 | 50 | 07/01/98 | 12/31/98 | 010531 | 98-01683 | SRRF 1998 | See Attachment C |
| NATIONAL UNION FIRE INSURANCE | 006309012 | GUY CARPENTER (FSEDGWICK RE) | 03717 | OBLIG 2ND WC -50% | 1998 | 27 | 07/01/98 | 12/31/98 | 010531 | 98-01683 | SRRF 1998 | See Attachment C |
| NATIONAL UNION FIRE INSURANCE | 006309012 | GUY CARPENTER (FSEDGWICK RE) | 04132 | OBLIG CESSION 2ND WC | 1999 | 30 | 01/01/99 | 12/31/99 | 010531 | 98-01683 | SRRF 1998 | See Attachment C |
| NATIONAL UNION FIRE INSURANCE | 006309012 | GUY CARPENTER (FSEDGWICK RE) | 04136 | OBLIG 2ND WC -50% | 1999 | 27 | 01/01/99 | 12/31/99 | 010531 | 98-01683 | SRRF 1998 | See Attachment C |
| AMERICAN HOME ASSURANCE COMPANY | 006270001 | BENFIELD COMPANY (FKA BENFIELD | 02851 | WC/GUARANTEED COST | 1998 | 4 | 07/01/98 | 06/30/99 | 010596 | 198-530 | LOG RE QCC/ACC | See Attachment D |
| AMERICAN HOME ASSURANCE COMPANY | 006609001 | BENFIELD COMPANY (FKA BENFIELD | 03151 | WC/GUARANTEED COST | 1999 | 4 | 07/01/99 | 06/30/00 | 010596 | 198-530 | LOG RE QCC/ACC | See Attachment E |

| ATTACHMENT A | |
| --- | --- |
| SRRF 1997 Retrocessionaire | Participation % |
| American Re-Insurance Co. | |
| American United Life Ins. Co. | |
| Chartwell Reinsurance Co. | 5.00% |
| Cologne Life Re Co. | 3.33% |
| Dorinco Reinsurance Co. | 5.75% |
| Equitable Life Assur. Society of the United States | |
| First Allmerica Financial Life Ins. Co. | 26.83% |
| Guardian Life Ins. Co. of America | |
| Hartford Life Ins. Co. | 6.00% |
| Houston Cas. Co. | |
| Ins. Corp. of Hannover | 2.00% |
| Life Reassur. Corp. of America | 1.67% |
| Manulife Re. Corp. (USA) | 12.33% |
| M&G Life Reassur. Co. of America | 3.00% |
| Monumental Life Ins. Co. | |
| Pan-American Life Ins. Co. | 2.00% |
| Phoenix Home Life Mutual Ins. Co. | 4.67% |
| Reliance National Ins. Co. | |
| Reliance Standard Life Ins. Co. | 6.67% |
| Reliastar Life Ins. Co. | 4.67% |
| Sun Life Assur. Co. of Canada | |
| Swiss Re Life & Health America Inc. | 5.00% |
| TMG Life Ins. Co. | 8.33% |
| Transamerica Occidental Life Ins. Co. | 2.75% |
| Total | 100.00% |
| AIU Treaty Retroceded | AIU Treaty Number |
| OCCUP.ACCID. XS WC | 02757 |

REDACTED

| ATTACHMENT B | |
| --- | --- |
| SRRF II 1998 Retrocessionaire | Participation % |
| American Re-Insurance Co. | 3.33% |
| American United Life Ins. Co. | 7.00% |
| Chartwell Reinsurance Co. | 5.00% |
| Cologne Life Re Co. | 5.67% |
| Dorinco Reinsurance Co. | |
| Equitable Life Assur. Society of the United States | |
| First Allmerica Financial Life Ins. Co. | 25.67% |
| Guardian Life Ins. Co. of America | 3.67% |
| Hartford Life Ins. Co. | 5.00% |
| Houston Cas. Co. | |
| Ins. Corp. of Hannover | 3.33% |
| Life Reassur. Corp. of America | |
| Manulife Re. Corp. (USA) | 8.00% |
| M&G Life Reassur. Co. of America | |
| Monumental Life Ins. Co. | |
| Pan-American Life Ins. Co. | |
| Phoenix Home Life Mutual Ins. Co. | 3.33% |
| Reliance National Ins. Co. | 3.33% |
| Reliance Standard Life Ins. Co. | 5.00% |
| Reliastar Life Ins. Co. | |
| Sun Life Assur. Co. of Canada | 5.00% |
| Swiss Re Life & Health America Inc. | 5.00% |
| TMG Life Ins. Co. | 11.67% |
| Transamerica Occidental Life Ins. Co. | |
| Total | 100.00% |

| AIU Treaty Retroceded | AIU Treaty Number |
| --- | --- |
| OCCUP ACCID 1ST XS | 03126 |
| OCCUP ACCID 1ST XS | 03926 |
| INDUST AID AIRCRAFT | 03128 |
| INDUST AID AIRCRAFT | 03128 |

| ATTACHMENT C | |
| --- | --- |
| SRRF 1998 Retrocessionaire | Participation % |
| American Re-Insurance Co. | 3.00% |
| American United Life Ins. Co. | 3.00% |
| Chartwell Reinsurance Co. | 5.00% |
| Cologne Life Re Co. | 5.00% |
| Dorinco Reinsurance Co. | 5.75% |
| Equitable Life Assur. Society of the United States | |
| First Allmerica Financial Life Ins. Co. | 26.83% |
| Guardian Life Ins. Co. of America | 3.00% |
| Hartford Life Ins. Co. | 6.00% |
| Houston Cas. Co. | |
| Ins. Corp. of Hannover | 2.00% |
| Life Reassur. Corp. of America | |
| Manulife Re. Corp. (USA) | 12.33% |
| M&G Life Reassur. Co. of America | |
| Monumental Life Ins. Co. | |
| Pan-American Life Ins. Co. | |
| Phoenix Home Life Mutual Ins. Co. | 4.67% |
| Reliance National Ins. Co. | |
| Reliance Standard Life Ins. Co. | 6.67% |
| Reliastar Life Ins. Co. | |
| Sun Life Assur. Co. of Canada | |
| Swiss Re Life & Health America Inc. | 5.00% |
| TMG Life Ins. Co. | 9.00% |
| Transamerica Occidental Life Ins. Co. | 2.75% |
| Total | 100.00% |

| AIU Treatry Retroceded | AIU Treaty Number |
| --- | --- |
| OBLIG CESSION 2ND WC | 03711 |
| OBLIG 2ND WC - 90% | 03717 |
| OBLIG CESSION 2ND WC | 04132 |
| OBLIG 2ND WC - 90% | 04136 |

REDACTED

| ATTACHMENT D | |
| --- | --- |
| OCC ACC 1998 | Participation % |
| American Re-Insurance Co. | |
| American United Life Ins. Co. | |
| Chartwell Reinsurance Co. | 10.00% |
| Cologne Life Re Co. | 6.50% |
| Dorinco Reinsurance Co. | 2.50% |
| Equitable Life Assur. Society of the United States | |
| First Allmerica Financial Life Ins. Co. | 30.00% |
| Guardian Life Ins. Co. of America | |
| Hartford Life Ins. Co. | 3.00% |
| Houston Cas. Co. | |
| Ins. Corp. of Hannover | 10.00% |
| Life Reassur. Corp. of America | |
| Manulife Re. Corp. (USA) | 12.50% |
| M&G Life Reassur. Co. of America | |
| Monumental Life Ins. Co. | 6.00% |
| Pan-American Life Ins. Co. | |
| Phoenix Home Life Mutual Ins. Co. | |
| Reliance National Ins. Co. | |
| Reliance Standard Life Ins. Co. | |
| Reliastar Life Ins. Co. | 4.50% |
| Sun Life Assur. Co. of Canada | |
| Swiss Re Life & Health America Inc. | 10.00% |
| TMG Life Ins. Co. | 5.00% |
| Transamerica Occidental Life Ins. Co. | |
| Total | 100.00% |
| AIU Treaty Retroceded | AIU Treaty Number |
| WC/GUARANTEED COST | 02851 |

| ATTACHMENT E | |
| --- | --- |
| OCC ACC 1999 | Participation |
| American Re-Insurance Co. | |
| American United Life Ins. Co. | 5.00% |
| Chartwell Reinsurance Co. | 10.00% |
| Cologne Life Re Co. | |
| Dorinco Reinsurance Co. | 5.00% |
| Equitable Life Assur. Society of the United States | 15.00% |
| First Allmerica Financial Life Ins. Co. | |
| Guardian Life Ins. Co. of America | 10.00% |
| Hartford Life Ins. Co. | |
| Houston Cas. Co. | 15.00% |
| Ins. Corp. of Hannover | |
| Life Reassur. Corp. of America | |
| Manulife Re. Corp. (USA) | 17.50% |
| M&G Life Reassur. Co. of America | |
| Monumental Life Ins. Co. | 6.00% |
| Pan-American Life Ins. Co. | |
| Phoenix Home Life Mutual Ins. Co. | |
| Reliance National Ins. Co. | |
| Reliance Standard Life Ins. Co. | |
| Reliastar Life Ins. Co. | 4.50% |
| Sun Life Assur. Co. of Canada | |
| Swiss Re Life & Health America Inc. | |
| TMG Life Ins. Co. | 12.00% |
| Transamerica Occidental Life Ins. Co. | |
| Total | 100.00% |
| AIU Treaty Retroceded | AIU Treaty Number |
| WC/GUARANTEED COST | 03151 |

Tab 3

In Arbitration Before Messrs. Hall,

Haber and Thomson

---

AMERICAN INTERNATIONAL GROUP, INC., on behalf
of its member and associated companies,

Petitioners,

-against-

AMERICAN RE-INSURANCE CO., AMERICAN UNITED
LIFE INSURANCE CO., COLOGNE LIFE REINSURANCE
CO., DORINCO REINSURANCE CO., EQUITABLE LIFE
ASSURANCE SOCIETY, FIRST ALLMERICA FINANCIAL
LIFE INSURANCE CO., THE GUARDIAN LIFE INSUR-
ANCE CO. OF AMERICA, HARTFORD LIFE INSURANCE
CO., HOUSTON CASUALTY CO., INSURANCE CORP. OF
HANNOVER, MANUFACTURERS LIFE INSURANCE CO.
USA, MONUMENTAL LIFE INSURANCE CO., PAN-
AMERICAN LIFE INSURANCE CO., PHOENIX LIFE IN-
SURANCE CO., RELIASTAR LIFE INSURANCE CO., SUN
LIFE ASSURANCE CO. OF CANADA (Responding on
Behalf of SUN LIFE AND CLARICA), SWISS RE LIFE
AND HEALTH AMERICA INC., and TRANSAMERICA
OCCIDENTAL LIFE INSURANCE CO.,

Respondents.

**INITIAL POSITION STATEMENT
FOR AIG COMPANIES**

# DOCUMENT REDACTED
# PURSUANT TO
# CONFIDENTIALITY
# AGREEMENT

Tab 4



**SRRF**

SRRF MANAGEMENT INCORPORATED

QUOTA SHARE RETROCESSIONAL AGREEMENT

by and among

CHARTWELL REINSURANCE COMPANY
(Chartwell)

and

THE RETROCESSIONAIRES WHOSE NAMES AND INTERESTS APPEAR
IN THE INTERESTS AND LIABILITIES ENDORSEMENT
(the Retrocessionaires)



SRRF MANAGEMENT INCORPORATED

## Article I - Term

This Agreement shall take effect July 1, 1997 and is to be a Continuous Agreement unless and until terminated in accordance with Article VIII.

