UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN REINSURANCE COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION NO: |
| v. | ) ) | 05-CV-11840-MLW |
| AIG, Inc. and TRENWICK AMERICA REINSURANCE CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

## NOTICE OF FILING Of DEFENDANT AIG, INC.'S REDACTED PLEADINGS

Pursuant to the Court's request, Defendant AIG, Inc. on behalf of its member and associated companies ("AIG") hereby submits as Exhibits 1 through 5 attached hereto, redacted copies of the following papers which were previously filed under seal:

Ex. 1.   Defendant AIG's Motion to Stay Proceedings Pending Arbitration. [Dkt. No. 3].

Ex. 2.   Affidavit of Eric S. Kobrick in Support of AIG's Motion To Stay Proceedings Pending Arbitration. [Dkt. No. 6].

Ex. 3.   Defendant AIG's Memorandum in Support of Motion To Stay Proceedings Pending Arbitration. [Dkt. No. 7].

Ex. 4.   Defendant AIG's Memorandum in Opposition to Plaintiffs' Motion for Remand and Reply in Support of AIG's Motion to Stay Proceedings Pending Arbitration. [Dkt. No. 27].

Ex. 5.   Defendant AIG's Renewed Motion to Stay Proceedings Pending Arbitration and Opposition to Plaintiffs' Renewed Motion for Remand. [Dkt. No. 38].

Plaintiffs and Defendant Trenwick America Reinsurance Corporation have assented to the form and substance of the enclosed redacted pleadings.

1008657

Respectfully submitted,

**AIG, Inc. on behalf of its member and associated companies,**

By its attorneys,

*/s/ John T. Harding*

_____
John T. Harding BBO #221270
Michael F. Aylward BBO #024850
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

Dated: June 19, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on  June 19, 2006.


*/s/ John T. Harding*

_____
John T. Harding, Jr. BBO #221270

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al., ) ) ) Plaintiffs, ) ) v. ) ) AMERICAN INTERNATIONAL GROUP, ) and TRENWICK AMERICA ) REINSURANCE CORPORATION, ) Defendants. ) | CIVIL ACTION NO: |

## DEFENDANT AIG'S MOTION TO STAY
## PROCEEDINGS PENDING ARBITRATION

Pursuant to the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 (the "New York Convention") and Section 3 of the Federal Arbitration Act, 9 U.S.C. §3 (the "FAA"), the relevant member and associated companies of defendant American International Group, Inc. ("AIG") move that the Court enter an Order staying this action pending the completion of two arbitrations that have been commenced by AIG against American Reinsurance Company ("American Re") and the other participants in a reinsurance pool facility who have joined as plaintiffs in this (the "Pool Members").

As grounds for this motion, AIG states that AIG and the Pool Members are parties to certain reinsurance agreements that contain a mandatory arbitration provision. The dispute that is the subject of this action is within the scope of the arbitration provision. Indeed, AIG and the Pool Members are actively arbitrating their dispute and there is no basis for the Pool Members to have commenced this separate action. Accordingly, this Court is required by the New York Convention and the FAA to stay the action in favor of the pending arbitrations. In the

962272v1

alternative, the Court should exercise its inherent authority to do so since the arbitrations are proceeding.

In further support of this Motion, AIG relies upon its accompanying Memorandum of Law and the supporting Affidavit of Eric S. Kobrick submitted herewith and states as follows:

1.     This dispute arises out of certain reinsurance pooling arrangements that were managed by an entity known as LDG Re and its affiliates located in Wakefield, Massachusetts. AIG ceded or transferred certain reinsurance risks to the LDG Re pools by means of a fronting company arrangement with defendant Trenwick America Reinsurance Corporation ("Trenwick"). In connection with these reinsurance arrangements, various agreements were entered into between Trenwick and the Pool Members (the "Retrocessional Agreements").

2.     In June 2004, AIG and Trenwick entered into a settlement of various matters relating to the reinsurance that had been ceded to the LDG Re pools.  Under the terms of the settlement, Trenwick assigned to AIG all of its rights, title and interest to the claims arising from the risks that Trenwick had ceded to the LDG Re pools, as well as its rights under the Retrocessional Agreements that had been entered into between Trenwick and the Pool Members. AIG thereafter made demand upon the Pool Members to contribute their respective shares of the settlement; AIG's demands were refused by the Pool Members.

3.     Each of the Retrocessional Agreements between Trenwick and the Pool Members that were assigned by Trenwick to AIG contains an arbitration clause which states, in relevant part:

> As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration

2

having no direct or indirect financial interest in either party or its affiliates.

Each of the Retrocessional Agreements further states that "the Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of this Agreement."

4.    Pursuant to the terms of the arbitration clause contained in the Retrocessional Agreements quoted above, AIG commenced an arbitration against the Pool Members in January 2005.[1]

REDACTED

Nevertheless, in July 2005 the Pool Members commenced this action relating to the same matters that are the subject of the arbitrations.[2]

5.    As demonstrated in the supporting Memorandum of Law filed herewith, the Court is required to stay this action in favor of the pending arbitrations because (1) a valid agreement to arbitrate exists; (2) AIG is entitled to invoke the arbitration clause; (3) the Pool Members are bound by the clause; and (4) the claims asserted by the Pool Members in this action are within the scope of the arbitration clause. 9 U.S.C. §3; *Intergen, N.V. v. Grina, et al.*, 344 F.3d 134, 142 (1st Cir. 2003). The Supreme Court has consistently held that there is a strong federal policy requiring that arbitration clauses be enforced. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *Municipality of San Juan v. Corporacion Para El*

---

[1] A separate arbitration was commenced against one of the Pool Members in March 2005 due to its refusal to waive a conflict issue relating to AIG's counsel.
[2] Pursuant to the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517, and its implementing statute, 9 U.S.C. §205, all defendants removed the state court action to this Court on September 9, 2005.

3

*Fomento Economico De La Ciudad Capital,* 415 F.3d 145, 2005 U.S. App. LEXIS 14218, *9 (1st Cir. 2005).

6.    Here, the broad arbitration clause contained in the Retrocessional Agreements clearly encompasses the claims that have been alleged by the Pool Members in their Complaint. The fact that the Pool Members have labeled their claims against AIG as sounding in tort or under the provisions of G.L. c. 93A, §11 is irrelevant.  At their heart, the claims alleged by the Pool Members require the Court to have "reference to the interpretation, application or effect of the [Retrocessional] Agreement[s]" which created the relationships among the parties and out of which the claims arise.  Accordingly, this Court is duty bound under the FAA to enforce the arbitration clause and stay this action pending the completion of the arbitrations.[3]

## REQUEST FOR HEARING

Pursuant to Local District Court Rule 7.1(D), AIG requests that the Court schedule a hearing with respect to the instant motion as oral argument will be of assistance to the Court in resolving this matter.

AMERICAN INTERNATIONAL
GROUP, INC.

By its attorneys,

Michel F. Aylward BBO #624850
John T. Harding BBO #221270
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

---

[3] In the alternative, the Court should exercise its discretion to stay this action under its inherent authority to control its docket, avoid duplication, promote judicial economy, avoid confusion and eliminate possibly inconsistent results. *See Moses H. Cone,* 460 U.S. at 21; *D.J. Mfg. Corp. v. Tex Shield, Inc.,* 998 F. Supp. 140, 145-46 (D.P.R. 1998); *Meadows Indemnity Co. v. Baccala & Shoop Insurance Services, Inc.,* 760 F. Supp. 1036, 1045 (E.D.N.Y. 1991).

4

Of Counsel:
William A. Maher
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York  10110
(212) 382-3300
(212) 382-0050 (facsimile)

Dated: September 9, 2005

## CERTIFICATE OF SERVICE

I, John T. Harding, counsel for Defendant American International Group, hereby certify that on September 9, 2005, I served a copy of the foregoing document by messenger or federal express on all known counsel of record.

_____
John T. Harding

5

962272v1

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al.,       Plaintiffs, ) ) ) ) ) v. ) ) AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION, ) ) ) )       Defendants. ) | CIVIL ACTION NO: |

## AFFIDAVIT OF ERIC S. KOBRICK IN SUPPORT OF
## AIG'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

I, Eric S. Kobrick, make the following affidavit under oath in support of the Motion to Stay Proceedings Pending Arbitration filed on behalf of the relevant member and associated companies of defendant American International Group, Inc. ("AIG"). As set forth in AIG's Motion and supporting Memorandum, AIG requests that the Court enter a stay of all further proceedings in this case so that the comprehensive arbitration proceedings commenced by AIG against Plaintiffs American Reinsurance Company, *et al* ("American Re") pursuant to the terms of contracts containing mandatory agreements to arbitrate can go forward. In further support of AIG's Motion, I state the following facts:

1. I am an Associate General Counsel and the Chief Reinsurance Legal Officer of AIG at its offices at 70 Pine Street, New York, New York. In that capacity, I am responsible for supervising the dispute between AIG and American Re, including the other insurance companies who are the plaintiffs in this action and the respondents in the arbitration proceedings

commenced by AIG. As such, I have personal knowledge of each of the matters set forth in this affidavit.

### Nature of the Dispute

2.      This dispute arises out of certain reinsurance pooling arrangements that were managed by an entity known as LDG Re and its affiliates located in Wakefield, Massachusetts. In simple terms, a reinsurance pool is formed by a group of reinsurance companies which join together, each accepting a specified percentage of risk (and receiving a specified percentage of premium) associated with particular lines of business. Certain of the member and associated companies of AIG "ceded" business -- or transferred the risk of the insurance policies they wrote - - to the pools managed by LDG Re. Most of the business ceded to the pools managed by LDG Re was workers' compensation. The ceding of the business to the LDG Re pools was accomplished through the use of an entity known as a "fronting" company; that is, a particular reinsurance company that accepted 100% of the risk from AIG before transferring it to the LDG Re pools. The fronting company for the LDG Re pools was Trenwick America Reinsurance Corporation, as the successor to Chartwell Reinsurance Company ("Trenwick"). The cessions to Trenwick were on a full conditions basis; that is, Trenwick kept a specific piece of the business that the LDG Re Pool Members, as life companies, could not accept and then transferred or "retroceded" the remainder of the risks to the Pool Members. The Pool Members included American Re and the other insurance companies that are the plaintiffs in this action (hereinafter, the "Pool Members").

3.      In 2002 and 2003, AIG became aware of facts indicating that Trenwick's financial condition had deteriorated rapidly. AIG invoked the Special Termination Clauses that were contained in its reinsurance agreements (known as "treaties") with Trenwick. Arbitrations were thereafter commenced between AIG and Trenwick with respect to AIG's termination of the

treaties. Eventually, these arbitrations were settled by two agreements, known in the industry as "commutations," including a settlement pertaining to the LDG Re business. The commutations expressly provided that Trenwick's rights under the LDG Re pool agreements were assigned to AIG. A true copy of the "LDG Pool Commutation, Settlement and Release Agreement" dated as of June 30, 2004 (the "Pool Commutation") is attached to my affidavit as Exhibit 1.

4.      The total settlement amount of the Pool Commutation was $81,745,503. The Pool Commutation included both a cash component and a Promissory Note in the amount of $73,360,000 issued by Trenwick to AIG. Pursuant to the Pool Commutation, and as security for repayment of the Promissory Note, Trenwick assigned to AIG all of its rights, title and interest to the claims arising from the risks that Trenwick had ceded to the LDG Re pools.

5.      In November 2004, AIG informed the Pool Members that the Pool Commutation had become effective and requested payment of each Pool Member's *pro rata* allocation of the Pool Commutation settlement amount. In the alternative, AIG proposed that the Pool Members enter into an agreement, known in the industry as a "novation," under which each Pool Member would agree to reassume 90% of its proportionate share of the liabilities that AIG had assumed in the Pool Commutation, with AIG retaining the remaining 10%. A true copy of the letter sent by AIG to plaintiff American Re concerning the Pool Commutation is attached to my affidavit as Exhibit 2. A similar letter was sent to each of the other Pool Members.

## The Subject Agreements Provide for Arbitration

6.      The reinsurance agreements or "treaties" between AIG and Trenwick were transferred or "retroceded" to the Pool Members pursuant to one or more retrocessional agreements. These agreements included a Participation Agreement; a "Quota Share Retrocessional Agreement" effective as of May 1, 1997 between and among Trenwick and various retrocessionaires; and a second "Quota Share Retrocessional Agreement" effective as of

- 3 -

958212v1

July 1, 1997 between and among Trenwick and various retrocessionaires. A true copy of each of these agreements is attached to my affidavit as Exhibits 3, 4 and 5, respectively. (I shall collectively refer to these agreements as the "Retrocessional Agreements").

7.     Each of the Retrocessional Agreements contains an Arbitration clause which states, in relevant part:

> As a condition precedent to any right of action hereunder, *any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof,* whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates. The Arbitration shall be held in a place mutually agreeable to the parties. One Arbitrator shall be chosen by Chartwell and the other by the Retrocessionaires. The Umpire shall be chosen by the two Arbitrators.

> Arbitration may be initiated by either party (the Petitioner) demanding arbitration and naming its Arbitrator. The other party (the Respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the Petitioner. If the Respondent fails to designate its Arbitrator within the time stated above, the Petitioner is expressly authorized and empowered to name the second Arbitrator; and Respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. If the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, such selection shall be made in accordance with the provisions of the Massachusetts Uniform Arbitration Act Chapter 251 of the Massachusetts General Laws Annotated.

> Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). *The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement.* The

- 4 -

Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest convenient date, but in no event later than one hundred and twenty (120) days from submission of the case to the Board, shall be final and binding upon all parties.

[Ex. 4 at 7-8 (emphasis added)]. The Retrocessional Agreements further specify that they "shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts." [Ex. 4 at 8]. The Retrocessional Agreements do not contain any provision suggesting that any dispute between or among any of the parties was to be resolved by litigation.

## The Arbitrations and the Present Action

8.    None of the Pool Members accepted the terms proposed by AIG with respect to the Pool Commutation, including the option of entering into a "novation" agreement that would completely resolve this matter and allow each of the Pool Members to pay claims as they were presented and became due. Accordingly, in January 2005, AIG served a demand for arbitration on each of the Pool Members. AIG named its party arbitrator in its demand.

9.    In response to AIG's demand for arbitration, the Pool Members collectively named the same arbitrator to serve on the Panel.[1] The party arbitrators in turn appointed an umpire for the Panel.

---

**REDACTED**

958212v1

REDACTED

REDACTED

Nevertheless, in contravention of the explicit arbitration clause contained in the Retrocessional Agreements, the Pool Members have improperly attempted to do an "end run" around the agreement to arbitrate by filing a court action against AIG relating to the Retrocessional Agreements, the Pool Commutation and other matters that are directly at issue in the arbitration proceedings.

12.    This separate action was filed in the Superior Court of Massachusetts, Suffolk County, Business Litigation Session on or about July 6, 2005. Pursuant to the provisions of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 (the "New York Convention") and the federal statute implementing the New York Convention, 9 U.S.C. §205, AIG and Trenwick have duly removed the state court action to this Court based upon the fact that one of the parties to the Retrocessional Agreements, Sun Life Assurance

REDACTED

- 6 -

Company of Canada, is a Canadian corporation.  Accordingly, the Retrocessional Agreements that are the subject of the case relate to international commercial arbitration agreements and the Defendants are entitled to remove the state court action commenced by the Pool Members to this Court.

13.    AIG now seeks the assistance of the Court to enforce its right to have all disputes between AIG and the Pool Members resolved in the pending arbitrations, which are already well underway.

- 7 -

Signed under the pains and penalties of perjury this 9th day of September 2005.

Eric S. Kobrick
Associate General Counsel and
Chief Reinsurance Legal Officer
American International Group, Inc.
70 Pine Street
New York, NY

SWORD TO BEFORE ME THIS 9th DAY
OF SEPTEMBER, 2005

Notary

MARC E. BERNSTEIN
Notary Public, State of New York
No. 02BE6006663
Qualified in New York County
Commission Expires Nov. 26, 20 05

958212v1

**EXHIBIT 1**

# LDG POOL COMMUTATION, SETTLEMENT AND RELEASE AGREEMENT

This LDG POOL COMMUTATION, SETTLEMENT AND RELEASE AGREE-MENT ("SETTLEMENT") entered into between Trenwick America Reinsurance Corporation, as successor to Chartwell Reinsurance Company (the "REINSURER"), and AMERICAN IN-TERNATIONAL GROUP, INC. on behalf of its member and associated companies, including but not limited to those companies listed on Exhibit A hereto (collectively, the "COMPANY"), is dated as of June 30, 2004 (the "EFFECTIVE DATE").

WHEREAS, the REINSURER entered into the reinsurance agreements (the "LDG-RELATED REINSURANCE AGREEMENTS"), in which the REINSURER acted as the front-ing reinsurer for various reinsurance pools arranged by LDG Reinsurance Corporation ("LDG"), including but not limited to those agreements listed in Exhibit B, pursuant to which the COM-PANY ceded to the REINSURER, and the REINSURER assumed from the COMPANY, certain liabilities arising from insurance written by the COMPANY; and

WHEREAS, the REINSURER entered into the retrocession agreements listed in Exhibit C hereto ("POOL AGREEMENTS") with certain retrocessionaires (the retrocessionaires and participants in the POOL AGREEMENTS shall be referred to herein as the "RETROCESSION-AIRES") in which the REINSURER retroceded, and the RETROCESSIONAIRES assumed, risks assumed by the REINSURER under the LDG-RELATED REINSURANCE AGREE-MENTS; and

WHEREAS, on July 9, 2003 the COMPANY invoked the Special Termination Pro-visions of the LDG-RELATED REINSURANCE AGREEMENTS, thereby purportedly acceler-ating the liabilities and obligations of the COMPANY thereunder; and

WHEREAS, REINSURER denies the validity of such invocation; and

WHEREAS, on August 27, 2003 the COMPANY commenced an arbitration against REINSURER seeking $129,866,183.00 and other relief from REINSURER (the "LDG POOL ARBITRATION"); and

WHEREAS, the REINSURER has offered to pay and the COMPANY has agreed to accept in full satisfaction of the REINSURER'S present and future liability under the LDG-RELATED REINSURANCE AGREEMENTS the sum of Eighty-One Million, Seven Hundred Forty-Five Thousand, Five Hundred Three United States Dollars ($81,745,503), to be paid to the COMPANY in the manner set forth herein; and

WHEREAS, the REINSURER and the COMPANY (individually, a "PARTY;" together, the "PARTIES") agree that it is mutually beneficial for the PARTIES to enter into this SETTLEMENT;

NOW THEREFORE, in consideration of the foregoing and of the material covenants and agreements of the PARTIES contained herein, the receipt and sufficiency of which is acknowledged by the undersigned, it is agreed by and between the REINSURER and the COMPANY that:

1.    Commutation Payment

(a)    No later than three business days after the EFFECTIVE DATE, REINSURER shall pay to COMPANY the total consideration Eighty-One Million, Seven Hundred Forty-Five Thousand, Five Hundred Three United States Dollars ($81,745,503) for reassuming certain risks insured by COMPANY under the LDG-RELATED REINSURANCE AGREEMENTS.

(b)    This amount shall be paid as follows:

(i)    One Million, Seven Hundred Forty-Five Thousand, Five Hundred Three United States Dollars ($1,745,503) in cash, as payment on account of commutation of the Difference in Conditions coverage under the LDG-RELATED REINSURANCE AGREEMENTS, it being understood that the term "Difference in Conditions Coverage" refers to that portion of the liability ceded to the REINSURER under the LDG-RELATED REINSURANCE AGREEMENTS that was not in turn retroceded under the POOL AGREEMENTS, it being further understood that if and to the extent that a portion of the liability arising from a given loss was retroceded under the POOL AGREEMENTS and a portion of such liability was not so retroceded, then only the portion not so retroceded is within the term "Difference in Conditions Coverage";

-2-

(ii) Four Million United States Dollars ($4,000,000), in cash, as payment on account of the REINSURER's retained participation in the POOL AGREEMENTS with respect to the LDG-RELATED REINSURANCE AGREEMENTS;

(iii) Two Million, Six Hundred Forty Thousand United States Dollars ($2,640,000), in cash, as payment on account of the participation of Reliance National Insurance Company in the POOL AGREEMENTS with respect to the LDG-RELATED REINSURANCE AGREEMENTS; and

(iv) a promissory note substantially in the form of Exhibit D hereto (the "NOTE") in the amount of Seventy-Three Million Three Hundred Sixty Thousand United States Dollars ($73,360,000), made by the REINSURER to the order of the COMPANY and delivered to the COMPANY, on account of the REINSURER's remaining participation in the LDG-RELATED REINSURANCE AGREEMENTS.

(c) Payment of items (i), (ii), and (iii) above shall be effected by release from escrow of the sums deposited into escrow with Cahill Gordon & Reindel LLP under and pursuant to that certain Commutation, Settlement And Release Agreement Between Trenwick America Reinsurance Corporation and American International Group, Inc. deemed effective as of September 30, 2003. Accrued interest on the escrowed amounts shall be paid to the COMPANY upon such release, with no credit being given to the REINSURER for the amount of such interest paid.

2. COMPANY shall accept the sums set forth in paragraph 1 herein in full and final settlement of any and all amounts claimed to be due to COMPANY from REINSURER and arising under or in respect of the LDG-RELATED REINSURANCE AGREEMENTS.

3. This SETTLEMENT is expressly limited to REINSURER'S participation in the particular underwriting years of the particular LDG-RELATED REINSURANCE AGREEMENTS. It is not the intention of the PARTIES to affect the terms, conditions or provisions of any other reinsurance agreement(s) or commutation agreements between the REINSURER and the COMPANY.

4. REINSURER hereby assigns to COMPANY all its rights, title and interest, if any, to its share or shares of any common account excess of loss protection which would inure to its benefit in connection with the LDG-RELATED REINSURANCE AGREEMENTS.

5. REINSURER represents and warrants that its liabilities and obligations under the LDG-RELATED REINSURANCE AGREEMENTS (except for the Differences in Conditions coverage) have been retroceded under the POOL AGREEMENTS to the RETROCESSIONAIRES.

6. REINSURER hereby assigns to the COMPANY, as security for payment of the promissory note given in paragraph 1(b)(iv) hereof,

    (a) all of the REINSURER's rights, title and interest in the recoverables arising from POOL AGREEMENTS on account of the retrocession thereunder of the LDG-RELATED REINSURANCE AGREEMENTS; *provided, however,* that such rights assigned do not include either (x) retrocessional protection, if any, available to REINSURER other than protection purchased through LDG or (y) REINSURER's share of retrocessional protection purchased by LDG on behalf of the LDG Pool Members, in both case (x) and case (y), insofar (but only insofar) as such retrocessional protection is applicable to REINSURER's NET LDG LIABILITY and/or the RELIANCE LDG LIABILITY and

    (b) any claims the REINSURER has, had, or may have against LDG and/or SRRF under the REINSURANCE MANAGEMENT AGREEMENTS as further security for payment of such promissory note.

REINSURER will provide COMPANY with any and all necessary governmental and regulatory approvals for this assignment or any other writings necessary to affect this assignment. In furtherance of the assignment and security interest granted above, the REINSURER shall receive any cash payments from the RETROCESSIONAIRES, LDG and/or SRRF Management Incorporated ("SRRF") as a trustee for the COMPANY and shall deliver up to the COMPANY any amounts so received, but the COMPANY shall have no further recourse to the REINSURER on or on account of the promissory note, except so as to enforce this paragraph.

7. The COMPANY shall not have recourse directly against the REINSURER on such promissory note but shall look solely and exclusively to the assigned rights against the RETROCESSIONAIRES, LDG, and/or SRRF, and/or any successors or affiliates thereof, in the POOL AGREEMENTS and REINSURANCE MANAGEMENT AGREEMENTS for repayment thereof. The cost of pursuing such assigned rights shall be borne solely by the COMPANY.

-4-

8.   REINSURER will cooperate fully with COMPANY, at the expense of the COMPANY, in any proceedings COMPANY (or REINSURER) may bring against the RETROCESSIONAIRES and/or LDG and/or SRRF.  Such cooperation will include, but not be limited to:

    (a)   making REINSURER's current officers and employees, and using its best efforts to make previous officers and employees, available to COMPANY for interviews and, as needed, for depositions and/or appearances at any hearings;

    (b)   providing COMPANY with all documents regarding REINSURER's dealings with RETROCESSIONAIRES and/or LDG and/or SRRF;

    (c)   assisting fully in any effort to procure non-party discovery; and

    (d)   assisting fully throughout any arbitration or other legal proceedings.

9.   If for any reason the assignment under paragraph 6 is deemed void, REINSURER shall commence proceedings against the RETROCESSIONAIRES and/or LDG and/or SRRF to recover Seventy-Three Million Three Hundred Sixty Thousand United States Dollars ($73,360,000).  Such litigation and/or arbitration shall be directed by COMPANY, which may appoint lead counsel of its own choosing, and all fees, costs and expenses reasonably incurred by REINSURER or any of its directors, officers, employees, advisors, or attorneys, past or present, in connection with such litigation and/or arbitration shall be paid by the Company.  The COMPANY shall receive all recoveries effected thereby.

10.   If and when REINSURER has fulfilled all of its obligations under this SETTLEMENT, then REINSURER, its affiliates, successors and assigns and their respective directors, officers, employees and agents shall be released and forever discharged from all remaining liability that REINSURER, its affiliates, successors and assigns and their respective directors, officers, employees and agents had, have or shall have to COMPANY by reason of or in respect of any act, matter, cause or thing whatsoever with respect to the LDG-RELATED REINSURANCE AGREEMENTS.  This release does not apply to LDG, SRRF or the RETROCESSIONAIRES.

