UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| AMERICAN REINSURANCE COMPANY, et al., | ) ) ) | |
| Plaintiffs, | ) | CIVIL ACTION NO: 05-11840-MLW |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION, | ) ) ) ) | |
| Defendants. | ) | |

## NOTICE OF FILING OF DEFENDANT TRENWICK AMERICA REINSURANCE CORPORATION'S REDACTED PLEADINGS

Pursuant to the Court's request, Defendant Trenwick America Reinsurance Corporation

("Trenwick") hereby submits as Exhibits 1 through 6 attached hereto, redacted copies of the

following papers which were previously filed under seal:

Exh. 1.    Defendant Trenwick's Motion to Stay Proceedings Pending Arbitration.  [Dkt. No. 9.]

Exh. 2.    Memorandum of Defendant Trenwick in Support of its Motion to Stay Proceedings Pending Arbitration.  [Dkt. No.8.]

Exh. 3.    Memorandum of Defendant Trenwick in Opposition to Plaintiffs' Motion to Remand and Reply in Further Support of Trenwick's Motion to Stay Proceedings Pending Arbitration.  [Dkt. No. 28.]

Exh. 4.    Defendant Trenwick's Renewed Motion to Stay Proceedings Pending Arbitration and in Opposition to Plaintiffs' Renewed Motion for Remand.  [Dkt. No. 39.]

Exh. 5.    Memorandum of Defendant Trenwick in Support of its Renewed Motion to Stay Proceedings Pending Arbitration and in Opposition to Plaintiffs' Renewed Motion for Remand.  [Dkt. No. 40.]

Exh. 6.    Reply Memorandum of Defendant Trenwick in Further Support of its Renewed Motion to Stay Proceedings Pending Arbitration.  [Dkt. No. 44.]

Plaintiffs and Defendant American International Group have assented to the form and substance of the enclosed redacted pleadings.

Respectfully submitted,

**TRENWICK AMERICA REINSURANCE CORPORATION**

By its attorneys,

 /s/Eben A. Krim
Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

Of Counsel:

Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
(212) 969-3000

Dated: August 24, 2006

## CERTIFICATE OF SERVICE

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation, hereby certify that on August 24, 2006, I caused a copy of the foregoing document to be served by overnight delivery on all known counsel of record.

 /s/Eben A. Krim
Eben A. Krim

- 2 -

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al.,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION,<br>　　　　Defendants. | CIVIL ACTION NO: 05-11840-MLW |

## DEFENDANT TRENWICK AMERICA REINSURANCE CORPORATION'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION

Defendant Trenwick America Reinsurance Corporation ("Trenwick"), for reasons set forth in the accompanying memorandum of law, respectfully moves this Court, pursuant to the provisions of Section 3 of the Federal Arbitration Act, 9 U.S.C. §3 (the "FAA"), for an Order: (i) determining that the only proper forum for the plaintiffs to assert their claims against Trenwick is arbitration, and (ii) staying this action pending the outcome of any arbitration that may be commenced involving Trenwick and the plaintiffs.

## REQUEST FOR HEARING

Pursuant to Local District Court Rule 7.1(D), Trenwick requests that the Court schedule a hearing with respect to the instant motion as oral argument will be of assistance to the Court in resolving this matter.

TRENWICK AMERICA
REINSURANCE CORPORATION

By its attorneys,

Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

Of Counsel:
Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
(212) 969-3000

Dated: September 15, 2005

## CERTIFICATE OF SERVICE

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation, hereby certify that on September 15, 2005, I caused a copy of the foregoing document to be served by overnight delivery on all known counsel of record.

Eben A. Krim

2

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN REINSURANCE COMPANY, et al., | ) ) ) | CIVIL ACTION NO: 05-11840-MLW |
| Plaintiffs, | ) ) | **THE ENCLOSED DOCUMENT IS BEING <u>FILED UNDER SEAL</u>** |
| v. | ) ) | **WITH THE COURT IN ACCORDANCE WITH THE** |
| AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION, | ) ) ) ) | **ASSENTED TO MOTION TO FILE UNDER SEAL FILED ON SEPTEMBER 15, 2005** |
| Defendants. | ) ) | |

**MEMORANDUM OF DEFENDANT TRENWICK AMERICA REINSURANCE CORPORATION IN SUPPORT OF ITS <u>MOTION TO STAY PROCEEDINGS PENDING ARBITRATION</u>**

Defendant Trenwick America Reinsurance Corporation ("Trenwick") respectfully submits this memorandum in support of its motion for an Order: (i) determining that the only proper forum for the plaintiffs to assert their claims against Trenwick is arbitration, and (ii) staying this action pending the outcome of any arbitration that may be commenced involving Trenwick and the plaintiffs.

<u>Preliminary Statement</u>

All of the plaintiffs are participants in certain reinsurance pools (and will hereinafter be referred to as the "Pool Members"). Co-defendant American International Group ("AIG") and the Pool Members currently are arbitrating matters arising from the contracts that define their rights and obligations. AIG already has explained why this proceeding should be stayed pending the outcome of those arbitrations because the claims asserted in the Complaint fall within the scope of the broad arbitration clauses of the relevant agreements. We will not repeat those arguments here and instead join in that portion of Defendant AIG's Memorandum in Support of

Motion to Stay Proceedings Pending Arbitration, dated September 9, 2005 ("AIG's Memorandum.).[1]

Trenwick writes separately to address two issues: (i) Trenwick's own right (separate from whatever right AIG has) to a stay of this litigation; and (ii) the arbitrability of Count VI of the Pool Members' Complaint, which is the one Count pleaded against Trenwick only, and seeks a declaratory judgment that the Pool Members are not required to indemnify Trenwick for a $4 million payment it made to AIG pursuant to the Pool Commutation.

First, the Pool Members have made allegations against AIG in the pending arbitrations that duplicate those they have made in this litigation. While the Pool Members have not made any claims against Trenwick in the arbitrations, and Trenwick is not currently a party to those arbitrations, the only proper forum for the Pool Members to make their claims against Trenwick is arbitration.

Second, there is no dispute that the Pool Members agreed to arbitrate "any dispute or difference . . . arising with reference to the interpretation, application or effect" of the Retrocessional Agreements. AIG already has demonstrated that the arbitration clause is a broad one and that the claims asserted in this litigation necessarily fall within its scope. The Pool Members' claims against Trenwick in this Court are subject to arbitration for all the same reasons that their claims against AIG are subject to arbitration.

Third and finally, the Pool Members' claim in Count VI – for a declaratory judgment against Trenwick that they do not need to indemnify Trenwick for the $4 million it paid to AIG under the Pool Commutation – likewise should be stayed pending the arbitrations. This is so for the same reasons that all of the other claims should be stayed. That count depends on all the

---

[1] Except where otherwise indicated capitalized terms have the same meaning as used in AIG's Memorandum.

other allegations of the Complaint and as such also arises "with reference to the interpretation,

application or effect" of the Retrocessional Agreements.

## FACTUAL AND PROCEDURAL BACKGROUND

Trenwick will not repeat the factual and procedural background as set forth in AIG's

Memorandum in Support of Motion to Stay Proceedings Pending Arbitration.

## ARGUMENT

**A.    TRENWICK IS INDEPENDENTLY ENTITLED TO A STAY OF THIS LITIGATION PENDING THE OUTCOME OF THE ARBITRATIONS**

AIG and the Pool Members currently are arbitrating the same issues that the Pool

Members seek to raise in their Complaint. Trenwick is not a party to those arbitrations.

Nevertheless, because the claims that the Pool Members assert against Trenwick in this litigation

fall within the broad arbitration clauses of the Retrocessional Agreements, including the Quota

Share Agreements, the only proper forum for the resolution of these claims is arbitration.

Accordingly, pursuant to Section 3 of the Federal Arbitration Act ("FAA"), the litigation against

Trenwick should be stayed.

AIG commenced the currently-pending arbitrations against the Pool Members as the

assignee of Trenwick to collect from each Pool Member its *pro rata* share of the Pool

Commutation settlement amount. The Pool Members have not contested that the central issues

in dispute, including their liability for their respective shares under the Pool Commutation, are

subject to arbitration.

**REDACTED**

3

**REDACTED**

Trenwick's right to arbitrate disputes with the Pool Members is equal to if not stronger than AIG's right. If there were any validity to the Pool Members' argument that AIG did not acquire the right to arbitration as a result of the assignment from Trenwick, it would have no effect whatsoever on the arbitrability of the disputes between Trenwick and the Pool Members.

**REDACTED**

But even if this is correct, it has no impact on the enforceability against the Pool Members of the arbitration clauses in the Quota Share Agreements because the Pool Members have affirmed the validity of those clauses and have sought the benefit of those clauses for themselves. Thus, the Pool Members now are estopped to deny their obligations to arbitrate their disputes with Trenwick. *See, e.g., Intergen N.V. v. Grina*, 344 F.3d 134, 146 (1st Cir. 2003) (stating that estoppel applies to "'cases involve[ing] non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'"); *Fluehmann v. Assocs. Fin. Servs.*, No. 01-40076-NMG, 2002 U.S. Dist. LEXIS 5755, at *18 (D. Mass. Mar. 29, 2002) (finding plaintiff, non-signatory, estopped from avoiding arbitration because plaintiff "cannot have it both ways, i.e., elect to secure only the benefits of the agreement at issue without likewise assuming their burdens").

The Pool Members have not argued that the Quota Share Agreements do not require them to arbitrate. To the contrary, the Pool Members never objected to AIG's demand for arbitration but rather have participated fully in the arbitration, including by appointing an arbitrator,

submitting a Position Statement, and proceeding with discovery.  *See* AIG Memorandum at 4-5, 10-11.

**REDACTED**

If the Pool Members seek to arbitrate their claims now stated in the Complaint against Trenwick, Trenwick too is prepared to arbitrate them.  And as we have just shown, the Pool Members cannot deny the applicability of the arbitration clauses.

Each of the claims raised in this litigation falls within the scope of the broad arbitration clause contained in the Retrocessional Agreements, including the Quota Share Agreements. Kobrick Aff., Exs. 3-5 (Retrocessional Agreements).  At bottom, the unfair practices, fraud, conspiracy and tort claims alleged in the Complaint center on allegations of breaches by Trenwick and AIG of duties to the Pool Members; duties that, if they exist, arise out of the

5

"interpretation, application or effect" of the reinsurance arrangements formed by the Retrocessional Agreements.

A comparison between the allegations of the Pool Members' Arbitration Statement and their Complaint illustrates that the proceedings address the same claims, the only difference is the legal label that the Pool Members choose to attach to those claims.  For example:

**REDACTED**

- Complaint:  The first paragraph summarizes the nature of the litigation as the claim that Trenwick and AIG "wrongfully manipulated" the reinsurance "arrangement to create almost $73 million in improper demands" against the Pool Members.  Cmplt. ¶ 1.

\*   \*   \*

**REDACTED**

- Complaint:  The Complaint alleges the same breach by Trenwick and AIG of the obligation of utmost good faith toward the Pool Members (Cmplt ¶¶ 38, 44-49), but in an attempt to avoid arbitration of that claim, the Pool Members characterize the breach as done pursuant to a "pattern of fraudulent, unfair and deceptive practices".  *Id.* at ¶49.

\*   \*   \*

6

**REDACTED**

- <u>Complaint</u>: The Complaint contains claims that AIG and Trenwick engaged in fraud and conspiracy, including allegations that "the Commutation was intended to give a lawful patina to AIG and Trenwick's unlawful scheme to present fraudulent claims for payment under the various reinsurance contracts." Cmplt. ¶ 107-116, 76.

These examples provide a sampling of the undeniable overlap between the claims raised in the two proceedings. Indeed, the factual recitations in the Complaint and in the Pool Members' Arbitration Statement are, all in all, merely two different tellings of the same story. If the Pool Members wish to tell that story in connection with claims against Trenwick, the only proper forum for them to do so is arbitration.

**B.    THE DECLARATORY JUDGMENT COUNT PLEADED AGAINST TRENWICK SHOULD BE STAYED**

Count VI of the Complaint seeks a declaration that the Pool Members are not required to indemnify Trenwick for the $4 million payment it made to AIG under the terms of the Pool Commutation. Because Count VI is pleaded only against Trenwick, we write to make clear that it is subject to arbitration for the same reasons as the other counts pleaded in the Complaint.

On its face, Count VI concerns a "dispute or difference . . . arising with reference to the interpretation, application or effect" of the Retrocessional Agreements. The Pool Members

7

expressly state that "[t]here is an actual controversy about whether plaintiffs are required to indemnify Trenwick for the $4 million Trenwick paid to AIG under the [Pool] Commutation." Cmplt. ¶ 132. In support of their position, the Pool Members in Count VI incorporate all of the prior allegations of the Complaint. Thus, the allegations that Trenwick breached its contractual duties to the Pool Members (*see e.g.*, Cmplt. ¶ 126), as well as all the other allegations raising issues of the "interpretation, application or effect" of the Retrocessional Agreements, form part of the Pool Members' basis for Count VI. Therefore, just like all of the other counts of the Complaint, Count VI depends upon the interpretation of rights and obligations under the Retrocessional Agreements, which are subject to arbitration for the reasons stated above and in AIG's Memorandum. If the Pool Members wish to assert the claim contained in Count VI, the only proper forum to do so is arbitration.

## CONCLUSION

For the foregoing reasons and those set forth in AIG's Memorandum, Trenwick respectfully requests, pursuant to Section 3 of the FAA, that this Court enter an Order: (i) determining that the only proper forum for the Pool Members to assert their claims against Trenwick is arbitration, and (ii) staying this action pending the outcome of any arbitration that may be commenced involving Trenwick and the Pool Members.

**TRENWICK AMERICA
REINSURANCE CORPORATION**

By its attorneys,

_Eben Krim_

Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

Of Counsel:

Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
(212) 969-3000

Dated: September 15, 2005

## CERTIFICATE OF SERVICE

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation,

hereby certify that on September 15, 2005, I caused a copy of the foregoing document to be

served by overnight delivery on all known counsel of record.

_Eben Krim_

Eben A. Krim

9

**APPENDIX**

LEXSEE 2002 U.S. DIST. LEXIS 5755

**Catherine Fluehmann, Plaintiff v. Associates Financial Services, Defendant.**

Civil Action No. 01-40076-NMG

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

*2002 U.S. Dist. LEXIS 5755*

March 29, 2002, Decided

**DISPOSITION:** [*1] Defendant's motion with respect to request to stay action pending arbitration ALLOWED. Defendant's request to strike class claims DENIED without prejudice.

**LexisNexis(R) Headnotes**

**COUNSEL:** For CATHERINE FLUEHMANN, Plaintiff: Christopher M. Lefebvre, Claude Lefebvre & Christopher, M. Lefevbre Law Offices, Pawtucket, RI USA.

For CATHERINE FLUEHMANN, Plaintiff: Daniel A. Edelman, Edelman, Combs & Latturner*, Chicago, IL.

For CATHERINE FLUEHMANN, Plaintiff: Danita V. Ivory, Edelman, Combs & Latturner, LLC, Chicago, IL.

For ASSOCIATES FINANCIAL SERVICES CO. OF AMERICA, INC., Defendant: Timothy M. Mitchelson, Jon M. Anderson.

For ASSOCIATES FINANCIAL SERVICES CO. OF AMERICA, INC., Defendant: Patricia A. Sullivan, Edwards & Angell, LLP, Boston, MA.

**JUDGES:** Nathaniel M. Gorton, United States District Judge.

**OPINIONBY:** Nathaniel M. Gorton

**OPINION:**

**MEMORANDUM & ORDER**

The plaintiff, Catherine Fluehmann ("Fluehmann"), filed a putative class action lawsuit against Associates Financial Services Company, Inc. ("Associates"), claiming that the lender failed to comply with its disclosure obligations under the Truth in Lending Act ("TILA"), *15 U.S.C. 1601* et seq., as amended by [*2] the Home Owners Equity Protection Act ("HOEPA"). Fluehmann

alleges that the defendant made inaccurate disclosures with respect to the annual percentage rate ("APR") applicable to a mortgage secured by her spouse, Mathias Fluehmann, from Associates. Plaintiff alleges, inter alia, an individual claim for rescission to clear Associates' lien from her property and class action claims for declaratory relief and damages.

This action is here under federal question jurisdiction. Plaintiff alleges that the defendant violated TILA, HOEPA and Regulation Z. Fluehmann also alleges claims under the Massachusetts analogue of TILA, the Massachusetts Consumer Credit Cost Disclosure Act ("CCDA"), M.G.L. c. 140D. The plaintiff contends she has standing to challenge the legality of Associates' disclosure practices on the ground that she executed a mortgage deed in favor of Associates, a consumer loan creditor pursuant to TILA.

Venue is properly established in the District of Massachusetts pursuant to *28 U.S.C. § 1391*(b). The plaintiff is a resident of Worcester, Massachusetts while the defendant has a principal place of business in New Hampshire although it conducts business [*3] in the Commonwealth.

Although several consolidated motions are currently pending, this Court, in the interest of judicial economy, will address only the defendant's motion to stay this action pending arbitration and to strike class claims pursuant to the overall loan transaction and any agreements therein. n1 Associates contends that a stay is warranted because the dispute at issue falls within the purview of the Federal Arbitration Act (FAA), *9 U.S.C. § 2*.

n1 In addition to the motion dealt with here, the plaintiff has filed 1) a motion for class certification, 2) a cross-motion for summary judgment, 3) a motion for partial summary judgment, and 4) a motion for leave to file an Amended Complaint. The defendant, for its part, has filed a motion to dismiss and a motion to strike.

The plaintiff, in response, has filed a motion to enjoin arbitration on the grounds that 1) she did not enter into an Arbitration Agreement with the defendant, 2) in any event, she rescinded the Loan Agreement and [*4] the related Arbitration Agreement pursuant to her TILA rescission demand, 3) Associates waived its right to arbitrate because its demand was not timely and 4) the cost of arbitration is excessive.

## I. Background

### A. The Mortgage

The plaintiff and her husband own and reside at the premises in Worcester, Massachusetts for which the plaintiff's husband obtained a 17.46% consumer mortgage loan ("the loan") on June 28, 2000 from Associates in the principal amount of $14,161. Plaintiff also executed the mortgage deed in order to subject her interest in the home to the mortgage. Only the husband, Mathias Fluehmann, however, signed the promissory note ("Loan Agreement") and the Arbitration Agreement.

The mortgage loan obtained by Mr. Fluehmann was a new lending product called a Track Reduction Adjustable Mortgage ("TRAM"), a sub-prime mortgage program offering lower rates to mortgagors once they establish a history of on-time payments. At the urging of the Department of Treasury, lenders developed different variants of TRAMs for consumers with poor credit ratings so they could rehabilitate those ratings without incurring the cost of refinancing. Although TRAMs are designed [*5] to buoy the financial standing of the less credit worthy, they are, as is the case with many loan instruments, rife with complexities that may make them incomprehensible to the average consumer.

### B. The Rate Reduction Rider

Under the structure of the Associates TRAM at issue, Mr. Fluehmann executed a Rate Reduction Rider ("the Rider") at the closing which provided that he could earn a reduction in the interest rate of 0.5% at any time during the life of the loan by making 12 consecutive payments not more than 30 days late. Mr. Fluehmann could achieve a second reduction of 0.75% by maintaining another consistent payment period and a third reduction of 1.0% by continuing that same payment pattern. In sum, Mr. Fluehmann could earn a maximum reduction of 2.25% over the life of the loan by complying with a pattern of timely payments. Such reductions were limited, however, by the minimum rate requirement of the highest "prime rate" plus 1.0% on the effective date of the reduction.

