UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS                    Civil Action No. 05-11840-MLW

---

American Reinsurance Company; American United Life
Insurance Company; Dorinco Reinsurance Company;
First Allmerica Financial Life Insurance Company;
Guardian Life Insurance Company of America; Hartford
Life Insurance Company; Houston Casualty Company;
John Hancock Life Insurance Company (U.S.A.);
Insurance Corporation of Hannover; Monumental Life
Insurance Company; Pan American Life Insurance
Company; Phoenix Life Insurance Company; Reliance
Standard Life Insurance Company; Reliastar Life
Insurance Company; Sun Life Assurance Company of
Canada; Swiss Re Life & Health America; and
Transamerica Occidental Life Insurance Company,

                              Plaintiffs,
             v.

American International Group and Trenwick America
Reinsurance Corporation,
                              Defendants.

---

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF APPRISING THE COURT OF NEW DEVELOPMENTS

Plaintiffs, members of various LDG reinsurance facilities (the "Facilities Members"), by

their counsel Lovells, submit this memorandum to bring to the Court's attention two

developments relevant to the motion seeking to remand this case to the Superior Court of

Massachusetts:  (1) the criminal indictment of a key witness to the acts under litigation -

Christopher Milton, the former Vice President of Reinsurance of Defendant American

International Group, Inc. ("AIG Inc.") - and (2) his subsequent execution of an affidavit invoking

his Fifth Amendment right against self-incrimination should he be called to testify about his role

as the architect of the fraudulent reinsurance Commutation that lies at the heart of this matter.[1]

As discussed in more detail below, Mr. Milton's decision to invoke the Fifth Amendment

should be considered as *prima facie* evidence in this civil matter of AIG Inc.'s direct and

independent involvement in the fraud perpetrated against the Facilities Members by the

Commutation.  It is also substantially determinative of the procedural issues now before this

Court on remand, where AIG Inc.'s efforts to invoke the Federal Arbitration Act under an

arbitration proceeding brought by its subsidiaries turn on its patently untenable claim that AIG,

Inc., the parent, acted solely in its capacity as the agent and representative of its "member and

associated companies,"[2] rather than in its own name and right, and for its own interests.

The Amended Complaint provides ample grounds for a finding that Plaintiffs have sued

AIG Inc. in its individual corporate capacity for actions taken on its behalf by senior managers

like Milton.  As alleged, Defendants AIG Inc. (rather than the subsidiaries that AIG, Inc.

controls), acting through employees such as Mr. Milton, and Trenwick colluded to wrongfully

commute reinsurance contracts running between Trenwick and certain AIG insurance

subsidiaries in order to create almost $73 million in improper indemnification claims against the

Plaintiffs as retrocessionaires to the coverage.  The pleadings further detail an extensive pattern

of deceptive and fraudulent practices by which AIG Inc. (not the subsidiaries) manipulated the

---

[1]   A copy of the February 6, 2006 Milton Affidavit entered in this litigation is attached as Exhibit 1.  Also attached at Exhibit 2 is the SEC Complaint filed February 2, 2006, alleging securities fraud and related violations.

[2]   In September 2005, Defendants removed this action under §205 of the Federal Arbitration Act, citing arbitral proceedings (the "AIG Subsidiaries Arbitration") brought by several AIG insurance subsidiaries to recover the false "paid losses" generated by the Commutation.  The subsidiaries were acting as assignees of Trenwick American Reinsurance Corporation ("Trenwick") under reinsurance contracts (the "QSA") issued by the Facilities Members. Plaintiffs moved to remand in October 2005, on grounds, *inter alia,* that Defendants lacked standing to invoke the QSA arbitration provisions, and thus cannot bring this matter within the scope of the FAA or the subject matter jurisdiction of this Court.  9 U.S.C. §203; *Intergen N.V. v. Grina,* 344 F.3d 134, 142 (1st Cir. 2003); *Restoration Preserv. Masonry, Inc. v. Grove Europe Ltd.,* 325 F.2d 54, 60 (1st Cir. 2003).  Briefing on Plaintiffs' motion for remand was completed on February 16, 2006.

reported insurance recoveries of its subsidiaries as part of a larger scheme to artificially inflate its own balance sheet and influence the market for its publicly-traded shares. *See, e.g.,* Amend. Compl. ¶ 95 (quoting charges brought by New York Attorney General that AIG Inc. "engage[ed] in sham insurance transactions to 'give the investing public the impression that AIG had a larger cushion of reserves to pay claims than it actually did'; '[hid] losses from [AIG Inc.'s] insurance underwriting business by converting underwriting losses to capital losses'; and '[created] false underwriting income.'"); ¶ 96 (alleging that "the scheme to inflate the AIG Inc. balance sheet to manipulate public perception of its financial health was carried out by the senior management of AIG Inc.," and stating specifically that "[a]mong the managers implicated is Christopher Milton, former AIG Inc. Vice President of Reinsurance"); *see also* ¶¶ 51-53, 68, 76 setting out actions taken by AIG Inc. in furtherance of the fraud.[3]

It is well recognized that a witness' invocation of Fifth Amendment protections against self-incrimination in a civil matter supports an adverse inference as to the substance of testimony not given. *FDIC v. Elio,* 39 F.3d 1239, 1248 (1st Cir. 1994); *Data General Corp v. Crumman Systems Support Corp.,* 825 F. Supp. 340, 352-53 (D. Mass. 1993). Here the inference is inescapable that Milton's testimony, if elicited, would substantiate the fraudulent acts by AIG, Inc. itself, alleged in Plaintiffs' pleadings, giving Milton "reasonable basis" for a "real apprehension of danger" of further criminal prosecution and/or conviction. *See U.S. v. Matthews,* 327 F. Supp.2d 527, 529-30 (E.D. Pa. 2004) (invoking the Fifth Amendment requires a "real apprehension of danger" having a "reasonable basis"); *Hoffman v. U.S.,* 341 U.S. 479,

---

[3]    The allegations in the government's recent indictment of Milton follow the same pattern. As Acting Deputy Attorney General Paul McNulty described, "Executives [including Milton] will be brought to justice not only for cooking their own company's books, but also for knowingly helping their counterparts at other companies do the same." Alister Barr, *Gen Re, AIG Execs Indicted,* Market Watch, Feb. 2, 2006, attached as Exhibit 3.

486-87 (1951) (A witness may invoke the Fifth Amendment only when requested to give testimony that "might be dangerous [to the witness] because injurious disclosure could result").

Moreover, the Milton Affidavit it quite specific that among the questions raising the specter of self-incrimination are "any questions concerning the June 30, 2004 Commutation ...." 6 Feb. 2006 Milton Affidavit ¶2. The Fifth Amendment right cannot be invoked as a "blanket privilege." It requires the witness have cause to apprehend danger from a direct answer about particular actions that give rise to criminal liability. *U.S v. Awerkamp,* 497 F.2d 832, 836 (7th Cir. 1974), *quoting Hoffman,* 341 U.S. 479. During the drafting of the Milton Affidavit, Milton's criminal defense counsel was given a copy of the Amended Complaint setting forth the causes of action brought by the Facilities Members and the allegations of wrongdoing by Milton.[4] Thus counsel had enough information to determine after consultation with her client about the facts, that her client had a reasonable basis for fearing criminal liability because of the actions Plaintiffs alleged.

As the Milton affidavit makes clear, AIG Inc. cannot credibly continue in its efforts to pass itself off before this Court as legally equivalent to its "member and associated companies." Milton's affidavit implicates AIG Inc., as itself and acting through Milton, in the fraud perpetrated on the Facilities Members. AIG Inc. is not a party to any agreement to arbitrate with Plaintiffs and is not a real-party-in-interest to the AIG Subsidiaries Arbitration. Nor are its assets at risk before the arbitration panel. As such, AIG Inc. cannot establish the rights to arbitrate

---

[4]    Exhibit 4, 25 January 2006 email from A. Hawker, Lovells to Susan Hafetz, Esq. Milton also entered two affidavits in the AIG Subsidiaries Arbitration:  the first specifically invoking the Fifth Amendment with respect to the Commutation; the second (subsequently entered and more vaguely worded), seeking to extend the Amendment's protection to yet additional deals.  Nothing in these affidavits revokes or recants Milton's asserting of Fifth Amendment privileges in this litigation or retracts Milton's stated belief that his actions in the Commutation expose him to criminal sanctions - a point conceded by AIG Inc. counsel Mr. Krugman. *See,* Exhibit 5, D. Beauchamp deposition in the AIG Subsidiaries Arbitration, at 44.

necessary to create subject matter jurisdiction in this Court under the FAA.  The Court should

remand this action to the Massachusetts Superior Court.

AMERICAN REINSURANCE COMPANY

By its attorneys,


_____/s/Steven L. Schreckinger_____
Steven L. Schreckinger (BBO No. 447100)
Lynch, Brewer, Hoffman & Fink, LLP
101 Federal Street
Boston, MA 02110
(617) 951-0800

Dated: August 25, 2006

# EXHIBIT 1

<table>
<tr><td colspan="2">UNITED STATES DISTRICT COURT<br/>DISTRICT OF MASSACHUSETTS</td></tr>
</table>

|  |  |
|---|---|
| AMERICAN REINSURANCE COMPANY, *et al.,*<br><br>                     Plaintiffs,<br><br>       V.<br><br>AMERICAN INTERNATIONAL GROUP and<br>TRENWICK AMERICAN REINSURANCE<br>CORPORATION<br><br>                   Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br><br>Civil Action No. 05-11840-MLW |

## Affidavit of Christian Milton

CHRISTIAN MILTON hereby swears under penalty of perjury:

     1. I submit this affidavit in response to a request by Plaintiffs, in lieu of being called as a witness in the captioned litigation which was originally filed with the Superior Court of Massachusetts, in and for Suffolk County, Business Litigation Session and was removed to the United States District Court, District of Massachusetts by Defendants. Plaintiffs' Motion to Remand is currently pending. A similar affidavit is attached relating to the pending Arbitration.

     2. If I were called as a witness in this matter I would assert my Fifth Amendment right against self-incrimination and decline to answer any questions concerning: the June 30, 2004 Commutation signed by American International Group, Inc. ("AIG, Inc."), on behalf of its member and associated companies, and Trenwick America Reinsurance Company ("Trenwick"); the issues in the captioned arbitration; AIG, Inc. (including its member and associated companies); Trenwick; the Respondents and Counter-Petitioners; or my background.

     3. For the reasons outlined above, I will not appear as a witness for any party in either proceeding or future related proceedings, nor will I provide any written statements or additional affidavits to any party in either proceeding or future related proceedings.

- 2 -

Dated:      New York, New York
~~December ___, 2005~~
February 6, 2006

CHRISTIAN MILTON

Sworn to before me this
6th day of ~~December, 2005~~
February 2006

NOTARY PUBLIC

LYNNE E. HARRISON
NOTARY PUBLIC, STATE OF NEW YORK
ID No. 01HA6131397
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES 09/01/2009

# EXHIBIT 2

MARK K. SCHONFELD (MS-2798)
REGIONAL DIRECTOR

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Northeast Regional Office
3 World Financial Center
New York, NY 10281-1022
(212) 336-1020



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

             -against-

RONALD FERGUSON,
ELIZABETH MONRAD,
CHRISTIAN MILTON,
ROBERT GRAHAM and
CHRISTOPHER GARAND,

                     Defendants.

