UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMERICAN RE-INSURANCE COMPANY; AMERICAN UNITED LIFE INSURANCE COMPANY; DORINCO REINSURANCE COMPANY; FIRST ALLMERICA FINANCIAL LIFE INSURANCE COMPANY; GUARDIAN LIFE INSURANCE COMPANY OF AMERICA; HARTFORD LIFE INSURANCE COMPANY; HOUSTON CASUALTY COMPANY; JOHN HANCOCK LIFE INSURANCE COMPANY (U.S.A.); INSURANCE CORPORATION OF HANNOVER; MONUMENTAL LIFE INSURANCE COMPANY; PAN AMERICAN LIFE INSURANCE COMPANY; PHOENIX LIFE INSURANCE COMPANY; RELIANCE STANDARD LIFE INSURANCE COMPANY; RELIASTAR LIFE INSURANCE COMPANY; SUN LIFE ASSURANCE COMPANY OF CANADA; SWISS RE LIFE & HEALTH AMERICA; AND TRANSAMERICA OCCIDENTAL LIFE INSURANCE COMPANY,<br><br>                                  Plaintiffs,<br><br>        v.<br><br>AMERICAN INTERNATIONAL GROUP, INC. and TRENWICK AMERICA REINSURANCE CORPORATION,<br>                        Defendants | Civil Action No. 05-11840-MLW |

## SUPPLEMENTAL AMENDED COMPLAINT

1.      The plaintiff insurance companies are all members of reinsurance facilities managed in Massachusetts that provided insurance to defendant Trenwick America Reinsurance Corporation ("Trenwick") to cover the risk of losses on contracts of reinsurance ostensibly "fronted" by Trenwick on their behalf, including reinsurance contracts Trenwick issued to various subsidiaries of defendant American International Group, Inc. ("AIG Inc."). Working in collusion with Trenwick, AIG Inc. wrongfully manipulated this arrangement to create a demand for more than $73 million in improper coverage against the plaintiffs as part of a pattern of unfair, deceptive

and fraudulent practices by AIG Inc. involving the workers' compensation, occupational accident and industrial aid claims of a number of AIG Inc. subsidiaries (the "AIG Subsidiaries").

JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under G.L. c. 212, § 4 (general jurisdiction), G.L. c. 93A, § 11 (unfair and deceptive trade practices) and c. 231A, § 1 (declaratory judgments).  This Court has personal jurisdiction over the defendants, AIG Inc. and Trenwick, under G.L. c. 223A, § 3 and otherwise, because they each transacted business or caused tortious injury by an act or omission in the Commonwealth.

3.      Venue is proper in this Court under G.L. c. 223, § 1 because one of the plaintiffs, John Hancock Life Insurance Company (U.S.A.), maintains its principal place of business in Boston, Massachusetts.

PARTIES

**Plaintiffs**

4.      Plaintiff American Re-Insurance Company ("Am Re") is a professional reinsurer domiciled in Delaware and licensed to conduct business in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of G.L. c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Am Re on false claims for reinsurance coverage.  On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Am Re an improper demand in the amount of $2,485,602, by reason of which Am Re has been damaged.  On March 28, 2006, the AIG Subsidiaries revised their demand to request Am Re's percentage share of $56.9 million.

5.      Plaintiff American United Life Insurance Company ("American United") is an insurance company domiciled in Indiana and licensed to conduct business in Massachusetts.

American United received over $36 million in premium and annuity considerations in 2004 from business conducted in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against American United on false claims for reinsurance coverage.  On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent American United an improper demand in the amount of $5,125,459, by reason of which American United has been damaged.

6.    Plaintiff Dorinco Reinsurance Company ("Dorinco") is a licensed insurance company domiciled in Michigan.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Dorinco on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Dorinco an improper demand in the amount of $448,261, by reason of which Dorinco has been damaged.

7.    Plaintiff First Allmerica Financial Life Insurance Company ("First Allmerica") is an insurance company domiciled in Massachusetts with its main office in Worcester, Massachusetts.  First Allmerica is licensed to conduct business in Massachusetts and received over $2 million in premium in 2004 from business conducted in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against First Allmerica on false claims for reinsurance coverage.  On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent First Allmerica an improper demand in the amount of $20,501,035, by reason of which First Allmerica has been damaged.

8.      Plaintiff Guardian Life Insurance Company of America ("Guardian") is an insurance company domiciled in New York and licensed to conduct business in Massachusetts. Guardian operates in Massachusetts through a subsidiary and through two administrative offices. Guardian received over $235 million in premium in 2004 from business conducted in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Guardian on false claims for reinsurance coverage.  On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Guardian an improper demand in the amount of $2,762,546, by reason of which Guardian has been damaged.

9.      Plaintiff Hartford Life Insurance Company ("Hartford") is an insurance company domiciled in Connecticut and licensed to conduct business in Massachusetts.  Hartford received approximately $185 million in premium in 2004 from business conducted in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Hartford on false claims for reinsurance coverage.  On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Hartford an improper demand in the amount of $4,024,509, by reason of which Hartford has been damaged.

10.      Plaintiff Houston Casualty Company ("HCC") is an insurance company domiciled in Texas and operating on a surplus lines basis in Massachusetts.  HCC received over $10 million in premium in 2004 from business conducted in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against

HCC on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent HCC an improper demand in the amount of $57,361, by reason of which HCC has been damaged.

11.    Plaintiff Insurance Corporation of Hannover ("ICH") is an insurance company domiciled in Illinois and licensed to conduct business in Massachusetts. ICH operates, in part, through an agent located in Lowell, Massachusetts. ICH received over $2.5 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against ICH on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent ICH an improper demand in the amount of $2,608,329, by reason of which ICH has been damaged.

12.    Plaintiff John Hancock Life Insurance Company (U.S.A.) ("John Hancock"), the successor through merger to Facility member The Manufacturer's Life Insurance Company (U.S.A.) ("Manulife"), is an insurance company domiciled in Michigan with its main office in Boston, Massachusetts. John Hancock is licensed to conduct business in Massachusetts and received over $45 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Manulife on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Manulife an improper demand in the amount of $6,765,043, by reason of which John Hancock, as successor-in-interest to Manulife, has been damaged.

13.     Plaintiff Monumental Life Insurance Company ("Monumental") is an insurance company domiciled in Maryland and licensed to conduct business in Massachusetts. Monumental received over $12 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Monumental on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Monumental an improper demand in the amount of $73,563, by reason of which Monumental has been damaged.

14.     Plaintiff Pan American Life Insurance Company ("Pan American") is an insurance company domiciled in Louisiana and licensed to conduct business in Massachusetts. Through its agents in Massachusetts, Pan American received over $500,000 in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Pan American under false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Pan American an improper demand in the amount of $72,885, by reason of which Pan American has been damaged.

15.     Plaintiff Phoenix Life Insurance Company, formerly Phoenix Home Life Mutual Insurance Company ("Phoenix Life"), is an insurance company domiciled in New York and licensed to do business in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Phoenix Life under false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of

the fraudulent scheme, the AIG Subsidiaries sent Phoenix Life an improper demand in the amount of $2,713,228, by reason of which Phoenix Life has been damaged.

16.    Plaintiff Reliance Standard Life Insurance Company ("RSL") is an insurance company domiciled in Illinois with an office in Boston, Massachusetts. RSL is licensed to do business in Massachusetts and received over $22 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against RSL on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent RSL an improper demand in the amount of $4,046,533, by reason of which RSL has been damaged.

17.    Plaintiff Reliastar Life Insurance Company ("ING") is an insurance company domiciled in Minnesota. ING is licensed to conduct business in Massachusetts and maintains an office in Boston, Massachusetts. ING received over $60 million in premium and annuity considerations in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against ING on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent ING an improper demand in the amount of $225,249, by reason of which ING has been damaged.