## Article II - Definitions

"Agreement Year" means each 12 consecutive calendar months during the continuance of this Agreement, beginning on each July 1.

"Subject Business" means occupational accident and health reinsurances and/or retrocessions which become effective as new or renewal business on or after the effective date of this Agreement, and which have been bound and accepted by Chartwell through SRRF Management.

All such reinsurances and/or retrocessions shall be provided in accordance with terms and provisions of Reinsurance Contracts issued to a Reinsured by Chartwell through SRRF Management, and shall apply on either an excess or pro-rata form, and on either a treaty or facultative basis, as bound and accepted by Chartwell through SRRF Management.

"Reinsured" means any insurance or reinsurance company or companies, or any other admitted insurer or reinsurer or non-admitted alien reinsurer reinsured under a Reinsurance Contract issued by Chartwell through SRRF Management.

"Reinsurance Contract" means all binders, contracts, agreements, treaties, certificates, addenda, endorsements, or other evidences of Occupational Accident and Health Reinsurance which have been issued by Chartwell through SRRF Management to a Reinsured, including renewals and cancellations thereof.

"Contract Term" means the consecutive period of a Reinsurance Contract issued by Chartwell through SRRF Management beginning on the inception date of each such contract, or on each renewal date thereof, and ending on a date no later than thirty-six (36) months thereafter.

Notwithstanding any statement to the contrary, Chartwell through SRRF Management at its discretion, may also issue continuous Reinsurance Contracts; provided that all such contracts retain a provision for termination at an initial termination date not longer than eighteen (18) months after the inception of each such contract, and at subsequent termination dates not to exceed twelve (12) month intervals thereafter.

"Contract Year" means each twelve (12) consecutive calendar months during the continuance of a Reinsurance Contract issued by Chartwell through SRRF Management, provided, however, that at the option of Chartwell, the first such Contract Year only may be comprised of any period of up to eighteen (18) consecutive months beginning on the initial inception date of each such contract.

2

REDACTED



SRRF MANAGEMENT INCORPORATED

SRRF Management shall perform the underwriting, claims management and accounting activities related to the business retroceded pursuant to this Agreement.

"Loss Adjustment Expenses" means all costs incurred by SRRF Management in investigating, resisting, settling, adjusting, managing, and processing of claims, exclusive of salaries of full-time employees and other office expenses of SRRF Management, unless otherwise agreed.

"Gross Net Reinsurance Premium" means gross premiums applicable to Reinsurance Contracts issued by Chartwell through SRRF Management, less cancellations and return premiums.

## Article III - Business Covered

Chartwell obligates itself to cede to the Retrocessionaire, and the Retrocessionaire obligates itself to accept a quota share part of all Subject Business underwritten by SRRF Management on behalf of Chartwell during the term of this Agreement. All Subject Business shall consist of the classes of business, and be written in accordance with terms, conditions, exclusions and limits that are set forth in the Reinsurance Management Agreement between SRRF Management and Chartwell, which Agreement is attached to, and made part of this Agreement.

## Article IV - Follow the Fortunes

Chartwell shall, in all cases, be the sole judge of (1) what constitutes a claim or loss covered under all Reinsured Contracts, (2) Chartwell's liability under the Reinsured Contracts, (3) commutation amounts, and (4) the amount for which the Retrocessionaire shall be liable, subject always to the terms and conditions of this Agreement and the Reinsurance Management Agreement. The Retrocessionaire shall be bound by Chartwell's judgment as to the obligation and liability of the Retrocessionaires. All cessions to the Retrocessionaires pursuant to this Agreement shall be subject in all respects to the same risks, terms, conditions, interpretations, assessments, waivers, modifications, alterations, and cancellations as the Reinsured Contracts, the true intent of this Agreement being that the Retrocessionaires shall, in every case to which this Agreement applies and in the proportions specified herein, follow Chartwell's fortunes with respect to the Reinsured Contracts.

## Article V - Errors and Omissions

Except as may be otherwise specifically provided herein no inadvertent errors, delays or omissions shall relieve any party to this Agreement from their liability or obligations hereunder, provided such errors, delays or omissions are rectified as soon as possible after discovery.

3



SRRF MANAGEMENT INCORPORATED

### Article VI - Reports and Remittances

1.  All books and records deemed necessary and appropriate for proper management and conduct of the Subject Business shall be maintained by SRRF Management or Chartwell and shall be available for inspection by the Retrocessionaire, or its designated representative, at all reasonable times for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof.

2.  As soon as possible after the close of each calendar quarter that this Agreement remains in force, but in no event longer than forty-five (45) days thereafter, SRRF Management shall furnish to Chartwell and the Retrocessionaire a quarterly report setting forth details of all transactions which affected business the subject matter hereof during each such quarter. Each such report shall provide the following information on both quarterly and cumulative year to date basis:

### Underwriting Report

A.  100% of Gross Net Reinsurance Premiums written during each such quarter.

B.  100% of allowances payable to SRRF Management during each such quarter.

C.  100% of allowances payable to Chartwell during each such quarter.

D.  100% of unearned premium reserves at the end of each quarter.

E.  100% of losses and loss expenses paid by Chartwell during each such quarter (net of recoveries from ceded reinsurance).

F.  100% of losses and loss expense reserves established by SRRF Management at the end of each such quarter for claims incurred and reported but not paid.

G.  100% of losses and loss expense reserves recommended by SRRF Management at the end of each such quarter for claims incurred but not reported.

H.  100% of net premiums payable during each such quarter for ceded reinsurance secured on behalf of Chartwell.

### Cash Report

A.  100% of Gross Net Reinsurance Premiums paid to Chartwell during each such quarter by Reinsurance Contract.

4



SRRF MANAGEMENT INCORPORATED

B.     100% of amounts recovered during each such quarter from ceded reinsurance secured on behalf of Chartwell.

C.     100% of net premiums paid during each such quarter for ceded reinsurance secured on behalf of Chartwell.

D.     100% of allowances paid to SRRF Management during each such quarter.

E.     100% of losses and loss expenses paid by Chartwell during each such quarter.

Amounts payable to the Retrocessionaire shall be remitted by SRRF Management at the same time that each such quarterly report is rendered. If, however, any amounts due from the Retrocessionaire exceed amounts on deposit in the special account and the claims reserve fund maintained by SRRF Management, such amounts shall be paid within three (3) business days following request by means of a wire transfer, same day available funds, to SRRF Management. Any amounts payable by the Retrocessionaire in accordance with this Article which are not remitted within the time required, shall bear interest at the rate of 1% per month (or part thereof) that the amount remains unpaid. If the Retrocessionaire fails to make the payment required in this Article on more than three (3) occasions, the Retrocessionaire shall be required to provide funding as set forth in Article VIII, below and SRRF Management shall not be required to pay any amounts to the Retrocessionaires until the Retrocessionaire has complied with Article VIII.

## Article VII - Currency

All amounts due to any party hereunder shall be payable in United States currency.

## Article VIII - Loss Funding

1.     If the Retrocessionaire is unauthorized in the state of Minnesota, the Retrocessionaire shall provide funding in an amount equal to 102% of the sum of the following:

    A.   losses and allocated loss adjustment expenses owed to Chartwell;
    B.   reserves for losses reported and outstanding;
    C.   reserves for losses incurred but not reported (IBNR);
    D.   reserves for allocated loss expenses; and
    E.   reserves for unearned premium.

2.     Such funding may be provided by permitting Chartwell to withhold funds otherwise payable to the Retrocessionaire in a trust account established for Chartwell's benefit or letter of credit issued for the benefit of Chartwell or any combination of the foregoing. If at any time, the funds so withheld are not equal to the amount required pursuant to Section 1 of this Article, the Retrocessionaire shall provide additional funds so that the

5



SRRF MANAGEMENT INCORPORATED

total amount of funds held by Chartwell equals the amount required by Section 1 of this Article.

3.  If the Retrocessionaire's rating from A.M. Best & Co. is, or, at any time during the pendency of this Agreement, declines to below "A-" or if the policyholders surplus of the Retrocessionaire is, or declines to below, $100 million, the Retrocessionaire shall provide funding of losses in accordance with paragraph 1 of this Article.

A claims reserve fund placed under Chartwell's control shall be established and shall be funded in the following manner. Quarterly deductions from the positive balances developed for account of the Retrocessionaires shall be withheld until a reserve fund of the greater or (1) $500,000 or (2) 20% of gross net reinsurance premium has been accumulated. The amounts thus withheld shall be separately maintained in a fiduciary trust account, and shall be used by Chartwell solely for the payment of losses payable pursuant to this Agreement. Upon payment of losses, the reserve fund shall be automatically re-established to the level specified above. If the amounts deposited have been reduced to the extent that they are inadequate to pay all or a part of losses payable pursuant to this Agreement, the liability of the Retrocessionaire shall continue in force as respects all such losses without diminution because of the inadequacy of the reserve fund.

The claims reserve fund shall be maintained until all losses have been finally settled.

## Article IX Liability of Chartwell

Under no circumstances will Chartwell be liable to the Retrocessionaires for extra or non-contractual damages or legal fees and expenses attendant to the defense thereof; including, but not limited to, compensatory, exemplary, and punitive damages or fines or statutory penalties which are awarded against SRRF Management as a result of an act or omission, or course of conduct committed by or on behalf of SRRF Management unless Chartwell shall have concurred in writing with the proposed act, omission or course of conduct to be taken by SRRF Management which led to the award of such damages.

## Article X - Termination

1.  This Agreement may be terminated at 12:01 A.M. Eastern Standard Time July 1, 1998 or any other subsequent July 1, by Chartwell or the Retrocessionaire giving one hundred and eighty (180) days prior written notice to the other party. Such termination shall not apply to Reinsurance Contracts having effective dates prior to the date of termination until the earlier of (A) the Reinsurance Contract's scheduled renewal date or (B) thirty-six (36) months from the date of termination.



SRRF MANAGEMENT INCORPORATED

2.    After the service of any notice of termination hereunder, all Articles of this Agreement that confer rights or liabilities upon any party shall continue to apply until the final settlement of the accounts for all Agreement Years in which the Retrocessionaire participates.

During the period after such notice of termination is given but before the effective date of termination, SRRF Management shall rightfully continue to accept, sign and issue Reinsurance Contracts and all endorsements or amendments thereto and all other acts hereunder on behalf of Chartwell.

## Article XI - Arbitration

As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates. The Arbitration shall be held in a place mutually agreeable to the parties. One Arbitrator shall be chosen by Chartwell and the other by the Retrocessionaires. The Umpire shall be chosen by the two Arbitrators.

Arbitration may be initiated by either party (the Petitioner) demanding arbitration and naming its Arbitrator. The other party (the Respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the Petitioner. If the Respondent fails to designate its Arbitrator within the time stated above, the Petitioner is expressly authorized and empowered to name the second Arbitrator; and Respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. If the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, such selection shall be made in accordance with the provisions of the Massachusetts Uniform Arbitration Act Chapter 251 of the Massachusetts General Laws Annotated.

Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement. The Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest

7



SRRF MANAGEMENT INCORPORATED

convenient date. but in no event later than one hundred and twenty (120) days from submission of the case to the Board. shall be final and binding upon all parties.

### Article XII - Controlling Law

This Agreement shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts.

### Article XIII - Insolvency

In the event of Chartwell's insolvency. any amounts payable hereunder by the Retrocessionaire shall be payable directly to Chartwell's liquidator, receiver. conservator or statutory successor without diminution because of the insolvency. except where this Agreement specifically provides another payee of such retrocessional amount due.

In the event of SRRF Management's insolvency or its refusal or inability to fulfill its responsibilities pursuant to the Reinsurance Management Agreement, any amounts payable to SRRF Management as consideration for services provided pursuant to the Reinsurance Management Agreement shall be paid to Chartwell which shall be substituted for SRRF Management until either the earlier of: (a) all reinsurance issued by Chartwell has been terminated and all obligations arising thereunder have been fulfilled or, (b) another manager has been appointed. No manager shall be appointed without the prior written consent of Chartwell. The Retrocessionaire shall pay its proportionate share of any increased costs incurred by Chartwell as a result of SRRF Management's inability to fulfill its contractual obligations. If the duties of SRRF Management are assumed by Chartwell. all fees, costs and expenses previously payable to SRRF Management shall be payable to Chartwell.

### Article XIV - Entire Agreement

This Agreement and the Reinsurance Management Agreement constitute the entire Agreement between the parties and may be varied only by a writing signed by the parties hereto. The headings of the Articles herein are for convenience only and are not a part of this Agreement.



SRRF MANAGEMENT INCORPORATED

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized representatives, have executed this Agreement in duplicate.

SRRF MANAGEMENT INCORPORATED

By _Barbara Smith_

Title _President_

CHARTWELL REINSURANCE COMPANY

By _____

Title _____

9

QUOTA SHARE RETROCESSIONAL AGREEMENT

by and among

CHARTWELL REINSURANCE COMPANY
(Chartwell)

and

THE RETROCESSIONAIRES WHOSE NAMES AND INTERESTS APPEAR
IN THE INTERESTS AND LIABILITIES ENDORSEMENT
(the Retrocessionaires)

Article I - Term

This Agreement shall take effect May 1, 1997 and is to be a Continuous Agreement unless and until terminated in accordance with Article VIII.

Article II - Definitions

"Agreement Year" means each 12 consecutive calendar months during the continuance of this Agreement, beginning on each May 1.

"Subject Business" means occupational accident and health reinsurances and/or retrocessions which become effective as new or renewal business on or after the effective date of this Agreement, and which have been bound and accepted by Chartwell through LDG Reinsurance Underwriters.

All such reinsurances and/or retrocessions shall be provided in accordance with terms and provisions of Reinsurance Contracts issued to a Reinsured by Chartwell through LDG-RE, and shall apply on either an excess or pro-rata form, and on either a treaty or facultative basis, as bound and accepted by Chartwell through LDG-RE.

"Reinsured" means any insurance or reinsurance company or companies, or any other admitted insurer or reinsurer or non-admitted alien reinsurer reinsured under a Reinsurance Contract issued by Chartwell through LDG-RE.

"Reinsurance Contract" means all binders, contracts, agreements, treaties, certificates, addenda, endorsements, or other evidences of Occupational Accident and Health Reinsurance which have been issued by Chartwell through LDG-RE to a Reinsured, including renewals and cancellations thereof.

"Contract Term" means the consecutive period of a Reinsurance Contract issued by Chartwell through LDG-RE beginning on the inception date of each such contract, or on each renewal date thereof, and ending on a date no later than thirty-six (36) months thereafter.

Notwithstanding any statement to the contrary, Chartwell through LDG-RE at its discretion, may also issue continuous Reinsurance Contracts; provided that all such contracts retain a provision for termination at an initial termination date not longer than eighteen (18) months after the inception of each such contract, and at subsequent termination dates not to exceed twelve (12) month intervals thereafter.

"Contract Year" means each twelve (12) consecutive calendar months during the continuance of a Reinsurance Contract issued by Chartwell through LDG-RE, provided, however, that at the option of Chartwell, the first such Contract Year only may be comprised of any period of up to eighteen (18) consecutive months beginning on the initial inception date of each such contract.

"LDG-RE" means LDG Reinsurance Underwriters who shall perform the underwriting, claims management and accounting activities related to the business retroceded pursuant to this Agreement.

"Loss Adjustment Expenses" means all costs incurred by LDG-RE in investigating, resisting, settling, adjusting, managing, and processing of claims, exclusive of salaries of full-time employees and other office expenses of LDG-RE, unless otherwise agreed.

"Gross Net Reinsurance Premium" means gross premiums applicable to Reinsurance Contracts issued by Chartwell through LDG-RE, less cancellations and return premiums.

## Article III - Business Covered

Chartwell obligates itself to cede to the Retrocessionaire, and the Retrocessionaire obligates itself to accept a quota share part of all Subject Business underwritten by LDG-RE on behalf of Chartwell during the term of this Agreement. All Subject Business shall consist of the classes of business, and be written in accordance with terms, conditions, exclusions and limits that are set forth in the Reinsurance Management Agreement between LDG-RE and Chartwell, which Agreement is attached to, and made part of this Agreement.

## Article IV - Follow the Fortunes

Chartwell shall, in all cases, be the sole judge of (1) what constitutes a claim or loss covered under all Reinsured Contracts, (2) Chartwell's liability under the Reinsured Contracts, (3) commutation amounts, and (4) the amount for which the Retrocessionaire shall be liable, subject always to the terms and conditions of this Agreement and the Reinsurance Management Agreement. The Retrocessionaire shall be bound by Chartwell's judgment as to the obligation and liability of the Retrocessionaires. All cessions to the Retrocessionaires pursuant to this Agreement shall be subject in all respects to the same risks, terms, conditions, interpretations, assessments, waivers, modifications, alterations, and cancellations as the Reinsured Contracts, the true intent of this Agreement being that the Retrocessionaires shall, in every case to which this Agreement applies and in the proportions specified herein, follow Chartwell's fortunes with respect to the Reinsured Contracts.

## Article V - Errors and Omissions

Except as may be otherwise specifically provided herein no inadvertent errors, delays or omissions shall relieve any party to this Agreement from their liability or obligations hereunder, provided such errors, delays or omissions are rectified as soon as possible after discovery.

## Article VI - Reports and Remittances

1.    All books and records deemed necessary and appropriate for proper management and conduct of the Subject Business shall be maintained by LDG-RE or Chartwell and shall be available for inspection by the Retrocessionaire, or its designated representative, at all reasonable times for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof.

2.    As soon as possible after the close of each calendar quarter that this Agreement remains in force, but in no event longer than forty-five (45) days thereafter, LDG-RE shall furnish to Chartwell and the Retrocessionaire a quarterly report setting forth details of all

transactions which affected business the subject matter hereof during each such quarter. Each such report shall provide the following information on both quarterly and cumulative year to date basis:

<u>Underwriting Report</u>

A.    100% of Gross Net Reinsurance Premiums written during each such quarter.

B.    100% of allowances payable to LDG-RE during each such quarter.

C.    100% of allowances payable to Chartwell during each such quarter.

D.    100% of unearned premium reserves at the end of each quarter.

E.    100% of losses and loss expenses paid by Chartwell during each such quarter (net of recoveries from ceded reinsurance).

F.    100% of losses and loss expense reserves established by LDG-RE at the end of each such quarter for claims incurred and reported but not paid.

G.    100% of losses and loss expense reserves recommended by LDG-RE at the end of each such quarter for claims incurred but not reported.

H.    100% of net premiums payable during each such quarter for ceded reinsurance secured on behalf of Chartwell.

<u>Cash Report</u>

A.    100% of Gross Net Reinsurance Premiums paid to Chartwell during each such quarter by Reinsurance Contract.

B.    100% of amounts recovered during each such quarter from ceded reinsurance secured on behalf of Chartwell.

C.    100% of net premiums paid during each such quarter for ceded reinsurance secured on behalf of Chartwell.

D.    100% of allowances paid to LDG-RE during each such quarter.

E.    100% of losses and loss expenses paid by Chartwell during each such quarter.

Amounts payable to the Retrocessionaire shall be remitted by LDG-RE at the same time that each such quarterly report is rendered. If, however, any amounts due from the Retrocessionaire exceed amounts on deposit in the special account and the claims reserve fund maintained by LDG-RE, such amounts shall be paid within three (3) business days following request by means

of a wire transfer, same day available funds, to LDG-RE. Any amounts payable by the Retrocessionaire in accordance with this Article which are not remitted within the time required, shall bear interest at the rate of 1% per month (or part thereof) that the amount remains unpaid. If the Retrocessionaire fails to make the payment required in this Article on more than three (3) occasions, the Retrocessionaire shall be required to provide funding as set forth in Article VIII, below and LDG-RE shall not be required to pay any amounts to the Retrocessionaires until the Retrocessionaire has complied with Article VIII.

## Article VII - Currency

All amounts due to any party hereunder shall be payable in United States currency.

## Article VIII - Loss Funding

1.  If the Retrocessionaire is unauthorized in the state of Minnesota, the Retrocessionaire shall provide funding in an amount equal to 102% of the sum of the following:

    A.  losses and allocated loss adjustment expenses owed to Chartwell;
    B.  reserves for losses reported and outstanding;
    C.  reserves for losses incurred but not reported (IBNR);
    D.  reserves for allocated loss expenses; and
    E.  reserves for unearned premium.

2.  Such funding may be provided by permitting Chartwell to withhold funds otherwise payable to the Retrocessionaire in a trust account established for Chartwell's benefit or letter of credit issued for the benefit of Chartwell or any combination of the foregoing. If at any time, the funds so withheld are not equal to the amount required pursuant to Section 1 of this Article, the Retrocessionaire shall provide additional funds so that the total amount of funds held by Chartwell equals the amount required by Section 1 of this Article.

3.  If the Retrocessionaire's rating from A.M. Best & Co. is, or, at any time during the pendency of this Agreement, declines to below "A-" or if the policyholders surplus of the Retrocessionaire is, or declines to below, $100 million, the Retrocessionaire shall provide funding of losses in accordance with paragraph 1 of this Article.

    A claims reserve fund placed under Chartwell's control shall be established and shall be funded in the following manner. Quarterly deductions from the positive balances developed for account of the Retrocessionaires shall be withheld until a reserve fund of the greater or (1) $500,000 or (2) 20% of gross net reinsurance premium has been accumulated. The amounts thus withheld shall be separately maintained in a fiduciary trust account, and shall be used by Chartwell solely for the payment of losses payable pursuant to this Agreement. Upon payment of losses, the reserve fund shall be automatically re-established to the level specified above. If the amounts deposited have been reduced to the extent that they are inadequate to pay all or a part of losses payable

pursuant to this Agreement, the liability of the Retrocessionaire shall continue in force as respects all such losses without diminution because of the inadequacy of the reserve fund.

The claims reserve fund shall be maintained until all losses have been finally settled.

## Article IX Liability of Chartwell

Under no circumstances will Chartwell be liable to the Retrocessionaires for extra or non-contractual damages or legal fees and expenses attendant to the defense thereof; including, but not limited to, compensatory, exemplary, and punitive damages or fines or statutory penalties which are awarded against LDG-RE as a result of an act or omission, or course of conduct committed by or on behalf of LDG-RE unless Chartwell shall have concurred in writing with the proposed act, omission or course of conduct to be taken by LDG-RE which led to the award of such damages.