11.   Effective on the same date on which COMPANY shall release the REIN-
SURER as provided for in paragraph 10 herein, REINSURER shall likewise release and forever
discharge COMPANY, their affiliates, successors and assigns and their respective directors, offi-
cers, employees, and agents from all liability that COMPANY, their affiliates, successors and
assigns and their respective directors, officers, employees and agents had, have or shall have to
REINSURER by reason of or in respect of any act, matter, cause or thing whatsoever with re-
spect to the LDG-RELATED REINSURANCE AGREEMENTS.  This release does not apply to
LDG, SRRF or the RETROCESSIONAIRES.

12.   In the event that the REINSURER fails to fulfill all of its obligations under
this SETTLEMENT, the PARTIES hereto agree that the REINSURER shall, at the request of
COMPANY, submit to the jurisdiction of any court of competent jurisdiction within the State of
Connecticut and shall comply with all the requirements necessary to give such court jurisdiction
with respect to any litigation commenced by COMPANY which arises out of this SETTLE-
MENT or the breach thereof or REINSURER'S liability to COMPANY on the LDG-RELATED
REINSURANCE AGREEMENTS.

13.   In the event that the REINSURER fails to make the payments to the COM-
PANY required to be paid under this SETTLEMENT, the COMPANY will be free to seek the
payment of such funds from the REINSURER.  Nothing in this SETTLEMENT, including with-
out limitation the releases in paragraphs 10 and 11, shall be deemed to prevent the COMPANY
from initiating such proceedings against the REINSURER.

14.   Within three (3) business days of REINSURER's fulfilling all of its obliga-
tions herein, except those described in paragraphs 8 and 9, the COMPANY and REINSURER
will inform the party-appointed arbitrators that the LDG POOL ARBITRATION has been re-
solved and should be dismissed with prejudice.  Following such dismissal, COMPANY and RE-
INSURER each agree to bear their own costs and attorney's fees regarding the LDG POOL AR-
BITRATION.

15.   The rights, duties and obligations set forth herein shall inure to the benefit of and be binding upon the COMPANY and the REINSURER as they are identified in this SET-TLEMENT and their respective predecessors, parents, successors, affiliates, officers, directors, employees, agents, subsidiaries, shareholders, representatives, attorneys, liquidators, receivers and assigns of the parties hereto and is not intended to confer any rights or benefits upon persons or entities other than the foregoing parties.

16.   This SETTLEMENT shall constitute the entire agreement between the PARTIES as it relates to the subject matter herein.  This SETTLEMENT may not be modified or amended, except by an instrument in writing signed by the PARTIES hereunder.

17.   The PARTIES hereto expressly warrant and represent that they are corpora-tions in good standing in their respective places of domicile, that the execution of this SETTLE-MENT is fully authorized by each of them, that any necessary regulatory approvals have been obtained, and that the person or persons executing this SETTLEMENT have the necessary and appropriate authority to do so.

18.   The PARTIES agree to maintain the confidentiality of this SETTLEMENT and its terms, subject to the following:

(a)   A PARTY may, when necessary or required, disclose this SETTLE-MENT to such PARTY's auditors, shareholders, or governing regula-tory bodies.

(b)   A PARTY may, when necessary or required, disclose this SETTLE-MENT to third parties in court proceedings and arbitrations in connec-tion with mandatory discovery requirements, or in any bankruptcy, in-solvency, or similar proceeding involving a parent, subsidiary or affili-ate of such PARTY.

(c)   The COMPANY may make such disclosures (including UCC-1 or other filings) as, in its judgment, are necessary to perfect the security interest granted herein.

(d)   Any PARTY may also disclose this SETTLEMENT and its terms un-der other circumstances if it obtains the prior written consent of the other PARTY for such disclosure.

(e)   Any PARTY may disclose this SETTLEMENT and its terms for pur-poses of enforcing the SETTLEMENT or seeking redress for any breach thereof.

In the event of any request or order for disclosure, other than pursuant to subparagraphs (a) or (c) above, no disclosure shall be made unless and until the disclosing party has given the other party not less than five (5) BUSINESS DAYS prior written notice of the requirement of making such disclosure and an opportunity to obtain a protective order. Any PARTY disclosing this SET-TLEMENT in a manner permitted by this article will take all reasonable precautions to protect its confidentiality.

19.    Each of the Parties represents to the other as follows: (a) it has had full opportunity to consult with its respective attorneys in connection with the review of this SETTLE-MENT; (b) it has carefully read and understands the scope and effect of each provision contained in this SETTLEMENT; (c) it has conducted all necessary due diligence, investigation and analysis of the transactions contemplated by this SETTLEMENT; and (d) it is not relying upon any representations made by any other party, its attorneys or other representatives.

20.    The PARTIES agree to execute and deliver such other documents and take such other action as may be necessary to effect this SETTLEMENT, including without limitation, providing such information and representations as may be requested by (a) the Insurance Department of the State of Connecticut, and (b) the REINSURER in connection with any retrocessionaire or other person or entity obligated to indemnify or reimburse it for any payment hereunder or under the LDG-RELATED REINSURANCE AGREEMENTS.

21.    The parties agree that, in order to enable and assist the REINSURER to present claims and information to its retrocessionaires, the COMPANY shall provide the REINSURER, upon the REINSURER's request, with the same notice of losses or occurrences, notices of subsequent developments respecting such losses or occurrences and proofs of loss that it would have been obligated to provide (or would in the ordinary course have provided) to the REINSURER under the LDG-RELATED REINSURANCE AGREEMENTS. It is understood and agreed that such requests will be limited to those reasonably necessary to accomplish such pur-

pose, and that the sufficiency of the COMPANY's response to such requests will be measured against their relation to such purpose.

22.    This SETTLEMENT shall be interpreted under and governed by the substantive laws of the State of Connecticut without regard to its conflict of law principles.

23.    All notices under this SETTLEMENT shall be in writing and shall be deemed to be duly given and received (i) upon delivery if delivered by certified mail; or (ii) on the next Business Day if sent by overnight courier.

24.    This SETTLEMENT may be executed in a number of counterparts, each of which when so executed and delivered shall constitute an original, but such counterparts together shall constitute one and the same SETTLEMENT.

The remainder of this page is left blank intentionally.

IN WITNESS WHEREOF the PARTIES hereto have executed this SETTLE-MENT AND RELEASE AGREEMENT in duplicate, as of the day and year first written above.

AMERICAN INTERNATIONAL GROUP, INC.
on behalf of its member and associated companies.

BY:_____          WITNESS:_____

TITLE:_____

BY:_____          WITNESS: _Anne Bergoni_

TITLE: _Assistant General Counsel_

TRENWICK AMERICAN REINSURANCE CORPORATION,
as successor to CHARTWELL REINSURANCE COMPANY

BY:_____          WITNESS:_____

TITLE:_____

-10-

IN WITNESS WHEREOF the PARTIES hereto have executed this SETTLE-MENT AND RELEASE AGREEMENT in duplicate, as of the day and year first written above.

AMERICAN INTERNATIONAL GROUP, INC.
on behalf of its member and associated companies.

BY:_____     WITNESS:_____

TITLE:_____

BY:_____     WITNESS:_____

TITLE:_____

TRENWICK AMERICA REINSURANCE CORPORATION,
as successor to CHARTWELL REINSURANCE COMPANY

BY:_____     WITNESS:_____

TITLE:_____

**EXHIBIT 2**

# CAHILL GORDON & REINDEL LLP
## EIGHTY PINE STREET
### NEW YORK, N.Y. 10005-1702

LLOYD ABRAMS
. HOWARD ADAMS
ROBERT A. ALESSI
ROGER ANDRUS
HELENE R. BANKS
MICHAEL A. BECKER
LANDIS C. BEST
GARY A. BROOKS
SUSAN BUCKLEY
KEVIN J. BURKE
JAMES J. CLARK
BENJAMIN J. COHEN
CHRISTOPHER T. COX
W. LESLIE DUFFY
ADAM M. DWORKIN
RICHARD E. FARLEY
PATRICIA FARREN
JOAN MURTAGH FRANKEL
BART FRIEDMAN
CIRO A. GAMBONI
WILLIAM B. GANNETT

CHARLES A. GILMAN
STEPHEN A. GREENE
ROBERT M. HALLMAN
WILLIAM M. HARTNETT
CRAIG M. HOROWITZ
DAVID G. JANUSZEWSKI
THOMAS J. KAVALER
LAWRENCE A. KOBRIN
IMMANUEL KOHN
EDWARD P. KRUGMAN
GEOFFREY E. LIEBMANN
MICHAEL MACRIS
JONATHAN I. MARK
GERARD M. MEISTRELL
ROGER MELTZER
MICHAEL E. MICHETTI
ATHY A. MOBILIA
DONALD J. MULVIHILL
NOAH B. NEWITZ
KENNETH W. ORCE
JOHN PAPACHRISTOS

TELEPHONE: (212) 701-3000
FACSIMILE: (212) 269-5420

1990 K STREET, N.W.
WASHINGTON, D.C. 20006-1181
(202) 862-8900
FAX: (202) 862-8958

AUGUSTINE HOUSE
6A AUSTIN FRIARS
LONDON, ENGLAND EC2N 2HA
(011) 44.20.7920.9800
FAX: (011) 44.20.7920.9825

WRITER'S DIRECT NUMBER

(212) 701-3506

LUIS R. PENALVER
ROY L. REGOZIN
DEAN RINGEL
JAMES ROBINSON
THORN ROSENTHAL
JONATHAN A. SCHAFFZIN
JOHN SCHUSTER
HOWARD G. SLOANE
LAURENCE T. SORKIN
LEONARD A. SPIVAK
SUSANNA M. SUH
GERALD S. TANENBAUM
JONATHAN D. THIER
JOHN A. TRIPODORO
ROBERT USADI
GEORGE WAILAND
GLENN J. WALDRIP, JR.
MICHAEL B. WEISS
DANIEL J. ZUBKOFF

SENIOR COUNSEL
WALTER C. CLIFF
DAVID R. HYDE
WILLIAM T. LIFLAND
DENIS McINERNEY
MATHIAS E. MONE
IRWIN SCHNEIDERMAN
JOHN R. VAUGHAN
GARY W. WOLF

COUNSEL
CORYDON B. DUNHAM
PHILIP A. HEIMOWITZ
JASON W. KAPLAN

November 23, 2004

Re: *Commutation Between AIG Companies and Trenwick*
*Related to LDG Re Business*

Dear Mr. Orlando:

I write on behalf of American International Group, Inc. and its member, affiliated, and associated companies ("AIG Companies") to inform you that AIG Companies and Trenwick America Reinsurance Corporation as successor to Chartwell Reinsurance Company ("Trenwick") have entered into the LDG Pool Commutation, Settlement and Release Agreement effective June 30, 2004 (the "Commutation"). The Commutation, a copy of which is enclosed herein, settles Trenwick's present and future liability to AIG Companies under reinsurance agreements (the "LDG-Related Reinsurance Agreements") in which Trenwick acted as the fronting reinsurer for various reinsurance pools arranged by LDG Reinsurance Corporation. Under the Commutation, the "Settlement Amount" was $81,745,503, including a promissory note in the amount of $73,360,000 (the "Promissory Note").

Pursuant to the Commutation, Trenwick assigned to AIG Companies, as security for payment of the Promissory Note, all of its rights, title and interest in recoverables arising from retrocession agreements and/or other arrangements pursuant to which Trenwick retroceded risks assumed under the LDG-Related Reinsurance Agreements to certain retrocessionaires, including American Re-Insurance Company ("American Re").

American Re's liability to AIG Companies on the assigned claim is $2,485,602. This figure represents a *pro rata* allocation of the Settlement Amount, adjusted for cash payments made by Trenwick,* that in percentage terms corresponds to American Re's proportionate share of the total exposure settled by the Commutation. A computation of such exposure is enclosed. Please remit your payment to AIG Companies within 30 days of your receipt of this letter. You may get in touch with Mindy Kipness, of AIG's Corporate Receivables Department, to arrange payment.

---

* Of the total Settlement Amount, $8,385,503 in cash payments have been made by Trenwick, representing payment on account of (i) commutation of the Difference in Conditions Coverage (as defined in the Commutation), (ii) Trenwick's retained participation in the Pool Agreements with respect to the LDG-Related Reinsurance Agreements, and (iii) the participation of Reliance National Insurance Company in the Pool Agreements with respect to the LDG-Related Reinsurance Agreements.

CAHILL GORDON & REINDEL LLP

-2-

In the alternative, AIG Companies would be pleased to release the assigned claim against American Re in exchange for American Re's agreement to reassume 90% of its proportionate share of the liabilities AIG Companies reassumed in the Commutation. As an incentive for American Re to go this route, AIG Companies will retain the remaining 10% of the share that would otherwise fall to American Re. A form of agreement to effect the reassumption of liabilities is enclosed herewith. If American Re wishes to go this route, please return the executed reassumption agreement to us within 30 days of your receipt of this letter.

If AIG Companies do not receive either payment of the assigned claim or an executed re-assumption agreement within 30 days, they will commence an arbitration to collect on the assigned claim.

We look forward to hearing from you.

Sincerely,

Edward P. Krugman /KMK

Edward P. Krugman

Mr. Michael Orlando
American Re-Insurance Company
555 College Road East
Princeton, New Jersey 08543-5241

American Re-Insurance Company
c/o LDG Reinsurance Corporation
401 Edgewater Place
Suite 400
Wakefield, Massachusetts 01880

**VIA FEDEX**

cc:    Eric Kobrick, Esq. (w/o enclosures)
       Ms. C. Mindy S. Kipness (w/o enclosures)

       Robin Dusek, Esq. (w/o enclosures)
       Deborah Levine, Esq. (w/o enclosures)
       Kenneth Pierce, Esq. (w/o enclosures)

**EXHIBIT 3**



## SRRF MANAGEMENT INCORPORATED

## PARTICIPATION AGREEMENT

This Agreement is made by and between:

**SRRF MANAGEMENT INCORPORATED**
with offices at 401 Edgewater Place
Wakefield, Massachusetts 01880

and

757 Third Avenue
New York, New York 10017

and

Chartwell Reinsurance Company
Four Stamford Plaza
P. O. Box 120043
Stamford, CT 06912-0043

A subscribing participant (hereinafter referred to as "MEMBER")
and together with other participants to be known collectively as
SPECIAL RISK REINSURANCE FACILITY II
(hereinafter referred to as "SRRF II")

Whereas the Member has elected to appoint SRRF Management for the purpose of marketing, underwriting, effecting and servicing, on its behalf, Accident and Health Reinsurance to be provided in favor of various Reinsureds, all as more fully set forth in this Agreement; and

Whereas, SRRF Management will enter into Agreement with other subscribing participants to participate as Members of SRRF II.

Now, therefore, in consideration of the mutual covenants and Agreements herein contained, it is agreed as follows:

SRRF II Participation Agreement
June 4, 1999
Page 1 of 19



# SRRF MANAGEMENT INCORPORATED

## Article I - Term

This Agreement shall take effect July 1, 1998 and is to be a continuous Agreement unless and until terminated in accordance with Article XIII.

## Article II - Definitions

"Agreement Year" means each twelve (12) consecutive calendar months during the continuance of this Agreement, beginning on each July 1.

"Accident and Health Reinsurance" means reinsurances and/or retrocessions which become effective as new or renewal business on or after the effective date of this Agreement, and which have been bound and accepted for SRRF II by SRRF Management.

Business bound and accepted by SRRF Management shall be limited to reinsurances and/or retrocessions of accident and/or health insurance benefits on the classes of business defined herein on Schedule A. Reinsurances and/or retrocessions in respect of the following classes will in no event be accepted for SRRF.

1. Portfolio Medical business
2. Specific and Aggregate Self-funded Medical Business
3. Disability Income business with Sickness benefit durations exceeding 5 years
4. Professional Sports (Accident and Sickness/Permanent Total Disability).
5. Financial Guarantee
6. Property and Casualty Reinsurance (Written as such).

All such reinsurances and/or retrocessions shall be provided in accordance with terms and provisions of Reinsurance Contracts issued to a Reinsured by SRRF Management, and shall apply on either an excess or pro-rata form, and on either a treaty or facultative basis, as bound and accepted by SRRF Management.

"Reinsured" means any insurance or reinsurance company or companies, admitted insurer or reinsurer or non-admitted alien reinsurer or any other reinsurer qualified by SRRF Management, and reinsured under a Reinsurance Contract issued by SRRF Management.

"Reinsurance Contract" means all binders, contracts, agreements, treaties, certificates, addenda, endorsements or other evidences of Accident and Health Reinsurance which have been issued by SRRF Management, on behalf of SRRF Management to a Reinsured, including renewals and cancellations thereof.



## SRRF MANAGEMENT INCORPORATED

"Contract Term" means the consecutive period of a Reinsurance Contract issued by SRRF Management, beginning on the inception date of each such contract, or on each renewal date thereof, and ending on a date no later than thirty-six (36) months thereafter.

Notwithstanding any statement to the contrary, SRRF Management, at its discretion, may also issue continuous Reinsurance Contracts; provided that all such contracts retain a provision for termination at any initial termination date not longer than eighteen (18) months after the inception of each such contract, and at subsequent termination dates not to exceed twelve (12) month intervals thereafter.

"Contract Year" means each twelve (12) consecutive calendar months during the continuance of a Reinsurance Contract issued by SRRF Management; provided, however, that at the option of SRRF Management the first such contract year only may be comprised of any period of up to eighteen (18) consecutive months beginning on the initial inception date of each such contract.

"Loss Adjustment Expenses" means all costs incurred by SRRF Management in investigating, resisting, settling, adjusting, managing, and processing of claims, exclusive of salaries of full-time employees and other office expenses of SRRF Management, unless otherwise agreed.

"Gross Net Reinsurance Premium" means gross premiums applicable to Reinsurance Contracts issued by SRRF Management, less cancellations and return premiums.

## Article III - Appointment of Manager

The Member does hereby appoint SRRF Management to market, underwrite, effect and service Reinsurance Contract(s) on its behalf pursuant to the terms and conditions set forth in this Agreement.

## Article IV - Duties and Responsibilities of SRRF Management

1.  SRRF Management shall manage and conduct Accident and Health Reinsurance business on behalf of the Member in a reasonable and prudent manner according to its complete discretion. Unless otherwise indicated herein, SRRF Management is authorized to exercise full discretion when performing all those activities on the Member's behalf incidental to managing and conducting said business. Authorized activities shall include but not be limited to:

    A.  Promoting, advertising and otherwise announcing the availability of reinsurance to prospective clients.

SRRF II Participation Agreement
June 4, 1999
Page 3 of 19



## SRRF MANAGEMENT INCORPORATED

B. Accepting applications, specifications and other requests for proposal; negotiating, underwriting, pricing, setting brokerage and commissions thereon, binding, executing and delivering Reinsurance Contracts including addenda and endorsements thereto and renewals and cancellations thereof, subject to the following limitations:

1. SRRF Management shall not propose, bind or accept a Reinsurance Contract with limits of acceptance exceeding those set forth below, unless prior to proposing, binding or accepting such contract a satisfactory retrocession or other form of common account protection has been arranged so that amounts retained by SRRF II, after application of such retrocession shall not exceed such limits of acceptance.

|  | Limits of Acceptance |
|---|---|
| Per person | $ 3,000,000 |
| Per known accumulation | $ 30,000,000 |

SRRF Management shall use its best judgment to maintain the underwriting limits specified above, but in the event of unknown accumulations Members shall nevertheless bear their proportionate share of all claims involved in any one accident or occurrence less any amounts recoverable under retrocessions which have been arranged on behalf of SRRF II by SRRF Management.

2. All Reinsurance Contracts executed pursuant to this Agreement shall exclude liability resulting from punitive, exemplary, consequential or other extra contractual damages, or legal fees and expenses attendant thereto, which are levied against the Reinsured as a result of the Reinsured's own acts or omissions, unless SRRF Management, in conjunction with the Advisory Committee shall have concurred in writing with such acts or omissions.

3. SRRF Management shall not knowingly execute a Reinsurance Contract which violates any legislative or regulatory requirements imposed by a governing body exercising jurisdiction over said contract. Upon discovery that such violation has occurred, SRRF Management shall immediately take such corrective action as may be necessary to comply with said legislative or regulatory requirements.

C. Negotiating, securing and servicing ceded reinsurance, on a treaty or facultative basis with any corporation or other entity, underwriting association or other insurer, reinsurer or retrocessionaire; provided such corporation, underwriting association, insurer, reinsurer or retrocessionaire is an admitted reinsurer, or a non-admitted alien reinsurer which has established letters of credit or funds withheld arrangements; and in connection therewith, executing binders contracts, agreements, treaties, addenda,

SRRF II Participation Agreement
June 4, 1998
Page 4 of 19



## SRRF MANAGEMENT INCORPORATED

endorsements or any other evidences of such ceded reinsurance including renewals and cancellations thereof.

D. SRRF Management shall have the right, at its sole discretion, to purchase common account reinsurance or other retrocessions for protection of the Members; such protection to be paid for by SRRF Management out of premiums due each Member; such protection to inure to benefit of each Member in the same proportion as the Member's pro-rata participation in this pool.

E. Billing, collecting and receiving premiums and other sums due in respect of all Reinsurance Contracts executed pursuant to this Agreement and paying return premiums and other sums due in respect of such contracts; paying premiums in respect of any ceded reinsurance secured on behalf of the Member and collecting return premiums in respect of such ceded reinsurance.

F. Admitting, settling, compromising, adjusting, managing, and paying claim losses and Loss Adjustment Expenses in respect of all Reinsurance Contracts executed pursuant to this Agreement; pursuing and collecting returns and recoveries, where applicable, including recoveries from any ceded reinsurance secured on Member's behalf.

G. Giving and receiving notice pursuant to the terms and conditions of Reinsurance Contracts executed pursuant to this Agreement and otherwise satisfying the contractual rights and responsibilities of such contracts.

H. Seeking and securing legal and other outside professional counsel when deemed appropriate.

2. Upon occurrence of any change in the constitution of SRRF II, SRRF Management shall notify the Member of such change as soon as reasonably possible.

Current Members of SRRF II shall have first option to assume any participation which becomes available as the result of the termination or reduction of any other Members authorized participation. Assumption of such participation shall be offered to current Members by SRRF Management in proportion to their own participations at the time of the termination or reduction. If any current Member declines to assume its proportionate share, such share shall be re-offered to remaining Members on a basis to be determined by SRRF Management. If 100% of the participation involved is not assumed by Members, SRRF Management will place shares remaining with qualifying companies not then Members of SRRF II. If 100% participation is not achieved, then each Member's dollar line shall stand for that Agreement Year and any subsequent Agreement Years in which the membership is not reconstituted to 100%.





## SRRF MANAGEMENT INCORPORATED

### Article V - Duties and Responsibilities of Member

1. The Member makes this Agreement as a participant in a group of subscribing participants which have executed counterparts of the Agreement, and which are to be known collectively as Special Risk Reinsurance Facility II (SRRF II). By executing this Agreement, the Member represents that it is duly licensed or admitted in a state or territory of the United States or the District of Columbia or, if non-admitted, an alien reinsurer, which has established letters of credit or funds withheld arrangements, and is and will at all times be duly qualified to write the reinsurances and/or retrocessions which are described in and are the subject of this Agreement.

2. The Member shall participate in each and every Reinsurance Contract which has been executed pursuant to this Agreement, and which becomes effective as new or renewal business during an Agreement Year for which the Member is a participant hereunder. The Member's participation in such Reinsurance Contract shall be in the same proportion that its authorized participation for a given Agreement Year bears to the total participations authorized for each such year by all subscribing Members of SRRF II, and shall entitle and obligate the Member to its proportionate share of all premiums and liabilities including all other fees, costs, expenses and allowances borne by Members under Article X and elsewhere herein, resulting from such Reinsurance Contracts.

   The Member's authorization as respects each Agreement Year shall be expressed as both a dollar participation and a percentage participation as set forth in Exhibit I herein; provided, however, that the dollar participation authorized by the Member as of the inception of this Agreement shall not be reduced during the continuance of this Agreement without the prior approval of both the Member and SRRF Management, except as provided in Article XIII. Exhibit I shall also set forth the authorized participation of all Members of SRRF II as respects each Agreement Year.

3. The liability of the Member with respect to all Reinsurance Contracts executed pursuant to this Agreement shall be several, not joint, along with the several liability of all other Members of SRRF II. In no event shall the Member participate in the liabilities of other Members of SRRF II, and all Reinsurance Contracts executed by SRRF Management pursuant to this Agreement shall clearly express such several liability.

### Article VI - Advisory Committee

SRRF Management shall nominate certain Members of SRRF II to comprise an Advisory Committee. Members accepting initial nomination shall serve as Advisory Committee Members until the expiration of the Agreement Year in which such service commenced. Prior to the expiration of each Agreement Year during the continuance of this Agreement, SRRF



## SRRF MANAGEMENT INCORPORATED

Management in conjunction with the Advisory Committee then constituted shall consider nomination of one or more current Members of SRRF II to replace or supplement incumbent Members of the Advisory Committee for the subsequent Agreement Year. Any Member accepting any such nomination, together with incumbent Advisory Committee Members agreeing to continue service, shall comprise the Advisory Committee for the duration of each such Agreement Year.

All Members will be advised of the Advisory Committee membership by SRRF Management, as well as any changes that may subsequently occur. The Advisory Committee shall convene periodically in accordance with a schedule to be determined by SRRF Management. The Committee shall review general underwriting practices established and implemented by SRRF Management, and may recommend modification or revision thereto, where deemed appropriate. The Advisory Committee may also consider and provide counsel with respect to other issues relevant to the operation of this Agreement, and shall otherwise discharge duties which have been specifically delegated to it by SRRF Management under the provisions of this Agreement. Such delegated duties may include, but not be limited to, the following:

1. Take down of claims reserve fund, in conjunction with SRRF Management.

2. Close out of Agreement Year experience, in conjunction with SRRF Management.

3. Calculation of reserve for loss development (IBNR), in conjunction with SRRF Management.

4. Establishment with SRRF Management of selection criteria for new SRRF II membership.

### Article VII - Federal Excise Tax

(Note: Applicable only to Member reinsurers domiciled outside the United States except Underwriters at Lloyd's, London and other foreign reinsurers exempt from the Federal Excise Tax.)