The defendant did not explain in its loan disclosure statement or at the closing the potential loan adjustments under this elaborate rate reduction scheme. Indeed, the

defendant failed altogether to reference [*6] the potential rate reduction in the TILA disclosure statement or in the advance HOEPA disclosures it submitted to the Fluehmanns.

### C. The Rescission Demand

Prior to initiating this litigation, Fluehmann made a rescission demand to Associates pursuant to TILA and Regulation Z, which allow consumers to void credit contracts where the lender fails to make the requisite disclosures for its non-purchase money security interest in the consumer's residence. *15 U.S.C. § 1635*(b). The status of that rescission demand has not yet been decided by this Court. On October 5, 2001, Mr. Fluehmann, however, paid off the subject loan in full and Associates discharged its mortgage on the Fluehmann residence.

### D. The Interconnected Mortgage, Loan Agreement and Arbitration Agreement

The Mortgage Deed signed by the Fluehmanns specifically references the "Loan Agreement" on four separate occasions. The Loan Agreement, which only Mr. Fluehmann signed, expressly states, in a section titled "ARBITRATION" that "the parties have on this date entered into *a separate Arbitration Agreement, the terms of which are incorporated herein* and made part hereof by reference." (emphasis [*7] added).

That Arbitration Agreement, again only signed by Mr. Fluehmann, expressly provides for arbitration *whenever* there is a dispute relating to the Loan Agreement. Indeed, it clearly states that either party has an "absolute right" to demand that any dispute be submitted to arbitration and further provides in, relevant part:

> Either you and or we can start arbitration any time a dispute arises between you and us. If either party brings a lawsuit, counterclaim, or other action in a court against the other party, *the other party can, within a reasonable time after service of the lawsuit,* counterclaim or other action (but in no event after judgment is entered), *demand arbitration of the entire dispute.* If arbitration is demanded, you and we agree that the entire dispute must be arbitrated in accordance with this agreement and any lawsuit, counterclaim, or other action must be discontinued. (emphasis added)

Perhaps to reiterate the point, the Arbitration Agreement stipulates that all claims "arising out of, in connection with or relating to" 1) the subject loan, 2) negotiations between the parties, 3) an allegation of misrepresentation and 4) federal statutory [*8] rights, among other things, are subject to arbitration. The

Arbitration Agreement expressly notifies Mr. Fluehmann that disputes as to whether the claim is arbitrable or the Arbitration Agreement is valid in the first instance also must be arbitrated. Moreover, it provides that its terms remain in effect even if Mr. Fluehmann repays his loan.

Finally, the Arbitration Agreement even anticipates the filing of class actions. In that event, the Agreement provides that its provisions are binding and that "there shall be no class action arbitration pursuant to this agreement."

### E. The Arbitration Demand

Three months after the commencement of the instant suit, Associates initiated arbitration with the American Arbitration Association and filed a motion in this Court to stay this action pending arbitration. Fluehmann contends that she is not obliged to participate in such arbitration and has moved this Court to enjoin it.

## II. Discussion

### A. The Purpose and Procedures of TILA

#### 1. Meaningful Disclosure

TILA imposes disclosure obligations upon creditors to assure the "informed use of credit" by consumers. *15 U.S.C. § 1601; Anderson Bros. Ford v Valencia, 452 U.S. 205, 219, 68 L. Ed. 2d 783, 101 S. Ct. 2266 (1981).* [*9] n2 Under TILA, Congress sought to promote "a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." *15 U.S.C. § 1601.* By its plain language, TILA does not provide a clear empirical process to determine what constitutes "meaningful disclosure," but as the Supreme Court has observed, the statute requires a delicate balancing between thoroughness and brevity: "Meaningful disclosure does not mean more disclosure. Rather, it describes a balance between competing considerations of complete disclosure ... and the need to avoid ... [informational overload]." *Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 568, 63 L. Ed. 2d 22, 100 S. Ct. 790 (1980)*(quoting S.Rep.No.96–73, p. 3 (1979))(internal quotation marks omitted).

n2 The CCDA (the state statute) closely parallels TILA and therefore this Court's analysis of TILA is intended to relate to the CCDA as well. *Mills v. Andover Bank, 1998 Mass. Super. LEXIS 666, 1999 WL 1336606, *2 n. 4 (Mass. 1999).*

[*10]

#### 2. Class Actions

Pursuant to TILA, an aggrieved party may recover actual as well as statutory damages. With respect to class actions, the statute explicitly limits the maximum potential recovery to the lesser of $500,000 or 1.0% percent of the net worth of the creditor. *15 U.S.C. § 1640(a)(2)(B).* Although class actions are clearly within the contemplation of the statute, the law does not expressly confer upon borrowers a right to commence them or suggest a congressional intent to exempt putative class action claims from binding arbitration clauses. *Johnson v. West Suburban Bank, 225 F.3d 366, 377–78 (3d Cir. 2000).* Even though TILA plaintiffs act as "private attorneys general" there is no inherent conflict between TILA and arbitration. The rationale is that

> the Arbitration Act, standing alone... mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights [*11] at issue... If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent will be deducible from [the statute's] text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes.

*Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 226–27, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987).*

Although the First Circuit Court of Appeals has not squarely addressed the interrelationship between TILA and class actions, this Court, consistent with other federal courts considering the issue at hand, finds that the substantive rights and judicial remedies established under TILA do not create a non-waivable "right" to judicial redress. See, e.g., *Johnson, 225 F.3d at 378 n. 5; Bowen v. First Family Financial Services, Inc., 233 F.3d 1331, 1338 (11th Cir. 2000); Wood v. Cooper Chevrolet, Inc., 102 F. Supp. 2d 1345, 1350 (N.D.Ala. 2000); Thompson v. Illinois Title Loans, Inc., 2000 U.S. Dist. LEXIS 232, 2000 WL 45493, *3–4 (N.D.Ill. 2000).* Although a borrower may contract to arbitrate a statutory claim, he does not, by implication, also [*12] waive his substantive rights under the statute. Rather, such a contract is merely an agreement by the parties about the forum in which to resolve their dispute as opposed to a consideration of the merits thereof. *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991).*

Because there is no inherent conflict between TILA

and arbitration, this Court will not, at this stage in the litigation, address that portion of the defendant's motion which seeks to strike the class claims.

### B. Interpreting HOEPA

HOEPA, an amendment to TILA, was a congressional response to the substantive abuses of creditors offering alternative, typically high-interest rate, home loans to residents in certain geographic areas. The statute was enacted to ensure that consumers most vulnerable to abuse would be afforded a safety net without impeding the flow of credit altogether. H.R.Rep. No. 103-652, at 159 (1994). HOEPA establishes a set of requirements, including a cost threshold, which, once met, prompts certain restrictions on creditors' practices with respect to high risk loans. *15 U.S.C.A. § 1602(aa)(1).*

To qualify as [*13] a mortgage loan within the definition of HOEPA, the loan must be a "consumer credit transaction" secured by the "consumer's principal dwelling." *15 U.S.C. §§ 1602(f), (h), and (v).* The loan also must meet either of two requirements: 1) that the Annual Percentage Rate ("APR") exceed certain levels or 2) that the total "points and fees" payable by the borrower at or before closing will exceed the greater of 8% of the total loan amount or $400. *15 U.S.C. §§ 1602(aa)(1)(A) and (B).* If HOEPA covers the subject mortgage, the creditor must make additional disclosures to the borrower at least three days prior to closing including, among other things, the APR in the case of a credit transaction with a fixed interest rate. *15 U.S.C. § 1639; 12 C.F.R. § 226.32(c).*

The parties do not dispute that the present cause of action falls within the parameters of TILA or HOEPA, but they vigorously contest whether the scope of those statutory rights should be decided by arbitration or litigation.

### C. The Scope of the Federal Arbitration Act

In determining whether the claims at issue are subject to arbitration, this [*14] Court must first consider whether the parties agreed to submit their claims to arbitration. The question of arbitrability and whether the parties agreed to arbitrate is a decision for the court "unless the parties clearly and unmistakably provide otherwise." *AT & T Technologies v. Communications Workers of America, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986).*

On balance, any point of ambiguity in the agreement should be resolved in favor of arbitration consistent with the "liberal federal policy favoring Arbitration Agreements." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983).* Notwithstanding such policy

prerogatives, "arbitration under the [FAA] is a matter of consent, not coercion... and a contract cannot bind a non-party." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989).*

#### 1. The Intersection of Contract Law and the FAA

Under the FAA, courts look to contract law principles to determine the validity of arbitration clauses. Although the FAA [*15] "directs courts to place arbitration agreements on equal footing with other contracts... it does not require parties to arbitrate when they have not agreed to do so." *Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 91, 148 L. Ed 373, 121 S. Ct. 513 (2000)* (citing *Volt Information Sciences v. Board of Trustees* 489 U.S. at 478); 9 U.S.C. § 2 (1994).

Mindful of that statutory and judicial background, the question before this Court is, at first blush, one of contract interpretation. This Court must determine whether the plaintiff's execution of the mortgage deed with the power of sale in favor of the defendant makes her an indispensable party to the loan transaction so that she is subject to the Arbitration Agreement which she never signed. Because the issue at hand implicates an arbitration provision involving interstate commerce, it must be resolved according to federal law. *McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir. 1994); 9 U.S.C. § 2.* This court may look to state common law as a model for developing federal common law unless policy prerogatives otherwise mandate a uniform federal rule. *Id. at 356.* [*16]

A party seeking to compel arbitration must therefore show, at the outset, that arbitration is consistent with the clear intent of the parties and the plain language of the contract. To that end, mutual assent as objectively manifested by the contract itself is a necessary condition for the creation of a binding arbitration agreement. *Chastain v. Robinson-Humphrey Co., 957 F.2d 851, 854 (11th Cir. 1992).* Accordingly, the party seeking a judicial rather than an arbitral forum must not only unambiguously allege that the parties never consummated an agreement to arbitrate but also must offer "some evidence" to substantiate such a denial. *Id. at 854* (citing *T & R Enters. v. Continental Grain Co., 613 F.2d 1272, 1278 (5th Cir.1980)).*

#### 2. The Scope of the Arbitration Agreement

Given that contract law principles are controlling, the language of the arbitration provision under consideration is the requisite starting point. To that end, courts have consistently drawn a distinction between narrow arbitration clauses specifically identifying the issues to which they apply and broader forms of arbitration clauses. *Elzinga & Volkers, Inc. v. LSSC Corp., 47 F.3d 879, 881 (7th Cir. 1995);* [*17] *Local Union No. 637, IBEW v. Davis H.*

*Elliot Co., 13 F.3d 129, 132–33 (4th Cir. 1993).*

In the instant case, the subject arbitration provision is ostensibly broad, covering any dispute that may "arise under" or "relate to" the Loan Agreement. When confronted with such broad language, courts presume the validity of an agreement to arbitrate, *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc., 174 F.3d 907, 910 (7th Cir. 1999),* and generally find that similarly broad arbitration clauses governing "all disputes" arising under the agreement apply even to a nonsignatory. *Thyssen, Inc. v. M/V Markos N, 1999 U.S. Dist. LEXIS 12578, 1999 WL 619634, *4 (S.D.N.Y. 1999).* The baseline assumption here, therefore, is that the Arbitration Agreement casts a wide net.

### 3. The Application of Arbitration Agreements to Non-Signatories

Fluehmann asserts that because she did not sign the Arbitration Agreement, she never assented to its terms and thus is not required to arbitrate her claims. Assent, however, often cannot be determined with mathematical precision but rather depends upon the context and character of the transaction under consideration. The issue "is not whether the [*18] parties, like the scrivener of old, followed some talismanic formula, but whether they manifested a mutual intent to arbitrate disputes arising out of the contracts..." *Tepper Realty Co. v. Mosaic Tile Co., 259 F. Supp. 688, 691 (S.D.N.Y. 1966).* A signature on a contract, while one manifestation of assent, is not the only one nor the end of the inquiry.

Indeed, it is well-established that a party may be bound by the terms of an unsigned arbitration agreement even absent a signature. Although the FAA requires a writing, it does not likewise require the parties' signatures. *Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987).* As the First Circuit Court of Appeals has recognized, under certain contract and agency principles "nonsignatories sometimes can be obligated by... agreements signed by others, and these principles can apply to arbitration provisions." *McCarthy, 22 F.3d at 356.* Thus, the fact that Fluehmann did not sign the Arbitration Agreement does not automatically preclude Associates from seeking arbitration based upon the loan transaction. *Id.*

Normally, disputes over arbitration arise between two corporate [*19] actors. Case law, consequently, has focused on the operation of arbitration clauses in the corporate setting but the principles enunciated in that line of cases is, nevertheless, relevant to the instant dispute. The Second Circuit Court of Appeals has identified five grounds for binding nonsignatories to the arbitration agreements of others: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and

5) estoppel." *Thomson–CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995).* To that end, courts focus their inquiry on the relationship among the parties and, alternatively, the relationship between the claims and the contract containing the arbitration clause.

The principal question is not whether an issue or claim is explicitly covered in the text of the agreement but rather whether it "arises under" that agreement. *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 F.3d 1110, 1113 (3d Cir. 1993).* A court's focus should be on the relationship established under the agreement and the duties and obligations set out therein. Initially, it considers whether the non-signatory seeking to avoid arbitration [*20] was an "integral participant in the events underlying the arbitrable disputes" and whether those disputes are so "inextricably intertwined" as to require arbitration. *Clarendon Nat. Ins. Co. v. Lan, 152 F. Supp. 2d 506, 519 n. 7 (S.D.N.Y. 2001); Hughes Masonry Co. v. Greater Clark County School Bldg. Corp., 659 F.2d 836 (7th Cir. 1981).*

### 4. The Relationship Between the Parties, the Claims and the Agreements

The defendant contends that because the Fluehmanns together, as tenants by the entirety, granted Associates a mortgage on their principal residence, they are both parties to the loan transaction of which the Arbitration Agreement is a constituent part. Here, it is manifest that Fluehmann's claim against Associates is based upon its allegedly inadequate disclosure in connection with the loan to Mr. Fluehmann and surely arose under the Loan Agreement (and thus, by incorporation, the Arbitration Agreement).

Although Fluehmann signed neither the Loan Agreement nor the Arbitration Agreement, she played no small part in securing her husband's mortgage from Associates. Indeed, Fluehmann's role as the co-signor of the mortgage deed in the loan transaction [*21] gave her standing in the first instance under TILA to rescind the entire transaction and sue for damages.

Applying traditional contract principles in the context of the FAA, courts, under an estoppel theory, have compelled arbitration when a non-signatory has exploited or benefitted from a contract that contained an arbitration clause. In that regard, Fluehmann cannot have it both ways, i.e. elect to secure only the benefits of the agreements at issue without likewise assuming their burdens. *Foster v. Sears, Roebuck & Co., 837 F. Supp. 1006, 1008 (W.D.Mo. 1993) (quoting A.L. Williams & Assoc. v. McMahon, 697 F. Supp. 488, 494 (N.D.Ga.1988)).* If the Loan Agreement and mortgage deed are sufficiently interdependent so as to give Fluehmann a cause of action un-

der TILA, Associates can likewise invoke the Arbitration Agreement against her. *Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1064 (2nd Cir. 1993); Keystone Shipping Co. v. New England Power Co., 1995 Mass. Super. LEXIS 444, 1995 WL 1146893, *2–3 (Mass. 1995); Foster, 837 F. Supp. at 1008; McAllister Bros. v. A & S Transportation Co., 621 F.2d 519, 524 (2nd Cir. 1980).* [*22]

Finally, in practice, the implication of Fluehmann's contention is untenable because it creates the potential for gaming the system. Suppose Associates attempted to take possession of the Fluehmanns' residence pursuant to the Loan Agreement after a hypothetical default. Fluehmann, ostensibly not bound by the Arbitration Agreement, could proceed to sue Associates to delay foreclosure. In that situation, it would be anomalous to suggest that Fluehmann is not subject to arbitration. Any other result would allow her to limit Associates' legal interest in her residence, thus materially altering the bargain struck in the Loan Agreement. Indeed, the purpose of requiring Fluehmann to sign the mortgage deed was to subject her interest in the family residence to Associates and, by implication, to bind her to the terms of her husband's mortgage. The inter-dependence between the transactions suggests that the mortgage deed Fluehmann signed was integrally linked to the Loan and Arbitration Agreements thus seriously undercutting her denial of coverage as a nonsignatory.

### D. The Effect of Rescission

Fluehmann next contends that she cannot be subject to the Arbitration Agreement because she [*23] rescinded the Loan Agreement. Pursuant to TILA, a consumer has the power to rescind a credit transaction by notifying the creditor before a certain date of his intent to rescind. *15 U.S.C. §§ 1635(a) and (b).* By placing consumers in a strong bargaining position, rescission under Section 1635 operates as an enforcement mechanism to police creditor practices. Rescission effectively voids the security interest at issue and annuls the contract, returning "the parties to the status quo ante." *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Intern., Ltd., 1 F.3d 639, 641 (7th Cir. 1993).*

The practical effect of rescission creates a conundrum: if the contract is, by statute, null and void, can the dispute, which serves as the basis for that rescission, "arise out" of the contract so as to void the Arbitration Agreement. Id. The Supreme Court, in considering the effect of rescission on an arbitration agreement, has held that although a federal court may proceed to adjudicate issues that implicate the formation of such an agreement, a claim of contract invalidity does not foreclose an arbitral forum. *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–04, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967).* [*24]

Indeed, particularly where the provisions of an arbitration agreement are broad, they are more likely to encompass the plaintiff's claims of rescission. Id. (observing that the parties' "contractual language is easily broad enough to encompass [the plaintiff's] claim that [the agreement is void].").

Although the plaintiff attempts to invalidate the Loan and Arbitration Agreements by virtue of rescission, her action is "nonetheless a result of the agreement[s] and has its origins in [them]." *Sweet Dreams, 1 F.3d at 642.* Mindful of the Supreme Court's instruction that a court must order arbitration unless "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute" *United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83, 4 L. Ed. 2d 1409, 80 S. Ct. 1347 (1960),* the plaintiff's putative rescission here does not render the Arbitration Agreement null and void.

### E. Waiver

Fluehmann offhandedly asserts that Associates has waived its right to seek arbitration because it waited three months before filing its motion to stay this [*25] action. Courts accord deference to the federal presumption in favor of arbitration notwithstanding "an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone, 460 U.S. at 24–25.* It is well-settled that "waiver is not to be lightly inferred, and mere delay in seeking [arbitration] without some resultant prejudice to a party cannot carry the day." *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc., 806 F.2d 291, 293 (1st Cir. 1986)* overruled on other grounds, *Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987),* (citing *Rush v. Oppenheimer & Co., 779 F.2d 885 (2d Cir. 1985))(quotation marks omitted).*

In determining whether there was prejudice, and consequently a waiver, several factors are relevant, including: 1) the length of Associates' delay in seeking the stay, 2) the extent to which it has participated in the lawsuit, 3) whether Associates has taken a position inconsistent with its arbitration right and 4) whether the "litigation machinery has been substantially invoked" and the consequent degree of preparation of the parties. *Jones Motor Co., Inc. v. Chauffeurs, Teamsters, and Helpers Local Union No. 633, 671 F.2d 38, 44 (1st Cir. 1982)* [*26] cert. denied, *459 U.S. 943, 74 L. Ed. 2d 200, 103 S. Ct. 257 (1982)* (quoting *Reid Burton Constr., Inc. v. Carpenters Dist. Council, 614 F.2d 698, 702 (10th Cir.1980)).*

The First Circuit Court of Appeals has enunciated other significant criteria in assessing whether a party has waived its arbitration right:

Other relevant factors are whether the defendants have invoked the jurisdiction of the court by filing a counterclaim without asking for a stay of the proceedings, ... whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration ...] had taken place, ... and whether the other party was affected, misled, or prejudiced by the delay...