**06 Civ. ____ 0778**

ECF CASE

COMPLAINT

---

       Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against defendants Ronald Ferguson, Elizabeth Monrad, Christian Milton, Robert Graham, and

Christopher Garand (collectively, the "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

      1.      This case concerns the conduct of four former senior executives of General Re

Corporation ("Gen Re") – Ferguson, Monrad, Graham, and Garand – and a former senior

executive of American International Group, Inc. ("AIG") – Milton – among others, to aid and

abet a securities fraud committed by AIG. The Defendants and others at Gen Re and AIG

helped AIG structure two sham reinsurance transactions that had as their purpose to provide

apparent support for AIG to add a total of $500 million in phony loss reserves to its balance

sheet in the fourth quarter of 2000 and the first quarter of 2001 – phony reserves that were

supposed to stay on AIG's books for at least two years. The transactions were initiated by AIG

to quell criticism by analysts concerning a reduction in AIG's loss reserves in the third quarter

of 2000. These transactions made it appear as though AIG had increased its loss reserves in the

fourth quarter of 2000 and first quarter of 2001 by a total of $500 million, which was not true.

The economic substance of the two transactions was that Gen Re was paying $500 million in

premiums in return for AIG reinsuring a $500 million risk. In other words, the transactions had

no economic substance, amounting to a round trip of cash; but they were designed to, and did,

have a specific, and false, accounting effect.

        2.      Without the phony loss reserves, AIG would have reported further declines in its

loss reserves in both quarters. Instead, as a result of the transactions, AIG's financial results

showed a false increase in reserves that AIG touted in the Company's quarterly earnings

releases. Although AIG and Gen Re had agreed that the sham deal would stay in place for two

years through December 2002, the phony loss reserves remained on AIG's financial statements,

artificially boosting its loss reserves by $500 million, for much longer. In a press release dated

March 30, 2005, AIG admitted that the accounting for these transactions was improper and

would be corrected. In its 2004 Form 10-K filed with the Commission on May 31, 2005, AIG

restated its financial statements to recharacterize the transactions as deposits rather than as

reinsurance. In that filing, AIG admitted that the transactions were "done to accomplish a

desired accounting result and did not entail sufficient qualifying risk transfer" to qualify as

reinsurance that would have allowed AIG to add loss reserves to its financial statements.

## VIOLATIONS

3.      By virtue of the conduct described herein, each of the Defendants is liable, pursuant to Section 20(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78t(e)], as an aider and abettor of AIG's violations of Sections 10(b), 13(a), 13(b)(2) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2) and 78m(b)(5)] and Rules 10b-5, 12b-20, 13a-1, 13a-13 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-13 and 240.13b2-1].

## JURISDICTION AND VENUE

4.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], seeking a judgment:

a.      permanently restraining and enjoining each defendant from violating or aiding and abetting violations of the federal securities laws;

b.      requiring each defendant to disgorge any ill-gotten gains and to pay prejudgment interest thereon;

c.      requiring each defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

d.      permanently barring each defendant, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

3

5.      This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

6.      The Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the transactions, acts, practices and courses of business alleged herein. Certain of these transactions, acts, practices and courses of business occurred in the Southern District of New York, including, among other things, portions of the negotiations concerning the transactions described herein. AIG also has its headquarters in New York, New York.

### THE DEFENDANTS

7.      **Ferguson**, age 63, is a resident of Fairfield, Connecticut. He was employed as the chief executive officer of Gen Re from 1987 through September 1, 2001, when he retired as chief executive officer and became non-executive chairman. In June 2002, Ferguson retired as non-executive chairman and began working for Gen Re as a consultant under contract until Gen Re terminated his consulting agreement in May 2005. Ferguson completed a series of actuarial exams in 1971 and is currently a fellow with the Actuarial Capital Society and a certified member of the American Academy of Actuaries.

8.      **Monrad**, age 51, is a resident of New Canaan, Connecticut. She was Gen Re's chief financial officer from June 2000 until July 2003, when she left Gen Re to become the chief financial officer of another company. From May 2002 through July 2003, Monrad was also a member of the executive committee of Gen Re's Board of Directors. From 1997, Monrad was the chief financial officer of Gen Re's North American Operations. Monrad was licensed as a certified public accountant in Massachusetts in 1983, but her license expired on June 30, 1993.

4

9.    **Milton**, age 58, is a resident of Wynnewood, Pennsylvania. He was AIG's vice president of reinsurance until he was terminated by AIG in March 2005. Milton was AIG's point person in the AIG/Gen Re transactions and took the lead role for AIG in structuring the transactions.

10.    **Graham**, age 57, is a resident of Westport, Connecticut. He was a senior vice president and assistant general counsel at Gen Re, which he joined in 1986, until he retired from Gen Re in October 2005. Graham has been a member of the Delaware Bar since 1973 and a member of the Connecticut Bar since 1988.

11.    **Garand**, age 58, is a resident of Upper Saddle River, New Jersey. He was a Gen Re senior vice president and the head and chief underwriter of Gen Re's finite reinsurance operations in the United States from 1994 until August 2005. During the time period relevant to the AIG/Gen Re transactions, Garand also served on the board of directors of Gen Re's subsidiary, Cologne Re Dublin ("CRD"), located in Dublin, Ireland. CRD is the subsidiary that Gen Re used to effect the transactions at issue here.

## FACTS

### Background

12.    This case is not about the violation of technical accounting rules. The Defendants structured two phony reinsurance transactions that had no real economic substance. They designed the transactions for the purpose of aiding AIG in manipulating its financial statements. The only economic benefit to either party was a $5 million fee AIG paid to Gen Re for putting the deal together – a side agreement not reflected in the deal documents. The parties agreed in another undisclosed side deal that AIG would never have to pay any losses under the contracts, even though the contracts were written to appear as if AIG could incur $100 million

in losses. Further, the premiums supposedly due AIG under the terms of the contracts were an illusion. In a roundtrip of cash, AIG gave Gen Re the money to pay the $10 million in premiums as part of another secret side agreement. In order to mask the real reason for the transfer of funds between AIG and Gen Re (the prefunding of the $10 million in "premiums" and Gen Re's $5 million fee for doing the deal), AIG and Gen Re commuted a separate, unrelated reinsurance contract between Gen Re and an AIG subsidiary, the Hartford Steam Boiler Inspection and Insurance Company ("HSB"). Gen Re and AIG also created a phony paper trail for the two transactions to make it appear as though Gen Re had solicited the reinsurance when all parties knew AIG sought the deal to manipulate its financial statements.

13. Each of the Defendants was aware that the true purpose of the transactions was to permit AIG to record and report phony loss reserves to calm analysts' criticism of AIG's reduction in loss reserves in the third quarter of 2000. Nevertheless, each of them knowingly took steps to help AIG accomplish its fraudulent purpose:

- Ferguson (Gen Re's chief executive officer when AIG's then chairman proposed the transaction) had discussions with AIG's chairman that initiated the transactions. He then formed and directed the Gen Re team that executed the transaction. Ferguson also approved the structure of the deal, including the undisclosed side agreements that AIG would never have to pay any losses under the contracts and that AIG would prefund the $10 million in premiums due AIG under the deal documents and pay Gen Re $5 million for putting the deal together.

- Monrad (Gen Re's chief financial officer) was involved in all aspects of the deal, including developing the initial structure that was proposed to AIG, communicating to AIG that AIG and Gen Re would be accounting for the transactions differently and making sure that AIG paid Gen Re its $5 million fee and prefunded the $10 million in premiums before any money was paid by Gen Re to AIG under the sham contracts.

- Milton (AIG's senior executive in charge of AIG's reinsurance) was the AIG point person assigned to work out the details with Gen Re for the sham transactions. He was involved in all aspects of the deal from AIG's side, including structuring the terms of the deal and effecting the undisclosed side agreements.

6

- Graham (senior Gen Re executive and assistant general counsel) knowingly drafted the sham contracts to make it appear as if AIG was assuming $100 million of risk in the deal and purposely omitted the side agreements between the parties that nullified any apparent risk on the face of the written contracts (*i.e.* the side agreements that AIG would not have to pay any losses under the contracts, that Gen Re was receiving a $5 million transaction fee for the deal and that AIG was prefunding the premiums due AIG under the contracts). Graham also helped create the phony paper trail to make it look like Gen Re, and not AIG, solicited the transaction.

- Garand (Gen Re senior executive in charge of Gen Re's U.S. finite reinsurance operations) played a key role in structuring and effecting the undisclosed side agreements (namely, the payment of Gen Re's undisclosed fee and AIG's prefunding of the premium payments) and masking the true purpose for the transfer of funds between AIG and Gen Re.

### AIG's Restatement

14.    On March 30, 2005, AIG issued a press release announcing a delay in the filing of AIG's 2004 Form 10-K. In the press release, AIG disclosed that an internal review of AIG's books and records was being conducted that included issues arising from pending regulatory investigations. The release also discussed the AIG/Gen Re transactions. It stated that "the documentation [for the AIG/Gen Re transactions] was improper and, in light of the lack of evidence of risk transfer," the transactions should not have been accounted for as reinsurance. As a result, AIG stated it would adjust its financial statements to recharacterize the transactions as deposits, effectively reversing the reserves that AIG had posted as a result of the AIG/Gen Re transactions.

15.    On May 31, 2005, AIG announced that it had completed its internal review and filed its 2004 Form 10-K. The Form 10-K included a restatement of its financial statements for the years ended December 31, 2000, 2001, 2002 and 2003, and selected quarterly information for the quarters ended March 31, June 30 and September 30, 2003 and 2004, and the quarter ended December 31, 2003. As part of the restatement, AIG amended its periodic quarterly filings on Form 10-Q for the periods ended March 31, 2003 and 2004 in a 10-Q/A filed on June

7

28, 2005; for the periods ended June 30, 2003 and 2004 on a 10-Q/A filed on August 9, 2005 and for the period ended September 30, 2004 in a 10-Q filed on November 14, 2005. The restatement resulted in, among other items, a reduction of AIG's net income for the year 2004 by $1.32 billion, which was an 11.9 percent reduction from the amount previously announced in AIG's February 9, 2005 earnings release. The restatement also reduced AIG's consolidated shareholders' equity by $2.26 billion.

16.    AIG also restated its accounting pertaining to the AIG/Gen Re transactions. AIG concluded in the 2004 Form 10-K that "the transaction[s were] done to accomplish a desired accounting result and did not entail sufficient qualifying risk transfer. As a result, AIG has determined that the transaction[s] should not have been recorded as insurance. AIG's restated financial statements recharacterize the transaction[s] as [] deposit[s] rather than as insurance."

### Overview of the AIG/Gen Re Transaction

17.    AIG's fraudulent scheme involving Gen Re arose from the market's negative reaction to AIG's third quarter 2000 earnings release, issued on October 26, 2000. In that release, AIG showed an approximate $59 million decline in general insurance reserves. The reduction in loss reserves drew criticism from market analysts. At least two analysts downgraded AIG after the earnings release, and AIG's stock price dropped 6 percent (down $6.06 to $93.31 per share) on October 26, 2000.

18.    Concerned about analysts' reaction to AIG's declining reserves and the resultant negative impact on AIG's stock price, on or about October 31, 2000, AIG's chairman called Ferguson (who was then Gen Re's chief executive officer) to solicit help in structuring a transaction between AIG and Gen Re that would transfer $200 million to $500 million of "loss reserves" to AIG by year end through a reinsurance arrangement between AIG and Gen Re. In

8

conversations with Ferguson, AIG's chairman made clear that, while he was looking to increase

AIG's loss reserves, the transaction he was contemplating was one that would *not* require AIG

to take on any actual risk. Ferguson understood that what the AIG chairman was describing was

not a bona fide reinsurance transaction, which would have required that AIG assume an actual

risk from Gen Re, but rather a transaction that would only look like reinsurance for AIG's

accounting purposes.