18.    Plaintiff Sun Life Assurance Company of Canada ("Sun Life") is domiciled in Ontario, Canada, but has its United States home office in Wellesley Hills, Massachusetts and is licensed to conduct business in Massachusetts. Sun Life received over $63 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful

scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Sun Life on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Sun Life an improper demand in the amount of $3,573,408, by reason of which Sun Life has been damaged.

19.    Plaintiff Sun Life is also the successor-in-interest by acquisition to Facility member Clarica Life Insurance Company ("Clarica"). In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Clarica on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Clarica an improper demand in the amount of $9,042,784, by reason of which Sun Life as successor-in-interest to Clarica has been damaged.

20.    Plaintiff Swiss Re Life & Health America, Inc. ("Swiss Re") is an insurance company domiciled in Connecticut and licensed to conduct business in Massachusetts. Swiss Re received over $95 million in premium in 2004 from business conducted in Massachusetts. In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Swiss Re on false claims for reinsurance coverage. On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Swiss Re an improper demand in the amount of $4,012,599, by reason of which Swiss Re has been damaged.

21.    Plaintiff Swiss Re is also the successor-in-interest to Facility member Mercantile & General Company ("M&G"). On November 23, 2004, in collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of

c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make an improper demand (mistakenly addressed to Generali USA Life Reassurance Company as successor to Mercantile and General Life Reassurance Company of America) in the amount of $109,328 representing M&G's proportionate share of the AIG Subsidiaries' demand against the LDG Facilities, by reason of which Swiss Re has been damaged.

22.     Plaintiff Transamerica Occidental Life Insurance Company ("Transamerica") is an insurance company domiciled in Iowa and licensed to conduct business in Massachusetts.  In collusion with Trenwick in an unlawful scheme to commit fraud and other torts against the plaintiffs, and in violation of c. 93A, AIG Inc. undertook to have the AIG Subsidiaries make a demand against Transamerica on false claims for reinsurance coverage.  On November 23, 2004, at the direction of AIG Inc. and in furtherance of the fraudulent scheme, the AIG Subsidiaries sent Transamerica an improper demand in the amount of $195,154, by reason of which Transamerica has been damaged.

**Defendants**

23.     Defendant AIG Inc. is an insurance holding company with registered offices in New York, New York.  With operations in more than 130 countries and jurisdictions, AIG Inc. holds interests in the largest commercial and industrial insurance group in the United States.  It is the parent of various insurance company subsidiaries, a number of which are licensed to conduct business in Massachusetts.  AIG Inc. transacted business or caused tortious injury by an act or omission in the Commonwealth.

24.     Defendant Trenwick (in its own right and as successor-in-interest to Chartwell Reinsurance Company by acquisition in December 2002) is an insurance company domiciled in Connecticut.  Trenwick transacted business or caused tortious injury by an act or omission in the Commonwealth.

FACTS

**Plaintiffs' Massachusetts Reinsurance Facilities**

25.     The plaintiffs are each members of one or more of three groups of reinsurers

called "facilities" that were formed by their members to share reinsurance risks underwritten for

the facilities by a common managing agent.  The facilities are the Special Risk Reinsurance

Facility, the Special Risk Reinsurance Facility II and the Occupational Accident & Health

Facility (each, an "LDG Facility;" collectively, the "LDG Facilities").

26.     The managing agent for each of the LDG Facilities is LDG Reinsurance

Corporation ("LDG"), formerly known either as SRRF Management Incorporated or LDG

Reinsurance Underwriters.  Throughout its existence LDG has been incorporated in

Massachusetts and, at all relevant times, has maintained its principal place of business in

Wakefield, Massachusetts.

27.     Each of the plaintiffs entered into an agency contract with LDG, called a

"participation agreement" (collectively, the "Participation Agreements"), under which they each

granted LDG authority to underwrite reinsurance risks, manage claims and undertake accounting

activities for the LDG Facilities on their behalf.  Under the Participation Agreements, LDG

collected premiums, handled any reported losses and paid claims on behalf of the plaintiffs from

its offices in Massachusetts.

28.     As the managing agent of the LDG Facilities, LDG was at the center of the

relationships among all parties to this action.  In implementing their wrongful scheme to unfairly

saddle the plaintiffs with false obligations based on inflated and unsubstantiated reinsurance

claims, the defendants prepared and transmitted numerous demand letters, position statements,

threats and other communications, and engaged in false and bad faith negotiations, that were

intended to be and were received and acted upon primarily and substantially in Massachusetts through plaintiffs' agent LDG.

### LDG Arranges For A "Fronting Member"
### To Issue Reinsurance For The Facilities

29.     In 1997, LDG, acting as managing agent of the LDG Facilities, arranged for Trenwick's predecessor-in-interest Chartwell Reinsurance Company ("Chartwell") to participate as a member in each of the LDG Facilities. Chartwell entered into a Participation Agreement by which it took a share of any reinsurance contracts issued by the LDG Facilities and granted LDG authority to underwrite risks, manage claims and undertake accounting activities on its behalf with respect to that reinsurance.

30.     That same year, Chartwell also agreed to act as one of the member "fronting" reinsurers for the LDG Facilities. As a fronting reinsurer, Chartwell issued reinsurance contracts to third parties such as the various AIG Subsidiaries and then reinsured ("ceded") those risks by placing 100% of the risk with one or more of the LDG Facilities in which it participated as a member (the "Fronting Arrangement"). LDG arranged for and managed this Fronting Arrangement from its offices in Wakefield, Massachusetts.

31.     Chartwell negotiated with LDG for a fee of 2.5% of the "gross net reinsurance premiums" for all reinsurance risks that were fronted under the Fronting Arrangement. This amount was deducted by Chartwell from the premium ceded to the plaintiffs as members of the LDG Facilities. Pursuant to the Fronting Arrangement, between 1997 and 2002 the LDG Facilities paid substantial sums to Chartwell and its successor-in-interest Trenwick.

32.     In an attempt to further formalize its role as fronting member, Chartwell sought to have LDG recommend that each Facility member enter into a written "fronting agreement" with Chartwell explicitly authorizing the ceding of Chartwell-fronted reinsurance to the LDG Facilities. This agreement, to be governed by Massachusetts law, was known as the Quota Share

Retrocessional Agreement ("QSA") and was designed and intended, once executed, to operate in conjunction with the Participation Agreements establishing LDG's underwriting and claims authority.

33.     In a series of letters and other communications between February 1998 and September 1998, Chartwell directly and through LDG pressed the various plaintiffs to sign the QSA.  When certain plaintiffs raised concerns about the scope of the authority granted to Chartwell under the QSA, Chartwell characterized the agreement's provisions as merely (i) reiterating the authority already granted to LDG by each of the members of the LDG Facilities under the Participation Agreements and (ii) confirming that the Participation Agreements allowed the ceding of risks from Chartwell to the LDG Facilities.

34.     To further induce the plaintiffs to sign the QSA, Chartwell often repeated that as a party to a Participation Agreement, Chartwell had itself granted LDG oversight authority as its chosen managing agent and that this authority was incorporated by reference in any fronting contract.  For example, on April 30, 1998, Chartwell's in-house counsel Kathleen M. Carroll wrote to LDG Facility member Manulife, making the following representations regarding the relative functions of LDG and the fronting reinsurer under the proposed terms:  "Where Chartwell fronts for the pool, LDG acts as Chartwell's agent and decisions made by LDG are binding on Chartwell . . .  As a practical matter, LDG will be performing all the actual claims handling as agent for Chartwell."  LDG saw this correspondence and agreed with the description provided by Chartwell.

35.     The QSA was never fully executed.  Certain of the plaintiffs declined to rely on Chartwell's representations and rejected the QSA as drafted.  On information and belief, lacking full participation by the LDG Facility members, Chartwell never signed the QSA.