## Article X - Termination

1.   This Agreement may be terminated at 12:01 A.M. Eastern Standard Time May 1, 1998 or any other subsequent May 1, by Chartwell or the Retrocessionaire giving one hundred and eighty (180) days prior written notice to the other party. Such termination shall not apply to Reinsurance Contracts having effective dates prior to the date of termination until the earlier of (A) the Reinsurance Contract's scheduled renewal date or (B) thirty-six (36) months from the date of termination.

2.   After the service of any notice of termination hereunder, all Articles of this Agreement that confer rights or liabilities upon any party shall continue to apply until the final settlement of the accounts for all Agreement Years in which the Retrocessionaire participates.

     During the period after such notice of termination is given but before the effective date of termination, LDG-RE shall rightfully continue to accept, sign and issue Reinsurance Contracts and all endorsements or amendments thereto and all other acts hereunder on behalf of Chartwell.

## Article XI - Arbitration

As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates. The Arbitration shall be held in a place mutually agreeable to the parties.
One Arbitrator shall be chosen by Chartwell and the other by the Retrocessionaires. The Umpire shall be chosen by the two Arbitrators.

Arbitration may be initiated by either party (the Petitioner) demanding arbitration and naming its Arbitrator. The other party (the Respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the Petitioner. If the Respondent fails to designate its Arbitrator within the time stated above, the Petitioner is expressly authorized and empowered to name the second Arbitrator; and Respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. If the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, such selection shall be made in accordance with the provisions of the Massachusetts Uniform Arbitration Act Chapter 251 of the Massachusetts General Laws Annotated.

Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement. The Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest convenient date, but in no event later than one hundred and twenty (120) days from submission of the case to the Board, shall be final and binding upon all parties.

## Article XII - Controlling Law

This Agreement shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts.

## Article XIII - Insolvency

In the event of Chartwell's insolvency, any amounts payable hereunder by the Retrocessionaire shall be payable directly to Chartwell's liquidator, receiver, conservator or statutory successor without diminution because of the insolvency, except where this Agreement specifically provides another payee of such retrocessional amount due.

In the event of LDG-RE's insolvency or its refusal or inability to fulfill its responsibilities pursuant to the Reinsurance Management Agreement, any amounts payable to LDG-RE as consideration for services provided pursuant to the Reinsurance Management Agreement shall be paid to Chartwell which shall be substituted for LDG-RE until either the earlier of: (a) all reinsurance issued by Chartwell has been terminated and all obligations arising thereunder have been fulfilled or, (b) another manager has been appointed. No manager shall be appointed without the prior written consent of Chartwell. The Retrocessionaire shall pay its proportionate share of any increased costs incurred by Chartwell as a result of LDG-RE's inability to fulfill its contractual obligations. If the duties of LDG-RE are assumed by Chartwell, all fees, costs and expenses previously payable to LDG-RE shall be payable to Chartwell.

### Article XIV - Entire Agreement

This Agreement and the Reinsurance Management Agreement constitute the entire Agreement between the parties and may be varied only by a writing signed by the parties hereto.  The headings of the Articles herein are for convenience only and are not a part of this Agreement.

IN WITNESS WHEREOF, the parties hereto, by their respective duly authorized representatives, have executed this Agreement in duplicate.


LDG REINSURANCE UNDERWRITERS


By_____

Title_____


CHARTWELL REINSURANCE COMPANY


By_____

Title_____

REDACTED

Occupational Accid.    and Health Facility

Interests & Liabilities

| | |
|---|---|
| Cologne Life | |
| Chartwell Reinsurance | |
| Dorinco Reinsurance Co. | 3/31/98 |
| First Allmerica | 5/7/98 |
| Hartford Life | 3/3?/98 |
| Houston Casualty | N/A |
| Insurance Corp. of Hannover | 4/1/98 |
| Life Ins. Co. of North America | |
| Life Reassurance Corp. | Will not sign |
| Manulife Reinsurance Swiss Re Mercantile & General | 5/11/98 |
| Monumental Life | |
| Reliastar | 3/30/98 |
| TMG Life | 4/7/98 |

01/12/99   08:45              ☎ 781 245 0052         0  1/99  19:30 ☐ :04    NO:920

INTERESTS AND LIABILITIES ENDORSEMENT
(continued)

Signed this the _12th_ day of _January_ , 199_9_

MANULIFE REINSURANCE CORPORATION (USA)

By _____

Title _AVP_

Signed this the _____ day of _____ , 199___

SWISS RE LIFE AND HEALTH LIMITED

By _____

Title _____

Signed this the _____ day of _____ , 199___

MONUMENTAL LIFE INSURANCE COMPANY

By _____

Title _____

Signed this the _____ day of _____ , 199___

RELIASTAR LIFE INSURANCE COMPANY

By _____

Title _____

INTERESTS AND LIABILITIES ENDORSEMENT

In WITNESS WHEREOF, the parties hereto have caused this Endorsement to be executed, in duplicate, by their duly authorized representatives:

Percentage Participation

Signed this the _____ day of _____, 199___

COLOGNE LIFE REINSURANCE COMPANY                    4.00%

By _____

Title _____


Signed this the _____ day of _____, 199___

CHARTWELL REINSURANCE COMPANY                      10.00%

By _____

Title _____


Signed this the _____ day of _____, 199___

DORINCO REINSURANCE COMPANY                         2.50%

By _____

Title _____


Signed this the _7 th_ day of _May_____, 199 _8_

FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY    30.00%

By _Peter M. Bone_____

Title _Director, Select Markets___

INTERESTS AND LIABILITIES ENDORSEMENT
(continued)

Signed this the _7th_ day of _April_____, 199_3_

TMG INSURANCE COMPANY                                    3.50%

By _____

Title _____

INTERESTS AND LIABILITIES ENDORSEMENT
(continued)

Signed this the _____ day of _____, 199___

MANULIFE REINSURANCE CORPORATION (USA)                12.50%

By _____

Title _____


Signed this the _____ day of _____, 199___

SWISS RE LIFE AND HEALTH LIMITED                10.00%

By _____

Title _____


Signed this the _____ day of _____, 199___

MONUMENTAL LIFE INSURANCE COMPANY                3.00%

By _____

Title _____


Signed this the 20th day of March _____, 1998

RELIASTAR LIFE INSURANCE COMPANY                4.50%

By _[signature]_

Title 2ND V.P.        ASSISTANT SECRETARY

INTERESTS AND LIABILITIES ENDORSEMENT

In WITNESS WHEREOF, the parties hereto have caused this Endorsement to be executed, in duplicate, by their duly authorized representatives:

Percentage Participation

Signed this the _____ day of _____, 199___

**COLOGNE LIFE REINSURANCE COMPANY**                     4.00%

By _____

Title _____


Signed this the _____ day of _____, 199___

**CHARTWELL REINSURANCE COMPANY**                     10.00%

By _____

Title _____


Signed this the 27ᵗʰ day of Feb. _____, 1998

**DORINCO REINSURANCE COMPANY**                     2.50%

By _Michele F Mahoney_____

Title _Treaty Jr._____

OUR REF: ___0 TA 63332_____


Signed this the _____ day of _____, 199___

**FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY**     30.00%

By _____

Title _____

INTERESTS AND LIABILITIES ENDORSEMENT
(continued)

Signed this the ____ day of _February____, 199_

HARTFORD LIFE INSURANCE COMPANY                    3.00%

By _____

Title _____


Signed this the ____ day of _____, 199__

INSURANCE CORPORATION OF HANNOVER                  10.00%

By _____

Title _____


Signed this the ____ day of _____, 199__

LIFE INSURANCE COMPANY OF NORTH AMERICA            3.00%

By _____

Title _____


Signed this the ____ day of _____, 199__

LIFE REASSURANCE CORPORATION OF AMERICA            4.00%

By _____

Title _____

INTERESTS AND LIABILITIES ENDORSEMENT
(continued)

Signed this the _____ day of _____, 199___

HARTFORD LIFE INSURANCE COMPANY                                    3.00%

By _____

Title _____

Signed this the _29th_ day of _December_ , 199_7_

INSURANCE CORPORATION OF HANNOVER                    10.00% ($2,500,000)
An Illinois Corporation

By _____
        Gary S. Reid
Title _Vice President_

Ref #: 13715-97

Signed this the _____ day of _____, 199___

LIFE INSURANCE COMPANY OF NORTH AMERICA                            3.00%

By _____

Title _____

Signed this the _____ day of _____, 199___

LIFE REASSURANCE CORPORATION OF AMERICA                           4.00%

By _____

Title _____

Tab 5

IN ARBITRATION BEFORE MESSRS. HALL, HABER AND THOMSON

AMERICAN INTERNATIONAL GROUP, INC., on behalf of its member and associated companies,

Petitioners,

-against-

AMERICAN RE-INSURANCE CO., AMERICAN UNITED LIFE INSURANCE CO., COLOGNE LIFE REINSURANCE CO., DORINCO REINSURANCE CO., EQUITABLE LIFE ASSURANCE SOCIETY, FIRST ALLMERICA FINANCIAL LIFE INSURANCE CO., THE GUARDIAN LIFE INSURANCE CO. OF AMERICA, HARTFORD LIFE INSURANCE CO., HOUSTON CASUALTY CO., INSURANCE CORP. OF HANNOVER, MANUFACTURERS LIFE INSURANCE CO. USA, MONUMENTAL LIFE INSURANCE CO., PAN-AMERICAN LIFE INSURANCE CO., PHOENIX LIFE INSUR-ANCE CO., RELIASTAR LIFE INSURANCE CO., SUN LIFE ASSURANCE CO. OF CANADA (Responding on Behalf of SUN LIFE AND CLARICA), SWISS RE LIFE AND HEALTH AMERICA INC., and TRANSAMERICA OCCIDENTAL LIFE INSURANCE CO.,

Respondents.

# DOCUMENT REDACTED PURSUANT TO CONFIDENTIALITY AGREEMENT

Tab 6

Westlaw.

26265302129                                                              Page 1

26265302129

CORPORATE RECORDS & BUSINESS REGISTRATIONS

This Record Last Updated:    01/07/2005
Database Last Updated:       10-05-2005
Update Frequency:            WEEKLY
Current Date:                10/06/2005
Source:                      AS REPORTED BY THE SECRETARY OF STATE OR OTHER
                             OFFICIAL SOURCE

THE FOLLOWING DATA IS NOT AN OFFICIAL RECORD OF THE DEPARTMENT OF STATE OR THE
STATE OF NEW YORK AND DUN & BRADSTREET IS NOT AN EMPLOYEE OR AGENT THEREOF. ALL
WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE INFORMATION PROVIDED HEREIN, ARE
DISCLAIMED BY THE DEPARTMENT OF STATE.