The Member has agreed to allow, for the purpose of paying the Federal Excise Tax, the applicable percentage of premium payable thereon as imposed under Section 4371 of the Internal Revenue Service Code to the extent such premium is subject to Federal Excise Tax. SRRF Management shall compute such tax, file the requisite tax returns, and pay such tax on behalf of a Member; and SRRF Management shall deduct the amount of such tax from the reinsurance premiums otherwise payable hereunder to such Member. In the event of any return of premium becoming due hereunder, the Member will deduct the applicable percentage of the return



## SRRF MANAGEMENT INCORPORATED

premium payable hereon from the amount of the return, and the Reinsured should recover the tax from the United States government.

### Article VIII – Premium and Loss Payments

1. Interest and Liabilities shall be assigned Agreement Years as follows:

   A. All premiums due including reinstatement premiums shall be apportioned to or charged to the Agreement Year in which such Reinsurance Contract(s) had its inception, anniversary, or was last renewed, without regard to the date actually received; returns and commissions, including contingent commissions, paid under Reinsurance Contract(s) shall be treated in the same manner.

   B. Losses shall be apportioned to or charged by date of occurrence to the Agreement Year in which such Reinsurance Contract(s) incurring the loss had its inception, anniversary, or was last renewed, without regard to the date actually reported or paid.

   C. Premium due during any run-off period or losses occurring during any run-off period (run-off period being defined as the time period in which Reinsureds continue to be afforded the protection of Reinsurance Contract(s) that are no longer in force as respects new and renewal business) shall be apportioned to or charged to the Agreement Year in which such Reinsurance Contract(s) had its inception, anniversary or was last renewed; provided, however, that such run-off period shall never exceed thirty-six (36) months. Losses commencing before, but extending beyond, the normal expiration date of a Reinsurance Contract(s) which are covered in their entirety by reason of any extended expiration clause shall be charged to the Agreement Year in which such losses commenced.

2. SRRF Management will collect all premiums and other sums on Reinsurance Contracts executed pursuant to this Agreement and such amounts will be deposited in a special account to be maintained at a bank selected by SRRF Management in the name of SRRF Management Fiduciary Account. SRRF Management agrees to notify the Advisory Committee in writing of the name of the bank depository and of any changes herein.

3. SRRF Management will pay all losses, including Loss Adjustment Expenses, out of the monies on deposit in the special account described in paragraph 2 of this Article. Monies remaining after payment of such losses, and the payment of allowances to SRRF Management as provided in Article X, and in excess of a claims reserve fund of $500,000 or 5% of Gross Net Reinsurance Premium, whichever is greater, as determined by SRRF Management, will be remitted to the Member in proportion to the Member's participation. The claims reserve fund will be accumulated on a periodic basis during each Agreement Year in the manner



# SRRF MANAGEMENT INCORPORATED

described in paragraph 4 hereof, and will be separately maintained for each such Agreement Year. Net amounts above the claims reserve fund prior to remittance to the Member may be invested by SRRF Management for its own account. All interest earned on amounts held in the claims reserve fund shall be credited to the Member for its pro-rata share.

4. A claims reserve fund to be placed under the control of SRRF Management shall be established during each Agreement Year during the continuance of this Agreement, and shall be funded in the following Manner:

Quarterly deductions from the positive balances developed for account of Members, as specified in Article XII, shall be withheld from amounts otherwise payable to Members, until a reserve fund of $500,000 or 5% of Gross Net Reinsurance Premium, whichever is greater, has been accumulated. The amounts thus withheld shall be separately maintained in a fiduciary trust account, and shall be used by SRRF Management solely for the payment of losses chargeable to each such Agreement Year.

Upon payment of losses, the reserve fund shall be automatically re-established to a level of $500,000 or 5% of Gross Net Reinsurance Premium, (whichever is greater) as determined, by subsequent deductions from amounts otherwise payable to Members. If the amounts deposited have been reduced to the extent that they are inadequate to pay all or a part of covered losses chargeable to each such Agreement Year, the liability of the Member shall continue in force as respects all such losses without diminution because of the inadequacy of the reserve fund.

The claims reserve fund will be taken down in consultation with the Advisory Committee as underwriting results for each Agreement Year develop, and any amounts remaining herein after final settlement of all liabilities accruing during each such Agreement Year will be remitted to the Member in proportion to the Member's participation. All interest earned on amounts held in the claims reserve fund shall be credited to the Member for its pro-rata share.

5. In the event that a reinsurance claim exceeds the amounts on deposit in the special account and the claims reserve fund, the excess amount needed to meet the Member's pro-rata share of such reinsurance claim will be immediately due and payable by the Member upon request from SRRF Management.

6. In the event that a Member becomes liable to make periodic payments on any loss hereunder, SRRF Management may at any time appoint an actuary or appraiser to investigate, determine, and capitalize such claim and the Member agrees that, subject to acceptance by the ceding company, it shall then be liable for its Share of such capitalized value, and payment thereof shall constitute a complete release of its liability for such claims.

SRRF II Participation Agreement
June 4, 1991
Page 9 of 19



## SRRF MANAGEMENT INCORPORATED

### Article IX - Errors and Omissions

No inadvertent errors, delays or omissions shall relieve either party from their liability or obligation hereunder, provided such errors, delays or omissions are rectified as soon as possible after discovery.

### Article X - Allowances

1. SRRF Management shall be reimbursed by the Member by SRRF Management's deductions from Gross Net Reinsurance Premiums for any costs and expenses incurred by SRRF Management in fulfilling its duties and responsibilities under Article IV and the payment of commissions, acquisition fees, premium taxes, including reimbursement for all expenses relating to claims and losses including claim and loss expenses; except, however, SRRF Management shall be solely responsible for all extra-contractual damages incurred as a result of SRRF Management's sole acts or conduct or negligence only. In addition, as compensation for the services rendered hereunder, SRRF Management shall receive a Management Fee of 6.0% for all Reinsurance Contract(s) written for and on behalf of the Member by SRRF Management. The Management Fee shall be calculated on Gross Net Reinsurance Premium and shall be paid only as and when such reinsurance premiums are collected. At the sole discretion of SRRF Management, the Management Fee(s) set forth herein may be reduced in respect of certain Reinsurance Contract(s).

2. SRRF Management shall maintain an adequate office staff, shall pay and discharge the expenses of conducting its own business and shall not incur any expenses chargeable to SRRF II, or Members thereof, other than those authorized herein without specific written approval.

### Article XI - Profit Commission

The Member agrees to pay to SRRF Management a profit commission on a sliding scale of profitability on the net profits earned by SRRF II during each Agreement Year during the continuance of this Agreement. Profit Commission shall be determined by applying to the amount of net profit, a profit commission factor in accordance with the following.

Profit commission calculations for each Agreement Year shall consist of interim calculations to be made, initially, 18 months after the expiration of each Agreement Year, and, subsequently, at each 12 month interval thereafter. Each calculation shall include all results developed during an adjustment period which are chargeable to each such Agreement Year.

"Adjustment period" means the period commencing on the inception date of each Agreement Year and ending on the date of each calculation of profit commission hereunder. Net profits for each period shall be the excess of Income over Outgo, calculated as follows:



## SRRF MANAGEMENT INCORPORATED

### A. INCOME

1. Member's share of Gross Net Reinsurance Premiums which have been earned during an adjustment period, and which have been paid to SRRF II.

### OUTGO

1. Member's share of allowances paid to SRRF Management on item 1 of income, including allowances to ceding companies and brokers.

2. Member's share of losses and loss expenses which have been paid for SRRF II in respect of claims incurred and reported during an adjustment period.

3. Member's share of losses and loss expenses which have been reserved for SRRF II in respect of claims incurred and reported during an adjustment period, but not paid.

4. Member's share of losses and loss expenses which have been reserved for SRRF II for loss development in respect of claims incurred during an adjustment period, but not reported.

5. 3.75% of Item 1 of Income for Member's expense.

6. Member's share of the portion of net premiums paid to accepting reinsurers for ceded reinsurance secured on behalf of SRRF II which have been earned during an adjustment period; less the Member's share of recoveries inuring to SRRF II thereunder.

7. Deficit(s) carried forward from previous calculations; provided that the deficit for any one Agreement Year shall be applied for a maximum of 3 consecutive Agreement Years only.

| B. | NET PROFIT RATIO* | PROFIT COMMISSION FACTOR |
|---|---|---|
| | < = 5% | 20.00% |
| | > 5% to < = 12% | 22.50% |
| | > 12% to < = 18% | 25.00% |
| | > 18% to < = 24% | 27.50% |
| | > 24% to < = 29% | 30.00% |
| | > 29% to < = 35% | 32.50% |
| | > 35% to < = 41% | 35.00% |
| | > 41% to < = 49% | 37.50% |
| | < = 49% | 40.00% |

\* Net Profit Ratio is the ratio of Net Profit to Gross Net Reinsurance Premium earned.

SRRF II Participation Agreement
June 4, 1996
Page 11 of 19



## SRRF MANAGEMENT INCORPORATED

Profit commission calculations for each Agreement Year shall include final results developed by all Reinsurance Contracts issued with inception dates commencing during each such Agreement Year; provided that such contracts have been issued for Contract Terms of 12 months or less, or for fixed Contract Terms of more than 12 months during which SRRF Management does not have an opportunity to effect a renewal position prior to the expiration of the Contract Term. With respect to Reinsurance Contracts issued on a continuous basis, or for fixed terms of more than 12 months during which SRRF Management can effect renewal positions at the end of each contract year, final results developed during each Contract Year shall be charged to the Agreement Year in which each such Contract Year commenced. An initial interim profit commission calculation shall be made 18 months after the expiration of each Agreement Year with 100% of the applicable profit commission, if any, to be then payable.

Subsequent interim calculations for each such Agreement Year shall be made annually thereafter using the latest figures then available, until SRRF Management in conjunction with the Advisory Committee has recognized each such Agreement Year as closed and experience therefor fully developed. Any variances in profit commission payable developed between the various calculations shall be adjusted accordingly and SRRF Management shall refund to the Member, or the Member shall pay to SKRF Management such amounts of profit commission as shall give effect to the variances so developed.

In the event of a dispute with respect to the amount or reserves regarding the calculation of Profit Commission (as defined in Article XI) at any adjustment, 50% of the amount calculated by SRRF Management to be due shall be paid by either party until the dispute is settled, when the remainder shall be paid by the Member or returned by SRRF Management, as the case may be.

In the event of termination of this Agreement, no further calculation of profit commission shall be made until the final settlement of all liabilities assumed prior to the date of such cancellation.

## Article XII - Reports and Remittances

1. SRRF Management shall maintain all books and records it deems necessary and appropriate for proper management and conduct of business transacted pursuant to this Agreement and to comply with applicable federal and/or state laws. Such books and records, and any other documents relating to the management and conduct of SRRF II, are the property of SRRF Management and shall be available for inspection by the Member or its designated representative, at all reasonable times for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof.



## SRRF MANAGEMENT INCORPORATED

2. As soon as possible after the close of each calendar quarter that this Agreement remains in force, but in no event longer than forty-five (45) days thereafter, SRRF Management shall furnish to the Member quarterly "cash" and "underwriting" bordereaux or other similar reports setting forth details of all transactions which affected business the subject matter hereof during each such quarter. Each such report shall provide the following information on both a quarterly and cumulative year to date basis, allocated also to the applicable Agreement Year:

### Cash Report

A. 100% of Gross Net Reinsurance Premiums paid to SRRF Management during each such quarter by Reinsurance Contract.

B. 100% of amounts recovered during each such quarter from ceded reinsurance secured on behalf of SRRF II.

C. 100% of net premiums paid during each such quarter for ceded reinsurance secured on behalf of SRRF II.

D. 100% of allowances paid to SRRF Management during each such quarter, in accordance with Article X.

E. 100% of losses and loss expenses paid by SRRF Management during each such quarter, in accordance with paragraphs 2 and 3 of Article VIII.

If items A plus B, less items C, D and E result in a positive balance, the applicable pro-rata share thereof shall be payable to the Member, less the Member's pro-rata share of any amounts withheld for claims reserve fund in accordance with the provisions of Article VIII. Amounts payable to Member shall be remitted by SRRF Management at the same time that each such quarterly bordereau or report is rendered. If a negative balance results, such balance shall be payable by the Member and shall be remitted to SRRF Management as soon as possible, but in no event longer than 30 days after receipt of the applicable quarterly bordereau or report.

### Underwriting Report

A. 100% of Gross Net Reinsurance Premiums written during each such quarter.

B. 100% of allowances payable to SRRF Management during each such quarter, in accordance with Article X.

C. 100% of unearned premium reserves at the end of each quarter.



## SRRF MANAGEMENT INCORPORATED

D. 100% of losses and loss expenses paid by SRRF Management during each such quarter (net of recoveries from ceded reinsurance).

E. 100% of loss and loss expense reserves established by SRRF Management at the end of each such quarter for claims incurred and reported but not paid.

F. 100% of loss and loss expense reserves recommended by SRRF Management at the end of each such quarter for claims incurred but not reported.

G. 100% of net premiums payable during each such quarter for ceded reinsurance secured on behalf of SRRF II.

### Article XIII - Termination

1. This Agreement may be terminated at 12:01 A.M. Eastern Standard Time July 1, 1999 or any other subsequent July 1, by either party giving 120 days prior written notice to the other party. Such termination shall not apply to Reinsurance Contracts having effective dates prior to the date of termination until the earlier of (A) the Reinsurance Contract's scheduled renewal date or (B) 36 months from the date of termination. However, the Member shall continue to participate pursuant to the terms of this Agreement with respect to all Reinsurance Contracts bound and effected in all Agreement Years during which this Agreement remained in effect for each Member.

2. Any such termination shall have the effect of terminating this Agreement only with respect to the Member who gives or has been given such notice of termination. Counterpart Agreements with other Members of SRRF II shall remain in full force and effect.

3. SRRF Management may terminate this Agreement with any Member immediately by written or telegraphic notice if:

   A. the Member shall become insolvent or make a general assignment for the benefit of creditors or commit an act of insolvency; or

   B. a petition under the Bankruptcy Act or any similar insolvency statute is filed by or against the Member and not dismissed within fifteen days of the date of filing; or

   C. a cease and desist order has been received by the Member from any insurance department; or

   D. the Member's Best's Rating falls below A or Financial Size VI.



### SRRF MANAGEMENT INCORPORATED

E. failure of a Member to comply with any provision of this Agreement.

4. After the service of any notice of termination hereunder, all Articles of this Agreement which confer rights or liabilities upon either party shall continue to apply until the final settlement of the accounts for all Agreement Years in which the Member participates.

During the period after such notice of termination is given but before the effective date of termination, SRRF Management shall rightfully continue to accept, sign and issue Reinsurance Contracts and all endorsements or amendments thereto and all other acts hereunder on behalf of Members.

In addition, during the period after such notice of termination is effective, SRRF Management shall rightfully:

    A. sign and issue endorsements and amendments relating to Reinsurance Contracts effective prior to the date of termination where such amendments and endorsements were effective prior to the effective date of termination; and

    B. during the period after the notice of termination is effective, sign and issue endorsements and amendments effective after the effective date of termination of this Agreement, provided that the Reinsurance Contracts to which they relate were effective prior to the effective date of termination of this Agreement, and that the changes effected by such amendments or endorsements are within the limitations otherwise provided for by this Agreement.

5. In the event of termination under paragraphs 1 or 3 of this Article, it is agreed that:

    a. if the terminating Member's pro-rata share of outstanding loss reserves and IBNR reserves at the date of termination exceeds such Member's pro-rata share of amounts held in the claims reserve fund at the date of termination, and if the terminating Member fails to meet any of its obligations for payments of amounts due in accordance with paragraph 2 of Article XII, the terminating Member shall upon request of SRRF Management transfer funds to SRRF Management equivalent to 75% of such excess. The funds thus transferred shall be held in a separate account identified as terminated Member's Fiduciary Account, and shall be used by SRRF Management to discharge liabilities accruing to the terminating Member as the result of its pro-rata participations prior to the date of termination.

    "Outstanding loss reserves and IBNR reserves" means the terminating Member's pro-rata share of all such reserves for each Agreement Year of participation, as estimated by SRRF Management in conjunction with the Advisory Committee at the quarterly accounting coincident with the date of termination.



## SRRF MANAGEMENT INCORPORATED

"Claims reserve fund" means the terminating Member's pro-rata share of amounts remaining in the claims reserve fund for each Agreement Year of participation at the quarterly accounting coincident with the date of termination.

B. changes in the terminating Member's pro-rata share of outstanding loss reserves and IBNR reserves shall be estimated on a semi-annual basis by SRRF Management in conjunction with the Advisory Committee following each corresponding quarterly accounting. Any increase in such reserves shall be posted and maintained by the terminating Member on a 100% basis, less any amounts paid in accordance with subparagraph (C) hereof.

C. cash distributions due to the terminating Member shall be paid to the terminated Member's Fiduciary Account and used to satisfy the funding levels described above.

D. amounts held in the terminated Member's Fiduciary Account in excess of funding levels described above shall be distributed to the terminating Member semi-annually following approval of SRRF Management in conjunction with the Advisory Committee.

E. in the event that liabilities accruing to the terminating Member exceed funds deposited by the Member to the terminated Member's Fiduciary Account, the Member shall pay the amounts of such excess to SRRF Management immediately upon request.

F. balances held on behalf of the terminating Member in the claims reserve fund shall continue to be held separate from amounts deposited by the Member to the terminated Member's Fiduciary Account. Distributions from the claims reserve fund shall be paid first to the terminated Member's Fiduciary Account to satisfy funding levels described above, and any excess shall be distributed as per subparagraph (D) hereof.

G. interest income on both the claims reserve fund and the terminated Member's Fiduciary Account shall inure solely to the terminated Member in proportion to its share.

H. each Agreement Year shall be recognized as closed and experience fully developed upon approval of SRRF Management in conjunction with the Advisory Committee. Upon final resolution of an Agreement Year any funds held in the terminated Member's Fiduciary Account and in the claims reserve fund in respect of each such year shall be returned to the terminating Member in proportion to its share.



## SRRF MANAGEMENT INCORPORATED

6. This Agreement may also be terminated for cause immediately upon written or telegraphic notice of termination directed to SRRF Management by a majority of Advisory Committee Members. Any such notice of termination shall automatically terminate this Agreement on behalf of all Members; provided, however, that termination for cause shall be limited to any of the following events which in the best judgment of each such Advisory Committee Member shall be deemed to have occurred:

   A. perpetration of any fraud by SRRF Management;

   B. involvement of SRRF Management in any act of insolvency or assignment for the benefit of creditors, or in any filing of a petition under the Bankruptcy Act or any similar insolvency statute unless such petition is withdrawn within 15 days from the date of filing;

7. In the event of termination under paragraph 6 of this Article, the Advisory Committee shall assume pro-tem the duties of SRRF Management, and all books and records maintained by SRRF Management in accordance with paragraph 1 of Article XII which are necessary for the continuing administration of this Agreement shall be transferred to the Advisory Committee or its designated representative. Such transfer shall be effected by SRRF Management within 30 days of its receipt of written request therefor from the Advisory Committee. As soon as possible after notice of termination has been rendered under paragraph 6, the Advisory Committee shall recommend to Members of SRRF II the continuation or dissolution of SRRF II on the basis of:

   A. appointment of an alternative administrator or creation of a new management office;

   B. run off of the existing business on the books by one of the Members of SRRF II appointed by the Advisory Committee.

## Article XIV - Arbitration

As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates. The seat of this Board of Arbitration shall be in the city in which SRRF Management's home office is located, unless the disputants agree otherwise.

SRRF II Participation Agreement
June 4, 1990
Page 11 of 19



## SRRF MANAGEMENT INCORPORATED

One Arbitrator shall be chosen by the Member and the other by SRRF Management. The Umpire shall be chosen by the two Arbitrators.

Arbitration may be initiated by either party (the petitioner) demanding arbitration and naming its Arbitrator. The other party (the respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the petitioner. In case the respondent fails to designate its Arbitrator within the time stated above, the petitioner is expressly authorized and empowered to name the second Arbitrator; and respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. In the event the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, each of them shall name three, of whom the other shall decline two; and the decision shall be made by drawing lots.

Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement. The Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest convenient date, but in no event later than 120 days from submission of the case to the Board, shall be final and binding upon all parties.

The Member and SRRF Management shall each pay the fee of its own Arbitrator and one-half of the fee of the Umpire, and the remaining costs of the Arbitration shall be paid as the Board shall direct. In the event both Arbitrators are chosen by the petitioner, as provided in the third paragraph of this Article, the Member and SRRF Management shall each pay one-half of the fees of both of the Arbitrators and the Umpire; and the remaining cost of the Arbitration shall be paid as the Board shall direct.

If more than one Member is involved in the same dispute, all such Members shall constitute and act as one party for purposes of this clause and communications shall be made by SRRF Management to each of the Members constituting the one part; provided however, that nothing herein shall impair the rights of such Members to assert several, rather than joint, defenses, or claims, nor be construed as changing in any way the liability of the Members under the terms of this Agreement.



## SRRF MANAGEMENT INCORPORATED

### Article XV – Controlling Law

This Agreement shall be governed by the interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts.

### Article XVI – New Members

New Members may be added to the Agreement as of the commencement of an Agreement Year. All Members will be advised of such additions in writing.

### Article XVII – Entire Agreement

This Agreement consisting of 19 pages, Schedule A and Exhibits I and II constitutes the entire Agreement between the parties and may be varied only by a writing signed by the parties hereto.

The headings of the Articles herein are for convenience only and are not a part of this Agreement.

In witness whereof, the parties hereto, by their respective duly authorized officers, have executed this Agreement in duplicate as of the date recorded in Exhibit II.



## SRRF MANAGEMENT INCORPORATED

## SCHEDULE A

## CLASSES OF BUSINESS

### Accidental Death, Dismemberment and Permanent Disability

24 Hour
Occupational
Non-Occupational

All Forms (deemed as special risk by SRRF Management)

### Disability

24 Hour                          Accident Only
Occupational                     Accident and Sickness
Non-Occupational                 Sickness Only

All Forms (deemed as special risk by SRRF Management)

### Medical

24 Hour                               Accident Only
Occupational                          Accident Only
Non-Occupational                      Accident Only
Organ Transplant                      Accident and Sickness
Student Insurance: College            Accident and Sickness
                   K-12                Accident Only
College Sports                        Accident Only
Interscholastic Sports                Accident Only

All Forms (deemed as special risk by SRRF Management)



# SRRF MANAGEMENT INCORPORATED

## EXHIBIT I

### ATTACHED TO AND FORMING PART OF
### PARTICIPATION AGREEMENT
between
SRRF MANAGEMENT INCORPORATED
and
MEMBER COMPANIES
of
SPECIAL RISK REINSURANCE FACILITY II

MEMBER COMPANIES AND PARTICIPATIONS
AGREEMENT YEAR July 1, 1998 THROUGH June 30, 1999
(Each Member severally and not jointly)

| MEMBER | Maximum Any One Occurrence* | Percentage Participation |
|---|---|---|
| American Re-Insurance Company | $ 1,000,000 | 3.333% |
| American United Life Insurance Company | $ 2,100,000 | 7.000% |
| Chartwell Reinsurance Company | $ 1,500,000 | 5.000% |
| Cologne Life Reinsurance Company | $ 1,700,000 | 5.667% |
| First Allmerica Financial Life Insurance Company | $ 7,700,000 | 25.667% |
| Hartford Life Insurance Company | $ 1,500,000 | 5.000% |
| Insurance Corporation of Hannover an Illinois Corp. | $ 1,000,000 | 3.333% |
| Manulife Reinsurance Corporation (U.S.A.) | $ 2,400,000 | 8.000% |
| Phoenix Home Life Mutual Insurance Company | $ 1,000,000 | 3.333% |
| Reliance National Insurance Company | $ 1,000,000 | 3.333% |
| Reliance Standard Life Insurance Company | $ 1,500,000 | 5.000% |
| Sun Life Assurance Company of Canada | $ 1,500,000 | 5.000% |
| Swiss Re Life and Health America Inc. | $ 1,500,000 | 5.000% |
| The Guardian Life Insurance Company of America | $ 1,100,000 | 3.667% |
| TMG Life Insurance Company, Inc. | $ 3,500,000 | 11.667% |
| | $ 30,000,000 | 100.000% |

*Maximum Any One Life $3,000,000



## SRRF MANAGEMENT INCORPORATED

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be executed, in duplicate, by their duly authorized representatives.

Signed in _____ this _____ day of _____, 1998

**SRRF MANAGEMENT INCORPORATED**

By_____

Title_____

Signed in _____ this _____ day of _____, 1998

**CHARTWELL REINSURANCE COMPANY**

By_____

Title_____

Exhibit II
Page 2

**EXHIBIT 4**

<u>QUOTA SHARE RETROCESSIONAL AGREEMENT</u>

by and among

CHARTWELL REINSURANCE COMPANY
(Chartwell)

and

THE RETROCESSIONAIRES WHOSE NAMES AND INTERESTS APPEAR
IN THE INTERESTS AND LIABILITIES ENDORSEMENT
(the Retrocessionaires)

LDG Reinsurance Underwriters
Workers Compensation Alternative Facility
1997

## Article I - Term

This Agreement shall take effect May 1, 1997 and is to be a Continuous Agreement unless and until terminated in accordance with Article VIII.

## Article II - Definitions

"Agreement Year" means each 12 consecutive calendar months during the continuance of this Agreement, beginning on each May 1.