Id. (citations omitted) (bracketed text in original).

Applying these standards to the present dispute, the facts fail to establish that Fluehmann was prejudiced so as to compel a finding that Associates waived its right to arbitration. In the first instance, the defendant's three-month delay in moving for a stay was not excessive and, at that point, the "litigation machinery" had just been set in motion. Although Associates answered [*27] the original complaint before moving for a stay, a party need not assert, as an affirmative defense, its arbitration right under *Fed.R.Civ.P. 8(c)*. *Lifetime Medical Nursing Services, Inc. v. Cambridge Automation Corp., 780 F. Supp. 882, 885 (D.R.I. 1991)*.

Moreover, Fluehmann, for her part, offers no evidence in support of her bare averment that Associates waived its right to arbitration. Indeed, she has made no credible allegation of prejudice as a result of Associates' delay. *Goldsmith v. Pinez, 84 F. Supp. 2d 228, 234 (D. Mass. 2000)*. Given the baseline presumption in favor of arbitration, Fluehmann has failed to sustain her burden of demonstrating waiver.

### F. Costs of Arbitration

Finally, the plaintiff seeks to invalidate the Arbitration Agreement on the ground that an arbitral forum would be prohibitively expensive. Although "large arbitration costs could preclude a litigant... from effectively vindicating her federal statutory rights", the Supreme Court has nonetheless recognized that the party seeking to avoid arbitration bears the burden "of showing the likelihood of incurring [prohibitively high] costs." *Green Tree, 531 U.S. at 92.* [*28]

In the instant case, the plaintiff has presented no evidence that she would be saddled with arbitration costs that she cannot afford. Moreover, the defendant asserts in its pleadings that it will pay the plaintiff's costs if she can demonstrate financial need. Thus, the plaintiff has not met her burden of proving that the costs of arbitration render the agreement unenforceable.

### III. Conclusion

Although Fluehmann neither signed the Loan Agreement nor the related Arbitration Agreement, the context and character of the instant dispute suggest that she is, nonetheless, bound by their terms. In seeking to enjoin arbitration, Fluehmann also fails to demonstrate conclusively that 1) her putative rescission bars the operation of the Arbitration Agreement, 2) the defendant waived its right to arbitration or 3) the costs of arbitration are prohibitively expensive. Accordingly, this Court will compel arbitration and stay this action but, pending resolution of the arbitration proceedings, this Court will reserve any action with respect to class claims, and the pending motion to strike such claims and all other pending motions will be denied, without prejudice.

### ORDER

For the [*29] foregoing reasons, the defendant's motion (Docket No. 14) is, with respect to its request to stay this action pending arbitration, **ALLOWED** and is, with respect to defendant's request to strike class claims, **DENIED**, without prejudice.

So ordered.

Nathaniel M. Gorton

United States District Judge

Dated: March 29, 2002.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION,<br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO: 05-11840-MLW<br><br>   **FILED UNDER SEAL** |

**MEMORANDUM OF DEFENDANT TRENWICK AMERICA
REINSURANCE CORPORATION IN OPPOSITION TO PLAINTIFFS'
MOTION TO REMAND AND REPLY IN FURTHER SUPPORT OF
TRENWICK'S MOTION TO STAY PROCEEDINGS PENDING ARBITRATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 4

ARGUMENT

     I.      ARBITRABILITY IS NOT A THRESHOLD ISSUE
            UNDER 9 U.S.C. § 205. THIS CASE WAS PROPERLY
            REMOVED BECAUSE IT "RELATES TO" AN ARBITRATION
            AGREEMENT FALLING UNDER THE CONVENTION. ................................ 4

     II.     TRENWICK DID NOT FORFEIT ITS RIGHT AND OBLIGATION
            TO ARBITRATE DISPUTES WITH THE POOL MEMBERS
            AS A RESULT OF TRENWICK'S ASSIGNMENT TO AIG
            OF LIMITED RIGHTS UNDER THE QUOTA SHARE AGREEMENTS. ......... 8

     III.    THE FACTUAL ALLEGATIONS UNDERLYING THE POOL
            MEMBERS' CLAIMS ARE COVERED BY THE BROAD
            ARBITRATION CLAUSES CONTAINED IN THE QUOTA SHARE
            AGREEMENTS. ................................................................................................ 11

     IV.    THE POOL MEMBERS' ATTEMPT TO CIRCUMVENT
            ARBITRATION OF COUNT VI SHOULD BE REJECTED. ............................ 14

CONCLUSION .............................................................................................................. 15

## TABLE OF AUTHORITIES

### CASES

*Acosta v. Master Maint. & Constr., Inc.*, 52 F. Supp. 2d 699 (M.D. La. 1999) ..............................6

*Advanced Testing Techs., Inc. v. Desmond (In re Computer Eng'g Assocs.)*, 337 F.3d 38 (1st Cir. 2003) ..............................................................................................................10

*Beiser v. Weyler*, 284 F.3d 665 (5th Cir. 2002) ............................................................................7

*Bowlby v. Carter Mfg. Corp.*, 138 F. Supp. 2d 182 (D. Mass. 2001) ..........................................13

*CAM S.A. v. ICC Tankers, Inc.*, No. 88 Civ. 9274 (KMW), 1989 U.S. Dist. LEXIS 5066 (S.D.N.Y. May 10, 1989)...........................................................................................................6

*Dale Metals Corp. v. Kiwa Chem. Indus. Co.*, 442 F. Supp. 78 (S.D.N.Y. 1977).........................6

*Font v. Paine Webber Inc.*, 649 F. Supp. 462 (D.P.R. 1986) ......................................................14

*Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840 (2d Cir. 1987) ..............................................12

*Hilti, Inc. v. Oldach*, 392 F.2d 368 (1st Cir. 1968) ....................................................................14

*Hosiery Mfrs. Corp. v. Goldston*, 143 N.E. 799 (N.Y. 1924)......................................................11

*In re Oil Spill by the "Amoco Cadiz,"*, 659 F.2d 789 (7th Cir. 1981) ..........................................13

*In re SPM Mfg. Corp.*, 984 F.2d 1305 (1st Cir. 1993).................................................................10

*InterGen N.V. v. Grina*, 344 F.3d 134 (1st Cir. 2003) ..............................................................5, 6

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) .......................11

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983) ................................14

*Mutual Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853 (D.N.J. 1992), *aff'd without opinion on other grounds*, 970 F. 2d 899 (3d Cir. 1992)...............................12, 13

*Puerto Rico Tel. Co. v. U.S. Phone Mfg. Corp.*, Nos. 04-2601 & 04-2602, 2005 U.S. App. LEXIS 22194 (1st Cir. Oct. 14, 2005) ........................................................................14

*RCM Techs., Inc. v. Brignik Tech., Inc.*, 137 F. Supp. 2d 550 (D.N.J. 2001).........................12, 13

*Sharon Steel Corp. v. Jewell Coal & Coke Co.*, 735 F.2d 775 (3d Cir. 1984) .............................11

*Thornton v. Kaye*, No. 96-4570, 1997 Mass. Super. LEXIS 251 (Mass. Supp. Ct. July 2, 1997) ....................................................................................................................................10

*York Hannover Holding A.G. v. Am. Arbitration Ass'n*, 794 F. Supp. 118 (S.D.N.Y. 1992) ...............................................................................................................6

## STATUTES

9 U.S.C. § 3...........................................................................................................1, 15

9 U.S.C. § 203 ............................................................................................................1

9 U.S.C. § 205...........................................................................................1, 2, 4, 5, 6, 7, 8

28 U.S.C. § 1447.........................................................................................................1

## TREATIES

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 21 Dec. 29, 1970, U.S.T. 2517 .........................................................................................5

Defendant Trenwick America Reinsurance Corporation ("Trenwick") respectfully submits this memorandum (i) in opposition to plaintiffs' motion, pursuant to 28 U.S.C. § 1447, to remand the claims in plaintiffs' complaint dated July 6, 2005 (the "Complaint") to the Superior Court of Massachusetts ("Motion to Remand"); and (ii) in further support of its motion, pursuant to the provisions of Section 3 of the Federal Arbitration Act, 9 U.S.C. § 3 (the "FAA"), to stay these proceedings pending both (a) the arbitrations that are currently proceeding between co-defendant American International Group ("AIG") and the plaintiffs (the "AIG Arbitrations") and (b) any additional arbitration plaintiffs may elect to commence against Trenwick ("Motion to Stay"). In an effort to streamline the briefing before the Court, Trenwick has consolidated in this single document both its opposition to plaintiffs' Motion to Remand and its reply in further support of its Motion to Stay. [Dkt. Nos. 9, 12.]

## PRELIMINARY STATEMENT

The plaintiffs (hereafter "Pool Members") base their Motion to Remand on the entirely erroneous assertion that "[w]here arbitrability of claims determines subject matter jurisdiction, as it does here, the question of whether the specific parties agreed to arbitrate a particular dispute is a threshold question that must be determined by the Court." *See* Pool Members' Remand Mem. at 10. The Court's jurisdiction over this action, however, is not decided by the arbitrability of the claims asserted in the Complaint. The basis of the Court's jurisdiction instead is 9 U.S.C. § 203, which gives the district courts original jurisdiction of "an action or proceeding falling under the Convention [on the Recognition and Enforcement of Foreign Arbitral Awards]." Removal of a state court action under 9 U.S.C. § 205 requires only that the "subject matter" of the action "relates to an arbitration agreement ... falling under the Convention," a low threshold, and one that is easily met here. An action plainly can "relate[ ] to . . . an arbitration agreement" whether or not the court ultimately finds the claims pleaded to be arbitrable. Accordingly, the Pool

Members' attempt to impose their own "arbitrability" requirement on 9 U.S.C. § 205 – a requirement that is not supported by either the language of the statute or the case law – should be rejected.

Based upon the erroneous assumption that arbitrability is a requirement for removal under 9 U.S.C. § 205, the Pool Members claim that Trenwick is not entitled to invoke the arbitration clause in the Quota Share Agreements[1] because Trenwick assigned to AIG all of its rights to recover from the Pool Members under those agreements. Even if this argument were right (and it is not), it is entirely irrelevant to the issue of this Court's jurisdiction. As explained more fully below and in Defendants' Notice of Removal, this Court is vested with jurisdiction because the subject matter of this action relates to an arbitration agreement that falls under the Convention. The Court should deny the motion to remand and proceed to consider AIG's and Trenwick's Motions to Stay.

The Pool Members' "arbitrability" argument, while unpersuasive in any context, is more properly directed to Trenwick's Motion to Stay. But even then, when looked at in that context, it is simply untrue that Trenwick assigned all of its rights under the Quota Share Agreements to AIG, including its right to arbitrate disputes with the Pool Members. Instead, Trenwick made a limited assignment of certain specific rights under the Quota Share Agreements – specifically, its right to recover the amounts due from the Pool Members for the AIG-related risks ceded to the Pool Members under the Quota Share Agreements. Thus, Trenwick did not assign away its right to arbitrate the claims made in this litigation. It would be absurd to think that Trenwick's limited assignment to AIG extinguished all of Trenwick's other rights and obligations under the Quota

---

[1] Except where otherwise indicated capitalized terms have the same meaning as used in Trenwick's Motion to Stay.

- 2 -

Share Agreements and caused Trenwick to forfeit all of its rights to arbitrate under those agreements.[2]

Trenwick's opening brief in support of its Motion to Stay demonstrated that each of the Pool Members' claims in this litigation, including Count VI (the declaratory judgment claim), falls within the broad arbitration clause contained in the Quota Share Agreements. All of the Pool Members' purported tort claims relate to actions taken by Trenwick and AIG in connection with the Pool Commutation, precisely the subject of the arbitration proceedings pending between the Pool Members and AIG. The AIG Arbitrations will determine whether the assignment of the reinsurance receivables by Trenwick to AIG pursuant to the Pool Commutation is valid and enforceable. As previously demonstrated, the overlap between the issues before the arbitrators and before this Court is significant. *See* Trenwick's Memorandum in Support of its Motion to Stay at 5-7. The Pool Members offer no support – because there is none – for their contention that the claims pleaded in this action are distinct from the claims and issues already being arbitrated. The Pool Members' claims in this case fall within the scope of the agreement to arbitrate because they arise out of and relate to the "interpretation, operation or effect" of the relevant agreements.

The Pool Members now conveniently assert that Count VI relates to some but not all of the Plaintiffs, and is not directed at obligations that arise under the Quota Share Agreements or any other written agreement and, therefore, is not subject to arbitration. Notwithstanding the Pool Members' insufficient pleading of Count VI — not even identifying on whose behalf the claims are pleaded! — at bottom the claim is that Trenwick's alleged breach of its duties under

---

[2] While it is clear to us that AIG also has the right to arbitrate its disputes against the Pool Members as the assignee of Trenwick, we leave that issue to AIG to brief and we note that Trenwick's right to arbitrate disputes with the Pool Members regarding its rights and duties under the Quota Share Agreements is independent of any right asserted by AIG. Trenwick is entitled to a stay whether or not AIG is.

the Quota Share Agreements entitles the unidentified plaintiffs to the relief sought in Count VI.
Thus, that claim too concerns a "dispute or difference . . . arising with reference to the
interpretation, application or effect" of the Quota Share Agreements, and is subject to arbitration.
The Pool Members' attempts to circumvent arbitration should be denied; Trenwick's Motion to
Stay should be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Trenwick will not repeat the factual and procedural background previously set forth in
AIG's Memorandum in Support of its Motion to Stay and in AIG's Memorandum in Opposition
to Plaintiffs' Motion to Remand and Reply in Support of its Motion to Stay, dated November 14,
2005 ("AIG's Consolidated Memorandum").

## ARGUMENT

### I.

### ARBITRABILITY IS NOT A THRESHOLD ISSUE UNDER 9 U.S.C. § 205. THIS CASE WAS PROPERLY REMOVED BECAUSE IT "RELATES TO" AN ARBITRATION AGREEMENT FALLING UNDER THE CONVENTION.

The Pool Members have grossly misstated the law in their Motion to Remand. Because
the foundation of their motion is flawed, upon inspection their argument crumbles.

The Pool Members contend that, in this case, the "arbitrability of claims determines
subject matter jurisdiction," and from that erroneous premise argue that "the question of whether
the specific parties agreed to arbitrate a particular dispute is a threshold question that must be
determined by the Court." Pool Members' Remand Mem. at 10. In fact, the Pool Members have
taken a threshold requirement on a motion to compel arbitration, *i.e.*, that the specific parties
agreed to arbitrate (which is inapplicable here), and erroneously transpose that requirement onto
the requirements for subject matter jurisdiction under 9 U.S.C. § 205.

The federal statute on which AIG and Trenwick base removal, 9 U.S.C. § 205, states:

- 4 -

> Where the subject matter of an action or proceeding pending in a
> State court *relates to an arbitration agreement* . . . falling under
> the Convention, the defendant or the defendants may, at any time
> before the trial thereof, remove such action or proceeding to the
> district court of the United States for the district and division
> embracing the place where the action or proceeding is pending . . .

9 U.S.C. § 205 (emphasis added).  As is evident from the plain language of 9 U.S.C. § 205, there

is no express requirement that the specific parties involved in the litigation agreed to arbitrate the

disputes at issue.  Instead, a defendant is entitled to remove an action to district court as long as

the case "relates to" an agreement to arbitrate falling under the scope of the Convention on the

Recognition and Enforcement of Foreign Arbitral Awards, Dec. 29, 1970, 21 U.S.T. 2517 (the

"Convention").

At page 10 of their memorandum, the Pool Members cite one case for their assertion that

9 U.S.C. § 205 requires an agreement to arbitrate between the specific parties: *InterGen N.V. v.

Grina*, 344 F.3d 134 (1st Cir. 2003) ("*InterGen*").  However, not only does *InterGen* not support

this supposed "requirement," but subject matter jurisdiction under 9 U.S.C. § 205 *is not even an

issue in the InterGen decision.*  The sole issue before the First Circuit in that case was whether

the district court properly denied a motion to compel arbitration, an issue not presented here.

In *InterGen*, the plaintiff brought suit against the defendants in Massachusetts state court.

*Id.* at 139.  Despite the fact that neither party was a signatory to the contract that contained the

arbitration clause at issue, the defendants removed to federal court based on 9 U.S.C. § 205 and,

a week later, moved to compel arbitration and stay litigation. *Id.* at 140-43.  The plaintiff moved

to remand to state court and opposed the defendants' motion to compel arbitration.  *Id.*

Subsequently, the district court denied plaintiff's motion to remand (*even though neither party

was a signatory to the arbitration contract*) and also denied the defendants' motion to compel

arbitration. *Id.*  At issue before the First Circuit was solely whether the motion to compel

- 5 -

arbitration was properly denied: "We uphold (albeit for different reasons) the district court's denial of [defendants'] motion to compel arbitration. That is the only matter before us, and we remit the case to the district court for further proceedings consistent with this opinion." *Id.* at 150. In short, *InterGen* is not relevant here as it deals only with a motion to compel arbitration.

Contrary to the Pool Members' arguments, there is no requirement that an arbitration agreement exist between the specific parties in the litigation for a federal court to find subject matter jurisdiction under 9 U.S.C. § 205. In fact, courts routinely have "assumed § 205 removal jurisdiction over state court actions involving parties not bound by arbitration agreements, where the state court claims involved the same subject matter as claims being asserted in pending arbitrations." *York Hannover Holding A.G. v. Am. Arbitration Ass'n*, 794 F. Supp. 118, 122 (S.D.N.Y. 1992) (*citing CAM S.A. v. ICC Tankers, Inc.*, No. 88 Civ. 9274 (KMW), 1989 U.S. Dist. LEXIS 5066, at *8 (S.D.N.Y. May 10, 1989) (finding jurisdiction under 9 U.S.C. § 205 "because although plaintiff and defendant did not agree to subject their disputes to arbitration ... they are currently engaged in consolidated arbitration over the same subject matter as the dispute here"); *Dale Metals Corp. v. Kiwa Chem. Indus. Co.*, 442 F. Supp. 78, 80, 81 n. 1 (S.D.N.Y. 1977) (denying a motion to remand despite the presence of a "party who was a stranger to the arbitration"). This liberal interpretation exists because Congress, in creating 9 U.S.C. § 205, "intended to provide the broadest removal statute in the federal code ... to insure that there would be a uniform federal common law regarding international arbitral obligations." *Acosta v. Master Maint. & Constr., Inc.*, 52 F. Supp. 2d 699, 703-04 (M.D. La. 1999).

"[T]he issue on removal is whether a party should be compelled to proceed in federal court, not whether an unwilling party should be forced to forego a legal remedy and proceed to arbitration." *CAM S.A.*, 1989 U.S. Dist. LEXIS 5066, at *8. Consequently, whether subject matter jurisdiction exists under 9 U.S.C. § 205 is an entirely different question from whether

- 6 -

arbitration should be compelled. The Pool Members' efforts to misstate the law and confuse the Court in this regard should be rejected. The broad standard set forth in 9 U.S.C. § 205 is one that the defendants easily met in their removal of this litigation.