      19.     AIG was one of Gen Re's largest clients and Ferguson was eager to

accommodate AIG's chairman. At Ferguson's direction, Monrad, Graham, Garand, and others

worked out the details of the transaction together with Richard Napier (the Gen Re senior vice

president responsible for Gen Re's relationship with AIG) and John Houldsworth (the chief

executive officer of Gen Re's Dublin subsidiary, CRD) to fulfill the request by AIG's chairman.

AIG's chairman assigned Milton, the head of AIG's reinsurance division, to act as the point

person to work with Gen Re in structuring the deal. Working together, these individuals

fashioned two retrocession contracts between CRD, Gen Re's subsidiary, and National Union

Fire Insurance Company of Pittsburgh, PA ("National Union"), an AIG subsidiary. In insurance

parlance, a "retrocession" is a transaction in which a reinsurer cedes to another reinsurer all or

part of a reinsured risk it previously assumed (*i.e.,* reinsurance of reinsurance). One contract

was effective December 1, 2000, and the second was effective March 31, 2001. These two

contracts were the fraudulent basis for the addition of loss reserves to AIG's financial

statements. In November 2004, at AIG's request, CRD and National Union commuted the first

contract. On August 1, 2005, Gen Re notified AIG that it "cancelled" the second contract.

20.     Under the contracts, National Union purportedly reinsured CRD for up to $600 million in losses ($300 million per contract). Attached to the two contracts was a skeleton schedule prepared by CRD that set forth these purported losses. The schedule listed the six underlying reinsurance contracts previously reinsured by CRD – "Contract A" through "Contract F" – the country of origin for each contract and the amount of "Reserves" associated with each contract. In consideration for the reinsurance from National Union, CRD was obligated to pay $500 million in premiums ($250 million per contract).

21.     The contracts did not reflect the actual arrangement. As everyone involved understood, this was to be a riskless transaction for both AIG and Gen Re. Thus, although on the face of the contracts National Union appeared to assume $100 million of risk over and above the $500 million in premiums CRD was obligated to pay, this extra $100 million of risk was pure fiction added to make it appear that the contracts transferred risk to National Union. In fact, National Union assumed no risk and CRD incurred no premium liability. Of the $500 million in premiums set forth in the contracts, $490 million was on a "funds withheld" basis (*i.e.*, the money was never paid to National Union but was retained by CRD). CRD was supposed to pay the remaining $10 million to National Union according to the contracts, but AIG "prefunded" the $10 million to CRD in what amounted to a round trip of cash in a side deal that was not reflected in the contracts.

22.     The Defendants went to considerable lengths to aid AIG in its fraud by concealing the true nature of the transactions. AIG agreed to pay Gen Re a $5 million fee for putting the deal together, but this fee arrangement was separate and was not reflected in the contracts. In order to effect the side agreements and conceal AIG's payment of the fee and the "prefunded" $10 million premium payment, Gen Re and AIG commuted a separate, unrelated

reinsurance contract, between Gen Re and another AIG subsidiary, HSB. And to make it look

to outsiders (*e.g.* auditors) as though Gen Re had solicited the contracts when, in fact, AIG

solicited the deal to manipulate its loss reserves, Gen Re and AIG deliberately created a sham

paper trail suggesting that Gen Re, not AIG, had initiated the transaction.

23.    Each of the Defendants understood that the deal was structured as a riskless

transaction in which neither AIG nor Gen Re would profit or lose except for the $5 million fee

AIG agreed to pay to Gen Re for its trouble. Each of the Defendants was also aware that,

contrary to what a company reinsuring losses would have done if the deal were legitimate, AIG

did not perform any due diligence regarding the underlying losses it was supposedly reinsuring.

In fact, during the course of the contracts, AIG did not seek or receive any claims or reports on

loss activity and did not maintain an underwriting file for the two contracts with CRD.

### Reinsurance Accounting Principles

24.    The purpose of these transactions was to make it appear as though Gen Re was

purchasing reinsurance from AIG so that AIG could record loss reserves associated with the

reinsurance contracts. Had this been real reinsurance involving a real transfer of risk, AIG

would have been entitled to record reserves in the amount of the loss that was probable and

reasonably estimable. However, these were not real reinsurance contracts. Their purported

terms were all undone in undisclosed side agreements. AIG assumed no risk, and the only

economic benefit to either party was the $5 million fee that AIG paid to Gen Re for putting the

deal together. Because the transactions had no economic substance, the contracts should not

have been accounted for at all. But even if some accounting for them was necessary, the

transactions at best resulted in a liability owing to Gen Re and therefore should have been

recorded as deposits on AIG's books, *i.e.*, money owed to Gen Re, which would have had no effect on AIG's reserves.

### The Defendants' Knowledge of AIG's Improper Purpose

25.     All of the Defendants understood the fraudulent purpose of the transactions. Each of them was aware of AIG's concerns about analysts' criticisms of AIG's declining reserves in the prior quarter. Each of them also was aware that AIG wanted a risk-free transaction. Each Defendant participated substantially in structuring the transactions and effecting undisclosed side agreements to help AIG achieve its fraudulent purpose of adding loss reserves to its financial statements without incurring any actual risk. The Defendants also created a sham paper trail to aid AIG in its fraud to cover up the true nature of the fraudulent transaction.

### The Defendants' Awareness of AIG's Desire to Add Loss Reserves to Quell Analyst Criticism

26.     Milton was the AIG point person who dealt directly with Gen Re's Napier. Milton told Napier that AIG's chairman wanted a no-risk transaction in which Gen Re would transfer $200 million to $500 million of loss reserves to AIG by year end. Monrad, Garand, Graham, and others worked with Napier and Houldsworth to develop the deal's structure. Ferguson was kept up-to-date on the progress of the deal by Napier and Monrad. Over the course of several weeks in the fourth quarter of 2000, they developed a structure for the fraudulent transaction.

27.     On October 31, 2000, Ferguson met with Napier and relayed the proposal that AIG's chairman had made in his telephone conversation with Ferguson that day: AIG's chairman wanted Gen Re to "transfer $200m-$500m of reserves to AIG for a six to nine month period" by year-end. In conversations with Ferguson, AIG's chairman also indicated that he did

not want AIG to incur any losses during the term of the deal. Ferguson cautioned that Gen Re

should: "make certain we do not create (reporting) problems of our own." Ferguson also told

Napier that Milton would be the AIG point person on the deal.

28.     On November 1, 2000, Napier sent an email to Ferguson and other Gen Re

officials confirming that he spoke with Milton and that Milton confirmed that AIG "only

want[s] reserve impact" from the deal "to address the criticism [AIG] received from the

analysts" in the third quarter of 2000.

29.     In a follow-up email on November 6, 2000, Napier advised Ferguson, Monrad,

and others about his recent conversation with Milton: "The deal has changed a little. Instead of

a 6 to 9 month duration, they are now seeking a 24 month term." Ferguson replied: "Thanks,

please keep me posted. Please do not make any pricing commitments or even pricing

suggestions without talking to me." Ferguson made clear that he wanted to be kept informed

about the transaction and that he wanted to exert control over the pricing of the deal. Napier

replied promptly:

> We are pushing to meet Chris [Milton's] commitment to [AIG's chairman] that
> we will have general ideas by the end of the week. The next step will be to meet
> with AIG representatives to discuss the details of the structures. To fashion a
> final solution we need a better understanding of the impact they are seeking and
> the financial costs they are prepared to bear (aside from the cost of our product).

30.     On or about November 7, 2000, Napier circulated a memorandum to Ferguson,

Monrad, and four other high level Gen Re employees. The memorandum, which bore the

subject line "MRG [AIG's chairman] Reserve Project," attached an analyst's report dated

October 27, 2000, regarding AIG's third quarter 2000 earnings release issued the day before.

The analyst's report contained the following in the section on AIG's reserves:

> The market was disturbed by AIG's net reserve decrease of $59 million . . . . AIG
> has reduced reserves twice recently – in the second and fourth quarters of 1999 –

13

and the market reacted badly then as well. AIG bounced back in both cases because (1) like today, the explanation for the reserve decline was reasonable and (2) more important, no "other shoe" ever dropped. We don't believe another shoe will drop this time either.

We do care a lot about reserves, and if we saw a steady trend of unexplained releases during a period of premium growth, we'd definitely be concerned. But that's not the case here.

In his cover memo attaching this report, Napier wrote:

Based upon [the analyst's] numbers, AIG reduced reserves $59m. It will be interesting to understand more about the $500m figure [AIG has] been using for [the proposed deal]. Perhaps [AIG is] planning for further releases in Q4 and are seeking a means to offset the cosmetic impact.

### Structuring the No Risk Deal to Appear as a Risk Transaction

31.    The Gen Re deal team turned to a Gen Re subsidiary in Ireland, CRD, to effect the transaction. In early November, prior to contacting CRD, Napier and Monrad met to discuss the transaction.

32.    Both Napier and Monrad understood that the transaction would involve no risk. Napier's contemporary notes of the meeting reflect this: "Deposit liabilities from [CRD] → AIG," "non risk deal," "NA problem, Sch F, Regulators" and "CRD no reports to anyone."

33.    The notes reflect the "NA problem," meaning the "North American problem" that arises from a schedule to an annual report, known as "Schedule F," which domestic reinsurance companies must file with state regulators. This report must provide certain specific information about each reinsurance transaction entered into, including the amount of premiums and the amount of reserves or deposit liabilities recorded relating to each transaction. If AIG and Gen Re both used domestic entities to effect the transactions, both companies would file a Schedule F reporting the transaction. If AIG reported the transaction as reinsurance while Gen Re reported the same transaction as deposits, this likely would raise red flags with the

14

regulators. Using CRD eliminated the "North American problem" because CRD is an Irish entity with no such reporting obligations.

34.    On November 13, 2000, Monrad called Houldsworth, the chief executive officer of CRD, to see if he could assist in the transaction. Houldsworth also was the chief underwriter for the "Alternative Solutions" business unit of Gen Re, which wrote so-called "finite" reinsurance policies that could be used to smooth earnings. In a telephone conversation the next day, Houldsworth discussed the proposed transaction with Garand, who was a CRD board member and the head of Gen Re's North American finite reinsurance division:

Houldsworth:    The story I got from Betsy [Monrad] . . . was that some time in the last few days . . . [AIG's chairman] phoned up Ron Ferguson and said 'Ron, I need your help. We've reduced reserves . . . by 500 million to boost our third quarter results, but we've now realized that come the end of the year, we, the fact that we've taken down those old year reserves is going to be fairly apparent to anyone studying our group and we don't like what's going to happen in terms of stock market reaction or analyst reaction or whatever. We want to borrow 500 million of reserves off you for a couple years. . . .' She [Monrad] was basically saying to me, is it possible for [CRD] to charge, to give AIG 500 million of reserves for a 500 million premium on a funds withheld basis for a couple years. . . .

Garand:    It has to come from outside the US. It would be apparent in our numbers if we ceded it. . . .