36.    In December 2002, Trenwick acquired Chartwell by merger and stepped into Chartwell shoes as successor-in-interest to its representations, rights and obligations under the Participation Agreement and the Fronting Arrangement with the LDG Facilities. As the chosen managing agent under Chartwell's Participation Agreement, to which Trenwick succeeded, LDG continued to act on behalf of Trenwick in underwriting risks, managing claims and undertaking accounting activities on all reinsurance ceded to the LDG Facilities.

37.    From December 2002 through August 2003, Trenwick continued to front reinsurance risks for the LDG Facilities, issuing no fewer than eleven separate reinsurance contracts to various AIG Subsidiaries providing coverage for their workers' compensation, occupational accident and industrial aid insurance risks. On information and belief, Massachusetts risks were among the AIG Subsidiaries' insurance policies reinsured by Trenwick and ceded 100% to the LDG Facilities and proportionately to the plaintiffs as Facility members. The plaintiffs paid almost $300,000 in fees to Trenwick for fronting the reinsurance of the AIG Subsidiaries' risks.

## The Defendants' Wrongful Scheme to Make False Claims

38.    The AIG Subsidiaries and Trenwick are bound by duties, imposed by reinsurance industry custom and recognized by law, to act in "utmost good faith" in their course of dealings with the plaintiffs and with LDG as the authorized agent of the plaintiffs and the LDG Facilities.

39.    Reinsurance is an insurance contract issued to an insurer, known as the "ceding insurer" or "cedent." The contract is one of "indemnity" and only provides a right for reimbursement when the cedent incurs losses by making payments to resolve claims under insurance policies or reinsurance contracts it has issued to others. The reinsurer owes nothing unless and until the cedent has paid a claim and can present a record of the payment as a "paid loss." The Trenwick Fronting Arrangement with the LDG Facilities is an arrangement providing

indemnity, and any right Trenwick has to reimbursement from the LDG Facilities can arise only after Trenwick itself has paid out funds to resolve claims made under the reinsurance contracts it issued for the LDG Facilities.

40.     Reinsurance typically spreads risk along a chain of insurers.  Direct insurers cede portions of the risk they assume to reinsurers.  Those reinsurers cede (technically, "retrocede") portions of the risk they assume to other reinsurers (otherwise called "retrocessionaires").  As the chain lengthens and fans out, risk can be distributed among an ever larger number of companies.

41.     The various AIG Subsidiaries, Chartwell (and later Trenwick) and the plaintiffs together formed a number of such reinsurance chains, each of similar but not identical structure.  Each of the reinsurance chains along which the AIG-related risks were distributed (the "AIG-Risk Chains") were structured in pertinent part substantially as follows: (a) as a fronting reinsurer, Chartwell would issue reinsurance contracts to the AIG Subsidiaries and (b) Chartwell, consistent with the relationship embodied by the QSA, would then cede those risks by placing 100% of the risk with one of the LDG Facilities, of which Chartwell (and later Trenwick) and each of the plaintiffs were members.  Each of Chartwell (and later Trenwick) and the plaintiffs as members of the LDG Facilities would then retain a proportionate share of the risk and (c) cede the remaining proportionate share (up to 95%) to a different LDG Facility and/or to another retrocessionaire.  No written contract effects or memorializes this latter ceding of risks.  The exact percentages ceded and the identities of the LDG Facilities and others acting as retrocessionaires in each of the AIG-Risk Chains varied among the eleven AIG Subsidiaries' contracts ceded or purported to be ceded to the LDG Facilities through Chartwell.

42.     Each of the reinsurance contracts in the AIG-Risk Chains is a contract of indemnity.  Under each of these contracts, the insured party must pay out a claim and present

record of payment as a "paid loss" before it is to be reimbursed by the reinsurers at the next level in the chain.

43.    The cedent owes a duty to its reinsurers to competently handle claims before paying them.  It owes a duty to provide timely notice of loss.  The cedent owes duties to provide specific and relevant claim information to its reinsurers, to allow account audits by the reinsurers, and in general, to cooperate with the reinsurers.  Because the cedent must first pay out funds to resolve claims before seeking reimbursement from its reinsurers, the ceding insurer has a financial incentive to investigate the legitimacy of any claims made under the reinsurance contracts it has obtained before fronting funds to pay those claims.  The requirement that Trenwick first incur "paid losses" before seeking payment from the LDG Facilities provided the plaintiffs, as Facility members, with an added safeguard against invalid or fraudulent claims.

44.    The cedent's duties are also enforced by an obligation of absolute and perfect candor.  By industry tradition and by law, all the cedent's duties must be performed with "utmost good faith" or *uberrimae fidei,* meaning openess and honesty and the absence of any concealment or deception.

45.    Without *uberrimae fidei* there would be no reinsurance.  Reinsurance works only if the reinsurance premium is less than the original premium received by the cedent.  For the reinsurance premium to be less, reinsurers cannot duplicate the costs of the primary insurer in evaluating risks and handling claims.  Thus, unlike the arms-length relationships typical among sophisticated parties in other industries, reinsurers must rely completely on the ceding insurer to provide accurate, complete and timely information regarding the nature of risks and extent of losses.

46.    The duty of *uberrimae fidei* underlies the entire reinsurance relationship.  Each party in a chain of reinsurance relationships must act in utmost good faith with respect to its

obligations to report and investigate claims. The good faith performance of these obligations is intended to benefit and be relied upon by each and every indemnifying party up the chain.

47.    As a fellow and fronting member of the LDG Facilities, Trenwick owed to each of the plaintiffs a duty of *uberrimae fidei* in all dealings regarding the LDG Facilities, including deference to LDG, the managing agent of the Facilities as chosen by Trenwick and each of the plaintiffs under their respective Participation Agreements.

48.    In making claims against the plaintiffs for alleged losses reinsured by Trenwick, the AIG Subsidiaries owed to Trenwick and to each of the plaintiffs a duty of *uberrimae fidei* requiring the AIG Subsidiaries, among other things, to submit only valid claims and to provide proof of the insured losses underlying such claims.

49.    As set forth in detail below, AIG Inc. aided and abetted each of Trenwick and the AIG Subsidiaries in breaching the duties set forth above by engaging in a pattern of fraudulent, unfair and deceptive practices to unfairly manipulate Trenwick's fronting arrangement to assert improper and inflated coverage claims against the LDG Facilities and the plaintiffs.

50.    On information and belief, in all undertakings alleged herein and at all relevant times, AIG Inc. acted with the knowledge that Trenwick was ceding 100% of the AIG-related business to the LDG Facilities and to the plaintiffs as members of the LDG Facilities, and AIG Inc. understood and intended that its dealings with Trenwick would have a direct financial impact on the plaintiffs.

51.    On information and belief, in all undertakings alleged herein and at all relevant times, AIG Inc. acted on its own behalf as part of a larger scheme by AIG Inc. to artificially inflate its balance sheets. AIG Inc. was investigated by the Securities and Exchange Commission and the Attorney General for the State of New York for improperly manipulating its financial reporting to increase its surplus. In May 2005, the People of the State of New York by

Eliot Spitzer filed suit against AIG Inc., and certain of its executives on grounds that AIG Inc. engaged in sham insurance transactions to "give the investing public the impression that AIG had a larger cushion of reserves to pay claims than it actually did," "[h]id losses from [AIG Inc.'s] insurance underwriting business by converting underwriting losses to capital losses"; and "[c]reated false underwriting income." As a result of these investigations, AIG Inc. agreed to pay a combined settlement of over $1.6 billion to resolve claims related to improper accounting, bid rigging and practices involving workers' compensation funds.