COMPANY INFORMATION

Name:                        AMERICAN INTERNATIONAL GROUP, INC.
Address:                     70 PINE ST

                             NEW YORK, NY 10270

D&B DUNS:                    04-469-1103

FILING INFORMATION

Filing Date:                 01/22/1969
State of Incorporation:      DELAWARE
Date Incorporated:           06/09/1967
Duration:                    PERPETUAL
Status:                      ACTIVE
Corporation Type:            PROFIT
Business Type:               CORPORATION
Address Type:                MAILING
Identification Number:       271507

Where Filed:                 SECRETARY OF STATE/CORPORATION DIVISION
                             162 WASHINGTON AVE
                             ALBANY, NY 12231

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

26265302129                                                           Page 2

## PRINCIPAL INFORMATION

Name:                          MAURICE R. GREENBERG
Title:                         CHAIRMAN OF THE BOARD
Address:                       70 PINE ST
                               NEW YORK, NY 10270

## AMENDMENT INFORMATION

Amendments:                    01/05/2005 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 050105002608
                               01/28/2003 ADDRESS CHANGE AMENDED EXECUTIVE OFFICE
                               LOCATION; REFER TO MICRO FILM NUMBER 030128002388
                               01/28/2003 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 030128002388
                               10/23/2002 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 021023002262
                               02/16/1999 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 990216002446
                               04/22/1997 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 970422002746
                               02/28/1994 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 940228002204
                               02/12/1993 ADDRESS CHANGE AMENDED PROCESS
                               INFORMATION; REFER TO MICROFILM NUMBER 930212002043
                               02/12/1993 MISCELLANEOUS ANNUAL STATEMENT FILED;
                               REFER TO MICROFILM NUMBER 930212002043
                               08/17/1992 ADDRESS CHANGE AMENDED PROCESS
                               INFORMATION; REFER TO MICROFILM NUMBER 920817000311
                               08/17/1992 MISCELLANEOUS CERTIFICATE OF CHANGE
                               FILED; REFER TO MICROFILM NUMBER 920817000311
                               05/11/1976 MISCELLANEOUS AMENDED PURPOSE; REFER TO
                               MICROFILM NUMBER A314074-3

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply.

THE PRECEDING PUBLIC RECORD DATA IS FOR INFORMATION PURPOSES ONLY AND IS NOT THE
OFFICIAL RECORD. CERTIFIED COPIES CAN ONLY BE OBTAINED FROM THE OFFICIAL SOURCE.

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

**BUSINESS RECORD**

D&B Completed Analysis:04-21-2005
Database Last Updated:04-26-2005
Source:Copyright (c) 2002 by Dun & Bradstreet,
Inc.
Current Date:10/06/2005

**COMPANY INFORMATION**

DUNS:04-469-1103
Name:AMERICAN INTERNATIONAL GROUP, INC
Address:70 PINE ST FL 50
City/State:NEW YORK, NY 10270-0094
County:NEW YORK

Telephone:212-770-7000

State of Incorporation:DE
Date of Incorporation:06/09/1967
Year Started:1919

**EXECUTIVE(S) INFORMATION**

PRESIDENTSULLIVAN, MARTIN J
PRESIDENTGALIOTO, ANTHONY
CEOSULLIVAN, MARTIN J
CHIEF OPERATING OFFICERKANAK, DONALD P
CHIEF FINANCIAL OFFICERBENSINGER, STEVEN J
CHIEF FINANCIAL OFFICERLATZ, RON
TREASURERDOOLEY, WILLIAM N
TREASURERBENSINGER, STEVEN J
SECRETARYSHANNON, KATHLEEN A
VICE PRESIDENTWISNER, FRANK G
OTHER EXECUTIVEHUPP, DAVID M
OTHER EXECUTIVEMASUCCI, VINCENT J
EXECUTIVE VPNOTTINGHAM, R K
SENIOR VPPATRIKIS, ERNEST T
SENIOR VPENGLISH, LAWRENCE W
SENIOR VPNEUGER, WIN J
VICE PRESIDENTJACOBSON, ROBERT F
VICE PRESIDENTDE SWART, JOHANNES
VICE PRESIDENTWYNDORF, GERRY
VICE PRESIDENTDOOLEY, WILLIAM N
VICE PRESIDENTSHANNON, KATHLEEN A
OTHER EXECUTIVETIZZIO, THOMAS R
OTHER EXECUTIVEJOHNSON, L O
ADMINISTRATIVEENGLISH, LAWRENCE W
DATA PROCESSINGKISIELEWSKI, RICHARD
DATA PROCESSINGSLAUGHTER, ANNETTE

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FINANCE VPJACOBSON, ROBERT P
MARKETINGKANAREK, JOE
SALESGRAHAM, JOHN
ADMINISTRATIVESLAUGHTER, ANNETTE

**BUSINESS DESCRIPTION**

Line of Business:HOLDING COMPANY MULTI-LINE
INSURANCE CARRIER

Primary SIC:

6331FIRE, MARINE, AND CASUALTY INSURANCE
63310000FIRE, MARINE, AND CASUALTY INSURANCE,
NSK

**FINANCIAL INFORMATION**

Net Worth:$80,607,000,000

Bank Name:JPMORGAN CHASE BANK
Bank DUNS:00-698-1831

**SALES INFORMATION**

Annual Sales Revision Date:06/01/2005
LATEST YEARTREND YEARBASE YEAR
(2005)(2004)(2001)

Annual Sales
(US):$97,987,000,000-ACTUALS
67,482,000,000$20,146,000,000

Trend Year = Year Prior to Latest Year
Base Year = 3 Years Prior to Trend Year

Accounting Firm:PRICEWATERHOUSECOOPERS LLP

**EMPLOYEE INFORMATION**

LATEST YEARTREND YEARBASE YEAR
(2005)(2004)(2001)

Employees Total:92,00080,00061,000

Trend Year = Year Prior to Latest Year
Base Year = 3 Years Prior to Trend Year

Employees Here:5,700-ACTUAL

Employment Growth:31

**COMPANY HISTORY/OPERATIONS/RELATIONSHIPS & OTHER INFORMATION**

This Company's Specifics:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
                               Establishment Is: US OWNED PUBLIC COMPANY

                               Located In:MSA Code:  5600
                                MSA Name:  NEW YORK, NY

                               Business Is A:HEADQUARTERS LOCATION
                                CORPORATION

                               DUNS:04-469-1103
            Corporate Family DUNS:
                 Ultimate Company:

                                04-469-1103
                               Occupancy Type:OWNED
END OF DOCUMENT
```

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Tab 7

APR 15 2003 17:11 FR AIG REINS. DIV. 9/3912 600 5110 TO 35093726          P.01/01



4/16/03
CC-JJB

**American International Group, Inc.®**
REINSURANCE SERVICES DEPARTMENT
110 William Street 15th Floor
New York, NY 10038

MEMORANDUM

TO:        M. R. Greenberg

FROM:      Christian Milton

DATE:      April 15, 2003

RE:        TRENWICK

We met with the Senior Management Group of Trenwick this morning. From our perspective the meeting was disappointing in that they had not done any work to effectively commence negotiations with a view to commuting their obligations.

The timeline as we speak is for them to reconcile the portfolio with us by the end of next week. We have provided them with all the necessary data for this to take place.

While the reconciliation is taking place, their new Chief Actuary will attempt to get his hands around the figures with a view to be ready to discuss figures by May 15th. The earliest they expect the commute to take place is by the end of May.

We will keep you apprised as we progress.

cc:       T. Tizzio
          H. Smith
          M. Castelli
          M. Kipness
          J. Blumenstock

*Chris*

** TOTAL PAGE.01 **

**CONFIDENTIAL**                                              **AIG 001578**

Tab 8

$73,360,000.00

## TRENWICK AMERICA REINSURANCE CORPORATION

### 6.0% Promissory Note

TRENWICK AMERICA REINSURANCE CORPORATION (together with its successors, the "Company"), for value received, and subject to the terms and conditions hereof and the Agreement (as defined below), hereby promises to pay to the order of AMERICAN INTERNATIONAL GROUP, INC. (the "Purchaser"), immediately upon the written demand of the Purchaser, the principal sum of SEVENTY-THREE MILLION THREE HUNDRED SIXTY THOUSAND DOLLARS ($73,360,000.00) by wire transfer of immediately available funds to the Purchaser's account (the "Bank Account") at such bank in the United States as may be specified in writing by the Purchaser to the Company, in such coin or currency of the United States of America as at the time of payment shall be legal ten-der for the payment of public and private debts.

Section 1.  Interest.  The Company promises to pay interest, semi-annually in arrears, on each May 15 and November 15 (unless such day is not a Business Day, in which event on the next succeeding Business Day) (each an "Interest Payment Date") to Purchaser and upon any repayment of principal, on the principal sum hereof outstanding in like coin or currency, at the rates per annum set forth below, by wire transfer of immediately available funds to the Bank Account from the most recent Interest Payment Date to which interest has been paid on this Note, or if no interest has been paid on this Note, from the date of this Note until payment in full of the principal sum hereof has been made.

Interest on this Note will accrue at the rate of 6.0% per annum from and in-cluding the date of this Note to but excluding the date of repayment thereof.  Interest shall be calculated on the basis of a year of twelve 30-day months and on the actual number of days elapsed.

Section 2.  Issuance.  This Note is being issued by the Company pursuant to the LDG Pool Commutation, Settlement and Release Agreement entered into between the Company and the Purchaser, dated as of June 30, 2004 (as the same may be amended, modi-fied or in effect from time to time in accordance with its terms, the "Agreement").  This Note is subject to the terms and conditions of the Agreement.  For avoidance of doubt if the Agree-ment is deemed to be void or invalid for any reason, this Note shall automatically be null and void.

Section 3.  Transfer; Replacement; and Prepayment.  In the event of any transfer or assignment of this Note, which shall be subject to the prior written consent of the Company, the Company agrees to issue from time to time replacement Notes in the form hereof to facilitate such transfer or assignment upon surrender and cancellation of the Notes to be replaced (or provision of a suitable indemnity to the Company in the event of any lost or stolen Notes).  This Note may be prepaid, in whole or in part, at any time and from time to time, without any penalty.

Section 4.   No Recourse.  The principal and interest due on this Note (together, the "Payment Obligations") are not general obligations of the Company.  Pursuant to the Agreement, the Purchaser shall not have any recourse against the Company or its assets (other than the assigned assets specified in this Section 4) on this Note, but shall look solely and exclusively to the assigned rights against the "Retrocessionaires," "LDG," and/or "SRRF," and/or any successors or affiliates thereof, in the "Pool Agreements" and the "Reinsurance Management Agreements" for payment of principal and interest due hereon (as each such term is defined in the Agreement).  Any judgment in any action or proceeding against the Company pursuant to this Note shall be enforceable only to the extent of the Company's interest in the assigned assets specified in this Section 4 and the Purchaser shall not bring any action, or make any claim, for any deficiency judgment against the Company in connection with this Note.  The cost of pursuing such assigned rights shall be borne solely by the Purchaser.  The Payment Obligations of the Company under this Note shall terminate upon certification by the Purchaser that its recovery efforts with respect to the assigned rights are concluded, regardless of the amounts recovered, it being understood that the Purchaser shall provide the certification to the Company promptly after such recovery efforts are concluded, and it being further understood that the Company will not request certification more frequently than once a year.

Section 5.   Governing Law; Venue; and Trial by Jury.  This Note shall be deemed to be a contract made under the laws of the State of Connecticut, and for all purposes shall be governed by and construed in accordance with the laws of said State without regard to its conflict of laws principles.  The Company irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court and any claim that any such proceeding brought in such a court has been brought in an inconvenient forum.  The Company hereby irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Note.

Section 6.   Headings; Construction.  The headings of the sections of this Note are inserted for convenience only and shall not be deemed to constitute a part hereof and words used herein which are either singular or plural shall be construed to include the other where appropriate.

The Purchaser by acceptance of this Note, agrees to be bound by the provisions of this Note which are expressly binding on Purchaser.

-2-

IN WITNESS WHEREOF, the Company has caused this instrument to be duly executed.

Dated:  June 30, 2004

TRENWICK AMERICA REINSURANCE
CORPORATION

By:

Name:  Timothy J. Graham

Title:  CRO

-3-

Tab 9

| | |
|---|---|
| In the Matter of the Arbitration Between: | ) |
| | ) |
| AIG Subsidiaries, | ) |
| | ) |
|    Petitioners, | ) |
| | ) |
|    vs. | ) Before the Arbitration Panel: |
| | ) |
| American Re-Insurance Company, American ) | Robert M. Hall, Umpire |
| United Life Insurance Company, AXA  ) | Paul J. Thomson III, Arbitrator |
| Equitable Life Insurance Company, Cologne ) | Martin D. Haber, Arbitrator |
| Life Reinsurance Company, Dorinco  ) | |
| Reinsurance Company, First Allmerica  ) | |
| Financial Life Insurance Company, The  ) | |
| Guardian Life Insurance Company of  ) | |
| America, Hartford Life Insurance Company, ) | |
| Houston Casualty Company, Insurance  ) | |
| Corporation of Hannover, Manufacturers Life) | |
| Insurance Company USA, Monumental Life  ) | |
| Insurance Company, Pan-American Life  ) | |
| Insurance Company, Phoenix Life Insurance ) | |
| Company, Reliance Standard Life Insurance ) | |
| Company[1], Reliastar Life Insurance  ) | |
| Company, Sun Life Assurance Company of  ) | |
| Canada (responding on behalf of Sun Life  ) | |
| and Clarica), Swiss Re Life and Health  ) | |
| America Inc., and Transamerica Occidental  ) | |
| Life Insurance Company,  ) | |
| | ) |
|    Respondents and Counter-Petitioners. ) | |
| | ) |
| | ) |

**Respondents and Counter-Petitioners' Preliminary Statement**

# DOCUMENT REDACTED PURSUANT TO CONFIDENTIALITY AGREEMENT

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

............................................................

AMERICAN REINSURANCE COMPANY, *et al.,*                    :

                        Plaintiff,                    :          Civil Action No. 05-11840-MLW

      V.

AMERICAN INTERNATIONAL GROUP and               :
TRENWICK AMERICAN REINSURANCE
CORPORATION                                                 :

                    Defendants.                   :

............................................................                   :

## CORRECTED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO STAY PROCEEDINGS

Plaintiffs American Reinsurance Company, *et al.,* each a member of one or more reinsurance pools (the "LDG Facilities"), submit this memorandum of law in opposition to the motions of Defendant American International Group ("AIG Inc.") and Defendant Trenwick America Reinsurance Corporation ("Trenwick") each seeking a stay of these proceedings pursuant to the mandatory stay provisions of the Federal Arbitration Act (9 U.S.C. § 205), or alternatively for a stay under the Court's discretionary powers to control its docket. On October 13, 2005, plaintiffs separately filed a motion to remand this action to the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session (the Massachusetts Superior Court), on grounds that federal subject matter jurisdiction is lacking under 9 U.S.C. § 203 because the parties named in this litigation have not entered an agreement to arbitrate their dispute. For the reasons set forth in support of plaintiffs' motion for remand, and those set forth below, plaintiffs request summary denial of defendants' motions for a stay of proceedings, together with the granting of plaintiffs' motion for remand. In the alternative, plaintiffs request that this Court institute proceedings to determine on evidence (1) the standing of each defendant to assert rights under the arbitration provision of the Quota Share Retrocessional Agreements (collectively, "QSA") and/or to intervene

REDACTED

in the on-going arbitration between plaintiffs and certain member and associated companies of defendant AIG Inc. (the AIG Subsidiaries) regarding indemnification requirements under the QSA, and (2) to determine if the rights to arbitrate asserted by defendant AIG Inc. were procured by fraud in collusion with Trenwick. The plaintiffs rely on this Memorandum of Law, the allegations of the Complaint, the admissions of defendants, and the Memorandum of Law in Support of Plaintiffs' Motion for Remand ("Remand MOL"), together with exhibits submitted therewith under the affidavit of Steven Schreckinger, Esq.[1]

## Preliminary Statement

This matter arises out of a reinsurance scam. Defendants AIG Inc. and Trenwick colluded to convert tens of millions of dollars in spurious claims asserted by AIG insurance subsidiaries ("AIG Subsidiaries") against Trenwick reinsurance contracts into more than $70 million in fraudulent "paid losses" to be presented to plaintiffs for reimbursement under a reinsurance fronting agreement between Trenwick and the LDG Facilities. The vehicle of this fraud – the "negotiating" by Trenwick and AIG Inc. of a commutation (settlement) of the AIG Subsidiaries' claims[2] in exchange for a non-recourse promissory note running from Trenwick to AIG Inc. and assignment to the AIG Subsidiaries of all of Trenwick's rights as cedent against the plaintiffs - was conceived and carried out by AIG Inc. management and in-house counsel, known to its most-senior officers, and financed from its coffers.

---

[1]      Materials attached to the Schreckinger Affidavit are hereinafter cited by reference to the tab number assigned in the Affidavit, together with a short name description, in the form "T-___: short name." Citations to the Complaint, which is found at Tab 1 of the Schreckinger Affidavit, are in the form "Compl. ¶ _"

[2]      T-2: June 30, 2004 LDG Pool Commutation, Settlement and Release Agreement (the "Commutation Agmt").

In their respective motions for stay, Trenwick and AIG Inc. seek a mandatory stay of this litigation based on arbitration proceedings (the "AIG Subsidiaries Arbitration") initiated in Massachusetts by the AIG Subsidiaries as assignees of Trenwick's interests under the QSA.

As set forth in detail in the plaintiffs' memorandum of law in support of remand, there is no agreement between the parties to arbitrate their dispute. Neither Trenwick nor AIG Inc. has standing to invoke the arbitration clause of the QSA. Even were the defendants found to have such standing, the causes of action in the Complaint raise issues in tort that are not within the scope of the QSA's narrow arbitration clause. Moreover, the issues raised in the Complaint do not overlap and are not derivative of the contract issues to be determined in the AIG Subsidiaries Arbitration, making this case inappropriate for the exercise of the Court's discretionary powers.

Defendants cannot assert rights to arbitration under the QSA or in the AIG Subsidiaries Arbitration on which they rely. This is fatal to their motion for a mandatory stay of these proceedings. For the reasons set forth herein and substantiated below, defendants' motions for stay should be denied, and the plaintiffs' motion for remand to the Superior Court of Massachusetts granted.

## Factual Background And Proceedings

1.    Plaintiffs are members of the LDG Facilities, reinsurance pools under the management of LDG Reinsurance Corporation ("LDG") that entered into a fronting arrangement with defendant Trenwick. Compl. ¶¶ 25, 26. Their agreement provided for plaintiffs to indemnify valid losses paid by Trenwick under reinsurance contracts it entered with primary insurers, including certain contracts (the "Trenwick-AIG Subsidiary Contracts") running between Trenwick and the AIG Subsidiaries. *Id.* ¶¶ 37, 39. Although never fully executed, the parties do not dispute that Trenwick and the plaintiffs performed their respective roles in this arrangement substantially as embodied in the QSA.

3