"Subject Business" means Workers Compensation and Alternative Workers Compensation reinsurances and/or retrocessions which become effective as new or renewal business on or after the effective date of this Agreement, and which have been bound and accepted by Chartwell through LDG Reinsurance Underwriters.

All such reinsurances and/or retrocessions shall be provided in accordance with terms and provisions of Reinsurance Contracts issued to a Reinsured by Chartwell through LDG-RE, and shall apply on either an excess or pro-rata form, and on either a treaty or facultative basis, as bound and accepted by Chartwell through LDG-RE.

"Reinsured" means any insurance or reinsurance company or companies, or any other admitted insurer or reinsurer or non-admitted alien reinsurer reinsured under a Reinsurance Contract issued by Chartwell through LDG-RE.

"Reinsurance Contract" means all binders, contracts, agreements, treaties, certificates, addenda, endorsements, or other evidences of Workers Compensation and Alternative Workers Compensation reinsurances which have been issued by Chartwell through LDG-RE to a Reinsured, including renewals and cancellations thereof.

"Contract Term" means the consecutive period of a Reinsurance Contract issued by Chartwell through LDG-RE beginning on the inception date of each such contract, or on each renewal date thereof, and ending on a date no later than eighteen (18) months thereafter.

Notwithstanding any statement to the contrary, Chartwell through LDG-RE at its discretion, may also issue continuous Reinsurance Contracts; provided that all such contracts retain a provision for termination at an initial termination date not longer than eighteen (18) months after the inception of each such contract, and at subsequent termination dates not to exceed twelve (12) month intervals thereafter.

"Contract Year" means each twelve (12) consecutive calendar months during the continuance of a Reinsurance Contract issued by Chartwell through LDG-RE, provided, however, that at the option of Chartwell, the first such Contract Year only may be comprised of any period of up to eighteen (18) consecutive months beginning on the initial inception date of each such contract.

"LDG-RE" means LDG Reinsurance Underwriters who shall perform the underwriting, claims management and accounting activities related to the business retroceded pursuant to this Agreement.

LDG Reinsurance Underwriters/Chartwell Re
Quota Share Retrocessional Agreement
Workers Compensation/Alternative Liability
1/98
Page 2

"Loss Adjustment Expenses" means all costs incurred by LDG-RE in investigating, resisting, settling, adjusting, managing, and processing of claims, exclusive of salaries of full-time employees and other office expenses of LDG-RE, unless otherwise agreed.

"Gross Net Reinsurance Premium" means gross premiums applicable to Reinsurance Contracts issued by Chartwell through LDG-RE, less cancellations and return premiums.

## Article III - Business Covered

Chartwell obligates itself to cede to the Retrocessionaire, and the Retrocessionaire obligates itself to accept a quota share part of all Subject Business underwritten by LDG-RE on behalf of Chartwell during the term of this Agreement. All Subject Business shall consist of the classes of business, and be written in accordance with terms, conditions, exclusions and limits that are set forth in the Reinsurance Management Agreement between LDG-RE and Chartwell, which Agreement is attached to, and made part of this Agreement.

## Article IV - Follow the Fortunes

Chartwell shall, in all cases, be the sole judge of (1) what constitutes a claim or loss covered under all Reinsured Contracts, (2) Chartwell's liability under the Reinsured Contracts, (3) commutation amounts, and (4) the amount for which the Retrocessionaire shall be liable, subject always to the terms and conditions of this Agreement and the Reinsurance Management Agreement. The Retrocessionaire shall be bound by Chartwell's judgment as to the obligation and liability of the Retrocessionaires. All cessions to the Retrocessionaires pursuant to this Agreement shall be subject in all respects to the same risks, terms, conditions, interpretations, assessments, waivers, modifications, alterations, and cancellations as the Reinsured Contracts, the true intent of this Agreement being that the Retrocessionaires shall, in every case to which this Agreement applies and in the proportions specified herein, follow Chartwell's fortunes with respect to the Reinsured Contracts.

## Article V - Errors and Omissions

Except as may be otherwise specifically provided herein no inadvertent errors, delays or omissions shall relieve any party to this Agreement from their liability or obligations hereunder, provided such errors, delays or omissions are rectified as soon as possible after discovery.

## Article VI - Reports and Remittances

1.    All books and records deemed necessary and appropriate for proper management and conduct of the Subject Business shall be maintained by LDG-RE or Chartwell and shall be available for inspection by the Retrocessionaire, or its designated representative, at all reasonable times for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof.

2.    As soon as possible after the close of each calendar quarter that this Agreement remains in force, but in no event longer than forty-five (45) days thereafter, LDG-RE shall furnish to Chartwell and the Retrocessionnaire a quarterly report setting forth details of all transactions which affected business the subject matter hereof during each such quarter. Each such report shall provide the following information on both quarterly and cumulative year to date basis:

### Underwriting Report

A.    100% of Gross Net Reinsurance Premiums written during each such quarter.

B.    100% of allowances payable to LDG-RE during each such quarter.

C.    100% of allowances payable to Chartwell during each such quarter.

D.    100% of unearned premium reserves at the end of each quarter.

E.    100% of losses and loss expenses paid by Chartwell during each such quarter (net of recoveries from ceded reinsurance).

F.    100% of losses and loss expense reserves established by LDG-RE at the end of each such quarter for claims incurred and reported but not paid.

G.    100% of losses and loss expense reserves recommended by LDG-RE at the end of each such quarter for claims incurred but not reported.

H.    100% of net premiums payable during each such quarter for ceded reinsurance secured on behalf of Chartwell.

### Cash Report

A.    100% of Gross Net Reinsurance Premiums paid to Chartwell during each such quarter by Reinsurance Contract.

B.    100% of amounts recovered during each such quarter from ceded reinsurance secured on behalf of Chartwell.

C.    100% of net premiums paid during each such quarter for ceded reinsurance secured on behalf of Chartwell.

D.    100% of allowances paid to LDG-RE during each such quarter.

E.    100% of losses and loss expenses paid by Chartwell during each such quarter.

Amounts payable to the Retrocessionaire shall be remitted by LDG-RE at the same time that each such quarterly report is rendered. If, however, any amounts due from the Retrocessionaire exceed amounts on deposit in the special account and the claims reserve fund maintained by LDG-RE, such amounts shall be paid within three (3) business days following request by means of a wire transfer, same day available funds, to LDG-RE. Any amounts payable by the Retrocessionaire in accordance with this Article which are not remitted within the time required, shall bear interest at the rate of 1% per month (or part thereof) that the amount remains unpaid. If the Retrocessionaire fails to make the payment required in this Article on more than three (3) occasions, the Retrocessionaire shall be required to provide funding as set forth in Article VIII, below and LDG-RE shall not be required to pay any amounts to the Retrocessionaires until the Retrocessionaire has complied with Article VIII.

## Article VII - Currency

All amounts due to any party hereunder shall be payable in United States currency.

## Article VIII - Loss Funding

1.  If the Retrocessionaire is unauthorized in the state of Minnesota, the Retrocessionaire shall provide funding in an amount equal to 102% of the sum of the following:

    A.  losses and allocated loss adjustment expenses owed to Chartwell;
    B.  reserves for losses reported and outstanding;
    C.  reserves for losses incurred but not reported (IBNR);
    D.  reserves for allocated loss expenses; and
    E.  reserves for unearned premium.

2.  Such funding may be provided by permitting Chartwell to withhold funds otherwise payable to the Retrocessionaire in a trust account established for Chartwell's benefit or letter of credit issued for the benefit of Chartwell or any combination of the foregoing. If at any time, the funds so withheld are not equal to the amount required pursuant to Section 1 of this Article, the Retrocessionaire shall provide additional funds so that the total amount of funds held by Chartwell equals the amount required by Section 1 of this Article.

3.  If the Retrocessionaire's rating from A.M. Best & Co. is, or, at any time during the pendency of this Agreement, declines to below "A-" or if the policyholders surplus of the Retrocessionaire is, or declines to below, $100 million, the Retrocessionaire shall provide funding of losses in accordance with paragraph 1 of this Article.

    A claims reserve fund placed under Chartwell's control shall be established and shall be funded in the following manner. Quarterly deductions from the positive balances developed for account of the Retrocessionaires shall be withheld until a reserve fund of the greater or (1) $500,000 or (2) 20% of gross net reinsurance premium has been accumulated. The amounts thus withheld shall be separately maintained in a fiduciary trust account, and shall be used by Chartwell solely for the payment of losses payable

pursuant to this Agreement. Upon payment of losses, reserve fund shall be automatically re-established to the level specified above. If amounts deposited have been reduced to the extent that they are inadequate to pay amount of losses payable pursuant to this Agreement, the liability of the Retrocessionaire continue in force as respects all such losses without diminution because of the inadequacy of the reserve fund.

The claims reserve fund shall be maintained until all losses have been finally settled.

## Article IX Liability of Chartwell

Under no circumstances will Chartwell be liable to the Retrocessionaires for extra or non-contractual damages or legal fees and expenses attendant to the defense thereof, including, but not limited to, compensatory, exemplary, and punitive damages or statutory penalties which are awarded against LDG-RE as a result of an act or omission or course of conduct committed by or on behalf of LDG-RE unless Chartwell shall have agreed in writing with the proposed act, omission or course of conduct to be taken by LDG-RE which led to the award of such damages.

## Article X - Termination

1. This Agreement may be terminated at 12:01 A.M. Eastern Standard Time May 1, 1998 or any other subsequent May 1, by Chartwell or the Retrocessionaire giving one hundred and eighty (180) days prior written notice to the other party. Such termination shall not apply to Reinsurance Contracts having effective dates prior to the date of termination until the earlier of (A) the Reinsurance Contract's scheduled renewal date or (B) eighteen (18) months from the date of termination.

2. After the service of any notice of termination hereunder, all articles of this Agreement that confer rights or liabilities upon any party shall continue to apply until the final settlement of the accounts for all Agreement Years in which the Retrocessionaire participates.

   During the period after such notice of termination is given but before the effective date of termination, LDG-RE shall rightfully continue to accept, sign and issue Reinsurance Contracts and all endorsements or amendments thereto and all other acts hereunder on behalf of Chartwell.

## Article XI - Arbitration

As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of

LDG Reinsurance Underwriting/Chartwell Re
Joint Share Retrocessional Agreement
Medical Underwriters Aggregate Exolder
2/98
Page 6

business under consideration having no direct or indirect financial interest in either party or its affiliates. The Arbitration shall be held in a place mutually agreeable to the parties. One Arbitrator shall be chosen by Chartwell and the other by the Retrocessionaires. The Umpire shall be chosen by the two Arbitrators.

Arbitration may be initiated by either party (the Petitioner) demanding arbitration and naming its Arbitrator. The other party (the Respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the Petitioner. If the Respondent fails to designate its Arbitrator within the time stated above, the Petitioner is expressly authorized and empowered to name the second Arbitrator; and Respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. If the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, such selection shall be made in accordance with the provisions of the Massachusetts Uniform Arbitration Act Chapter 251 of the Massachusetts General Laws Annotated.

Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement. The Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest convenient date, but in no event later than one hundred and twenty (120) days from submission of the case to the Board, shall be final and binding upon all parties.

## Article XII - Controlling Law

This Agreement shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts.

## Article XIII - Insolvency

In the event of Chartwell's insolvency, any amounts payable hereunder by the Retrocessionaire shall be payable directly to Chartwell's liquidator, receiver, conservator or statutory successor without diminution because of the insolvency, except where this Agreement specifically provides another payee of such retrocessional amount due.

In the event of LDG-RE's insolvency or its refusal or inability to fulfill its responsibilities pursuant to the Reinsurance Management Agreement, any amounts payable to LDG-RE as consideration for services provided pursuant to the Reinsurance Management Agreement shall be paid to Chartwell which shall be substituted for LDG-RE until either the earlier of: (a) all reinsurance issued by Chartwell has been terminated and all obligations arising thereunder have been fulfilled or, (b) another manager has been appointed. No manager shall be appointed without the prior written consent of Chartwell. The Retrocessionaire shall pay its proportionate share of any increased costs incurred by Chartwell as a result of LDG-RE's inability to fulfill its

contractual obligations. If the duties of LDG-RE are assumed by Chartwell, all fees, costs and expenses previously payable to LDG-RE shall be payable to Chartwell.

## Article XIV - Entire Agreement

This Agreement and the Reinsurance Management Agreement constitute the entire Agreement between the parties and may be varied only by a writing signed by the parties hereto. The headings of the Articles herein are for convenience only and are not a part of this Agreement.

## INTERESTS AND LIABILITIES ENDORSEMENT

In WITNESS WHEREOF, the parties hereto have caused this Endorsement to be executed, in duplicate, by their duly authorized representatives:

**Percentage Participation**

Signed this the _____ day of _____, 199___

CHARTWELL REINSURANCE COMPANY                    10.00%

By _____

Title _____


Signed this the _____ day of _____, 199___

DORINCO REINSURANCE COMPANY                      6.81%

By _____

Title _____


Signed this the 29th day of __December__, 1997.

INSURANCE CORPORATION OF HANNOVER                11.25%  ($1,350,000)
An Illinois Corporation

By _____

Title __Vice President__
   Gary S. Reid

Ref #:  14425-97


Signed this the _____ day of _____, 199___

AMERICAN RE-INSURANCE COMPANY                    6.13%

By _____

Title _____

**INTERESTS AND LIABILITIES ENDORSEMENT**
(continued)

Signed this the _16th_ day of _December_, 199_7_

SCOR REINSURANCE COMPANY                                      13.64%

By _____

Title _____ _V.P._


Signed this the _____ day of _____, 199___

SOREMA NORTH AMERICA REINSURANCE COMPANY          6.82%

By _____

Title _____


Signed this the _____ day of _____, 199___

TIG REINSURANCE COMPANY                                     37.50%

By _____

Title _____


Signed this the _____ day of _____, 199___

TRANSATLANTIC REINSURANCE COMPANY                      6.13%

By _____

Title _____

**INTERESTS AND LIABILITIES ENDORSEMENT**
(continued)

Signed this the _16_ day of _December_ , 199_7_

**USF RE INSURANCE COMPANY**                    1.72%

By _Curtis J. Hibbard_

Title _Exec. Vice Pres._

**INTERESTS AND LIABILITIES ENDORSEMENT**
(continued)

Signed this the _____ day of _____, 199___

SCOR REINSURANCE COMPANY                                    13.64%

By _____

Title _____


Signed this the _____ day of _____, 199___

SOREMA NORTH AMERICA REINSURANCE COMPANY          6.82%

By _____

Title _____


Signed this the _____ day of _____, 199___

TIG REINSURANCE COMPANY                                    37.50%

By _____

Title _____


Signed this the 19 day of January, 199___

TRANSATLANTIC REINSURANCE COMPANY                          6.13%

By _____

Title _____ VP. _____

## INTERESTS AND LIABILITIES ENDORSEMENT
### (continued)

Signed this the _____ day of _____, 199___

SCOR REINSURANCE COMPANY                                    13.64%

By _____

Title _____


Signed this the 4th day of February, 199_8_

SOREMA NORTH AMERICA REINSURANCE COMPANY                   6.82%

By _Dennis J. Stokes_____
    DENNIS STOKES
Title _VICE PRESIDENT_____


Signed this the _____ day of _____, 199___

TIG REINSURANCE COMPANY                                    37.50%

By _____

Title _____


Signed this the _____ day of _____, 199___

TRANSATLANTIC REINSURANCE COMPANY                          6.13%

By _____

Title _____


_LDR Re/ Chartwell Re Joint Venture_
_Quota Share Retrocessional Agreement_
_12/97_

## INTERESTS AND LIABILITIES ENDORSEMENT

In WITNESS WHEREOF, the parties hereto have caused this Endorsement to be executed, in duplicate, by their duly authorized representatives:

Percentage Participation

Signed this the _____ day of _____, 199___

**CHARTWELL REINSURANCE COMPANY**                           10.00%

By _____

Title _____


Signed this the 27ᵗʰ day of Feb _____ 199 Y

**DORINCO REINSURANCE COMPANY**                            6.81%

By _Michelle P Mahoney_

Title _Treaty ofer._

OUR REF TR33332


Signed this the _____ day of _____, 199___

**INSURANCE CORPORATION OF HANNOVER**                       11.25%

By _____

Title _____


Signed this the _____ day of _____, 199___

**AMERICAN RE-INSURANCE COMPANY**                           6.13%

By _____

Title _____

01/19/98   16:09   ☎1212 .              TRANSATLANTIC-RE                    ☎002

## INTERESTS AND LIABILITIES ENDORSEMENT
### (continued)

Signed this the _____ day of _____, 199___

SCOR REINSURANCE COMPANY                          13.64%

By _____

Title _____


Signed this the _____ day of _____, 199___

SOREMA NORTH AMERICA REINSURANCE COMPANY          6.82%

By _____

Title _____


Signed this the _____ day of _____, 199___

TIG REINSURANCE COMPANY                           37.50%

By _____

Title _____


Signed this the _19_ day of _January_, 199___

TRANSATLANTIC REINSURANCE COMPANY                 6.13%

By _____

Title ___VP._____

## INTERESTS AND LIABILITIES ENDORSEMENT
### (continued)

Signed this the _____ day of _____, 199___

SCOR REINSURANCE COMPANY                                    13.64%

By _____

Title _____


Signed this the _____ day of _____, 199___

SOREMA NORTH AMERICA REINSURANCE COMPANY                   6.52%

By _____

Title _____


Signed this the _15TH_ day of _MAY_____, 199_8_

TIG REINSURANCE COMPANY                                     37.50%

By _____

Title ___VP_____


Signed this the _____ day of _____, 199___

TRANSATLANTIC REINSURANCE COMPANY                          6.13%

By _____

Title _____

**EXHIBIT 5**



**S·R·R·F**

SRRF MANAGEMENT INCORPORATED

## QUOTA SHARE RETROCESSIONAL AGREEMENT

by and among

### CHARTWELL REINSURANCE COMPANY
(Chartwell)

and

### THE RETROCESSIONAIRES WHOSE NAMES AND INTERESTS APPEAR
### IN THE INTERESTS AND LIABILITIES ENDORSEMENT
(the Retrocessionaires)



SRRF MANAGEMENT INCORPORATED

## Article I - Term

This Agreement shall take effect July 1, 1997 and is to be a Continuous Agreement unless and until terminated in accordance with Article VIII.

## Article II - Definitions

"Agreement Year" means each 12 consecutive calendar months during the continuance of this Agreement, beginning on each July 1.

"Subject Business" means occupational accident and health reinsurances and/or retrocessions which become effective as new or renewal business on or after the effective date of this Agreement, and which have been bound and accepted by Chartwell through SRRF Management.

All such reinsurances and/or retrocessions shall be provided in accordance with terms and provisions of Reinsurance Contracts issued to a Reinsured by Chartwell through SRRF Management, and shall apply on either an excess or pro-rata form, and on either a treaty or facultative basis, as bound and accepted by Chartwell through SRRF Management.

"Reinsured" means any insurance or reinsurance company or companies, or any other admitted insurer or reinsurer or non-admitted alien reinsurer reinsured under a Reinsurance Contract issued by Chartwell through SRRF Management.

"Reinsurance Contract" means all binders, contracts, agreements, treaties, certificates, addenda, endorsements, or other evidences of Occupational Accident and Health Reinsurance which have been issued by Chartwell through SRRF Management to a Reinsured, including renewals and cancellations thereof.

"Contract Term" means the consecutive period of a Reinsurance Contract issued by Chartwell through SRRF Management beginning on the inception date of each such contract, or on each renewal date thereof, and ending on a date no later than thirty-six (36) months thereafter.

Notwithstanding any statement to the contrary, Chartwell through SRRF Management at its discretion, may also issue continuous Reinsurance Contracts; provided that all such contracts retain a provision for termination at an initial termination date not longer than eighteen (18) months after the inception of each such contract, and at subsequent termination dates not to exceed twelve (12) month intervals thereafter.

"Contract Year" means each twelve (12) consecutive calendar months during the continuance of a Reinsurance Contract issued by Chartwell through SRRF Management, provided, however, that at the option of Chartwell, the first such Contract Year only may be comprised of any period of up to eighteen (18) consecutive months beginning on the initial inception date of each such contract.

2



## SRRF MANAGEMENT INCORPORATED

SRRF Management shall perform the underwriting, claims management and accounting activities related to the business retroceded pursuant to this Agreement.

"Loss Adjustment Expenses" means all costs incurred by SRRF Management in investigating, resisting, settling, adjusting, managing, and processing of claims, exclusive of salaries of full-time employees and other office expenses of SRRF Management, unless otherwise agreed.

"Gross Net Reinsurance Premium" means gross premiums applicable to Reinsurance Contracts issued by Chartwell through SRRF Management, less cancellations and return premiums.

### Article III - Business Covered

Chartwell obligates itself to cede to the Retrocessionaire, and the Retrocessionaire obligates itself to accept a quota share part of all Subject Business underwritten by SRRF Management on behalf of Chartwell during the term of this Agreement. All Subject Business shall consist of the classes of business, and be written in accordance with terms, conditions, exclusions and limits that are set forth in the Reinsurance Management Agreement between SRRF Management and Chartwell, which Agreement is attached to, and made part of this Agreement.

### Article IV - Follow the Fortunes

Chartwell shall, in all cases, be the sole judge of (1) what constitutes a claim or loss covered under all Reinsured Contracts, (2) Chartwell's liability under the Reinsured Contracts, (3) commutation amounts, and (4) the amount for which the Retrocessionaire shall be liable, subject always to the terms and conditions of this Agreement and the Reinsurance Management Agreement. The Retrocessionaire shall be bound by Chartwell's judgment as to the obligation and liability of the Retrocessionaires. All cessions to the Retrocessionaires pursuant to this Agreement shall be subject in all respects to the same risks, terms, conditions, interpretations, assessments, waivers, modifications, alterations, and cancellations as the Reinsured Contracts, the true intent of this Agreement being that the Retrocessionaires shall, in every case to which this Agreement applies and in the proportions specified herein, follow Chartwell's fortunes with respect to the Reinsured Contracts.

### Article V - Errors and Omissions

Except as may be otherwise specifically provided herein no inadvertent errors, delays or omissions shall relieve any party to this Agreement from their liability or obligations hereunder, provided such errors, delays or omissions are rectified as soon as possible after discovery.

3



## SRRF MANAGEMENT INCORPORATED

### Article VI - Reports and Remittances

1. All books and records deemed necessary and appropriate for proper management and conduct of the Subject Business shall be maintained by SRRF Management or Chartwell and shall be available for inspection by the Retrocessionaire. or its designated representative, at all reasonable times for the purpose of obtaining any and all information concerning this Agreement or the subject matter hereof.

2. As soon as possible after the close of each calendar quarter that this Agreement remains in force, but in no event longer than forty-five (45) days thereafter, SRRF Management shall furnish to Chartwell and the Retrocessionaire a quarterly report setting forth details of all transactions which affected business the subject matter hereof during each such quarter. Each such report shall provide the following information on both quarterly and cumulative year to date basis:

### Underwriting Report

A. 100% of Gross Net Reinsurance Premiums written during each such quarter.

B. 100% of allowances payable to SRRF Management during each such quarter.

C. 100% of allowances payable to Chartwell during each such quarter.

D. 100% of unearned premium reserves at the end of each quarter.

E. 100% of losses and loss expenses paid by Chartwell during each such quarter (net of recoveries from ceded reinsurance).

F. 100% of losses and loss expense reserves established by SRRF Management at the end of each such quarter for claims incurred and reported but not paid.

G. 100% of losses and loss expense reserves recommended by SRRF Management at the end of each such quarter for claims incurred but not reported.

H. 100% of net premiums payable during each such quarter for ceded reinsurance secured on behalf of Chartwell.

### Cash Report

A. 100% of Gross Net Reinsurance Premiums paid to Chartwell during each such quarter by Reinsurance Contract.

4

## SRRF MANAGEMENT INCORPORATED

B.    100% of amounts recovered during each such quarter from ceded reinsurance secured on behalf of Chartwell.

C.    100% of net premiums paid during each such quarter for ceded reinsurance secured on behalf of Chartwell.

D.    100% of allowances paid to SRRF Management during each such quarter.

E.    100% of losses and loss expenses paid by Chartwell during each such quarter.

Amounts payable to the Retrocessionaire shall be remitted by SRRF Management at the same time that each such quarterly report is rendered. If, however, any amounts due from the Retrocessionaire exceed amounts on deposit in the special account and the claims reserve fund maintained by SRRF Management, such amounts shall be paid within three (3) business days following request by SRRF Management, by means of a wire transfer, same day available funds, to SRRF Management. Any amounts payable by the Retrocessionaire in accordance with this Article which are not remitted within the time required, shall bear interest at the rate of 1% per month (or part thereof) that the amount remains unpaid. If the Retrocessionaire fails to make the payment required in this Article on more than three (3) occasions, the Retrocessionaire shall be required to provide funding as set forth in Article VIII, below and SRRF Management shall not be required to pay any amounts to the Retrocessionaires until the Retrocessionaire has complied with Article VIII.

### Article VII – Currency

All amounts due to any party hereunder shall be payable in United States currency.

### Article VIII – Loss Funding

1.    If the Retrocessionaire is unauthorized in the state of Minnesota, the Retrocessionaire shall provide funding in an amount equal to 102% of the sum of the following:

A.    losses and allocated loss adjustment expenses owed to Chartwell;
B.    reserves for losses reported and outstanding;
C.    reserves for losses incurred but not reported (IBNR);
D.    reserves for allocated loss expenses; and
E.    reserves for unearned premium.

2.    Such funding may be provided by permitting Chartwell to withhold funds otherwise payable to the Retrocessionaire in a trust account established for Chartwell's benefit or letter of credit issued for the benefit of Chartwell or any combination of the foregoing. If at any time, the funds so withheld are not equal to the amount required pursuant to Section 1 of this Article, the Retrocessionaire shall provide additional funds so that the

5



### SRRF MANAGEMENT INCORPORATED

total amount of funds held by Chartwell equals the amount required by Section 1 of this Article.