When evaluating the propriety of removal pursuant to the provisions of the Convention, district courts have repeatedly held that the standard for removal is "low." The removing defendant need only show that the case "relates to" an arbitration agreement falling under the Convention. The phrase "relates to" is broadly construed. For example, the Fifth Circuit has held that:

> [T]he district court will have jurisdiction under § 205 over just about any suit in which a defendant contends that an arbitration clause falling under the Convention provides a defense. As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case. That is all that is required to meet the low bar of 'relates to.'

*Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002).

As stated in defendants' Notice of Removal, the subject matter of this action relates to certain reinsurance agreements, which contain arbitration clauses, that fall under the Convention. [Dkt. No. 1.] The Pool Members do not dispute that "one or more of the seventeen named plaintiffs . . . is a reinsurance company domiciled outside of the United States." Pool Members' Remand Mem. at 9 n.13. And the Pool Members acknowledge "that Trenwick and the plaintiffs performed their respective roles . . . substantially as embodied in the [Quota Share Agreements]." *Id.* at 5. The Quota Share Agreements undeniably contain arbitration clauses. And finally, the Pool Members admit that they have participated in arbitration proceedings relating to the Quota Share Agreements since January 2005. As such, the Pool Members cannot dispute that the Quota Share Agreements fall under the Convention.

The subject matter of this action undeniably "relates to" the Quota Share Agreements. The core issues asserted in the Complaint are whether the Pool Members have been presented with "almost $73 million in improper demands for coverage," and whether or not AIG and Trenwick have improperly "work[ed] in collusion" to "create" those demands. *See* Complaint ¶1. In particular, the unfair practices, fraud, conspiracy and tort claims alleged in the Complaint center on allegations of breaches by Trenwick and AIG of duties to the Pool Members; duties that, if they exist, arise out of the "interpretation, application or effect" of the reinsurance arrangements formed by the Quota Share Agreements. Thus, removal was proper. Moreover, because this case satisfies the statutory criteria for removal under § 205, it could have been accomplished by either Trenwick or AIG or both defendants. Accordingly, the Pool Members' defense to removal — that AIG does not have standing to remove — is irrelevant. The case was properly removed by Trenwick whether or not AIG has "standing."

## II

## TRENWICK DID NOT FORFEIT ITS RIGHT AND OBLIGATION TO ARBITRATE DISPUTES WITH THE POOL MEMBERS AS A RESULT OF TRENWICK'S ASSIGNMENT TO AIG OF LIMITED RIGHTS UNDER THE QUOTA SHARE AGREEMENTS.

The Pool Members argue that Trenwick is not entitled to rely on the arbitration provisions of the Quota Share Agreements by virtue of its assignment to AIG. As previously shown, Trenwick can remove this case whether or not it is entitled to invoke the arbitration provisions of the Quota Share Agreements. But, in addition, the claims brought by the Pool Members against Trenwick do fall within the broad arbitration clause of the Quota Share Agreements, and Trenwick's limited assignment of a particular debt to AIG does not somehow erase the arbitration agreement that Trenwick and the Pool Members included in those agreements. If the Pool Members want to bring claims against Trenwick concerning the

- 8 -

relationship formed by the Quota Share Agreements, the proper forum — the only forum — to do that is arbitration.

The Quota Share Agreements are contracts of broad applicability that bind each of the Pool Members and Trenwick together to share reinsurance risks underwritten for the pools by a common managing agent. *See* Quota Share Agreements, annexed as Exhibits 4 and 5 to the Affidavit of Eric S. Kobrick dated September 9, 2005 ("Kobrick Aff."), submitted in support of AIG's Motion to Stay. AIG was only one of many companies whose risks were reinsured by the pools. In paragraph 6(a) of the Pool Commutation between AIG and Trenwick, Trenwick assigns to AIG "all of [Trenwick's] rights, title and interest in the recoverables arising from Pool Agreements on account of the retrocession thereunder" of AIG-related reinsurance. *See* Kobrick Aff., Ex. 1. By the plain terms of the Pool Commutation, Trenwick assigned to AIG only Trenwick's right to collect recoverables from the Pool Members under the Quota Share Agreements for AIG-related reinsurance. The Pool Members argue that this limited assignment actually resulted in Trenwick surrendering any rights it had to arbitrate with the Pool Members under those same agreements. Amazingly, although it is argued that Trenwick lost the right to compel arbitration by its assignment to AIG, the Pool Members also contend that AIG did not gain the right to arbitrate. The Pool Members, apparently, believe the agreement to arbitrate has somehow disappeared. In reality, apart from whatever rights AIG has, Trenwick has its own separate, independent right to arbitrate disputes under the Quota Share Agreements.

The Pool Members cannot, on one hand, argue that Trenwick breached various duties of the relationships arising under the Quota Share Agreements, and then on the other hand argue that Trenwick has no right to defend itself against those charges in an arbitration forum as originally envisioned and specifically agreed by the parties. The Quota Share Agreements plainly contain broad arbitration clauses. And the Pool Members recognize "that Trenwick and

- 9 -

the plaintiffs performed their respective roles . . . substantially as embodied in the [Quota Share Agreements]." Pool Members' Remand Mem. at 5. Any duties and obligations that exist between the Pool Members and Trenwick exist by virtue of these agreements, and the parties' performance under them. As such, the Pool Members' position is equivalent to arguing that Trenwick still owes duties under the Quota Share Agreements, has to answer for their breach, but no longer has any corresponding rights to arbitrate disputes arising under those agreements. The Pool Members cannot pick and choose what rights and duties Trenwick retained under the Quota Share Agreements depending on what suits their purposes.

The Pool Members and Trenwick made their intentions perfectly clear in the Quota Share Agreements. They provided for an arbitration board consisting of reinsurance industry experts. They directed those experts to "interpret this Agreement as an honorable engagement rather than as a legal obligation ...." Kobrick Aff., Exs. 4 and 5 at art. XI (Quota Share Agreements). Trenwick's right to have the Pool Members' claims against it resolved in this manner can hardly be defeated because it assigned a particular debt to AIG.

"Partial assignments — *i.e.*, an assignment of only part of a larger interest . . . are valid and enforceable." *Advanced Testing Techs., Inc. v. Desmond (In re Computer Eng'g Assocs.)*, 337 F.3d 38, 46 (1st Cir. 2003). Under Massachusetts law, "the assignee steps into the shoes of the assignor for the portion of the claim assigned." *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1318 (1st Cir. 1993). In other words, where there has been a partial assignment, the assignor "still retains part of the substantive right." *Thornton v. Kaye*, No. 96-4570, 1997 Mass. Super. LEXIS 251, at *9 (Mass. Supp. Ct. July 2, 1997). Trenwick assigned to AIG only its right to recover from the Pool Members for AIG-related reinsurance risks ceded to the Pool Members based on the Quota Share Agreements. The Pool Members' claims against Trenwick thus remain arbitrable.

- 10 -

Likewise, the scope of an assignment (that bears on arbitrability) should be resolved in favor of arbitration. "Arbitration clauses would be of no value if either party thereto could escape the effect of such a clause by assigning a claim subject to arbitration between the original parties to a third party." *Hosiery Mfrs. Corp. v. Goldston*, 143 N.E. 799, 780 (N.Y. 1924). Therefore, if the roles were reversed and if Trenwick were bringing a claim against the Pool Members that fell under the arbitration clause of the Quota Share Agreements, Trenwick could not argue that that the claim was not subject to arbitration because of its limited assignment to AIG. Likewise, the Pool Members cannot argue that their claims against Trenwick are not subject to arbitration because of Trenwick's limited assignment to AIG. A contrary result would undermine the federal policy favoring arbitration and would be inconsistent with the plain language of the assignment.

### III

### THE FACTUAL ALLEGATIONS UNDERLYING THE POOL MEMBERS' CLAIMS ARE COVERED BY THE BROAD ARBITRATION CLAUSES CONTAINED IN THE QUOTA SHARE AGREEMENTS.

"So long as the [movant's] claim of arbitrability [is] plausible, interpretation of the contract should [be] passed on to the arbitrator." *Sharon Steel Corp. v. Jewell Coal & Coke Co.*, 735 F.2d 775, 778 (3d Cir. 1984). As demonstrated by Trenwick and AIG in their opening briefs in support of the Motions to Stay, each of the claims raised in this litigation falls within the scope of the broad arbitration clause contained in the Quota Share Agreements. And as fully explained in Trenwick's Memorandum in Support of its Motion to Stay (at 5-7), the claims raised by the Pool Members in the arbitrations with AIG undeniably overlap the claims raised in this litigation.

If the allegations of the complaint involve matters covered by the parties' underlying agreement, the claims must be arbitrated, regardless of the legal labels ascribed to the claims. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985). In

other words, the focus should be "on the factual allegations in the complaint rather than the legal causes of action asserted." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987).

The Pool Members have essentially taken the claims they asserted in the AIG Arbitrations and attached legal labels such as "fraud," "deceit," and "conspiracy" in a feeble attempt to circumvent their contractual duty to arbitrate "any dispute or difference ... arising with reference to the interpretation, application or effect" of the Quota Share Agreements. *See* Kobrick Aff., Exs. 4-5. As demonstrated in defendants' opening briefs on the Motions to Stay, Trenwick and AIG already have shown that "the particular factual allegations underlying the [Pool Members' claims] are covered by the [Quota Share Agreements'] arbitration clause[s]" and are mere overlaps of their claims submitted in arbitration. *See RCM Techs., Inc. v. Brignik Tech., Inc.*, 137 F. Supp. 2d 550, 555 (D.N.J. 2001) (refusing to classify all fraud claims as outside the scope of a particular arbitration clause; instead, adopting a fact-specific analysis into whether the case "will require interpretation of the parties' agreement").

In their opposition papers to defendants' motions to stay (at 8), the Pool Members cite *Mutual Benefit Life Insurance Co. v. Zimmerman* ("*Zimmerman*"), claiming that because the nearly identical arbitration clause in *Zimmerman* "did not authorize arbitration of fraud and conspiracy claims," this Court should not require arbitration of the Pool Members' fraud and conspiracy claims. *See Zimmerman*, 783 F. Supp. 853, 872 (D.N.J. 1992), *aff'd without opinion on other grounds*, 970 F. 2d 899 (3d Cir. 1992). The Pool Members' reliance on *Zimmerman* is misplaced. First, as demonstrated by AIG's Consolidated Memorandum, the *Zimmerman* Court's reasoning in concluding that the arbitration clause at issue was "narrow" is fundamentally flawed. Second, and more important, regardless of whether the clause is broad or narrow, the focus of a court's inquiry should be on whether the dispute "falls within the scope of

- 12 -

an existing arbitration clause." *See Bowlby v. Carter Mfg. Corp.*, 138 F. Supp. 2d 182, 187 (D. Mass. 2001). "Whether a particular claim is arbitrable depends not upon the characterization of the claim, but upon the relationship of the claim to the subject matter of the arbitration clause." *In re Oil Spill by the "Amoco Cadiz,"* 659 F.2d 789, 794 (7th Cir. 1981). "Were the rule otherwise, a party could frustrate any agreement to arbitrate simply by the manner in which it framed its claims." *Id.*

The *Zimmerman* court ultimately held that the majority of the fraud, conspiracy, and breach of fiduciary duty claims asserted fell outside the relevant arbitration clause.[3] *See Zimmerman*, 783 F. Supp. at 871-75. In most instances, this was due to the fact that the defendants involved were "not parties to the Management Agreement," which was the agreement that contained the relevant arbitration clause. *See id.* However, for the defendant that was a party to the Management Agreement, the *Zimmerman* court found that the breach of fiduciary duty claim against that defendant *was* within the scope of the arbitration clause: "Whether Zimmerman exceeded his authority or breached his fiduciary responsibilities involve the application of the Management Agreement; accordingly, Count Seven [breach of fiduciary duty] would be arbitrable." *Id.* at 873.

Thus, even though its reasoning concerning the scope of arbitration clauses is faulty, *Zimmerman*, upon which the Pool Members heavily rely, supports Trenwick's entitlement to arbitration. Trenwick and the Pool Members are parties who contracted with each other and all parties agree that the Quota Share Agreements contain the applicable terms. Whether Trenwick exceeded its authority or breached its fiduciary responsibilities involves the application of the Quota Share Agreements. Further, "any doubts concerning the scope of arbitrable issues should

---

[3] *But see RCM Techs., Inc.*, 137 F. Supp. 2d at 555 (holding that an arbitration clause similar in scope to the one in *Zimmerman* encompassed plaintiffs' fraud claims because "[u]nlike the claims in *Zimmerman*, the claims in this case almost undoubtedly will require interpretation of the parties' agreement").

be resolved in favor of arbitration." *Puerto Rico Tel. Co. v. U.S. Phone Mfg. Corp.*, Nos. 04-

2601 & 04-2602, 2005 U.S. App. LEXIS 22194, at *12-13 (1st Cir. Oct. 14, 2005) (*citing Moses*

*H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).  The Court should

hold that the Pool Members' claims are arbitrable.

## IV

### THE POOL MEMBERS' ATTEMPT TO CIRCUMVENT ARBITRATION OF COUNT VI SHOULD BE REJECTED.

"If arbitration defenses could be foreclosed simply by adding as a defendant a person not

a party to an arbitration agreement, the utility of such agreements would be seriously

compromised." *Hilti, Inc. v. Oldach*, 392 F.2d 368, 369 (1st Cir. 1968).  The same reasoning

applies to a plaintiff's addition of another cause of action.  *See Font v. Paine Webber Inc.*, 649 F.

Supp. 462, 466 (D.P.R. 1986) (rejecting plaintiffs' attempt to "circumvent arbitration" by adding

a sixth cause of action).

The Pool Members' effort to avoid arbitration of Count VI should be rejected.  The Pool

Members now assert that Count VI relates to some but not all of the plaintiffs, and is not directed

at obligations that arise under the Quota Share Agreements or any other written agreement and,

therefore, is not subject to arbitration.  *See* Pool Members' Substituted Memorandum of Law in

Opposition to Defendants' Motions to Stay Proceedings at 9 n.4.  The Pool Members' own

pleading, however, shows that the predicate to their claim is a determination that in entering into

the Pool Commutation, Trenwick breached its duties under the Quota Share Agreements.[4]  Thus,

---

[4] *See, e.g.*, Cmplt. ¶ 1 (arguing that Trenwick and AIG "wrongfully manipulated" the reinsurance "arrangement" to "create almost $73 million in improper demands" against the Pool Members); Cmplt. ¶¶ 38, 44-49 (alleging a breach by Trenwick and AIG of the obligation of utmost good faith toward the Pool Members); Cmplt. ¶ 66 (stating that "AIG induced Trenwick to improperly usurp LDG's rightful role as manager of the LDG facilities and to breach the duty of utmost good faith owed to the plaintiffs"); Cmplt. ¶ 83 (arguing that "Trenwick furthered AIG's scheme to defraud the LDG Facilities and the plaintiffs" by "failing to exercise basic care on behalf of the LDG Facilities, care that the plaintiffs, as LDG Facility members, were entitled to and expected from Trenwick as a fronting member"); Cmplt. ¶ 84 (stating that

- 14 -

Count VI too concerns a "dispute or difference . . . arising with reference to the interpretation, application or effect" of the Quota Share Agreements, and is subject to arbitration.

In initiating this action, the Pool Members have relabeled their arbitrable claims against AIG, added Trenwick as a defendant, and included an additional cause of action (Count VI) in an effort to circumvent arbitration. Each and every one of the Pool Members' claims in this litigation overlap their claims in the AIG Arbitrations and depend upon the interpretation of rights and obligations under the Quota Share Agreements. Consequently, this Court should stay this action pending the outcome of the AIG Arbitrations and any other arbitration that may be commenced involving Trenwick and the Pool Members.

## CONCLUSION

For the foregoing reasons and for those set forth in Trenwick's Memorandum in Support of its Motion to Stay, Trenwick respectfully requests that this Court enter an order: (1) denying the Pool Members' Motion to Remand; and (2) staying this litigation, pursuant to Section 3 of the FAA, in favor of the pending arbitrations (and any arbitration between Trenwick and the Pool Members should the Pool Members elect to commence such an arbitration).

---

without information from AIG, the Pool Members cannot asses the validity of AIG's claims, "a determination that Trenwick, as fronting member, should have made, but entirely failed to pursue"); Cmplt ¶ 99 (arguing that "[p]resenting the fraudulently inflated Commutation as a paid loss under the Trenwick QSA" constitutes unfair or deceptive acts or practices under Chapter 93A); Cmplt ¶ 118 (stating that "Trenwick had a fiduciary obligation to the plaintiff insurance companies to act under a duty of *uberrimae fidei* or utmost good faith in all dealings with respect to its role as a fronting reinsurer for the LDG Facilities"); Cmplt. ¶ 119 (arguing that "AIG induced Trenwick to breach that fiduciary duty" by presenting AIG's coverage claim to plaintiffs "as a 'paid loss' under plaintiffs' QSA with Trenwick); Cmplt. ¶ 126 (stating that "AIG knowingly and intentionally induced Trenwick to breach its contractual duties as a fronting reinsurer").

TRENWICK AMERICA
REINSURANCE CORPORATION

By its attorneys,

_____
Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

Of Counsel:

Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
(212) 969-3000

Dated: November 14, 2005

- 16 -

## <u>CERTIFICATE OF SERVICE</u>

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation, hereby certify that on November 14, 2005, I caused a copy of the foregoing document to be served by overnight delivery on all known counsel of record.

Eben A. Krim

**APPENDIX**

*CAM S.A. v. ICC Tankers, Inc.*

LEXSEE 1989 U.S. DIST. LEXIS 5066

CAM S.A., Plaintiff, v. ICC TANKERS INCORPORATED, ICC TANKERS
INCORPORATED, Third-Party Plaintiff, v. RUNGSTED SHIPPING A/S and DAN
ERRIA SHIPPING, A.P.S., Third-Party Defendants

No. 88 CV 9274 (KMW)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW
YORK

*1989 U.S. Dist. LEXIS 5066*

**May 8, 1989, Decided; May 10, 1989, Filed**

LexisNexis(R) Headnotes

OPINIONBY: [*1]

WOOD

OPINION:

MEMORANDUM OPINION

KIMBA M. WOOD, UNITED STATES DISTRICT
JUDGE

Plaintiff moves this Court for an order remanding this
action for damages to the Supreme Court of the State of
New York, County of New York, on the ground that this
Court lacks removal jurisdiction Defendant cross-moves
for an order, pursuant to *9 U.S.C. § 3*, staying these pro-
ceedings until arbitration involving the parties has been
completed. For the reasons stated below, plaintiff's motion
is denied. Defendant's motion is granted on the condition
that defendant and plaintiff agree to incorporate into their
ongoing arbitration the dispute at issue in this action.

BACKGROUND

Plaintiff CAM S.A. ("CAM") is a corporation or-
ganized and existing under the laws of the Republic of
France with its principal office in Paris. Defendant ICC
Tankers Incorporated ("ICC") is a New York corpora-
tion with an office in New York City. Rungsted Shipping
A/S ("Rungsted") and Dan Erria Shipping, A.P.S. ("Dan
Erria") are related and/or alter ego foreign corpora-
tions engaged in the shipping business.

The following facts are set forth in the Affirmation
in Support of Motion for Remand and the Affidavit in
Support of Motion to Stay [*2]  Proceedings and, for
purposes of these motions, do not appear to be in dispute.