Houldsworth:    . . . if you do it in the States it's just going to stand out like a sore, it's going to look very odd in our numbers. . . . The way Betsy described it to me initially on the phone . . . she basically said just can you give $500 million of reserves or deposit stuff to AIG and get it back in a couple of years which clearly we probably could do, but I just don't see how that solves anything. So, I've got two choices. One is to let you go and talk to Betsy or one is I call her up and ask her myself, and I just wanted your advice on which one to do.

Garand:    Well, she went to you. I think you should respond directly back to her. The issue over here is we can't do it over here so she is looking for where in the group we can find something.

15

Houldsworth: Oh, yeah, yeah, but you're clearly understanding the motives, AIG's motivations and the issues in meeting those motivations better than I will, but either way I will talk to her and I will try and see where she is coming from. I think basically they were sitting in the office last night and she just thought 'oh god who can I call that might be able to help. Who has got $500 million in reserves outside of the States without too much regulatory oversight that would cause, you know, those sort of problems.' It is fairly obvious that she was going to come in our direction really. There is nowhere else.

Garand:        Yeah, I mean anything we do over here is going to be transparent.

Thus, Garand, like Houldsworth, understood the "North American problem" created by AIG's

request, and he appreciated the need to find a way to avoid transparency in the deal.

35.    On November 15, 2000, Houldsworth wrote an email to Garand, Napier, Monrad,

and others summarizing Monrad's request and attaching a draft "slip" (*i.e.* term sheet):

Can CRD provide a retrocession contract transferring approximately $500m of reserves on a funds withheld basis to the client with the intention that no real risk is transferred and that this may well be commuted or gradually reduced in a few years.

Houldsworth, Monrad, Napier, and Garand all understood that the proposed deal with AIG

would involve transferring "no real risk" to AIG. They also understood, as Houldsworth noted

in the same email, that any premium CRD paid would be repaid by AIG and that Gen Re would

receive a fee or "margin" for doing the deal:

Given that we will not transfer any losses under this deal it will be necessary for [AIG] to repay any fee [(*i.e.,* premium paid by CRD)] plus the margin they give us for entering this deal.

36.    In order to ensure that AIG would be able to record additional loss reserves,

Houldsworth suggested structuring the deal so that it appeared to transfer significant risk to AIG

by adding an illusory $100 million to the coverage limit. In a telephone conversation between

16

Houldsworth and Monrad on November 14, 2000, Houldsworth told Monrad about his idea to

create the appearance of risk transfer:

> Houldsworth: I was thinking of doing something like a 600m, well they might
> not accept this, I presume they need risk transfer to put on the
> thing! So something like a 600m limit for 500m, obviously,
> underlying reserves 500m . . . . The only question is, in my
> viewpoint, clearly we got to have risk transfer in there, so I would
> say, you know, this 100m, if they think they are all deposits
> underneath you know we tell them we are not going to bill them
> [for the additional $100 million] are they going to believe it, but
> again, that's up to them, they are going to have to leave a gap
> somewhere.

Monrad and Houldsworth both knew that AIG was looking for a no risk transaction and that

there was virtually no risk associated with the losses they were proposing to have AIG reinsure.

As they stated in the same conversation on November 14, 2000:

> Monrad:        So let's assume they take the deposit liability I will tell you any
> way we structure it yes it's got to look more like deposit because
> they are not really looking to take risks! Well I think if we spend
> a lot of time trying to figure out how to transfer 500m of risk, we
> won't get this deal done in the time they want.

> Houldsworth: Yeah, I mean as you say, if there's enough pressure on their end, they'll
> find ways to cook the books won't they?! [Monrad laughs] It's no
> problem there, it's up to them! We won't help them to do that too much.
> We'll do nothing illegal!

37.    In a later conversation that same day between Monrad, Napier, and Houldsworth,

they again acknowledged the lack of risk transfer in the transaction and the need for a

"handshake" deal between Ferguson and AIG's chairman:

> Houldsworth: There is clearly no risk transfer. You know there is no money
> changing hands.

> Monrad:        [AIG] may have a tough time getting the accounting they want out
> of the deal that they want to do. . . . They are not looking for real
> risk. . . .

* * * * *

17

Napier:          [W]hat would happen if we just did this where there was no risk?
                 I mean we just charge them a fee for doing this deal.

Houldsworth:  Well what I was thinking is if you know, we charge them, if we
                 give them a fee on this, my idea would be for them to, they would
                 have to come to you and say what that fee is plus some sort of
                 margin, you must have agreed to give that to us before we will
                 sign this deal, or at the same time as we sign this deal so you
                 know, net, we get our margin and I think it's just the same thing,
                 but I think to give them a deal with no risk in it and just charge
                 them a fee you can assume their auditors are being pushed in one
                 direction, but I think that's going too far. I think that's detail, you
                 know they are going to come to that and if they suggest it, then
                 fine, but I just can't see how on earth anybody, you know we can
                 charge the 500m for a 500 limit and get them to book that as a
                 reserve but I would be staggered if they get away with that.

Napier:          Then the way to do this, if there is risk in this, the way to become
                 whole requires [AIG's chairman] and Ron [Ferguson] to have a
                 handshake.

Napier's contemporaneous handwritten notes from this call refer to a "side deal" to pay CRD its

fee and refund the premium CRD would pay to AIG and that CRD "pay[s] AIG $10M fee [*i.e.*,

premium]; AIG pay[s CRD] $10M fee back + fee for deal."

       38.      Shortly after this call, Ferguson met with Garand, Napier, and Monrad to receive

an update. During this meeting, Monrad explained to Ferguson the basic outlines of the deal

that would accommodate AIG's request for a no risk transaction. She described the use of Gen

Re's Dublin offshore entity and the need to work out the mechanism for Gen Re to receive its

fee and for CRD to get back the premium that CRD would pay to AIG. Ferguson made clear

during this meeting that he was aware that the contracts would make it appear as though Gen Re

was paying premiums for the deal and that this would mislead outsiders reviewing the

transactions. Ferguson also made clear that he understood how the deal was structured, knew

that there would be no real risk transfer under the deal and that AIG would make Gen Re whole

18

by returning or prefunding in a side deal all required premiums Gen Re was to pay under the deal documents.

39.    Ferguson and Napier met again about the deal on November 17, 2000. Ferguson told Napier that he had spoken the night before with AIG's chairman to relay Gen Re's proposed structure. AIG's chairman informed Ferguson that AIG wanted to split the deal into two parts: $250 million in 2000 and the other $250 million in 2001. AIG's chairman and Ferguson also set the fee to be paid to Gen Re for doing the deal at 1% or $5 million (1% of $500 million) and agreed that the parties still had to perfect the return of the $10 million in premiums to be paid to AIG by Gen Re for the deal. AIG's chairman told Ferguson that AIG's chief financial officer and Milton would be the point persons on the deal at AIG.

40.    Ferguson asked that Napier relay to Milton what AIG's chairman and Ferguson agreed upon. Napier did so, and later that day he summarized his conversation with Milton in an email to Ferguson, Monrad, Houldsworth, and others:

> Ron, I spoke with Chris [Milton] and brought him up to date on your discussion with [AIG's chairman] as follows:
>
> • Dublin structure as outlined in [Houldsworth's November 15 email with attached slip]
> • Fee = 1%
> • Two tranches of $250m (one for 2000, the other in 2001)
> • [AIG's then chief financial officer] and Chris [Milton] will be the point people at AIG
> • Among the details to be worked out is how to recover the [premium] we advance . . .
>
> I will be sending a slightly edited version of [Houldsworth's draft slip] to Chris [Milton] as a discussion document. Betsy [Monrad] and I are to get together with them [AIG] at 4:00 on Monday.

Ferguson replied to all, instructing the Gen Re team to keep the transactions confidential:

> Thanks. Note to all – let's keep the circle of people involved in this as tight as possible.

19

The Gen Re team dubbed the transaction "Project A" and "Project Alpha," among other actions, in an effort to maintain confidentiality about AIG's plans.

    41.      Similarly, the cover note to the underwriting file for the contracts states:

> Specific guidance has been received from Ron Ferguson that this file is to be kept confidential and consequently to be kept locked in [a CRD underwriter's] desk at all times. Permission to review this file is to be sought from the [CRD underwriter], [CRD CEO] John Houldsworth or [the CEO of Cologne Re Germany]. In CRD the only personnel authorized to review the file are [the CRD underwriter], John Houldsworth and [Houldsworth's assistant].

    42.      Napier also sent an email to Milton and Monrad on November 17, 2000, following up on Napier's telephone conversation with Milton earlier that day, which outlined the general structure of the proposed transaction and attached a draft term sheet:

> Chris, below is a very general overview of the structure we propose. . . . As I mentioned this afternoon, Ron's [Ferguson's] discussions with [AIG's chairman] established the following points [listing the bullet points in Napier's email to Ferguson earlier that day reprinted above]. A point that may not be sufficiently clear in the discussion document is the term of the agreement. In accordance with our conversations, we anticipate terminating the agreement at 24 months via a commutation.

    43.      During a November 20, 2000 conference call, Monrad, Napier, Garand, Graham, and Milton discussed the proposed structure of the deal in detail. Graham, an assistant general counsel at Gen Re, joined the Gen Re deal team prior to this conference call to assist on accounting issues and deal documentation. During the call, Graham provided input on both topics. The parties also discussed mechanical issues including which AIG subsidiaries should be used to effect the transaction.

    44.      On this last issue, Graham sent an email to Napier, Garand, and Monrad shortly after the conference call ended, reflecting his understanding that the deal should be structured in such a way that no one could "connect the dots to CRD":

In chatting with Chris Garand on the way back from the meeting, we discussed a possible scenario in which the initial transaction is between CRD and an AIG non-US entity, coming onshore as a related party reinsurance transaction between AIG entities.

If it's split up enough among AIG's US entities, the transaction would probably not reach the [state insurance] regulatory prior approval threshold for any of them (it would need to be reported on an after the fact basis).

The benefit of this approach would be that, since the AIG US entities would report the AIG non-US entity as cedants on Schedules F and P, any reviewer of the AIG US entity's statements wouldn't be able to connect the dots to CRD and beyond.

45.    On December 7, 2000, Napier told Ferguson, Garand, Monrad, Houldsworth, and others in an email that he had heard from Milton and that AIG was ready to proceed with the deal as proposed in the draft term sheet Napier emailed to Milton and "in accordance with REF's [Ferguson's] conversation with [AIG's chairman]. Two installments, $250m each, one for '00, the other in '01. We need to get together to discuss next steps." Graham undertook to draft the contract documents to send to Milton.

46.    Milton and his counterparts at Gen Re also understood that the accounting for the transaction would not be "symmetrical," that is, that AIG and Gen Re would account for it differently. AIG planned to account for the transactions using reinsurance accounting to improperly add loss reserves to AIG's balance sheet. Gen Re, however, would use deposit accounting. In a telephone conversation on December 8, 2000, Monrad told Napier and Houldsworth that she had discussed this with Milton, who accepted it:

Monrad:        We told AIG that there would not be symmetrical accounting here.

Houldsworth:  Okay, fine.

Monrad:        We told them that was one of the aspects of the deal they would have to digest.

21

| Houldsworth: | That's fine then.  That should do it, shouldn't it?  It's so unlikely to be an issue so . . . |
|---|---|
| Monrad: | We haven't heard any push back from them in terms of can you change this, change that so . . . |
| Napier: | It's quite to the contrary.  When Chris [Milton] called he said we're going to take it as - - |
| Monrad: | It's a go. |
| Napier: | - - we like it. |
| Houldsworth: | Okay.  Okay. |
| Monrad: | Done. |

### The Sham Paper Trail

47.    Although AIG had solicited the transaction to add loss reserves to AIG's balance sheet, AIG and Gen Re created a "paper trail" to make it appear to outsiders that Gen Re had proposed the deal.  AIG proposing a transaction to assume losses from Gen Re (as opposed to Gen Re seeking a reinsurer to take the liabilities off its books) would appear odd to auditors and regulators and might have caused further scrutiny of the transaction.