52.    In April 2003, Trenwick reported to LDG that AIG Inc. was requesting a full and final settlement or "commutation" of all past, current and future liabilities owed by Trenwick under the fronted reinsurance contracts issued to the AIG Subsidiaries. Since that date, LDG, in keeping with its duty of utmost good faith as managing agent of the LDG Facilities, has repeatedly sought fair access to the claim records of the AIG Subsidiaries to confirm the reasonableness and accuracy of the alleged outstanding losses. At all relevant times, AIG Inc. and the AIG Subsidiaries knew that LDG, as the manager of the LDG Facilities, was the chosen agent for Trenwick and the plaintiffs for handling any incoming claims. AIG Inc. and the AIG Subsidiaries have persistently refused LDG access to such records, and their refusal has precluded LDG from handling, adjusting or paying any of the losses AIG Inc. alleges and its subsidiaries have demanded under the contracts fronted by Trenwick.

53.    When AIG Inc. inserted itself into the claims resolution process, it could have and should have acted in a manner consistent with the AIG Subsidiaries' duties of utmost good faith by providing LDG, as agent for the plaintiffs, with access to any records substantiating the AIG Subsidiaries' alleged claims. To the contrary, AIG Inc. engaged in a pattern of evasive and deliberately obstructionist behavior calculated, on information and belief, to avoid disclosure of unlawful practices resulting in inflated claims in the AIG Subsidiaries' workers' compensation

and other books of business. Further, at all relevant times, AIG Inc. has pursued a strategy of negotiating unfairly using escalating demands for payment intended, on information and belief, to co-opt Trenwick in the pursuit of unsupportable claims payments and a restructuring of the AIG Subsidiaries' reinsurance coverage at the expense of the plaintiffs as Facility members.

54.    Because of its deteriorating financial circumstances, Trenwick colluded with AIG Inc. in carrying out these unfair, deceptive and tortious activities, the nature, purpose and effect of which were to hijack LDG's rightful gatekeeper role in handling claims for the LDG Facilities and to give unfair advantage to AIG Inc. in its scheme to pass off inflated loss reports in the AIG Subsidiaries' workers' compensation and other books of business.

## AIG Inc. Seizes the Opportunity to Co-opt Trenwick

55.    In the fall of 2002, the Trenwick group of companies faced a financial crisis. Trenwick's parent, Trenwick America Corporation, suffered a loss of public confidence in its stock. Onerous financing covenants were widely reported as restricting its options for recovery. As Trenwick's management looked for ways to ensure its survival, on information and belief, AIG Inc. took advantage of Trenwick's financial vulnerabilities by improperly pressuring for payment of insufficiently substantiated losses reported by the AIG Subsidiaries under the reinsurance contracts Trenwick fronted for the LDG Facilities.

56.    When, in April 2003, AIG Inc. requested a commutation of liabilities allegedly owed under Trenwick-fronted reinsurance contracts, Trenwick reported AIG Inc.'s demand to LDG as manager of the LDG Facilities and as agent for Trenwick and the plaintiffs in handling any incoming claims. Writing from its offices in Wakefield, Massachusetts on or about June 26, 2003, LDG responded to AIG Inc.'s demands regarding coverage for the AIG Subsidiaries claims by requesting an audit of the accounts of the various covered AIG Subsidiaries to verify

the reported losses. The requested audits were to be coordinated through the offices of C. Mindy Kipness, Director of Corporate Receivables for AIG Inc.

57.    AIG Inc., on information and belief, knew the reported workers' compensation and other claims of the AIG Subsidiaries were grossly inflated. In a deliberate strategy to avoid having to disclose the improper claims accounting practices of the AIG Subsidiaries, as well as the larger scheme to inflate the AIG Inc. balance sheet, AIG Inc. itself responded to LDG's request to verify purported losses by taking actions that threatened Trenwick's solvency.

58.    On July 9, 2003, less than two weeks after receiving LDG's audit request, AIG Inc. Associate General Counsel Eric S. Kobrick sent a formal demand letter to LDG at its offices in Wakefield, Massachusetts. The letter was written on AIG Inc. letterhead and addressed LDG in its capacity as "Managing General Agent of Trenwick." In the letter, AIG Inc. stated that its "relevant member and associated companies" purported to exercise rights under "special termination provisions" governing the reinsurance contracts with Trenwick to "accelerate Trenwick's obligations, requiring immediate settlement of all present and future obligations." By AIG Inc.'s unsubstantiated accounting, the "losses" owed by Trenwick totalled almost $130 million. The letter demanded that Trenwick "remit payment promptly."

59.    On July 25, 2003, LDG again requested an on-site audit of the records of the AIG Subsidiaries' accounts to verify each of the components of the $130 million claim, including outstanding losses, unsettled balances, and incurred but not reported claims ("IBNR"). On August 11, 2003, outside counsel Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), on information and belief acting on instruction from AIG Inc.'s management, wrote LDG threatening arbitration proceedings against Trenwick if the demanded $130 million payment was not promptly made. The demand letter further stated that access to the records of AIG Subsidiaries would only be granted on the condition that LDG first agree to render its due

diligence meaningless by executing on behalf of the plaintiffs a "clean, irrevocable, evergreen letter of credit" covering the entire amount of the disputed claims.

60.    On August 20, 2003, Trenwick's parent, Trenwick America Corporation, filed for Chapter 11 protection in the United States District Court for the District of Delaware.

61.    On information and belief, on or about August 27, 2003, having provided no information to substantiate the claims of the AIG Subsidiaries, management at AIG Inc. instructed Gibson Dunn to commence an arbitration proceeding against Trenwick seeking payment in full of the approximately $130 million "claim," together with interest and attorneys' fees.  The demand for arbitration was delivered into and, as intended, was received and acted upon by LDG within the Commonwealth of Massachusetts.  The letter commencing arbitration was sent to LDG at its offices in Wakefield, Massachusetts and "require[d] LDG/Trenwick" to appoint an arbitrator within one month.

62.    Upon information and belief, Trenwick submitted to voluntary supervision by the Connecticut Department of Insurance during this time period or shortly thereafter.

### AIG Inc. and Trenwick Collude to Give AIG Inc. Unfair Leverage in Negotiations for a Novation

63.    From July 2003 through June 2004, AIG Inc. engaged in negotiations with LDG, in its role as managing agent of the LDG Facilities and the plaintiffs, ostensibly to resolve obstacles to payment of the claims asserted by the AIG Subsidiaries.  In reliance on AIG Inc.'s purported good faith, LDG sent to and received from AIG Inc. numerous letters and other communications concerning a review of the accounts of the reinsured AIG Subsidiaries.  AIG Inc.'s express and implied representations as to its good faith in the course of its dealings with LDG were delivered to LDG in Massachusetts and, as intended by AIG Inc., were received and relied upon by the plaintiffs through their agent LDG in Massachusetts.

64.    At this same time, Trenwick was on notice that LDG was negotiating with AIG Inc. on behalf of the LDG Facilities and that pursuant to the terms of its Participation Agreement and the representations of its predecessor-in-interest Chartwell, Trenwick was required to defer to the authority of LDG as managing agent with regard to such negotiations. On September 8, 2003, LDG formally wrote Trenwick to advise that the LDG Facility members "will not be bound by any settlement reached or any payments made by Chartwell to AIG in the absence of their express preapproval."

65.    On September 18, 2003, Trenwick responded to LDG and promised plaintiffs "a full and fair opportunity to review and comment upon the proposals" before any commutation relating to AIG Subsidiaries' contracts would be agreed. Trenwick's representations were delivered to LDG in Massachusetts and, as intended by Trenwick, were received and relied upon by the plaintiffs through their agent LDG in Massachusetts.

66.    The plaintiffs now know that during the period July 2003 through June 2004, AIG Inc. entered into secret negotiations with the financially vulnerable Trenwick aimed at securing an improper commutation of various reinsurance contracts Trenwick had issued to the AIG Subsidiaries. In so doing, AIG Inc. acted in bad faith and induced Trenwick to engage in conflicts of interest and other breaches of Trenwick's fiduciary duties to the plaintiffs.