2.     Reinsurance typically spreads risk along a chain of insurers. Direct insurers cede portions of the risk they assume to reinsurers. Those reinsurers cede (technically, "retrocede") portions of the risk they assume to other reinsurers. Each link of the chain establishes distinct contractual relationships. As the chain lengthens and fans out, risk can be distributed among an ever larger number of companies. *Id.* ¶ 40.

3.     In the risk chain at issue in this matter, the AIG Subsidiaries as direct insurers, ceded portions of the risks on their workers compensation and other books of business through Trenwick, as a reinsurer using contracts of reinsurance. Trenwick then retroceded 100% of the risks covered by the terms of the QSA to the LDG Facilities members using the QSA. Each of the LDG Facilities members (including Trenwick) further retroceded up to 95% of their respective portions of the risk taken. *Id.* ¶ 41. These retrocessions were reflected through accounting statements but were not memorialized as written contracts

4.     As part of the AIG-Risk Chains, each of the Facilities members, including Trenwick, paid its proportionate share of risks properly ceded to the LDG Facilities. This obligation arose out of the QSA. Once those risks were paid, each of the LDG Facilities members then ceded up to 95% of its proportionate share of that risk to a different Facility and/or to another retrocessionaire. *Id.* ¶ 41. This next step in the chain arose out of a separate set of contractual relationships and is not subject to arbitration.

5.     In July 2005, the plaintiffs filed this action in the Superior Court of Massachusetts. The Complaint asserts tort claims sounding in fraud, civil conspiracy, aiding and abetting breach of fiduciary duty, and tortious interference with contractual relations, as well as unfair and deceptive acts in violation of Massachusetts G.L. § 93A. The factual allegations set out in detail how AIG Inc. and Trenwick manipulated the QSA fronting arrangement to create false recoverables against the LDG Facilities members. The focus of the claims is defendants' intent and conduct: their bad

4

faith negotiation practices (*id.* ¶¶ 61, 64, 66-69, 71), concealing of material facts (*id.* ¶¶ 54-57, 77-80, 84), and efforts to wrongfully enrich themselves at plaintiffs' expense. *Id.* ¶¶ 66, 76, 82, 90.

6.     The named defendants in this litigation are American International Group and Trenwick American Reinsurance Company. As set forth in the Complaint, defendant Trenwick is "an insurance company domiciled in Connecticut" (*id.* ¶ 23) and defendant "American Insurance Group" is "an insurance holding company with registered offices in New York, New York" and "the parent of various insurance company subsidiaries." *Id.* ¶ 24.

7.     Defendant AIG Inc. is a corporation validly existing under the laws of Delaware and headquartered at 70 Pine Street, New York New York. Its shares are publicly traded on the New York Stock Exchange and on one or more international exchanges. According to its 2004 Annual Report, AIG Inc. has approximately 60,000 common shareholders. T-6: Corporate Documents. On information and belief, AIG Inc. is engaged solely in the business of holding and managing its investments in more than 200 subsidiaries.

8.     The Complaint alleges specific actions taken by AIG Inc., under the control of and through its senior officers and management, including, *inter alia*:

- AIG Inc. "on information and belief, knew the reported workers' compensation and other claims of its insurance subsidiaries were grossly inflated. In a deliberate strategy to avoid having to disclose the improper claims accounting practices of its subsidiaries, AIG itself responded to LDG's request to verify purported losses by taking actions that threatened Trenwick's solvency." Compl. ¶ 55.

- "[L]ess than two weeks after receiving LDG's audit request, AIG Associate General Counsel Eric S. Kobrick sent a formal demand letter to LDG" *Id.* ¶ 56.

- "On information and belief, the Commutation was negotiated by and under the direction of Christian Milton, AIG Vice President of Reinsurance." *Id.* ¶ 74.

- The Commutation Agreement was signed by a Vice President of AIG [Christian Milton] and by Jane Byrne, AIG Assistant General Counsel. *Id.* ¶ 73.

9.

# REDACTED

5

# REDACTED

In an April 15, 2003 memorandum to M.R. Greenberg, then-Chairman of AIG Internal, Milton reports on progress toward securing the Trenwick commutation, with promises to keep the AIG Chairman apprised.  T-7: April 15 Memorandum at 1.

10.    With respect to the parties to and terms of the Commutation Agreement as executed, it is undisputed that

- The parties to the Commutation Agreement are Trenwick and "American International Group, Inc. on behalf of its member and associated companies, including but not limited to those companies listed on Exhibit A [t]hereto,"[3] and that the Agreement is executed by "American International Group, Inc. on behalf of its member and associated companies."  T-2: Commutation Agmt at 1; T-5:

# REDACTED

- The Commutation Agreement by its terms provides for Trenwick to assign all its "rights, title and interest" in the recoverables arising from the [QSA]" to "American International Group Inc. on behalf of its members and associated companies."  T-2: Commutation Agmt. ¶ 6(a).

- AIG Subsidiaries Arbitration was "commenced by the relevant member and associated companies of defendant American International Group, Inc.," [i.e., the AIG Subsidiaries.] Defendant AIG Inc.'s Memorandum in Support of Motion to Stay ("AIG Inc. MOL") at 1.  In their initial position statement before the arbitration panel in the AIG Subsidiaries Arbitration, the petitioners named themselves the "AIG Companies," defined as "AIG, on behalf of those of its member and associated companies that ceded business ... to the LDG Re pools [the LDG Facilities].  T-3: AIG Companies. Int'l Position Stmt at 1

11.    The Initial Position Statement of the AIG Companies in the AIG Subsidiaries Arbitration, as well as Trenwick and AIG Inc.'s representations before this Court, affirm that the petitioners in the AIG Subsidiary Arbitration "are proceeding as assignees of Trenwick's rights under the pool agreements." T-3: AIG Companies Int'l Position at 2; see also Memorandum of Law

---

[3]    Exhibit A to the Commutation Agreement lists 30 separately incorporated insurance subsidiaries of AIG Inc.

of Defendant Trenwick in Support of Motion to Stay ("Trenwick MOL") at 3; Memorandum of Law of Defendant AIG Inc. in Support of Motion to Stay ("AIG Inc. MOL") at 1, 3, 10-11.

12.    It is undisputed that the AIG Subsidiaries Arbitration is brought under the arbitration clause of the QSA, which provides that: "As a condition precedent to any right of action hereunder, any dispute or difference hereunder arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration."  QSA art XI; *see* Trenwick MOL at 5; AIG Inc. MOL at 3-4. The relief sought and "issues in dispute" set forth by the AIG Subsidiaries as petitioners in the AIG Subsidiaries Arbitration confirm a contract dispute seeking interpretation of terms in the QSA and Participation Agreements with respect to commutation, audit rights, and follow the fortunes, leading to a determination and award of amounts alleged to be due and owing to the AIG Subsidiaries as Trenwick's assignees under the Commutation Agreement.  T-3:  AIG Companies Int'l Position at 7-10; T-9: LDG Members Prelim. Stmt. at 12.

## ARGUMENT

### I.    MANDATORY STAY IS NOT AVAILABLE TO THIRD PARTIES WITH NO CONRACT TO ARBITRATE

In seeking a mandatory stay under the FAA, defendants assert that the "subject matter" of the litigation relates to matters being arbitrated in the AIG Subsidiaries Arbitration under the QSA. This is not sufficient to establish rights to a stay under the FAA § 205 mandatory stay provisions. Rather each defendant must demonstrate that it is entitled to invoke rights to arbitrate this particular dispute under the QSA.  "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *Intergen v. Grina*, 344 F.2d 134, 142 (1st Cir. 2003) (quoting "first principles" from *United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574 (1960)).

7

As set forth more fully in plaintiffs' memorandum of law on remand, in determining whether specific parties agreed to arbitrate a particular dispute, courts in the First Circuit apply a four-part test: (1) is there a valid agreement to arbitrate; (2) is the moving party entitled to invoke the arbitration clause; (3) is the clause binding on the party to be compelled; and (4) do the claims at issue fall within the scope of the clause. *Intergen,* 344 F.3d at 142 (applying Chapter 2 of the FAA to international parties). Of these four elements, defendants cannot establish two: First, neither Trenwick nor AIG Inc. can itself invoke arbitration rights under the QSA with respect to this dispute. Trenwick cannot both affirm the rights of the AIG Subsidiaries to bring proceedings as its assignees, and claim to stand before the panel with those self-same rights. Remand MOL at 11-13. Nor can AIG Inc. - itself not a signatory, not an assignee, not a third-party beneficiary, and not even a proper party to the LDG Facilities reinsurance relationships - pierce its own veil to acquire through its subsidiaries rights to arbitrate it never contracted for. Remand MOL at 13-16.

Second, plaintiffs' claims against Trenwick and AIG Inc. for fraudulently and deceitfully manufacturing false reinsurance "paid losses" are not within the QSA's narrow arbitration clause. Remand MOL at 16-20. Indeed, in a well-reasoned and widely cited opinion, the District Court of New Jersey found that the identical clause - construed in its entirety in the context of a reinsurance-pool relationship - did not authorize arbitration of fraud and conspiracy claims substantially similar to those asserted in the Complaint. *Mutual Benefit Life Ins. Co. v. Zimmerman,* 783 F. Supp 853, 872 (D.N.J. 1992). Moreover, the claims in the Complaint do not duplicate the contract issues before the panel. AIG Inc. and Trenwick's fraud against the plaintiffs was complete upon their agreement to execute a commutation fraudulently manufacturing "paid losses" to create a false liability against the LDG Facilities. When litigated, the proof at trial will focus on the defendants' intent and conduct - on their bad faith negotiation practices, their concealing of material facts, and their seeking to wrongfully enrich themselves at the expense of plaintiffs - and not on matters of

Lovells

contract interpretation and performance.[4]

Neither Trenwick nor AIG Inc can bring itself or the claims against the defendants within the ambit of the QSA arbitration clause. Defendants' lack of standing in the AIG Subsidiaries Arbitration is fatal to their motion for a mandatory stay of these proceedings. Defendants' motions for a mandatory stay should be denied, and the plaintiffs' motion for remand to the Superior Court of Massachusetts granted

## II.    ISSUES OF ARBITRABILITY MUST BE DECIDED BY THIS COURT

The question of whether a valid agreement has been entered that binds specific parties to arbitrate a particular dispute is a threshold question to be determined by the Court and is not arbitrable.[5] *First Options of Chicago Inv. v. Kaplan*, 514 U.S. 938, 944 (1995); *Intergen v. Grina*, 344 F.3d 134, 142 (2003). "[C]ourts should be extremely cautious about forcing arbitration in situations in which the identity of the parties who have agreed to arbitrate is unclear." *Intergen*, 344 F.3d at 142. Policies favoring enforcement of arbitration contracts do not extend to circumstances

---

[4] Contrary to Trenwick's arguments in its memorandum of law supporting this stay, Count VI of the Complaint is not directed at obligations that arise under the QSA, or any other written agreement among Trenwick and any of the LDG Facilities members. Rather, the declaratory judgment count seeks a ruling with respect to certain demands for payment made by Trenwick against those plaintiffs in this action who agreed to reinsure portions of the risks Trenwick held as a member of the LDG Facilities. To illustrate, risk was spread through various reinsurance agreements along the AIG Risk Chain, starting with (1) the AIG Subsidiaries as direct insurers, who (2) ceded risk to Trenwick as a reinsurer, who (3) pursuant to the QSA ceded 100% of the risk to the LDG Facilities (of which Trenwick was itself a member), and then (4) Trenwick ceded the risk is took as an LDG Facilities member on to other facilities and retrocessionaires, some portion of that risk being taken at this level by some of the plaintiffs. Statement of Facts ("SF") ¶¶ 3, 4. And so the chain of risk is spread among many insurers. Compl. ¶¶ 40-41. Trenwick did not memorialize this fourth link in retrocession chain in a written contract and no arbitration clause governs those reinsurance relationships. The declaratory judgment action seeks a ruling concerning the obligations of plaintiffs who took risk from Trenwick at this fourth level – in essence one "step up" from the QSA – where no written agreement and no arbitration clause is in effect.

[5]

# REDACTED

raised within this litigation by virtue of the defendants' removal to federal court on grounds of subject matter jurisdiction under the FAA.    The issue of AIG Inc. standing to arbitrate was first

Lovells

such as these where the identities of the parties, the scope of agreement, or other threshold issues are in dispute. *Intergen,* 344 F.3d at 150.

Should the Court determine that summary disposition of defendants' motions for stay and plaintiffs' motion for remand cannot be granted at this time, the Court should initiate further proceedings to determine on evidence the standing of defendants to assert rights under the QSA arbitration clause, and to determine if any such rights were procured by fraud.

Although the Court has broad discretion in controlling its docket, this is not an appropriate case for the exercise of that power. Certainly the mere overlap of facts argued here by defendants is not a sufficient basis to stay this litigation while arbitration among other parties proceeds in the AIG Subsidiaries Arbitration. *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213 (1985); *see also Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1517 (10th Cir. 1995). Each of the two proceedings focuses on different legal issues: the Arbitration on the requirements of performance under the Quota Share Agreements; the litigation on AIG Inc.'s and Trenwick's concealment of material facts and their intent and conduct in the negotiating and executing the Commutation Agreement to create false "paid losses." Indeed, the Arbitration panel could decide the issues before it without ever considering or determining *any* of the issues before this Court. If the panel accepts arguments that the Commutation Agreement violates reinsurance principles, with a resulting determination that the assignment between Trenwick and the AIG Subsidiaries conveyed nothing, that finding would end the Arbitration, but would obviously not determine whether or not the Commutation was itself the product of a fraudulent transaction.