3. If the Retrocessionaire's rating from A.M. Best & Co. is, or, at any time during the pendency of this Agreement, declines to below "A-" or if the policyholders surplus of the Retrocessionaire is, or declines to below, $100 million, the Retrocessionaire shall provide funding of losses in accordance with paragraph 1 of this Article.

A claims reserve fund placed under Chartwell's control shall be established and shall be funded in the following manner. Quarterly deductions from the positive balances developed for account of the Retrocessionaires shall be withheld until a reserve fund of the greater or (1) $500,000 or (2) 20% of gross net reinsurance premium has been accumulated. The amounts thus withheld shall be separately maintained in a fiduciary trust account, and shall be used by Chartwell solely for the payment of losses payable pursuant to this Agreement. Upon payment of losses, the reserve fund shall be automatically re-established to the level specified above. If the amounts deposited have been reduced to the extent that they are inadequate to pay all or a part of losses payable pursuant to this Agreement, the liability of the Retrocessionaire shall continue in force as respects all such losses without diminution because of the inadequacy of the reserve fund.

The claims reserve fund shall be maintained until all losses have been finally settled.

### Article IX Liability of Chartwell

Under no circumstances will Chartwell be liable to the Retrocessionaires for extra or non-contractual damages or legal fees and expenses attendant to the defense thereof, including, but not limited to, compensatory, exemplary, and punitive damages or fines or statutory penalties which are awarded against SRRF Management as a result of an act or omission, or course of conduct committed by or on behalf of SRRF Management unless Chartwell shall have concurred in writing with the proposed act, omission or course of conduct to be taken by SRRF Management which led to the award of such damages.

### Article X - Termination

1. This Agreement may be terminated at 12:01 A.M. Eastern Standard Time July 1, 1998 or any other subsequent July 1, by Chartwell or the Retrocessionaire giving one hundred and eighty (180) days prior written notice to the other party. Such termination shall not apply to Reinsurance Contracts having effective dates prior to the date of termination until the earlier of (A) the Reinsurance Contract's scheduled renewal date or (B) thirty-six (36) months from the date of termination.

6



## SRRF MANAGEMENT INCORPORATED

2.   After the service of any notice of termination hereunder. all Articles of this Agreement that confer rights or liabilities upon any party shall continue to apply until the final settlement of the accounts for all Agreement Years in which the Retrocessionaire participates.

During the period after such notice of termination is given but before the effective date of termination. SRRF Management shall rightfully continue to accept, sign and issue Reinsurance Contracts and all endorsements or amendments thereto and all other acts hereunder on behalf of Chartwell.

### Article XI - Arbitration

As a condition precedent to any right of action hereunder, any dispute or difference hereafter arising with reference to the interpretation. application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement, shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire. all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates. The Arbitration shall be held in a place mutually agreeable to the parties. One Arbitrator shall be chosen by Chartwell and the other by the Retrocessionaires. The Umpire shall be chosen by the two Arbitrators.

Arbitration may be initiated by either party (the Petitioner) demanding arbitration and naming its Arbitrator. The other party (the Respondent) shall then have sixty (60) days within which to designate its Arbitrator after receiving demand, in writing, from the Petitioner. If the Respondent fails to designate its Arbitrator within the time stated above, the Petitioner is expressly authorized and empowered to name the second Arbitrator; and Respondent shall not be deemed aggrieved thereby. The Arbitrators shall designate an Umpire within sixty (60) days after both Arbitrators have been named. If the two Arbitrators do not agree within sixty (60) days on the selection of an Umpire, such selection shall be made in accordance with the provisions of the Massachusetts Uniform Arbitration Act Chapter 251 of the Massachusetts General Laws Annotated.

Each party shall submit its case to the Board of Arbitration within sixty (60) days from the date of appointment of the Umpire, but this period of time may be extended by unanimous consent, in writing, of the members of the Board of Arbitration (the Board). The Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement. The Board shall be relieved from all judicial formalities and may abstain from following the strict rules of the law. The decision of the Board, or a majority of the Board, in writing, rendered at the earliest

7



## SRRF MANAGEMENT INCORPORATED

convenient date, but in no event later than one hundred and twenty (120) days from submission of the case to the Board, shall be final and binding upon all parties.

### Article XII - Controlling Law

This Agreement shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts.

### Article XIII - Insolvency

In the event of Chartwell's insolvency, any amounts payable hereunder by the Retrocessionaire shall be payable directly to Chartwell's liquidator, receiver, conservator or statutory successor without diminution because of the insolvency, except where this Agreement specifically provides another payee of such retrocessional amount due.

In the event of SRRF Management's insolvency or its refusal or inability to fulfill its responsibilities pursuant to the Reinsurance Management Agreement, any amounts payable to SRRF Management as consideration for services provided pursuant to the Reinsurance Management Agreement shall be paid to Chartwell which shall be substituted for SRRF Management until either the earlier of: (a) all reinsurance issued by Chartwell has been terminated and all obligations arising thereunder have been fulfilled or, (b) another manager has been appointed. No manager shall be appointed without the prior written consent of Chartwell. The Retrocessionaire shall pay its proportionate share of any increased costs incurred by Chartwell as a result of SRRF Management's inability to fulfill its contractual obligations. If the duties of SRRF Management are assumed by Chartwell, all fees, costs and expenses previously payable to SRRF Management shall be payable to Chartwell.

### Article XIV - Entire Agreement

This Agreement and the Reinsurance Management Agreement constitute the entire Agreement between the parties and may be varied only by a writing signed by the parties hereto. The headings of the Articles herein are for convenience only and are not a part of this Agreement.

8



SRRF MANAGEMENT INCORPORATED

IN WITNESS WHEREOF. the parties hereto. by their respective duly authorized representatives. have executed this Agreement in duplicate.

SRRF MANAGEMENT INCORPORATED

By _Barbara Spitzer_

Title _President_

CHARTWELL REINSURANCE COMPANY

By _____

Title _____

9



## SRRF MANAGEMENT INCORPORATED

## INTEREST AND LIABILITIES ENDORSEMENT

## SRRF II

**IN WITNESS WHEREOF,** the parties hereto, by their respective duly authorized representatives, have executed this Agreement in duplicate.

American United Life Insurance Company                    Date

Cologne Life Reinsurance Company                          Date

Crown Life Insurance Company                              Date

First Allmerica Financial Life Insurance Company          Date

Hartford Life Insurance Company                           Date

Insurance Corporation of Hannover an Illinois Co.         Date

Life Reassurance Corporation of America                   Date

Manulife Reinsurance Corporation (U.S.A.)                 Date

10

0673



## SRRF MANAGEMENT INCORPORATED

**SRRF II - continued**

Mercantile & General Life Re. Co. of America _____     Date _____
(A Member of the Swiss Re Group)


Pan-American Life Insurance Company _____     Date _____


Phoenix Home Life Mutual Insurance Company _____     Date _____


Reliance National Insurance Company _____     Date _____


Reliance Standard Life Insurance Company _____     Date _____


Reliastar Life Insurance Company _____     Date _____


Sun Life Assurance Company of Canada _____     JUN 2 9 1999
                                                          Date _____


Swiss Re Life Company America _____     Date _____


TMG Life Insurance Company _____     Date _____

II

0674

## EXHIBIT 6

### ENTIRE DOCUMENT REDACTED

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al., <br><br>           Plaintiffs, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, and TRENWICK AMERICA REINSURANCE CORPORATION, <br>          Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )      CIVIL ACTION NO: |

## DEFENDANT AIG'S MEMORANDUM IN SUPPORT OF
## MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

The Court should stay this action pending the resolution of the comprehensive arbitrations commenced by the relevant member and associated companies of defendant American International Group, Inc. ("AIG") against Plaintiffs American Reinsurance Company ("American Re") and the other participants in a reinsurance pool facility (collectively, the "Pool Members"). The agreements that are at issue mandate arbitration of "any dispute or difference hereinafter arising with reference to the interpretation, application or effect of" the agreements, and provide that the arbitrators are to interpret each agreement as "an honorable engagement rather than as a legal obligation." The instant case is nothing more than a transparent attempt by the Pool Members to avoid a broad agreement to arbitrate all disputes relating to the reinsurance pool facility in which they willingly took part. Whatever legal "label" the Pool Members may seek to attach to the claims alleged in their Complaint, those claims are clearly within the scope of the arbitration clause. The Court must exercise its clear duty under the Federal Arbitration



Act to enforce the agreement to arbitrate by staying all further proceedings in this case until the arbitrations are completed.

## FACTUAL AND PROCEDURAL BACKGROUND

### Nature of the Dispute

This dispute arises out of reinsurance pooling arrangements that were managed by an entity known as LDG Re and its affiliates located in Wakefield, Massachusetts. A reinsurance pool is formed by a group of reinsurance companies which join together, each accepting a specified percentage of risk (and receiving a specified percentage of premium) associated with particular lines of business, *e.g.*, workers' compensation. Certain of the member and associated companies of AIG "ceded," or transferred the risk of the insurance policies they wrote, to the pools managed by LDG Re. Most of the business ceded to the pools managed by LDG Re was workers' compensation. The ceding of business to the LDG Re pools was accomplished through the use of an entity known as a "fronting" company; that is, a particular reinsurance company that accepted 100% of the risk from AIG before transferring it to the Pool Members. The fronting company for the LDG Re pools was Trenwick America Reinsurance Corporation, as the successor to Chartwell Reinsurance Company ("Trenwick"). Trenwick retained a specific piece of the business that the Pool Members, as life companies, could not accept and then transferred or "retroceeded" the remainder of the risks to the LDG Re pools. [Affidavit of Eric S. Kobrick dated September 9, 2005, ¶ 2 (hereinafter, "Kobrick Aff.")].

In 2002 and 2003, AIG became aware of facts indicating that Trenwick's financial condition had deteriorated. AIG invoked the Special Termination Clauses that were contained in its reinsurance agreements (known as "treaties") with Trenwick. Thereafter, arbitrations were commenced between AIG and Trenwick concerning AIG's termination of the treaties. Eventually, those arbitrations were settled by two agreements, known in the industry as

2

961705v1

"commutations," including a commutation pertaining to the LDG Re business (the "Pool Commutation"). The Pool Commutation had the effect of canceling Trenwick's reinsurance obligations to AIG in exchange for a payment of the net present value of the losses that were expected to develop on the business. The total settlement amount of the Pool Commutation was $81,745,503. The Pool Commutation included both a cash component and a Promissory Note in the amount of $73,360,000 issued by Trenwick to AIG. Pursuant to the Pool Commutation, and as security for repayment of the Promissory Note, Trenwick assigned to AIG all of its rights, title and interest to the claims arising from the risks that Trenwick had ceded to the LDG Re pools. [Kobrick Aff., ¶¶3-4 and Ex. 1 thereto].

In November 2004, AIG informed the Pool Members that the Pool Commutation had become effective and requested payment of each Pool Member's *pro rata* allocation of the Pool Commutation settlement amount. In the alternative, AIG proposed that the Pool Members enter into an agreement (known in the industry as a "novation") under which each Pool Member would agree to reassume 90% of its proportionate share of the liabilities that AIG had assumed in the Pool Commutation, with AIG retaining the remaining 10%. [Kobrick Aff., ¶5 and Ex. 2 thereto]. The Pool Members rejected AIG's requests.

### The Subject Agreements Provide for Mandatory Arbitration

The reinsurance agreements between AIG and Trenwick were transferred or "retroceeded" to the Pool Members pursuant to one or more retrocessional agreements. These agreements included a Participation Agreement and two "Quota Share Retrocession Agreements" effective as of May 1, 1997 and July 1, 1997 between and among Trenwick and various retrocessionaires. [Kobrick Aff., ¶6 and Exs. 3-5 thereto] (all three agreements are collectively referred to as the "Retrocessional Agreements"). Each of the Retrocessional Agreements contains an Arbitration clause, which states in relevant part:

961705v1

> As a condition precedent to any right of action hereunder, *any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement,* shall be referred to a Board of Arbitration consisting of two Arbitrators and an Umpire, all of whom shall be active or retired executive officers of insurance or reinsurance companies being experienced in the class of business under consideration having no direct or indirect financial interest in either party or its affiliates.

[Kobrick Aff., ¶7 and Ex. 4 thereto (emphasis added) (hereinafter, the "Arbitration clause")].

The Arbitration Clause further states that "the Board shall interpret this Agreement as an honorable engagement rather than as a legal obligation and shall make its award with a view to effecting the general purpose and intent of this Agreement in a reasonable manner, rather than in accordance with the literal interpretation of the Agreement." [*Id.* at 8]. The Retrocessional Agreements also specify that they "shall be governed by and interpreted in all respects and in accordance with the laws of the Commonwealth of Massachusetts." [*Id.* at 8]. The mandatory agreement to arbitrate is broad and does not contain any "carve outs" or exceptions.

### The Arbitrations and the Present Action

None of the Pool Members accepted the terms proposed by AIG with respect to the Pool Commutation, including the option of entering into a novation agreement that would have allowed each of the Pool Members to pay claims as they were presented and became due. Accordingly, in January 2005, AIG served a demand for arbitration on each of the Pool Members. AIG also named its party arbitrator in its demand. [Kobrick Aff., ¶¶8-9]. In response to AIG's demand for arbitration, the Pool Members collectively named a single arbitrator to serve on the Panel.[1]  The party arbitrators in turn appointed an umpire.



REDACTED

REDACTED

Nevertheless, in contravention of the explicit Arbitration clause contained in the Retrocessional Agreements, the Pool Members have improperly attempted to do an "end run" around the agreement to arbitrate by filing a duplicative court action against AIG relating to the Retrocessional Agreements, the Pool Commutation and other matters that are directly at issue in the arbitrations.

That separate action was filed in the Superior Court of Massachusetts, Suffolk County, Business Litigation Session, on or about July 6, 2005. Pursuant to the provisions of the



REDACTED

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517 (the "New York Convention") and the federal statute implementing the New York Convention, 9 U.S.C. §205, on September 9, 2005 AIG and Trenwick removed the state court action to this Court. Removal was based upon the fact that one of the parties to the various reinsurance agreements, Sun Life Assurance Company of Canada, is a Canadian corporation. Accordingly, the agreements that are the subject of the case relate to international commercial agreements containing an arbitration provision and the case is within the original jurisdiction of this Court.

The Complaint filed by the Pool Members purports to allege claims against AIG based upon the provisions of G.L. c. 93A, §11 (Count I); Common Law Fraud (Count II); Civil Conspiracy (Count III); Aiding and Abetting Breach of Fiduciary Duty (Count IV); and Tortious Interference with Contractual Relations (Count V). Reduced to its essence, the Pool Members allege a grand scheme by AIG and Trenwick that violated the standards of the reinsurance industry and the Pool Members' contractual entitlements. By way of example only, the Pool Members make the following specific allegations:

- "Chartwell sought to have LDG recommend that each Facility member enter into a written 'fronting agreement' with Chartwell explicitly authorizing the ceding of Chartwell-fronted reinsurance to the LDG Facilities. This agreement, to be governed by Massachusetts law, was known as the Quota Share Retrocessional Agreement ("QSA") and was designed and intended, once executed, to operate in conjunction with the Participation Agreements establishing LDG's underwriting and claims authority." [¶32].

- "Trenwick agreed to participate with AIG in a commutation to cram down a settlement on the plaintiffs by (a) issuing a promissory note to AIG, (b) presenting AIG's wrongfully inflated coverage claim to the plaintiff members of the LDG Facilities as a 'paid loss' under the QSA, and (c) assigning to AIG any and all 'collection rights' Trenwick had against the plaintiff Facility members under the QSA. [¶69].

- "Trenwick's 'payment' of over $73 million of the Commutation by funds obtained from AIG under a promissory note with terms and conditions more favorable to Trenwick than otherwise available in the marketplace, and secured by an assignment to AIG of collection rights against the LDG Facilities and the plaintiffs, is unorthodox and contrary to the practices and standards of the

6

reinsurance industry. Under the QSA, Trenwick was required to pay the full amount of the Commutation and then seek indemnity from the LDG Facilities. This requirement was designed to ensure that Trenwick would have a strong financial interest in investigating the validity of claims under the reinsurance contracts and in paying only legitimate obligations." [¶82].

- "The following conduct by AIG and Trenwick, as described above in greater detail, constitutes unfair and deceptive acts or practices committed in Massachusetts in willful and knowing violation of c. 93A: . . .Presenting the fraudulently inflated Commutation amount as a paid loss under the Trenwick QSA." [¶99(b)].

- "AIG knowingly and intentionally induced Trenwick to breach its contractual duties as a fronting reinsurer and to commute AIG's reinsurance contract in a manner detrimental to the plaintiffs and unduly favorable to AIG; to present AIG's wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a 'paid loss' under plaintiffs' QSA with Trenwick; and to enable AIG pursuant to a wrongful assignment of Trenwick's contract rights to pursue an improper demand for arbitration to enforce fraudulent insurance claims." [¶126].

However the Pool Members may have chosen to cast their claims in the Complaint, it is clear that all of the claims require the Court to have "reference to the interpretation, application or effect" of the Retrocessional Agreements; without those contracts there would be no connection among the parties.

## ARGUMENT

### I.    THE COURT IS REQUIRED TO STAY THIS ACTION

Through the passage of the Federal Arbitration Act ("FAA") and the ratification of the New York Convention, Congress established a strong federal policy favoring arbitration.[3] To implement this strong federal policy, the Supreme Court has held that any doubts concerning the scope of what issues are subject to arbitration should be resolved in favor of arbitration. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Recent

---

[3] Consistent with this strong federal policy, orders that refuse a stay of litigation in favor of arbitration under Section 3 of the FAA are immediately appealable on an interlocutory basis, whereas orders that grant a stay of litigation are not. *Campbell v. General Dynamics Government Systems Corp.*, 407 F.3d 546, 550 (1st Cir. 2005).

cases from the First Circuit and this Court have similarly held that when a contract contains a broad arbitration clause, "doubts should be resolved in favor of coverage" and "an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Municipality of San Juan v. Corporacion Para El Fomento Economico De La Ciudad Capital*, 415 F. 3d 145, 2005 U.S. App. LEXIS 14218, *9 (1st Cir. 2005), *quoting AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650 (1986). *Accord First Allmerica Financial Life Insurance Co. v. Minnesota Life Ins. Co.*, 188 F. Supp. 2d 101, 104 (D. Mass. 2002) ("[i]n determining whether a particular dispute falls within the scope of an arbitration clause, a presumption of arbitrability exists such that arbitration should be compelled "unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute").

Federal appellate courts, including the First Circuit, routinely hold that federal courts have a nondiscretionary duty to enforce the New York Convention and the FAA by granting motions to stay litigation in favor of arbitration under Section 3 of the FAA and/or to compel arbitration under Section 4 of the FAA.[4] *See, e.g., Intergen, N.V. v. Grina, et al*, 344 F.3d 134, 142 (1st Cir. 2003) ("We therefore hold that so long as the parties are bound to arbitrate and the district court has personal jurisdiction over them, the court is under an unflagging,

---

[4] Federal Courts have consistently recognized that the terms of the New York Convention, when read together with the provisions of the FAA, authorize the Courts to stay litigation in favor of arbitration. *See Hughes, Hooker & Co. v. American Steamship Owners Mutual Protection and Indemnity Association*, No. 04 Civ. 1859, 2005 U.S. Dist. Lexis 11381, *11 n. 2 (S.D.N.Y. June 9, 2005). Pursuant to 9 U.S.C. §208, Chapter 2 of the FAA implements the New York Convention, and Chapter 1 of the FAA is incorporated into Chapter 2 to the extent that Chapter 1 is not in conflict with Chapter 2 or the New York Convention. *Id; Hartford Accident & Indemnity Co. v. Equitas Reinsurance Ltd.*, 200 F. Supp. 2d 102, 107 (D. Conn. 2002)(Section 208 of the New York Convention specifically directs that Chapter One of the FAA applies to actions and proceedings brought under the New York Convention absent a conflict).

8



nondiscretionary duty to grant a timely motion to compel arbitration and thereby enforce the New York Convention as provided in chapter 2 of the FAA . . ."). Section 3 of the FAA expressly mandates a stay of litigation where an arbitration clause exists and the dispute is within the scope of the clause:

> If any suit or proceeding be brought . . . upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

9 U.S.C. §3 (emphasis added). Section 3 embodies the strong federal policy favoring arbitration. The plain language of the FAA is a directive, not a suggestion, that courts *must* stay an action involving issues that are referable to arbitration.

In the First Circuit, a party seeking to stay proceedings under Section 3 of the FAA is required to demonstrate:  (1) that a valid agreement to arbitrate exists; (2) that the movant is entitled to invoke the arbitration clause; (3) that the other party is bound by that clause; and (4) that the claim asserted comes within the scope of the clause. *Intergen, N.V.*, 344 F.3d at 142; *see Campbell v. General Dynamics Government Systems Corp.*, 407 F.3d 546, 552 (1st Cir. 2005). As demonstrated below, each of these factors is satisfied here and the Court is required to stay this action in favor of the pending arbitrations.

**A.    THE PARTIES AGREED TO MANDATORY ARBITRATION AND, IN FACT, CURRENTLY ARE ARBITRATING THEIR DISPUTES**

As set forth above, all of the parties to this litigation (except Trenwick) currently are engaged in two separate arbitrations with respect to the issues that the Pool Members are seeking to assert in this litigation. By their actions, therefore, the Pool Members have conceded that the first three factors in the First Circuit's four-factor test have been satisfied. Apparently, the Pool Members only contest the fourth factor, namely whether the claims asserted by them in this litigation fall within the scope of the Arbitration clause.

9

There can be no dispute that the Pool Members agreed to arbitrate all disputes that have reference to the "interpretation, application or effect" of the reinsurance that was ceded to the various LDG Re pools. The Retrocessional Agreements each contain an arbitration clause that so states. [Kobrick Aff., ¶¶6-7 and Exs. 3-5 thereto]

REDACTED



That the Pool Members apparently contest AIG's rights to step into Trenwick's shoes pursuant to the terms of the Pool Commutation is entirely irrelevant to this Court's analysis under the FAA. As a threshold matter, the Pool Members have not advanced any legal or factual basis for their position. The general rule in Massachusetts is that contract rights are freely assignable. *See Barry v. Duffin*, 290 Mass. 398, 404-405 (1935). A contractual right can be assigned unless the assignment is expressly forbidden by the terms of the contract, by statute, or where the substitution of parties would materially change the duty or risk of the obligor. *See American Employers' Ins. Co. v. City of Medford*, 38 Mass. App. Ct. 18, 21 (1995); *Beaconsfield Townhouse Condominium Trust v. Zussman*, 49 Mass. App. Ct. 757, 763 n. 14 (2000) ("unless assignment is expressly forbidden, a contractual right can be assigned"). The same rule applies in the context of settlements. *See Rubenstein v. Royal Ins. Co. of America*, 45 Mass. App. Ct. 244, 246 (1998) (upholding assignment in a settlement agreement between insured and insurer that authorized the insured to pursue claims against the other insurers).

10

REDACTED

The Complaint filed by the Pool Members does not ask this Court to make any determination of AIG's rights as the successor to Trenwick under the Retrocessional Agreements. Thus, the first three requirements for a stay under the FAA are clearly satisfied.

### B.    THE SCOPE OF THE ARBITRATION CLAUSE IS BROAD

The Arbitration clause that AIG seeks to enforce is indisputably broad and includes within its scope all of the claims alleged by the Pool Members in this action.[5] Rather than identifying only limited issues that are subject to arbitration, the Arbitration clause at issue here requires the parties to arbitrate *"any dispute* or difference hereafter arising with *reference to the interpretation, application or effect of this Agreement...".* [Kobrick Aff. ¶7 and Exs. 3-5 thereto (emphasis added)]. This clause "'evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause," and thus is a "broad" clause. *See Louis Dreyfus Negoce, S.A. v. Blystad Shipping & Trading, Inc.,* 252 F. 3d 218, 225 (2d Cir.), *cert. den.,* 534 U.S. 1020 (2001).

The First Circuit has held a similar arbitration clause to be a "broad" clause. *See International Brotherhood of Electrical Workers, Local 1228, AFL-CIO v. Freedom WLNE-TV, Inc.,* 760 F.2d 8, 11 (1st Cir. 1985) (arbitration clause held to be "broad" where it required arbitration of "the application or interpretation of this Agreement or the performance of any party under it"). Numerous other courts that have considered similar arbitration clauses also have held

---

[5] In construing the scope of arbitration clauses, courts typically draw a distinction between "broad" arbitration clauses and "narrow" ones, with the latter category being confined to clauses specifically identifying and limiting the issues to which they apply. *See Fluehmann v. Associates Financial Services,* No. 10-40076-NMG, 2002 U.S. Dist. LEXIS 5755, *16-17 (D. Mass. March 29, 2002).

11

961705v1

that such clauses are broad. *Louis Dreyfus Negoce*, 252 F. 3d at 225 (arbitration clause held to

be "broad" where it provided that "'Contract Arbitrator shall have the power to decide all

differences arising between the parties to this agreement as to interpretation, application or

performance of any part of this agreement'") (*quoting Abram Landau Real Estate v. Benova*, 123

F.3d 69, 71 (2d Cir. 1997)); *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1515 (10th

Cir. 1995) (arbitration clause held to be "broad" where it required arbitration of "[a]ny dispute

arising in connection with the implementation, interpretation or enforcement of this agreement");

*Nat'l. R.R. Passenger Corp. v. Boston & Me. Corp.*, 850 F. 2d 756, 760 (D.C. Cir. 1988)

(arbitration clause held to be "broad" where it required arbitration of "any claim or controversy

between [the parties] concerning the interpretation, application or implementation of this

agreement"); *see also Deprenyl Animal Health, Inc. v. The University of Toronto Innovations*

*Foundation*, 297 F.3d 1343, 1347, 1358 (Fed. Cir. 2002) (arbitration clause held to be "broad"

where it required arbitration of "any disagreement . . . in connection with the interpretation,

application or effect of this Agreement"); *Maryland Transit Administration v. National Railroad*

*Passenger Corporation*, 372 F. Supp. 2d 478, 480 (D. Md. 2005)(arbitration clause held to be

"broad" where it provided that "[a]ny dispute, claim, or controversy between the parties hereto

relating to the interpretation, application, or implementation of this Agreement shall be submitted

to binding arbitration"); *NYP Holdings, Inc. v. Newspaper and Mail Deliverers' Union of New*

*York and Vicinity*, No. 01-Civ.-4451, 2002 U.S. Dist. LEXIS 13151, *5, 14-15 (S.D.N.Y. July

18, 2002) (arbitration clause held to be "broad" where it required arbitration of "[a]ll . . . disputes

arising out of the interpretation or application of this Agreement . . .").