In December of 1985, plaintiff entered into a Contract
of Affreightment ("COA") with Dan Erria pursuant to
which Dan Erria agreed to provide ocean-going vessels
to carry cargo for plaintiff from various ports in North
America to Algeria. Plaintiff's Exhibit ("PX") A. The
COA refers to three voyages, the third of which was to be
between Montreal and Quebec, Canada and two ports in
Algeria.

Dan Erria and plaintiff subsequently agreed, in an ad-
dendum to the COA, that the vessel to perform the third
voyage would be the M/T SANDRA FARBER — a ves-
sel previously chartered by Rungsted and owned by the
defendant. Dan Erria and plaintiff agreed that the ship
would be ready to load in Montreal beginning on April
13, 1986 and in Quebec beginning on April 15, 1986. PX
B. Notwithstanding this agreement, the M/T SANDRA
FARBER actually arrived in Quebec on May 6, 1986.

Seeking to recover damages resulting from the de-
lay in the arrival of the M/T SANDS FARBER, plain-
tiff demanded arbitration against Dan Erria pursuant to
the arbitration clause found in the COA. Subsequently,
Dan Erria/Rungsted demanded arbitration against [*3]
defendant pursuant to the arbitration clause in the voy-
age charter. While the timing is unclear from counsels'
statements, defendant also demanded arbitration against
Rungsted seeking to recover demurrage earned by the
Vessel on the voyage and Dan Erria/Rungsted, in turn,
made claim on plaintiff for this demurrage.

Dan Erria/Rungsted thereafter commenced an action
in this Court to compel a consolidated arbitration proceed-
ing between defendant and Rungsted on the one hand and
Dan Erria and plaintiff on the other. n1 Plaintiff joined
in this request, and over the objection of defendant, on
January 5, 1988, Judge Owen entered an Order directing
the parties to proceed with a consolidated arbitration be-

1989 U.S. Dist. LEXIS 5066, *3

fore three arbitrators in New York. Pursuant to that Order, there is currently an ongoing consolidated arbitration proceeding in which all parties have appeared.

> n1 In the Matter of the Arbitration between Rungsted Shipping A/S and Cam S.A. AND ICC TANKERS, Inc., 87 Civ. 7901 (RO).

Based on information plaintiff claims it learned for the first time during the consolidated arbitration proceedings, plaintiff decided to seek damages directly from defendant for the loss it suffered [*4] as a result of the vessel's delay. Webber Affirmation at para. 17. Unable to pursue a direct claim for an intentional tort against defendant in arbitration (defendant does not dispute this), plaintiff commenced this action in state court on October 21, 1988 alleging that defendant, knowing the vessel would be delayed, conspired with Dan Erria to provide plaintiff with false information as to the whereabouts of the vessel and her anticipated arrival at Quebec. More specifically, plaintiff alleges that on at least April 18, 21, 22, 24 and 26 of 1986, defendant transmitted false position reports, allegedly from the Master of the M/T SANDRA FARBER to Dan Erria, and had reason to believe that plaintiff would rely upon such information to its detriment.

In an effort to keep the entire dispute in arbitration, on October 26, 1988, plaintiff's counsel proposed to counsel for defendant that the ongoing arbitration be expanded to include the tort claims made directly against ICC by CAM. Defendant apparently refused, answering plaintiff's complaint and filing a third-party complaint against Rungsted and Dan Erria. According to plaintiff's counsel, the parties discussed plaintiff's proposal to [*5] arbitrate the entire dispute in late December of 1988 but were unable to reach an agreement. Thereafter, on December 30, 1988, defendant petitioned this Court for removal of this action. Paragraph one of the petition for removal states:

This is a petition to remove a matter now pending in the New York State Supreme Court and is within the jurisdiction of this Court pursuant to 9 U.S.C. § 1 and § 205 and 28 U.S.C. § 1441 et seq.

DISCUSSION

1. Plaintiff's Motion to Remand this Proceeding to State Court

A. Removal Under 9 U.S.C. § 205

In order to invoke the jurisdiction of the Court under 9 U.S.C § 205, defendant must show that the subject matter of this action relates to an arbitration agreement or an award falling under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"). n2 While it is undisputed that there are arbitration agreements between plaintiff and Dan Erria/Rungsted, on one hand, and defendant and Dan Erria/Rungsted, on the other, plaintiff argues that defendant has not met this requirement because there is no agreement, written or oral, to arbitrate between plaintiff and defendant. Plaintiff further maintains [*6] that a removal to this Court (which has authority to stay an action pending arbitration pursuant to 9 U.S.C. § 3) would not result in any judicial economies because plaintiff cannot arbitrate its state law tort claim against defendant and would thus merely proceed on its claim in federal court instead of state court.

> n2 Title 9 U.S.C. § 205 states: [w]here the subject matter of action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

Defendant admits that plaintiff cannot arbitrate its tort claim directly against ICC, but argues that plaintiff's claim against ICC "relates to an arbitration agreement . . . falling under the Convention." 9 U.S.C. § 205. Defendant claims that it is pure sophistry . . . for Cam to argue now that the case was improvidently removed and that the claims do not relate to an arbitration agreement, when CAM joined vigorously and successfully in the effort [*7] to compel consolidation of arbitration proceedings of the very facts and substantially (if not identical) legal issues as are being raised in the litigation.

Memorandum of Law in Opposition to Motion to Remand at 4.

Neither defendant nor plaintiff cite any case law interpreting the word "relates" in 9 U.S.C. § 205, and the Court's research has also not uncovered any authority on point. Plaintiff argues that its position is supported by a select portion of legislative history it refers to the Court. Plaintiff cites the colloquy between Richard D. Kearney, Chairman of the Secretary of State's Advisory Committee on Private International Law, and Senator Fulbright, then Chairman of the Senate Committee on Foreign Relations in which Mr. Kearney testified that "[t]he Convention and implementing legislation will apply to a transaction only because the parties to that transaction have agreed to settle disputes by arbitration." Hearing held before the Committee on Foreign Relations on February 9, 1970 (cited in Fuller Co. v. Compagnie De Bauxites Des Guinee, 421 F. Supp. 938, 941-943 [W.D. Pa. 1976]).

This testimony of one witness at a committee hearing is far from conclusive as to the [*8] meaning of the statutory language. Moreover, the issue on removal is whether a party should be compelled to proceed in federal court, not whether an unwilling party should be forced to forego a legal remedy and proceed to arbitration.

Looking then to the plain language of statute, it would seem that this action clearly "relates" to an arbitration agreement falling under the Convention. This is especially true here because although plaintiff and defendant did not agree to subject their disputes to arbitration, by previous order of this Court, they are currently engaged in consolidated arbitration over the same subject matter as the dispute here. Therefore, plaintiff's motion to remand is denied.

II. Defendant's Motion to Stay this these Proceedings Pending Arbitration

Defendant moves to stay this action, pursuant to 9 U.S.C § 3, until arbitration has been completed between the parties. According to 9 U.S.C. § 3,

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit [*9] or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

This Court also has the equitable power to stay these proceedings incidental to the power inherent in every court to control the disposition of cases on its docket. *Landis v. North American Co.*, 299 U.S. 248, 254-55, 81 L. Ed. 153, 57 S. Ct. 163 (1936).

Defendant recognizes that plaintiff's tort claim against ICC is non-arbitrable, but argues nevertheless that because the facts and legal issues are the substantially the same as claims "which are referable to arbitration" under 9 U.S.C. § 3, the tort claims should be stayed pending the outcome of the arbitration.

Defendant cites *Dale Metals v. Kiwa Chemical Co.*, 442 F. Supp. 78, 81-82 (S.D.N.Y. 1977), for the proposition that where every issue in the litigation would be "vigorously pressed" in the arbitration, the litigation should be stayed even though some parties in the litigation are not parties to the arbitration. Defendant also relies on *Lawson Fabrics v. Akzona Inc.*, 355 F. Supp. 1146, 1151 (S.D.N.Y.), , affirmed, [*10] 486 F.2d 1394 (2d Cir. 1973)

which holds that litigation may be stayed pending arbitration where an arbitration award will at least partially determine issues to be litigated against a third party.

Plaintiff disputes defendant's contention that the issues raised in this litigation will be vigorously pressed in arbitration. Plaintiff points out that it has no incentive to prove fraud or deceit in the pending arbitration because Rungsted/Dan Erria is the only party against whom plaintiff can recover, and plaintiff need only show that Rungsted/Dan Erria sent false vessel position reports to establish liability.

Moreover, plaintiff notes that in Dale Metals, Judge Lasker stayed the federal action only on the condition that the defendants that were not subject to the arbitration proceeding agree to participate and to be bound by its findings. *442 F. Supp. at 82.* And in another case cited by defendant, *Hikers Industries Inc. v. William Stuart*, 640 F. Supp. 175 (S.D.N.Y. 1986), the court conditioned the stay upon the arbitration proceeding being completed within six months of the court's granting the stay.

The Court declines to issue a stay under 9 U.S.C. § 3 because the literal language [*11] of the statute requires that there be an "issue referable to arbitration under an agreement in writing for such arbitration" and none exists between the parties in this case. See *Lawson Fabrics Inc.*, 355 F. Supp. at 1151 (declining to grant a stay under 9 U.S.C. § 3 because of the non-identity of the parties in the two proceedings) However, given that the very same parties that are now before this Court are currently proceeding in an arbitration involving the very same incidents at issue here, the federal policy favoring arbitration and judicial economy dictate that this Court seek to incorporate this matter into the ongoing arbitration. Thus, the Court adopts Judge Lasker's solution in Dale Metals; defendant's motion to stay is granted on condition that defendant and plaintiff agree within 10 days to submit the claims in this action to the pending arbitration proceeding and to be bound by any award granted by the arbitrators.

Conclusion

Plaintiff's motion to remand this action to state court is denied. Defendant's motion to stay this action pending the conclusion of the arbitration proceeding is granted on the condition that defendant and plaintiff agree to submit the [*12] claims in this action to the ongoing arbitration. In the event that defendant does not accept the conditions stated within 10 days, the motion to stay will be denied upon further application.

SO ORDERED.

DATED: New York, New York, May 8, 1989

*Puerto Rico Tel. Co. v. U.S. Phone Mfg. Corp.*

LEXSEE 2005 U.S. APP. LEXIS 22194

**PUERTO RICO TELEPHONE COMPANY, INC., as Liquidator on behalf of Reliance Insurance Co. (in liquidation), Plaintiff, Appellant/Cross-Appellee, v. U.S. PHONE MANUFACTURING CORPORATION, Defendant, Appellee/Cross-Appellant.**

Nos. 04-2601, 04-2602

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

*2005 U.S. App. LEXIS 22194*

**October 14, 2005, Decided**

**PRIOR HISTORY:** [*1] APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. Hon. Jaime Pieras, Jr., Senior U.S. District Judge. *P.R. Tel. Co. v. United States Phone Mfg. Corp., 2004 U.S. Dist. LEXIS 28691 (D.P.R., Mar. 9, 2004)*

**LexisNexis(R) Headnotes**

**COUNSEL:** Jesus E. Cuza, with whom Elliot H. Scherker, Pamela A. DeBooth, and Greenberg Traurig, P.A., were on brief, for appellant/cross-appellee Puerto Rico Telephone Company.

Pedro Jimenez Rodriguez, with whom Adsuar Muniz Goyco & Besosa, P.S.C., was on brief, for appellee/cross-appellant U.S. Phone Manufacturing Corporation.

**JUDGES:** Before Torruella, Dyk *, and Howard, Circuit Judges.

    * Of the Federal Circuit, sitting by designation.

**OPINIONBY:** Dyk

**OPINION:**

    **DYK, Circuit Judge.** Puerto Rico Telephone Company, Inc. ("PRTC") appeals from the district court's denial of its motion to vacate and entry of judgment confirming an arbitral award. The award granted $2.5 million in damages to U.S. Phone Manufacturing Corp. ("USPhone") for breach of contract. At issue is whether and how parties can contract for standards of judicial review of arbitration awards other than those set forth in the Federal Arbitration Act ("FAA" or "Act"). *9 U.S.C. §§ 10, 11 (2000).*

    We hold that the judicial review provisions of the FAA can be displaced only [*2] by explicit contractual language evincing the parties' clear intent to subject the arbitration award to a different standard of review. Here, no such clear statement was contained in the contract. Under the proper review standard set forth in the FAA there were no grounds for vacating the award. We accordingly affirm the district court. On the cross-appeal by USPhone, we also affirm the district court's decision to deny an award of attorneys' fees to USPhone.

    I.

    The present dispute had its genesis in 1987, when PRTC solicited bids to procure telephones for its residential customers over a five-year period. USPhone was awarded the bid, jointly with two other companies, on February 10, 1988. On December 2, 1988, PRTC and USPhone executed a requirements contract under which USPhone agreed to supply PRTC's five-year requirements of residential memory telephones, estimated at 25,000 per year ("the contract"). The contract was drafted by PRTC. Clause 4 of the contract, titled "Language and Law," contained a provision stating that "this Contract shall be governed by and interpreted in accordance with the laws of the Commonwealth of Puerto Rico."

2005 U.S. App. LEXIS 22194, *2

n1 Clause 17, titled "Arbitration", [*3] stated, in pertinent part:

> 17.2 Arbitration Panel
>
>> If an attempt at settlement has failed, the disputes shall be finally settled under the Rules of Conciliation and Arbitration of the American Arbitration Association.
>>
>> Each Party shall appoint a member to a three-person panel. The two members so appointed shall within twenty (20) days agree upon a third member who shall be a jurist and chair the panel. If the two members fail to appoint the third member within thirty (30) days, he will be appointed by the President of the American Arbitration Association. The panel shall meet in Puerto Rico and apply the law of the Commonwealth of Puerto Rico.
>
> 17.3 Judgment
>
>> The arbitral award shall be substantiated in writing and the findings shall be final and binding for both parties. This arbitration procedure shall be a condition precedent to any right of legal action. The panel shall decide on the matter of costs of the arbitration.

n1 Clause 4 also stated "this Contract is drawn up in the English language, which shall govern and shall be designated as the 'Ruling Language.'"

[*4]

During the course of performance, various disputes arose between the parties, which they were unable to resolve. The contract was eventually terminated by PRTC, pursuant to the contract's termination clause, effective January 2, 1993. On September 13, 1993, USPhone commenced arbitration against PRTC, before the American Arbitration Association ("AAA"). Three years later, following various procedural skirmishes regarding the choice of a neutral arbitrator, the United States District Court for the District of Puerto Rico ordered the parties to proceed to arbitration. U.S. Phone Mfg. Corp. v. P.R. Tel. Co., Civ. No. 96-1265CCC, slip op. at 5 (D.P.R. Sept. 30, 1996).

An AAA panel was convened in June 1997 and spent over two years considering the matter. More than a decade after the initial request for arbitration, on March 4, 2003, a unanimous panel awarded USPhone $2,552,123.99 in damages basing its decision on a record including "approximately 10 days of testimony . . . 1900 pages of transcripts, and approximately 175 exhibits, including physical evidence, as well as documents comprising approximately 1700 pages." As is common in arbitration awards, the arbitrators' decision [*5] contained no discussion of the arbitrators' reasoning. See, e.g., Raytheon Co. v. Automated Bus. Sys., Inc., 882 F.2d 6, 8 (1st Cir. 1989).

On June 2, 2003, PRTC filed a motion to vacate the arbitration award in the United States District Court for the district of Puerto Rico. The motion did not challenge the arbitrability of any aspect of the controversy. However, PRTC claimed that the limited FAA standard of judicial review of awards was inapplicable and that the contract provided for judicial review of all errors of law in the arbitration award. The motion alleged "various errors in the structure of the arbitration, the procedures of the arbitration, and the ultimate findings of the arbitration." P.R. Tel. Co. v. U.S. Phone Mfg. Corp., 2004 U.S. Dist. LEXIS 28691, Nos. 03-1593, 03-1815, slip op. at 1 (D.P.R. Mar. 9, 2004). The case was consolidated with an earlier action brought by USPhone in the Southern District of New York for confirmation of the award pursuant to the FAA.

The district court denied PRTC's motion to vacate, holding that the FAA review standards applied. The district court concluded that under the FAA standard, judicial review of arbitral awards is "only [*6] allowed in cases of corruption, serious error, misconduct, and miscalculation," and that "district courts do not have the luxury 'to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts.'" 2004 U.S. Dist. LEXIS 28691, slip op. at 2 (quoting United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987)).

The district court found that PRTC's challenge to the award did "not rise to anywhere near the level required under the

2005 U.S. App. LEXIS 22194, *6

Federal Arbitration Act in order to allow court review ... [and] that PRTC's objections to the arbitration are essentially disagreements with the arbitrators' conclusions." *2004 U.S. Dist. LEXIS 28691, slip op. at 3*. In denying PRTC's motion, the court further observed that "the mere filing of this motion controverts the purpose of the Federal Arbitration Act and is a waste of the time and resources of this Court." *2004 U.S. Dist. LEXIS 28691, slip op. at 4*. Subsequently, the court granted USPhone's motion to amend the judgment, nunc pro tunc, to reflect confirmation of the award. In this same order, the court denied U.S. Phone's request for attorneys' fees but granted pre-judgment and post-judgment interest [*7] on the award. *P.R. Tel. Co. v. U.S. Phone Mfg. Corp., 2004 U.S. Dist. LEXIS 28693, Nos. 03-1593, 03-1815, slip op. at 2-3 (D.P.R. Oct. 6, 2004)*.

PRTC appeals the denial of its motion to vacate and the judgment confirming the award. USPhone cross-appeals the denial of attorneys' fees. We have jurisdiction pursuant to *28 U.S.C. § 1291*. We review the district court decision upholding the arbitration award under "ordinary, not special, standards." *First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 948, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995)*. n2

> n2 USPhone argues that PRTC's motion to vacate the arbitration award was untimely. Section 12 of the FAA provides: "Notice of a motion to vacate ... an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered." *9 U.S.C. § 12 (2000)*. The FAA requires service on nonresidents "in like manner as other process of the court" and refers to *Rule 4 of the Federal Rules of Civil Procedure*. Wright & Miller, 4A Fed. Prac. & Proc. Civ. 3d § 1101 (2002). Here, PRTC served its motion to vacate on USPhone and its counsel by mail at least four times prior to the deadline, and was able to effect personal service on USPhone on June 5, 2003, one day after the deadline.
>
> We need not decide whether mail service complied with *Rule 4* in these circumstances, for courts have held that a failure to comply with *Rule 4* (for example, by serving only the defendant's attorney) may be excused if notice actually is received. Id. USPhone does not deny receipt of actual notice during the three month window, nor allege any significant prejudice. The district court was within its discretion to excuse the one-day delay. See *Piccolo v. Dain, Kalman & Quail, Inc., 641 F.2d 598, 601 (8th Cir. 1981)* (recognizing a "due diligence" exception to the three-month limit); see also *Petrol Shipping Corp. v. Kingdom of Greece, Ministry of Comm., Purchase Directorate 360 F.2d 103, 107-08 (2nd Cir. 1966)*; Matter of Arbitration between *InterCarbon Bermuda, Ltd. and Caltex Trading and Transp. Corp., 146 F.R.D. 64, 71 (S.D.N.Y. 1993)*.