48.    The paper trail idea was first raised in a December 8, 2000 email to Napier, Monrad, and Garand in which Houldsworth asked:  "Do we need to produce a paper trail offering the transaction to the client?"

49.    Milton and Napier discussed Houldsworth's idea later that day, and Milton concluded that a paper trail was needed.  Napier reported his conversation with Milton by email to Graham, Monrad, and Houldsworth later that day on December 8, 2000:

> Chris [Milton] felt we should establish a traditional paper trail for this transaction.
> Rob's [Graham's] work on the contract should complete the trail.

22

Napier sent a separate email to Ferguson that day stating "the reserve transfer is on track. Rob Graham is drafting the agreement," to which Ferguson replied, "thanks."

50.     As part of the paper trail, Houldsworth faxed Milton an offer letter and draft contract on December 18, 2000, which had been sent earlier to Napier, Monrad, and Graham for review and was edited by Graham. The letter stated:

> I am writing further to your various conversations . . . with Rick Napier of our parent company in Stamford. I hope that I can give you a little more background on the proposal we hope that you will be able to help us with."

After a page long discussion of the "primary objectives" CRD is "seeking to achieve," the letter to Milton concluded:

> I hope that the above gives you a feel for what we have in mind and look forward to any comments you may have in respect of either my letter or the attached 'discussion' draft slip. I hope that on further review AIG will be able to support this cover and look forward to working together over the next few years.

The offer letter to Milton falsely suggested that CRD was asking for AIG's "help" and "support." But Milton knew that it was AIG that had asked for help from Gen Re, as he indicated in a handwritten note transmitting Houldsworth's fax to the head of AIG's actuarial department in charge of AIG's statutory accounting: "This is the General Re Deal that [AIG's chairman] talked to me about."

51.     On December 22, 2000, Graham emailed the contract he drafted to Houldsworth with a copy to Garand, Monrad, Napier, and Ferguson, stating "once you've all had a chance to review, it will be in shape to share with AIG." Ferguson replied to all: "Thank you all for working on this matter – it seems to be very very high profile at AIG and is much appreciated." Garand replied, "looks good as is" after he had reviewed the contract and made sure that there was a commutation provision allowing Gen Re the option to end the contract "at our whim" and to take all funds in the experience account to ensure that there was no upside for AIG.

23

52.    In a telephone conversation on December 27, 2000, Houldsworth asked Graham's

advice regarding the mechanics of the sham paper trail:

| | |
|---|---|
| Houldsworth: | I'll be happy for [the contract] to go straight off to AIG today, when they put the real question out for Rick [Napier] as to who's gonna send that. Do we send that again with another [offer] letter? |
| Graham: | I think the answer is you need to send [the contract].  What you want is, is for all of the deal correspondence on this thing really to come from you because it's your company that doing the deal. |
| Houldsworth: | Yeah.  Okay. |
| Graham: | It's okay for our guys [in Stamford] to have meetings and conversations but any paper trail ought to really lead to Dublin. |

During the same conversation, after Graham conferenced Napier into the call, Graham reiterated:

"What I said to [Houldsworth] is that all the paper trail for the deal really needs to go between

Dublin and AIG, rather than from here to AIG."

53.    Later on December 27, 2000, Houldsworth emailed Graham's contract to Milton

with another cover letter for the paper trail that made it appear as if CRD solicited the

transaction, when everyone involved in the deal knew it was AIG that solicited the deal to

manipulate its loss reserves:

> We are encouraged that you believe AIG will be able to provide us with cover for
> [the six reinsurance transactions that CRD had previously reinsured]. . . .
> Consequently we have drafted a contract wording for discussion purposes which I
> have attached for your examination. . . .  I hope that on review of the draft
> agreement you will be able to support this cover and look forward to hearing from
> you shortly with your initial comments.

54.    In a telephone conversation with Houldsworth and Napier on December 28, 2000,

Milton confirmed receipt of Houldsworth's December 27, 2000 letter.  He also told them he

expected to send a reply email to Houldsworth that day accepting Houldsworth's proposal.

Milton said that he did not need any further documentation by year end to book the transaction as

a year 2000 transaction, and that once Milton sent his reply email accepting the offer, the "paper

trail" would be complete.

    55.    As promised, Milton sent his reply email completing the paper trail later that

evening:

> Just to confirm our 50% participation [50% in 2000 and the other 50% in 2001] in
> your adverse loss experience cover. Will review specific contract wording this
> weekend and get back to you if we need any changes.

Napier forwarded Milton's email to Ferguson, Monrad, Graham, Garand, and others thanking

them for their roles in completing the transaction and adding:

> This is a very unique solution to a special need for an important client. It looks
> like all that is left are a few housekeeping matters that should be cleaned up in the
> next couple weeks.

    56.    In a telephone conversation on December 8, 2000, between Houldsworth,

Monrad, and Napier, Monrad discussed the need also for a paper trail showing that CRD paid the

$10 million in premiums to AIG even though AIG planned to refund that amount:

> Monrad:    I think for paper trail purposes we want to make all the gross cash flows
> which is what I presume you expect too. . . . You need to have a wire
> that shows 10 million at some point left in your [CRD's] account, and we
> need them [AIG] to give us 10 million back. . . . We need to get ten back
> and we need five on top of that, right?

> Houldsworth: Yeah.

> Monrad:    For doing this.

### Concealing Payments Through Undisclosed Side Agreements

    57.    The parties still needed to effect the undisclosed side agreements, namely AIG's

prefunding the $10 million in premiums CRD was supposed to pay under the agreements and

paying Gen Re its $5 million transaction fee for putting the deal together. Gen Re did not want

25

to give National Union the $10 million in purported premiums until AIG paid that amount to Gen Re, plus Gen Re's fee for doing the deal.

     58.    Milton proposed a solution to Napier: AIG and Gen Re would enter into a purportedly unrelated transaction to conceal the payment by AIG. The unrelated transaction, which was finalized in December 2001, involved an existing reinsurance contract between Gen Re and an AIG subsidiary, HSB. At the time, Gen Re held over $30 million in an account that would be owed to HSB if the reinsurance contract were commuted.

     59.    Milton proposed the idea to use the HSB money to pay the $10 million premium and the $5 million transaction fee. Napier relayed this initially to Monrad and Houldsworth in an email dated February 9, 2001:

> I have not forgotten the outstanding issues. I continue to follow up with Chris [Milton] at least weekly. Two recent developments:
>
> • They [AIG] want to do part 2 in Q1 [2001] [referring to the second contract to transfer $250 million in "reserves" to AIG]
>
> We [Gen Re] are holding a large positive balance on a finite deal for HSB. AIG wants to unwind the transaction. Chris [Milton] is looking at ways we can use this balance.

     60.    Napier also relayed Milton's proposal to Ferguson, Monrad, Garand, and Graham. Napier further explained his conversations with Milton to Ferguson in a memorandum dated February 21, 2001, which was written to prepare Ferguson for an upcoming meeting with AIG's chairman. The second and third of over ten items listed in the memorandum dealt with "HSB" and the "Dublin Reserve Transaction," respectively. Napier informed Ferguson that:

> We have a finite cover in place [with HSB], which will be unwound during the year. . . . We may be able to apply the positive balance to the Dublin transaction. Chris [Milton] and [AIG's chief financial officer] are working on the details and owe us a report.

61.    Similarly, Napier wrote a memorandum to Ferguson dated July 20, 2001, in preparation for an upcoming meeting Ferguson was to have with AIG's chairman. The first item out of many dealt with the HSB commutation to fund the AIG/Gen Re deal. Napier informed Ferguson that: "We are winding up the finite cover and will use the proceeds to fund the reserve cover. Documents have been drafted and are on Chris [Milton's] desk."

62.    In a telephone conversation on March 7, 2001, Graham and Houldsworth discussed the need for AIG to transfer the proceeds from the HSB commutation to Gen Re prior to CRD's "paying" any "premiums" under the contracts; they also discussed the leverage held by Gen Re if AIG failed to pay Gen Re its fee and prefund the premiums:

Houldsworth:    We [Gen Re] aren't going to pay them [AIG] the fee [premium] yet. You know, we don't intend to pay them until we get the cash. If they turn around and start kicking up a fuss, I don't think they really want this made public, this transaction. I would be very surprised. There's a whole pile of things.

Graham:    Yeah, I think it's likely that it will go through as planned, because [AIG] need[s] the relief.

63.    Later in the same conversation, Houldsworth and Graham discussed AIG's accounting "issues" given that no risk was being transferred in the transaction:

Graham:    I personally would have been a lot more comfortable if the deal had been inked before 12/31, and this is gray area stuff for large zeros.

Houldsworth:  Yes, it's quite shocking actually.

Graham:    There's folks at pay grades higher than mine that have made the business decision they're willing to do that.

Houldsworth:  Well, I think the AIG situation more than ours – I mean from our view point, you know, this is Cologne Re Dublin, we haven't closed our accounts.

Graham:    Sure.

27

| | |
|---|---|
| Houldsworth: | And to be quite frank, this route does not make a difference to our accounts. You know, there's no risk transfer in it. It's deposit accounted. |
| Graham: | Sure. |
| Houldsworth: | But they're the ones who you really look at and think wow, this is impressive. |
| Graham: | Well, and their [AIG's] organizational approach to compliance issues has always been pay the speeding ticket, so, which is different than our [Gen Re's] organizational approach to compliance. So I'm pretty comfortable that our own skirts are clean but they [AIG] have issues. |

64.    AIG and Gen Re decided to commute the HSB contract and distribute approximately $15 million from the HSB account to Gen Re, $10 million of which would be later paid to National Union by CRD as premiums, with the remaining $5 million to compensate Gen Re for doing the deal.

65.    Three additional sham contracts were developed by Garand and Milton, with the assistance of Graham, Monrad, and Napier, to effect the transfers of the funds in the HSB account and mask the funding for the AIG/Gen Re transactions. First, Gen Re and HSB executed a commutation agreement on December 21, 2001, signed by Garand on behalf of Gen Re, under which Gen Re was expressly obligated to pay $7.5 million to HSB (compared to the over $30 million HSB otherwise would have been entitled to receive).

66.    Second, Gen Re and National Union executed a retrocession agreement on December 27, 2001, signed by Garand on behalf of Gen Re and Milton on behalf of National Union, in which National Union agreed to reinsure Gen Re for any losses Gen Re became obligated to pay under its reinsurance contract with HSB. This was the very reinsurance contract that Gen Re and HSB had commuted just a few days earlier, eliminating the possibility that Gen Re could incur any losses under it. Nevertheless, Gen Re paid National Union

approximately $9.1 million in "premiums" under their meaningless contract, thus concealing the true reason for the transfer of the $9.1 million and obscuring that their source was the HSB account.