67.    During this same period of time, Trenwick intentionally excluded LDG from its negotiations with AIG Inc., effectively preventing LDG from acting as the gatekeeper to improper claims ceded to the LDG Facilities. Trenwick's actions prevented LDG from exercising the authority, granted to it by Chartwell (and later by Trenwick) and the plaintiffs under their respective Participation Agreements, to act as agent for the LDG Facilities in managing claims and undertaking accountings on behalf of the Facility members. Trenwick

prevented LDG from fulfilling its role of representing the plaintiffs' interests as Facility members.

68.    On information and belief, AIG Inc. induced Trenwick to improperly usurp LDG's rightful role as manager of the LDG Facilities and to breach the duty of utmost good faith owed to the plaintiffs by offering the financially distressed company a global settlement favorably resolving all of Trenwick's reinsurance liabilities to AIG Subsidiaries, of which the risks ceded to the LDG Facilities comprised only a part.

69.    With respect to the reinsurance contracts issued to the AIG Subsidiaries by Trenwick and ceded to the LDG Facilities, Trenwick faced demands that it pay claims nominally totalling more than $130 million reduced to what AIG Inc. claimed was a present value of more than $81 million.

70.    Under the deal, AIG Inc. would fund Trenwick's "payment" of most of the remaining risk by accepting a non-recourse promissory note from Trenwick in the amount of approximately $73 million.  This financing would relieve Trenwick of the need to secure funds to pay the AIG Subsidiaries' claims from either the other members of the LDG Facilities or the general marketplace.  Given Trenwick's perilous financial situation at the time, such financing would have been available only on terms unfavorable to Trenwick.

71.    In exchange for such favorable treatment from AIG Inc., Trenwick agreed to assist AIG Inc. in unfairly pressuring the plaintiffs to enter a novation on terms dictated by AIG Inc. by which the plaintiffs would assume direct responsibility to the AIG Subsidiaries and succeed to Trenwick's contractual rights and obligations under its contracts with the AIG Subsidiaries.  In the event negotiations for the novation failed, Trenwick agreed to participate with AIG Inc. acting on behalf of the AIG Subsidiaries in a commutation to cram down a settlement on the plaintiffs by (a) issuing a promissory note to AIG Inc. and (b) presenting the

AIG Subsidiaries' wrongfully inflated coverage claim to the plaintiff members of the LDG

Facilities as a "paid loss" under the QSA. Trenwick also agreed to secure its promissory note to

AIG Inc. by assigning to the AIG Subsidiaries any and all of Trenwick's purported "collection

rights" with respect to the inflated paid loss as against the plaintiff Facility members under the

QSA.

72.     AIG Inc.'s first attempt to force novation came in early December 2003, when

AIG Inc. and Trenwick jointly confronted LDG with the fruits of their private negotiations. At

that time, AIG Inc. demanded that a novation on its proposed terms be executed by the end of

January 2004. If LDG did not agree and the plaintiffs, as Facility members, did not pay as

demanded, AIG Inc. and Trenwick threatened to go forward with a commutation under which

Trenwick would pass through to the LDG Facilities as "paid losses" roughly $80 million in the

AIG Subsidiaries' claims. AIG Inc.'s demand was delivered to LDG in Massachusetts and, as

intended by AIG Inc. and Trenwick, was to be acted upon by plaintiffs through their agent LDG

in Massachusetts.

73.     On February 3, 2004, LDG initiated negotiations with AIG Inc. In a letter also

copied to Trenwick, LDG set out proposed terms for a novation acceptable to the Facility

members. Over the next five months, LDG continued its good faith efforts to negotiate a

novation of the AIG Subsidiaries' risks. At the time, LDG and the plaintiffs believed AIG Inc. to

be negotiating in good faith with LDG to achieve a mutually agreed novation, and to have ceased

its talks with Trenwick seeking an improperly collusive commutation. Plaintiffs now know that

over these five months, AIG Inc. clandestinely continued to collude with Trenwick against the

LDG Facility members' interests.

74.     On May 25, 2004, upon information and belief, at the direction of AIG Inc.'s

management, outside counsel wrote to LDG threatening that unless a novation on AIG Inc.'s

terms was finalized by June 15, 2004, all reinsurance accepted by the LDG Facilities from the AIG Subsidiaries with Trenwick as a front would be "automatically commuted" and the AIG Subsidiaries would seek the full amount of each Facility member's share immediately, by arbitration if necessary. On information and belief, over the next two weeks AIG Inc. revealed to LDG that Trenwick had agreed to enter a written commutation agreement under which Trenwick would pass through to the LDG Facilities as "paid losses" roughly $80 million in AIG Subsidiaries' claims if the novation AIG Inc. proposed was not accepted. Each of these demands was delivered to LDG in Massachusetts and, as intended by AIG Inc. and Trenwick, was to be acted upon by plaintiffs through their agent LDG in Massachusetts.

75.    By letter dated June 24, 2004, several of the plaintiffs advised Trenwick that the ultimatum received from AIG Inc. by the LDG Facilities through LDG as managing agent was "completely unacceptable" and that the proposed commutation did not conform to "established principles of good faith within the reinsurance industry." As members of the LDG Facilities, these plaintiffs objected to Trenwick's not having carried out an independent valuation of the AIG Subsidiaries' claims and to Trenwick's failure to assess the validity of the $80 million commutation figure. The June 24 letter advised Trenwick that further discussion of novation would require full disclosure of all relevant facts, including copies of any agreements or side letters between AIG Inc. (or its subsidiaries) and Trenwick, as well as information regarding the calculation of IBNR and any data, assumptions and actuarial methodologies that might support AIG Inc.'s demand on behalf of its subsidiaries. Neither AIG Inc. nor Trenwick provided the requested information to LDG or to any of the plaintiffs.

### The Suspicious "Commutation" By AIG Inc. and Trenwick

76.    Instead, on June 30, 2004, Trenwick entered into an unlawful agreement executed by AIG Inc., on behalf of the AIG Subsidiaries, commuting more than $81 million in

fraudulently inflated and unsubstantiated claims asserted by the AIG Subsidiaries under reinsurance contracts Trenwick fronted for and ceded to the Facility members (the "Commutation"). On information and belief, the Commutation was negotiated by and under the direction of Christian Milton, AIG Inc. Vice President of Reinsurance. The Commutation agreement was signed by Milton and by Jane Byrne, AIG Inc. Assistant General Counsel. On information and belief, the Commutation was negotiated on behalf of Trenwick by its Chief Executive Officer, David B. Semeraro, and signed by Trenwick under his authority. AIG Inc. and Trenwick are the only signatories to the Commutation agreement.

77.     At the time of the Commutation, Trenwick also issued a promissory note to AIG Inc., secured by Trenwick's assignment to the AIG Subsidiaries under the terms of the Commutation of any and all of Trenwick's purported "collection rights" with respect to the inflated paid loss as against the plaintiff Facility members under the QSA.

78.     By letters dated August 19 and October 11, 2004, respectively, and addressed and delivered to plaintiffs' agent LDG at its offices in Wakefield, Massachusetts, AIG Inc. (on behalf of its subsidiaries) and Trenwick each advised the plaintiffs that the Commutation would pass the AIG Subsidiaries' inflated claims through to the LDG Facilities as "paid losses" to be covered by the LDG Facility members.

79.     The Commutation was intended to give a lawful patina to AIG Inc.'s and Trenwick's unlawful scheme to present fraudulent claims for payment under various reinsurance contracts.

80.     Both the reported loss demand for more than $130 million asserted by AIG Inc. "on behalf of" the AIG Subsidiaries and the "paid loss" amount of $81 million passed on by Trenwick were on their face inconsistent with reasonable commercial and actuarial expectations given the age and nature of the underlying coverages.