A stay of proceedings should not be entered in this matter for the additional reason that such an action by the Court would effectively permit AIG Inc. and Trenwick to benefit from their fraud and deception in consummating the Commutation Agreement. It is a clearly established policy of the courts not to enforce contractual rights obtained solely by fraud. *Perma Life Mufflers, Inc. v.*

*Int'l Parts Corp.,* 392 U.S. 134, 151, 88 S. Ct. 1981, 20 L.Ed.2d 982 (1968) ("The principle that a wrongdoer shall not be permitted to profit through his own wrongdoing is fundamental in our jurisprudence.") Nor will a court "lend its power to assist or protect a fraud." *Kitchen v. Rayburn,* 19 Wall. 254, 86 U.S. 254, 262, 22 L.Ed. 64 (1873). Here, the Complaint alleges ample grounds for a *prima facie* finding that AIG Inc. obtained the right to arbitrate only because of and as a direct result of its immoral and illegal acts in defrauding the LDG Facilities members. Thus the Court should take steps to ensure a ruling enforcing arbitration would not in effect lend the Court's integrity to the defendants' wrongdoing. *See, Commercial Union Ins. Co. v. David E.W. Lines,* 378 F.3d 204, 208 (2d Cir. 2004) (courts should not lend integrity to arbitration procured by fraud).

## CONCLUSION

Defendants have not and cannot meet their burden in establishing an existing agreement among the parties named in this litigation to arbitrate the dispute before this Court. Plaintiffs respectfully request this Court summarily deny each defendant's motion to stay these proceedings and remand this action to the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session. In the alternative, plaintiffs request this Court institute proceedings to determine

11

on evidence the standing of each defendant to assert rights under the arbitration provision of the QSA and to determine if any such rights were procured by fraud.

By their attorney,

Steven L. Schreckinger (BBO #447100)
PALMER & DODGE LLP
111 Huntington Avenue at Prudential Center
Boston, MA  02199-7613
617.239.0100

OF COUNSEL:

Joseph T. McCullough IV
Robin C. Dusek
Lovells
One IBM Plaza
Suite 1900
Chicago, IL  60611
(312) 832-4400

Kathy L. McFarland
Lovells
900 Third Avenue
New York, NY  10022
(212) 909-0600

Dated: October 17, 2005

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be served upon the attorney of record for each other party by mail on October 7, 2005.

12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------

American Re-Insurance Company, et al.,                    :

                                        Plaintiffs,       :

                          v.                              :

American International Group, Inc. and Trenwick           :
America Reinsurance Corporation,

                                        Defendants.       :

-------------------------------------------------------------  :

Civil Action No. 05-11840-MLW

*FILED UNDER SEAL*

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE RENEWED MOTIONS OF DEFENDANTS AIG INC. AND TRENWICK TO STAY PROCEEDINGS PENDING ARBITRATION

Plaintiffs, members of various LDG reinsurance facilities (the "LDG Facilities Members") submit this memorandum in opposition to Defendants American International Group, Inc. ("AIG Inc.") and Trenwick American Reinsurance Corporation ("Trenwick") renewed motions to stay these proceedings. In their motions Defendants each argue that Plaintiffs' Amended Complaint ("ACompl.") has no bearing on arguments already before this Court on removal, stay and remand, and thus can be ignored.[1] Plaintiffs offer this brief to refute that argument.[2] Plaintiffs filed the Amended Complaint as a matter of right on December 30, 2005, to clarify allegations that Defendants have sought to obfuscate, and to add a further cause of action in conversion against each Defendant.

In simplest terms, Defendants removed this action to this Court asserting federal jurisdiction under the Federal Arbitration Act on grounds that this dispute is "related to" a matter

---

[1]    AIG Inc.'s Renewed Motion to Stay Proceedings ("AIG Renewed Mot.") at 2-3; Trenwick's Memorandum in Support of Renewed Motion to Stay Proceedings at 2.

[2]    Pursuant to agreement by the parties to the AIG Subsidiaries Arbitration, this Memorandum is being filed under seal in order to preserve the confidentiality of the attached Arbitration Material. Plaintiffs otherwise rely on, and incorporate herein by reference, each of Plaintiffs' Memorandum of Law and Reply Memorandum of Law in Support of Motion to Remand, filed October 13, 2005 and December 14, 2005 respectively, Plaintiffs' Memorandum in Opposition to Defendants' Motions for Stay, filed October 14, 2005 and Plaintiffs Renewed Motion for Remand to the Superior Court of Massachusetts.

- 2 -

currently being arbitrated between the Plaintiffs and various subsidiaries of AIG Inc. (the "AIG Subsidiaries") pursuant to the arbitration provisions of a reinsurance quota share agreement (the "QSA"). Plaintiffs moved to remand on grounds that Defendants cannot invoke the arbitration clause of the QSA or participate as parties-in-interest in the AIG Subsidiaries' arbitral proceedings, and thus, by statute and under controlling First Circuit law, cannot invoke in this dispute either the Federal Arbitration Act or the subject matter jurisdiction of the Court. 9 U.S.C. §203; *Intergen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003); *Restoration Preserv. Masonry, Inc. v. Grove Europe Ltd.*, 325 F.2d 54, 60 (1st Cir. 2003).

Plaintiffs' prior briefing provides ample grounds for remand. The AIG Subsidiaries, the claimants in the arbitral proceedings, are not parties in this lawsuit. By contrast, the Defendants Trenwick and AIG Inc. can neither enforce nor be forced to participate as parties-in-interest in the ongoing AIG Subsidiaries Arbitration because: (1) Trenwick assigned to the AIG Subsidiaries any rights it had to arbitrate under the QSA, those rights have been taken up by the AIG Subsidiaries

# REDACTED

(2) AIG Inc. is neither a signatory to the QSA, nor an intended beneficiary of its arbitration clause, nor has AIG Inc., by virtue of having acted in some manner of representational capacity for the AIG Subsidiaries, acquired any rights under the QSA to arbitrate disputes arising from torts AIG Inc. has committed against the Facilities Members on its own

---

3

# REDACTED

- 3 -

volition and in pursuit of its own interests; and (3) in any event, the QSA arbitration clause is too narrow to reach Plaintiffs' tort claims.

The Amended Complaint strengthens these already substantial grounds for remand in at least two ways:

First, the Amended Complaint is fatal to AIG Inc.'s repeated argument that it has standing to arbitrate the claims brought against it in this litigation on grounds that it undertook all actions complained of - and thus is a party to the QSA and the AIG Subsidiaries Arbitration - in a representative capacity "on behalf of its member and associated companies." *See, e.g.,* AIG Renewed Mot. at 3. The allegations in the Amended Complaint clearly set forth bases for Plaintiffs' claims against AIG Inc. that arise out of actions taken by AIG Inc. in its individual capacity, on its own behalf and in pursuit of its own interests. *See, e.g.,* ACompl. ¶¶ 23, 49-51, 95-97, 122-136. Further, the Amended Complaint places AIG Inc.'s wrongful acts against the Facilities Members in context of a sustained pattern of interference with insurance underwriting and other relationships in its business units and subsidiaries by which AIG Inc. sought to manipulate its own bottom line and the investment markets. *See, e.g., id.* ¶¶ 51, 76, 95-97. These manipulations occur in the same time frame, involve related business lines (*e.g.,* Workers Compensation coverage), and involve the same AIG Inc. managers and employees as the wrongdoing alleged in the Amended Complaint. *Id.*

AIG Inc. now seeks to piggyback on the QSA arbitration clause by renewing its motion to stay this case as "AIG, Inc., on behalf of its member and associated companies." But AIG Inc.'s "member and associated companies" have not been sued in this litigation and are not before this Court. And AIG Inc. is not itself a party to the QSA. The wrongdoings alleged in the Amended Complaint are those of AIG Inc. itself. The arbitration rights that AIG Inc. purports to invoke are not. First Circuit law in the circumstance is clear. As a mere representative of the AIG Subsidiaries, AIG Inc. has acquired no rights to arbitrate on its own behalf. *McCarthy v. Azure,* 22 F.3d 351, 356 (1st Cir. 1994). There is no agreement between plaintiffs and AIG Inc. to arbitrate AIG Inc.'s own torts against the LDG Facilities members. *Id.* at 359. AIG Inc. has no

- 4 -

standing before this Court to seek either enforcement of the QSA arbitration clause or a stay of these proceedings. *Intergen*, 344 F.3d at 142; 9 U.S.C. §203 incorporating the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), 26 U.S.T. 2517, art. II, III & IV.

Second, the Amended Complaint provides additional grounds for the Court to find that the claims asserted in this litigation are not subject to and will not be resolved by the AIG Subsidiaries Arbitration. The operative arbitration provision in the QSA is narrowly limited to disputes arising out of the "interpretation, application or effect" of the Agreement itself. QSA art. XI. The provision does not cover fraud, conspiracy, Mass. G.L. c. 93A, and related tort claims such as those asserted by Plaintiffs. *Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853, 872 (D.N.J. 1992) (interpreting substantially identical clause in insurance fraud context). It certainly does not reach the claims asserted in the Amended Complaint involving AIG Inc., which is neither a signatory nor a real-party-in-interest to the QSA. ACompl. *passim*. It does not reach reinsurance relationships that are not created by the QSA. *Id.*, ¶¶ 41, 137-143. It does not reach acts such as conversion of another's assets that are beyond any recognized scope of contract performance. *Id.* ¶¶ 76-77, 85, 89, 144-154. It does not reach the "broad new rights" arising under Mass. G.L. c. 93A that "forbid[] conduct not previously unlawful under the common law of contract and tort or under any prior statute." *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 78 (1977); *see* ACompl. ¶¶ 101-111. Indeed, if arguments currently being advanced by the AIG Subsidiaries in the arbitral proceedings were to be credited, the AIG Subsidiaries Arbitration proceedings do not even reach so far as to provide for an audit of primary insurance records underlying the AIG Subsidiaries' claims for reinsurance indemnity under the QSA. *See*, Exh. 2, Tab G: January 25, 2006 letter of AIG Subsidiaries' counsel at 1 (stating position of AIG Subsidiaries that "[a]n underwriting and premium audit ... is well beyond the scope of the arbitration"); *see also*, Exh. 2: Plaintiffs January 27, 2006 filing before AIG Subsidiaries Arbitration (stating position of LDG Facilities Members).

- 5 -

Defendants have not and cannot meet their burden of establishing the federal subject matter jurisdiction of this Court over the claims in the Amended Complaint either pursuant to 9 U.S.C. §203 and the New York Convention, or under *Intergen* and *Restoration Preservation*, the controlling law in the First Circuit. *See*, 344 F.3d at 142 and 325 F.2d at 60, respectively. Plaintiffs respectfully request this Court summarily deny each defendant's motion to stay these proceedings and remand this action to the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session.

Respectfully submitted,

Steven L. Schreckinger (BBO #4471000)
LYNCH BREWER HOFFMAN & FINK LLP
101 Federal Street, 22nd Floor
Boston, MA  02199-7613
(617) 951-0800

Joseph T. McCullough IV
Robin Dusek
LOVELLS
One IBM Plaza
Suite 1900
Chicago, IL  60611
(312) 832-4400

Kathy L. McFarland
LOVELLS
900 Third Avenue
New York, NY  10022
(212) 909-0600

Dated:  February 2, 2006

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail on February 2, 2006.

Anne Robbins

234733_1 DOC

# TAB 1

In the Matter of the Arbitration Between:                )
                                                          )
AIG Subsidiaries,                                         )
                                                          )
              Petitioner,                                 )
                                                          )
        vs.                                               )
                                                          )
American Re-Insurance Company, American )
United Life Insurance Company, AXA                       )
Equitable Life Insurance Company, Cologne )
Life Reinsurance Company, Dorinco                       )
Reinsurance Company, First Allmerica                    )
Financial Life Insurance Company, The                   )
Guardian Life Insurance Company of                      )
America, Hartford Life Insurance Company, )
Houston Casualty Company, Manufacturers )
Life Insurance Company USA, Monumental )
Life Insurance Company, Pan-American Life )
Insurance Company, Phoenix Life Insurance )
Company, Reliance Standard Life Insurance )
Company, Reliastar Life Insurance Company,)
Sun Life Assurance Company of Canada                    )
(responding on behalf of Sun Life and                   )
Clarica), Swiss Re Life and Health America )
Inc., and Transamerica Occidental Life                  )
Insurance Company                                        )
                                                          )
        Respondents and Counter-Petitioners. )

Requests for Production Propounded by
Respondents and Counter-Petitioners to
Trenwick

Before the Arbitration Panel:

Robert M. Hall, Umpire
Paul J. Thomson III, Arbitrator
Martin D. Haber, Arbitrator

# DOCUMENT REDACTED
# PURSUANT TO
# CONFIDENTIALITY
# AGREEMENT

# TAB 2

**DOCUMENT
[AND ATTACHMENTS]
REDACTED PURSUANT TO
CONFIDENTIALITY
AGREEMENT**