Based upon this overwhelming authority, and the specific language at issue here, it is

clear that the Arbitration clause contained in the Retrocessional Agreements is a "broad" clause

and requires that the Court stay these proceedings.

961705v1

## C.     THE CLAIMS AT ISSUE ARE WITHIN THE SCOPE OF THE ARBITRATION CLAUSE

Since the Arbitration clause at issue here is "broad," there can be no dispute that it gives rise to a "presumption of arbitrability" and arbitration must be ordered unless it can be said with "positive assurance" that the Arbitration clause is *not* susceptible of an interpretation that covers the asserted dispute. *See Genesco, Inc. v. T. Kakiuchi*, 815 F.2d 840, 847 (2d Cir. 1987); *Municipality of San Juan*, 415 F. 3d 145, 2005 U.S. App. LEXIS 14218, *9 (doubts concerning scope of clause should be resolved in favor of coverage); *First Allmerica Life Ins. Co.*, 188 F. Supp. 2d at 104 (same); *see also Conntech Dev. Co. v. University of Conn.*, 102 F.3d 677, 684 (2d Cir. 1996) (same). Because the claims asserted in this litigation by the Pool Members would certainly require the Court to refer to the "interpretation, application or effect of [the] Agreement[s]," the Pool Members cannot possibly meet their burden of demonstrating with "positive assurance" that the Arbitration clause is not susceptible of an interpretation that covers the asserted claims. *See Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 77 (2d Cir. 1998) (reversing because district court "failed to recognize the presumption of arbitrability and [plaintiff's] failure to overcome it").

In determining whether a particular claim falls within the scope of the parties' arbitration agreement, courts focus upon the factual allegations in the complaint rather than upon the legal causes of action asserted. *See Genesco, Inc.*, 815 F.2d at 846. Thus, if the allegations underlying the claims "touch matters" covered by the parties' agreement to arbitrate, then those claims must be arbitrated, whatever the legal labels that may be attached to them. *Id.; see ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 34 (2d Cir. 2002); *In Re Oil Spill by the "Amaco Cadiz" off the Coast of France*, 659 F.2d 789, 794 (7th Cir. 1981)("Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the

13

relationship of the claim to the subject matter of the arbitration clause. Were the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims").

The fact that the Pool Members purport to allege causes of action under G.L. c. 93A, §11 or for fraud or other tort-based conduct is of no moment. What is important here is that all of the Pool Members' purported tort claims arise out of allegedly improper conduct with respect to the contractual arrangements among the parties. In such circumstances, the First Circuit has held that a broad arbitration clause is sufficient to encompass both contract and related tort claims. *See Maldonado v. PPG Industries, Inc.*, 514 F.2d 614, 616 (1st Cir. 1975)(a broad arbitration clause "covers contract-generated and contract-related disputes between the parties however labeled; it is immaterial whether claims are in contract or in tort").[6] However the Pool Members have styled their claims in the Complaint, they all require the Court to refer to the "interpretation, application or effect of [the] Agreement[s]" and whether any actions of AIG in connection with those agreements constitute conduct that gives rise to a claim under G.L. c. 93A or any other cause of action. Clearly, the Court would be required to determine what duties were allegedly owed by AIG to the Pool Members by referring to the matrix of contracts that defines their relationship. As such, the Pool Members' claims unquestionably fall within the scope of the Arbitration clause. *See Maldonado, Inc.*, 514 F.2d at 616 ("The contracts established and defined [the parties'] relationship, and it seems inconceivable that one or both parties to the third-party action will not need to refer to them. No assessment of the ultimate burden between [the parties] can realistically be made without reference to the contracts").

---

[6] Claims under G.L. c. 93A § 11 are referable to arbitration. *See Greenleaf Engineering & Construction Company, Inc. v. Teradyne, Inc.*, 15 Mass. App. Ct. 571, 574-76 (1983).

14

961705v1

There can be no doubt that the causes of action alleged in the Complaint are squarely grounded in the Retrocessional Agreements. The Complaint sets forth in great detail the terms of the Retrocessional Agreements and the various other contracts through which the LDG Re reinsurance pooling facility was established and functioned. [*See* Complaint, ¶¶25-37]. The Pool Members further allege their understanding of how these various arrangements interacted. [Id.]. Without these agreements and the alleged duties that were created under them, the predicate background for the Chapter 93A and other claims that follow would be totally lacking.

Having set forth the contractual context in which the parties operated, the Pool Members then go on to allege that, in its simplest form, AIG somehow improperly manipulated these reinsurance facility arrangements to its own advantage. [*See* Complaint, ¶¶38-95]. For example, the Pool Members contend:

- The commutation was contrary to the terms of the Retrocessional Agreements, which required Trenwick to pay the amount of the commutation and then seek indemnity from the LDG facilities. [Complaint, ¶82].

- AIG knowingly and intentionally induced Trenwick to breach its contractual duties as a fronting reinsurer and to commute AIG's reinsurance contract in a manner detrimental to the plaintiffs and unduly favorable to AIG; to present AIG's wrongfully inflated coverage claim to the plaintiffs, as LDG facility members, as a "paid loss" under plaintiffs' QSA with Trenwick; and to enable AIG pursuant to a wrongful assignment of Trenwick's contract rights to pursue an improper demand for arbitration to enforce fraudulent insurance claims. [Complaint, ¶126].

Indeed, the entire thrust of the Pool Members' purported Chapter 93A claim is an effort to show that AIG engaged in behavior that was "in disregard of known contractual arrangements" and "intended to secure benefits for the breaching party" since a mere breach of contract standing alone is insufficient to give rise to a claim under Chapter 93A. *See Anthony's*

15

*Pier Four v. HBC Assocs.*, 411 Mass. 451, 475 (Mass. 1991); *Wang Labs., Inc. v. Business Incentives, Inc.*, 398 Mass. 854, 860-61 (Mass. 1986).

It would be impossible for the Court to make any determination of whether AIG engaged in any conduct that gives rise to a claim under Chapter 93A or any of the other theories of liability alleged in the Complaint without having "reference to" the "interpretation, application or effect" of the Retrocessional Agreements and the other contracts that establish the relationship among the Pool Members, AIG and Trenwick. The Court could not determine whether there has been any improper, unfair or deceptive "manipulation" of the contracts without first "interpreting" the contracts and determining what duties they required of the parties. The Court would be called upon to "apply" the terms of the contracts to the claims made by the Pool Members and consider the "effect" of the contractual terms upon these claims.

These are precisely the types of issues that the parties agreed would be submitted to arbitration, before a Panel of sophisticated insurance and reinsurance experts. *See Merit Ins. Co v. Leatherby Ins. Co.*, 714 F.2d 673, 679 (7th Cir. 1983) ("Thus, people who arbitrate do so because they prefer a tribunal knowledgeable about the subject matter of their dispute to a generalist court with its austere impartiality but limited knowledge of subject matter"). In the unique world of the reinsurance industry, arbitration rather than litigation is the norm. *CNA Reinsurance Co. v. Trustmark Ins. Co.*, No. 01-C-1652, 2001 U.S. Dist. LEXIS 7523, *18 n.5 (N.D. Ill. 2001)(…"broad agreements to arbitrate are standard in the reinsurance industry"); Wollan, *Handbook of Reinsurance Law*, §8.01 (2003) (noting that "arbitration has been used to resolve disputes in the reinsurance industry since the early nineteenth century"). Thus, in disputes stemming from reinsurance agreements, arbitration clauses are given effect and related litigation is routinely stayed. *See e.g., Hartford Accident & Indem. Co. v. Swiss Reins. Am. Corp.*, 246 F.3d 219 (2d Cir. 2001); *Progressive Cas. Ins. Co. v. C.A. Reasegurardora Nacional*

16



*De Venezuela,* 991 F.2d 42, 45 (2d Cir. 1993). Here, there is nothing in the parties' contracts which suggests they ever contemplated litigating any dispute. This Court is duty bound to enforce the agreement to arbitrate and stay this action.

## II.    THE COURT SHOULD EXERCISE ITS DISCRETION TO STAY THIS ACTION

Thus, without regard to how the Court decides the instant motion, the arbitrations will proceed. The duplication between the litigation (were it to go forward) and the arbitrations is patent. Indeed, since the Pool Members do not contest that there is a binding agreement to arbitrate with respect to the matters at issue here, it is hard to see what conceivable purpose this litigation has other than to foster duplication and increased expense for all parties.

Accordingly, even assuming that the claims alleged in the Complaint are not within the scope of the Arbitration clause (which they are), as a matter of discretion the Court should stay this litigation pending the outcome of the arbitrations. A District Court has the authority to stay litigation pending the outcome of an arbitration "as a matter of its discretion to control its docket." *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 21 n. 23 (1983) (citations omitted). This discretion may be exercised even when the litigation is concerned with nonarbitrable claims. *See D.J. Mfg. Corp. v. Tex Shield, Inc.,* 998 F. Supp. 140, 145-46 (D.P.R. 1998) (holding that "'[t]he decision whether to stay nonarbitrable claims pending arbitration is largely within the discretion of the trial court'" (*quoting Acquaire v. Canada Dry Bottling,* 906 F. Supp. 819, 838 (E.D.N.Y. 1995) (citations omitted)). In fact, "[t]he First Circuit has held that when plaintiff's claims are interrelated and arbitration 'could serve to clarify and perhaps even simplify the remaining issues which must be litigated,' a stay of both the arbitrable and the non-

17

961705v1

arbitrable claims is within the trial court's sound discretion." *D.J. Mfg. Corp.*, 998 F. Supp. at 146 (*citing Sevinor v. Merryl, Lynch, Pierce, Fenner & Smith, Inc.*, 807 F.2d 16, 20 (1st Cir. 1986) (citations omitted)).

In a case that is strikingly similar to this one, the District Court stayed both arbitrable and nonarbitrable claims pending the outcome of arbitration to promote "judicial economy, avoidance of confusion and possible inconsistent results ....". *Meadows Indemnity Co. v. Baccala & Shoop Insurance Services, Inc.*, 760 F. Supp. 1036, 1045 (E.D.N.Y. 1991) (citations omitted). In *Meadows*, the plaintiff, a participant in a reinsurance pool, brought suit against the issuing insurance companies ("Issuing Defendants") and the managing insurance companies running the pool ("Managing Defendants"), claiming that the defendants conspired to manipulate the reinsurance pool arrangements for their own financial benefit. *Id.* at 1037-38. The Issuing Defendants moved to stay the litigation and compel arbitration pursuant to the contracts between their companies and the plaintiff. *Id.* Meanwhile, the Managing Defendants moved to stay the litigation as to them (though they were not parties to the arbitration) because the claims asserted against the Issuing Defendants were the same claims asserted against the Managing Defendants. *Id.* at 1039. The plaintiff argued that its claims brought in the litigation were not arbitrable, but even if they were, that the claims brought against the Managing Defendants should not be stayed. *Id.*

The court stayed all claims against both defendants pending the outcome of arbitration. *Id.* at 1045. The court noted that "[t]he decision whether to stay the action as to the Managing [] Defendants, pending arbitration between [plaintiff] and the Issuing [] Defendants, is within this court's discretion." *Id.* at 1039. The court then opined that "the arbitration of [plaintiff's] claims against the Issuing [] Defendants might at least partially determine issues forming the basis of the claims asserted against the Managing [] Defendants ... and may provide the court with

18

insight into the issues of fact and law involved in the claims against the Managing []
Defendants." *Id.* As a stay of the claims against the Managing Defendants would "promote
judicial economy, avoidance of confusion and possible inconsistent results ... and would not
work undue hardship or prejudice against [plaintiff]" the court, in its discretion, ordered a stay of
the litigation pending the outcome of arbitration. *Id.*

The factors relied upon in *Meadows* equally support the entry of an order staying this
case. The arbitrations commenced by AIG are proceeding. The overlap and duplication between
this litigation and the issues which all parties agree are subject to arbitration is obvious.
[*Compare* Complaint, ¶¶25-95 with Ex. 6 to Kobrick Aff.]. Such duplication presents the real
prospect of inconsistent findings of fact or rulings of law by this Court and the arbitration Panels.
This is precisely the type of situation in which the Court should exercise its inherent authority to
stay this action in favor of the pending arbitrations.

## CONCLUSION

The Retrocessional Agreements unequivocally provide for mandatory arbitration of all
disputes; no issues were "carved out" for litigation. The Pool Members should be required to
honor their agreement to arbitrate. AIG therefore respectfully requests that this Court enter an
Order staying this litigation in favor of the pending arbitrations pursuant to Section 3 of the
FAA.

19

961705v1

**AMERICAN INTERNATIONAL GROUP, INC.**

By its attorneys,

Michel F. Aylward BBO #024850
John T. Harding BBO #221270
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

Of Counsel:
William A. Maher
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
(212) 382-0050 (facsimile)

Dated: September 9, 2005

## CERTIFICATE OF SERVICE

I, John T. Harding, counsel for Defendant American International Group, hereby certify that on September 9, 2005, I served a copy of the foregoing document by messenger or federal express on all known counsel of record.

John T. Harding

20

961705v1

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, *et al.*,        Plaintiffs, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION,        Defendants. | CIVIL ACTION NO: 05-CV-11840-MLW <br><br> *FILED UNDER SEAL* |

## DEFENDANT AIG, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR REMAND AND REPLY IN SUPPORT OF AIG, INC.'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION[1]

### INTRODUCTORY STATEMENT

The Court should reject the attempt by Plaintiffs American Reinsurance Company, *et al.* (the "Pool Members") to challenge the Court's subject matter jurisdiction over this action, which was properly removed to this Court by Defendants American International Group, Inc. on behalf of its member and associated companies ("AIG, Inc."), and Trenwick America Reinsurance Corporation ("Trenwick") [Dkt. No. 1]. The Pool Members completely ignore the applicable statutory requirements for removal under 9 U.S.C. §205 and the correspondingly narrow inquiry to be undertaken by the Court when presented with a motion to remand. The Pool Members improperly seek to collapse the threshold jurisdictional issue with the substantive issue of whether AIG, Inc. is entitled to a stay of this action pending completion of the parallel, ongoing arbitration between AIG, Inc. and the Pool Members that involves the same subject matter.

---

[1] In the interest of avoiding repetition and burdening the Court with additional briefs, AIG, Inc. has consolidated its Memorandum in Opposition to Plaintiffs' Motion for Remand with its Reply in further support of its Motion to Stay Proceedings Pending Arbitration. [*See* Dkt. Nos. 24, 25].

The Pool Members have offered only the thinnest of grounds for attempting to send this matter back to the Massachusetts Superior Court. *First*, the Pool Members contend that the Court should distinguish between AIG, Inc. and its member and associated companies on whose behalf AIG, Inc. has consistently acted with respect to the Pool Commutation and the ensuing arbitration. Based upon this supposed "distinction," the Pool Members claim that AIG, Inc. lacks "standing" to enforce the agreement to arbitrate and consequently does not have a right to invoke this Court's jurisdiction. [*See* Memorandum of Law in Support of Plaintiffs' Motion for Remand to the Superior Court of Massachusetts dated October 13, 2005 at 13-16 (hereafter, "Pool Members' Mem.")]. *Second*, the Pool Members contend that removal is improper because their claims against AIG, Inc. are outside the scope of any agreement to arbitrate. [Pool Members' Mem. at 16-20]. Neither of these contentions by the Pool Members provides a basis to remand this case to the Superior Court.

*First*, under the controlling provisions of 9 U.S.C. §205, AIG, Inc. and Trenwick were entitled to remove this case as long as it "relates to" an agreement to arbitrate falling within the scope of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 26 U.S.T. 2517 (the "New York Convention"). The standard for removal does not require that the claims asserted by the Pool Members be definitively shown to be subject to arbitration at the outset. Given the breadth of the definition of "relates to" as defined in cases such as *Beiser v. Abolya Weyla*, 284 F. 3d 665, 669 (5th Cir. 2002), there can be no dispute that this case "relates to" an agreement to arbitrate falling under the New York Convention and removal was proper. *See Jaranilla v. Megasea Maritime, Ltd.*, No. 02-2048, 2002 U.S. Dist. LEXIS 16505, *4 (E.D.La. 2002) (a federal district court will have removal jurisdiction under § 205 over any action where the defendant argues that an arbitration agreement covered by the Convention provides a defense so long as the defendant's argument is to some degree justifiable and

2

possible); *Lannes v. Operators Int'l,* No. 04-584, 2004 U.S. Dist. LEXIS 25781, *15 (E.D. La. 2004) ("The *Beiser* court clarified that for purposes of a federal court's jurisdictional analysis, the question of whether a particular arbitration provision may ultimately be enforced or the question of whether a particular party may be compelled to arbitrate does not control the jurisdictional analysis because it 'has the disadvantage of frontloading a merits inquiry into the district court's examination of its jurisdiction'"). This case clearly "relates to" an agreement to arbitrate falling under the New York Convention because the relevant Quota Share Agreements (collectively, the "QSA") contain an arbitration clause; the QSA includes foreign entities involved in a commercial relationship; and the QSA has a connection to the claims asserted by the Pool Members. Nothing more is required to sustain the Court's jurisdiction.

*Second,* there is no basis for the Pool Members to challenge AIG, Inc.'s "standing." The Pool Members ignore the fact that AIG, Inc. and the Pool Members are already engaged in arbitration. Further, AIG, Inc. (on behalf of its member and associated companies) executed the Pool Commutation containing the assignment of rights from Trenwick upon which the pending arbitration is founded. [Complaint, ¶ 74]. The record shows that AIG, Inc. has always acted on behalf of its member companies with respect to the Pool Commutation that is at the heart of the parties' dispute. Moreover, the undisputed facts and the Pool Members' own allegations establish that there is no meaningful difference between the parties to this case and the parties to the arbitration. All that the Pool Members have done is attempt to manufacture such a distinction by purporting to sue AIG, Inc. in its "individual" capacity (even though it consistently acted on behalf of its member and associated companies) in an attempt to defeat the federal policy of enforcing agreements to arbitrate.

*Third,* to the extent that the scope of the agreement to arbitrate is at the core of the pending motions, the Pool Members rely upon a lone case from the New Jersey District Court

3

973413v1

that is both distinguishable from this dispute and which adopted a strained reading of the arbitration provision at issue there. *Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853 (D.N.J. 1992), *aff'd without opinion on other grounds*, 970 F. 2d 899 (3d Cir. 1992). The Pool Members offer no textual, contractual, legal or other analysis of the arbitration clause contained in the QSA to support their contention that the clause is "narrow." The Pool Members do not provide any other support for their argument that the claims they have attempted to assert against AIG, Inc. in this action are separate, distinct and independent from the issues already being arbitrated. Nor do the Pool Members refute the extensive caselaw cited by AIG, Inc., which demonstrates that the claims in this case are within the scope of the broad arbitration clause contained in the QSA.

The bottom line is that all of the Pool Members' purported claims in this case relate to AIG, Inc.'s actions on behalf of its associated and member companies in connection with the Pool Commutation that is the subject of the parallel arbitration proceedings. The arbitration will determine whether AIG, Inc.'s claims for the reinsurance receivables assigned by Trenwick pursuant to the Pool Commutation are valid. If the claims are valid, then any purported basis for the Pool Members' "tort" claims vanishes. Accordingly, the Pool Members cannot show that the claims they have asserted here are outside the scope of the agreement to arbitrate. The Pool Members' claims clearly have "reference to" the "interpretation, operation or effect" of the QSA. Given this direct connection, a stay of the litigation until the validity of AIG, Inc.'s claims is determined in the arbitration is the appropriate course for the Court to take.

The Pool Members' Motion for Remand should be summarily denied and the Court should grant AIG, Inc.'s Motion to Stay Proceedings Pending Arbitration.

## FACTUAL BACKGROUND

The factual background of this dispute is fully set forth in Defendant AIG's Memorandum in Support of Motion to Stay Proceedings Pending Arbitration and the supporting Affidavit of Eric S. Kobrick, together with the exhibits attached thereto, filed on September 9, 2005. [Dkt. Nos. 6, 7]. To the extent that the Pool Members' Motion for Remand raises additional alleged "facts," the Complaint and the exhibits submitted by the Pool Members contradict their assertions that AIG, Inc. is a "stranger" to the arbitration or that a meaningful distinction can be drawn between AIG, Inc. and the member companies on whose behalf it has acted. The Pool Members' attempt to create such a distinction is freshly minted. The relevant documents unequivocally demonstrate that AIG, Inc. has the right to enforce the obligations arising from the QSA and standing to invoke arbitration.[2]

### A.    The Pool Commutation Was Executed by AIG, Inc.

The Pool Commutation, which is at the heart of the parties' dispute in the arbitration and this case, expressly states that it is entered into between Trenwick and "American International Group, Inc. on behalf of its member and associated companies." [Tab 2 to Schreckinger Aff.; Dkt. No. 15]. AIG, Inc.'s employees negotiated the Pool Commutation which gave rise to the rights to reinsurance receivables that are the subject of the pending arbitration. [Tab 5 to Schreckinger Aff.]. The Pool Commutation was executed by AIG, Inc., on behalf of its member and associated companies. [*Id.*]. Equally, the Promissory Note that Trenwick issued in connection with the Pool Commutation is payable "to the order of AMERICAN INTERNATIONAL GROUP, INC." [*Id.*].

---

[2] The Pool Members admit that even though the QSA was never fully executed by all parties, it governs the parties' relationships and contains the relevant arbitration provision. [Pool Members' Mem. at 5].

5

**B.     The Assignment of Rights Was Made to AIG, Inc.**

The assignment of certain rights by Trenwick, which forms the basis for the claims asserted in the arbitration, was likewise made in favor of AIG, Inc. on behalf of its member and associated companies.  Under the terms of the Pool Commutation, Trenwick assigned its rights, title and interest in the reinsurance receivables arising from the QSA to "the COMPANY," which is defined at page 1 of the Pool Commutation as "American International Group, Inc. on behalf of its member and associated companies." [Tab 5 to Schreckinger Aff. at ¶6(a)].  As noted, the Pool Commutation was then executed by "American International Group, Inc. on behalf of its member and associated companies." [*Id.* at p. 10].  Accordingly, AIG, Inc. (on behalf of its member and associated companies) is an assignee of Trenwick's rights to reinsurance receivables under the QSA.  Accordingly, there is no basis for the Pool Members' oft-repeated claim that AIG, Inc. is a stranger to the operative agreement.[3]

**C.     The Demands for Arbitration Were Made by AIG, Inc.**

Consistent with the Pool Commutation and the assignment of rights received from Trenwick, AIG, Inc. (on behalf of its member and associated companies) initially demanded in November 2004 that the Pool Members either pay their respective shares of the Pool Commutation or enter into a novation agreement.  [Kobrick Aff., ¶ 5].  When no affirmative response to the request for payment or to enter into such an agreement was forthcoming, AIG, Inc. demanded arbitration of its dispute with the Pool Members. [Kobrick Aff., ¶ 8].

---

[3] The twisted logic of the Pool Members' position is demonstrated by their simultaneous contention that Trenwick does not have standing to arbitrate because it assigned away its rights *and* that AIG, Inc. does not have standing even though it received the assignment on behalf of its member and associated companies.  [*See* Pool Members' Mem. at 11-16].  In effect, the Pool Members appear to contend that no one has standing to arbitrate the dispute even though the Pool Members are actively arbitrating the validity of the claims.

In their "Response and Counterclaims for Arbitration - - AIG/Trenwick Contracts" dated March 7, 2005, the Pool Members "respond[ed] to *AIG's* January 10, 2005 Demands for Arbitration." [Ex. 1 hereto]. The Pool Members made no distinction between "AIG" and any of its member companies. Instead, they consistently referred to "AIG." Moreover, while reserving their "rights to contest the propriety of the purported assignment between AIG and Trenwick as well as AIG's asserted right to demand arbitration under the Quota Share Agreement," the Pool Members chose *not* to file a court action to contest AIG, Inc.'s arbitration rights. Instead, the Pool Members filed "counterclaims" in the arbitration, stating their unequivocal intention and agreement to present issues arising out of the Pool Commutation to the arbitration Panel. [Ex. 1 hereto]. The Pool Members proceeded to appoint Paul Thomson as their arbitrator to hear the dispute. [*Id.*]

Even more tellingly, the Pool Members stated their intention to assert *in the arbitration* the very same claims against AIG, Inc. that they now are attempting to litigate here, namely: "(1)Trenwick/AIG's wrongful refusal to allow the [Pool Members] to exercise their unconditional contractual right to audit; (2) AIG's tortious interference with the [Pool Members'] contractual relationship with Trenwick; (3) *AIG's violation of the Massachusetts Unfair Trade Practices Act; and (4) AIG's bad faith in dealing with the [Pool Members]*" [Ex. 1 at 2 (emphasis added)]. Thus, the Pool Members admitted at the outset that their purported "tort" claims are linked with the other claims to be arbitrated.

D.   **AIG, Inc. Is a Party to the Arbitration**



7.