[*8]

**II. The Appropriate Standard of Judicial Review**

On appeal, the parties agree that this contract is governed by the FAA. They also agree that the FAA provides for very limited review of an arbitration award. *Section 10* permits courts to vacate an award only:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*9 U.S.C. § 10 (2000)*. n3 Thus, the statute "carefully limits judicial intervention to instances where the arbitration has been tainted in certain specific ways ... [and] contains no express ground upon which an award can be overturned because it rests on garden-variety [*9] factual or legal [errors]." *Advest, Inc. v. McCarthy, 914 F.2d 6, 8 (1st Cir. 1990)*. Under the FAA, an award may be vacated for legal error only when in "manifest disregard of the law." *Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc., 274 F.3d 34, 35-36 (1st Cir. 2001)*.

N3 *Section 11*, not relevant here, provides the district court with authority to "make an order modifying or correcting" an arbitration award in cases of "evident material miscalculation of figures or an evident material mistake ...[;] where the arbitrators have awarded upon a matter not submitted to them ...[;] [or] where the award is imperfect in matter of form not affecting the merits of the controversy." *9 U.S.C. § 11 (2000)*.

However, PRTC contends that the parties contracted for more rigorous review of arbitration awards than that provided for by the FAA. In particular, PRTC asserts that the contract, by adopting Puerto Rican law and by providing that the "contract [*10] shall be governed by and interpreted in accordance with the laws of the Commonwealth of Puerto Rico" (language which they claim, under Puerto Rican law, requires review of the award for legal errors), demonstrates that the parties agreed to judicial review of the award for errors of law. Resolution of this question requires examination of the FAA and case law interpreting it.

A. **Background and Purpose of the FAA**

The FAA was enacted in 1925, 43 Stat. 883, and then reenacted and codified in 1947 as *Title 9 of the United States Code*. The Act's "purpose was to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991)*; see also *Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270, 130 L. Ed. 2d 753, 115 S. Ct. 834 (1995)* (FAA's purpose was to "overcome courts' refusals to enforce agreements to arbitrate"). The FAA broadly provides that written agreements to arbitrate "involving commerce ... shall be valid, [*11] irrevocable, and enforceable." *9 U.S.C. § 2 (2000)*.

Under the Act, federal courts may, inter alia, stay litigation on issues that are within the scope of the arbitration agreement, *9 U.S.C. § 3*; compel parties to submit to arbitration, *9 U.S.C. § 4*; appoint neutral arbitrators, *9 U.S.C. § 5*; compel appearances of witnesses at arbitration hearings, *9 U.S.C. § 7*; confirm arbitration awards and enter judgment accordingly; *9 U.S.C. § 9*; and, as discussed above, in very limited circumstances, vacate, modify, or correct arbitration awards, *9 U.S.C. §§ 10 & 11*.

In light of the FAA's explicit purpose to override state law that impedes the enforceability of arbitration agreements, it is well established that the provisions of the FAA will prevail over contrary state-law rules. The "broad principle of enforceability" of arbitration agreements embodied in the Act is not subject "to any additional limitations under state law." *Southland Corp. v. Keating, 465 U.S. 1, 11, 79 L. Ed. 2d 1, 104 S. Ct. 852 (1984)*. The Supreme Court has repeatedly enforced [*12] the federal policy favoring arbitration where the controversy concerns the scope of the arbitration clause itself.

For example, in Perry v. Thomas, the Court held that disputes over commissions on securities sales were arbitrable under a contract that provided for arbitration, even though the California Labor Code mandated court litigation of such "wage" disputes, "despite the existence of an agreement to arbitrate." *482 U.S. 483, 486, 490-91, 96 L. Ed. 2d 426, 107 S. Ct. 2520 (1986)*. This was because *section 2 of the FAA* "embodies a clear federal policy of requiring arbitration" where there is an enforceable agreement to arbitrate. *Id. at 489*. Similarly, in Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., the Court held that the parties' antitrust claims were arbitrable, notwithstanding Puerto Rican law requiring judicial resolution. *473 U.S. 614, 623 n.10, 87 L. Ed. 2d 444, 105 S. Ct. 3346 (1985)*.

The Court has also held that the federal policy favoring arbitration and reflected in the FAA "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983)*. [*13] This is so "whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Id. at 25*; See also *Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 400, 18 L. Ed. 2d 1270, 87 S. Ct. 1801 (1967)* (holding that notwithstanding a contrary state rule, consideration of a claim of fraud in the inducement of a contract "is for the arbitrators and not for the courts"); *Volt Info. Sciences v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 475-76, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)*.

A difficulty has arisen, however, when another important policy in the FAA has been implicated – namely the federal policy of allowing the parties to craft their own agreements. Passage of the FAA "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered." *Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 220, 84 L. Ed. 2d 158, 105 S. Ct. 1238 (1985)*. The general rule is that arbitration agreements are to be enforced

2005 U.S. App. LEXIS 22194, *13

according to their terms. *Volt, 489 U.S. at 479; Prima Paint, 388 U.S. at 404 n.12.* [*14]

These two policies contained within the FAA – the policy favoring arbitral resolution of disputes notwithstanding state law to the contrary, and the policy favoring enforcement of arbitration agreements according to general contract principles – are potentially in conflict in two situations. First, choice-of-law provisions in arbitration contracts (providing that the contract will be governed by the law of a particular state) have been argued to evidence the parties' desire that arbitration be conducted pursuant to state law. Second, even where federal law governs, where an arbitration agreement adopts a particular arbitration rule that departs from the FAA standard (either a state–law rule or one created for the particular agreement), there is an argument that the agreement should be enforced according to its terms, and that the specific rule chosen by the parties should prevail over the FAA standard. Here, we must first determine whether state or federal law applies to the standard of review issue and then determine if the federal standard of the FAA has been displaced.

**B. Effect of the Choice-of-Law Clause**

We consider first the choice-of-law argument. PRTC argues that [*15] by incorporating Puerto Rican law the parties agreed that the Puerto Rican law of judicial review of arbitration awards should apply. The Supreme Court has considered the choice-of-law issue in the Volt and Mastrobuono cases, and appears to have instructed us that the outcome should depend on whether there is a significant FAA policy that would be undermined by the state rule.

Mastrobuono involved a policy central to the FAA: the allocation of powers between the court and the arbitrators. *Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 59–60, 131 L. Ed. 2d 76, 115 S. Ct. 1212 (1995).* The Court held that a choice-of-law provision could not be interpreted to substitute state for federal law. *Id. at 58–61.* The petitioners in Mastrobuono were unsophisticated investors who had opened a securities trading account with a large brokerage firm. *Id. at 54.* The contract, drafted in full by the brokerage firm, contained an arbitration clause providing for arbitration in accordance with the National Association of Securities Dealers ("NASD") rules. These rules allowed an award of punitive damages. *Id. at 60–61.* The [*16] contract also included a choice-of-law clause stating that the contract was to be governed by New York law. *Id. at 54–55.* New York law prohibited arbitrators from awarding punitive damages. *Id. at 55.*

In light of the federal policy favoring arbitration, the Court concluded that the "best way to harmonize the choice-of-law provision with the arbitration provision [was] to read 'the laws of the State of New York' to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration." *Id. at 63–64 (emphasis added).* In other words, a choice-of-law clause, standing alone, generally will not be interpreted to require the application of state law restricting "the authority of arbitrators."

Volt, on the other hand, held that a choice-of-law provision could properly be interpreted by the state court to provide for application of California law as to the relative timing of judicial and arbitration proceedings. *489 U.S. at 479.* [*17] There, the contract provided that "the contract shall be governed by the law of the place where the Project is located," that is, California. *Id. at 470 (modification in original).* California law provided that an arbitration should be stayed pending related litigation by one of the parties to the arbitration agreement with parties not bound by the arbitration agreement. There was no provision of the FAA either requiring a stay of arbitration in such circumstances or prohibiting a stay. n4 The Supreme Court, deferring to the state court's interpretation of the contract, found that the federal policy favoring arbitration was not offended by application of California's laws because, "there is no federal policy favoring arbitration under a certain set of procedural rules." *Volt, 489 U.S. at 476.* More recently, the Court has clarified that the proper inquiry is whether the state law requirement "undermines the goals and policies of the FAA," *Doctor's Assocs. v. Casarotto, 517 U.S. 681, 685, 134 L. Ed. 2d 902, 116 S. Ct. 1652 (1996)* (internal quotation marks omitted), and explained that "the state rule examined in Volt determined only the efficient [*18] order of proceedings." *Id. at 688 (emphasis added).* Thus, Volt establishes that application of state law rules is appropriate only when there is no conflicting federal policy.

n4 Section 3 of the FAA states:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such

2005 U.S. App. LEXIS 22194, *18

arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

*9 U.S.C. § 3 (2000).* This provision has been interpreted to require a stay of litigation between the parties to the arbitration agreement when the subject of the litigation is within the scope of the agreement. See e.g., *Moses H. Cone, 460 U.S. at 22, 22 n.27. Section 3* does not directly address the issue of stays of litigation involving non-parties. Other courts have broadly interpreted *section 3* — in combination with the district court's inherent power to manage its own docket — to authorize the district court to issue a stay of litigation involving non-parties. See, e.g., *City of Bismarck v. Toltz, King, Duvall, 767 F.2d 429, 432–33 (8th Cir. 1985).*

[*19]

We conclude that this case is closer to Mastrobuono than to Volt, because here, the policies of the FAA are implicated. Here, PRTC argues that the choice-of-law provision requires us to apply Puerto Rican law to determine whether the contract requires more searching judicial review of the arbitration award than that provided for in the FAA. The extremely limited judicial review contemplated by the FAA clearly implicates the federal policy favoring final resolution of disputes by arbitration and, in particular, affects the allocation of powers between the court and the arbitrators. *Mastrobuono, 514 U.S. at 59–60.* Allowing more searching judicial review would inherently limit the authority of arbitrators. *Jacada Ltd. v. Intern. Mktg. Strategies, 401 F.3d 701, 711 (6th Cir. 2005);* see also *Bowen v. Amoco Pipeline Co., 254 F.3d 925, 936 (10th Cir. 2001)* ("Expanded judicial review would threaten the independence of arbitration ... and reduces arbitrors' willingness to create particularized solutions for fear the decision will be vacated by a reviewing court.").

In light of this policy, the mere inclusion of a generic choice-of-law [*20] clause within the arbitration agreement is not sufficient to require the application of state law concerning the scope of review, since there is a strong federal policy requiring limited review. This is particularly so when the state law at issue is "specifically and solely applicable to arbitration agreements." *Painewebber Inc. v. Elahi, 87 F.3d 589, 593 (1st Cir. 1996).* Just as the generic choice-of-law clause in Mastrobuono was insufficient to invoke New York law precluding arbitrators' awards of punitive damages, a "generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default regime" for vacatur of arbitral awards. *Roadway Package Sys., Inc. v. Kayser, 257 F.3d 287, 289, 297 (3rd Cir. 2001).*

Our conclusion in this respect is in keeping with the decisions of every circuit that has considered the question. These other circuits have held that the mere inclusion of a choice-of-law clause within the arbitration agreement is insufficient to indicate the parties' intent to contract for the application of state law concerning judicial review of awards. [*21] n5

n5 See, e.g., *Jacada, 401 F.3d at 711–12* (holding that generic choice-of-law provision did "not unequivocally suggest an intent to displace the default federal standard"); *Roadway, 257 F.3d at 289; UHC Mgmt. Co. v. Computer Scis. Corp., 148 F.3d 992, 997 (8th Cir. 1998)* (finding choice-of-law provision insufficient to invoke state law providing for more searching judicial review; "we will not interpret an arbitration agreement as precluding the application of the FAA unless the parties' intent that the agreement be so construed is abundantly clear").

Our holding is also consistent with the decisions of this circuit and others that have found a generic choice-of-law provision insufficient to incorporate state law on the allocation of powers between the court and the arbitrator. See, e.g., *Elahi, 87 F.3d at 593* (following Mastrobuono to "find that the choice-of-law clause in this case is not an expression of intent to adopt New York caselaw requiring the courts to apply section 15 [the NASD time bar on arbitration]"); *Sec. Ins. Co. of Hartford v. TIG Ins. Co., 360 F.3d 322, 327 (2d Cir. 2004)* ("This Court has rejected the argument that a general choice-of-law provision without more evidences the parties intent to incorporate New York decisional law on the allocation of powers between the court and the arbitrator.") (internal quotation marks and citations omitted); *Ferro Corp. v. Garrison Indus., Inc. 142 F.3d 926, 937 (6th Cir. 1998)* (holding choice-of-law clause was "not an unequivocal inclusion" of the Ohio arbitration rule that courts, not arbitrators decide the issue of fraudulent inducement of the agreement to arbitrate) (internal quotation marks omitted); *Porter Hayden Co. v. Century Indem. Co., 136 F.3d 380, 382–84 (4th Cir. 1998)* (finding general choice-of-law provision insufficient to require application of Maryland arbitration law and that timeliness defenses should therefore be submitted to arbitration).

[*22]

Thus, here the choice-of-law provision in Clause 4 of the contract is insufficient to render applicable Puerto Rican law concerning the scope of judicial review.

## C. Effect of Other Provisions

PRTC argues, however, that, even applying federal law, the contract should be read as evidencing an explicit decision to provide for more searching judicial review. Specifically, it urges that the language of Clause 4 of the contract is not merely a choice-of-law clause because it provides that "this Contract shall be governed by and interpreted in accordance with the laws of the Commonwealth of Puerto Rico." Under Puerto Rican law, if the parties' arbitration agreement specifies that the award should be "conformable to law" ("conforme al derecho"), then the award will be reviewed for legal error. See, e.g., *Union de la Industria Licorera de Ponce v. Destileria Serralles. Inc., 16 P.R. Offic. Trans. 426, 432, 116 P.R. Dec. 348 (P.R. 1985); S.I. U. De Puerto Rico v. Otis Elevator Co., 5 P.R. Offic. Trans. 1156, 1163, 105 P.R. Dec. 832 (P.R. 1977);* see also *Febus v. MARPE, 135 D.P.R. 206, 1994 Juris P.R. 19 (1994).* PRTC argues that the "in accordance with the laws" language demonstrates an intent [*23] to subject the arbitrators' award to review for errors of law. USPhone, on the other hand, urges the language here is insufficient under Puerto Rican law to invoke review for legal error, and that the contract itself explicitly provides that the findings of the arbitrator "shall be final and binding for both parties," thus precluding more searching review.

We need not decide whether as a matter of local law this contract would be construed as providing for review of legal error, for we conclude that the FAA creates a presumption that the more limited FAA standard will govern, and the language here, as a matter of federal law, is insufficient to overcome the presumption.

The issue whether the parties by contract can supplant the FAA standard of review has generated substantial litigation. Some circuits that have held that parties can never by contract agree to a different standard of review, holding that "because Congress has specified the exclusive standard by which federal courts may review an arbitrator's decision ... private parties may not contractually impose their own standard on the courts." *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc., 341 F.3d 987, 994 (9th Cir. 2003)* [*24] (en banc); *Bowen, 254 F.3d at 935.* n6

> n6 The Eighth Circuit has also suggested that it would not allow parties to contract for expanded judicial review, although it did not finally decide the issue, finding the contract language at issue insufficient to indicate the parties' intent to do so. See *UHC Mgmt. Co., 148 F.3d at 996-97.* The Seventh Circuit, in a decision construing *section 301* of the Taft-Hartley Act but "looking to" the FAA for guidance has also suggested that parties cannot contract for vacatur standards other than those set forth in the FAA. *Chi. Typographical Union No. 16 v. Chi. Sun-Times, Inc., 935 F.2d 1501, 1504-05 (7th Cir. 1991).*

These cases construe the FAA to preclude such a contractual provision on the theory that allowing private parties to contract for more searching review standards would create federal jurisdiction by contract. *Kyocera, 341 F.3d at 999* (citing *Chi. Typographical Union, 935 F.2d at 1504-05).* [*25] This concern seems to us misplaced, as it is well settled that federal courts have jurisdiction over suits seeking to compel arbitration (or to vacate or enforce arbitration awards) only if the parties are of diverse citizenship, or some separate grant of jurisdiction applies. n7 Modifying the review standard does not expand federal jurisdiction.

> n7 The FAA is "something of an anomaly in the field of federal-court jurisdiction. It creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate, yet it does not create any independent federal-question jurisdiction under [28 U.S.C. § 1331 (2000)] or otherwise." *Moses H. Cone, 460 U.S. at 25 n.32.*

These decisions also rest on a policy concern that "broad judicial review of arbitration decisions could well jeopardize the very benefits of arbitration, rendering informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process." *Kyocera, 341 F.3d at 998;* [*26] accord *Bowen, 254 F.3d at 935.* These cases invoke the goal of preserving the "independence of the arbitration process," *Bowen, 254 F.3d at 935,* or, put otherwise, the independence of the arbitrators.

However, the Supreme Court has emphasized on more than one occasion that the principal objective behind the passage of the FAA was enforcement of the parties' agreements, and that efficient dispute resolution should not be favored over the FAA's primary goal of enforcing private agreements to arbitrate, given Congress's "preeminent concern in passing the Act ... to enforce private agreements." *Dean Witter Reynolds, 470 U.S. at 221*; see also *Moses H. Cone, 460 U.S. at 20* (FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement") (emphasis omitted).

Other circuits have held that the parties may contract to displace the FAA standards. See, e.g., *Jacada, 401 F.3d at 712*, *Roadway, 257 F.3d at 288–89*; *Gateway Techs., Inc. v. MCI, 64 F.3d 993, 996–97 (5th Cir. 1995)*. These courts have held that the Act's ultimate purpose is to enforce the terms of [*27] the agreement to arbitrate, and that they are therefore bound by federal law to enforce the arbitration agreements as drafted. See, e.g., *Roadway, 257 F.3d at 292*. At the same time they have recognized that the federal policy in favor of recognizing broad authority of the arbitrators, even if not sufficient to override the parties' agreement for more searching review, at least requires a presumption that the FAA standard will apply. *Id. at 294*. Thus, in the few cases where courts have found that the parties contracted for more searching judicial review of arbitral awards, there has been explicit contractual language that specified the precise nature of the intended judicial review. See, e.g., *Gateway Techs., 64 F.3d at 996* (contract language stated that "the arbitration decision shall be final and binding on both parties, except that errors of law shall be subject to appeal")(emphasis and modification in original); *Harris v. Parker Coll. of Chiropractic, 286 F.3d 790, 793–94 (5th Cir. 2002)* (contract expressly provided that "each party shall retain his right to appeal any questions of law").

We agree [*28] with the other circuits that have concluded that the parties can by contract displace the FAA standard of review, but that displacement can be achieved only by clear contractual language. The contract here, even if sufficient under Puerto Rican law, is far short of the explicit language required by federal law to displace the FAA standard of review, particularly in light of the agreement's language that any disputes "shall be finally settled" under the AAA Rules. See *Elahi, 87 F.3d at 594*. We conclude that the FAA standard applies.