67.     Third, to mask the purpose of the transfer of $12.6 million from the HSB account from Gen Re to CRD, $10 million to prefund the premiums that CRD would pay to National Union, plus approximately $2.6 million for CRD's portion of the fee AIG agreed to pay Gen Re under the two original agreements between CRD and National Union ($5 million as originally agreed plus $200,000 later characterized as interest), Gen Re and CRD entered into a sham reinsurance contract whereby CRD would pay $400,000 in purported premiums to Gen Re for $13 million in supposed reinsurance coverage.  This sham agreement was signed by Garand on behalf of Gen Re and by CRD's then chief executive officer.  On December 28, 2001, Gen Re paid $12.6 million to CRD as "loss payments" due under this newly created reinsurance contract.  Gen Re kept the remaining approximately $2.6 million as its share of the transaction fee.  That same day, CRD transferred $10 million to National Union for the premium supposedly due under the agreements.

68.     The Defendants all understood that these contractual contortions were intended merely to mask the real reason for the transfer of funds between AIG and Gen Re.

69.     Garand oversaw and was responsible for working out the details regarding how to effect the transfer of funds in a manner that would conceal the true purpose for the transfers. Garand came up with the idea, in a telephone conversation with Houldsworth on December 11, 2000, to transfer the $12.6 million between Gen Re and CRD so the reason would not be apparent to outsiders reviewing the transaction:  "On a totally unrelated contract, we [Gen Re] could write you [CRD] a losing transaction."  In addition to working out the details to mask the

29

true purpose of the transfer of funds between Gen Re and CRD, Garand was also the Gen Re

point person to work out the details of funding the AIG/Gen Re deal with Milton.

70.     Garand spent several months working out the details with Milton for the HSB

commutation that AIG would use to prefund the $10 million premium payment from Gen Re to

AIG and to fund the $5 million transaction fee owed by AIG to Gen Re.  Ferguson stayed on top

of these discussions and wanted to make sure that Gen Re received its fee.  In an email to

Monrad and others in August 2001, Ferguson remarked that he was surprised that "we [Gen Re]

have not been paid" by AIG yet.  Monrad replied to everyone:  "While we have not yet been

'paid', we are holding the related cash that AIG has agreed to use from commutation of an

existing HSB finite deal with a positive pot."

71.     Two days later, Ferguson sent a Gen Re senior executive an email with the

subject line "AIG reserve transaction - slow moving," stating that, "it is [Napier's] opinion that

AIG is not trying to stiff us on this transaction/fee but that rather it is caught up in the

unwinding or restructuring of the HSB funding cover – which has gotten a bit slow and

complicated owing to AIG changing their mind about how they want to handle the HSB

unwind."  The executive responded:  "I think we need to push [Napier] to get both of these

items in the 'done pile.'"  Ferguson replied that Napier "is on it – he just wrote a letter to CM

[Chris Milton]."

72.     When the mechanics of the HSB commutation and the funding for the sham

transaction were close to final, Garand sent an email to a senior Gen Re executive on

December 18, 2001, "Subject: AIG wrap-ups," seeking the executive's approval for the transfer

of funds for AIG/Gen Re transactions:

> Earlier in the year we were wrestling with locking in our $5mm intended
> economics [*i.e.* Gen Re's fee] on the accommodation cover CRD wrote for AIG,

30

on which we were to take a $10mm hit [*i.e.* the $10 million in premiums CRD was obligated to pay per the written contract terms]. We are now virtually there, as soon as I get Milton to accept the commutation we are doing on HSB and the retrocession to AIG. Cash settlements are intended to flow on December 28th as follows . . . :

1) First, we will pay HSB roughly $5mm in full settlement of all obligations. This compares to the funding cover pot of roughly $31.8mm that we would otherwise be obligated to return . . . at year end.

2) From the $26.8mm remainder we subtract $10mm to prepay us for the $10mm booking and cash loss that Dublin should reflect at the end of 2001.

3) From the $16.8mm remainder we subtract $5.2mm as our compensation (includes roughly $.2mm of investment income to reflect that our $5mm fees were due slightly less than a year ago, on average) for taking the CRD hit. . . .

The only potential problem I can envision with Milton is how the $16.8mm is split between him [Milton] and HSB, but the $5mm is fully supportable, and HSB can well argue for more, though they are resigned to the fact that AIG is raiding their cookie jar.

73.    On December 28, 2001, the Gen Re senior executive signed the necessary paperwork effecting the funding for the AIG/Gen Re deal.

### Accepting Gen Re's "Reputational Risk"

74.    The Gen Re defendants knew there was a "reputational risk" to Gen Re if anyone discovered the sham nature of the transactions. The general view apparently taken by the Gen Re individuals working on the AIG transaction can be summed up best by an email from Graham to Gen Re's then general counsel, dated December 22, 2000, regarding the transaction:

[T]he AIG project continues. It is now a two step loss portfolio deal between Cologne Re Dublin and National Union. . . . Our group will book the transaction as a deposit. How AIG books it is between them, their accountants and God; there is no undertaking by them to have the transaction reviewed by their regulators. Ron [Ferguson] et al. have been advised of, and have accepted, the potential reputational risk that US regulators (insurance and securities) may attack the transaction and our part in it.

75.    In a December 11, 2000 telephone conversation between Houldsworth and

Garand, Houldsworth emphasized the need to get Ferguson to sign off on the deal's

"reputational risk" to Gen Re:

> Houldsworth:  We're going to ask . . . Ron [Ferguson] to sign off on the
> reputational risk. I think it's Ron's deal so he's the one that ought
> to.
>
> Garand:      Yep.
>
> Houldsworth:  I mean he's effectively done that by being involved but we may as
> well follow the rules.
>
> Garand:      Sure. Make him sign in blood.
>
> Houldsworth:  Well, I don't care what he signs in as long as I know it's him.

76.    Ferguson was aware of and signed off on the potential reputational risk to Gen

Re associated with the deal early on. In mid-November 2000, Napier and others at Gen Re met

with Ferguson and discussed the potential reputation risk to Gen Re in doing the deal. Ferguson

told them that any resulting reputational risk would be manageable.

### AIG Improperly Adds Loss Reserves to Its Financial Statements

77.    As the Defendants anticipated, AIG accounted for the agreements between

National Union and CRD as if they were real reinsurance contracts that transferred risk from

Gen Re to AIG, when all parties involved knew or recklessly disregarded that there was no risk

transfer and that the transactions in reality had no economic substance, other than the

undisclosed $5 million fee AIG paid to Gen Re to create the sham transactions. By treating the

contracts as if they were real reinsurance, AIG falsely inflated its Reserves for Losses and Loss

Expense by $250 million and its Premiums and Other Considerations by $250 million in the

financial statements contained in the Form 10-K for the year ended December 31, 2000, which

AIG filed with the Commission on April 2, 2001. Similarly, AIG falsely inflated its Reserves

for Losses and Loss Expense by an additional $250 million and its Premiums and Other

Considerations by $250 million in the financial statements contained in the Form 10-Q for the

quarter ended March 31, 2001, which AIG filed with the Commission on May 15, 2001.  AIG

also falsely inflated its Reserves for Losses and Loss Expense by $500 million and its Premiums

and Other Considerations by $500 million in total in the financial statements contained in the

Form 10-K for the year ended December 31, 2001, which AIG filed with the Commission on

April 1, 2002.

78.    These sham loss reserves stayed on AIG's financial statements filed with the

Commission, improperly boosting AIG's loss reserves by $500 million, until the first contract

was commuted in November 2004 (AIG's loss reserves were then decreased by $250 million)

and until AIG restated its accounting for the transaction on May 31, 2005 (at which time the

$500 million were restated as deposits).

### AIG's Fourth Quarter 2000 and First Quarter 2001 Earnings Releases

79.    Reflecting the impact of the December 2000 contract between National Union

and CRD, AIG issued its fourth quarter 2000 earnings release on February 8, 2001.  In this

release, AIG's chairman stated:  "AIG had a very good quarter and year. . . .  We added $106

million to AIG's general insurance net loss and loss adjustment reserves for the quarter, and

together with the acquisition of HSB Group, Inc., increased the total of those reserves to $25.0

billion at year-end 2000."

80.    Analysts reacted favorably to the added reserves and premiums, including one

analyst who noted:

> We think this quarter was a good example of AIG doing what it does best:
> growing fast and making the numbers.  The key takeaways were 20% local
> currency growth in international life premium equivalents, an increase from last
> quarter's 18.5% growth rate, and another acceleration of growth in nonlife

33

insurance, with domestic general premiums growing 17.7% compared to 8.7% last quarter. *As important was the change in reserves: AIG added $106 million to reserves and the paid/incurred ratio fell to 97.1%, the lowest level since the first quarter of 1999.* [emphasis added]

Finally, AIG put to rest a minor controversy from last quarter by adding $106 million to reserves, worth 7.1 points on the combined ratio. This lowered the paid/incurred ratio to 97.1%, the lowest level since the first quarter of 1999. For the full year, reserve increases were 2% of earned premiums for a paid/incurred ratio of 99.1%, down from 100.2% in 1999.

81.    Similarly, in AIG's first quarter 2001 earnings release issued on April 26, 2001,

AIG's chairman noted the loss reserves AIG had added to its books:

AIG had a solid first quarter, benefiting from a continuing strengthening of pricing in the commercial property casualty market, as well as strong performance by our overseas life insurance business and financial services businesses. . . . We added $63 million to AIG's general insurance net loss and loss adjustment reserves for the quarter, bringing the total of those reserves to $25.0 billion at March 31, 2001.

82.    Analysts again commented favorably upon the added reserves.

83.    Without the phony loss reserves added to AIG's balance sheet, AIG's reported

loss reserves would have been $250 million less in the fourth quarter of 2000, and $500 million

less in the first quarter 2001. This means that the $106 million increase in reserves that AIG's

chairman touted in AIG's fourth quarter 2000 earnings release was, in reality, a $144 million

decrease in reserves, and the $63 million increase in reserves touted in AIG's first quarter 2001

earnings release was, in reality, a $187 million decrease in reserves.

## FIRST CLAIM FOR RELIEF
### Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5
#### (All Defendants)

84.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 83.

85.     AIG and others, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, have:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of AIG securities and upon other persons, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

86.     Defendants and others knowingly provided substantial assistance to AIG and others in the commission of these violations.

87.     By reason of the activities described, Defendants aided and abetted AIG's violations of Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section 13(a)
### of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13
#### (All Defendants)

88.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 83.

89.    AIG failed to file with the Commission such financial reports as the Commission has prescribed, and AIG failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made, in light of the circumstances in which they were made, not misleading, in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

90.    Defendants and others knowingly provided substantial assistance to AIG in the commission of these violations.

91.    By reason of the foregoing, Defendants aided and abetted AIG's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

### THIRD CLAIM FOR RELIEF
**Aiding and Abetting Violations
of Section 13(b)(2) of the Exchange Act**
(All Defendants)

92.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 83.

93.    AIG failed to:

    a.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

    b.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:

36

     i.     transactions were executed in accordance with management's general or specific authorization;

     ii.     transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and to maintain accountability for assets;

     iii.     access to assets was permitted only in accordance with management's general or specific authorization; and

     iv.     the recorded accountability for assets was compared with the existing assets at reasonable intervals and appropriate action was taken with respect to any differences.

94.     Defendants and others knowingly provided substantial assistance to AIG in the commission of these violations.

95.     By reason of the foregoing, Defendants aided and abetted AIG's violations of Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Rule 13b2-1 of the Exchange Act
### (All Defendants)

96.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 83.

97.     AIG and others, directly or indirectly, falsified or caused to be falsified the books, records and accounts of AIG that were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

98.    Defendants and others knowingly provided substantial assistance to AIG and others in the commission of these violations.