81.     The demand for acceleration of the liabilities under reinsurance contracts with Trenwick required reliance on actuarial projections for IBNR, *i.e.,* for anticipated claims that assume the existence of insured events, such as an industrial accident, for which a claim has not yet been reported to the insurer.  To be valid, IBNR projections must use sound actuarial methods applied to assumptions reasonably related to historical experience.  Of the almost $130 million demanded from Trenwick by  the AIG Inc. on behalf of the AIG Subsidiaries, less than $15 million represented claims paid or identified for payment, while more than $116 million represented  IBNR projections of unasserted, unpaid claims.  Offered baldly, without supporting detail, and in light of both AIG Inc.'s and Trenwick's continuing refusal to provide any back-up information and audit, the IBNR component of the AIG Subsidiaries ' reported losses appeared highly suspicious.

82.     The claims asserted under the AIG Subsidiaries' contracts with Trenwick have always been suspect because, without explanation, they asserted losses that are contrary to reasonable commercial and actuarial expectations.  Prevailing industry experience demonstrates that workers' compensation claims are usually asserted early in the coverage cycle, and by 2004 a book of such business written in 1999 and 2000 would characteristically have a significantly lower percentage of "losses" in the form of IBNR than presented in the claims.  The ratio of $15 million paid and reserved claims to $116 million of IBNR claims reported by AIG Inc. on behalf of its Subsidiaries on this book of business was, at best, an aberration.  Further, more than $117 million of the total exposure was disproportionately attributed to a single risk – an unexpected pattern that, without explanation, raises questions as to whether losses were properly allocated among the contracts and whether required retentions were properly applied.

83.     Despite the suspicious characteristics of the AIG Subsidiaries' claims, Trenwick and AIG Inc. passed the AIG Subsidiaries' claims through to the LDG Facilities in a "paid loss"

report. The paid loss report and the wrongful representations it contained were delivered to and intended to be acted on by plaintiffs through their agent LDG in Massachusetts.

84.    The "paid loss" report was also suspect because it lacks any signs that Trenwick followed common and expected industry practice to substantiate underlying claims before payment. With so large a portion of the claim based on projected IBNR, industry custom and prudent claims-handling practice required Trenwick either directly or through LDG to, at a minimum, audit any supporting actuarial calculations and underlying claims history. Yet Trenwick's "paid loss" report to the LDG Facilities is strikingly devoid of evidence that Trenwick conducted even a minimal coverage analysis. The paid loss report fails to provide basic supporting detail required of AIG Subsidiaries both under their reinsurance contracts and by industry custom and practice. Trenwick did not require AIG Inc. or the AIG Subsidiaries to report how the purported IBNR or the commutation value of its subsidiaries' claims were calculated. To the contrary, Trenwick informed the members of the LDG Facilities that AIG Inc. was unwilling to provide calculations for IBNR and other amounts. Nor did Trenwick exercise its contractual right under its contracts with the AIG Subsidiaries to open the transaction up to the light of day by demanding review by an independent auditor.

85.    In addition, Trenwick's "payment" of over $73 million of the Commutation by funds obtained from AIG Inc. under a promissory note with terms and conditions more favorable to Trenwick than otherwise available in the marketplace, and secured by an assignment to the AIG Subsidiaries under the Commutation of Trenwick's collection rights against the LDG Facilities and the plaintiffs, is unorthodox and contrary to the practices and standards of the reinsurance industry. Under the QSA, Trenwick was required to pay the full amount of the Commutation and then seek indemnity from the LDG Facilities. This requirement was designed to ensure that Trenwick would have a strong financial interest in investigating the validity of

claims under the reinsurance contracts it issues and in paying only legitimate obligations. The benefits Trenwick realized under its promissory note to AIG Inc. eliminated Trenwick's financial incentive to negotiate on behalf of itself and the LDG Facilities and, on information and belief, induced Trenwick to accept Commutation terms dictated by AIG Inc.

86.    Trenwick furthered AIG Inc.'s scheme to defraud the LDG Facilities and the plaintiffs by among other things (a) failing to exercise basic care on behalf of the LDG Facilities, care that the plaintiffs, as LDG Facility members, were entitled to and expected from Trenwick as a fronting member, and (b) colluding with AIG Inc. to avoid review by LDG of the validity of claims that AIG Inc. fraudulently inflated by presenting those claims as "paid losses" under the Trenwick Fronting Arrangement.

**AIG Inc. and Trenwick Collude to Pass Off**
**AIG Inc.'s Inflated Claims as Paid Losses**

87.    After the Commutation, until its Subsidiaries were required to produce documents by order of an arbitration panel, AIG Inc. flatly refused the LDG Facilities any access to the AIG Subsidiaries' records. Without such information, LDG and the plaintiffs, as LDG Facility members, could not assess the validity of the AIG Subsidiaries' claims, a determination that Trenwick, as fronting member, should have made, but entirely failed to pursue. On information and belief, AIG Inc.'s stonewalling extends beyond its own files to continuing pressure on Trenwick to refuse cooperation with reasonable requests made by LDG on behalf of the Facilities to investigate the paid loss claim.

88.    On or about August 19, 2004, Trenwick wrote LDG as managing agent of the LDG Facilities to request that LDG collect payment from the LDG Facilities' retrocessionaires, many of whom also participated as LDG Facilities Members, in settlement of Trenwick's claim for indemnification on paid losses relating to the AIG-Risk Chains. In support of its claim, Trenwick presented a purported "paid loss" of $4 million, representing Trenwick's payment to

the AIG Subsidiaries (financed by Trenwick's promissory note issued to AIG Inc.) to consummate the wrongful Commutation, for which it seeks reimbursement of 95%. By collecting on this claim, Trenwick seeks to reduce to approximately $200,000 its total outlay for resolving in excess of $130 million in asserted liabilities arising out of the AIG Subsidiaries' contracts.

89.     As a cedent to retrocessionaires in various AIG-Risk Chains, Trenwick owes a duty of *uberrimae fidei* requiring Trenwick to submit only valid claims and to provide proof of the insured losses underlying the claim. In seeking reimbursement for its participation in a fraudulent and deceptive scheme with AIG Inc., Trenwick has breached this duty to the plaintiffs who act as its retrocessionaires in the AIG-Risk Chains.

90.     On November 23, 2004, AIG Inc. on behalf of its subsidiaries sent each plaintiff a demand for payment of its alleged proportional share of the $73,360,000 promissory note, addressing the demand letter both to each plaintiff's own offices and to the plaintiff's attention, care of LDG in Wakefield, Massachusetts. LDG was also included as a direct recipient of each demand letter.

91.     Each of the November 23, 2004 letters offered to release the addressed plaintiff from any obligation under the promissory note if the plaintiff signed the previously unacceptable novation agreement. Absent payment or novation, the AIG Subsidiaries threatened to commence arbitration within 30 days.

92.     As cedents to retrocessionaires farther out the AIG-Risk Chains, the defendants owe a duty of *uberrimae fidei* requiring each of them, among other things, to submit only valid claims and to provide proof of the insured losses underlying the claim. In light of AIG Inc.'s and Trenwick's continuing refusal to provide any supporting documentation for the claims they have asserted, neither LDG nor any of the plaintiffs has agreed, nor consistent with the duty of

*uberrimae fidei* could they agree, to either option offered by AIG Inc. on behalf of its subsidiaries.

### AIG Inc. and Trenwick Collude to Collect the Spoils of Their Unfair Practices in Massachusetts

93.    AIG Inc., with Trenwick's collusion, manufactured a claim for more than $81 million in fraudulent "paid losses" for which it directed the AIG Subsidiaries to assert a claim for more than $73 million in wrongful demands for payment under reinsurance contracts ceded to the plaintiffs.