973413v1



REDACTED

E.    **The Pool Members' Admissions In This Case**

In their motion papers, the Pool Members suggest that their claims in the court case are solely against AIG, Inc. in its individual capacity. However, it is evident from the face of the Complaint that AIG, Inc.'s allegedly "wrongful" actions were always taken on behalf of its member companies. To suggest that AIG, Inc. was acting on its own behalf at any time is simply untenable.[4] The Pool Members' allegations equally show that any suggestion that there is a

---

[4] In light of the undisputed facts and the Pool Members' allegations, there is no need for the Court to give any meaningful consideration to the Pool Members' suggestion that the Court permit discovery on issues relating to the internal relationship between AIG, Inc. and its member companies or conduct some type of evidentiary hearing on this issue. [Pool Members' Memorandum in Opposition to Motion to Stay at 10-12; Dkt. No. 20]. The Pool Members fail to articulate any reason why such discovery is required for the Court to engage in the limited inquiry of whether removal under 9 U.S.C. §205 was proper and whether the action should be stayed pending arbitration. The Pool Members' request is simply an effort to use this case for

material difference in the identity of the parties to the litigation as compared to the arbitration is fatally flawed. For example:

- The Pool Members allege in their Complaint that *"AIG"* (defined therein to mean "American International Group") made the demand for arbitration against the Pool Members. [Complaint, ¶92].

- The Pool Members affirmatively allege that *"AIG"* is a party to the June 30, 2004 Pool Commutation. [Complaint, ¶74].

- The Pool Members assert that Trenwick discussed with *"AIG"* both novation and commutation, which would include "issuing a promissory note to AIG" and "assigning to AIG any and all 'collection rights' Trenwick had against the Pool Members under the Retrocessional Agreements." [Complaint, ¶69].

- The Pool Members allege that *"AIG"* has asserted and "continues to assert" claims for payment under the reinsurance contracts ceded to the Pool Members. [Complaint, ¶90].

These statements confirm that the Pool Members are seeking to avoid their obligation to arbitrate by attempting to create entirely illusory and inconsequential distinctions.

## ARGUMENT

### I.    AIG, INC. AND TRENWICK PROPERLY REMOVED THIS ACTION

### A.    The Pool Members Ignore the Applicable Legal Standard

While ostensibly styled as a motion for remand, the Pool Members nowhere discuss the applicable legal standard for removal under 9 U.S.C. §205 or why Defendants' removal under that statute is allegedly defective. Instead, the Pool Members sidestep the issue and seek to have the Court proceed to consider the merits of AIG, Inc.'s request to stay this case in favor of the pending arbitration. In doing so, the Pool Members seek a substantive ruling that AIG, Inc. lacks

improper discovery purposes even though the Pool Members are challenging the Court's jurisdiction to hear the case at all.

9

"standing" to invoke arbitration and a declaration as to the scope of the arbitration clause.[5] But that is not the purpose of a motion to remand, which is confined to the threshold jurisdictional issue of whether there was a proper basis for removal.

The removal provisions of 9 U.S.C. §205 state, in relevant part:

> When the subject matter of an action or proceeding in a State court *relates to* an arbitration agreement or award falling under the Convention,[6] the defendant or defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States District Court for the district and division embracing the place where the action or proceeding is pending (emphasis added).

The Supreme Court has noted that "the goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements and international contracts and to unify the standard by which the agreements to arbitrate are observed and arbitral awards are enforced in signatory countries." *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 520 n.15 (1974).

In light of this stated federal policy, district courts evaluating the propriety of removal pursuant to the provisions of the Convention have repeatedly held that there is a low threshold standard for removal. Specifically, the removing defendant need only show that the case "relates to" an arbitration agreement falling under the Convention. Contrary to the Pool Members' assertions, the defendant is *not* required to establish the substantive arbitrability of the claims asserted in the action or its entitlement to a stay in order to remove the case to federal court.

---

REDACTED

---

[6] The Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 U.S.T. 2517.

10

In a leading case on the issue, *Beiser v. Ibolya Weyler*, 284 F.3d 665, 669 (5th Cir. 2002), the Fifth Circuit Court of Appeals concluded that the "relates to" language means that a case will be removable whenever an agreement falling under the Convention could conceivably affect the outcome of the plaintiff's case. As the court explained:

> The Supreme Court has described the normal sense of the phrase 'relates to' as having 'a connection with' or 'reference to'. . .The phrase '*relates to*' generally conveys a sense of breadth...Whatever else the phrase 'relates to' conveys, it means at least as much as having a possible effect on the outcome of an issue or decision...Thus, the district court will have jurisdiction under §205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense. *As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case. That is all that is required to meet the low bar of 'relates to.'*

*Beiser*, 284 F.3d at 669 (emphasis added). *Accord Sarhank Group v. Oracle Corp.*, 404 F.3d 657, 660 (2d Cir. 2005)(court had subject matter jurisdiction under the Convention where allegations of relationship to arbitration agreement were not immaterial or frivolous); *Jaranilla v. Megasea Maritime Ltd.*, No. 02-2048, 2002 U.S. Dist. LEXIS 16505, *4 (E.D. La. 2002)("Thus, a federal district court will have removal jurisdiction under §205 over any action where the defendant argues that an arbitration agreement covered by the Convention provides a defense. If the defendant's argument is to some degree justifiable and possible, the action will 'relate to' an arbitration agreement or award failing under the Convention, and will thus be removable under §205," *citing Beiser*); *Pinnoak Resources, LLC v. Certain Underwriters at Lloyd's*, No. 5:04-0192, 2005 U.S. Dist. LEXIS 827, *14 (S.D.W.Va. 2005)("easy removal of actions involving arbitration clauses with foreign nationals, such courts have said, is exactly what Congress intended in enacting §205").

11

**B.   This Action "Relates To" an Agreement
to Arbitrate Falling Under the Convention**

Applying the legal standards set forth in *Beiser* requires that the Court deny Plaintiffs'

Motion for Remand.   This case "relates to" an agreement to arbitrate that falls within the scope

of the Convention.   In considering this issue, the Court performs "a very limited inquiry,"

resolving four preliminary questions:

> (1)   Is there an agreement in writing to arbitrate the
> subject of the dispute?
>
> (2)   Does the agreement provide for arbitration in the
> territory of a signatory of the Convention?
>
> (3)   Does the agreement arise out of a legal relationship,
> whether contractual or not, which is considered
> commercial?
>
> (4)   Is a party to the agreement not an American citizen,
> or does the commercial relationship have some
> reasonable relation with one or more foreign states?

*Dimercurio v. Sphere Drake, Inc., PLC*, 202 F.3d 71, 74 n.2 (1st Cir. 2000); *Ledee v. Ceramiche

Rango*, 684 F.2d 184, 186-187 (1st Cir. 1982).[7]   Moreover, as one court recently emphasized, the

jurisdictional issue and the merits inquiry are separate and distinct: "The *Beiser* court clarified

that for purposes of a federal court's jurisdictional analysis, the question of whether a particular

arbitration provision may ultimately be enforced or the question of whether a particular party

may be compelled to arbitrate does not control the jurisdictional analysis because it 'has the

disadvantage of frontloading a merits inquiry into the district court's examination of its

jurisdiction.'" *Lannes v. Operators, Int'l.*, No. 04-584, 2004 U.S. Dist. LEXIS 25781, *15 (E.D.

La. 2004) (*quoting Beiser*, 284 F. 3d at 670).

---

[7] Although they fail to address the relevant legal standard for removal, the Pool Members do not
suggest that items (2), (3) or (4) are in dispute. The arbitration is taking place in the territory of a
signatory to the Convention; the Pool Members concede that foreign entities are parties to the
arbitration, and that the QSA contains an arbitration clause [Pool Members' Mem. at 9 n.13]; and
there is no disagreement that this dispute involves commercial relationships.

In the unique procedural context of this case (where the parties are actually engaged in an active, parallel arbitration), it is not open to the Pool Members to contest that there is "an agreement in writing to arbitrate." In fact, there are two separate agreements to arbitrate that can serve as the predicate for AIG, Inc.'s removal. *First,* the best evidence that there is an "agreement in writing to arbitrate" is the fact that AIG, Inc. and the Pool Members *are* actively engaged in a pending arbitration with respect to issues arising out of the Pool Commutation and the QSA based upon their exchange of a written demand and response in early 2005. In January 2005, AIG, Inc. (on behalf of its member companies) demanded arbitration [Complaint, ¶ 92]. In response to AIG, Inc.'s demand, the Pool Members filed counterclaims, appointed an arbitrator and proceeded with the arbitration. Indeed, the Pool Members specifically stated their intention to bring in the arbitration the very same claims for "fraud" and violation of Mass. Gen. Laws c. 93A that they now seek to "carve out" of the arbitration and litigate here. [Ex. 1 hereto].

Significantly, the Pool Members *did not* respond to AIG, Inc.'s demand for arbitration by commencing an action in court to obtain a ruling that they had no legal obligation to arbitrate any dispute with AIG, Inc. The Pool Members did not seek a court ruling with respect to the validity of the assignment of rights by Trenwick pursuant to the terms of the Pool Commutation, which gave rise to the demand for arbitration        REDACTED                                By proceeding in this fashion, the Pool Members conceded the existence of an enforceable agreement to arbitrate.

*Second,* it is undisputed that, by its express terms, the QSA contains a written arbitration clause. [Kobrick Aff., ¶¶ 6-7 and Exs. 4, 5 thereto]. The Pool Members specifically state that *"the AIG Subsidiaries Arbitration is brought under the arbitration clause of the QSA."* [Pool Members' Mem. at 11 (emphasis added)]. Thus, either or both of these "agreements to arbitrate"

13

satisfy the removal criteria under 9 U.S.C. §205 that there be an "agreement to arbitrate in writing." *Dimercurio*, 202 F. 3d at 74 n. 2.

Moreover, the arbitration that is proceeding on a parallel track with this case clearly "relates to" the "subject of the dispute" that the Pool Members have alleged in their Complaint. This is particularly so in light of the "limited inquiry" to be conducted by the Court for the purpose of determining whether it has jurisdiction to resolve the merits of Defendants' request for a stay. This test does not require the Court to engage in a full "scope" analysis or make an ultimate determination of whether the precise claims asserted by the Pool Members are encompassed by the arbitration clause.[8] Rather, the "subject of the dispute" in both this case and the arbitration concerns the respective rights, obligations and liabilities of the parties arising from the Pool Commutation and AIG, Inc.'s claims for payment based upon the assignment of certain reinsurance recoverables from Trenwick. This broad identity of the "subject of the dispute" between the court case and the arbitration is all that is required to sustain the Court's jurisdiction.

The illogic of any contrary argument by the Pool Members is demonstrated by the fact that the matters to be determined in the arbitration are necessary predicates to the "tort" claims that the Pool Members are attempting to assert here. The Pool Members' briefs are rife with hyperbole that this case involves a "reinsurance scam" and that AIG, Inc. and Trenwick conspired to present "spurious claims" and "fraudulent paid losses" to the Pool Members [*See* Pool Members' Mem. at 2]. The Pool Members simply ignore the fact that determining whether AIG, Inc.'s demands for payment are proper is the province of the arbitration Panel. The Pool Members have not alleged in their Complaint that this Court should make any determination of

---

[8] As AIG, Inc. demonstrated in its original Memorandum in Support of its Motion to Stay and reiterates in Part III of this Memorandum, the Court must ultimately conclude that the purported claims asserted by the Pool Members in their Complaint have reference to the "interpretation, application or effect" of the QSA and, accordingly, a stay of this action pending completion of the ongoing arbitration is mandated under Section 3 of the FAA.

14

AIG, Inc.'s entitlement to payment of the claims. If the arbitration Panel determines that the claims presented by AIG, Inc. are proper, then the Pool Members' purported "tort" claims have no basis.

Accordingly, for the Pool Members to argue that the claims in this case do not "relate to" the subject of the arbitration simply ignores common sense. Essentially, the Pool Members are contending that they could litigate an insurance "bad faith" claim without first establishing a breach of the relevant insurance contract. Or, to use another analogy, the Pool Members are requesting that a court award "punitive damages" when there has not been a finding of liability. Such contentions stand logic and law on their head.[9]

In light of the broad "relates to" test of *Beiser*; the strong Congressional policy of making removal under 9 U.S.C. §205 easy as long as the agreement to arbitrate "arguably" falls under the Convention; and the "limited inquiry" to be conducted on a motion to remand, the Court must conclude that AIG, Inc.'s and Trenwick's removal of this case was proper.

## II. AIG, INC. HAS STANDING TO INVOKE ARBITRATION

### A. The Pool Members Have Conceded that the Issue of "Standing" is a Matter for the Arbitration Panel

The Pool Members' attempt to inject issues of AIG, Inc.'s "standing" into the present case is a classic example of a party seeking to get the proverbial "two bites at the same apple."



---

[9] Indeed, it is difficult to fathom how the Pool Members have any independent "tort" claims under any scenario since they have no proof of damages. Despite their assertions that they are the victims of a "reinsurance scam," the fact is that the Pool Members have never paid any of the claims presented to them.

15

973413v1

**REDACTED**

The Pool Members should not be permitted to simultaneously litigate the question of AIG, Inc.'s "standing" in two different forums.  Such a "tactic" is contrary to the federal policy favoring arbitration; the arbitration agreement embodied in the QSA;

**REDACTED**

The Pool Members' assertion that the issue of "arbitrability" (including a party's right to invoke arbitration) is exclusively a matter for the Court is just plain wrong in the context of this case.[10]  In contrast to the cases upon which the Pool Members rely, such as *InterGen N.V. v. Grina*, 344 F. 3d 134 (1st Cir. 2003) ("*InterGen*"), this is not a situation where a party is asserting that there is *no* right (or obligation) to arbitrate at all.  When presented with AIG, Inc.'s demand for arbitration in January 2005, the Pool Members did not commence an action in court contesting the fact that AIG, Inc. (on behalf of its member and associated companies) has a right to arbitrate the dispute with the Pool Members.  In other words, the Pool Members did not contest the "arbitrability" of the central dispute.  Instead, they served a response to the arbitration demand, filed counterclaims, appointed an arbitrator and proceeded with the arbitration.

**REDACTED**

Accordingly, the Pool Members' reliance upon cases where an initial court challenge was made to the obligation to arbitrate is entirely misplaced.  *See First Options of*

---

[10] [*See also* discussion in Trenwick's Mem. In Opp. to Motion for Remand].

16

*Chicago Inv. v. Kaplan*, 514 U.S. 938 (1995) (party was forcefully objecting to the arbitrators deciding their dispute with First Options).

### B.    The Undisputed Facts Show that AIG, Inc. is Entitled to "Invoke" Arbitration

AIG, Inc. is not obligated to demonstrate that it is a party to the original agreement containing the arbitration clause in order to be entitled to a stay. Instead, the operative standard is whether AIG, Inc. is entitled to "invoke" arbitration. *InterGen*, 344 F.3d at 142 (identifying factors relevant to issue of whether a party is entitled to compel arbitration). As *InterGen* and similar cases have recognized, it is not necessary that there be a precise identity of parties so long as the party seeking to require that a matter be arbitrated has a legal entitlement to "invoke" arbitration. 344 F.3d at 143.[11]

The facts recited above show that AIG, Inc. is entitled to "invoke" arbitration in this case on behalf of its member and associated companies, including as the entity that executed the Pool Commutation. Although the Pool Members make fanciful claims that AIG, Inc. is somehow an "interloper" in this matter, they do not provide the Court with any facts or legal analysis that support their position. The record is clear that AIG, Inc., on behalf of its member and associated companies, negotiated and executed the Pool Commutation. As the direct signatory to the Pool Commutation [Tab 2 to Schreckinger Aff.], AIG, Inc. (on behalf of its member and associated companies) clearly acquired the rights that were being assigned by Trenwick. The fact that the Pool Members are currently engaged in arbitration with AIG, Inc. evidences the fact that the

---

[11] Although the Pool Members place almost exclusive reliance upon the First Circuit's decision in *InterGen* to support their position that this action should not be stayed in favor of the pending arbitration, *InterGen* presents a completely different situation than this case. In *InterGen*, *none* of the relevant parties that entered into the contracts containing an arbitration provision were actually parties to the litigation. As the First Circuit noted, "[i]n short, no party to this case, plaintiff or defendant, is a signatory to any of the five agreements." 344 F.3d at 143. Here, of course, the Pool Members are seeking to escape the effect of an arbitration agreement to which they are clearly bound.

17

Pool Members have agreed that the assignment included the right (and obligation) to arbitrate.[12] The Pool Members specifically allege in their Complaint that the assignment was made to AIG. [Complaint, ¶ 74]. The Pool Members readily admit that "AIG" was the entity that demanded arbitration to which the Pool Members responded, including by filing counterclaims. [*See* Ex. 1 hereto].         REDACTED

It is equally clear that, to the extent the Pool Members believe they have any claims against AIG, Inc., those claims are solely for acts allegedly engaged in by AIG, Inc. *on behalf of its member and associated companies.* The Pool Members repeatedly state that what they are complaining about is the alleged concoction of "fraudulent" or "spurious" claims under the original reinsurance contracts ceded to the Pool Members and the attempt by AIG, Inc. to collect upon those claims pursuant to the terms of the Pool Commutation. [Pool Members' Mem. at 2-4]. The ability of AIG, Inc. to recover upon those claims is at the heart of the pending arbitration. Accordingly, the Pool Members' suggestion that the litigation is strictly against AIG, Inc. in some capacity other than on behalf of its member and associated companies, or that the arbitration does not involve AIG, Inc., is pure sophistry.

The Pool Members seek to nullify the arbitration clause in the QSA by purportedly naming AIG, Inc. in its individual capacity, while at the same time claiming that AIG, Inc.'s alleged "misconduct" was on behalf of its member and associated companies. Federal courts faced with similar allegations in analogous circumstances have consistently afforded a non-

---

[12] The Pool Members do not and cannot contest that the right (and obligation) to arbitrate in accordance with the terms of the arbitration clause contained in the QSA was part and parcel of the assignment made by Trenwick. AIG, Inc. does not contend that by receiving an assignment of Trenwick's reinsurance receivables pursuant to the Pool Commutation it was free to litigate the claims in court rather than arbitrating them in accordance with the clear provisions of the QSA. Since AIG, Inc. stands in Trenwick's "shoes" for the purpose of seeking to collect the assigned receivables, it is equally bound to the duty to arbitrate contained in the QSA.

signatory the benefit of an arbitration agreement. *See e.g., Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990) ("if appellant can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified"); *Bolanos v. Globe Airport Sec. Servs. Inc.*, No. 02-21005, 2002 U.S. Dist. LEXIS 11056, *6-7 (S.D. Fl. 2002) (non-signatory defendants can compel arbitration based upon agreement executed by defendants' principal).

### C. The Pool Members are Equitably Estopped from Contesting AIG, Inc.'s Right to Enforce the Arbitration Clause

The uncontested facts discussed above demonstrate that AIG, Inc. is a party to the Pool Commutation pursuant to which Trenwick's reinsurance recoverables and its corresponding right (and obligation) to arbitrate were assigned. However, even if the Court was to conclude that the assignment only ran in favor of the specific member and associated companies, AIG, Inc. would nevertheless be entitled to invoke arbitration and enforce the arbitration clause against the Pool Members under principles of equitable estoppel.

The Pool Members cannot challenge that AIG, Inc. was acting on behalf of its member and associated companies in connection with the Pool Commutation and the alleged "conduct" which forms the basis of the Pool Members' Complaint. Thus, whether the assignment directly ran in favor of AIG, Inc. is irrelevant. In such circumstances, it has been widely held that courts will apply the doctrine of equitable estoppel to allow a non-signatory to enforce an arbitration clause against a signatory if (1) the non-signatory is alleged to be the agent of a signatory *or* (2) the claims against the non-signatory are "fundamentally grounded" in or "intimately founded in and intertwined with" the agreement containing the arbitration clause. *See Restoration Preservation Masonry, Inc. v. Grove Europe Ltd.*, 325 F.3d 54, 62 n.2 (1st Cir. 2003); *Grigson v.*

*Creative Artists Agency,* 210 F.3d 524, 527 (5th Cir. 2000); *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.,* 10 F.3d 753, 757 (11th Cir. 1993); *Hughes Masonry Co., Inc. v. Greater Clark County Bldg. Corp.,* 659 F.2d 836, 838 (7th Cir. 1981).[13]  As recently summarized by one court,

> "[e]xisting case law demonstrates that equitable estoppel allows a nonsignatory to compel arbitration in two different circumstances. First, equitable estoppel applies when the signatory to a written agreement containing an arbitration clause must "rely on the terms of the written agreement in asserting [its] claims against the nonsignatory. When each of a signatory's claims against a nonsignatory "makes reference to" or "presumes the existence of" the written agreement, the signatory's claims "arise[] out of and relate[] directly to the [written] agreement," and arbitration is appropriate. Second, "application of equitable estoppel is warranted ... when the signatory [to the contract containing the arbitration clause] raises allegations of ... substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract." Otherwise, "the arbitration proceedings [between the two signatories] would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted."

*Brantley v. Republic Mortgage Insurance Company,* 424 F.3d 392, 395-396 (4th Cir. 2005)(*quoting MS Dealer Serv. Corp. v. Franklin,* 177 F. 3d 942, 947 (11th Cir. 1999) (citations omitted); *P.L. Services LP v. Millenium Construction, Inc.,* 328 F. Supp. 2d 245, 249 n.1 (D.P.R. 2004), *citing Thomson-CSF, S.A v. Am. Arbitration Ass'n.,* 64 F. 3d 773, 779 (2d Cir. 1995); *Goer v. Jasco Indus., Inc.,* 2005 U.S. Dist. LEXIS 26589, *13 (D.S.C. 2005)("Under the intertwined claims test, "the circuits have been willing to estop a signatory from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."); *Thixomat, Inc. v. Takata Physics Int'l,* 2001 U.S. Dist. LEXIS 10812, *7-8 (S.D.N.Y. 2001)("the great

---

[13] As previously noted, this case is fundamentally different from the *InterGen* decision relied upon by the Pool Members since in *InterGen* not a single one of the parties to the court case was a signatory to the agreements which contained an arbitration clause. Here, of course, the Pool Members are parties to the agreement containing the arbitration clause that AIG, Inc. seeks to enforce.

wealth of federal cases suggest that a non-signatory to an arbitration agreement may compel a signatory to arbitrate when the issues the nonsignatory is seeking to arbitrate are intertwined with the underlying agreement.")  Here, AIG, Inc. is clearly alleged to have acted on behalf of its member and associated companies (who became the equivalent of "signatories" to the QSA via the assignment from Trenwick) and the claims against AIG, Inc. are thus "intertwined with" the QSA.[14]

In an analogous case involving a reinsurance dispute, a federal district court reached precisely this result.  *Gulf Guaranty Life Ins. Co. v. Connecticut General Life Ins. Co.*, 957 F.Supp. 839 (S.D. Miss. 1997).  Plaintiff Gulf Guaranty and defendant Connecticut General entered into a reinsurance contract with respect to certain credit life insurance certificates. The reinsurance contract contained an arbitration clause. Thereafter, a dispute arose with respect to payment of a claim. Cigna Reinsurance Company ("CRC") handled the claim on behalf of Connecticut General.

Gulf then sued Connecticut General and CRC in state court, claiming that CRC (acting on behalf of Connecticut General) had wrongfully refused to pay the claim.  The defendants removed the action to federal court and sought to compel arbitration under the reinsurance agreement.  Gulf agreed that its claims against Connecticut General were subject to arbitration, but contended that the claims against CRC were not since CRC was not a signatory to the contract containing the agreement to arbitrate. Gulf further claimed that it should not be subject to arbitration because its claims against CRC were for an independent tort based upon the conduct of CRC in handling the claim.

---

[14] While AIG , Inc. does not agree with the Pool Members' characterization of the arbitration, the Pool Members are clearly arbitrating with the AIG Subsidiaries, who are not original signatories to the QSA.  Any claims against AIG, Inc. are clearly "intertwined with" the claims being arbitrated, equally entitling AIG, Inc. to invoke arbitration.

21

The Mississippi District Court rejected Gulf's position and ordered arbitration. The court noted that the equitable estoppel test only requires that the party seeking to enforce arbitration be an agent of the signatory *or* that the claims be "founded upon" or "intertwined with" the contract containing the agreement to arbitrate. The court ruled that the complaint alleged that CRC acted as agent for Connecticut General and that the alleged claim-handling conduct clearly arose out of the underlying contract. The court noted that equitable estoppel cases such as *Hughes Masonry* specifically denounce efforts to circumvent an arbitration clause by suing the agent instead of the principal:

> It would allow a party to defeat an otherwise valid arbitration clause simply by alleging that an agent of the party seeking arbitration has improperly performed certain duties under the contract and thereby committed a tort that is so integrally related to the subject of arbitration between the parties as to constitute a bar to such arbitration.

*Hughes Masonry*, 659 F.2d at 838-839.

These principles clearly require that the Court reject the Pool Members' contention that AIG, Inc. is not entitled to invoke the arbitration provisions of the QSA. The Complaint filed by the Pool Members specifically alleges that AIG, Inc. acted on behalf of its member and associated companies in structuring the Pool Commutation, the assignment of reinsurance recoverables from Trenwick, and the claims for payment that are at the heart of the dispute presently being arbitrated. [Complaint, ¶¶ 70, 74, 77]. Given these allegations, the Pool Members have no basis to contest AIG, Inc.'s right to invoke arbitration in that same capacity. *Bolamos v. Globe Airport Sec. Servs., Inc.*, No. 02-21005, 2002 U.S. Dist. LEXIS 11056, *6-7 (S.D. Fl. 2002) (non-signatory defendants can compel arbitration based upon agreement executed by defendants' principal).

It is impossible for the Pool Members to dispute that the claims asserted in this case are "founded upon" or "intertwined with" the QSA which contains the agreement to arbitrate.