### III. Interpreting the Governing Standard

PRTC contends that, even applying the federal standard, the award should be set aside. As we noted earlier, under the FAA itself, "judicial review of arbitration awards is available where arbitrators have acted in manifest disregard of the law." *Prudential-Bache Secs., Inc. v. Tanner, 72 F.3d 234, 239 (1st Cir. 1995)* (citing *Wilko v. Swan, 346 U.S. 427, 436–37, 98 L. Ed. 168, 74 S. Ct. 182 (1953)*). Thus, "a mere mistake of law by an arbitrator cannot serve as the basis for judicial review." *Id. at 239 n.6*. Rather, "manifest disregard" means that "arbitrators [*29] knew the law and explicitly disregarded it." *Advest, 914 F.2d at 10*. Vacatur is appropriate under the manifest disregard standard only when the award is "'unfounded in reason and fact, ... based on reasoning so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling, or is mistakenly based on a crucial assumption which is decidedly a non-fact.'" *Challenger Caribbean Corp. v. Union General de Trabajadores, 903 F.2d 857, 861 (1st Cir. 1990)* (quoting *In re Hotel Da Vinci, 797 F.2d 33, 34 (1st Cir. 1986)*). Put differently, "disregard implies that the arbitrators appreciated the existence of a governing legal rule but wilfully decided not to apply it. As arbitrators need not explain their award, and did not do so here, it is no wonder that appellant is hard pressed to satisfy the exacting criteria for invocation of the doctrine." *Advest, 914 F.2d at 10* (internal quotation marks and citations omitted). n8

> n8 "'As long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' a court's conviction that the arbitrator made a serious mistake or committed grievous error will not furnish a satisfactory basis for undoing the decision," under the manifest disregard standard. *Advest, 914 F.2d at 9* (quoting *Misco, 484 U.S. at 38*).

[*30]

This standard has not remotely been satisfied here. PRTC contends that the arbitrators failed to recognize various breaches of cardinal contractual obligations by USPhone that provided a defense to USPhone's claims for breach of contract. Thus, for example, USPhone allegedly violated the contract by failing to comply with applicable FCC requirements. PRTC's argument that the district court failed to review the arbitration award under the "manifest disregard of the law standard" is nothing more than a thinly veiled attempt to obtain appellate review of the arbitrators' legal and factual determinations regarding the contract dispute. The district court properly rejected PRTC's claim, finding that "PRTC's objections to the arbitration are essentially disagreements with the arbitrators' conclusions." *P.R. Tel., 2004 U.S. Dist. LEXIS 28693, Nos. 03–1593, 03–1815, slip op. at 3*.

2005 U.S. App. LEXIS 22194, *30

### IV. Attorneys' Fees

In its cross-appeal, USPhone contends that the district court erred in refusing to award attorneys' fees, in light of various observations made by the district court when dismissing with PRTC's motion with prejudice. n9 Our review of the district court's denial of attorney fees is for abuse of discretion. *Top Entm't, Inc. v. Torrejon, 351 F.3d 531, 533 (1st Cir. 2003).* [*31]

> n9 Specifically, USPhone cites to the following language from the district court's Opinion and Order:

> > The Court finds that the basis for review stated by PRTC in this case does not rise to anywhere near the level required under the Federal Arbitration Act in order to allow court review. The Court finds that PRTC's objections to the arbitration are essentially disagreements with the arbitrators' conclusions. This type of disagreement cannot form the basis of a legitimate motion to vacate an arbitration award because it would subvert the very purpose of arbitration. ... The mere filing of this motion controverts the purpose of the Federal Arbitration Act and is a waste of the time and resources of this Court."

> *P.R. Tel., 2004 U.S. Dist. LEXIS 28693, Nos. 03-1593, 03-1815, slip op. at 3-4.*

Puerto Rican law, which governs the question of fees in this diversity action, see *Newell P.R., Ltd. v. Rubbermaid Inc., 20 F.3d 15, 24 (1st Cir. 1994),* provides that "in the event any party or its lawyer has acted [*32] obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct." P.R. R. Civ. P. 44.1(d). Puerto Rican law thus provides that an award of fees shall be made for either (1) obstinate conduct or (2) frivolous litigation. There is no basis for USPhone's contention that federal law requires a more liberal standard for the award of attorney's fees in suits seeking to set aside arbitration awards. n10

> n10 The case relied upon by USPhone, *Courier-Citizen Co. v. Boston Electrotypers Union No. 11, 702 F.2d 273, 282 (1st Cir. 1983),* involved an arbitration award enforceable under *section 301(b)* of the Labor Management Relations Act, codified at *29 U.S.C. § 185(b).*

Under Rule 44.1(d), "a finding of obstinacy requires that the court determine a litigant to have been unreasonably adamant or stubbornly litigious, beyond the acceptable demands of the litigation, thereby [*33] wasting time and causing the court and the other litigants unnecessary expense and delay." *De Leon Lopez v. Corporacion Insular de Seguros, 931 F.2d 116, 126 (1st Cir. 1991).* Factual findings of specific instances of misconduct, taking into account the overall character of the litigation, are required to support a finding of obstinacy mandating the award of attorney fees under Puerto Rican law. See, e.g., *Mejias-Quiros v. Maxxam Prop. Corp., 108 F.3d 425, 429 (1st Cir. 1997); Dopp v. Pritzker, 38 F.3d 1239, 1253-54 (1st Cir. 1994).* "Examples of obstinate conduct include: denying all liability in answering a complaint, where the defendant later admits liability; raising inapplicable defenses; denying all liability when only the amount of damages sought is contested; and denying a fact, knowing it is true." *Correa v. Cruisers, a Div. Of KCS Int'l, Inc., 298 F.3d, 13, 31 (1st Cir. 2002)* (citation omitted). The district court here made no such explicit factual findings, nor does the record otherwise document specific instances of obstinate conduct. Compare *Top Entm't, 351 F.3d at 534.* [*34]

The district court also did not conclude that the motion to vacate was frivolous, although the court did observe that PRTC's filing of its motion was "a waste of time and resources of this court." Moreover, a finding of frivolity would not be justified in this case. The district court acted within its discretion in denying USPhone's motion for the award of fees.

### V.

In sum, we hold that the parties did not by contract displace the FAA standard of review and, under the FAA standard, the district court properly denied the motion to vacate and confirmed the arbitration award. The district court also did not err in denying U.S. Phone's motion for attorney fees. Accordingly, we affirm the district court's judgment.

It is so ordered.

*Thornton v. Kaye*

LEXSEE 1997 MASS. SUPER. LEXIS 251

**Barbara Thornton v. Kaye, Fialkow, Richmond & Rothstein et al. n1**

**n1 Stephen Sheehy, Jay L. Fialkow, Stephen M. Richmond, David Rothstein, Kenneth A. Sweder, Siri F. Boreske, Peter Wittenborg, Richard E. Gentilli, Joel J. Feinburg, James M. Liston, John L, Hackett, Jr., David C. Phalen, Howard M. Brown, and Peter J. Antoszyk, and Bloomenthal & McNamara, P.C., Leslie Bloomenthal, and Peter J. McNamara.**

**96-4570**

**SUPERIOR COURT OF MASSACHUSETTS, AT MIDDLESEX**

*1997 Mass. Super. LEXIS 251*

**July 2, 1997, Decided**

**DISPOSITION:** [*1] ORDERED that pursuant to *Mass.R.Civ.P. 21*, Adoks A. S., Inc., Richard Libbey, and Richard Brown shall be joined as plaintiffs in this action; Defendant Kaye Fialkow's motion to dismiss DENIED.

**LexisNexis(R) Headnotes**

**JUDGES:** Margot Botsford, Justice of the Superior Court.

**OPINIONBY:** MARGOT BOTSFORD

**OPINION:** MEMORANDUM OF DECISION AND ORDER ON CERTAIN DEFENDANTS' MOTION TO DISMISS

Introduction

The plaintiff Barbara Thornton has brought this action for legal malpractice against Kaye, Fialkow, Richmond & Rothstein, a partnership of attorneys, the individual partners of Kaye Fialkow (the partnership and the attorneys are referred to collectively as Kaye Fialkow), another law firm, and its attorneys. Thornton's claim concerns a lawsuit brought against Thornton and others by third parties, in which Thornton was represented successively by the defendant attorneys; the underlying suit ended in a default judgment against Thornton in the amount of approximately $15 million. Pursuant to *Mass.R.Civ.P. 12(b)(6)* and (7), Kaye Fialkow has moved to dismiss the claims against them in this action on the grounds that (1) Thornton has assigned her interest in this malpractice action to the third parties who prevailed against her in [*2] the underlying lawsuit (Adoks plaintiffs), and as assignees they are the real parties in interest; (2) a cause of action for legal malpractice is not assignable and therefore cannot survive a motion to dismiss; and (3) Thornton herself has suffered no injury. n2 For the reasons discussed below, the motion to dismiss is DENIED.

n2 The other defendants, Leslie Bloomenthal, Peter McNamara, and their firm, Bloomenthal & McNamara, P.C., have not so moved.

Facts

Thornton's complaint in this case alleges the following facts, all of which I accept as true for purposes of the motion to dismiss. In October 1992, Adoks A. S. Inc., a Delaware Corporation, Richard Libbey, and Richard Brown (Adoks plaintiffs) filed an action against Thornton and a number of other parties, *Adoks A. S., Inc. et al. v. Ivan Gazda, Inc. et al., 1994 Mass. Super. LEXIS 117* (Suffolk Superior Court, C. A. No. 92-6253-F) (Adoks litigation). n3 The complaint in the Adoks litigation asserted violations of the federal RICO statute, *18 U.S.C. 1964 et seq.*, the Massachusetts [*3] Consumer Protection Act, G.L.c. 93A, and various common law torts. Thornton was claimed to have been a former officer of Adoks; and in that capacity she was alleged to have participated in a fraudulent scheme to transfer Adoks' assets without consideration and to prevent Adoks from taking advantage of corporate opportunities which should have been offered to the corporation. (Thornton Complaint, 9, 10.)

n3 The Adoks litigation included as defendants six other individuals and a corporation all affiliated with Czechoslovakia (Czechoslovakia defendants); they are not parties in the instant action.

1997 Mass. Super. LEXIS 251, *3

Thornton was initially represented in the Adoks litigation by Leslie Bloomenthal, Esquire, one of the defendants in the instant action. On December 27, 1992 and January 14, 1993, the Adoks plaintiffs deposed Thornton but did not complete the deposition. On December 9, 1993, the Adoks plaintiffs renoticed Thornton's deposition which was ultimately scheduled for 10 a.m. on January 18, 1994; Thornton and Bloomenthal showed [*4] up late. n4 (Complaint, 46.) Consequently, the Adok's plaintiffs' counsel filed a motion to compel Thornton's attendance at her deposition, and the motion was allowed. The court order reads in part: "Failure of Defendant . . . to appear for her continued deposition on February 28, 1994 (as scheduled per Order of this Court), and on each consecutive day or days thereafter until her deposition is completed, shall constitute a default thereunder." (Complaint, 47.) This order was entered on the same day that Bloomenthal was given leave to withdraw as Thornton's counsel, February 14, 1994.

> n4 Thornton states in her complaint that Bloomenthal misrepresented the time of the deposition.

Thornton retained Kaye Fialkow to represent her in the Adoks litigation on February 25, 1994, and paid Kaye Fialkow $5,000 as a retainer. (Complaint, 49.) On March 2, 1994, Thomas Looney, an associate at Kaye Fialkow, advised Thornton to leave her deposition before it was completed because he had to appear in Middlesex Superior Court. [*5] (Complaint, 55.) The Adoks plaintiffs moved for default immediately following the termination of the deposition pursuant to the February 14, 1994 court order. On March 23, 1994 the default motion was argued, and on April 1, 1994 a judge of this court defaulted Thornton for failing to comply with the February 14, 1994 order. (Complaint, 62.)

Following entry of the default, a hearing to assess damages was held on May 12, 1994. Thornton alleges that Kaye Fialkow was negligent in conducting discovery and missed various filing dates in connection with the assessment hearing, causing her prejudice; and that because of their negligence, they were unprepared for the damages hearing and unable either to cross-examine witnesses or present an effective defense of Thornton. (Complaint, 67.)

During the initial settlement hearings, the Adoks plain-

tiffs suggested a settlement figure of $50,000. Sheehy advised against paying that sum, indicating that Thornton would likely pay less after the hearing. (Complaint, 68.) Subsequently, on July 12, 1994 a judge of this court found that Thornton was liable for damages of $5,260,790 to the plaintiffs and trebled the figure under RICO and G.L.c. [*6] 93A to reach a judgment in excess of $15,782,370. On July 22, 1994, Kaye Fialkow filed a notice of appeal on behalf of Thornton. While the appeal was pending, however, Thornton settled with the Adoks plaintiffs. (Complaint, 72, 73.)

Thornton and the Adoks plaintiffs entered into a written settlement agreement (initial agreement) in April of 1995. Under the initial agreement: Thornton agreed to withdraw with prejudice her notice of appeal; the Adoks plaintiffs reduced the final judgment to $13,000,000; the Adoks plaintiffs agreed never to enforce the final judgment; and Thornton assigned to the Adoks plaintiffs the right to prosecute, and collect the proceeds of, her malpractice claims against Bloomenthal and Kaye Fialkow. On December 6, 1996, Thornton and the Adoks plaintiffs entered into a "Substitute Settlement Agreement Between Barbara Thornton and Adoks, A. S., Richard Libbey, and Robert Brown" (substitute agreement), which modifies their initial agreement, inter alia, to effect a partial assignment instead of an entire assignment of her right to prosecute her malpractice claim. n5

> n5 Kaye Fialkow argues that the substitute agreement should be disregarded because it is post hoc paperwork and cannot revive a cause of action which has expired. The argument is without merit. The substitute agreement was entered into before the three year statute of limitations on Thornton's malpractice claims against Kaye Fialkow had run. Kaye Fialkow further argues that the substitute agreement lacks consideration. In Massachusetts, the effective substitution of an executory contract requires no consideration beyond mutual releases by the parties from the obligations of the prior contract. *Baldwin's Steel Erection Co., Inc. v. Champy Construction Co., Inc.*, 353 Mass. 711, 715, 234 N.E.2d 763 (1968). See *Zlotnick v. McNamara*, 301 Mass. 224, 226, 16 N.E.2d 632 (1938); *Rollins v. Marsh*, 128 Mass. 116, 120 (1880).

[*7]

Under the substitute agreement, Thornton does not expressly assign her malpractice claims against Bloomenthal and Kaye Fialkow. Rather she retains her right to select counsel and to settle her malpractice claims.

The substitute agreement stipulates that through her counsel, Thornton must notify the Adoks plaintiffs of any settlement offers, of her intention to settle, of the terms and dates of any payment of sums under a judgment or settlement, and of the receipt of any sums under a judgment or settlement. Furthermore, any proceeds she receives through either the settlement or judgment of her malpractice claims are to be given to her attorneys and disbursed under the terms of a "Confidential Settlement Memorandum," a separate document executed by Thornton and the Adoks plaintiffs. Thornton is obligated to prosecute this malpractice action under the substitute agreement and she must give 85% of any judgment and a currently undisclosed portion of any settlement over to the Adoks plaintiffs.

> n6 By court order, Kaye, Fialkow have obtained a redacted copy of the Confidential Settlement Memorandum. Kaye, Fialkow argue that they need access to the unredacted copy at this time, for purposes of advancing their motion to dismiss. I disagree that the requested access would have any impact on the resolution of this motion, but Kaye, Fialkow is certainly entitled to press for access to the full copy as part of discovery.

[*8]

Discussion

"In ruling on a motion to dismiss, the allegations of the complaint and annexed exhibits as well as such inferences that may be drawn therefrom in the plaintiff's favor are to be taken as true." *Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 87, 390 N.E.2d 243 (1979).* Further, a motion to dismiss a complaint should not be allowed unless it appears certain that the complaining party is not entitled to relief under any state of facts which could be proven in support of its claim. *Spinner v. Nutt, 417 Mass. 549, 550, 631 N.E.2d 542 (1994); Rae v. Air-Speed, Inc., 386 Mass. 187, 191, 435 N.E.2d 628 (1982).* Kaye Fialkow's argument is twofold: (1) because the Adoks plaintiffs are the assignees of the malpractice claim, they are the real party in interest under *Mass.R.Civ.P. 17* and must be added as plaintiffs to the action; and (2) once the Adoks plaintiffs are added, this action must be dismissed because in Massachusetts, an assignment of a legal malpractice cause of action is prohibited on public policy grounds.

1. There is some force to the argument that the Adoks plaintiffs should be joined under Rule 17. Rule 17(a) provides that "every action shall [*9] be prosecuted in the name of the real party in interest." "The effect of this rule is to avoid a multiplicity of suits by similarly situated

plaintiffs involving the same or similar causes of action." *Mass. Ass'n. of Independent Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 297, 367 N.E.2d 796 (1977)* (MAIIAB was a real party in interest; allowing associational standing avoids multiplicity of actions and insures the interests of the members). The substitute agreement in substance at least calls for a partial assignment of the fruits of this action and may be read to give the Adoks plaintiffs a meaningful role in its prosecution. Where there has been a partial assignment, the assignee and the assignor (who still retains part of the substantive right) should join as plaintiffs, each suing in his own name. "The rule with respect to partial assignments is that . . . the partial assignor of a chose in action should be joined with the assignee." *Boris v. Moore, 152 F. Supp. 595, 599 (E.D. Wis. 1957)* (in a suit brought by the assignee, court joined the assignor under *Fed.R.Civ.P. 17(a)*). See *Airlines Reporting Corp. v. S. and N. Travel, Inc., 857 F. Supp. 1043,* [*10] *1047 (E.D.N.Y. 1994)* (an assignee for purposes of collection holds legal title to the debt and is a real party in interest, even though the assignee must account to the assignor for whatever is recovered in the action); J. W. Smith & H. B. Zobel, Rules of Practice 17.5 (1975).

By joining the Adoks plaintiffs as party plaintiffs in this case, their interests as well as the interests of the defendants are served. Although the confidential agreement conferred more, the substitute agreement still gives the Adoks plaintiffs a substantial stake in this case, and including them as plaintiffs will recognize this fact. Pursuant to *Mass.R.Civ.P. 21*, the Adoks plaintiffs are to be added as plaintiffs to this case.

2. Kaye Fialkow argues that the assignability of a legal malpractice claim is void on grounds of public policy. It is true that a majority of other jurisdictions have barred assignability of legal malpractice claims. "The assignment of such claims could relegate the legal malpractice action to the market place and convert it to a commodity to be exploited and transferred to economic bidders who have never had a professional relationship with the attorney and to whom the attorney [*11] has never owed a legal duty and who have never had any prior connection with the assignor or his rights." *Goodley v. Wank and Wank, Inc., 62 Cal. App. 3d 389, 397, 133 Cal. Rptr. 83 (1976).* The Massachusetts appellate courts, however, have not yet addressed the assignability of legal malpractice claims. *Leone v. Security Ins. Co. of Hartford, 14 Mass. App. Ct. 1026, 1027, 442 N.E.2d 414 (1982)* (court did not reach the question of the validity of an assignment to the plaintiff of "rights" against the various attorneys who, assignor claims, negligently represented him). n7

1997 Mass. Super. LEXIS 251, *11

n7 The First Circuit has found that through the assignment of a certificate of title a plaintiff/assignee cannot proceed against the assignor's attorney for negligent certification. *One National Bank v. Antonellis, 80 F.3d 606 (1st Cir. 1996)*. The court did not expressly reach the issue of whether a legal malpractice claim is assignable because the plaintiff had failed to raise that issue below. *80 F.3d at 612-13 n. 6*. The court did, however, point out that Massachusetts case law emphasizes the fiduciary nature of the attorney–client relationship and the obligation of confidentiality imposed on an attorney. The court concluded: "In the absence of further guidance from the Massachusetts courts, we refuse to allow a third party, of whom the attorney does not know, to assume the rights of a client through assignment. We therefore find that One National did not acquire the right to proceed against Antonellis through the assignment of the certificate of title." *Id. at 614*.