99.    By reason of the foregoing, Defendants aided and abetted AIG's violations of Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

**FIFTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of**
**Section 13(b)(5) of the Exchange Act**
(All Defendants)

100.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 83.

101.    AIG and others knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified, directly or indirectly, or caused to be falsified books, records and accounts of AIG that were subject to Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A).

102.    Defendants and others knowingly provided substantial assistance to AIG and others in the commission of these violations.

103.    By reason of the foregoing, Defendants aided and abetted AIG's violations of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court grant a Final Judgment:

**I.**

Permanently enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the

38

injunction by personal service or otherwise, and each of them, from violating or aiding and abetting violations of Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1] and from aiding and abetting violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-13 [240.12b-20, 240.13a-1 and 240.13a-13].

## II.

Ordering each defendant to disgorge any ill-gotten gains from the conduct alleged herein and to pay prejudgment interest thereon.

## III.

Ordering each defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Permanently barring each defendant, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Granting such other and further relief as to this Court seems just and proper.

Dated:   New York, New York
         February 2, 2006

                                   By:  _____
                                        MARK K. SCHONFELD (MS-2798)
                                        Regional Director
                                        Attorney for Plaintiff
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Northeast Regional Office
                                        3 World Financial Center
                                        New York, New York 10281-1022
                                        (212) 336-1020

Of Counsel:

Andrew M. Calamari
Robert J. Keyes
Ken C. Joseph
Valerie A. Szczepanik
Eduardo A. Santiago-Acevedo
Linda L. Arnold

# EXHIBIT 3

MarketWatch

Get Quote: [          ] [Find symbol]     Search: [          ]
Advanced search

**NEWS & COMMENTARY** | **MARKETS** | **MUTUAL FUNDS & ETFS** | **PERSONAL FINANCE** | **TOOLS & RESEARCH** | **MY MARK**

⊞ MY STORIES(0)

# Former GenRe, AIG execs indicted
## Fraud charges relate to controversial reinsurance deals

*By Alistair Barr, MarketWatch*
*Last Update: 2:06 PM ET Feb 2, 2006*

**SAN FRANCISCO (MarketWatch) -- The Department of Justice said on Thursday that it indicted three former General Re executives and one ex-American International Group executive with multiple counts of fraud over controversial reinsurance transactions between the two companies.**

Ronald Ferguson, Gen Re chief executive from about 1987 through September 2001, Elizabeth Monrad, Gen Re's chief financial officer from about June 2000 through July 2003, Robert Graham, Gen Re assistant general counsel from about 1986 through October 2005, and Christian Milton, AIG's vice president of reinsurance from about April 1982 until March 2005, were the people indicted, the DOJ said in a statement.

They're charged with one count of conspiracy to commit securities fraud, four counts of securities fraud, two counts of causing false statements to be made to the Securities and Exchange Commission, four counts of wire fraud and two counts of mail fraud, the agency added.

If convicted of all charges, the defendants each face a maximum of 95 years in prison and more than $7 million in fines, the DOJ said.

Ferguson, Monrad, Graham and Milton were also charged with securities fraud by the SEC.

Another former General Re executive - ex-Senior Vice President Christopher Garand - was charged with securities fraud by the SEC but wasn't indicted by the DOJ.

The case stems from reinsurance transactions in late 2000 and early 2001 between AIG (AIG ) and General Re that helped AIG artificially inflate its loss reserves by $500 million.

"Executives will be brought to justice not only for cooking their own company's books, but also for knowingly helping their counterparts at other companies do the same," Acting Deputy Attorney General Paul McNulty, who chairs President George Bush's Corporate Fraud Task Force, said in a statement.

Thursday's action "is yet another step in the pursuit of those responsible for helping AIG to deceive investors by materially misstating the company's financial results." Linda Chatman Thomsen, director of the SEC's Division of Enforcement, said.

The SEC also noted that the investigations are continuing.

Questions that surfaced last year about the agreements triggered multiple accounting investigations of AIG that toppled longtime Chief Executive Maurice "Hank" Greenberg. AIG admitted the infractions last year and restated several years of results. The giant insurer is close to a settlement with New York Attorney General Eliot Spitzer over the scandal.

Warren Buffett, the billionaire investing legend who runs Berkshire Hathaway (BRKA ) (BRKB ) , was also questioned by regulators about the deals as a witness. General Re, one of the world's largest reinsurers, is owned by Berkshire.

"There are no charges right now against the two biggest fish in the ocean: Warren Buffett and Hank Greenberg, both

Former GenRe, AIG execs indicted on fraud charges - MarketWatch                    Page 2 of 2

of whom have been reported to be involved in the reinsurance transactions in question," Donald Light, senior insurance analyst at Boston-based financial consulting and research firm Celent.

"Unless prosecutors win the cooperation-through whatever means of the people below Buffett and Greenberg, it is unlikely that their reach will extend to them," Light added.

"But Greenberg and Buffet are not home free yet," he warned. "Prosecutors have said their investigation is continuing, so additional indictments remain possible."

In June 2005, two senior Gen Re executives, John Houldsworth and Richard Napier, each pleaded guilty to conspiracy to falsify SEC filings in connection with the transactions.

The Wall Street Journal reported the indictments on Wednesday evening.

Frederick Hafetz, Milton's attorney, said on Wednesday that he hadn't been told about an indictment. If indicted, Hafetz said Milton would challenge the allegations in court.

Monrad's lawyer, Paul Shechtman, also said he hadn't been told about any indictments and declined to comment further.

Hafetz and Shechtman didn't return calls on Thursday seeking comment.

Douglas Koff, Ferguson's lawyer, and Alan Vinegrad, Graham's lawyer, also didn't return calls on Thursday.

Robert Cleary, the attorney representing Garand, said he was surprised to learn that his client had been charged by the SEC.

"Mr. Garand has met with SEC on multiple occasions and educated them about the complex nuances of reinsurance," Cleary said. "Throughout all this my client did nothing wrong. He was not intimately involved in this transaction."

Cleary, who worked as a government prosecutor for more than a decade, also said he was dismayed that the SEC didn't warn him that his client was about to be charged or send him a copy of the complaint.

"In the 18 years I've been working as a lawyer, this is unique," said Cleary, who still hadn't seen a copy of the complaint by Thursday afternoon. ■

*Alistair Barr is a reporter for MarketWatch in San Francisco.*


Copyright © 2006 MarketWatch, Inc. All rights reserved.
By using this site, you agree to the Terms of Service and Privacy Policy (updated 4/3/03).

Intraday data provided by Comstock, a division of Interactive Data Corp. and subject to terms of use.
Historical and current end-of-day data provided by FT Interactive Data.
More information on NASDAQ traded symbols and their current financial status.
Intraday data delayed 15 minutes for Nasdaq, and 20 minutes for other exchanges.
Dow Jones IndexesSM from Dow Jones & Company, Inc.
SEHK intraday data is provided by Comstock and is at least 60-minutes delayed.
All quotes are in local exchange time.

# EXHIBIT 4

**Boyer, Mark**

| | |
|---|---|
| **From:** | Hawker, Alexis |
| **Sent:** | Thursday, August 24, 2006 1:52 PM |
| **To:** | Boyer, Mark |
| **Subject:** | FW: Chris Milton Affidavits |

-----Original Message-----
**From:** Hawker, Alexis
**Sent:** Wednesday, January 25, 2006 1:00 PM
**To:** 'susan@hafetzlaw.com'
**Cc:** Dusek, Robin
**Subject:** Chris Milton Affidavits

Susan,

I have attached draft affidavits for Chris Milton in the arbitration and related litigation between AIG and/or its subsidiaries and several reinsurers arising from AIG's commutation with Trenwick.

Also attached is the Amended Complaint in the litigation, which will give you and Mr. Milton an idea of the issues in dispute. Though providing documents from the arbitration would raise confidentiality issues, the arbitration arises out of the same factual background as the litigation, on which the Amended Complaint is informative.

Please let us know if you have any further questions or any comments on the draft affidavits.

Regards,

Alexis A. Hawker
Lovells
330 N. Wabash, Suite 1900
Chicago, IL 60611
312.832.4410

# EXHIBIT 5

**Page 1**

```
 1
 2    - - - - - - - - - - - - - - - - - - -x
 3    In the Matter of the Arbitration
 4         -between-
 5    AIG COMPANIES,
 6              Petitioners,
 7         -and-
 8    AMERICAN RE-INSURANCE COMPANY, et al.,
 9              Respondents.
10    - - - - - - - - - - - - - - - - - - -x
11
              April 4, 2006
12            9:09 a.m.
13
14         Deposition of DREW BEAUCHAMP,
15    taken by attorneys for Respondents and
16    Cross-Petitioners, pursuant to Agreement, held
17    at the offices of Lovells, 590 Madison Avenue,
18    New York, New York, before Andrew Walker, a
19    Registered Professional Reporter (1991) and
20    Notary Public.
21
22
23
24
25
```

WINTER REPORTING, INC.   (212) 953-1414

**Page 2**

```
 1
 2    A P P E A R A N C E S :
 3
 4    CAHILL GORDON & REINDEL LLP
           Attorneys for Petitioners and
 5         Cross-Respondents
           80 Pine Street
 6         New York, New York  10005
 7    BY:  EDWARD P. KRUGMAN, ESQ.
           GABRIEL Y. POSNER, ESQ.
 8
 9    LOVELLS
           Attorneys for Respondents and
10         Cross-Petitioners
           One IBM Plaza
11         330 N. Wabash Avenue - Suite 1900
           Chicago, Illinois  60611
12
      BY:  JOSEPH T. McCULLOUGH IV, ESQ.
13         ROBIN C. DUSEK, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25
```

WINTER REPORTING, INC.   (212) 953-1414

**Page 3**

```
          1
09:05:52  2         THE VIDEOGRAPHER:  This is
09:05:52  3    Tape No. 1 of the videotaped deposition
09:05:54  4    of Drew Beauchamp in the matter of the
09:05:56  5    arbitration between AIG Companies,
09:05:59  6    petitioners, and American Re-Insurance
09:06:02  7    Company et al., respondents.  This
09:06:04  8    deposition is being held at the law
09:06:06  9    offices of Lovells, 590 Madison Avenue,
09:06:10 10    New York, New York, on April 4th, 2006,
09:06:13 11    at approximately 9:09 a.m.  My name is
09:06:16 12    Juan Torres and I am the legal video
09:06:18 13    specialist.  The court reporter is
09:06:19 14    Andrew Walker.
09:06:21 15         Will counsel please introduce
09:06:23 16    themselves.
09:06:24 17         MS. DUSEK:  My name is Robin
09:06:26 18    Dusek, from Lovells.  I represent the
09:06:28 19    facility members.
09:06:30 20         MR. McCULLOUGH:  Joe McCullough,
09:06:31 21    from Lovells.  I also represent the
09:06:33 22    facility members and respondents and
09:06:35 23    cross-petitioners in this proceeding.
09:06:37 24         MR. KRUGMAN:  Ed Krugman, from
09:06:38 25    Cahill Gordon, for petitioners and for
```

WINTER REPORTING, INC.   (212) 953-1414

**Page 4**

```
          1
09:06:41  2    the witness, and with me is Gabriel
09:06:44  3    Posner of my firm.
09:06:47  4         THE VIDEOGRAPHER:  Will the court
09:06:48  5    reporter please swear in the witness.
09:06:50  6    D R E W  B E A U C H A M P,
09:06:50  7    having been first duly sworn by the Notary
09:06:50  8    Public (Andrew Walker), was examined and
09:06:50  9    testified as follows:
09:07:10 10    EXAMINATION
09:07:10 11    BY MS. DUSEK:
09:07:11 12         Q.   Good morning, Beauchamp.
09:07:13 13         I take it from that comment,
09:07:14 14    you've probably --
09:07:15 15         MR. KRUGMAN:  Was there a "Mr." in
09:07:16 16    front of that?  I'm sorry, you said
09:07:18 17    "good morning, Beauchamp."
09:07:19 18         MS. DUSEK:  I believe I said
09:07:20 19    Mr. Beauchamp.  I'm sorry if --
09:07:23 20         MR. KRUGMAN:  I'm sorry --
09:07:27 21         Q.   I may have mumbled, I may not have
09:07:29 22    enunciated as well as the court reporter wanted.
09:07:33 23         I take it from that comment that
09:07:34 24    you've been deposed before and know some of the
09:07:36 25    ground rules --
```

WINTER REPORTING, INC.   (212) 953-1414

41

Beauchamp - 4/4/06

09:59:06 2    A.  No, not offhand, no.