94.    The false liabilities manufactured by AIG Inc. in an unlawful scheme with Trenwick have implicated the plaintiffs' forecasting and reserving practices, and have required the victimized plaintiffs to expend significant time and money on the investigation of and defense against these claims and demands for payment.

95.    After being forced to produce documents to the Facility members in a Massachusetts arbitration and after scrutiny of its witnesses by the Facility members, AIG Inc., upon information and belief, has been forced to acknowledge serious flaws in the actuarial work and assumptions allegedly supporting the commutation amount it forced upon Trenwick. As a result of these flaws, AIG Inc. acknowledged that its subsidiaries were not entitled to the demands totalling more than $73 million from the Facility members that it had negotiated with Trenwick and demanded from plaintiffs. AIG Inc., therefore, advised plaintiffs on March 28, 2006, that it was revising its demand downward from approximately $73 million to approximately $57 million. However, even these revised demands are still flawed, and on information and belief, include more than $14 million that is not actuarially supportable.

96.    Upon information and belief, this unlawful scheme was part of a larger scheme by AIG Inc. to artificially inflate its balance sheets which is the subject of a continuing investigation by the Securities and Exchange Commission. As alleged in the May 2005 suit against AIG Inc.

245594                                        30

by the State of New York, this scheme included engaging in sham insurance transactions to "give the investing public the impression that AIG had a larger cushion of reserves to pay claims that it actually did"; "[hide] losses from [AIG Inc.'s] insurance underwriting business by converting underwriting losses to capital losses"; and "[create] false underwriting income."

97.    Upon information and belief, the scheme to inflate the AIG Inc. balance sheet to manipulate public perception of its financial health was carried out by the senior management of AIG Inc. Among the managers implicated is Christopher Milton, former AIG Inc. Vice President of Reinsurance, who under questioning by government investigators about his role in arranging improper financial transactions to mislead investors asserted his Fifth Amendment rights against self-incrimination. The Commutation was signed by Milton, and on information and belief, was negotiated by and under his direction.

98.    On February 6, 2006, Milton signed an affidavit relating to this Complaint asserting his Fifth Amendment right against self-incrimination and declining to answer questions relating to "the June 30, 2004 Commutation signed by American International Group, Inc. ("AIG, Inc."), on behalf of its member and associated companies, and Trenwick America Reinsurance Company ("Trenwick"); the issues in the captioned arbitration; AIG, Inc. (including its member and associated companies); Trenwick; the Respondents and Counter-Petitioners; or my background," and therefore refusing to testify in this proceeding.

99.    On January 10, 2005, acting as purported assignee under the Commutation of Trenwick's collection rights, the AIG Subsidiaries initiated arbitration asserting rights under the QSA to enforce its unlawful demands for payment. The AIG Subsidiaries sent each plaintiff a demand for arbitration. The demands were addressed both to each plaintiff's own offices and in care of LDG in Wakefield, Massachusetts. The arbitration has commenced in Massachusetts.

100.    Trenwick, as purported assignor under the Commutation of its rights under the QSA, is not a party to the arbitration. Trenwick is requiring any inquiry of its role in the Commutation and the events leading thereto be conducted by third-party subpoena.

101.    To protect their rights, the plaintiffs have been required to respond to the AIG Subsidiaries' arbitration demands, and have to date expended very substantial sums in investigating and defending themselves from the claims asserted by the AIG Subsidiaries, as manufactured by AIG Inc.

102.    By reason of the foregoing wrongful acts on the part of Trenwick and AIG Inc., each of the plaintiffs has suffered damage, and their damages continue to rise.

## COUNT I

### Chapter 93A Claim (Against AIG Inc. and Trenwick)

103.    The plaintiffs adopt by reference the allegations of ¶¶ 1-102, above.

104.    This claim is brought pursuant to G.L. c. 93A, § 11.

105.    Each of the plaintiffs, and both of the defendants, have been engaged in trade or commerce within the meaning of c. 93A, § 11.

106.    The following conduct by AIG Inc. and Trenwick, as described above in greater detail, constitutes unfair and deceptive acts or practices committed in Massachusetts in willful and knowing violation of c. 93A:

(a)    Providing improperly inflated calculations of losses in demanding accelerated payment on each of the eleven separate reinsurance contracts issued to AIG Subsidiaries by Chartwell and ceded to the LDG Facilities;

(b)    Presenting the fraudulently inflated Commutation amount as a paid loss under the Trenwick QSA;

    (c)      Demanding that each of the eighteen plaintiff insurance companies pay its purported share of the fraudulently inflated Commutation amount;

    (d)      Presenting wrongful and fraudulent paid loss figures to Trenwick's retrocessionaires in the AIG-Risk Chains;

    (e)      Trenwick's accepting financial benefits under the Commutation in exchange for violating its duty of care owed to the plaintiffs by not investigating AIG Inc.'s claims;

    (f)      Purporting to negotiate in good faith with LDG, the plaintiffs' representative, while simultaneously agreeing to, but not disclosing, the Commutation;

    (g)      Negotiating in bad faith in an attempt to pressure LDG and the plaintiffs to settle the dispute on terms favorable to AIG Inc.; and

    (h)      AIG Inc.'s wrongfully directing the AIG Subsidiaries to file a demand for arbitration in Massachusetts to enforce fraudulent claims for reinsurance coverage.

107.    The defendants AIG Inc. and Trenwick, by their actions set forth above, have engaged in a course of unfair and deceptive acts and practices aimed at wrongfully collecting almost $73 million from plaintiffs.

108.    The defendants have carried out a pattern of evasive and obstructionist conduct in rejecting all attempts by LDG, on behalf of the plaintiffs, to obtain information supporting the claims, and have given no indication of a willingness to reciprocate LDG's desire to amicably resolve the parties' disputes.

109.    The defendants' actions and statements in connection with their improper scheme were aimed at, and were acted upon by, LDG, on behalf of the plaintiffs, in Wakefield, Massachusetts.

110.    The defendants' unfair and deceptive acts and practices occurred primarily and substantially in Massachusetts.

111.    The defendants' conduct constitutes unfair and deceptive acts and practices in violation of c. 93A.

112.    The defendants knowingly and wilfully violated c. 93A.

113.    The plaintiff insurance companies have each suffered a loss of money or property in an amount to be determined at trial as a result of the defendants' violations of c. 93A.

## COUNT II

### Common Law Fraud (against AIG Inc. and Trenwick)

114.    Plaintiffs adopt by reference the allegations of ¶¶ 1-113, above.

115.    AIG Inc. and Trenwick each individually and together engaged in wrongdoing that included the making of numerous materially false and misleading statements, representations and omissions with respect to their course of dealings and the Commutation of the AIG Subsidiaries' reinsurance contracts, including but not limited to colluding to present the AIG Subsidiaries' wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" and Trenwick's presentation of a fraudulent and wrongful paid loss to its retrocessionaires in the AIG-Risk Chains.

116.    Each of AIG Inc. and Trenwick knew that their statements, representations and omissions were materially false and misleading with respect to presently existing or past facts.

117.    Each of AIG Inc. and Trenwick intended that each plaintiff rely to its detriment on their materially misleading false and misleading statements, representations and omissions in

processing, reserving for, investigating and paying the fraudulent and inflated claims under the AIG Subsidiaries' reinsurance contracts ceded to the LDG Facilities.

118.    Each of the plaintiffs reasonably relied upon such false and misleading statements, representations and omissions to its detriment by, among other things, entering a false liability on its books, paying unnecessary fees and expending monies for the investigation and defense against claims fraudulently created.