22

973413v1

Inexorably, the claims alleged here flow back to the underlying claims for recovery of Trenwick's receivables that are the subject of the pending arbitration. A determination of whether the claims for payment made by AIG, Inc. are valid is the necessary predicate for the Pool Members' purported "tort" claims. As such, the Pool Members' claims in this case are either "founded upon" or "intertwined with" the claims in the arbitration and AIG, Inc. is entitled to enforce the arbitration clause against the Pool Members.[15]

### III.    THE SCOPE OF THE ARBITRATION CLAUSE ENCOMPASSES THE CLAIMS IN THIS CASE

The Pool Members have the burden of proving with "positive assurance" that the arbitration clause at issue is *not* susceptible of an interpretation that covers the claims in the Complaint. In the absence of such proof, the Court must order that the dispute be submitted to arbitration. *See Municipality of San Juan v. Corporation Para El Fomento Economico De La Ciudad Capital*, 415 F. 3d 145, 2005 U.S. App. LEXIS 14218, *9 (1st Cir. 2005), *quoting AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650 (1986); *First Allmerica Financial Life Insurance Co. v. Minnesota Life Ins. Co.*, 188 F. Supp. 2d 101, 104 (D. Mass.

---

[15] Because the Pool Members' claims against AIG, Inc. are solely for acts allegedly engaged in by AIG, Inc on behalf of its member and associated companies, an additional theory of estoppel is applicable to this dispute. Federal courts have applied the doctrine of equitable estoppel to allow a non-signatory to enforce an arbitration clause against a signatory when charges against a parent company and its subsidiary are based upon the same facts and are inherently inseparable. *See J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-321 (4th Cir. 1988)("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement. As the Fifth Circuit explained under similar circumstances, 'If the parent corporation was forced to try the case, the arbitration proceedings would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted,'" *citing Sam Resifeld & Son Import Co. v. S.A. Etco*, 530 F.2d 679, 681 (5th Cir. 1976)); *Burlington Ins. Co. v. Trygg-Hansa Ins. Co.*, 2001 U.S. App. Lexis 10625, *18-19 (4th Cir. 2001) (..."because the exact issues to be determined here were pre-committed to arbitration, it would violate the intent of the parties and the purpose of the FAA to not hold Burlington Group to the arbitration clauses"); *Thixomat, Inc. v. Takata Physics Int'l*, 2001 U.S. Dist. LEXIS 10812, *9-10 (S.D.N.Y. 2001).

23

2002).  As the relevant cases further hold, if the allegations in the complaint underlying the claims "touch matters" covered by the parties' agreement to arbitrate, then those claims must be arbitrated, whatever the legal labels that may be attached to them. *See ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24, 34 (2d Cir. 2002).  Simply calling a claim a "tort" does not take it outside the scope of a broad contractual agreement to arbitrate.

While contesting this Court's subject matter jurisdiction, the Pool Members nevertheless seek a substantive ruling that the alleged "tort" claims asserted in the Complaint are not subject to an agreement to arbitrate.  [Pool Members' Mem. at 16-20].  In doing so, the Pool Members contend that the arbitration clause contained in the QSA is "narrow."  The Pool Members offer no textual, contextual, contractual, legal or other analysis to support their position.  Instead, they simply contend that the issue should be determined by a lone decision of the United States District Court for the District of New Jersey. *Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853 (D.N.J. 1992), *aff'd without opinion on other grounds*, 970 F. 2d 899 (3d Cir. 1992) ("*Zimmerman*").

In an effort to avoid the great weight of authority interpreting arbitration clauses as "broad" that are similar to the one in the QSA, as well as the clear and heavy presumption in favor of arbitrability, the Pool Members invite this Court to follow *Zimmerman's* unclear and flawed  reasoning for its narrow interpretation of a similar arbitration clause.  The *Zimmerman* decision held, in relevant part, that "[t]he arbitration clause, however, contains words of limitation – 'as a condition precedent to any right of action hereunder,' and 'with reference to the interpretation, application or other effect of this Agreement'". . . Accordingly, it appears that the arbitration clause in the Management Agreement is not a general clause." *Zimmerman*, 783 F. Supp. at 870-71. Inexplicably, the court in *Zimmerman* (i) read a "hereunder" from one part of the arbitration clause into another part of the clause; and (ii) interpreted the phrase "with

24

973413v1

reference to the interpretation, application or effect of" as narrow. As demonstrated below, the reasoning of the sole case relied upon by the Pool Members is both flawed and contrary to the great weight of authority interpreting very similar arbitration clauses as the one at issue here to be broad.

**A.    The Phrase "As A Condition Precedent to Any Right of Action Hereunder," Does Not Appear in the Operative Part of the Clause**

In the present case, the arbitration clause provides in relevant part that "As a condition precedent to any right of action hereunder, *any dispute or difference hereafter arising with reference to the interpretation, application or effect of this Agreement or any part hereof, whether arising before or after termination of this Agreement,* shall be referred to a Board of Arbitration" (emphasis added). Rather than acknowledge the unambiguous language of the clause's operative phrase, *Zimmerman* instead concluded that the word "hereunder" in the phrase "[a]s a condition precedent to any right of action hereunder" should not be read to modify "any right of action" after which it appears, but rather should be read to modify the phrase, "any dispute or differences," which appears in the words that follow it. The Court relied upon no authority either specifically relating to arbitration provisions, or generally relating to contract interpretation, which would support such a forced construction of the contractual language involved there and here.

Indeed, the Second and Tenth Circuits have held that the preamble, "as a condition precedent to any right of action hereunder," is a procedural clause that addresses how issues are arbitrated and when judicial action may be brought, but it does not manifest an intent to limit the scope of the parties' broad agreement to arbitrate. *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 31 (2d Cir. 2002) ("As a condition precedent to any right of action hereunder" is a prefatory clause that does not limit the scope of the arbitration clause but rather

25

establishes a limitation on when a judicial action may be brought under the Agreement); *Nat'l Am. Ins. Co. v. SCOR Reinsurance Co.*, 362 F.3d 1288, 1291 (10th Cir. 2004) ("As a condition precedent to any right of action hereunder" is a procedural clause that addresses how issues are arbitrated and when judicial action may be brought, but it does not manifest an intent to limit the scope of the parties' broad agreement to arbitrate "any irreconcilable dispute.").[16]

The word "hereunder" does not appear in the operative portion of the clause at issue and does not limit the scope of the arbitration clause. *Zimmerman's* reliance upon this word to create a limitation where none exists is not well-reasoned. Simply stated, the decision in *Zimmerman* goes against the great weight of authority interpreting similar arbitration clauses.

### B.    "[W]ith Reference To" Is Expansive Language

The operative language of the arbitration clause at issue provides that the parties must arbitrate "with reference to the interpretation, application or effect of this agreement." Contrary to *Zimmerman's* conclusion that "with reference to" are words of limitation, numerous courts have held to the contrary. Indeed, courts have described the phrase "with reference to" as being synonymous with the broad term "relating to." *Smith v. Lucent Technologies, Inc.*, No. 02-0481, 2004 U.S. Dist. LEXIS 4074, *29 (E.D.La. March 16, 2004) (*citing Phoenix Leasing, Inc. v.*

---

[16] Moreover, while the *Zimmerman* case held that "as a condition precedent to any right of action hereunder . . . are words of limitation," the cases which it relied upon have the word "under" or "hereunder" in the operative part of the clause, unlike the clause which the court was interpreting. *Republic of Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 473 (9th Cir. 1991) (The arbitration clause stated "[a]ny and all disputes arising under the arrangements contemplated hereunder . . ."); *Mediterranean Enters. v. Ssangyong Corp.*, 708 F.2d 1458, 1461 (9th Cir. 1983) (the arbitration clause stated, "[a]ny disputes arising hereunder or following the formation of joint venture shall be settled through binding arbitration . . ."); *Good(E) Business Systems, Inc. v. Raytheon Co.*, 614 F. Supp. 428, 429 (D. Wis. 1985) (the court was interpreting a clause that did not even contain the word "under" or "hereunder" but the clause – "all disputes arising in connection with this Agreement shall be settled by arbitration . . ."). None of these cases are applicable here as each case relied upon by the *Zimmerman* Court utilized the word "under" or "hereunder" in the operative part of the arbitration provision. No such similar modifying language appears in the operative part of the clause at issue.

26

*Sure Broad., Inc.*, 843 F.Supp. 1379, 1388 (D. Nev. 1994), *aff'd,* 89 F.3d 846 (9th Cir. 1996));

*Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-129 (2d Cir. 2001); *see also Vt.*

*Pure Holdings, Ltd. v. Descartes Systs. Group, Inc.*, 140 F.Supp.2d 331, 334-35 (D. Vt. 2001)

(The phrase "related to" has been found to be synonymous with phrases such as "in connection

with" "associated with" "with reference to" and "with respect to"). Accordingly, the arbitration

clause is broad, requiring arbitration of "any dispute . . . between the parties . . . with reference

to the interpretation, application, or effect of this Agreement."

### C.    The Phrase "Relating To" is Not A Requirement of a Broad Arbitration Clause

As set forth above, not only does the clause at issue contain the expansive and broad

language "with reference to," but the Pool Members cite to no authority for the proposition that

an arbitration clause must include the phrase "relating to" in order to reach claims based upon the

provisions of G.L. c. 93A, §11, fraud, civil conspiracy, aiding and abetting breach of fiduciary

duty, and/or tortious interference with contractual relations.[17]  Indeed, numerous courts have

found arbitration clauses that do not include those words to be broad. *See AT&T Technologies,*

*Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986) (clause is as broad,

which provides for arbitration of "any differences arising with respect to the interpretation of this

contract or the performance of any obligation hereunder . . ."); *International Brotherhood of*

*Electrical Workers, Local 1228, AFL-CIO v. Freedom WLNE-TV, Inc.*, 760 F.2d 8 (1st Cir. 1985)

(arbitration clause held to be "broad" where it required arbitration of "all problems arising out of

grievances or out of the application or interpretation of this Agreement or the performance of any

party under it"); *North River Ins. Co. v. Allstate Ins. Co.*, 866 F. Supp. 123, 127 (S.D.N.Y. 1994)

---

[17] *Zimmerman*, in *dicta*, cites a Ninth Circuit case interpreting an entirely different arbitration clause and states that the omission of the phrase "relating to" in the agreement is significant. *Zimmerman*, 783 F. Supp. at 871.

27

("if any dispute shall arise between the reinsured and the reinsurer with reference to the interpretation of this contract . . . the dispute shall be referred to three arbitrators . . .").

### D.    The Pool Members Exaggerate Both the Relevance and the Significance of the *Zimmerman* Decision

The Pool Members exaggerate both the relevance and the significance of the *Zimmerman* decision, going so far as to assert with no factual support that unnamed individuals who drafted the QSA *five years* after the *Zimmerman* decision " reasonably can be presumed to have known of the case and the court's holding, and to have incorporated the arbitration clause into the QSA with the expectation it would continue to be construed narrowly." [Pool Members' Mem. at 18]. The Pool Members just make this up.

Further, *Zimmerman* has hardly been treated by courts as a seminal reinsurance arbitration decision. In fact, based upon counsel's review, it has never been subsequently cited by any court in the context of a reinsurance dispute, whether concerning the scope of an arbitration clause or otherwise. Similarly, the Pool Members' assertions that the "Civil RICO Report" and the "New Jersey Bar Journal" are considered "must reads" by reinsurance underwriters is entirely manufactured. As noted in AIG, Inc.'s Memorandum In Support of Motion to Stay Proceedings at 11-12, since the *Zimmerman* decision, numerous other courts that have considered similar arbitration clauses have construed the language broadly.

The Pool Members' own characterization of the dispute with AIG, Inc. and Trenwick is instructive in emphasizing that the dispute concerning the validity of the reinsurance claims arises "with reference to the interpretation, application or effect of this Agreement." As the Pool Members state:

> This matter arises out of a reinsurance scam. Defendants AIG Inc. and Trenwick colluded to convert tens of millions of dollars in spurious claims asserted by AIG insurance subsidiaries ("AIG Subsidiaries") against Trenwick reinsurance contracts into more

28

> than $76 million in fraudulent "paid losses" to be presented to plaintiffs for reimbursement under a reinsurance fronting agreement between Trenwick and the LDG Facilities.

[Pool Members' Mem. at 2].

The allegedly "spurious claims," "fraudulent paid losses" and the right of AIG, Inc. to present the same to the Pool Members simply cannot exist without the QSA, the contract that governs the relationship, rights and obligations between the reinsureds and their reinsurers and mandates arbitration of any dispute that has reference to "the interpretation, application or effect" of the agreement. Despite the Pool Members' attempts to characterize their claims in this action as torts arising independently from the QSA, the alleged "misconduct" (if any) clearly relates to AIG, Inc.'s attempts to recover claims arising from the risks ceded to the Pool Members pursuant to the QSA. Thus, both the validity of the reinsurance claims and the Pool Members' purported tort claims are entirely dependent upon a court's interpretation of the QSA. At a minimum, any consideration of the Pool Members' claims would require the Court to have "reference to" the "interpretation, application or effect" of the QSA. The tort claims cannot be neatly parsed out and would not exist but for the underlying claims to reinsurance recoverables that flow from the QSA.

As the Second Circuit Court of Appeals has succinctly explained:

> ...reinsurance is a contract by which one insurer insures the risks of another insurer. Under a reinsurance contract, the original insuring entity (the "reinsured") transfers, or "cedes," part or all of its risk under its policy of insurance to another entity (the "reinsurer"). When entering into a reinsurance contract, a reinsured agrees to pay a particular premium to a reinsurer in return for the reinsurer assuming the risk of a portion of the reinsured's potential financial exposure under certain direct insurance policies it has issued to its insured.

*North River Insurance Company v. Ace American Reinsurance Company*, 361 F.3d 134, 137 (2nd Cir. 2004) (internal citations omitted). Here, it is impossible for the Court to determine whether

there have been any "spurious claims" or "fraudulent paid losses" without first interpreting and applying the provisions of the QSA. The applicable contracts mandate, however, that such disputes be resolved by arbitration, before a panel of industry experts, not by this Court.

In contrast to the situation here, the court in *Zimmerman* concluded that certain claims which were predominately unrelated, related only peripherally, or that did not involve or require an interpretation of rights under the Management Agreement, were outside the scope of the arbitration clause. *Zimmerman*, 783 F. Supp. at 872-874. However, the claim involving breach of fiduciary duties was held to be within the scope of the arbitration clause because without the Management Agreement there would not have been a fiduciary relationship. *Id.* Simply put, without the QSA, there would not have been a reinsurance relationship between and among Trenwick, AIG, Inc. and the Pool Members. *See Maldonado v. PPG Industries, Inc.*, 514 F.2d 614, 616-17 (1ˢᵗ Cir. 1975) ("The contracts established and defined [the parties'] relationship, and it seems inconceivable that one or both parties to the third-party action will not need to refer to them. No assessment of the ultimate burden between [the parties] can realistically be made without reference to the contracts"). To the extent that the Pool Members claim that AIG, Inc. somehow engaged in improper conduct here, the conduct was on behalf of its member and associated companies with respect to these reinsurance relationships.

To allow the Pool Members to proceed with the litigation would defeat the federal policy favoring arbitration, raise the prospect of inconsistent findings of fact or rulings of law by this Court and the arbitration Panel, and ignore the fact that the Pool Members have brought claims in the arbitration and here that are inextricably linked with the QSA. The Court must reject the Pool Members' assertions than the claims in this case are outside the scope of the agreement to arbitrate and exercise its statutory obligation under Section 3 of the FAA to stay this action. *See CNA Reinsurance Co. v. Trustmark Ins. Co.*, No. 01-C-1652, 2001 U.S. Dist. LEXIS 7523, *18

30

973413v1

n.5 (N.D. Ill. 2001)(…"broad agreements to arbitrate are standard in the reinsurance industry");

Wollan, *Handbook of Reinsurance Law*, §8.01 (2003) (noting that "arbitration has been used to

resolve disputes in the reinsurance industry since the early nineteenth century").[18]

## CONCLUSION

The Pool Members have attempted to create confusion where none exists. The Court has

jurisdiction; AIG, Inc. is entitled to invoke arbitration on behalf of its member and associated

companies; and the claims asserted by the Pool Members are within the broad scope of the

arbitration clause. The Court should deny the Plaintiffs' Motion for Remand and stay this action

pending the completion of the arbitration.

AMERICAN INTERNATIONAL
GROUP, INC. on behalf of its member
and associated companies,

John T. Harding BBO #221270
Michael F. Aylward BBO #024850
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

---

[18] As noted in AIG, Inc.'s Memorandum In Support of Motion to Stay Proceedings, even if the Court were to conclude that the Pool Members' claims are not encompassed by the arbitration clause, a discretionary stay is still appropriate. It cannot be disputed that resolving the merits of AIG, Inc.'s rights to payment of the claims at issue in the arbitration could serve to streamline this case or eliminate the need for it to proceed at all. *See D.J. Mfg. Corp. v. Tex Shield, Inc.*, 998 F. Supp. 140, 146 (D.P.R. 1998) (noting that "[t]he First Circuit has held that when plaintiff's claims are interrelated and arbitration 'could serve to clarify and perhaps even simplify the remaining issues which may be litigated,' a stay of both the arbitrable and the non-arbitrable claims is within the trial court's sound discretion," *quoting Sevinor v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 807 F. 2d 16, 20 (1st Cir. 1986)).

31

Of Counsel:

William A. Maher
**WOLLMUTH MAHER &
DEUTSCH LLP**
500 Fifth Avenue
New York, New York  10110
(212) 382-3300
(212) 382-0050 (facsimile)

Dated: November 14, 2005

## CERTIFICATE OF SERVICE

I, John T. Harding, counsel for Defendant American International Group, hereby certify that on November 14, 2005, I served a copy of the foregoing document by messenger and/or FedEx on all counsel of record.

John T. Harding

32

973413v1

## **EXHIBIT 1**

**ENTIRE DOCUMENT
HAS BEEN REDACTED**

**EXHIBIT 5**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AMERICAN REINSURANCE COMPANY, *et al.*,<br>                    Plaintiffs,<br><br>v.<br><br>AIG, INC. and TRENWICK AMERICA REINSURANCE CORPORATION,<br>                    Defendants. | CIVIL ACTION NO:<br>05-CV-11840-MLW<br><br>*FILED UNDER SEAL* |

**DEFENDANT AIG, INC.'S RENEWED MOTION TO STAY PROCEEDINGS PENDING ARBITRATION AND OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR REMAND**

Defendant AIG, Inc., on behalf of its member and associated companies ("AIG, Inc."), hereby renews its Motion to Stay Proceedings Pending Arbitration filed on September 9, 2005 and opposes the Renewed Motion for Remand served by Plaintiffs American Reinsurance Company, *et al* (the "Pool Members") on January 5, 2006 [Dkt. No. 35]. The allegations made by the Pool Members in their Amended Complaint served on AIG, Inc. and Trenwick America Reinsurance Corporation ("Trenwick") on December 30, 2005 (the "Amended Complaint") [Dkt. No. 34] neither defeat the Court's subject matter jurisdiction over this action, nor change the fact that the Pool Members have purported to sue AIG, Inc. in its "individual" capacity in a blatant attempt to circumvent a clear agreement to arbitrate this dispute. The Court should reject the request for a remand and enter an order staying all further proceedings until the comprehensive arbitration between AIG, Inc. and the Pool Members is resolved.

984340

The parties spent four months engaged in extensive briefing with respect to AIG, Inc.'s and Trenwick's Motions to Stay Proceedings Pending Arbitration and the Pool Members' Motion for Remand. At no time did the Pool Members contend that any of the statements contained in the Complaint upon which AIG, Inc. and Trenwick relied to support their request for a stay were inaccurate. After this lengthy process was completed, and in an effort to shore up their deficient arguments, the Pool Members served an Amended Complaint under Fed.R.Civ.P. 15(a) on December 30, 2005.[1]

The Pool Members have not advised the Court why any of the amendments allegedly make a difference as respects the pending motions; indeed, they appear to concede that the amendments do not make any such difference. Based upon AIG, Inc.'s review of the Amended Complaint and the generic statements concerning the amendments contained in Plaintiffs' Renewed Motion for Remand, it appears that the Pool Members have "clarified" certain of their allegations with respect to actions allegedly undertaken by AIG, Inc. in its own right and/or on its own behalf; included references to litigation brought by the Attorney General of the State of New York concerning entirely unrelated matters that have absolutely no connection to this case[2];

---

[1] AIG, Inc. does not concede that it was procedurally correct for the Pool Members to have served such an amended pleading after having moved to remand this matter to the Superior Court. At best, it is certainly odd that the Pool Members filed an amended pleading when they simultaneously contend that this Court does not have subject matter jurisdiction over this action. However, for the purpose of the pending motions, none of the amendments matter.

[2] The Pool Members make these allegations solely upon "information and belief" (Amended Complaint ¶ 51) and with absolutely no supporting facts. The Pool Members merely cite to a complaint filed by the New York Attorney General against AIG, Inc. The complaint is a set of unproven allegations and, in any event, cannot possibly be construed to relate to the Commutation with Trenwick. These allegations were included in the Amended Complaint to sling mud and in an effort to circumvent the obvious point that any involvement by AIG, Inc. in the Commutation that is the subject of this dispute was on behalf of its member and associated companies. The Pool Members do not (and cannot) claim that the Commutation with Trenwick was a subject of the complaint filed by the New York Attorney General.

983687                                    2

and asserted a new cause of action against AIG, Inc. and Trenwick for "conversion." [*See e.g.,* Amended Complaint ¶¶ 51, 95, 144-154].[3]

Simply put, the new or modified allegations contained in the Amended Complaint do nothing to refute AIG, Inc.'s and Trenwick's prior showings as to why they are entitled to the relief they have requested. This Court has removal jurisdiction pursuant to 9 U.S.C. §205. Despite the Pool Members' attempt at artful pleading in the Amended Complaint, it is readily apparent that the Pool Members' purported claims in this case relate to AIG, Inc.'s actions on behalf of its member and associated companies. There is no meaningful distinction between the parties and issues involved in this case and in the parallel and ongoing arbitration. The Pool Members' claims clearly have "reference to" the "interpretation, operation or effect" of the relevant Quota Share Agreements (collectively, the "QSA"). The heart of the Pool Members' claims in both proceedings is that AIG, Inc. has sought to recover wrongfully inflated reinsurance claims under the QSA pursuant to the assignment of rights from Trenwick in the Commutation.[4] The Pool Members' assertions of alleged tort and other claims here does not permit them to avoid the binding agreement to arbitrate contained in the QSA.

Insofar as the Pool Members' Renewed Motion for Remand does not advance any new arguments, but instead incorporates the Pool Members' prior briefs on these issues, AIG, Inc. similarly adopts and incorporates by reference AIG, Inc.'s and Trenwick's Notice of Removal to

---

[3] AIG, Inc. adopts the argument with respect to the count for "conversion" set forth in "Defendant Trenwick's Memorandum In Support of its Renewed Motion to Stay Proceedings Pending Arbitration and Opposition to Plaintiffs' Renewed Motion for Remand" filed on January 19, 2006. While it is difficult to discern from the Amended Complaint what "property" of the Pool Members they claim was allegedly "converted" by AIG, Inc., it is clear that any such claim necessarily relates to the Quota Share Agreements and is subject to mandatory arbitration.

[4] As the Pool Members allege: "In the event negotiations for the novation failed, Trenwick agreed to participate with AIG, Inc. acting on behalf of the AIG Subsidiaries in a commutation to cram down a settlement on the plaintiffs by (a) issuing a promissory note to AIG, Inc. and (b) presenting the AIG Subsidiaries' wrongfully inflated coverage claim to the plaintiff members of the LDG Facilities as a paid loss under the QSA." [Amended Complaint ¶ 71].

the United States District Court, filed September 9, 2005; AIG, Inc.'s Motion to Stay Proceedings Pending Arbitration, filed September 9, 2005; AIG, Inc.'s Memorandum in Support of Motion to Stay Proceedings Pending Arbitration, filed September 9, 2005; the Affidavit of Eric S. Kobrick in Support of AIG, Inc.'s Motion to Stay Proceedings Pending Arbitration, filed September 9, 2005; and AIG, Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Remand and Reply in Support of AIG, Inc.'s Motion to Stay Proceedings Pending Arbitration, filed November 14, 2005.

There is no basis for the Pool Members to challenge the validity of the removal effected by AIG, Inc. and Trenwick. To allow the Pool Members to proceed with the litigation would defeat the federal policy favoring arbitration, raise the prospect of inconsistent findings of fact or rulings of law by this Court and the arbitration panel, and ignore the fact that the Pool Members have brought claims in the arbitration and here that are inextricably linked with the QSA. The Court must reject the Pool Members' assertions that the claims in this case are outside the scope of the agreement to arbitrate and exercise its statutory obligation under Section 3 of the FAA to stay this action. None of the "amendments" made by the Pool Members in their December 30, 2005 pleading affect the Court's analysis or change the result.

<div style="margin-left:40%">

**AMERICAN INTERNATIONAL GROUP, INC. on behalf of its member and associated companies,**

_John T. Harding_

John T. Harding BBO #221270
Michael F. Aylward BBO #024850
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

</div>

Of Counsel:

William A. Maher
**WOLLMUTH MAHER &**
**DEUTSCH LLP**
500 Fifth Avenue
New York, New York 10110
(212) 382-3300
Dated: January 19, 2006                    (212) 382-0050 (facsimile)

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1, AIG, Inc. hereby requests a hearing with respect to this motion on the grounds that argument will be of assistance to the Court in light of the complexity of issues that are presented.

## CERTIFICATE OF SERVICE

I, John T. Harding, counsel for Defendant American International Group, Inc. hereby certify that on January 19, 2006, I served a copy of the foregoing document by e-mail on all counsel of record.

John T. Harding

983687                                            5