[*12]

Courts which have prohibited assignments of legal malpractice claims have been particularly concerned where, as here, the assignee was the plaintiff in the underlying lawsuit which gave rise to the legal malpractice claim because of the risk of collusion. In *Coffey v. Jefferson County Board of Education, 756 S.W.2d 155, 155–56 (Ky. 1988)*, for example, the assignor was the defendant in the underlying lawsuit; he confessed judgment and, instead of paying the $1,000,000, assigned his claims of malpractice against his attorney to the underlying lawsuit's plaintiff. Granting the defendant's motion for summary judgment, the court called the assignment a "contrived and elaborate scheme," stating, "it appears to us that this transaction is so collusive that same should be held against public policy." *Id. at 156*. See *Wagener v. McDonald, 509 N.W.2d 188, 191 (Minn. Ct. App. 1993)* (legal malpractice claims held unassignable due in part to risk of collusion); *Zuniga v. Groce, Locke & Hebdon, 878 S.W.2d 313, 316 (Text Ct. App. 1994)* (assignment held to be a transparent device to replace a judgment proof, uninsured defendant with a solvent defendant).

The central factor [*13] distinguishing these cases from the case at bar, however, is that on the abbreviated record before me, this case appears to involve a partial assignment, rather than an entire assignment, of a legal malpractice claim. If this is so, many of the policy considerations which other courts have identified as militating against assignment do not come into play so sharply. Clearly, the substitute agreement on its face raises a risk of collusion, a

risk made stronger when the original agreement and substitute agreement are considered together. Nevertheless, the risk of collusion may not necessarily lead to dismissal as the appropriate remedy. The Supreme Judicial Court has held that where a satisfactory basis for the issue of collusion exists, the defendant can argue it to the factfinder. *Campione v. Wilson, 422 Mass. 185, 193, 661 N.E.2d 658 (1996)*. n8

N8 In the circumstances, it is at best premature to rule on Kaye Fialkow's contention that assignment of Thornton's legal malpractice claim is void as against public policy. Discovery may lead to information suggesting that the substitute agreement effects more of an assignment than currently appears to be the case, thereby placing Kaye Fialkow's argument in sharper focus. But we are not there yet.

[*14]

3. Kaye Fialkow further contends that this action must be dismissed because under the settlement agreement the Adoks plaintiffs will not enforce their judgment against Thornton; therefore, they contend, Thornton has suffered no damages. The court in *Campione* rejected the "somewhat metaphysical contention" that the legal basis for the claim against the insurer disappeared when the insured became insulated from liability due to a release or a covenant not to execute. *Campione v. Wilson, supra, 422 Mass. at 191-92*, quoting *Gray v. Grain Dealers Mut. Ins. Co., 276 U.S. App. D.C. 388, 871 F.2d 1128, 1132 (D.C.Cir. 1989)*. In any event, Massachusetts courts have held that the gist of a legal malpractice claim is a breach of implied contract and a breach of contract carries with it at least nominal damages. *Fall River Savings Bank v. Callahan, 18 Mass. App. Ct. 76, 81–82, 463 N.E.2d 555 (1986)*. As such, dismissal because of an alleged absence of damages is inappropriate.

Kaye Fialkow requests that if their motion to dismiss is denied, I report the question of assignability to the Appeals Court for an appellate ruling before the trial. I decline to do so at this time. As previously [*15] discussed, the present record suggests the assignment in question is only a partial assignment, not an entire assignment: the substitute agreement does not deprive Thornton of her rights to litigate her malpractice claim but only the right to a percentage of the proceeds. Discovery in this case may expand the record on the nature of the assignment, and if appropriate, the question of reporting the case may be raised again.

ORDER

1997 Mass. Super. LEXIS 251, *15

For the foregoing reasons, it is ORDERED that pursuant to *Mass.R.Civ.P. 21*, Adoks A. S., Inc., Richard Libbey, and Richard Brown shall be joined as plaintiffs in this action; an amended complaint which names them as plaintiffs along with Thornton is to be filed within 21 days. It is further ORDERED that the defendant Kaye Fialkow's motion to dismiss be DENIED.

  Margot Botsford

Justice of the Superior Court

Dated: July 2, 1997

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al.,<br><br>          Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION,<br>          Defendants. | CIVIL ACTION NO: 05-11840-MLW<br><br>**THE ENCLOSED DOCUMENT IS BEING <u>FILED UNDER SEAL</u> WITH THE COURT IN ACCORDANCE WITH THE ASSENTED TO MOTION TO FILE UNDER SEAL FILED ON JANUARY 19, 2006** |

## DEFENDANT TRENWICK AMERICA REINSURANCE CORPORATION'S RENEWED MOTION TO STAY PROCEEDINGS PENDING ARBITRATION AND IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR REMAND

Defendant Trenwick America Reinsurance Corporation ("Trenwick"), for reasons set forth in the accompanying memorandum of law, respectfully moves this Court, pursuant to the provisions of Section 3 of the Federal Arbitration Act, 9 U.S.C. §3 (the "FAA"), for an Order: (i) determining that the only proper forum for the plaintiffs to assert their claims against Trenwick is arbitration, (ii) staying this action pending the outcome of any arbitration that may be commenced involving Trenwick and the plaintiffs, and (iii) denying plaintiffs Renewed Motion to Remand.

## REQUEST FOR HEARING

Pursuant to Local District Court Rule 7.1(D), Trenwick requests that the Court schedule a hearing with respect to the instant motion as oral argument will be of assistance to the Court in resolving this matter.

TRENWICK AMERICA
REINSURANCE CORPORATION

By its attorneys,

Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

Of Counsel:
Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
(212) 969-3000

Dated: January 19, 2006

## CERTIFICATE OF SERVICE

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation, hereby certify that on January 19, 2006, I served a copy of the foregoing document by overnight delivery on all known counsel of record.

Eben A. Krim

2

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN REINSURANCE COMPANY, et al.,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP and TRENWICK AMERICA REINSURANCE CORPORATION,<br>　　　　　Defendants. | CIVIL ACTION NO: 05-11840-MLW<br><br>**THE ENCLOSED DOCUMENT IS BEING <u>FILED UNDER SEAL</u> WITH THE COURT IN ACCORDANCE WITH THE ASSENTED TO MOTION TO FILE UNDER SEAL FILED ON JANUARY 19, 2006** |

**MEMORANDUM OF DEFENDANT TRENWICK AMERICA REINSURANCE CORPORATION IN SUPPORT OF ITS RENEWED MOTION TO STAY PROCEEDINGS PENDING ARBITRATION AND <u>IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR REMAND</u>**

Defendant Trenwick America Reinsurance Corporation ("Trenwick") respectfully submits this memorandum (1) in support of its renewed motion to stay these proceedings pending both (a) the arbitrations that are currently proceeding between co-defendant American International Group ("AIG") and the plaintiffs (the "Pool Members") and (b) any additional arbitration the Pool Members may elect to commence against Trenwick and (2) in opposition to the Pool Members' Renewed Motion for Remand.

**<u>PRELIMINARY STATEMENT</u>**

Trenwick is renewing its original motion to stay these proceedings (filed on September 15, 2005) in light of the filing of the Pool Members' amended complaint on December 30, 2005 ("Amended Complaint"). We submit this memorandum to addresses new issues related to Trenwick; specifically, the claim for conversion (Count VII) and the additional allegations made in support of the Pool Members' declaratory judgment claim (Count VI). However, as a review

of the Amended Complaint readily reveals, because no new arguments have been advanced in the Pool Members' Renewed Motion to Remand, we adopt and incorporate by reference the arguments against remand as stated in AIG's Memoranda[1] and in Trenwick's Memoranda.[2]

The Pool Members' original complaint ("Original Complaint") pleaded a declaratory judgment claim against Trenwick in the most conclusory fashion. *See* Original Complaint at ¶¶ 129-33. The Pool Members' Amended Complaint adds some alleged factual detail without materially changing the nature of the claim. *See* Amended Complaint at ¶¶ 137-43. The Pool Members' Amended Complaint also includes a new claim of conversion against Trenwick. *See id.* at ¶¶ 144-54. The conversion claim alleges that one feature of the AIG-Trenwick agreement that the Pool Members previously complained about, specifically, Trenwick's assignment of certain rights it had under the Quota Share Agreement ("QSA"), was a conversion of the Pool Members' assets to Trenwick's own use. *Id.* at ¶¶ 147-48. The assertion of the new conversion claim and additional allegations regarding the declaratory judgment claim do nothing to change the fact that this action should be stayed.

In addition, the Amended Complaint provides no new basis to remand this action to state court. Neither the conversion claim (which is merely another label placed on the same alleged conduct previously objected to by the Pool Members) nor the additional allegations in support of the declaratory judgment claim affect this Court's jurisdiction pursuant to 9 U.S.C. § 205.

---

[1]   "AIG's Memoranda" includes AIG's Memorandum in Support of Its Motion to Stay dated September 9, 2005 and AIG's Memorandum in Opposition to Plaintiffs' Motion to Remand and Reply in Support of AIG's Motion to Stay dated November 14, 2005.

[2]   "Trenwick's Memoranda" includes Trenwick's Memorandum in Support of Its Motion to Stay dated September 15, 2005 and Trenwick's Memorandum in Opposition to Plaintiffs' Motion to Remand and Reply in Further Support of Trenwick's Motion to Stay dated November 14, 2005.

### ARGUMENT

**A.     THE DECLARATORY JUDGMENT COUNT
PLEADED AGAINST TRENWICK SHOULD BE STAYED**

On its face, the declaratory judgment claim (Count VI) concerns a "dispute or difference .

. . arising with reference to the interpretation, application or effect" of the Retrocessional

Agreements (which include the QSA) and therefore is subject to arbitration.[3]  Count VI

incorporates the Pool Members' allegations that Trenwick breached its contractual duties to the

Pool Members under the Retrocessional Agreements (*see, e.g., id.* at ¶ 134), as well as all the

other allegations raising issues of the "interpretation, application or effect" of the Retrocessional

Agreements.  Therefore, just like all of the other counts of the Complaint, Count VI depends

upon the interpretation of rights and obligations under the Retrocessional Agreements, including

the QSA.  Nothing in the new detail that has been added to the Amended Complaint changes

this.  Thus, despite the new allegations, Count VI continues to be subject to arbitration for the

reasons stated in AIG's Memoranda and Trenwick's Memoranda.

**B.     THE NEW CONVERSION COUNT SHOULD BE STAYED**

Similarly, the newly pleaded conversion claim against both AIG and Trenwick (Count

VII), concerns a "dispute or difference . . . arising with reference to the interpretation, application

or effect" of the Retrocessional Agreements (which include the QSA) and, as such, is subject to

arbitration.  The basis for Count VII is that, allegedly, Trenwick, by acting as the Pool Members'

agent, "breached its fiduciary duty to plaintiffs ... by creating inflated 'paid losses' under the

QSA by paying claims known to be fraudulently inflated."  Amended Complaint at ¶ 146.  These

allegations are just a reformulation of conduct previously objected to by the Pool Members.  The

---

[3]     *See* Affidavit of Eric S. Kobrick dated September 9, 2005 ("Kobrick Aff.") submitted in support
of AIG's Motion to Stay Proceedings Pending Arbitration, Exhs. 3-5 (Retrocessional
Agreements) at Art. XI.

3

QSA is one of the agreements that forms the basis of the relationship between Trenwick and the Pool Members. In Count VII, as in the prior counts, the Pool Members incorporate all of the prior allegations of the Complaint. Therefore, just like all of the other counts of the Complaint, Count VII depends upon the interpretation of rights and obligations under the QSA, and thus, is subject to arbitration for the reasons stated in AIG's Memoranda and in Trenwick's Memoranda. If the Pool Members wish to adjudicate the conversion claim, they must do so in arbitration.

### C.    THE AMENDED COMPLAINT PROVIDES NO NEW BASIS FOR REMAND

As previously stated in Trenwick's Memorandum in Opposition to Plaintiffs' Motion to Remand and Reply in Further Support of Trenwick's Motion to Stay, removal of a state court action under 9 U.S.C. § 205 requires only that the "subject matter" of the action "relates to an arbitration agreement … falling under the Convention."

The Pool Members new conversion claim is simply another label placed on the same conduct alleged in the Pool Member's Original Complaint. Central to the conversion claim is Trenwick's assignment of certain rights to AIG under the QSA. Consequently, this claim, like the rest of the Pool Members' claims, "relates to" the QSA, and is subject to arbitration.

4

## CONCLUSION

For the foregoing reasons and those set forth in AIG's Memoranda and in Trenwick's

Memoranda, Trenwick respectfully requests (1) pursuant to Section 3 of the FAA, that this Court

enter an Order staying this litigation in favor of the pending arbitrations (and any arbitration

between Trenwick and the Pool Members should the Pool Members elect to commence such an

arbitration) and (2) this Court enter an order denying the Pool Members' Renewed Motion to

Remand.

**TRENWICK AMERICA
REINSURANCE CORPORATION**

By its attorneys,

Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

Of Counsel:

Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York  10036
(212) 969-3000

Dated: January 19, 2006

**CERTIFICATE OF SERVICE**

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation, hereby certify that on January 19, 2006, I served a copy of the foregoing document by overnight delivery on all known counsel of record.

Eben A. Krim

6

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| AMERICAN REINSURANCE COMPANY, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO: 05-11840-MLW |
| v. | ) ) | |
| AMERICAN INTERNATIONAL GROUP, INC. and TRENWICK AMERICA REINSURANCE CORPORATION, | ) ) ) ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM OF DEFENDANT TRENWICK AMERICA
REINSURANCE CORPORATION IN FURTHER SUPPORT OF ITS RENEWED
<u>MOTION TO STAY PROCEEDINGS PENDING ARBITRATION</u>**

Defendant Trenwick America Reinsurance Corporation ("Trenwick") respectfully

submits this memorandum in further support of its renewed motion to stay these proceedings

pending both (a) the arbitration (the "AIG Arbitration") that is currently proceeding between co-

defendant American International Group, Inc. on behalf of its member and associated companies

(collectively "AIG") and the plaintiffs (the "Pool Members") and (b) any additional arbitration

the Pool Members may elect to commence against Trenwick.  We write to briefly address several

fallacies present in the Pool Members' opposition to defendants' renewed motions to stay (the

"Opposition").

First, the Pool Members continue to combine, and thus obfuscate, the separate and

distinct standards applicable to (a) whether the Court has subject matter jurisdiction over this

dispute (*i.e.*, whether this Court should grant or deny the Pool Members' motion to remand) and

(b) whether this Court should grant defendants' renewed motions to stay proceedings pending

arbitration.  For example, in their latest opposition, the Pool Members state that they "moved to

remand on grounds that Defendants cannot invoke the arbitration clause of the QSA ["Quota

Share Agreement"] or participate as parties-in-interest in the AIG Subsidiaries' arbitral

proceedings, and thus ... cannot invoke ... the subject matter jurisdiction of this Court." *See*

Feb. 2, 2006 Opposition at 2.  As thoroughly explained in both AIG's Memoranda[1] and

Trenwick's Memoranda[2], removal of a state court action under 9 U.S.C. § 205 requires only that

the "subject matter" of the action "relates to an arbitration agreement ... falling under the

Convention," *a standard surely met here*.  Whether AIG or Trenwick can invoke the arbitration

clause of the QSA (which, as both AIG's Memoranda and Trenwick's Memoranda prove, either

defendant can), is a question solely related to whether this Court has the power to issue a stay of

litigation, not whether this court has subject matter jurisdiction to determine whether it should or

should not issue a stay.  As defendants already have conclusively established, the Court has

jurisdiction over this case.

  Second, the Pool Members continue to address the issue of a stay of this litigation as if

AIG and Trenwick were one party in interest.  The fact remains that AIG and Trenwick are

separate defendants and each has independent reasons why a stay of litigation is proper as to it.

AIG has the ground, among others, that the very claims alleged against it here are being fought

in the pending arbitration.  Trenwick has the ground that its agreements with the Pool Members

mandate arbitration of disputes that relate to the agreements.  Thus, it makes no difference at all

---

[1]   "AIG's Memoranda" includes AIG's Memorandum in Support of Its Motion to Stay dated September 9, 2005, AIG's Memorandum in Opposition to Plaintiffs' Motion to Remand and Reply in Support of AIG's Motion to Stay dated November 14, 2005, and AIG's Renewed Motion to Stay Proceedings Pending Arbitration and Opposition to Plaintiffs' Renewed Motion for Remand dated January 19, 2006.

[2]   "Trenwick's Memoranda" includes Trenwick's Memorandum in Support of Its Motion to Stay dated September 15, 2005, Trenwick's Memorandum in Opposition to Plaintiffs' Motion to Remand and Reply in Further Support of Trenwick's Motion to Stay dated November 14, 2005, and Trenwick's Memorandum in Support of its Renewed Motion to Stay Proceedings Pending Arbitration and in Opposition to Plaintiffs' Renewed Motion for Remand dated January 19, 2006.

to Trenwick, for example, whether AIG is in the arbitration on its own behalf, on behalf of its affiliates, or others – in any event Trenwick separately has an enforceable arbitration clause and cannot be made to litigate.

To the extent the Pool Members assert any argument why Trenwick cannot enforce the arbitration clause, it seems to be that Trenwick somehow has surrendered its right to arbitrate the claims the Pool Members have alleged in their complaint here because of Trenwick's limited assignment of its collection rights under the QSA to AIG.  But the Pool Member do not and cannot point to anything in Trenwick's limited assignment to AIG that extinguished its right to arbitrate with the Pool Members under the QSA.  As explained in Trenwick's Memoranda, the Pool Members' efforts to transform a simple assignment of a collection right into an abandonment of an arbitration clause is a remarkable invention, entirely without foundation in fact or law.

Attempting to bolster their fabricated abandonment-of-arbitration argument, the Pool Members argue that "any cooperation by Trenwick in the arbitral proceedings must be obtained by third-party subpoena." *See* Feb. 2, 2006 Opposition at 2.  The Pool Members' decision not to assert claims against Trenwick in arbitration, and to proceed instead by subpoena, should be recognized for what it is – their own tactical choice.

Finally, we emphasize what the Pool Members choose to ignore:  the issues raised by the Pool Members' allegations here are being arbitrated right now between AIG and the Pool Members.  It would be a foolish waste of the resources of the Court and the parties to duplicate those proceedings here.

3

## CONCLUSION

For the foregoing reasons and those set forth in AIG's Memoranda and in Trenwick's
Memoranda, Trenwick respectfully requests, pursuant to Section 3 of the FAA, this Court enter
an Order staying this litigation in favor of the pending arbitration (and any arbitration between
Trenwick and the Pool Members should the Pool Members elect to commence such an
arbitration).

<div style="margin-left:auto;">

**TRENWICK AMERICA
REINSURANCE CORPORATION**

By its attorneys,

 /s/Eben A. Krim
Mark W. Batten BBO #566211
Eben A. Krim BBO #652506
**PROSKAUER ROSE LLP**
One International Place, 22nd floor
Boston, MA 02210
(617) 526-9700

</div>

Of Counsel:

Ronald S. Rauchberg
Margaret A. Dale
David L. Shaul
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036
(212) 969-3000


Dated: February 16, 2006

4

## CERTIFICATE OF SERVICE

I, Eben A. Krim, counsel for Defendant Trenwick America Reinsurance Corporation, hereby certify that on February 16, 2006, I caused a copy of the foregoing document to be served by overnight delivery on all known counsel of record.

/s/ Eben A. Krim
Eben A. Krim

5