09:59:13 3    MS. DUSEK:  Could you read the

09:59:14 4    question and answer.

09:59:15 5    (Record read)

09:59:29 6    Q.  Near the bottom of the page or

09:59:32 7    almost the bottom of the page, there are some

09:59:34 8    additional notes that I believe are your

09:59:36 9    handwriting.

09:59:37 10    Is that correct, that that's your

09:59:40 11    handwriting?

09:59:40 12    A.  Yes.

09:59:40 13    Q.  And could you read what those say?

09:59:44 14    A.  "If division's losses are in this

09:59:46 15    range, and average division attachment point is"

09:59:54 16    blank line, is blank, "what percent of ultimate

09:59:58 17    losses are excess of" blank, "so what are losses

10:00:02 18    within the first" blank.

10:00:09 19    Q.  Do you know what that note means?

10:00:29 20    A.  Yeah, I think I was playing

10:00:32 21    with -- I obviously didn't have the numbers, so

10:00:34 22    I couldn't do anything with this, but I was

10:00:39 23    trying to make a relationship between the

10:00:42 24    division's results and the ground-up results,

10:00:46 25    which included the attachment points above which

WINTER REPORTING, INC.    (212)  953-1414

42

Beauchamp - 4/4/06

10:00:48 2    the division attached, because this was excess

10:00:53 3    comp business, so they attached over an average

10:00:55 4    attachment point of, I think it was between 350

10:00:58 5    and 400 thousand dollars.

10:01:03 6    Q.  And why were you trying to do

10:01:04 7    that?

10:01:06 8    A.  I don't know, I just probably had

10:01:09 9    an idea and was thinking about it and wrote it

10:01:12 10    down.  You see there's blanks, so it never went

10:01:16 11    any further than this, from what I recall.

10:01:21 12    MS. DUSEK:  There's -- we're

10:01:23 13    almost at the end of the videotape, so

10:01:25 14    we can either take a short break now and

10:01:28 15    just change the videotape or stake a

10:01:31 16    full break.

10:01:32 17    MR. KRUGMAN:  Well, we've been

10:01:33 18    going about an hour, so why don't we

10:01:34 19    take a break.

10:01:35 20    MS. DUSEK:  Okay.

10:01:36 21    THE VIDEOGRAPHER:  The time is

10:01:36 22    10:05 a.m., this ends Tape No. 1 of the

10:01:40 23    videotaped deposition of Drew Beauchamp.

10:01:44 24    (Recess taken)

10:20:51 25    THE VIDEOGRAPHER:  The time is

WINTER REPORTING, INC.    (212)  953-1414

43

Beauchamp - 4/4/06

10:20:52 2    10:24 a.m.  This begins Tape No. 2 of

10:20:54 3    the videotaped deposition of Drew

10:20:57 4    Beauchamp.

10:21:00 5    BY MS. DUSEK:

10:21:01 6    Q.  Mr. Beauchamp, are you aware that

10:21:05 7    Chris Milton has taken the Fifth Amendment to

10:21:08 8    protect his right against self-incrimination

10:21:12 9    specifically with respect to this commutation?

10:21:15 10    MR. KRUGMAN:  Object to the form

10:21:16 11    of the question.

10:21:20 12    MS. DUSEK:  What is the basis for

10:21:20 13    the form objection, Ed?

10:21:22 14    MR. KRUGMAN:  It's blanket

10:21:24 15    assertion of the Fifth, it's not

10:21:25 16    specific to the form of the commutation.

10:21:29 17    MS. DUSEK:  Well, let's

10:21:30 18    introduce --

10:21:30 19    MR. KRUGMAN:  I've been told by

10:21:32 20    his lawyer that that affidavit, which

10:21:34 21    was drafted by you folks, was signed and

10:21:36 22    there will be a subsequent affidavit

10:21:39 23    that makes it clear it's a blanket

10:21:42 24    assertion of the Fifth.

10:21:44 25    MR. McCULLOUGH:  Is it your

WINTER REPORTING, INC.    (212)  953-1414

44

Beauchamp - 4/4/06

10:21:45 2    assertion that Chris Milton didn't read

10:21:46 3    this affidavit before he signed it?

10:21:48 4    MR. KRUGMAN:  All I know is that

10:21:49 5    there will be a subsequent affidavit, as

10:21:51 6    I have been told, that makes it clear

10:21:53 7    that it is a blanket assertion, not

10:21:55 8    specific to the subject matter here.

10:21:57 9    MR. McCULLOUGH:  So he is going to

10:21:59 10    recant his affidavit on this

10:22:00 11    particular --

10:22:02 12    MR. KRUGMAN:  I would not regard

10:22:03 13    it as recanting and you're free to make

10:22:05 14    whatever arguments you want to make.  My

10:22:08 15    point is simply that I was asked for the

10:22:11 16    basis for the objection to the form, and

10:22:14 17    I think that you are reading that in a

10:22:16 18    way that he did not intend -- or I have

10:22:19 19    been informed by his lawyer that he did

10:22:21 20    not intend when he signed and therefore

10:22:23 21    there will be an affidavit that makes it

10:22:25 22    clear, I am told.  I don't know that

10:22:27 23    it's going to happen, the affidavit as

10:22:29 24    far as I know hasn't been signed yet,

10:22:30 25    but I was asked for the basis of my

WINTER REPORTING, INC.    (212)  953-1414

**45**

Beauchamp - 4/4/06

```
10:22:33   2   objection. There it is.
10:22:36   3          MS. DUSEK: Can you read the
10:22:37   4   question back.
10:22:38   5          (Record read)
10:22:54   6   A.   No.
10:23:25   7          MS. DUSEK: I will state for the
10:23:26   8   record that Mr. Milton has signed an
10:23:29   9   affidavit stating, "If I were called as
10:23:32  10   a witness in this matter, I would assert
10:23:34  11   my Fifth Amendment right against
10:23:38  12   self-incrimination and decline to answer
10:23:38  13   any questions concerning the June 30th,
10:23:41  14   2004 commutation signed by American
10:23:43  15   International Group, Inc. on behalf of
10:23:46  16   its member and associated companies and
10:23:49  17   Trenwick Reinsurance Company, the issues
10:23:51  18   in the captioned arbitration, AIG, Inc.,
10:23:55  19   Trenwick, the respondents and
10:23:56  20   counterpetitioners, or my background."
10:24:08  21   Q.   Are you aware that last week, the
10:24:13  22   petitioners in this matter, the AIG Companies,
10:24:18  23   issued a corrected actuarial estimate for the
10:24:25  24   business that was the subject of the commutation
10:24:28  25   between Trenwick and AIG, Inc.?
```

WINTER REPORTING, INC.   (212) 953-1414

**47**

Beauchamp - 4/4/06

```
10:25:59   2   question back, please.
10:26:00   3          (Record read)
10:26:19   4   A.   I don't -- I don't think I could
10:26:26   5   answer that question.
10:26:28   6   Q.   Why can't you answer that
10:26:29   7   question?
10:26:31   8   A.   Because I don't know that the
10:26:32   9   numbers were corrected. I thought they were
10:26:34  10   just revised.
10:26:37  11   Q.   Did you know that the self-insured
10:26:41  12   retention had not been properly factored into
10:26:46  13   the actuarial calculations that were conducted
10:26:50  14   by the AIG actuaries?
10:26:54  15          MR. KRUGMAN: Objection to form;
10:26:57  16   objection, foundation.
10:26:59  17   Q.   Could you state your answer out
10:27:00  18   loud?
10:27:02  19          THE WITNESS: Could you read that
10:27:02  20   back.
10:27:03  21          (Record read)
10:27:17  22   A.   I didn't know anything about the
10:27:18  23   calculation, how they did it, what they took
10:27:21  24   into account, what they didn't take into
10:27:23  25   account, I don't know what they changed, I don't
```

WINTER REPORTING, INC.   (212) 953-1414

**46**

Beauchamp - 4/4/06

```
10:24:34   2   A.   Yes.
10:24:36   3   Q.   Did that surprise you, that a
10:24:38   4   corrected actuarial -- that the actuarial work
10:24:47   5   had to be corrected?
10:24:53   6   A.   I didn't give it any thought, one
10:24:55   7   way or the other.
10:24:56   8   Q.   When did you learn that this
10:24:58   9   correction was taking place?
10:25:03  10   A.   Ed mentioned --
10:25:05  11          MR. KRUGMAN: Excuse me, if you
10:25:05  12   only learned it through counsel, then
10:25:10  13   I'm going to direct you not to answer.
10:25:13  14   A.   No, I only learned it through Ed.
10:25:21  15   Q.   Have you seen the corrected
10:25:23  16   actuarial work?
10:25:27  17   A.   No.
10:25:34  18   Q.   Did the fact that the actuarial
10:25:37  19   work was corrected confirm your belief that,
10:25:43  20   your original belief, that the numbers being
10:25:48  21   discussed for the Division 2 business were too
10:25:51  22   high?
10:25:52  23          MR. KRUGMAN: Objection to the
10:25:52  24   form; objection, foundation.
10:25:58  25          THE WITNESS: Can you read the
```

WINTER REPORTING, INC.   (212) 953-1414

**48**

Beauchamp - 4/4/06

```
10:27:24   2   know what they revised, I don't know if they
10:27:26   3   corrected anything. I just know they came out
10:27:32   4   with a revised estimate. I don't know any of
10:27:36   5   the reasons why.
10:27:40   6   Q.   Do you know that the estimate is
10:27:42   7   lower than the amount that was -- than the --
10:27:48   8   let me strike that and start over.
10:27:50   9        Do you know that the restated
10:27:53  10   actuarial calculation that was presented last
10:27:56  11   week is lower than the 125 million calculation
10:28:05  12   that you had seen in 2003?
10:28:07  13          MR. KRUGMAN: Objection;
10:28:07  14   foundation.
10:28:17  15   A.   I don't think I know anything
10:28:18  16   about it. I just know it was revised.
10:28:36  17   Q.   You do know that the original
10:28:39  18   commutation price was $80 million, correct?
10:28:52  19   A.   I only know that from a document
10:28:55  20   that Ed showed me.
10:28:59  21   Q.   You didn't know at the time that
10:29:01  22   the commutation price was $80 million?
10:29:05  23   A.   No. I wasn't involved in it.
10:29:57  24          MS. DUSEK: Can you mark this as
10:29:58  25   Exhibit 4.
```

WINTER REPORTING, INC.   (212) 953-1414