119.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT III

### Civil Conspiracy (Against AIG Inc. and Trenwick)

120.    Plaintiffs adopt by reference the allegations of ¶¶ 1-119, above.

121.    By various wrongful acts, defendants AIG. Inc. and Trenwick have acted in concert in furtherance of a common plan to commit insurance fraud and other unlawful acts, the object of which was to defraud the plaintiff insurance companies with respect to reinsurance coverage claims presented against the LDG Facilities.

122.    By various wrongful acts, defendants AIG Inc. and Trenwick have acted in concert in furtherance of a common plan to wrongfully file a demand for arbitration to enforce fraudulent claims for reinsurance coverage, the object of which is to defraud the plaintiff insurance companies.

123.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT IV

### Aiding and Abetting Breach of Fiduciary Duty (Against AIG Inc.)

124.    Plaintiffs adopt by reference the allegations of ¶¶ 1-123, above.

125.    Trenwick had a fiduciary obligation to the plaintiff insurance companies to act under a duty of *uberrimae fidei* or utmost good faith in all dealings with respect to its role as a fronting reinsurer for the LDG Facilities and LDG Facility members.

126.    The AIG Subsidiaries who were Trenwick's reinsureds, having knowledge of Trenwick's relationship to plaintiffs, also owed plaintiffs a duty of utmost good faith.

127.    By various wrongful acts, AIG Inc. directed, aided and abetted the AIG Subsidiaries in breaching their fiduciary duty by presenting wrongfully inflated coverage claims for commutation into fraudulent "paid losses" for indemnification by plaintiffs, as LDG Facilities members, and by wrongfully pursuing a demand for arbitration on claims known to be inflated.

128.    AIG Inc., acted at all times with knowledge that the AIG Subsidiaries stood in a relationship to plaintiffs giving rise to a duty of utmost good faith.

129.    By various wrongful acts, AIG Inc. induced Trenwick to breach its fiduciary duty to plaintiffs by participating in a scheme to commit insurance fraud by presenting the AIG Subsidiaries' wrongfully inflated coverage claim to the plaintiffs, as LDG Facility members, as a "paid loss" under plaintiffs' QSA with Trenwick, and by assisting the AIG Subsidiaries in pursuing a wrongful demand for arbitration to enforce fraudulent claims for reinsurance coverage and to commit other torts to the plaintiffs' detriment.

130.    At the time AIG Inc. approached Trenwick, AIG Inc. understood that Trenwick was acting as a fronting reinsurer for the LDG Facilities and knew of the duties that arise from that relationship.

131.    By acting in concert with Trenwick to commit insurance fraud, to fraudulently inflate the Commutation amount and to commit other torts, AIG Inc. knowingly participated in and facilitated Trenwick's breach of fiduciary duty.

132.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT V

### Tortious Interference With Contractual Relations (Against AIG Inc.)

133.    Plaintiffs adopt by reference the allegations of ¶¶ 1-132, above.

134.    One or more of the plaintiffs had a contractual relationship with Trenwick by which Trenwick acted as a fronting reinsurer for the LDG Facilities.

135.    AIG Inc. was not a party to that contractual relationship, but knew that Trenwick had a business relationship with the plaintiffs that was manifested by a contract specifying that Trenwick would act on the plaintiffs' behalf as a fronting reinsurer.

136.    AIG Inc. knowingly and intentionally induced Trenwick to breach its contractual duties as a fronting reinsurer and to commute the AIG Subsidiaries' reinsurance contracts in a manner detrimental to the plaintiffs and unduly favorable to AIG Inc.; to present wrongfully inflated coverage claims to the plaintiffs, as LDG Facility members, as a "paid loss" under plaintiffs' QSA with Trenwick; and to enable the AIG Subsidiaries pursuant to a wrongful assignment of Trenwick's contract rights to pursue an improper demand for arbitration to enforce fraudulent insurance claims.

137.    AIG Inc. had no justification for interfering with the contractual relations between Trenwick and the plaintiffs.  AIG Inc.'s motive was to commute the claims in an unreasonable manner that would unfairly benefit AIG Inc.

138.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.

## COUNT VI

### Declaratory Judgment (Against Trenwick)

139.    Plaintiffs adopt by reference the allegations of ¶¶ 1-138, above.

140.    Trenwick, as a member of the LDG Facilities, retained a small percentage, approximately 5%, of its proportionate share of the AIG Subsidiaries Contract risks and retroceded the remaining portion of its share on to other facilities and retrocessionaires.

141.    No written contract effects or memorializes the retroceding by Trenwick of the bulk of its proportionate share of the AIG Subsidiaries Contracts risks.

142.    Pursuant to the retroceding of approximately 95% of the AIG Subsidiaries Contract risks, Trenwick has demanded that certain of the plaintiffs indemnify the $4 million cash payment Trenwick made to AIG Inc. under the Commutation.

143.    The plaintiffs have rejected Trenwick's unjustified and wrongful demand for indemnification.

144.    There is an actual controversy about whether the plaintiffs are required to indemnify Trenwick for the $4 million Trenwick paid to AIG Inc. under the Commutation.

145.    The declaratory judgment sought by the plaintiffs would properly resolve this controversy.

## COUNT VII

### Conversion (Against Trenwick and AIG Inc.)

146.    Plaintiffs adopt by reference the allegations of ¶¶ 1-145, above.

147.    As a Fronting Member of the LDG Facilities, Trenwick acted as agent and fiduciary for the plaintiffs as Facilities Members with respect to the plaintiffs' assets and resources.

245594

148.    Trenwick breached its fiduciary duty to plaintiffs with respect to plaintiffs' assets and resources by creating inflated "paid losses" under the QSA by paying claims known to be fraudulently inflated.

149.    Trenwick pledged the collection rights to the inflated "paid losses" as security for the non-recourse promissory note to AIG Inc. by which Trenwick effected the Commutation by retiring its obligations under reinsurance contracts issued to the AIG Subsidiaries.

150.    Trenwick's pledge of security in support of the non-recourse promissory note converted plaintiffs' assets to Trenwick's own use.

151.    Trenwick's  pledge of plaintiffs' assets was not in the ordinary purview or practice of its agency relationship with the plaintiffs.

152.    Trenwick reaped a benefited from its breach of fiduciary duty.

153.    AIG Inc. accepted the non-recourse promissory note knowing that Trenwick would use the proceeds to effect the Commutation by retiring Trenwick's obligations under reinsurance contracts issued to the AIG Subsidiaries.

154.    AIG Inc. accepted Trenwick's wrongful pledge of plaintiffs' assets as security for the non-recourse promissory note with knowledge that such pledge was in violation of Trenwick's fiduciary duties to plaintiffs.

155.    AIG Inc. reaped a benefit from the wrongful Commutation of the AIG Subsidiaries claims into "paid losses" financed by the non-recourse promissory note.

156.    The plaintiff insurance companies as a result have each suffered damages in an amount to be determined at trial.


Each of the plaintiff insurance companies demands judgment against the defendants AIG Inc. and Trenwick as follows:

245594                                      39

a.    For compensatory damages;

b.    For disgorgement of all benefits received by either defendant as a result of their fraud or unfair and deceptive acts and practices;

c.    For treble damages under c. 93A;

d.    For punitive and exemplary damages;

e.    For interest and costs;

f.    For a declaration that the plaintiffs serving as retrocessionaires in the AIG-Risk Chains are not required to indemnify Trenwick for the $4 million Trenwick paid to AIG Inc. under the Commutation; and

g.    For such other and further relief as the Court may deem just.

By its attorneys,


_____/s/Steven L. Schreckinger_____
Steven L. Schreckinger (BBO # 447100)
LYNCH, BREWER, HOFFMAN & FINK, LLP
101 Federal Street
Boston, MA 02110-1800
(617) 951-1851

Joseph T. McCullough, IV
Robin C. Dusek
LOVELLS
One IBM Plaza
330 North Wabash Avenue, Suite 1900
Chicago, IL 60611
(312) 832-4400


Dated: August 30, 2006